**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 18 CR 278 |
| v. ) | |
| ) | |
| ERNESTO GODINEZ ) | |

**ERNESTO GODINEZ'S OBJECTIONS TO THE PSR AND SENTENCING MEMORANDUM**

**NOW COMES,** the Defendant, Ernesto Godinez, through his attorneys, Lawrence Hyman and Gal Pissetzky, and respectfully submits the following Sentencing Memorandum. In support thereof, the Mr. Godinez states as follows:

**I.** **Introduction**

Ernesto Godinez is a 29-year-old loving son, partner, and father. While Mr. Godinez has made mistakes, all can be traced to dire circumstances Mr. Godinez faced growing up on Chicago's south side. Probation recommends this court depart upward from the guidelines' sentencing range and sentence Mr. Godinez to a completely unreasonable and unnecessary 360 months of incarceration. Probation attempts to support such a draconian term through 'heart wrenching' interviews with law enforcement and others worthy of over four pages of its PSR. In contrast, probation only found time to attempt to interview Mr. Godinez's sister and tells a completely hollow story of Mr. Godinez's very difficult and extremely sad upbringing. The recommended sentence is based upon an utterly unbalanced investigation and inappropriately biased conclusions. While no one denies Agent Crump suffered greatly, this court cannot ignore Mr. Godinez's horrible circumstances defined by inescapable violence that he had absolutely nothing to do with. Mr. Godinez comes before this court ready and willing to accept whatever sentence it fashions,

1

but implores this court to resist the urge to simply close the door and throw away the key on a person who, despite being forced to live a very difficult life, nevertheless has potential to become a productive and contributing member of society. As will be further expounded upon below, a very long sentence within 147-153 months of incarceration is certainly "sufficient, but not greater than necessary" to effectuate the goals of sentencing established by Congress. 18 U.S.C. § 3553(a).

## II.  Offense Level Calculations and Objections

Mr. Godinez was found guilty of assaulting and interfering with a Special Agent while he was engaged in the performance of his duties and did so by using a deadly weapon, in violation of 18 U.S.C. § 111(a) and (b); and in committing the offense he discharged a firearm in violation of 18 U.S.C. 924(c)(1)(A)(iii). As the PSR correctly notes, the base offense level is 14. U.S.S.G. § 2A2.2; (PSR at ¶ 31). Both Probation and the government, however, incorrectly enhance the offense level to 25 and 28 respectfully.

### A.  More Than Minimum Planning

Both Probation and the government assert the offense level should be increased by 2 levels because the offense involved more than minimal planning. (PSR at ¶ 32, Gov. Vers. at 6). Application note 2 defines more than minimum planning as "more planning than is typical for commission of the offense in a simple form." "For example, waiting to commit the offense when no witnesses were present would not alone constitute more than minimum planning," but "luring the victim to a specific location or wearing a ski mask to prevent identification would constitute more than minimal planning." Here, the testimony at trial aligns with the first example.

At trial, the government argued surveillance video showed Mr. Godinez waiting in a gang way before shooting at a group of individuals believed to be rival gang members. Mr. Godinez did not wear a ski mask or "lure" Agent Crump to the area. Instead, according to the government, Mr.

Godinez simply shot at the rival gang members from the gangway. Just as described in Application note 2, the offense involved little to minimum planning.

The government's citation to the Sixth Circuit's unpublished *Tilghman* decision is unpersuasive. There, the defendant, a federal inmate, stabbed another inmate after the inmate accused the defendant of being a snitch. *United States v. Tilghman*, 332 Fed. App'x. 269, 270-71 (6th Cir. 2009). In applying the enhancement, the Sixth Circuit highlighted the defendant's multiple communications to the victim expressing his intention to kill him in the days leading up to the assault. *Id.* at 273. The court further stressed that the defendant followed the victim down a corridor and likely had to meticulously plan the attack to both avoid metal detectors and prison officials finding the knife.

In comparison, the testimony here revealed that Mr. Godinez did not follow Agent Crump, but merely reacted when the Agents drove past him. Mr. Godinez did not spend days stewing over his plan to assault the Agent. He did not have days to plan the assault, but rather, according to the testimony at trial, he fired the gun because he saw what he believed to be rival gang members walking down the street. Indeed, the Sixth Circuit specifically suggested that leaving the weapon in a hiding place would detract from the enhancement's application. *Id.* at 242. The testimony at trial shows this offense involved minimum planning and was not comparable to that before *Tilghman* court.

The Fourth Circuit's *Hashi* decision is similarly distinguishable. There, the defendant combined and heated several substances, before he threw the mixture on a Federal Deportation Officer's face causing second degree burns. *United States v. Hashi*, 318 Fed. App'x 241 (4th Cir. 2009). The Fourth Circuit found the offense involved more than minimum planning because the defendant specifically mixed several substances together to create a mixture more harmful than if

3

the substances would have been used separately. *Id.* at 242. Again, Mr. Godinez did nothing of the sort and merely had a gun and fired it at the Agent. Mr. Godinez's actions are incomparable to the elaborate efforts in *Hashi* and cannot be said to involve more than minimum planning.

Moreover, Mr. Godinez's actions following the assault do not amount to "significant affirmative steps" to conceal the offense. The government makes too much out of Mr. Godinez's alleged actions following the assault. While Mr. Godinez put a white shirt on top of his black shirt some time after the shooting, doing so hardly amounts to a "significant" step. Mr. Godinez did not "abandon his cell phone," but simply left it in his vehicle before turning himself in. Mr. Godinez also did not hide his vehicle, he simply parked it at a friend's house after taking another friend to the airport. More importantly, the vehicle had nothing to do with the offense itself – this was not a drive by shooting. These acts, or spending time with Destiny Rodriguez and their child the following day cannot amount to significant steps taken to conceal the offense.

Nor should this court conclude Mr. Godinez was on the run or attempted to evade law enforcement's capture - he surrendered upon learning that he was suspected of committing this offense. Finally, there was zero evidence to support the government's claim that Mr. Godinez hid or asked someone else to hide the gun. Mr. Godinez did not take significant affirmative steps to conceal the offense. He was arrested mere days following the shooting at a time his attorney arranged for his surrender.

**B. Permanent Injury**

Probation and the government erroneously assert that Agent Crump suffered permanent bodily injury. Though the PSR describes the injury as "what is believed to be permanent vision difficulties," it also details that Mr. Crump returned to work as a Special Agent and is "able to perform all of his job duties." (PSR at ¶¶'s 17, 34). Accordingly, while Agent Crump certainly

4

suffered bodily injury, it does not appear to be permanent or life threatening and only a three level enhancement is appropriate.

### C. Discharge of a Weapon and Conviction under 18 U.S.C. 111(b)

The government asserts that the offense level should be increased by 5 levels because Mr. Godinez discharged a firearm during the commission of the offense. Importantly, Mr. Godinez was also convicted of violating 18 U.SC. §924(c) and, as probation correctly concludes, the enhancement does not apply. Specifically, Application Note 4 of §2K2.4 - the applicable guideline for 924(c) – instructs:

> If a sentence under this guideline is imposed in conjunction with a sentence for an underlying offense, do not apply any specific offense characteristic for possession, brandishing, use, or discharge of an explosive or firearm when determining the sentence for the underlying offense.

Because Mr. Godinez was also convicted of violating 924(c) this court cannot enhance the offense level under (b)(2)(A).

The enhancement under (b)(7) does not apply for the same reason. Specifically, (b)(7) enhances the offense level by 2 where a person is convicted of violating 18 U.S.C. 111(b). A person violates 111(b) when he uses a deadly or dangerous weapon in committing an assault. 18 U.S.C. 111(b). As detailed above, §2K2.4 Application Note 4 specifically instructs this court not to apply any specific offense characteristic for using firearm when determining the sentence for the underlying offense. §2A2.2(b)(7) clearly enhances the offense level based on the use of a dangerous weapon. Accordingly, it cannot be applied in Mr. Godinez's case.

### D. Total Adjusted Offense Level and Criminal History

Nearly all of the government's and probation's cited enhancements do not apply, save a three level enhancement for bodily injury, resulting in a total offense level of 17. Mr. Godinez has

two prior convictions that amount to four criminal history points and result in a criminal history category III.

The guidelines, however, allow sentencing courts to depart downward where "the criminal history category substantially over-represents the seriousness of the defendant's criminal history." Here, the single criminal history point for Mr. Godinez's misdemeanor possession of 5 grams of marijuana over eight years ago, which was decriminalized in 2016 and will not be punishable at all in 2020, pushes his criminal history points to four. This meager conviction causes an unfair and undoubtedly overstated criminal history score. Accordingly, Mr. Godinez requests this court to depart downward one criminal history point and find Mr. Godinez's criminal history category is category II.

Thus, a total offense level of 17 combined with a criminal history category II results in a guideline range of 27 – 33 months. Because Mr. Godinez was also convicted of violating 924(c), he must serve an additional 10 year consecutive sentence. Thus, Mr. Godinez's guideline range is more accurately stated to be 147 – 153. Mr. Godinez respectfully requests that this Honorable Court sentence him to a term of imprisonment of within the range of 147 – 153 months.

I. **Sentencing Considerations Pursuant to 18 U.S.C. § 3553(a) Support a Very Long Sentence within 147-153 Months of Incarceration**

After first calculating the applicable sentencing range, district courts are then tasked with imposing a sentence that is reasonable under 18 U.S.C. § 3553(a). Over a decade ago, the United States Supreme Court ruled that the Sentencing Guidelines are only advisory in nature. *United States v. Booker*, 125 S. Ct. 738, 765-67 (2005). As a result, this Court maintains unfettered discretion to fashion a sentence that punishes the offender, as opposed to just the crime. *Pepper v. United* States, 562 U.S. 476, 131 S. Ct. 1229, 1240 (2011). Though appellate courts presume a

guideline sentence is reasonable, a guideline sentence is not reasonable *per se*. *United States v. Cunningham*, 429 F.3d 673, 676 (7th Cir. 2005). In fact, sentencing courts can treat the applicable guideline range as presumptively unreasonable. *Nelson v. United States,* 129 S. Ct. 890, 891 (2009). The guideline range is only but a single factor for this Court to consider. *Kimbrough v. United States,* 552 U.S. 85, 92 (2007). A sentence's reasonableness "depends on its conformity to the sentencing factors set forth in 18 U.S.C. § 3553(a)(2)." *Cunningham*, 429 F.3d at 675. As the parsimony provision commands, sentencing courts shall only impose "a sentence sufficient, but not greater than necessary to comply with the purposes set forth" under 18 U.S.C. § 3553. *United Sates v. Dean*, 414 F.3d 725, 728 (7th Cir. 2005). So long as the sentence is "rooted in § 3553(a), a sufficiently individualized to the circumstances of [the] case, and generally associated with sentencing leniency[,]" a below guidelines sentence is appropriate. *United States v. Wachowiak*, 496 F.3d 744, 745 (7th Cir. 2007).

In determining a sentence that reflects this directive, Section 3553(a) specifically directs courts to consider:

"the nature and circumstances of the offense and the history and characteristics of the defendant;

the kinds of sentences available;

the defendant's guidelines range;

any relevant policy statements;

the need to avoid unwarranted sentence disparities among defendants with similar records;

who have been found guilty of similar conduct; and

the need to provide restitution to any victims of the offense."

18 U.S.C. § 3553(a). The statute further directs the sentencing court to impose the shortest sentence possible that (A) reflects "the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;" (B) deters future criminal conduct; (C) protects the public from the defendant; and (D) provides the defendant with the "needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553.

### A. Nature and Seriousness of the Offense

There is no disputing the offense conduct as described in the PSR and the government's version is very serious. Firing a gun at anybody, whether they're a rival gang member or a federal agent, is reprehensible. Though Mr. Godinez does not dispute the seriousness of the conviction, it is important to clarify inaccuracies found throughout the PSR.

The PSR seeks to amplify Mr. Godinez's offense to create additional victims in an attempt to convince this court to fashion an even more significant sentence. In its Sentencing Recommendation, probation asserts that this court should depart upward to reflect Mr. Godinez's uncharged aggravated assault of the other agents and its opinion that Mr. Godinez could have been "charged with a more serious offense, such as assault with intent to commit murder." (Sent Rec. at 3, 5). The fact of the matter is that the government did not charge him with the additional charges, and more importantly, did not present any evidence at trial to support the probation's conclusion. This court must fashion a sentence for the offense Mr. Godinez was convicted of committing, not offenses probation believes were possible. Moreover, even if Mr. Godinez was charged and convicted of assaulting the additional agents, the offense level would not have been increased. Therefore, probation's upward departure argument amounts to a 3553 based argument largely dependent on selfserving statements made during victim impact interviews.

Specifically, Agent Spratte told probation that "he heard the gunshots and felt one fly past his head." (PSR ¶ 9). This is the first time Agent Spratte has ever made such a claim. He did not testify to it at trial or give this description in any of his countless witness interviews. In fact, it has been shown at trial that Agent Spratt has an unhealthy habit to embellish and change his stories based on his audience. This court should disregard this description and it should be stricken from the PSR.

Probation further contends an upward departure is appropriate because Mr. Godinez was a gang "chief" "who has been terrorizing his local community for many years." (Sent. Rec. at 4). Neither assertion is supported by fact or trial testimony. At trial, Hector Ruiz, the government's gang witness, admitted that Mr. Godinez was not a chief, soldier, or someone who would stand post. (Tr. at 103-04, 107-109). Mr. Ruiz admitted that Mr. Godinez was a low-level member who sold small amounts of marijuana and cocaine. (Tr. at 107-08).

The probation's conclusions and recommendations are inappropriately biased. Mr. Godinez does not deny the seriousness of his conviction, but asserts the seriousness is adequately reflected by his guidelines' calculation. What the guidelines do not reflect, and what probation downplays, however, are Mr. Godinez's life circumstances and upbringing that propelled him down the path that led him before this court. To simply fashion a sentence based on the offense of conviction would ignore Congress' directive to consider the fuller picture. The fuller picture tells a more complicated tale that supports a guideline sentence.

**B. Mr. Godinez's History and Characteristics**

We are all more than our worst moments and Mr. Godinez is no different. Discounting Mr. Godinez's distinct traits and life experiences would undermine a system of justice centered around the belief that every single individual must be treated fairly under the law. Indeed, the Supreme

9

Court instructs that "defendants who commit criminal acts that are attributable to a disadvantaged background or to emotional or mental problems may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989). Mr. Godinez's upbringing reflects the exact type of disadvantaged background the *Penry* Court references.

Mr. Godinez was born and raised in Chicago's southside along with his six siblings. Though Mr. Godinez was lucky enough to know both his mother and father, his childhood was defined by struggle and loss. Mr. Godinez's father, Rodrigo, was deported when Mr. Godinez was a young child. His mother worked tirelessly to provide for her seven young children. Though Mr. Godinez's basic necessities were met, he does not have glowing memories of birthdays or Christmas mornings. Instead, Mr. Godinez tosses and turns reliving the day his older brother Gabriel was killed after being runover by a vehicle. Mr. Godinez was only six years old when he was forced to navigate through unthinkable loss.

At some point, Mr. Godinez's father returned to the United States to help his mother. Still, there was much work to be done to provide for the family. With both parents out of the house, Mr. Godinez was primarily raised by his older siblings. Children raising children is difficult to imagine, let alone on Chicago's notorious south side. Mr. Godinez smoked marijuana when he was only ten years old and dropped out of high school after freshman year. Probation "wonders" whether Mr. Godinez was actually expelled after threatening the principal, and in so doing completely ignores forces derailing Mr. Godinez's ability to make levelheaded decisions as simple as completing high school.

Mr. Godinez grew up in a neighborhood rife with gangs, drugs, and violent crime. He vividly remembers his sister being beaten up by gang members and soon after joined a gang to avoid more violence. Despite what the PSR asserts, Mr. Godinez was never "a chief, or leader, of

10

his block." (PSR ¶ 87). Mr. Godinez was never anything more than a low-level member who was forced to join the gang for his own protection. Ironically, the decision Mr. Godinez made to save himself did nothing of the sort. Instead, it further propelled him down the same road defined by violence and loss.

Shortly after joining the gang, Mr. Godinez's brother Manuel was murdered. Mr. Godinez was one of the first to arrive at the crime scene and saw his brother's dead body, riddled with bullet holes. No arrests were ever made. The PSR casually mentions that Manuel had a criminal history involving drugs, as if such a fact would make the loss less devastating. A few months after Manuel was murdered, Mr. Godinez and a group of friends were shot at. Mr. Godinez was hit in the thumb, while one of his friends was hit in the leg, and another was shot in the face and died on the scene. No arrests were ever made. Mr. Godinez lived this same violent story again and again. A friend of his would be shot at. Maybe they survived, maybe they would not. No arrests would be made. And then he would be expected to go on live life as if nothing happened. The PSR references these unimaginable circumstances in a cold matter-of-fact manner. Perhaps because it is a story this court hears too often, but it is a story this court cannot discount or ignore – a young men swallowed by his socioeconomic environment.

Despite the circumstances he faced, Mr. Godinez knows that he controls his future. Indeed, Mr. Godinez made affirmative and positive changes in his life during the years leading to this arrest. During the first few years of his daughter Aubrey's life, Kathlyn Cardenas, Aubrey's mother, would not allow Mr. Godinez to see her. During these years, Mr. Godinez thought it may be better or even easier to stay away, but since stepped up. Mr. Godinez did not want his daughter to grow up without having a relationship with her father. He took it upon himself to seek the family court's intervention. Unlike some fathers who simply ask for visitation and do nothing to earn it,

11

Mr. Godinez enrolled in and completed parenting courses and consistently paid child support. He made the most of the weekends he spent with Aubrey - taking her to the park, museums, restaurants, and making sure she always had new toys to play with. The joys Mr. Godinez never experienced in his childhood would not be lost on Aubrey's.

Shortly before his arrest, Mr. Godinez began dating Destiny Rodriguez and became a father for the second time. The two share a loving relationship and Mr. Godinez plans on marrying Ms. Rodriguez upon his release. Before his arrest, Mr. Godinez planned to take the GED examination and to enroll in a CDL course. Mr. Godinez wanted to be an example for both his son and daughter. Unfortunately, this conviction derailed those plans.

Mr. Godinez's arrest, trial, and conviction have all forced him to contemplate what he truly wants to do with his life. Unlike previous run-ins with the law, Mr. Godinez is not facing time served or a few years in prison at 50% of the time to serve. Rather, for the first time in his life, this conviction will cost him over a decade in prison and away from his loved ones. Luckily, when he is released he will still have time he does not intend to waste. Mr. Godinez knows his daughter, son, and partner will be waiting for him upon his release. Waiting for him to be the support system he never had. Waiting for him to show them the way and guide them through formative years. Mr. Godinez's sister, Nereida, attests that Mr. Godinez is a "very great dad," who at times makes bad choices. Mr. Godinez is ready, willing, and capable of being that good father, free of bad choices, and a productive member of society.

### C. Recidivism and Deterrence

The sentencing statute requires this court to consider the "need for the sentence imposed . . . to afford adequate deterrence to criminal conduct" and the need to "protect the public from further crimes of the defendant." 18 U.S.C. §§ 3553(a)(2)(B), and (C). Deterrence is usually

divided into two subcategories: specific and general. Specific deterrence, of course, is to deter Mr. Godinez from reoffending. The government will presumably contend, much like probation, that this is not the first time Mr. Godinez will be convicted of a gun related offense; that Mr. Godinez's previous criminal convictions indicate a high likelihood that Mr. Godinez will reoffend; and that a long prison sentence is needed to properly deter him. While Mr. Godinez has committed a shooting in the past, the government's anticipated argument fails to recognize that this will be the first time Mr. Godinez faces a significant term of imprisonment. Indeed, Mr. Godinez has never served a sentence longer than a couple years. Unlike before, Mr. Godinez's proffered sentence amounts to over a decade behind bars. Such a very long sentence will properly deter him from ever reoffending.

As to general deterrence, a message certainly needs to be sent to the community at large these offenses will not be tolerated and will be significantly punished. It is the certainty of punishment, however, not its severity that will best deliver this message. *See United States v. Kloda*, 133 F. Supp. 2d 345, 347-48 (S.D.N.Y. 2001) (Hellerstein, J.) (in context of business crimes); *Sentence Severity and Crime: Accepting the Null Hypothesis,* 30 Crime & Just. 143 (Univ. of Chicago 2003) (arguing that severity of punishment does not deter crime); Jeffrey Grogger, *Certainty vs. Severity of Punishment*, 29 Econ. Inquiry 297, 308 (1991) (concluding increased certainty of punishment generates significant deterrent effects while increased severity produces insignificant results); William N. Trumbull, *Estimations of the Economic Model of Crime Using Aggregate and Individual Level Data*, 56 S. Econ. J. 423, 427-37 (1989) (analyzing data to conclude certainty of punishment has greater deterrent effect than severity); Ann Dryden Witte, *Estimating the Economic Model of Crime with Individual Data*, 94 Q.J. Econ. 57, 81-83 (1980) (maintaining certainty of punishment produces greater deterrent effect than severity of

13

punishment). The certainty of that punishment, the inevitability of getting caught, prosecuted, punished deters the public, not the severity of prison time.

Mr. Godinez's convictions are no different than those reviewed above. Word will certainly get out concerning Mr. Godinez's convictions, either through the media or word-of-mouth. The public will know that Mr. Godinez got caught, punished to a significant prison term, and will forever be branded a federal felon. The public will be sufficiently deterred by a 147-153 months sentence.

### D. Promoting Respect for the Law and Providing Just Punishment

With regard for promoting respect for the law and providing just punishment, it must be remembered that "[r]espect for the law is promoted by punishments that are fair… not those that simply punish for punishment's sake. There is no reason to believe that respect for the law will increase if a defendant who deserves leniency is sentenced harshly any more than there is reason to believe that respect for the law will increase if a defendant who deserves a harsh punishment receives a slap on the wrist." *United States v. Stern,* 590 F. Supp. 2d 945, 957 (N.D. Ohio). Thus, respect for the law does not mean fear of the law. A law is fully respected when it is tempered by mercy and results in a just punishment. Sentencing courts can take significantly effective strides toward reaching such a goal by handing down fair and commensurate sentences. Only then will respect for the law truly be promoted.

### CONCLUSION

Congress instructs this Honorable Court to fashion a sentence sufficient, but not greater than necessary accomplish the goals of criminal punishment under § 3553(a). Mr. Godinez respectfully submits guidelines' sentence of 147-153 months adheres to Congress' requirements.

Respectfully submitted,

/s/ Lawrence H. Hyman
Lawrence H. Hyman
LAWRENCE H. HYMAN & ASSOCIATES
*Attorney for Defendant, ERNESTO GODINEZ*
111 West Washington Street
Suite 1025
Chicago, Illinois 60602
(T): (312) 346-6766
(F): (312) 346-9688
(E): hymanlaw@lhyman.com


/s/ Gal Pissetzky
Gal Pissetzky
Attorneys for Mr. Godinez
Pissetzky & Berliner
35 East Wacker, Suite 1980
Chicago, IL 60604
(312)566-9900

## **CERTIFICATE OF SERVICE**

The undersigned, Gal Pissetzky, hereby certifies that in accordance with Fed.R.Crim.P. 49, Fed.R.Civ.P. 5, and the General Order on Electronic Case Filing (ECF), the

**ERNESTO GODINEZ'S OBJECTIONS TO THE PST AND SENTENCING**

**MEMORANDUM**

was served, on September 4, 2019, pursuant to the district court's ECF filers to the following:

Assistant United States Attorney
Northern District of Illinois


Respectfully submitted,

/s/ Gal Pissetzky
Gal Pissetzky
35 E. Wacker Dr., Suite 1980
Chicago, IL 60601