UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 18 CR 278 |
| v. | ) | |
| | ) | Judge Harry T. Leinenweber |
| ERNESTO GODINEZ | ) | |
| | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

Save for a few millimeters, Ernesto Godinez would have killed a 28 year old federal agent on May 4, 2018. The defendant's assault on ATF Special Agent Kevin Crump was brazen, callous, and cowardly. At 3:18 a.m. on Friday, May 4, 2018, the defendant hid in a gangway at 4332 S. Hermitage Ave and fired five gunshots a half block south down Hermitage Ave. At that exact moment, Agent Crump, ATF Special Agent Daniel Winter, and ATF Task Force Officer Thomas Spratte were crossing the intersection of 44th and Hermitage Ave. One of the defendant's gunshots struck Agent Crump in the head, entering at the base of his neck and jawline, and exiting between his eyes. Agent Crump miraculously survived the shooting.

Given the seriousness of the defendant's actions, the likelihood of recidivism, and the need to protect the public, a substantial sentence is both reasonable and warranted. For the reasons set forth below, the government moves the Court to sentence Ernesto Godinez to a term of imprisonment of 180 months on Count One and a consecutive term of imprisonment of 180 months on Count Two, for total term of imprisonment of 360 months.

## I.  OFFENSE CONDUCT[1]

On May 4, 2018, the defendant left his house at 3:00 a.m., got into his white Kia SUV, and began circling the blocks of his neighborhood. Surveillance video captured the defendant methodically driving around each of the blocks near his home, patrolling the territory of the Latin Saints street gang for rivals.  The defendant then parked his car near 44th and Wood St., south of his house, at about 3:08 a.m.

A member of the Latin Saints testified at trial about the Saints territory and Godinez's role in the gang.  He testified that the defendant was a chief, or leader, of the Wood block of the Latin Saints, and that Godinez lived at 4345 S. Wood St., squarely within the Saints territory.  He further testified that members of the Saints were required to be vigilant and protect Saints territory from rival gang members. If a rival was seen in Saints territory, Saints members were required to shoot at the rival and chase them out.  This is precisely what Godinez did on the morning of May 4th.

At approximately 3:12 a.m., two ATF task force officers began their surveillance of the neighborhood, making sure it was clear of other people and safe for the agents to replace the GPS tracking devices on cars parked in Latin Saints territory. Driving an unmarked car and wearing plain clothes, the officers slowly circled the blocks of the neighborhood, and unbeknownst to them, drove past the defendant parked on Wood St.

---

[1] The facts set forth in this section and throughout the Government's Sentencing Memorandum rely upon the Presentence Investigation Report, the government's version of the offense and supplements, and the evidence admitted at trial.

Seeing the unmarked car circling the blocks of the Saints territory and drive slowly up his own street, the defendant ran back into his house at 3:15 a.m., retrieved a gun, came out of his house, and continued up Wood St. Halfway up the block, he turned east into a gangway between two buildings and crossed into the alley. Surveillance footage from the alley shows the defendant looking both ways before crossing the alley and then entering the gangway between 4332 S. Hermitage Ave. and 4336 S. Hermitage Ave. The defendant then waited in the shadows of the gangway.

Agent Crump, Agent Winter, TFO Spratte, and TFO Kevin O'Neal drove south down the 4300 block of Hermitage Ave. in an unmarked car at 3:17 a.m. At the intersection of 44th St. and Hermitage Ave., TFO O'Neal stopped the car, and at 3:18 a.m., Agent Crump and the other agents, all dressed in plain clothes with the hoods of their sweatshirts up, exited the car and began crossing the street.

At 3:18 a.m., obscured in the gangway of 4332 S. Hermitage Ave., the defendant fired five gunshots south down Hermitage Ave. One of the bullets hit Agent Crump, travelling through his head and ultimately landing in front of 4416 S. Hermitage Ave. Law enforcement recovered the five shell casings from the defendant's gun from the gangway later that morning.

Immediately after the shooting, the defendant ran out the gangway, crossed the alley, and back to his house on Wood St. There, he messaged his girlfriend, Victoria Jean-Baptiste, via Snapchat and asked her to pick him up. While waiting for Ms. Jean-Baptiste, at 3:23 a.m., the defendant walked towards the house of his

3

brother, Rodrigo Godinez, which was a few houses north on Wood St. Seconds later, Ms. Jean-Baptiste arrived in a dark colored sedan. The defendant returned from the area of his brother's house soon after that. Ms. Jean-Baptiste testified that the defendant got into her car, sweaty, and said, "I feel good. Fuck that flake."[2] Ms. Jean-Baptiste and the defendant then drove to a Shell gas station on Ashland Ave. near the neighborhood.

On the way to the Shell gas station, the defendant and Ms. Jean-Baptiste downloaded a cellphone application for a police scanner to monitor the law enforcement activity in the neighborhood. They heard that an ATF agent had been shot. After they left the Shell gas station, the defendant asked Ms. Jean-Baptiste to drive him to another gas station well south of their neighborhood for the sole purpose of buying a t-shirt. At the second gas station, the defendant bought a white t-shirt and put it on over the black t-shirt he had worn at the time of the shooting.

Ms. Jean-Baptiste testified that the defendant then asked to be dropped off at 43rd St. and Honore St., two blocks from his house. At 4:41 a.m., surveillance footage showed the defendant, wearing a white t-shirt, emerge from another gangway, cross Wood St., and stop in front of his brother's house again. The defendant stayed in the shadows by his brother's house for one minute, before crossing back to the west side of Wood St. and walking to his car. He did not return to his own house.

According to surveillance footage and Snapchat GPS records, at approximately 10:30 a.m., the defendant then drove the white Kia SUV to the house of his friend on

---

[2] Ms. Jean-Baptiste and Mr. Ruiz both testified that the word "flake" refers to a rival gang member.

the northwest side of the city. The defendant hid the white SUV at his friend's house and, still wearing the white t-shirt, returned to the neighborhood in a different car. Destiny Rodriguez testified that, on May 4th, the defendant picked her and their baby up at 12:00 p.m. for the baby's doctor appointment. She testified that the defendant normally drove the white Kia SUV, but on May 4, 2018, he was driving a gray SUV that she had never seen before.

Later on the evening of May 4, 2018, the defendant returned to his friend's house on the northwest side of the city, this time with Ms. Rodriquez and the baby. There, Ms. Rodriguez received a text of a "Wanted" poster with the defendant's photograph on it. Upon seeing the text, the defendant began crying, told Ms. Rodriguez that he was sorry, and then left, never to be seen by Ms. Rodriguez again. The defendant abandoned one of his cellphones at his friend's house, and stopped using his phone and Snapchat.

## II.    CALCULATION OF THE ADVISORY SENTENCING GUIDELINES

The government concurs in the calculation of the advisory sentencing guidelines set forth in the Presentence Investigation Report (PSR) and has no factual objections to the PSR. The government agrees with the probation officer and the defendant that the enhancement under §2A2.2(b)(2)(A) does not apply because of the defendant's conviction under 18 U.S.C. §924(c)(1)(A)(iii). As set forth below, the enhancements for more than minimal planning and causing permanent bodily injury are applicable. Further, the defendant's criminal history has been properly calculated. Therefore, the total offense level is 25, the criminal history category is III, and the resulting advisory guidelines range for Count One is 70-87 months

imprisonment. Count Two carries a mandatory minimum sentence of 120 months' imprisonment to run consecutive to the sentence imposed on Count One.

### A. The Enhancement for "More than Minimal Planning" is Appropriate

The offense level is increased by 2 levels, pursuant to Guidelines § 2A2.2(b)(1) because the assault of Agent Crump involved more than minimal planning. ""[M]ore than minimal planning" means more planning than is typical for commission of the offense in a simple form. "More than minimal planning" also exists if significant affirmative steps were taken to conceal the offense…" U.S.S.G. § 2A2.2, Application Note 2; see also, *United States v. Tilghman*, 432 Fed. App'x. 269 (6th Cir. 2009); *United States v. Hashi*, 318 Fed. App'x. 241, 242 (4th Cir. 2009); *United States v. Huie*, 210 F.3d 363 (4th Cir. 2000). Where the defendant had motive for the assault, took time to plan the assault, and took efforts after the assault to conceal his actions, the 2 level enhancement for "more than minimal planning" is appropriate. *Tilghman*, 432 Fed. App'x. at 273. In *Tilghman*, the defendant assaulted victim because the victim accused the defendant of being a "snitch." Id. The court found that the defendant planned the assault by following the victim down a prison hallway, bringing a knife with him, and attacking the victim from behind. Additionally, the court found that, after the attack, the defendant attempted to hide his clothes and the knife, all of which warranted the enhancement. Id.

Here, the defendant shot Agent Crump and at the other agents because he believed they were gang members. He ran back to his house to get the gun after seeing TFO Schoenecker's unmarked car slowly circling Saints territory and driving

up Wood St. After retrieving the gun, the defendant waited in the gangway until Agent Crump and the others exited their unmarked car and shot at them from behind.

Further, after the shooting, he took multiple steps to conceal his actions. Victoria Jean-Baptiste testified at trial that Godinez asked her to drive to a gas station well outside of their neighborhood, where Godinez bought a white t-shirt to cover up the clothing he wore during the shooting. Godinez returned to his neighborhood an hour after the shooting – he specifically asked Jean-Baptiste not to drop him off on his own street – wearing the white t-shirt. Pole camera footage then showed Godinez stop in front of his brother's house, where he lingered for multiple minutes, before he left again. This is one of the many instances, in the nearly four days between the shooting and his arrest, where Godinez had an opportunity to hide the gun he used.

Godinez then hid his white SUV outside the neighborhood. This is the same car he used to patrol his neighborhood for rival gang members prior to the shooting. The notion that he did not hide the car is preposterous. R. 101 at 4. Godinez not only hid the car in the garage of a friend who lived 45 minutes away from him. He also obtained another car, so that he could re-enter the neighborhood without being detected by law enforcement. Destiny Rodriguez testified that Godinez regularly drove her white SUV, but on the afternoon of May 4, he picked her and their son up in a gray SUV she had never seen before. Godinez then abandoned his phone, and car, and stopped using his Snapchat accounts. Beginning almost immediately after

the shooting, Godinez took step after step to conceal his actions and his identity, each step becoming more and more drastic as it became clear to Godinez that he had shot a law enforcement officer and was wanted for the shooting. Based on these facts, the 2 level enhancement for "more than minimal planning" is applicable.

### B. The Enhancement for "Permanent Bodily Injury" is Appropriate.

The offense level is further increased by 7 levels, pursuant to Guidelines §2A2.2(b)(3) because Agent Crump sustained life-threatening or permanent bodily injuries. To put it plainly, Godinez shot Agent Crump in the head. The bullet entered through the back of the agent's neck near the edge of the left side of his jaw and exited directly between his eyes.

Miraculously, Agent Crump survived the shooting, but he did suffer permanent damage to his vision. Godinez flatly argues that, because Agent Crump was able to return to his law enforcement position, the injury he suffered could not have been permanent. Application Note 1 to Guidelines §1.1 defines a permanent bodily injury as "an injury involving substantial risk of death; loss or substantial impairment of the function of a bodily member, organ or mental faculty that is likely to be permanent…" *See also United States v. Phillips*, 239 F.3d 829, 848 (7th Cir. 2001) (shooting victim's facial scars were permanent bodily injury.) Godinez's bullet exited Agent Crump's head between his eyes – there are not many injuries that carry more of a substantial risk of death that that. Further, Agent Crump has suffered substantial impairment and loss of vision in his left eye because of the shooting. Agent Crump "no longer has tear ducts in [his] left eye, has nerve damage to the left side of

8

his face,...[and] has no vision in the upper left quadrant of his left eye." PSR ¶ 16. Agent Crump's medical records, as attached to the government's versions of the offense, describe these injuries further. These injuries are certainly "permanent" within the meaning of the Guidelines. The enhancement under §2A2.2(b)(3)(C) is properly applied here.

### C.     Defendant's Criminal History is Properly Calculated

The probation officer calculated Godinez has having four criminal history points, and therefore, being in Criminal History Category III. The defendant argues that his criminal history category should be reduced to Category II because his 2011 conviction for possession of marijuana was decriminalized years later. The defendant does not, and cannot, claim that the conviction had been expunged. The defendant served a sentence of imprisonment for the conviction, which warranted the one criminal history point under §4A1.1(c). "The fact that one of the convictions was a marijuana misdemeanor has no substantive effect on the calculation of criminal history under U.S.S.G. § 4A1.2." *United States v. Acrey*, 2010 WL 2925921, at *1, No. 10 C 3071 (07 CR 211) (N.D. Ill. July 20, 2010).

If anything, Godinez's criminal history points are understated. The probation officer found that Godinez receives no criminal history points for the 2012 conviction, and 1 year sentence of imprisonment. PSR ¶ 52. This conviction resulted from his possession of a loaded .40 caliber handgun as he and a fellow Latin Saint drove through rival gang territory, presumably looking for a shooting target. PSR ¶ 52. While this sentence is excluded from the PSR's criminal history calculation pursuant to §4A1.2, App. Note 6, this conduct, as set forth below, should be taken into account

in the analysis of the defendant's history and characteristics under 18 U.S.C. § 3553(a). The PSR properly calculates the defendant to be in Criminal History Category III.

## III.  SECTION 3553(a) FACTORS SUPPORT AN ABOVE GUIDELINES SENTENCE

Sentencing has four purposes: retribution; deterrence; incapacitation; and rehabilitation. *See United States v. Milbourn*, 600 F.3d 808, 812 (7th Cir. 2010). Title 18, United States Code, Section 3553(a), sets forth the facts courts are to consider in fashioning a sentence that is sufficient but not greater than necessary to comply with these purposes. First, however, the Court must calculate the applicable Guidelines range, which provides a starting point and initial benchmark for sentencing. *Gall v. United States*, 552 U.S. 38, 49-50 (2007); see also 18 U.S.C. § 3553(a)(4). Next, the Court must consider the other § 3553(a) factors. *United States v. Omole*, 523 F.3d 691, 697 (7th Cir. 2008). These factors include the need "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(A)-(D).

### A. Godinez's History and Characteristics

Ernesto Godinez's first arrest was at the age of 15. PSR ¶58.  Incidentally, according to Godinez, this is also the age at which he joined the Latin Saints. PSR ¶87.  From the age of 15 through his arrest at the age of 28 for shooting Agent Crump,

10

Godinez amassed 13 arrests and 6 convictions. As he has gotten older, despite a significant prior period of incarceration and court supervision, the fallout from Godinez's criminal conduct continues to increase in severity.

In particular, the prior convictions for the 2011 aggravated discharge of a firearm and the 2012 aggravated unlawful use of a weapon send a striking signal to the Court that Godinez poses a risk of recidivism and a lengthier than normal sentence is necessary to deter him. *See United States v. Ewing*, 12 F.3d 430 (7th Cir. 1997) ("If a defendant has been convicted of the same offense more than once, he has demonstrated the need for greater sanctions to deter him from committing the same crimes again – greater sanctions than might be required for a defendant who has never been convicted of a similar offense.); *United States v. Anderson*, 72 F.3d 563, 566 (7th Cir. 1995) (where "prior crimes are similar to the offense of conviction, the inference arises that the defendant through aptitude or experience has become skilled in the commission of a particular type of class of crimes and as a result is able to get away with most of them.")

On June 20, 2011, one month after being released from court supervision on a prior conviction, Godinez fired multiple gunshots at a man in front of his house in a neighborhood immediately to the east of Latin Saints territory. PSR ¶ 51. The man's wife and young children were in the house at the time of the shooting. A bullet hole was found in the side of the house. Id. The man told the police that Godinez yelled "Saint Love" as he fired the gun at the man. After shooting at the man, Godinez ran west back towards Saints territory. The man chased after Godinez, and he continued

11

to fire multiple additional gunshots at the man. Godinez was arrested on the 4500 block of S. Wood St. in Saints territory. He was convicted of aggravated discharge of a firearm in May 2015 and sentenced to 4 years' imprisonment.

While the June 2011 aggravated discharge case was pending, Godinez did not step back from his duties as a Latin Saint. Instead, he leaned further in. On March 25, 2012, CPD officers were patrolling an area in the Back of the Yards controlled by a rival gang of the Saints after members of the rival gang were reported to have chased women associated with the Latin Saints. PSR ¶ 52. While on patrol in the rival gang's territory, CPD officers observed Godinez and another member of the Latin Saints driving around the rival gang's territory. As soon as they noticed the police, Godinez and the other Latin Saint sped away. The officers then saw Godinez throw a handgun from the car as it fled away from the police. Presumably, Godinez and the other Saint were out looking for retribution. Godinez was convicted of aggravated unlawful use of a weapon in May 2015 and sentenced to 1 year in prison. He was discharged from supervised release for this conviction on January 4, 2018. He shot Agent Crump exactly five months later.

Godinez would have the Court believe that his increasingly violent and dangerous criminal history is the result of a difficult and tortured childhood that mitigates against a long sentence. Yet, based on the defendant's own words, his childhood was anything but tortured. Godinez's parents both worked hard to put food on the table and a roof over their family's head. PSR ¶74. According to Godinez, "his family would share meals together and, on his father's days off work, they would visit

12

the beach together." PSR ¶76. He also argues that, prior to his arrest, he was in a loving relationship with Destiny Rodriguez and that he hoped to marry Ms. Rodriguez when released. PSR ¶ 80. Yet, Victoria Jean-Baptiste, when questioned by defense counsel at trial, readily testified that she was one of Godinez's many girlfriends prior to his arrest. To be clear, the defendant's monogamy, or lack thereof, is of no import to the Court's sentencing determination; the government only points to Ms. Jean-Baptiste's testimony to highlight the self-serving nature of the defendant's arguments. Mitigation in the context of sentencing refers to a fact or circumstance that reduces the defendant's level of culpability for the instant offense and thus warrants a reduction in punishment. The defendant's childhood and romantic relationships do not warrant such a reduction.

The murder of the defendant's brother, Manuel Godinez, in December 2017, however, is relevant to the Court's determination. But it does not support a reduction in sentence though. It is tragic that Manuel Godinez was gunned down by gang violence in his own neighborhood. Yet, instead of taking his brother's death as sign to extricate himself from the Latin Saints, Godinez abided by the rules of the gang even more vigilantly. On May 4, 2018, he was patrolling Saints territory at 3 a.m., driving down the same block where his brother was killed,[3] on the lookout for rival gang members. Manuel Godinez's death made the defendant even more loyal to the Saints and their rules. The defendant's loyalty to the Saints, his quick willingness to

---

[3] The defendant's brother, Manuel Godinez, was shot and killed at 43rd and Honore in December 2017. *See* https://chicago.suntimes.com/2017/12/9/18330363/man-35-killed-in-back-of-the-yards-drive-by-shooting. Mr. Ruiz testified that the defendant's brother was believed to have been killed by rival gang members.

13

commit heinous violence for the gang, and his violent criminal history support the 30 year sentence recommended by the government and probation.

**B.       Seriousness of the Offense and Need for Just Punishment**

The seriousness of the defendant's crime cannot be overstated. Agent Crump and the other agents were in the Back of Yards to complete a routine task as part of their investigation into the defendant's gang. The agents were there that night to stop the senseless gang shootings that had plagued those blocks for years, including Godinez's own past shootings. They were there to reduce violence and fear, to help residents take back their neighborhood. Instead, they became another victim. Godinez's suggested sentence of 147 to 153 months' imprisonment is insufficient to address the seriousness of his crime. A sentence of 47-53 months imprisonment for assaulting a federal agent, while the agent while was performing a routine task as part of his job, is wholly inadequate. It is nothing short of a miracle that Agent Crump was not killed on the morning of May 4.

The Court should also take into account Agent Winter and Officer Spratte as victims in determining the defendant's sentence. *United States v. Ingram,* 427 Fed. App'x. 531, 533 (7th Cir. 2011) (affirming above guidelines sentence of 180 months for §111(b) conviction where "the district court found that the guidelines did not reflect the seriousness of [defendant]'s assault because they presumed the assault of a single officer, rather than assaults on multiple officers.") While they were not physically shot by Godinez, Agent Winter and Officer Spratte are most certainly victims of the defendant's heinous crime. Godinez fired five times on the morning of May 4 – one bullet was found lodged in a tree on the west side of the street and the

14

other bullet traveled through Agent Crump's head. While the other three bullets were not found, the surveillance videos from that morning clearly show Agent Winter and Officer Spratte ducking to take cover from the defendant's gunfire. Indeed, Agent Winter and Officer Spratte reacted before Agent Crump did, arguably because Godinez began shooting from east to west, across the intersection, until he hit Agent Crump. The other law enforcement officers on scene had to lift Agent Crump's bleeding body into the back of a car, and at least one agent performed basic first aid on his colleague as they rushed to a hospital. PSR ¶15.

Godinez's crime was not spur of the moment, not committed in the heat of passion. The defendant was not protecting himself. He was not being fired upon by a rival gang member. He retrieved the gun from his house, hid in the gangway, and shot at the backs of three strangers, thinking they were rival gang members. When Godinez realized he was successful in shooting these "flakes," he got into his girlfriend's car and expressed just how proud he was of himself ("I feel good."). Then, per Ms. Jean-Baptiste's testimony, they drove off to smoke some pot. Godinez knew he had just shot another human being, and his reaction was to hang out with his girlfriend and get high.

Godinez may not have known that his victims were agents, but this merely highlights the seriousness of his conduct. He did not know— or care— at whom he shot. This was indiscriminate, deadly violence by a recidivist shooter. Godinez shamelessly hid in the shadows of a gangway while firing bullets at complete strangers. Having suffered the death of his own brother because of gun violence and

15

having been shot himself (R. 101 at 11), the defendant well knew that firing a gun at people was not a game. He knew the consequences of firing that weapon and did so purposefully. Godinez intended to shoot the three individuals standing in the intersection, and knew that his gunfire could have killed one of them. As a Latin Saint, that was his goal. Godinez tries to hide behind the violence perpetrated in his community (R. 101 at 11), as if it were not the Latin Saints who perpetuated that violence. The depravity of the defendant's crime is remarkable. A sentence of 30 years' imprisonment is the only fair answer here, both to punish this reprehensible crime and to protect the community he endangered time and time again.

## C. Protecting the Public and General Deterrence

The brazen and callous nature of the defendant's crime warrants the continued protection of the public from the possibility of recurrent crimes by Godinez. Whatever potential for rehabilitation exists is unlikely given the recurring violent and criminal behavior he exhibited. He has not exhibited the kind of remorse and contrition necessary to demonstrate that he has a possibility of rehabilitation. Likewise, nor he has demonstrated that he has or will leave behind their criminal association with the Latin Saints; this too justifies the need to protect the public for as long as possible.

His lack of remorse – which currently manifests itself as continued assertions of innocence despite the overwhelming evidence of his guilt, as well as the denial of the role of his gang affiliation in the offense – demonstrates that recidivism is a real concern. Godinez may have intended to shoot gang members rather than law enforcement, but for purposes of general deterrence, it is critical that assaults on law enforcement be met with serious punishment. The daily reports appearing in the

16

news reinforce the plague of violence imposed upon the residents of Chicago by gang members. This significant sentence will demonstrate that the courts are devoted to stemming the tide of this cycle of violence. The defendant was trying to shoot a rival gang member, but instead shot a federal agent. Perhaps this sentence will convince a young gang member that the potential of a decades-long sentence outweighs the short-term gratification of pulling the trigger.

## IV. SUPERVISED RELEASE

The government recommends that the Court impose a period of supervised release of five years to run concurrently on both counts. During that period, the government recommends that the Court consider imposing the following conditions of supervised release, as set forth in the PSR:

### A. Mandatory Conditions, Pursuant to 18 U.S.C. § 3583(d)

- The defendant shall not commit another federal, state, or local crime.

- The defendant shall not unlawfully possess a controlled substance.

- The defendant shall refrain from any unlawful use of a controlled substance AND submit to one drug test within 15 days of release on probation and at least two periodic tests thereafter, up to 104 periodic tests, during each year of supervised release for use of a controlled substance.

- The defendant shall cooperate in the collection of a DNA sample from the defendant at the direction of the United States Probation Office.

### B. Discretionary Conditions, Pursuant to 18 U.S.C. §§ 3583(d) and 3563(b)

The following conditions should be imposed on the basis that they (1) facilitate supervision by the probation officer, which is important here to promote defendant's respect for the law and deter the defendant from future crimes; and (2) are tailored

17

to address mental health and substance abuse issues which, if left untreated, will prevent defendant from successfully reintegrating into society:

- The defendant shall provide financial support to dependents if financially able.

- The defendant shall seek, and work conscientiously, at lawful employment or pursue conscientiously a course of study or vocational training that will equip him for employment.

- The defendant shall refrain from knowingly meeting or communicating with any person he knows to be engaged, or planning to engage in criminal activity, including known gang members.

- The defendant shall refrain from any use of alcohol (defined as having a blood alcohol concentration greater than .08%) or any use of a narcotic drug or other controlled substance.

- Defendant shall refrain from possessing a firearm, destructive device or other dangerous weapon.

- Defendant shall participate, at the direction of a probation officer, in a substance treatment program, which may include urine testing up to a maximum of 104 tests per year.

- Defendant shall refrain from knowingly leaving the federal judicial district where defendant is being supervised, unless granted permission to leave by the court or a probation officer.

- Defendant shall report to the probation office as directed by the court or a probation officer.

- Defendant shall permit a probation officer to visit the defendant at any reasonable time at home; at work; at school; at a community service location; or at another reasonable location specified by a probation officer; and permit confiscation of any contraband observed in plain view of the probation officer.

- Defendant shall notify the probation officer within 72 hours of any change in residence, employer, or workplace and, absent constitutional or other legal privilege, answer inquiries by a probation officer.

- Defendant shall notify the probation officer within 72 hours if arrested or questioned by a law enforcement officer.

- Defendant shall participate in a GED preparation course and seek to obtain a GED within the first year of supervisions.

- Defendant shall participate in an approved job skill-training program at the direction of a probation officer within the first 60 days of placement on supervision.

- Defendant shall, if unemployed after the first 60 days of supervision, or if unemployed for 60 days after termination or lay-off from employment, perform at least 20 hours of community service per week at the direction of the U.S. Probation Office until gainfully employed.

- Defendant shall not enter into any agreement to act as an informer or special agent of a law enforcement agency without the permission of the court.

- Defendant shall observe one Reentry court session.

These supervised release terms are narrowly tailored to facilitate supervision by the probation officer, deter the defendant from future crimes, support defendant's rehabilitation and reintegration into the community, and ensure that he is engaged in lawful pursuits rather than criminal activity.

## V.    CONCLUSION

The government respectfully requests that the Court sentence Ernesto Godinez to a term of imprisonment of 180 months for the assault of ATF Special Agent Kevin Crump, and to a consecutive term of imprisonment of 180 months for the use and discharge of a firearm during the assault on Agent Crump. Sentences such as this should be reserved for the most dangerous offenders and the most serious crimes. The defendant falls into both categories.


Dated: November 24, 2019

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By:    /s/ Kavitha J. Babu
KAVITHA J. BABU
NICHOLAS J. EICHENSEER
Assistant U.S. Attorneys
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 353-5300

20