1     IN THE UNITED STATES DISTRICT COURT
      NORTHERN DISTRICT OF ILLINOIS
2            EASTERN DIVISION

3                          )
      UNITED STATES OF AMERICA,    )   Case No. 18 CR 278
4                          )
                Plaintiff,    )
5                          )
           vs.              )   Chicago, Illinois
6                          )   December 4, 2019
      ERNESTO GODINEZ,        )   10:11 AM
7                          )
                Defendant.   )
8
           TRANSCRIPT OF PROCEEDINGS - Sentencing
9     BEFORE THE HONORABLE HARRY D. LEINENWEBER

10
      APPEARANCES:
11
      For the Plaintiff:       JOHN R. LAUSCH, JR.
12                          UNITED STATES ATTORNEY
                            BY:  MS. KAVITHA J. BABU
13                          Assistant United States Attorney
                            219 South Dearborn Street
14                          5th Floor
                            Chicago, Illinois  60604
15

16    For the Defendant:       MR. GAL PISSETZKY
                            35 East Wacker Drive, Suite 1980
17                          Chicago, Illinois  60604

18
                            LAWRENCE H. HYMAN & ASSOCIATES
19                          BY: MR. LAWRENCE H. HYMAN
                            111 West Washington Street, Suite 1025
20                          Chicago, Illinois 60602

21

22    Court Reporter:          SANDRA M. MULLIN, CSR, RMR, FCRR
                            Official Court Reporter
23                          219 S. Dearborn Street, Room 2260
                            Chicago, Illinois  60604
24                          (312) 554-8244
                            sandra_mullin@ilnd.uscourts.gov
25

1    (Proceedings heard in open court:)

2              THE CLERK:  18 CR 278, USA versus Godinez.

3              MS. BABU:  Good morning, your Honor.  Kavitha Babu on

4    behalf of the United States.

5              MR. HYMAN:  May it please the court, Lawrence Hyman,

6    H-y-m-a-n, and Gal Pissetzky, P-i-s-s-e-t-z-k-y, for

7    Mr. Godinez.

8              MR. PISSETZKY:  Good morning, your Honor.

9              THE COURT:  Are we ready for sentencing?

10             MR. HYMAN:  Yes, Judge.

11             MS. BABU:  We are, your Honor.

12             THE COURT:  I have received the pre-sentence

13   investigative report prepared by Ms. Foley dated August 12th of

14   this year, her supplemental report dated August 22nd, her

15   sentencing recommendation, the government's sentencing

16   memorandum, Mr. Godinez's objections to the pre-sentence report

17   and sentencing recommendation and a series of -- I believe

18   there are seven or eight letters written on behalf of

19   Mr. Godinez.  And also there is a number of exhibits to the

20   pre-investigation report.  Anything else I should have?

21             MR. PISSETZKY:  No, your Honor.

22             MS. BABU:  No, I don't believe so, your Honor.

23             THE COURT:  Mr. Hyman, Mr. Pissetzky, have you read

24   the report?

25             MR. PISSETZKY:  We have, Judge.

1          MR. HYMAN:  We have.

2          THE COURT:  And the supplemental report?

3          MR. PISSETZKY:  Yes.

4          MR. HYMAN:  Yes, Judge.

5          THE COURT:  Have you discussed it with Mr. Godinez?

6          MR. HYMAN:  Correct.

7          THE COURT:  Leaving out your objections to the

8     calculations of the guideline, is it factually accurate?

9          MR. PISSETZKY:  Well, your Honor, there is some facts

10    that we dispute that I will speak of later on relating to the

11    offense itself.  But, as we disputed at trial, there are some

12    disputes here.  There is a couple of additions to disputes --

13    it's factual disputes.  That's why I did not file a certain

14    objection to it because -- I'll give you an example of one of

15    the factual disputes, which I raised in the sentencing

16    memorandum, and that is Officer Spratte's description that he

17    felt one bullet fly past his head.  This is something that came

18    up, newly discovered evidence, during the PSI interview.  And

19    Officer Spratte, as you know, has testified extensively on the

20    stand and never said anything like that before.  So we are

21    disputing that, but I think these are more factual

22    discrepancies.

23          THE COURT:  All right.  Let me rephrase the question.

24    Historically -- leaving out the incident itself, historically,

25    as far as Mr. Godinez's background, current state of affairs,

1  and so forth, is it accurate?

2          MR. PISSETZKY:  Yes.

3          MR. HYMAN:  Yes.

4          THE COURT:  Mr. Godinez, have you read this report?

5          THE DEFENDANT:  Yes.

6          THE COURT:  Have you discussed it with your lawyers?

7          THE DEFENDANT:  Somewhat.

8          THE COURT:  Pardon?

9          THE DEFENDANT:  Somewhat, sir.

10          THE COURT:  Okay.  When you say somewhat, I'm --

11          THE DEFENDANT:  I don't really understand all of it.

12          THE COURT:  Well, have they -- have you raised your

13  questions with them?

14          MS. BABU:  Your Honor, we can take a moment, if they

15  would like, to discuss the PSR further.

16          THE COURT:  Well, let's just see what -- what the

17  problem is.

18          MR. HYMAN:  Judge, I think the issue really is for

19  Mr. Godinez -- the issue for Mr. Godinez is that he understands

20  the report.  It is the disputes that Mr. Pissetzky has raised

21  which he is concerned about and he has disputed.

22          THE COURT:  All right.  Well, let me go back.  Let me

23  just rephrase the question.  As I said, historically, is it

24  accurate as far describing your background, Mr. Godinez, and,

25  you know, your schooling, your record, and so forth?  Is it

1  accurate, as far as you know?

2  THE DEFENDANT:  Well, when I was arrested she said
3  something that I -- that I got kicked out of school because
4  something about a principal.  That's a lie.  I was picking up
5  my nieces, and some teacher had an argument with me while
6  picking up my nieces, and she kicked me out.  That was at a
7  different school.

8  THE COURT:  Okay.  That -- that is a statement.  You
9  deny that you threatened the teacher; is that right?

10  THE DEFENDANT:  Yes.

11  THE COURT:  Other than that, is it accurate?

12  THE DEFENDANT:  Yes.

13  THE COURT:  Okay.  Is the government satisfied with
14  the pre-sentence report?

15  MS. BABU:  We do not have any factual objections,
16  your Honor.

17  THE COURT:  All right.  So let's -- now that we've
18  got that out of the way, let's move to the guideline
19  calculations.  I believe that both sides agree that the base
20  guideline for 18 USC 111(a) and (b) is 14; is that right?

21  MR. PISSETZKY:  Yes, Judge.

22  MS. BABU:  Yes, your Honor.

23  THE COURT:  And the specific characteristic, more
24  than minimal planning.  And the defense objects to more than
25  minimum planning; is that right?

1    MR. PISSETZKY:  Correct.

2    THE COURT:  Do you want to state your position?  I

3    know it -- it's in your memorandum, but --

4    MR. PISSETZKY:  Yes, your Honor.  So just -- we've

5    laid out in the memorandum, but to highlight it to apply this

6    specific enhancement of two points, the government has to show

7    more planning than is typical for the commission of an offense

8    in the simple form.  And it can also be applied if, and I

9    emphasize, significant, affirmative steps were taken to conceal

10   the offense.  The government cited two cases.  One of them is

11   *Tillman*, which is a case that the defendant there planned the

12   assault on, I believe it was a snitch, or somebody, another

13   person, for quite some time.  It's not even close to the way

14   that this -- this case was presented to the jury.  As in any

15   case that is an assault with a firearm, an attempt murder, or a

16   murder, a person does not stick into seeing to wait for the

17   rival gang members to show up or the police to show up.  People

18   always flee.  That is not extensive or more than minimum

19   planning.  Disposing of the firearm.  Again, this is not more

20   than minimal planning.  That is the simple form of that type of

21   a crime.

22        What happened here, as far as trying to conceal after

23   the fact, according to the government, my client drove around

24   the neighborhood for a long period of time after this event

25   happened.  He went -- he even went back to his house.  We saw

1  the video.  He circled the neighborhood.  He was in the

2  neighborhood.  He didn't do anything to conceal himself or run

3  away.  The government is going to argue he put a different

4  shirt on.  Putting a different shirt on with a long ponytail

5  and still having the hat on, and all that, that's not

6  concealing when you're still driving around the neighborhood.

7  He went to a very well-known associate of his, a friend of his.

8  He didn't -- he even drove to the airport.  Your Honor, if he

9  wanted to conceal his after -- what happened afterwards, he

10  would have gotten on a flight because he had a valid passport,

11  he had a valid ID.  His father lives in Mexico.  He has a house

12  in Mexico.  He could have -- that's -- he could have concealed

13  himself there.

14  What happened here, your Honor, is, when he found out

15  that there was a -- that he is a wanted person and it wasn't

16  fake news on Facebook, when he actually found out that he was

17  wanted, he, him and his family, contacted an attorney,

18  Mr. Hyman, to turn himself in.  There was no concealment

19  whatsoever, your Honor.  He didn't run away.  He didn't run

20  away to Mexico.  He didn't run away with his friend that he

21  dropped off at O'Hare.

22  As far as what happened before the shooting, unlike

23  what the government describes in their sentencing memorandum,

24  your Honor, he -- Mr. Godinez, or the way that the evidence was

25  presented, never saw Agent Crump's car prior to the shooting.

1  If you watch the videos, it is other -- and there was

2  testimony.  There was -- it's other cars, not even similar

3  cars, that are driving around the neighborhood.  It is

4  impossible for him to think that Car A is somehow related to

5  Car B that is Agent Crump's car, and then say, oh, I saw Car A

6  10 minutes ago, so I'm going to shoot at Car B to get back at

7  Car A.  There was no connection.  The government never

8  established any connection in -- that Mr. Godinez knew that the

9  car that Agent Crump was in was related to any other

10  individuals or cars on the street.

11  The government's argument that he went back to his

12  house after he saw a car circling the neighborhood to get a gun

13  and then go to the alley and wait for that car and shoot just

14  doesn't make sense because he never -- that -- Agent Crump's

15  car and Godinez never, ever crossed paths that evening prior to

16  the shooting itself.  So, again, it is the simplest form of

17  that type of a crime.

18  According to the government, Mr. Godinez was in an

19  alley.  He had access to a gun.  He poked his head out of the

20  alley, thought it was rival gang members who got out of the

21  car, or whatever it is that he saw to -- got out of the car in

22  his neighborhood, and he shot.  And after he shot, he ran away.

23  That is the simplest form of that type of a crime, your Honor.

24  THE COURT:  All right.  Ms. Babu?

25  MS. BABU:  Your Honor, so the Sixth Circuit has

1    considered this, as Mr. Pissetzky noted, in the *Tillman* case.

2    And in the *Tillman* case, the court there found that there was

3    significant planning because, there, the defendant after the

4    attack, after he had attacked this prison snitch, attempted to

5    hide his clothes and the knife that he used in the attack, and

6    that warranted the use of the enhancement.

7        THE COURT:  Let me ask you this:  It was the

8    government's theory in the case that this was happenstance.  In

9    other words, they didn't realize that these were government

10   agents.  They thought that -- he thought that, based on the way

11   they were dressed, and the hour, and so forth, that they were

12   rival gang members.  And the planning, if there was any at all,

13   it seemed to me had to do with the fact that he apparently had

14   the job of protecting the neighborhood.

15       MS. BABU:  Correct, your Honor.

16       THE COURT:  So I'm thinking that -- I mean, there was

17   no planning ahead of time at this specific -- that these

18   specific individuals should be shot at.  They just -- they

19   appeared out of the blue, and the way they were dressed and the

20   time and the location, he, as I understand the government's

21   theory and the one that I believe the jury bought, that he was

22   protecting the neighborhood, so he shot at him, which seems to

23   me it was not a planned assault.

24       MS. BABU:  And, your Honor, I think our case does

25   closely track the *Tillman* case, in which they did find there

1  was more than the minimal planning. In that case, the

2  defendant followed the victim down the hallway, he had the

3  knife on him, and then attacked the victim from behind. Here,

4  Mr. Godinez, after seeing Officer Schoenecker and Daquilante's

5  car, which he thought were rival gang members, drive down

6  Hermitage Avenue, he then ran back up Wood Street, ran into his

7  house to get the gun. Then went up the street, across the

8  alley, and then waited in the gangway until a car drove past

9  him on Hermitage, which is when he fired at them.

10              MR. PISSETZKY: It's too --

11              MS. BABU: But the application -- the application

12  note also notes that this enhancement can be applied if there

13  is also significant or affirmative steps taken to conceal the

14  offense.

15              THE COURT: Well, again, the -- my initial reaction

16  what I understood was the government's case that he -- that it

17  was a much more planned escape than turned out that it was.

18  That he was -- he went, and he bought gas, and he went to a --

19              MR. HYMAN: Shake and Steak or --

20              THE COURT: Yeah, and bought a T-shirt, put it on.

21              MS. BABU: Your Honor, if I may, I can give you the

22  chronology because I know it has been a few months. I can give

23  you the chronology of what exactly happened after the shooting.

24              MR. PISSETZKY: I can give it to you too, Judge.

25              THE COURT: Well, I know you can. I'm asking her.

1    MS. BABU:  And so immediately after the shooting,

2    your Honor, the defendant gets in -- he gets into his

3    girlfriend's car, they leave to go to the gas station on

4    Ashland Avenue.  And, there, they buy some cigarettes and then

5    drive around the neighborhood, according to the girlfriend's

6    testimony.  At that point, they're listening to the police

7    scanner and realize that it was a federal agent that's been

8    shot.  He then asks the girlfriend to drive him to a different

9    gas station.

10    THE COURT:  Well, that's not planning, that's

11    happenstance.  He is listening.  He thinks he shot a -- what

12    was it they called them?  They have a name.

13    MR. HYMAN:  A flake.

14    MS. BABU:  A flake.

15    THE COURT:  A flake. He thought he shot a flake, and

16    then all of a sudden he finds out on the scanner that, no, he

17    shot an agent.

18    MS. BABU:  Well, and then this is the step of

19    concealment that he takes, your Honor.  He drives --

20    THE COURT:  Well, then, he did take steps of

21    concealment.  It seemed to me that, until he found out what he

22    had actually done, he didn't.

23    Anyway, I'm going to find that I don't believe there

24    was minimal planning, so I will not enhance by two.

25    Now, the next objection, as I understand it, is the

1  seven-point enhancement because of the permanent injury

2  suffered by Agent Crump as a result of the -- you have an

3  objection to that.

4      MR. PISSETZKY:  We do have an objection to that.

5  We've listed it in our objections.  Again, your Honor, based on

6  what we understand, Agent Crump came back to -- again,

7  without -- we're not taking it lightly, obviously, but he did

8  come back to work pretty quickly.  He does have -- my

9  understanding, he does have some vision issue or loss of

10  vision.  However, other than that, he is back at work.  He can

11  do the same functions that he did in the past.  There is no

12  serious injury at this point at all.  It was serious bodily

13  injury at the time, but he recovered.

14      THE COURT:  Well, it's my understanding, based upon

15  the evidence in the case and the current -- his current

16  position, that it was a very serious injury, and it does

17  warrant the seven-level enhancement, so I'm going to overrule

18  your objection.

19      The next -- did you object to the two-level

20  enhancement for 111(b)?  That's the next one on the list.

21      MS. BABU:  Your Honor, I believe they did.  And we,

22  after further review, we agree that the additional two-level

23  enhancement for 111(b) would not apply.

24      THE COURT:  All right.

25      MS. BABU:  Because of the application note to the

1    firearm.

2           THE COURT:  Okay.  The government agrees, that's

3    Paragraph 35, the two-level enhancement for US guideline,

4    2A2.2(b)(7); is that right?

5           MS. BABU:  Correct, your Honor.

6           THE COURT:  All right.  So doing the math, we have 14

7    plus 7 is 21.  Is that right?

8           MR. PISSETZKY:  Yes.

9           THE COURT:  And the criminal history is not objected

10   to.

11          MR. PISSETZKY:  Your Honor, we did file an objection

12   to the criminal history based on overstating the seriousness of

13   one of the convictions.

14          THE COURT:  That's more of a 3553 argument; isn't it?

15   Or is that --

16          MR. PISSETZKY:  Actually, it was an objection to the

17   criminal history to -- for -- to -- for downward departure

18   based on overstating the seriousness of the -- it's on our

19   Page 9 of our memorandum.  Oh, that's -- that's the

20   government's, actually, response to it.  Page 6.  Yeah, Page 6,

21   right.  Page 5 going into 6.

22          THE COURT:  Just a minute.  That has to do with

23   departure rather than establishing what the guidelines are.

24   But the points that he --

25          MR. PISSETZKY:  The points are the points, correct.

1    THE COURT:  The points are the points.

2    MR. PISSETZKY:  Yes.

3    THE COURT:  So that makes out to a three.  So without

4    questioning the departure, then, the guideline, then, would be

5    46 to 57; is that correct?

6    MS. BABU:  That's correct, your Honor.

7    THE COURT:  And then there is the 120-month

8    consecutive sentence.

9    MR. PISSETZKY:  Correct, Judge.

10   THE COURT:  So the guideline, then, would be 166 to

11   177, without taking into account the departure; is that right?

12   MR. PISSETZKY:  Correct, Judge.

13   THE COURT:  And you're moving for a departure

14   downward based on the overstatement of the seriousness of the

15   criminal history.

16   MR. PISSETZKY:  Correct, of one of the -- one of the

17   convictions is for a very small -- it's a 2011 conviction for

18   possession of marijuana.  It was five grams.  Mr. Godinez

19   received two days, time served, which, in fact, in state court,

20   as your Honor knows, he was picked up on one day, spent the

21   night at the precinct at the district and was brought to court

22   and pled just to get out of prison or jail.  So it's

23   technically two days, time served.  That's how it works.  It

24   was a misdemeanor.  It's five grams, which is not a crime today

25   anymore.  And in less than a month, it's probably going to be

1  legal.

2         THE COURT:  What -- isn't there a -- didn't the

3  government argue that they missed one, he was under a -- one of

4  the convictions was while he was under --

5         MS. BABU:  Correct, your Honor.  The 2012 conviction

6  for the aggravated unlawful use of a weapon was not assigned

7  any points correctly by probation because the underlying

8  statute was found to be unconstitutional.  So the probation

9  officer correctly found that that conviction does not receive

10  any criminal history points.  But that -- the underlying acts,

11  the defendant's acts, and the fact that he was convicted of the

12  crime, should be taken into account by the court in considering

13  the 3553(a) factors.  And I believe, we would argue, that his

14  criminal history category is actually understated, in that his

15  criminal history points and the category that he ended up in

16  does not reflect --

17         THE COURT:  So it's the government's position it

18  balances out?

19         MS. BABU:  Correct, your Honor.

20         MR. PISSETZKY:  Your Honor, but when a statute is

21  unconstitutional, a statute is unconstitutional, and then you

22  would have not been arrested in the first place because it's an

23  unconstitutional statute.  And so if they would have stopped

24  him when the statute was unconstitutional, he would not have

25  been charged.  So arguing that -- arguing the fact that he

1  should get these points because he was charged but then the

2  statute was unconstitutional, in a way kind of turns it on its

3  head.

4           MS. BABU:  Except, your Honor, he pled guilty to the

5  facts of that case, and so he accepted that he was driving

6  around in a rival gang's territory with a gun in his car trying

7  to take retribution for his gang's associates being harassed by

8  a rival gang.  So he accepted the facts of that underlying

9  conviction.

10          MR. PISSETZKY:  We all know what that means when

11  somebody -- when you pled guilty in state court like that.  He

12  didn't -- if the statute was unconstitutional, even though he

13  drove around, or whatever it is that he accepted at the time,

14  he would not have been before the court if the statute was

15  un -- if the statute was not in the books or was not written

16  the same way it was written.  So saying to enhance it because

17  of that, that really is -- that's punishing somebody for an

18  unconstitutional statute, which is not proper, Judge.

19          MS. BABU:  Your Honor, these are facts that the court

20  can take into account as part of the defendant's

21  characteristics and his history.  These are certainly facts

22  that you can consider in whether or not -- in how you fashion a

23  sentence because that -- the history and the characteristics of

24  the defendant are certainly important here.

25          MR. PISSETZKY:  True, under 3553, but not under

1  departures.

2          THE COURT:  All right.  I'm finding that the criminal

3  history is not understated -- it's not overstated, and so

4  the -- again, I will affirm what the actual guidelines are, 166

5  to 177.

6          Is there -- was there anything else other -- on the

7  guidelines?  I think that summarizes the -- that concludes the

8  guideline aspect of the case; is that right?

9          MR. PISSETZKY:  Correct, Judge.

10          MS. BABU:  Correct, your Honor.

11          THE COURT:  All right.  So now the government has

12  made a recommendation, and they wish to proceed with your

13  recommendation for sentencing.

14          MS. BABU:  We do, your Honor.  The government is

15  asking for a sentence of 360 months.  And that's 100 months on

16  Count 1 and 100 months to run consecutively on Count 2.  We

17  recognize that this is a very significant and lengthy sentence,

18  and we don't --

19          THE COURT:  You mean 180 months; don't you?

20          MS. BABU:  I'm sorry, 180 and 180.

21          THE COURT:  Yeah, I was going to say, that doesn't

22  work out.

23          MS. BABU:  Math is not my strong suit, your Honor.

24          THE COURT:  All right.  Proceed.

25          MS. BABU:  So the 360-month total sentence, your

1 Honor, we recognize that this is a significant and a lengthy

2 sentence, and we don't make this recommendation lightly, but we

3 request this sentence, and this is the same sentence that was

4 recommended by probation, because it meets the purposes of

5 sentencing, specifically here the need for a just sentence, the

6 need to protect the public, and the need to deter others from

7 committing these same crimes. And under the 3553(a) factors, a

8 sentence of 360 months is sufficient but not greater than

9 necessary to meet those purposes.

10 I know that the defendant's crime here was described

11 almost down to the second during the trial, and so there is no

12 need to go into that detail here. However, the court has the

13 videos, the government's versions of the offenses, the PSR, the

14 parties' submissions. But for the context for my 3553(a)

15 arguments, I'd like to just briefly summarize what happened.

16 As the court understood it, and as the jury

17 understood it, the defendant was circling the blocks of his own

18 neighborhood at 3:00 a.m. because his neighborhood is the heart

19 of the territory of the Latin Saints gang, and the defendant is

20 a loyal member and a leader of the gang, was patrolling the

21 neighborhood for rivals.

22 Minutes after being out there, he sees two unknown

23 men in an unknown car, also circling the blocks. He thinks

24 those men are rival gang members, but the men turn out to be

25 officers with an ATF group who are investigating the Latin

1    Saints, and they are in that neighborhood to replace tracking
2    devices on cars parked on Hermitage Avenue.  The defendant,
3    though, after seeing those officers, runs back up Wood Street
4    towards his house, runs into the house, he gets the gun, he
5    runs back up the street, across the alley, and then he hides in
6    a gangway.  He hides in the gangway until the car carrying
7    Agent Crump, Agent Winter and Officer Spratte drives past him
8    on Hermitage Avenue.  That car gets to the intersection of
9    Hermitage and 44th Street, and those three officers are
10   specifically tasked with replacing the tracking devices on the
11   cars that are parked on Hermitage.  So those three agents get
12   out of the car.  Agent Crump is to the west of the intersection
13   and Agent Winter and Officer Spratte are on the east side of
14   the intersection.  They're walking away from the defendant.  As
15   they are walking away, the defendant fires five shots.  You see
16   in the videos, your Honor, Agent Winter and Officer Spratte
17   duck first.  They duck first, and they turn out of, in the
18   video, out of the frame of the video to try and take cover.
19   You then see in the video Agent Spratte turn to his left to
20   look and see what his partners are doing, and then he reacts to
21   the gunshots.  It's then that Agent Crump is hit.  And Agent
22   Crump, as was detailed during the trial and in his medical
23   records that were submitted as part of the government's
24   versions, was hit in the head with a bullet that entered at the
25   base of his jaw, on the left side of his neck, and the bullet

1  traveled through his head and exited between his eyes.

2  Agent Crump survived that, and as defense counsel

3  pointed out, is back working as an agent.  However, the

4  seriousness of that crime and of what the defendant did that

5  morning is the context with which we ask you to consider our

6  recommendation.  And while all of the 3553(a) factors must be

7  considered by the court, some are -- you are allowed to give

8  more importance to some over others.  And we think the

9  seriousness of the crime is one such factor.

10  And the defendant's crime here was serious for a

11  whole host of reasons.  But one of those reasons is that the

12  victims of these crimes were law enforcement officers, and they

13  were in that neighborhood just doing their job.  They were out

14  in the Back of the Yards for what was supposed to be a routine

15  investigative maneuver.  They were in the Back of the Yards

16  because of the Latin Saints.  And they were conducting an

17  investigation of the very gang that makes the Back of the Yards

18  in that neighborhood so dangerous.  They were trying to slow

19  down the violence in that neighborhood, and, instead, became a

20  victim of that violence.

21  And before I talk about Agent Crump, who is the most

22  obvious victim here, I do want to talk about the other victims

23  that the probation officer raised and the government raised in

24  its sentencing memo.  And I do think it's appropriate for the

25  court to consider those victims in fashioning its sentence

1    here.

2    Officer Spratte and Agent Winter were also on that

3    street corner when the defendant fired his weapon.  And as I --

4    as I mentioned, they also duck -- they try to take cover from

5    these -- from these bullets, and either of them could have been

6    hit by the defendant's gunfire.  I expect that Officer Spratte

7    will address the court in a victim impact statement, but they

8    both spoke to the probation officer and gave lengthy victim

9    impact statements to the probation officer.  They spoke about

10   the impact on themselves and to their families.

11   Your Honor, these are seasoned law enforcement

12   officers who probably suffered one of the worst nights of their

13   careers because of the defendant's actions.  They found Agent

14   Crump cowering on the street between the curb and parked car

15   making noises that barely sounded human, and he was bleeding

16   from his neck and his face.  Agent Winter testified having to

17   put his hands over Agent Crump's hands to try and stop the

18   bleeding, not knowing where the bleeding was coming from.  And

19   in the second submission videos submitted to the court, you can

20   see the agents having to pick Agent Crump up by his limbs to

21   put him into the back of another car that was taking him to the

22   hospital.  The other agents that were in the car had to perform

23   first aid on Agent Crump as they took him to Stroger Hospital,

24   not knowing whether or not he was going to live during that

25   ride.

1        And while these officers, all of the officers, that

2   were there that morning did not suffer physical wounds, and

3   certainly not the physical wounds that Agent Crump suffered,

4   the effect of the defendant's crime has on them and on their

5   family should certainly be taken into account when you fashion

6   your sentence for the defendant.

7        And, your Honor, obviously the most -- the victim

8   that was harmed most here is Agent Crump.  He had been an agent

9   for all of four months, or an agent in the field.  He had just

10  come to Chicago, arriving straight from training.  This was his

11  first job in law enforcement.  And four months into the job he

12  was shot through the neck with a bullet exiting through his

13  eyes.  The bone in between Agent Crump's eyes has been replaced

14  by a metal mesh.  And I have said this so often to family and

15  friends, your Honor, that it almost feels cliché, but it truly

16  is a miracle that Agent Crump didn't die that morning.

17       And that fact puts our recommendation into context,

18  your Honor, because -- and this is a hypothetical that I am

19  providing only to provide context for our recommendation.  But

20  if the defendant had killed Agent Crump that night and had been

21  charged with a second-degree murder of a federal officer, he

22  would have been charged under Section 1114 of Title 18, and we

23  would be looking at a totally different guidelines calculation.

24  The guidelines calculation there would have been under

25  Section 2A1.2, and the base offense level would have been 38.

1   And the range, then, with the government's -- with the

2   defendant's current criminal history would be 292 to 365.

3          We recognize the defendant didn't kill Agent Crump,

4   but that is not because of any affirmative step that the

5   defendant took.  It wasn't because he was trying to be careful.

6   The defendant didn't go out of his way to aim for the limbs of

7   his targets.  He didn't shoot into the air to just scare them.

8   But for a few millimeters, your Honor, the defendant's bullet

9   could have killed Agent Crump, and that is one of the important

10  reasons that the government makes such a serious

11  recommendation.

12         In addition to the seriousness of this offense, the

13  court must also take into account the defendant's history and

14  characteristics. And, your Honor, I would argue that one of the

15  most important characteristics about this defendant for you to

16  consider is that he is a Latin Saint.  And I say that based on

17  the defendant's own actions.  I would suggest that being a --

18  well, I don't even need to suggest, your Honor.  Being a Latin

19  Saint is important to the defendant.  But I would suggest that

20  it's more important to him than being a son, than being a

21  father, than being a brother.  And it certainly is more

22  important to him than being a member of the community that he

23  lives in.  He shot someone from behind, ran across the alley,

24  got into his girlfriend's car and told her that he felt good.

25  He was proud of himself.  He was proud that he had shot three

1  strangers in the back from behind.

2  And, your Honor, the defendant, the defendant's

3  family, is here in the courtroom to support the defendant, and

4  they have written letters.  And certainly the social support

5  and the safety net that they will provide and that they hope to

6  provide when he is released will help reintegrate the defendant

7  into -- back into society.  But, your Honor, the idea that the

8  defendant took affirmative and positive steps in his life

9  before he was arrested on this crime, as the defendant

10  suggested in his sentencing memo, is self-serving and merely to

11  gain this court's sympathy.  His criminal history clearly shows

12  that he didn't want to become a better person.  He wasn't on

13  that path.  The path he was on was to become more violent and

14  to become more of a danger to his community.  And his criminal

15  history clearly shows that.  It was a pattern of violence and a

16  pattern of loyalty to the Latin Saints.

17  His first conviction was when he was at the age of

18  15, and the defendant told probation that was the same age that

19  he joined the Latin Saints.  He was convicted in April of 2011.

20  That was his first conviction.  And two months later, in June

21  of 2011, he was charged with the aggravated discharge of a

22  weapon.  Now, that was the one count that he was convicted on.

23  He was charged with 45 counts.  And the underlying details of

24  this conviction are set forth in the PSR and in the

25  government's sentencing memo.  But the defendant yelled "Saint

1    Love" at his victims while he sprayed bullets at this man

2    standing in front of his house.  His children and his wife were

3    in his house.  And as the defendant took off running, the

4    victim chased after him, and the defendant continued to fire at

5    him.  The defendant did this in the neighborhood one over from

6    where he lives, in rival gang territory, yelling out the

7    monicker of his gang because he was loyal to the Saints.  This

8    is what he is supposed to do.

9         While he is on bond for that arrest, one year later,

10   in March of 2012, he is arrested for the aggravated UUW.  This

11   is the conviction for which he doesn't receive any criminal

12   history points.  And in this conviction, he and another member

13   of the Latin Saints are driving through La Raza territory.

14   They're driving through La Raza territory, and Mr. Godinez is

15   seen throwing a gun out of the car.  He and the other member of

16   the Latin Saints are driving through La Raza territory because

17   members of La Raza were seen by CPD harassing their friends.

18   And so Mr. Godinez and his buddy Saint drove around looking for

19   someone to get revenge on.  Thankfully, nothing happened, they

20   drove away, but he was then arrested for the IUUW.

21        He is sentenced on both of those charges in March of

22   2015.  He receives a four-year sentence on the 2011, charge and

23   a one-year sentence to run consecutive on the 2012, charge.  He

24   is released from IDOC custody on January 4th of 2016.  While he

25   is on supervised release for those convictions, he is arrested

1 two more times for maintaining contact with the Latin Saints.

2 His supervised release ends on January 4th of 2018. On May 4th

3 of 2018, Mr. Godinez shot Special Agent Kevin Crump in the

4 head.

5 So, your Honor, despite his family's support, his

6 history and characteristics don't mitigate against a lengthy

7 sentence. In fact, we would argue that his violent criminal

8 history and his loyalty to the Saints are an aggravating factor

9 that support the government's recommendation here.

10 And finally, your Honor, the reason for our -- one of

11 the other reasons for our sentence -- two of the other reasons

12 for our sentence is because the community must be protected

13 from the defendant, and the sentence must also deter others

14 from taking the same action. I've talked a lot about the law

15 enforcement officers being the victims here, but the Back of

16 the Yards and the defendant's neighborhoods are also victims of

17 the defendant and the Latin Saints. The defendant saw a car he

18 didn't recognize so the action he took was to hide in a gangway

19 and fire a gun a half a block down at complete strangers from

20 behind. It did not matter to him who those people were. The

21 defendant has no regard for human life. And this defendant,

22 more so than most people, should know the implication of gang

23 violence. His brother was shot and killed by a rival gang just

24 six months prior. The defendant told probation that he was the

25 one to find his brother's body. And yet, six months later, the

1 defendant isn't deterred. He is, in fact, emboldened, and the
2 community has to be protected from such a person.

3 And, finally, your Honor, we recommend such a grave
4 sentence because others have to be deterred from doing the same
5 thing. It cannot be that you shoot a federal agent in the head
6 and you still get out of prison young enough to go right back
7 to being a shooter. But a sentence of 12 years, which is what
8 the defendant recommends, or even a guideline sentence, your
9 Honor, does precisely that. The defendant recommends a
10 sentence of approximately two-and-a-half years for the 111
11 conviction. It's only after the congressionally mandated ten
12 year mandatory sentence is added that he even gets to the
13 12-year sentence. This is wholly insufficient.

14 And even using the high end of the guidelines here,
15 your Honor, which has now been calculated to be 177, your
16 Honor, assume that time in prison is uneventful and the
17 defendant serves only 85 percent of his time in prison, as he
18 rightfully will do if his time in prison is uneventful, he will
19 be released in about 12 years, your Honor. Such a sentence
20 allows a gang member to make -- to make this a business
21 decision. It allows him to contemplate, is it worth 12 years
22 of my life to assault a federal law enforcement officer so that
23 I can continue to conduct my gang business. Such a defendant
24 would likely be young enough that when they're released they
25 can just get right back to it. Just like the defendant would

1  be, your Honor, if he is given even an above-guideline

2  sentence.  He would be in his early 40s when released.  For

3  someone like the defendant, your Honor, with his violent

4  criminal history and the seriousness of the offense, the

5  punishment for shooting a federal officer should not just

6  become the cost of doing business.

7  And for those reasons, your Honor, the government

8  moves that this court sentence the defendant to 180 months on

9  Count 1 and a consecutive term of 180 months on Count 2 for a

10  total of 360 months.

11  THE COURT:  Counsel.  Mr. Pissetzky, proceed.

12  MR. PISSETZKY:  Judge, it was a terrible, terrible

13  thing that happened that night.  Everybody agrees.  The

14  serious -- the seriousness of what happened that night is

15  terrible.  But I want to talk about a few things that the

16  government has raised and I wholeheartedly disagree with.

17  First of all, as you know, your Honor, the law was

18  created by Congress, and the guidelines were created by

19  Congress, and they were created for this specific offense.  And

20  so they took into consideration this specific events and the

21  serious of the offense.  They also took into consideration the

22  difference between an attempt -- what we would call an attempt

23  murder or an -- and a murder.  And that is the reason why there

24  is such great differences in the guidelines to those two

25  separate offenses.  And that is the reason why even in state

1   court there is large discrepancies or differences.

2   Second, your Honor, the government has gone through
3   rehashing exactly what happened in this -- during the trial and
4   the evidence that they presented. And they -- they did that
5   also as a self-serving to get sympathy from the court,
6   especially the extensive explanations of what happened and the
7   fact that these -- that the victim here, Agent Crump, is, in
8   fact, an agent.

9   I want to remind the court, with all due respect to
10  the government and to the agents that are sitting here in
11  court, that the life of an agent is no different than a life of
12  a gang member or a life of somebody else. The fact that
13  these -- that Agent Crump and his -- and the two other agents
14  were on the street there that night doing their job cannot be
15  used to punish Mr. Godinez because these were agents that were
16  doing their job. They signed up for that job. They signed up
17  for a very dangerous job. That's why they carry sidearms.
18  That's why they go through training. They're probably a lot
19  more trained and know what they are going into than a gang
20  member that drives through a neighborhood. They -- that's the
21  reason why they had multiple cars drive prior to the last car
22  that Agent Crump was there to make sure nobody is around.
23  That's why we heard testimony that there were a car up the
24  street and a car down the street, to look around. So the fact
25  that if they were agents and the fact that the victim here was

1  Agent Crump should not persuade your Honor to place more

2  significance on the life of an agent than the life of any other

3  person in general.

4  According to the government, Mr. Godinez was shooting

5  at a gang member. That was their theory at trial. I don't

6  think that they have changed it now, and I still believe that

7  their theory is that Mr. Godinez was -- believed that he was

8  shooting at a rival gang member, a member that he -- the

9  government claims came out of a car, Godinez recognized him

10 possibly as a gang member, and then he shot. There was no

11 testimony at all, and, in fact, the government's entire

12 argument is that he didn't know that they were gang members --

13 or agents. So for the fact that they were agents --

14 THE COURT: That fact is clear, that the theory of

15 the government was that they were shooting rival -- what he

16 thought was a rival gang member, not at federal agents. So I

17 agree with you there, and I think Ms. Babu agrees, too.

18 MS. BABU: We do, your Honor.

19 MR. PISSETZKY: Right. And so the fact that when a

20 person -- when you sentence a person for shooting another, the

21 title of that person doesn't really -- should not really be

22 taken into consideration for aggravation because every -- my

23 life is as valuable as your Honor's life, I think.

24 THE COURT: Well, that's not entirely true. The

25 federal law applies to judges.

1           MR. PISSETZKY:  Right, so, but this -- a life is a
2    life.  And the guidelines already take into consideration that
3    the nature and seriousness of the offense were severe.  Great
4    bodily harm was -- the great bodily harm here increased the
5    guideline sentence by seven points.  That is significant,
6    significant increase.  There is the additional 121 months that
7    the law and the guidelines take into consideration.  So the
8    seriousness of the offense in order to vary upwards has to
9    include more facts, facts such as, he tortured the individual.
10   He had months of planning and taunted the individual and went
11   ahead and caught and kidnaped that individual and stabbed him a
12   few times before shot him.  These are considerations as
13   examples where you should depart upward from the guidelines
14   because they're truly heinous.  They're truly something that is
15   not -- that we don't see and requires additional punishment
16   for.

17           Here, you have a gangland shooting.  Unfortunately,
18   in the Back of the Yards in Chicago, that's where you have -- I
19   don't want to take the seriousness away from it, but that's
20   really what this is.  It's a gang shooting.  One member, one
21   gang member, shooting at another gang member.  It's an
22   unfortunate gang shooting, but it was not a planned shooting of
23   the police officer.

24           Officer -- Agent Winters and Spratte, they could have
25   been charged with the shooting, or the government could have

1   charged Mr. Godinez with the shooting at their direction, and,

2   in fact, there was shooting in their direction.  However, we

3   heard at trial.  At trial, Agent Spratte, with all due respect,

4   did not testify that a bullet whisked through his ear and that

5   he heard it.  I -- as much as he testified, he would have

6   100 percent testified because you don't forget about that.  You

7   don't forget when a bullet flies by your ear.  He would have

8   said it.  And probably one of the first things that he would

9   have said is that, I felt like I was being shot at.  He said, I

10  returned fire to where the shots were coming from, but never

11  really testified that he was being shot at.

12          Now, even if he was added to the indictment, as the

13  guidelines and I think pretrial emphasizes, the guideline range

14  would have been the same.  Agent Winter, Agent Spratte,

15  luckily, thankfully, were not injured, were not taken -- were

16  not a victim in this case as far as being shot by a bullet.

17  And so departing more than double than what the guidelines are

18  is not -- is going to be -- it is a punishment that is not

19  justified to the circumstances here.  The guidelines -- and,

20  again, Agent Spratte and Agent Winter were -- if -- if at all

21  the claim is that the shooter, that the government claimed was

22  Mr. Godinez, saw them coming out of the car -- because, if you

23  remember, we saw the videos and the -- and the alley -- the way

24  the alley, and there were trees in the way, and there were some

25  parked cars in the way.  We don't even know if Mr. Godinez, the

1  shooter, the government claims he was the shooter, was -- even
2  saw the other two individuals.  The shooter certainly saw
3  Spratte.  And the bullet direction, especially the one that
4  was -- there was one in the tree, showed that the bullet
5  directions only went down the street, the way that we can see
6  it.  And, again, the agents joined the ATF with the knowledge
7  that their job is dangerous, your Honor.

8       We agree, and I think that Mr. Godinez agrees, and
9  condemns that shootings in his neighborhood is terrible, is not
10 good.  Mr. Godinez accepts the jury's verdict, but he will
11 appeal it.  Mr. Godinez was, as was described during the
12 testimony, was a weed dealer, a marijuana dealer, in the
13 neighborhood.  He was not a chief.  And there was testimony --
14 and I think that the individual that testified that Mr. Godinez
15 was a chief was impeached and impeached thoroughly on that
16 point.  There was evidence that Mr. Godinez did sell marijuana
17 and some drugs.  Mr. Godinez does condemn the shooting.  And,
18 unfortunately, it's an unfortunate way of life in the city in
19 that manner -- in that area.

20      By the time Mr. Godinez -- he is 29, I believe today.
21      THE DEFENDANT:  Yes.

22      MR. PISSETZKY:  Yeah, he is 29.  The guideline
23 sentence when Mr. Godinez will be released, he will be at least
24 in his mid 40s, your Honor, if your Honor sentences him to a
25 guideline sentence.  You have to consider that age when

1  somebody is released from custody. He is not going to be in

2  his 20s, he is not going to be in his 30s. He is certainly not

3  in his teens anymore. Without ever serving a long prison

4  sentence, let alone in federal custody. The chances that

5  Mr. Godinez will be a repeated offender after he is released of

6  recidivism, your Honor, is very low, according to statistics

7  and according to the fact that Mr. Godinez is going to be in a

8  different stage of his life altogether.

9       A long sentence also will not deter other people,

10  other young people, and I'll explain why. And that really is

11  what we're talking about when we talk about general deterrence.

12  It's not general deterrence through law-abiding citizens, I

13  assume, it's deterrence to people that are similarly situated

14  in these neighborhoods as Mr. Godinez. You don't shoot. You

15  don't want to shoot. That's the message that the government

16  wants to send, we all want to send. However, the people that

17  live in those neighborhoods, first and foremost, usually don't

18  listen to the news. So I know there is some probably news

19  reporters here, and there is going to be reports in the news

20  about this sentence. However, the people in the neighborhood,

21  especially the young people in their late teens, or so, they

22  don't listen and don't -- they don't listen to the news. And

23  if they do, a very long sentence in those neighborhoods might

24  actually anger them more than anything else because they would

25  believe possibly that an injustice was done by sentencing

1    somebody for such a long period of time when they have police

2    officers in the neighborhood harassing them.  Or their

3    mentality, your Honor, is different than the mentality of

4    somebody that does not live in those small neighborhoods.  The

5    effect on the neighborhood of a very long sentence when you

6    send somebody away for a very long time at a certain point

7    becomes a negative effect on the neighborhood, rather than a

8    positive effect because you want to show the neighborhood that

9    you are there to assist them.  And how do you assist --

10              THE COURT:  Where did you get that?  Is there a

11   statistic on that?

12              MR. PISSETZKY:  Your Honor, there is no statistics on

13   it.  However, when -- you can see that the reaction from a

14   neighborhood when you sentence somebody for a long period of

15   time, and they believe it's unjust, they just go out, and they

16   retaliate against another gang member.  They retaliate -- they

17   retaliate against snitches.  They retaliate against other

18   people that they believe the unjust was created.  So if you

19   take somebody from the neighborhood away, they will go out in

20   the neighborhood, or outside of the neighborhood, to retaliate

21   against the unjust.  They take justice into their own hands.

22   And, unfortunately, that's the reason -- that's -- that's what

23   happens in those neighborhoods.  It's not what happens in the

24   North Shore, it's what happens in the inner-city neighborhoods.

25   And that's the reason why we get so many shootings in the

1    neighborhoods, I believe, your Honor, because the people, the
2    young people in those neighborhoods, see things differently,
3    see things as unjust.  And in order for them to correct the
4    unjust, they go out and take things into their own hands.  And
5    that is the reason why I'm saying a very long sentence may
6    have -- may have a negative effect as well, if they see it to
7    be something that was unjust or unfair, if they can point a
8    finger at somebody to blame.

9             Your Honor, as I said before, Mr. Godinez was not a
10   chief.  His father was deported when he was very young.  His
11   mother was -- unfortunately had to work very hard outside of
12   the home most of the time, so that led him to be raised by the
13   neighborhood.  He was outside most of the time.  Unfortunately,
14   and it is a sad way of life, only a few can really get out of
15   that cycle of life.  It was not Mr. Godinez's plan to be born
16   into that life, to be born and raised the way he was born and
17   raised, your Honor.  He is -- he did not choose to be there.
18   And Mr. Godinez did not choose his place of upbringing and did
19   not have the tools to succeed, unlike a person with a parent
20   being present, your Honor.  A father being deported, a brother
21   murdered, sisters being beaten, friends being shot and killed.
22   That is the life that surrounded him.  Mr. Godinez was shot at
23   a certain time.  This is the life of the unfortunate, your
24   Honor.

25             What are we supposed to do?  Are we supposed to

1   sentence them to a long prison sentence?  30 years, 40 years,
2   life?  Throw away the key and look away?  That is not what our
3   reform justice system is all about.  There would be nobody left
4   in the neighborhoods if that is what we are supposed to do.
5   Rehabilitation, and true rehabilitation, which I think the
6   government forgot about in their argument, is what is needed
7   because the argument that -- the argument that the government
8   said is that it's Mr. Godinez's business to calculate I'll be
9   out in 12, 13 years, I can go back to the streets.  The
10  government forgot that, when you go to prison, you're taken out
11  from society.  One of the main purposes of prison -- prison,
12  aside from being punished, is to rehabilitate and to bring
13  people back into society as productive members of society.  And
14  that is what needs to be done, really, in prison.  It's not the
15  length of the sentence because Mr. Godinez, a guideline
16  sentence is very, very lengthy.  He is going to spend over a
17  decade in prison, for sure.  He is going to spend possibly a
18  decade-and-a-half in prison, your Honor.  That's a very long
19  time for somebody to work on rehabilitation.  And if we have
20  that good system in the Bureau of Prisons, which I hope we do,
21  and that is the purpose of it, and that's why we have these
22  reforms, and that's why we have these classes and education
23  that we give people there, that is what really will mark
24  Mr. Godinez when he comes out, to use -- to be able to be given
25  the tools that he was never given in the neighborhood.  That he

was never given, unfortunately, by his -- by his brother or
sisters or neighborhood friends.  It is impossible, it is
almost impossible, when you grow up in an area where it is
almost nature, it is embedded in you that your enemy lives
across the street, unfortunately, your Honor.  It is not your
fault.  This is where you were brought, this is how you were
raised.  This is, unfortunately, if you look at the Middle
East, this is for centuries has been like that.  It's not your
fault that you are almost from -- it's -- you need education.
You need rehabilitation.  Years of hard work might fix that
problem, it might fix the problems in the inner cities of
Chicago, that subconsciousness of hatred to the person who
lives across the street from you.  You're almost born with it,
your Honor.  You're integrated so deeply in those neighborhoods
that it is impossible.  Very few are able to shut it off and
move away.  Very, very few.

          Sure, people make their choices.  I know the
government and people always say, you make your own choices.
But when you don't have the right tools to make those choices,
your Honor, you don't know any difference.  When you don't have
the tools, you don't know any difference.  And prison, a long
prison sentence, is not the answer.  Prison is the answer
because you do need to punish somebody, but a long prison
sentence is not the answer for that.  Sure, you need
punishment, but that's the least important factor in this

1 scenario. You need education. You need to take people like
2 Mr. Godinez -- and I know, and I know, your Honor, you've seen
3 before you people that you have sentenced, and they went to
4 federal prison, and they changed, and they were rehabilitated,
5 and they were given the tools, and now they come out, and they
6 are leaders in the community, in the gang community, trying to
7 convince young people not to offend again. Mr. Godinez has
8 that passion. And he will -- he can be one of those people, if
9 you give him the opportunity, to sentence him to a guideline
10 sentence with the appropriate tools that he can get to
11 rehabilitate himself, to come back to society with these tools
12 and education that he needs.

13 And just like the government said, his family is here
14 to support him, your Honor. A sentence higher than the
15 guidelines is simply unjust in this case. Simply unjust. The
16 guidelines take into consideration all that needs to be taken
17 into consideration here.

18 THE COURT: Mr. Godinez?

19 THE DEFENDANT: Yes, sir. Yes, your Honor.

20 THE COURT: Would you like to make a statement on
21 your own behalf, sir?

22 THE DEFENDANT: Thank you, your Honor, for
23 considering the argument that were represented to you. So
24 thank you for listening to my case. I appreciate the
25 statement -- the speech he just gave here. It's true, you

1  know, I just want to get home to my family, my sons, guide them

2  in the right paths, teach them the best I can, my daughter.  I

3  appreciate you, your Honor.  Sorry about that.  Just --

4  honestly, I'm stuck.  I'm stuck.

5          THE COURT:  It's all right.  Take your time.

6          THE DEFENDANT:  To my loved ones, I love you very

7  much.  I appreciate your support, you know.  I hope that I get

8  home to my -- our beautiful kids.  You know, lead them in the

9  right paths that we can, never give up and do better with

10 ourselves, you know, better ourselves.  I'm going to finish --

11 I'm going to finish getting my CDL, my GED, so I can, you know,

12 get the house you always wanted, you know.  Hopefully I get

13 home to you soon.  God's will.  God bless everybody in this

14 courtroom.  Thank you.  Thank you, your Honor.

15         THE COURT:  Okay.  Anything further?

16         MS. BABU:  Your Honor, we would like -- there are

17 three agents that would like to make statements as well, victim

18 impact statements.

19         THE COURT:  All right.  Have them come forward.

20         Yes, sir.

21         SPECIAL AGENT LOPEZ:  Good morning, your Honor.  My

22 name is David Lopez, and I'm a Special Agent with ATF, here in

23 Chicago.  I was a participant in the operation that occurred in

24 the early morning of May 4, 2018.  Being a law enforcement

25 officer is a dangerous job.  That is something that we, the ATF

1   agents and task force officers out there, were all reminded of
2   that morning.  The placing of covert trackers on vehicles can
3   be described as a pretty routine task when compared to some of
4   the other high-risk operations we conduct.  However, there was
5   nothing routine about that morning.

6          I have worked with Special Agent Kevin Crump since he
7   first arrived in Chicago after he graduated the academy.  He
8   was eager to do the job and quickly became a valued member of
9   our team.  Kevin has become a good friend of mine, and we work
10  together daily.

11         I will never forget hearing the shots that morning.
12  I was in a vehicle a couple blocks away.  To be honest, when I
13  first heard the shots, for just a second, I thought they were
14  unrelated.  Perhaps someone was shooting nearby in the
15  neighborhood.  Kevin, along with Special Agent Dan Winter and
16  Task Force Officer Tom Spratte, had just been dropped off.
17  They were still a block away from the target vehicle.  We had a
18  plan, and we had discussed contingencies, but we never
19  anticipated a scenario where they would be shot at just seconds
20  after exiting their vehicle.

21         When I got to the scene, Kevin was on the ground.  I
22  watched as other members of the team loaded him in the back of
23  Agent Ryan Holcomb's vehicle.  I got into the vehicle with
24  Ryan, and we drove off, first heading to a nearby fire station,
25  but then rerouting directly to the hospital.  During the ride,

1   I climbed to the back seat to provide first-aid to Kevin.
2   Everything up until that moment had happened so fast, but I
3   think it was at that moment that I truly realized the gravity
4   of the situation.  There I was, staring at my friend who was
5   bleeding profusely from his face.  One of the things we're
6   trained to do to treat a gunshot wound is to try and stop the
7   bleeding by covering the wound and applying pressure.  But I
8   couldn't.  The blood was coming out of the front of his face.
9   I did not want to constrict Kevin's breathing.  I felt to
10  myself, I just need to keep him conscious and make sure he
11  keeps breathing.  I did my best to keep Kevin talking.  At one
12  point, he asked me how much longer until we got to the
13  hospital.  I thought he was going to die in the back of that
14  car.  I thought I was going to watch my friend die.  It was a
15  terrifying moment.  I'm not an emotional person, but it's still
16  hard for me to talk about it.

17          Thankfully, Kevin survived that night, and he is here
18  today, just as eager to do the job as he was when he first
19  arrived in Chicago.  This is a testament to the type of person
20  Kevin is.

21          The defendant is an admitted member of the Latin
22  Saints criminal street gang.  A gang that has terrorized the
23  Back of the Yards community and the City of Chicago for years.
24  On the morning of May 4th, the defendant shot another human
25  being from approximately 50 yards away.  He had not had any

1    contact with Kevin.  He had no idea who Kevin was or what Kevin
2    was doing.  This is a testament to the type of person Ernesto
3    Godinez is.  This complete lack of regard for human life is
4    egregious.  Unfortunately, this behavior is routine for the
5    Latin Saints street gang and its members.  It is what has made
6    the gang notorious.  It is the reason we were conducting our
7    investigation.

8            I ask that the court hold the defendant, Ernesto
9    Godinez, accountable for his actions that morning and sentence
10   him to the maximum term of imprisonment.  Not only will this be
11   justice for Kevin, but it will be an example to the thousands
12   of gang members operating in Chicago that this behavior will
13   not be tolerated.

14           I thank the court for your time.  Thank you, your
15   Honor.

16           THE COURT:  Any questions from the defense?

17           MR. HYMAN:  Agent Lopez, you're still working today;
18   true?

19           SPECIAL AGENT LOPEZ:  I'm sorry?

20           MR. HYMAN:  You're working today?

21           SPECIAL AGENT LOPEZ:  Yes, I am.

22           MR. HYMAN:  And you're still working in dangerous
23   situations; true?

24           SPECIAL AGENT LOPEZ:  That's correct.

25           MR. HYMAN:  And so is Agent Crump; right?

1    SPECIAL AGENT LOPEZ:  That's correct.

2    MR. HYMAN:  Nothing else, Judge.

3    THE COURT:  Thank you.  Thank you, Agent.

4    Do you have another one?

5    THE COURT:  Yes, sir.

6    OFFICER SPRATTE:  Good morning, your Honor.  My name
7    is Thomas Spratte, and I was a Chicago police officer assigned
8    to ATF Group 7 in the early morning of May 4, 2018.  My role
9    that morning, like it had been numerous times before, was to
10   replace two of the court-ordered tracking devices on vehicles.
11   These early mornings were never normal routine for us because
12   we knew the type of individuals we were dealing with.
13   Individuals like Ernesto Godinez, a violent street gang member
14   that has caused so much pain and suffering to the citizens of
15   Chicago.

16        That night, Special Agent Kevin Crump, Daniel Winter
17   and myself exited our vehicle to conduct this covert mission
18   when we were almost immediately met with direct gunfire.  I
19   will never forget the sounds and some of the things I saw that
20   night.  The muzzle flashes as I turned my head when I heard the
21   shots, the sound of a bullet whistling past me, or my friend's
22   voice when a bullet tore through his flesh.  I will live with
23   many regrets from that night for the rest of my life, but none
24   more than not immediately recognizing that my friend had just
25   been critically wounded.  I had no choice but to immediately

1    return fire and to try to stop this dangerous individual that
2    had no regard for human life who decided to shoot at three
3    individuals who are half a city block away.  People he had
4    never met.
5           What felt like an eternity to me was merely seconds.
6    But I have to live with knowing that Kevin laid there on his
7    own, courageously fighting for his life while holding his own
8    wounds.  As myself and Special Agent Winter ran back to find
9    our friend between the sidewalk and the street, we both knew
10   there was no time to spare.  Kevin was holding his neck while
11   blood was coming through his fingers and face.
12          I was torn on what my -- I was torn on what my next
13   actions would be.  I immediately ran to try to get the vehicle
14   to take Kevin to the hospital and have one of our members
15   notify CPD to try to get some help while Dan stayed with Kevin.
16   I remember placing myself between them and where the shots had
17   come from because I didn't know the intent was, if we were
18   going to be shot at again.
19          ATF agents, CPD officers, along with Kevin's own
20   courage and determination, saved his life that night.  After
21   Kevin was loaded into Special Agent Holcomb's vehicle, we tried
22   briefly locating the offender.  However, I ended up being
23   transported to the hospital to be examined as well.  After I
24   was released from the hospital later that morning, I spent the
25   next couple days at the hospital with Kevin.  There I got to

1  meet his family where I saw firsthand the toll his action had

2  taken on them and mine.

3      I was placed on a 30-day administrative duty pursuant

4  to my department's policy.  It is then when I started to

5  realize the effects this incident had taken on me.  I had

6  trouble sleeping, and all I could think about was what happened

7  that morning.

8      I re-live that early morning a thousand times.  I was

9  feeling guilty.  Kevin was a new agent, and this was the first

10  time he exited the vehicle with me to place trackers.

11      I had a hard time believing that someone could be so

12  evil and have so little regard for a human's life.

13      The defendant's intent was to kill us that night.  I

14  will forever be changed because of his actions.  Every time I

15  look at my friend, I get a bad feeling in the pit of my stomach

16  because I'm reminded of what Kevin had to go through.  Kevin is

17  one of the strongest and hard-working individuals I know, and

18  it showed in his determination to fight.  There hasn't been a

19  day that has gone by that I haven't thought about that, and I

20  don't think there ever will be.

21      I ask the court, hold the defendant, Ernesto Godinez,

22  accountable for his actions that morning and sentence him to a

23  maximum term of imprisonment.

24      THE COURT:  Thank you.  Any questions?

25      MR. HYMAN:  Officer, you're still working today;

1  true?

2          OFFICER SPRATTE: Yes, sir.

3          MR. HYMAN:  And you're still involved with

4  investigating other gangs; true?

5          OFFICER SPRATTE: Not currently, sir.

6          MR. HYMAN:  You never -- when you turned to fire in

7  the direction of where you saw the muzzle flashes, you never

8  saw this man; true?

9          MS. BABU:  Your Honor, these are not questions that

10 are relevant to the victim impact statement.

11         THE COURT:  I will let it stand.  Go ahead.

12         MR. HYMAN:  You never saw him?

13         OFFICER SPRATTE:  No, sir.

14         MR. HYMAN:  Okay.  Nothing else, Judge.

15         THE COURT:  Anything further?

16         MS. BABU:  Agent Crump would like to make a

17 statement.

18         THE COURT:  Okay.

19         AGENT CRUMP:  Good morning, your Honor.

20         THE COURT:  Good morning.

21         AGENT CRUMP:  My name is Kevin Crump, and on May 4,

22 2018, I was shot by Ernesto Godinez.  I am here today to

23 describe how the actions of Mr. Godinez have changed my life so

24 that the full impact of this crime is brought to your

25 attention.  I apologize if I repeat some facts that have

1  already been mentioned today, but I would like to tell you my

2  account of this morning from my point of view.

3  My colleagues and I were in Mr. Godinez's

4  neighborhood on the early morning hours of May 4th as part of

5  an operation to install GPS trackers on multiple vehicles.

6  These vehicles were specifically chosen due to their

7  involvement in local crimes associated with the Latin Saints

8  street gang, the gang that Mr. Godinez himself was a part of.

9  This operation was one of many we conducted in the

10  Back of the Yards neighborhood in 2018.  Our overall goal was

11  to reduce the violent crime and improve the quality of life for

12  all the residents living there.  Installing these trackers is

13  normally a routine task that requires only a few individuals to

14  safely complete.  However, due to the violence fueled by the

15  members of the Latin Saints street gang, we chose to have 11

16  law enforcement members present in the immediate area.

17  However, none of us expected that our mere presence on that

18  quiet morning would instigate such a violent attack by

19  Mr. Godinez.

20  At approximately 3:18 a.m., as we simply walked down

21  the street, keeping to ourselves, Mr. Godinez appeared from

22  behind and ambushed us.  Without any warning, he began firing

23  multiple rounds at our backs.  As I turned around to the sound

24  of the gunfire, one of the rounds struck me in the side of the

25  head and exited directly between my eyes.  I immediately fell

1  to the ground but was able to find cover before Mr. Godinez
2  could hit me again.

3  Fortunately, my team members were able to suppress
4  Mr. Godinez's gun fire and come to my aid within seconds.  They
5  immediately threw me into a vehicle and rushed me to the
6  hospital, saving my life.  I am confident that, had they not
7  been there, Mr. Godinez would have left me in the street for
8  dead.

9  The ride to the trauma center is something I will
10  never forget.  I felt the blood pouring from my face and
11  somehow making its way to the back of my mouth and obstructing
12  my breathing.  I began to fully realize that I was just shot in
13  the head, and I assumed at any moment I would lose
14  consciousness and possibly never wake up.  I didn't immediately
15  understand why I was unable to see or why I couldn't easily
16  breath.  It would take the next several months for me to
17  completely understand the severe damage that the single gunshot
18  wound inflicted.

19  I initially spent five nights in the trauma intensive
20  care unit.  I learned that the bullet traveled behind my face,
21  broke my jaw, pierced through my eye muscles and blew out my
22  nose bridge, destroying my sinuses.  I spent months visiting a
23  variety of doctors in an attempt to repair my vision and my
24  face.  After undergoing a third surgery last year, doctors were
25  able to repair most of the cosmetic injuries; however, the

1 damage that remains to my left eye is permanent.

2 I am currently 28 years old with less than three

3 years into my law enforcement career, and for the rest of my

4 life I will not have the full use of my left eye.  Throughout

5 this recovery of this injury, I was forced to miss months of

6 work, planned vacations, many gatherings with family and

7 friends.  While those close to me understood the reason for my

8 absence, they continued to struggle in understanding why this

9 attack had happened in the first place.  I too continue to

10 struggle understanding why Mr. Godinez chose the actions that

11 he did.

12 Without the support of my other team members that

13 morning, I am not sure if I would even be here today.  And even

14 though not everyone here received physical injuries during the

15 attack, we all became victims of Mr. Godinez's homicidal

16 behavior that morning.

17 Although surviving the attack brings a sense of -- a

18 big sense of relief, being a victim in this process comes with

19 its own frustrations.  From the moment Mr. Godinez was

20 arrested, through the trial and conviction, and what has

21 continued somewhat through today's hearing, many have attempted

22 to portray Mr. Godinez as a family man who has changed his ways

23 from his criminal past.  I stand here before you to tell you

24 that this narrative is and has always been completely false.  I

25 am in a unique position as I address this court today as not

1   only one of the victims of this attack but also as a member of

2   law enforcement who has investigated the Latin Saints,

3   including Mr. Godinez and his criminal past prior to being shot

4   by him.

5           As the government discussed today, Mr. Godinez has

6   been convicted for numerous felonies in the past, including a

7   prior shooting and a prior illegal possession of firearm here

8   in Chicago after serving minimal time in prison.

9           MR. PISSETZKY:  Your Honor, I would object that

10  that's not a victim statement.

11          THE COURT:  Overruled.  It's his statement.

12          AGENT CRUMP:  After serving minimal time in prison

13  for these convictions, Mr. Godinez returned to the Back of the

14  Yards neighborhood where he continued to actively be involved

15  in Latin Saints drug operation to carry out acts of violence on

16  behalf of the gang.  I discuss these prior convictions and

17  actions to highlight the fact that he has had multiple chances

18  to learn from his mistakes and turn his life around.  He simply

19  has chosen not to.  He could have easily let us walk through

20  his neighborhood, undisturbed on the morning of May 4th;

21  however, he simply chose not to.  Instead, he ran into his

22  house, grabbed his gun, and without any regard for human life,

23  began firing multiple gunshots at the back of three strangers

24  quietly walking down the street.  I fear that if the

25  appropriate sentence is not imposed on Mr. Godinez today, he

1 will continue his life of violence and only more victims will

2 suffer.

3 I feel like it is time that the criminal justice

4 system do what it is intended to do, keep the criminals locked

5 up and the community safe. I realize that you have the final

6 say on the recommendation of Mr. Godinez's sentence.

7 Considering the violent nature of this crime, the lifelong

8 effect it has on my life, the effect it has on others, and the

9 simple fact that Mr. Godinez had clearly not learned from his

10 prior convictions, I ask that you sentence Mr. Godinez to the

11 maximum sentence allowable my law. Thank you for your time,

12 your Honor.

13 THE COURT: Questions?

14 MR. PISSETZKY: Sir, to the probation officer you

15 stated that a sentence of 20 to 25 years you feel is

16 sufficient; right?

17 AGENT CRUMP: I may have said that at the time. I

18 can't recall.

19 MR. PISSETZKY: Thank you.

20 MR. HYMAN: Nothing else, Judge.

21 THE COURT: Anything further?

22 MS. BABU: No, your Honor.

23 THE COURT: Okay.

24 AGENT CRUMP: Thank you.

25 THE COURT: Thank you. Sentencing is not the easiest

1    job.  Here we have a very, very, very serious, everybody

2    agrees, a very serious crime with very serious results, not

3    just to Officer Crump, but to the other officers who were under

4    fire.  So everybody agrees this is very serious and that -- and

5    certainly the injuries that Officer Crump sustained were and

6    remain very serious.

7              The guidelines take into consideration the nature of

8    the charge here, which was assault on a federal officer and use

9    of a firearm in a crime of violence.  Congress has determined

10   that the use of a firearm in conjunction with a crime of

11   violence is very serious, and they mandated a ten-year -- at

12   least ten-year minimum sentence for such a crime.  They have --

13   assault on a federal agent is also very serious.  In this

14   particular case, there -- I believe that we said the guideline

15   calculations would have been 46 to 57 months, which makes the

16   total guideline sentence of 166 to 177 months.

17             Now, as everybody knows, since the guidelines are not

18   mandatory, they're discretionary on the part of the court, they

19   are merely a point of reference so that we know that the

20   drafters of the guidelines believe that the sentence -- the

21   crime that was committed here at least be in the range of 166

22   to 177 months.  But we also know that the court must consider

23   the various sentencing factors which have been discussed here:

24   The seriousness of the crime, the background of the offender,

25   the history and characteristics of the offender, deterrence,

1  both general and specific.

2  We can start on deterrence. If I believe that

3  anything I could do that would eliminate crimes of violence --

4  gun violence in the -- any part of the City of Chicago, I would

5  be happy to try to do that. But I know that, no matter what

6  happens, we're going to continue on the current path, at least

7  for the near future. I don't think anything I do, as far as

8  general deterrence is concerned, is going to really do much.

9  First of all, it's pointed out that people who are to

10  be deterred probably aren't aware of what's going on, as far as

11  sentencings are concerned, and there is a -- I believe an

12  abiding understanding on the part of the criminal population

13  based upon what they understand happens in state court, not

14  what happens in federal court. I recall once, when I was at a

15  session with the Federal Judicial Conference, we had a

16  discussion with a series of federal offenders who were

17  incarcerated. Not a single one of them was aware that there

18  was a federal sentencing guidelines, that there even was a

19  federal court. Their total experience in almost every instance

20  was that they were handled through the state court. So the

21  fact that we take crimes of violence more serious than the

22  state court unfortunately does not have a particular deterrent

23  effect on the general population.

24  Now, obviously, specific deterrence, anything I do

25  will deter Mr. Godinez for, at least for the near future,

1  committing any particular crimes because he will be off the

2  street.

3        And the other -- the other comment about deterrence

4  is concerned, there almost is a reverse deterrence in the --

5  some of the communities here in the City of Chicago because

6  violence begets violence.  There is a shooting that occurs, and

7  then there is going to be retribution carried out, which is

8  more violence, and then there is going to be retribution and

9  more violence, and it's a -- unfortunately it's almost a

10 reverse deterrence.  Committing a crime and to be deterred by

11 the community itself through the form of retribution just

12 begets more violence, and that seems to be the unfortunate

13 situation that we are in.

14        So it appears to me that general deterrence, I would

15 love to think that whatever I do today would have some effect,

16 but I doubt that it particularly will.  I know that we've had a

17 lot of gang trials in this courthouse.  We've put away a lot of

18 gang members, and it doesn't -- it seemed to -- they don't seem

19 to run out of replacement.  So as far as deterrence is

20 concerned, unfortunately general deterrence is not particularly

21 valuable.

22        Now, as far as the seriousness of the crime, as I

23 said, Congress itself, drafting the guidelines and drafting the

24 statute, has made these particular two crimes to which

25 Mr. Godinez is charged and was convicted very serious.  And

1  we're talking about close to, let's see, 180 months, which is

2  15 years of a person's lifetime.  And, again, that is the --

3  what Congress has established is the appropriate here.

4         Now, the crime here, again, there are crimes and

5  there are crimes.  We have here a crime against federal

6  officers, and it is, I think, very relevant that, as far as

7  Mr. Godinez is concerned, he did not know that he was shooting

8  a federal officer.  He thought he was shooting a foe, another

9  member of another gang that happened to tread onto his

10  territory.  That doesn't make his crime less serious.  He is

11  trying to take human life, and he almost succeeded here.  And I

12  believe it's -- it's just a blessing that he was unsuccessful,

13  as far as being able to take the life of what he thought was a

14  flake what turned out to be a federal officer.  So it was

15  happenstance that he -- again, it was not a case where he

16  started, I'm going to go get the pigs, and there goes one and

17  shoot the pig.  We've seen crimes like that that have occurred,

18  and that, I think, is a very, very, very serious form of a

19  particular crime which Mr. Godinez has been charged with.  So

20  that -- it doesn't make the crime less serious, but it puts it

21  a little bit in perspective on why the particular guidelines

22  probably are what they are rather than what they would have

23  been.

24         Now, if you had killed Officer Crump, as pointed out,

25  the guidelines itself would have been no more than 365 months.

1    But, again, of course, we're, again, talking about

2    discretionary period of time.  But, nevertheless, the fact of

3    the matter is that a person who is killed is obviously more

4    serious than the person who is wounded, in most cases.  Now,

5    there are cases where people obviously had been turned into

6    vegetables, which could very well have happened in this

7    particular case.  And the grace of God it didn't.  And

8    everybody is so happy to see that Agent Crump is, in fact, able

9    to resume his life work of being a law enforcement official.

10   Although, again, one can only imagine what the effect on his

11   mental feelings are and also the mental feelings of his

12   colleagues who were under fire on that particular day.

13          So, anyway, we talk about the seriousness of the

14   crime.  And then the next, the history and characteristics of

15   the defendant.  Now, there is some -- there is very little

16   that's good.  There is some good, however, and I will mention

17   that.  It turns out, at least based upon what I read in the

18   pre-sentence report, that he did take his fatherhood seriously.

19   He actually went and took -- when the mother of his children

20   wouldn't let him see them, he actually went and sought to

21   obtain the right to see the children and submitted himself to

22   taking a fatherhood class, and so forth.  And I've also

23   received the letters from some of his family members and

24   acquaintances which indicate that he isn't totally a monster,

25   that he does have some good points which I'm hopeful that --

1  because he will get out at some point, that this will stand him
2  well.

3        However, the fact that he is a dyed-in-the-wool Latin
4  Saint who, unbelievably, had a brother that six months before
5  was murdered, and he himself about, I guess about 10, 12 years
6  ago was shot himself, and he -- I believe he was shot in the
7  hand, wasn't that what -- I believe.

8        MS. BABU:  I believe it was in 2017, your Honor.

9        THE COURT:  Pardon?

10       MS. BABU:  The shooting was in 2017.

11       THE COURT:  Yeah, so, I mean, he has had experience
12  on being on the receiving end, not personally, as far as his
13  brother is concerned, but on the receiving hand in the sense
14  that a family member was murdered.  And he himself was shot,
15  presumably, in a gang-line type of proceeding.  So with that
16  experience, you'd think that he would learn something, but he
17  did not.  There is -- so there is some mitigation as far as his
18  own personal belief is concerned, but it's not much.  The fact
19  that he would be right back, six months after he was -- his
20  family was a victim, that he would be back shooting people.
21  But, again, we get into that kind of reverse deterrence
22  situation.

23       So what the sentence should be is always difficult,
24  particularly when we receive discretion because we have an
25  obligation to the community, we have an obligation to the

1  defendant in that somebody should receive a sentence that's

2  adequate and not excessive but not too low that it amounts to a

3  slap on the wrist.  And it just occurs to me that 360 months,

4  as recommended by the government and by the probation officer,

5  is excessive.

6        What it should be is difficult.  Again, the crime is

7  extraordinarily serious.  His history as a seasoned gang member

8  criminal is serious, and certainly the sentence should be at

9  the, certainly, at the upper end of whatever range that we can

10  think about.  It appears to me that all the factors --

11  considering all the factors, that a sentence of 200 months

12  custody is the appropriate sentence, to be followed by ten

13  years supervised release.  I'm going to waive a fine because of

14  inability to pay, and we should now deal with the terms of

15  supervised release.

16        Have the -- Mr. Pissetzky, have you and Mr. Hyman

17  gone over the proposed terms of supervised release?

18        MR. PISSETZKY:  Yes, your Honor.

19        THE COURT:  Are there any objections?  We'll go over

20  them in detail, but have you discussed them with Mr. Godinez?

21        MR. PISSETZKY:  Your Honor, generally they are

22  acceptable.  There is a couple of things when we go

23  individually I will point to the court.

24        THE COURT:  All right.  Well, they start out with the

25  mandatory conditions, 1, 2, 5 and 6.  Not commit another

1  crime --

2          MS. BABU:  Your Honor?

3          THE COURT:  Yes.

4          MS. BABU:  If I may interrupt?  I apologize.  Before

5  you continue, I believe for the supervised release term, I

6  believe that the maximum term of supervised release that can be

7  imposed is five years.

8          THE COURT:  Oh, it's five years?

9          MS. BABU:  I believe that's correct, your Honor.

10          MR. PISSETZKY:  I was actually going to raise that.

11          THE COURT:  Five years supervision.  Thank you.

12  Refrain from using -- give a DNA sample, not possess controlled

13  substance, not use a controlled substance, and submit to drug

14  tests.  Is there any objection to those?

15          MR. PISSETZKY:  No, your Honor.

16          THE COURT:  All right.  Then the discretionary

17  conditions:  One, provide financial support for and seek work

18  conscientiously or pursue conscientiously a course of study or

19  vocational training that will equip you for employment.

20          Six:  You shall not knowingly meet or communicate

21  with any person known to be engaged in criminal activity and

22  shall not knowingly meet or communicate with the following

23  persons:  Known gang members.  Any objection to those?

24          MR. PISSETZKY:  No, your Honor.  The only problem

25  here is that, as the government claims, some of my client's

1    immediate family members are potentially gang members.  So it

2    kind of puts it in a -- in a scenario where it's almost

3    impossible to avoid it.

4              MS. BABU:  Your Honor, we are fine, with the

5    exception of his brother, Rodrigo Godinez, who is the --

6              THE COURT:  All right, with the exception of family

7    members.

8              MR. PISSETZKY:  Thank you, Judge.

9              THE COURT:  All right.  Seven:  Refrain from any use

10   of -- excessive use of alcohol.

11             MR. PISSETZKY:  We would ask for it to be excessive

12   use of alcohol, your Honor.

13             THE COURT:  Any objection by the government to make

14   it excessive?

15             MS. BABU:  No, your Honor.

16             THE COURT:  Okay.  We will make it excessive.

17             Shall not possess a firearm, destructive device or

18   other dangerous weapon.

19             MR. PISSETZKY:  No objection.

20             THE COURT:  Nine:  You shall participate at the

21   direction of a probation officer in a substance abuse treatment

22   program which may include urine testing up to a maximum 104

23   tests per year.

24             MR. PISSETZKY:  No objection.

25             THE COURT:  14, you shall not knowingly leave from

1    the Federal Judicial District where you are being supervised,

2    unless granted permission to leave by the court or probation

3    officer.

4              MR. PISSETZKY:  No objection.

5              THE COURT:  15, you shall report to the probation

6    officer as directed by the court or a probation officer.

7              MR. PISSETZKY:  No objection.

8              THE COURT:  16, you shall permit a probation officer

9    to visit you at any reasonable time, at home, work, school,

10   community service location, other reasonable locations

11   specified by the probation officer.  You shall permit

12   confiscation of contraband observed in plain view of a

13   probation officer.

14             MR. PISSETZKY:  The only objection I have is for at

15   work and at school.  I find that to be very intruding and could

16   lead to unfortunate situations sometimes.

17             THE COURT:  Any objection to any of those?

18             MS. BABU:  Your Honor, we think that it is

19   appropriate here to include it at work and at school and allow

20   probation to do that at their discretion.

21             THE COURT:  It does give them discretion to eliminate

22   that, so that they wouldn't have to.  If he has a job, and the

23   probation officer is certainly capable of knowing whether or

24   not a person would lose the job if they show up.  So that's

25   permission of the probation officer.  It doesn't mandate the

1   probation officer to do that.  So your objection is overruled
2   on that.
3            17, notify a probation officer 72 hours after
4   becoming aware of any change in residence, employer or work
5   place.  And absent constitutional and other legal privilege,
6   answer inquiries by a probation officer.  You shall answer
7   truthfully any inquiries by the probation officer, subject to
8   any constitutional or other legal privilege.
9            MR. PISSETZKY:  No objection.
10           THE COURT:  18, you shall notify a probation officer
11   72 hours after being arrested, charged with a crime or
12   questioned by law enforcement officer.
13           MR. PISSETZKY:  No objection.
14           THE COURT:  22, you shall satisfy such other
15   conditions listed below.
16           23, submit your person, property, house, residence,
17   vehicle, papers, computers, other electronic communication,
18   data storage devices or media or office through the search
19   conducted by United States Probation Officers.  Any objection
20   to that?
21           MR. PISSETZKY:  I do have an objection to that.  I
22   mean, this is not relevant to this type of a case.
23           MS. BABU:  Your Honor, we think this is appropriate,
24   particularly --
25           THE COURT:  Okay.  I'll leave that over your

1  objection.

2        On supervised, comply with the following special

3  conditions:  If you have not obtained a high school diploma or

4  equivalent, you shall participate in a General Education

5  Development preparation course and seek a GED within the first

6  year of supervision.

7        MR. PISSETZKY:  No objection.

8        THE COURT:  Two, you shall participate in approved

9  job training program at the direction of a probation officer

10  within the first 60 days of placement of supervision.

11        MR. PISSETZKY:  No objection.

12        THE COURT:  Three, you shall, if unemployed after the

13  first 60 days of supervision, or if unemployed for 60 days

14  after termination or layoff, perform at least 20 hours of

15  community service at the direction of a probation officer until

16  gainfully employed.  The amount shall not exceed 400 hours.

17        MR. PISSETZKY:  No objection.

18        THE COURT:  Ten, you shall pay the clerk any

19  financial obligations ordered herein that remains unpaid at the

20  commencement of the term -- is there any restitution?

21        MS. BABU:  There is not, your Honor.

22        THE COURT:  Okay. Really, the only $100 is the only

23  financial obligation, so I don't think we need that.

24        11, you shall not enter into any agreement to act as

25  an informer or special agent of a law enforcement agency

1    without permission of the court.

2              MR. PISSETZKY:  No objection.

3              THE COURT:  You shall observe one re-entry court

4    session as instructed by your probation officer.

5              MR. PISSETZKY:  I'm not sure what that is.

6              MR. HYMAN:  I'm not sure what that is.

7              THE COURT:  Well, it's something that's new.

8              MS. BABU:  It's re-entry court proceedings here in

9    the federal court, your Honor.

10             THE COURT:  It's something for their benefit.

11             MR. PISSETZKY:  Okay.

12             THE COURT:  Or for his benefit, I should say.

13             MR. PISSETZKY:  No objection.

14             THE COURT:  Mr. Godinez, you're entitled to appeal

15   every aspect of your case, including any errors that occurred

16   during the course of the trial, or prior to trial, and your

17   sentence here today.  Do you understand that, sir?

18             THE DEFENDANT:  Yes, sir.

19             THE COURT:  In order to do so, you must file a

20   written notice of appeal within 14 days, and I will ask

21   Mr. Hyman and Mr. Pissetzky to discuss with you whether you

22   wish to appeal, and if you do, to file a notice of appeal on

23   your behalf.  Will you do that, Gentlemen?

24             MR. PISSETZKY:  Yes.

25             MR. HYMAN:  Yes.

1          THE COURT: All right. And if you cannot afford an

2 attorney while on appeal, one will be appointed to represent

3 you. Do you understand that, sir?

4          THE DEFENDANT: Yes, sir.

5          MR. PISSETZKY: You Honor, and we have been appointed

6 on this case, so we'll continue through the appeal.

7          THE COURT: All right. Well, I mean, he doesn't --

8 you know, if he decides to appeal, he will be entitled to, if

9 he can't afford an attorney, to have one appointed. And I

10 assume it would be you gentlemen.

11          Is there anything further?

12          MS. BABU: No, your Honor.

13          MR. PISSETZKY: Your Honor, two things: Would you

14 please recommend a drug treatment program at the Bureau of

15 Prisons as well?

16          THE COURT: All right. I'll recommend that he

17 receive drug treatment while incarcerated. And, also, I would

18 assume he will receive vocational training.

19          MR. PISSETZKY: Right. And to be placed in a

20 facility close to Chicago.

21          THE COURT: All right. And in a facility close to

22 Chicago.

23          MR. PISSETZKY: Thank you.

24          THE COURT: Anything further?

25          MR. PISSETZKY: No, your Honor.

1            MR. HYMAN:  No, your Honor.

2            PROBATION OFFICER:  Good morning, your Honor.

3    Rebecca Fowlie on behalf of the probation department.

4            THE COURT: Yes.

5            PROBATION OFFICER:  I'm hoping you could specify the

6    200 months, how it's to run on the two counts.

7            THE COURT:  Oh, between the two?  120 on the -- on

8    Count 2 and 80 on Count 1.

9            MR. PISSETZKY:  Yes, Judge.

10            THE COURT:  Okay.

11            PROBATION OFFICER:  Thank you, your Honor.

12            THE COURT:  Thank you.

13            MR. PISSETZKY:  Thank you, your Honor.

14            MR. HYMAN:  Thank you very much.

15        (Which were all the proceedings heard.)

16                        CERTIFICATE

17        I certify that the foregoing is a correct transcript from

18    the record of proceedings in the above-entitled matter.

19

20    /s/ *SANDRA M. MULLIN*_____            February 13, 2020

21    SANDRA M. MULLIN, CSR, RMR, FCRR
      Official Court Reporter
22

23

24

25