1          IN THE UNITED STATES DISTRICT COURT
      FOR THE NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION

3  UNITED STATES OF AMERICA,        )
                                    )
4            Plaintiff,             )
                                    )
5       v.                          )  No. 18 CR 00278
                                    )
6  ERNESTO GODINEZ,                 )  Chicago, Illinois
                                    )  June 11, 2019
7            Defendant.             )  10:00 a.m.

8                      VOLUME 2-A
             TRANSCRIPT OF PROCEEDINGS - Trial
9     BEFORE THE HONORABLE HARRY D. LEINENWEBER and a Jury

10  APPEARANCES:

11  For the Plaintiff:        HON. ZACHARY T. FARDON
                             United States Attorney
12                           BY:  MS. KAVITHA J. BABU
                                  MR. NICHOLAS J. EICHENSEER
13                           Assistant United States Attorneys
                             219 South Dearborn Street, Suite 500
14                           Chicago, Illinois 60604
                             (312) 353-5300
15
    For the Defendant:        MR. LAWRENCE H. HYMAN
16                           111 West Washington Street
                             Suite 1025
17                           Chicago, Illinois 60602
                             (312) 346-6766
18
                             PISSETZKY & BERLINER
19                           BY:  MR. GAL PISSETZKY
                             35 West Wacker Drive, Suite 1980
20                           Chicago, Illinois 60601
                             (312) 566-9900
21

22  Court Reporter:           Judith A. Walsh, CSR, RDR, F/CRR
                             Official Court Reporter
23                           219 South Dearborn Street, Room 2118
                             Chicago, Illinois 60604
24                           (312) 702-8865
                             judith_walsh@ilnd.uscourts.gov
25

I N D E X

OPENING STATEMENT ON BEHALF OF PLAINTIFF     Page 223

OPENING STATEMENT ON BEHALF OF DEFENDANT     Page 232


| WITNESS | DX | CX | RDX | RCX |
|---------|----|----|-----|-----|
| DANIEL WINTER | | | | |
| By Ms. Babu | 251 | | | |
| By Mr. Hyman | | 277 | | |
| STEVE CRAIG GREENE | | | | |
| By Mr. Eichenseer | 295 | | | |
| By Mr. Pissetzky | | 352 | | |
| PAUL GREENE | | | | |
| By Ms. Babu | 372 | | 409 | |
| By Mr. Hyman | | 393 | | 410 |

E X H I B I T S

| NUMBER | RECEIVED |
|--------|----------|
| Government Exhibit | |
| Nos. 100 through 102 | 264 |
| Nos. 103 and 104 | 266 |
| Nos. 200 and 201 | 267 |
| No. 108 | 275 |
| Nos. 109, 110, 110-A, 111, 112 and 113 | 313 |
| | |
| Godinez Video 1 | 357 |

1    (Proceedings heard in open court:)

2         THE CLERK:  18 CR 278, United States versus Godinez.

3         THE COURT:  Appearances?

4         MR. PISSETZKY:  Gal Pissetzky and Larry Hyman for

5    Mr. Godinez who we're expecting to come out.

6         THE COURT:  Oh, that's right.  We're waiting for him.

7    Is he on his way down, I hope?

8         THE CLERK:  Yes, sir.

9         THE COURT:  He's on his way down.  We talked about --

10   please be seated, everybody.

11        We talked about, we'll pick two alternates.

12        MR. HYMAN:  Yes.

13        THE COURT:  Each side gets one challenge.  So I

14   purport, why don't I interrogate four jurors, and then you can

15   pick whatever ones you like.

16        MR. PISSETZKY:  "Interrogate them"?

17        THE COURT:  If you like all of them, we'll take all

18   of them.  Does that work?

19        MR. PISSETZKY:  Yes.

20        THE COURT:  Both sides agree to do it that way?

21        MR. PISSETZKY:  Yes.

22        MS. BABU:  That's fine by the government, your Honor,

23   just for the record.

24        THE COURT:  If we can't get four, we'll go as far as

25   we can.

1          MS. BABU:  That's fine for the government, your

2     Honor.  And for the record, Kavitha Babu and Nick Eichenseer

3     for the government.

4          THE COURT:  Okay.  As soon as we get him down here,

5     we will bring the jurors in here.

6          (Pause.)

7          MR. PISSETZKY:  Judge, before we start, can we raise

8     something?

9          THE COURT:  Yes.  Your client is not here.  Is that

10    all right?

11         MR. PISSETZKY:  Yes.

12         THE COURT:  All right.

13         MR. PISSETZKY:  The government just gave us a video

14    of, an agent took a video of the alley behind where they claim

15    my client cut across.  That is the reason why we wanted to

16    take the jurors to the scene.

17         Today, the government gives us a video that their

18    agent took sometime a couple -- or a couple days ago for, I'm

19    assuming, purposes of showing the jury what this place looked

20    like during the daytime because the video from the nighttime

21    is very grainy.

22         I think that this video that produced by the agent is

23    not accurate.  It's the way that he perceived things.  And

24    that is the reason why we wanted to take the jurors to the

25    scene because they need -- in our opinion, they need -- they

1  actually need to see in their own eyes what it looked like

2  without us telling them anything, just to bring them to the

3  scene and to look at the alley and to look at the -- if the

4  government is going to request to introduce that video, we're

5  going to object to it because it's not a video that portrays

6  anything.

7  THE COURT: Either it does or it doesn't. And the

8  witness, they know how to prove up an exhibit, so if they do,

9  they do.

10  Here's what I'll do. I will not foreclose that, but

11  we'll wait until your case.

12  MS. BABU: And, your Honor, if I may, the agent will,

13  of course, lay the foundation for the video. We -- the agent

14  will testify that the video was taken last week and will be

15  able to state when the video was taken, how it was taken, but

16  also the defendant has taken photos of the neighborhood and

17  has given them to us to be able to prove up what they believe

18  it looks like.

19  THE COURT: What I will do is I will deny the motion

20  without prejudice. You can raise it in your case, and I will

21  at that time assess in my own mind whether I think it has been

22  fairly done.

23  MR. PISSETZKY: Thank you.

24  THE COURT: All right. So as soon as he's down here,

25  away we go.

1    (Recess from 10:05 a.m. to 10:12 a.m.)

2    (Proceedings heard in open court.  Prospective jurors in.)

3    THE COURT:  Good morning, ladies and gentlemen.

4  You've been called here to participate in jury selection in a

5  case entitled United States of America versus Ernesto Godinez.

6  The -- I'm going to give you a description of the case so that

7  you'll understand somewhat about what the case is about.

8    Defendant, Ernesto Godinez, has been charged with

9  assaulting a special agent of the Bureau of Alcohol, Tobacco,

10  Firearms, and Explosives, also known as the ATF, on May 4th,

11  2018, and using a firearm during the assault.  Specifically,

12  Count 1 of the indictment alleges that the defendant used a

13  firearm to inflict bodily injury upon the special agent while

14  the agent was performing official duties.  Count 2 of the

15  indictment alleges that the defendant used and discharged a

16  firearm during the assault of the agent.

17    The defendant has pled not guilty of the charges.

18  And the purposes of this trial is to determine whether or not

19  the government has sufficient evidence to approve the charges

20  beyond a reasonable doubt.  That's what this case is all about.

21    Now, I'm going to introduce the participants.  The

22  government is represented by Ms. Kavitha Babu and Mr. Nicholas

23  J. Eichenseer.

24    Would you introduce the people at your table,

25  Ms. Babu?

1    MS. BABU:  Good morning, ladies and gentlemen.  My

2  name is Kavitha Babu.  This is my trial partner Nicholas

3  Eichenseer, and this is ATF Special Agent Beau Jacobsen.

4    THE COURT:  The defendant is in court and through his

5  counsel, Mr. Lawrence Hyman and Mr. Gal Pissetzky.

6    Mr. Hyman, would you introduce the people at your

7  table?

8    MR. HYMAN:  Good morning, ladies and gentlemen.  I'm

9  Lawrence Hyman.  This is Gal Pissetzky.  This is Mr. Godinez.

10  And this is Marta Kascuba who is our paralegal.

11    THE COURT:  Thank you.  Now, usually, the biggest

12  question that potential jurors have is how long is the case

13  going to take.  We anticipate the case will take this week and

14  some part of next week.  We're not sure exactly how long.  But

15  it will not be more than two weeks.

16    Our court day begins at approximately 10:00 a.m. on

17  most days and concludes at 5:00.  We take an hour off for

18  lunch during the middle of the day and take a break in

19  midmorning and a break in midafternoon.  So if you are

20  selected as a juror in this case, you would be required to be

21  present between 10:00 and 5:00 p.m. every day until the case

22  concludes, which we anticipate probably early next week.

23    Would you all rise and be sworn, please?

24    (Prospective jurors sworn.)

25    THE COURT:  Please be seated.

1       We're going to now have -- I should say that we

2  have -- we commenced the case yesterday with jury selection,

3  and we selected 12 jurors.  And the purpose today is to select

4  alternates who will sit and hear the case.  And in the event

5  that something occurs so that one of the 12 jurors cannot

6  complete service, then the alternate would take place.  And

7  the reason is that the Constitution requires that 12 -- the

8  jury consist of 12 citizens.  So it's necessary to ensure that

9  we will have 12 at the end of the case.  So that's the purpose

10  why we select alternates.

11       So a couple of words now about the process of jury

12  selection.  I will ask a certain number of questions to you,

13  which I apologize in advance because it's a slight invasion of

14  your privacy, but it's necessary because the attorneys are

15  entitled, A, to have jurors who have no preconceived notions

16  about how the case should come out, people that can fairly and

17  honestly and without preconceived ideas conclude the case by

18  deciding it based upon the evidence of the case and not some

19  preconceived notions or prejudices and so forth; and secondly,

20  they're entitled to request exclusion of a certain number of

21  jurors without having to justify why they don't want them,

22  what we call a peremptory challenge.

23       And in order for them to exercise their statutory

24  rights, and the federal law gives them these rights, they have

25  to know a little something about you.  Hence, it would be

1  necessary to learn something about you.

2  So having said that, I don't want to frighten you

3  into -- we're not trying to embarrass you or anything like

4  that. We're just trying to determine what your experiences

5  are and that sort of thing so that they can make intelligent

6  decisions.

7  I'm going to read a list of the witnesses that may --

8  or potential witnesses. And I want to emphasize "potential"

9  because the list is fairly long, but it includes the names of

10  people not only who may be called as witnesses but whose name

11  may be referred to during the course of the trial. So one of

12  my questions will be to the potential jurors is, do you know

13  anybody whose name was read to you. So I'm going to read the

14  list, and I would ask you to pay close attention.

15  Nicholas Brown; Chris Chmelar, C-h-m-e-l-a-r; Kevin

16  Crump; C-r-u-m-p; Arnold Esposito; Paul Greene; Steve Greene;

17  Beau Jacobsen; Victoria Jean-Baptiste; Kevin O'Neill; Paul

18  Presnell, P-r-e-s-n-e-l-l; Destiny Rodriguez; Hector Ruiz,

19  R-u-i-z; Jason Schoenecker, S-c-h-o-e-n-e-c-k-e-r; Thomas

20  Spratte, S-p-r-a-t-t-e; Daniel Winter; Anthony Green;

21  Neil Evans; Adriana Oropeza, O-r-o-p-e-z-a; Jose "Manny"

22  Segoviano, S-e-g-o-v-i-a-n-o; and Lucy Segoviano; and

23  Stephen -- G. Steven Sangdahl, S a-n-g-d-a-h-l, ESI

24  Corporation.

25  So I will ask you during the course of my questioning

1  whether you know any of these people.  So if you do, then you

2  can tell me then that you -- that you do or you don't know

3  them.

4          So would you call four people, please?

5          THE CLERK:  William Herman.

6          Tyler May.

7          Steve Martinez.

8          And Terri Dunmore.

9          THE COURT:  The first gentleman, you are William

10  Herman; is that correct, sir?

11          PROSPECTIVE JUROR:  Yes, sir.

12          THE COURT:  Where do you live, sir?

13          PROSPECTIVE JUROR:  Plainfield, Illinois.

14          THE COURT:  How old are you?

15          PROSPECTIVE JUROR:  52.

16          THE COURT:  What's your educational background?

17          PROSPECTIVE JUROR:  I have a bachelor's degree.

18          THE COURT:  And what is your occupation or business?

19          PROSPECTIVE JUROR:  IT.

20          THE COURT:  What -- would you give us a little more

21  detail?

22          PROSPECTIVE JUROR:  IT management for a local

23  government, Downers Grove.

24          THE COURT:  Okay.  Are you married?

25          PROSPECTIVE JUROR:  Yes.

1     THE COURT:  What does your spouse do?

2     PROSPECTIVE JUROR:  She is an administrative

3  assistant for Argonne National Labs.

4     THE COURT:  Okay.  Anybody in your family employed in

5  law enforcement?

6     PROSPECTIVE JUROR:  No.

7     THE COURT:  Okay.  Now, this case was investigated by

8  the ATF, the Alcohol, Tobacco, and Firearms agency, and the

9  Chicago Police Department.  Have you had any dealings with

10 either one of these agencies?

11    PROSPECTIVE JUROR:  I know people that work for the

12 Chicago Police Department, yes.

13    THE COURT:  I know, but have you ever personally had

14 a dealing with them?  Have they given you a ticket or any kind

15 of --

16    PROSPECTIVE JUROR:  No.

17    THE COURT:  -- interaction?

18    PROSPECTIVE JUROR:  No.

19    THE COURT:  Okay.  The case involves the charges that

20 include the use of a firearm.  Do you have any feelings or

21 beliefs regarding firearm laws that would make it difficult

22 for you to be impartial to either side in this case?

23    PROSPECTIVE JUROR:  No, sir.

24    THE COURT:  Okay.  There may be evidence introduced

25 in this case that the defendant may be a member of a group

1  that can be classified as a gang.  The Constitution gives us

2  the right to associate with others.  There is nothing

3  inherently illegal or wrongful in associating with a gang.

4  You should not decide any issue of fact solely due to the

5  alleged gang membership.

6         Now, I'll just make a little explanation on that.

7  There's -- obviously, the issue of gangs is controversial.

8  And we're not asking you whether it's a good thing or a bad

9  thing.  The point of the question is, if there is allegation

10  that the defendant was a member of a gang, would you cut the

11  government any slack in deciding the case because that would

12  be improper.

13         But we need to know that the mere fact that maybe he

14  was alleged to be a member of a gang, whether that would cause

15  you to let the government off the hook of proving the case

16  beyond a reasonable doubt.  Do you understand my question?

17         PROSPECTIVE JUROR:  Yeah.  No.

18         THE COURT:  Would you be able to do that?

19         PROSPECTIVE JUROR:  I believe so.

20         THE COURT:  Okay.  Have you ever had, been affected

21  by any gang violence?

22         PROSPECTIVE JUROR:  No.

23         THE COURT:  Under the Constitution, the defendant

24  need not testify in the case, and his silence cannot be used

25  against him.  It is also the government's obligation to prove

1　the charges which I have outlined a little earlier against the

2　defendant beyond a reasonable doubt, and it is not his

3　obligation to prove he's innocent.  These are basic principles

4　of our criminal justice system.

5　　　　Do you have any objection to those?

6　　　　PROSPECTIVE JUROR:  No.

7　　　　THE COURT:  In evaluating a witness' testimony, you

8　should use the same tests regardless of whether the witness is

9　a law enforcement official or a lay witness.

10　　　　Now, I'll give a little explanation of this.

11　Whenever you meet somebody and talk to them and if -- you use

12　your various inherent instincts in evaluating whether the

13　person is blowing smoke or you can rely on what he's saying or

14　things of that nature.  We all do that.  It depends on, first

15　of all, how important the matter is that you're being told,

16　whether the person, is he furtive in his actions towards you

17　or is he direct.  There's various shortcuts we use in

18　evaluating whether we can believe a particular person.

19　　　　The point of the question, the law is, and there will

20　be an instruction later in the case about the various factors

21　that we consider -- age, education, among other things, and

22　again, whether the person is nervous or whether he's not --

23　these are normal things we use every day when we talk to

24　somebody, and that is what the law is.

25　　　　Now, when you talk to -- whether you talk to a law

1  enforcement officer or whether you talk to a person who is not

2  a law enforcement officer, we use these same tests in

3  determining whether we believe this person or not. It may be

4  that because of the person's background and their occupation

5  and so forth, you would probably normally give more credence

6  to that particular person.

7  So I guess the question is, will you do that? Will

8  use the same tests when you evaluate a witness, whether it's a

9  law enforcement officer, whether it's a layman?

10  PROSPECTIVE JUROR: Yes.

11  THE COURT: Okay. Have you or your family member

12  ever been charged with or convicted of a serious crime?

13  PROSPECTIVE JUROR: No.

14  THE COURT: Have you been a crime victim?

15  Pardon?

16  PROSPECTIVE JUROR: I'm sure at some point.

17  THE COURT: But nothing, I mean, does anything stand

18  out?

19  PROSPECTIVE JUROR: No, no.

20  THE COURT: In other words, whatever it would be,

21  would be relatively minor; is that correct?

22  PROSPECTIVE JUROR: Yeah. No.

23  THE COURT: Have you ever been a party to a lawsuit

24  either as a plaintiff or a defendant?

25  PROSPECTIVE JUROR: No.

1          THE COURT:  Okay.  Have you been on jury duty before?

2          PROSPECTIVE JUROR:  Yes.

3          THE COURT:  When and where?

4          PROSPECTIVE JUROR:  Not in quite a few years.  Once

5   downtown here, once in Will County where I live.

6          THE COURT:  Okay.

7          PROSPECTIVE JUROR:  Once on California, and the other

8   one there --

9          THE COURT:  California would be a criminal case,

10  correct?

11         PROSPECTIVE JUROR:  Yeah, it was a criminal.

12         THE COURT:  You sat on the --

13         PROSPECTIVE JUROR:  I didn't serve, though.

14         THE COURT:  Okay.

15         PROSPECTIVE JUROR:  I got excused.

16         THE COURT:  The one downtown would be civil?

17         PROSPECTIVE JUROR:  Yes.

18         THE COURT:  And did you sit on that one?

19         PROSPECTIVE JUROR:  Yes, I did.

20         THE COURT:  Okay.  And you helped decide the case?

21         PROSPECTIVE JUROR:  Yes.

22         THE COURT:  And one in Joliet?

23         PROSPECTIVE JUROR:  I was excused.  I didn't have to

24  serve.

25         THE COURT:  All right.  Did you recognize any of the

1   names on the list of witnesses?

2          PROSPECTIVE JUROR:  No.

3          THE COURT:  Do you have any religious, philosophical,

4   or moral beliefs that make it difficult for you to sit in

5   judgment of another person?

6          PROSPECTIVE JUROR:  No.

7          THE COURT:  What is your regular source for news?

8          PROSPECTIVE JUROR:  My regular source for news?  The

9   internet mostly.  Fox News, the internet.

10         THE COURT:  Okay.  Will you follow the law that I

11  give to you even if you don't agree with it?

12         I'm going to explain a little bit on this for

13  everybody.  What I mean by that is that we kind of have a dual

14  system here.  The judge, me, instructs you as to what the

15  applicable law is and you, juror, tell the judge, me, what the

16  facts are.

17         So my duty is to determine what the applicable law is

18  and instruct the jury to what the applicable law is and tell

19  them to carry it out, and they determine what the facts are

20  and apply those to the law.

21         And the question is, will you follow the law that I

22  give to you even if you might disagree with it?  A lot of

23  times people say, "We think the law isn't very good, it ought

24  to be changed," but until it's changed, we're stuck with what

25  it is.

1           So the question is:  Will you follow the law as I
2   give it to you even if you disagree with it?
3           PROSPECTIVE JUROR:  Yes.
4           THE COURT:  Any reason you couldn't be fair and
5   impartial?
6           PROSPECTIVE JUROR:  I don't think so.
7           THE COURT:  Thank you.
8           The next person, Tyler May?
9           PROSPECTIVE JUROR:  Yes.
10          THE COURT:  Where do you live, sir?
11          PROSPECTIVE JUROR:  Chicago.
12          THE COURT:  How old are you?
13          PROSPECTIVE JUROR:  28.
14          THE COURT:  What is your educational background?
15          PROSPECTIVE JUROR:  I have a master's degree in
16  interactive entertainment.
17          MR. PISSETZKY:  We can't hear.  I'm sorry.
18          PROSPECTIVE JUROR:  Oh, I have a master's degree.
19          THE COURT:  In what area?
20          PROSPECTIVE JUROR:  Interactive entertainment.
21          THE COURT:  Explain a little bit.
22          PROSPECTIVE JUROR:  Yeah.  I went to a program in
23  Florida that was geared around video game development, so I
24  focused on production and project management for game
25  development in interactive entertainment.

1          THE COURT:  What is your business or occupation?

2          PROSPECTIVE JUROR:  I am a project manager for a

3     website and app development company.

4          THE COURT:  And what do they normally develop?

5          PROSPECTIVE JUROR:  They develop web and native

6     applications for all sorts of businesses, things like gas

7     stations or hotels, loyalty programs, things like that.

8          THE COURT:  Okay.  Are you married?

9          PROSPECTIVE JUROR:  I'm not, no.

10          THE COURT:  Anybody in your family employed in law

11     enforcement, that you're aware of?

12          PROSPECTIVE JUROR:  No.

13          THE COURT:  Okay.  Have you had any experience with

14     either the Chicago -- the ATF or the Chicago Police

15     Department?

16          PROSPECTIVE JUROR:  No.

17          THE COURT:  Now, the case involves charges that

18     include the use of a firearm.  Do you have any feelings or

19     beliefs regarding firearm laws that would make it difficult

20     for you to be impartial in this case?

21          PROSPECTIVE JUROR:  No.

22          THE COURT:  Okay.  And again, on the -- if the

23     evidence introduced indicates that defendant may be a member

24     of a gang, would you -- as I said, there's nothing inherently

25     illegal or wrongful in associating with a gang, and you should

1   not decide any issue of fact solely due to alleged gang

2   membership. Can you do that?

3          PROSPECTIVE JUROR: Yes, I can.

4          THE COURT: Have you ever been affected personally by

5   gang violence?

6          PROSPECTIVE JUROR: No.

7          THE COURT: Under the Constitution, the defendant

8   need not testify, and his silence cannot be used against him.

9   The government has the obligation to prove the charges against

10   the defendant beyond a reasonable doubt, and it is not his

11   obligation to prove his innocence. Do you accept those

12   principles?

13          PROSPECTIVE JUROR: Yes.

14          THE COURT: In evaluating any witness' testimony, you

15   should use the same tests regardless of whether the witness is

16   a law enforcement officer or a lay witness. Can you do that?

17          PROSPECTIVE JUROR: Yes.

18          THE COURT: Have you or a family member ever been

19   charged with or convicted of a serious crime?

20          PROSPECTIVE JUROR: No.

21          THE COURT: Have you been a crime victim?

22          PROSPECTIVE JUROR: No.

23          THE COURT: Have you ever been a party to a lawsuit

24   either as a plaintiff or a defendant?

25          PROSPECTIVE JUROR: No.

1          THE COURT:  Have you been on jury duty before?

2          PROSPECTIVE JUROR:  No.

3          THE COURT:  Do you recognize -- did you recognize any

4    of the names on the list of witnesses?

5          PROSPECTIVE JUROR:  No.

6          THE COURT:  Do you have any religious, philosophical,

7    or moral beliefs that would make it difficult for you to sit

8    in judgment of another person?

9          PROSPECTIVE JUROR:  No.

10         THE COURT:  What is your source for news, regular?

11         PROSPECTIVE JUROR:  The internet.  I read a lot of

12   the Atlantic and also Reddit sometimes.

13         THE COURT:  Okay.  Will you follow the law that I

14   give to you even if you disagree with it?

15         PROSPECTIVE JUROR:  Yes.

16         THE COURT:  Any reason you couldn't be fair?

17         PROSPECTIVE JUROR:  No.

18         THE COURT:  The next gentleman is Steve Martinez.

19   Where do you live, sir?

20         PROSPECTIVE JUROR:  Round Lake.

21         THE COURT:  Round Lake.  Okay.  How old are you, sir?

22         PROSPECTIVE JUROR:  23.

23         THE COURT:  What is your educational background?

24         PROSPECTIVE JUROR:  I'm in college right now.

25         THE COURT:  Where do you go to college?

1            PROSPECTIVE JUROR:  College of Lake County in

2   Grayslake.

3            THE COURT:  Okay.  And what are you studying?

4            PROSPECTIVE JUROR:  I'm still undecided.  Doing

5   basics right now.

6            THE COURT:  Okay.  Are you employed currently?

7            PROSPECTIVE JUROR:  Yes.

8            THE COURT:  What do you do?

9            PROSPECTIVE JUROR:  I'm a supervisor at UPS.

10           THE COURT:  Okay.  Are you married?

11           PROSPECTIVE JUROR:  No.

12           THE COURT:  Anybody in your family employed in law

13  enforcement?

14           PROSPECTIVE JUROR:  I have a cousin.

15           THE COURT:  And where is -- what does he do or who

16  does he do it for?

17           PROSPECTIVE JUROR:  Chicago here.

18           THE COURT:  Chicago policeman?

19           PROSPECTIVE JUROR:  Yes.

20           THE COURT:  Okay.  Are there any attorneys in your

21  family?

22           PROSPECTIVE JUROR:  What was that?

23           THE COURT:  Are there any attorneys in your --

24           PROSPECTIVE JUROR:  No.

25           THE COURT:  Okay.  I forgot to ask that question of

1  the other two.  Do either of you have attorneys in your

2  family?

3          PROSPECTIVE JUROR HERMAN:  By marriage.

4          THE COURT:  Pardon?

5          PROSPECTIVE JUROR HERMAN:  By marriage.

6          THE COURT:  Okay.  Where does -- is that a woman or a

7  man?

8          PROSPECTIVE JUROR HERMAN:  Both.

9          THE COURT:  Both.

10         PROSPECTIVE JUROR HERMAN:  Brother-in-law and

11  godfather.

12         THE COURT:  Where do they practice?

13         PROSPECTIVE JUROR HERMAN:  Good question.  Lyons, and

14  I don't know where the other one is.  I think --

15         THE COURT:  Okay.  Are either of them criminal?

16         PROSPECTIVE JUROR HERMAN:  I don't think they do a

17  lot of criminal.

18         THE COURT:  Okay.  And --

19         PROSPECTIVE JUROR MAY:  No.

20         THE COURT:  And Mr. Tyler -- I mean, Mr. May?

21         PROSPECTIVE JUROR MAY:  No.

22         THE COURT:  Okay.  And Mr. Martinez, you have no

23  attorneys?

24         PROSPECTIVE JUROR:  No, correct.

25         THE COURT:  Okay.  Have you had any dealings with

1     either the ATF or the Chicago Police Department?

2           PROSPECTIVE JUROR: No.

3           THE COURT: Now, the case involves the charges

4     including the use of a firearm. Do you have any feelings or

5     beliefs regarding firearm laws that would make it difficult

6     for you to be impartial?

7           PROSPECTIVE JUROR: No.

8           THE COURT: And there may be evidence introduced that

9     the defendant may be a member of a group that can be

10     classified as a gang. That in and of itself is not illegal or

11     wrongful. Can you decide this case solely on the facts

12     presented by the government without being influenced by a

13     possible allegation of gang membership?

14           PROSPECTIVE JUROR: No.

15           THE COURT: You can or can't?

16           PROSPECTIVE JUROR: I can. Sorry.

17           THE COURT: Okay. Have you ever been affected

18     personally by gang violence?

19           PROSPECTIVE JUROR: No.

20           THE COURT: Under the Constitution, a defendant need

21     not testify in the case, and his silence cannot be used

22     against him. Can you follow -- do you believe in this? I

23     mean, can you accept those two principles?

24           PROSPECTIVE JUROR: Yes.

25           THE COURT: All right. In evaluating a witness'

1    testimony, you should use the same tests regardless of whether

2    the witness is a law enforcement official or a lay witness.

3    Can you do that?

4         PROSPECTIVE JUROR:  Yes.

5         THE COURT:  Have you or your family member ever been

6    charged with or convicted of a serious crime?

7         PROSPECTIVE JUROR:  I've had a DUI.

8         THE COURT:  Okay.  How long ago was that?

9         PROSPECTIVE JUROR:  December last year.

10        THE COURT:  Is there anything about that experience

11   which would affect you in this case?

12        PROSPECTIVE JUROR:  No.

13        THE COURT:  Okay.  Have you been a crime victim?

14        PROSPECTIVE JUROR:  No.

15        THE COURT:  Have you ever been a party to a lawsuit

16   either as a plaintiff or a defendant?

17        PROSPECTIVE JUROR:  No.

18        THE COURT:  Have you been on jury duty before?

19        PROSPECTIVE JUROR:  No.

20        THE COURT:  Did you recognize any of the names on the

21   list of witnesses?

22        PROSPECTIVE JUROR:  No.

23        THE COURT:  Do you have any religious, philosophical,

24   or moral beliefs that would make it difficult for you to sit

25   in judgment of another?

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  What is your source of news?

3          PROSPECTIVE JUROR:  The internet.

4          THE COURT:  Okay.  Will you follow the law that I

5    give to you even if you disagree with it?

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  Any reason you couldn't be fair?

8          PROSPECTIVE JUROR:  No.

9          THE COURT:  Okay.  Terri Dunmore?

10         PROSPECTIVE JUROR:  Yes.

11         THE COURT:  Ms. Dunmore, where do you live?

12         PROSPECTIVE JUROR:  In Wheaton.

13         THE COURT:  How old are you?

14         PROSPECTIVE JUROR:  49.

15         THE COURT:  What is your educational background?

16         PROSPECTIVE JUROR:  Bachelor's.

17         THE COURT:  In what area?

18         PROSPECTIVE JUROR:  Marketing.

19         THE COURT:  And what is your business or occupation?

20         PROSPECTIVE JUROR:  I'm a homemaker right now.

21         THE COURT:  When you last worked, what did you do?

22         PROSPECTIVE JUROR:  I worked at Fifth Third Bank in

23   human resources.

24         THE COURT:  All right.

25         PROSPECTIVE JUROR:  About ten years ago.

1          THE COURT:  Okay.  I take it, you're married?

2          PROSPECTIVE JUROR:  Yes.

3          THE COURT:  What does your spouse do?

4          PROSPECTIVE JUROR:  He works at a company in the

5   finance industry.  They develop front-end software for traders

6   in the options industry.

7          THE COURT:  All right.  Anybody in your family

8   employed in law enforcement?

9          PROSPECTIVE JUROR:  No.

10         THE COURT:  Now, have you had any dealings with

11  either the ATF or the Chicago Police Department?

12         PROSPECTIVE JUROR:  No.

13         THE COURT:  The case involves the use of a firearm,

14  alleged use of a firearm.  Do you have any feelings or beliefs

15  regarding firearm laws that would make it difficult for you to

16  be impartial?

17         PROSPECTIVE JUROR:  No.

18         THE COURT:  Okay.  And there may be evidence

19  introduced that the defendant may be a member of a group that

20  can be classified as a gang.  Can you -- there's nothing

21  inherently illegal or wrongful in associating with a gang, and

22  you should not decide any issue of fact solely due to alleged

23  gang membership.  Can you do this?

24         PROSPECTIVE JUROR:  Yes.

25         THE COURT:  Have you ever been affected by gang

1  violence?

2         PROSPECTIVE JUROR:  No.

3         THE COURT:  Under the Constitution, a defendant need

4  not testify in the case, and his silence cannot be used

5  against him.  And it is the government's obligation to prove

6  the charges against the defendant beyond a reasonable doubt

7  and not his obligation to prove his innocence.  Can you do

8  that?

9         PROSPECTIVE JUROR:  Yes.

10        THE COURT:  In evaluating any witness' testimony, you

11 should use the same test regardless of whether the witness is

12 a law enforcement official or another.  Can you do that?

13        PROSPECTIVE JUROR:  Yes.

14        THE COURT:  Have you or a family member ever been

15 charged with or convicted of a serious crime?

16        PROSPECTIVE JUROR:  No.

17        THE COURT:  Have you been a crime victim?

18        PROSPECTIVE JUROR:  No.

19        THE COURT:  Have you ever been a party to a lawsuit

20 either as a plaintiff or a defendant?

21        PROSPECTIVE JUROR:  Small claims court about five

22 years ago.

23        THE COURT:  Okay.  And what did that involve?

24        PROSPECTIVE JUROR:  It was suing a contractor for not

25 finishing a job.

1        THE COURT:  All right.  Did it get resolved?

2        PROSPECTIVE JUROR:  Yeah.

3        THE COURT:  Okay.  Have you been on jury duty before?

4        PROSPECTIVE JUROR:  Yes.

5        THE COURT:  When and where?

6        PROSPECTIVE JUROR:  DuPage County, the summer of last

7   year.

8        THE COURT:  What kind of case did you hear?

9        PROSPECTIVE JUROR:  It was an assault case.

10        THE COURT:  Criminal case?  Or was it civil or

11   criminal, do you remember?

12        PROSPECTIVE JUROR:  It was criminal.

13        THE COURT:  Okay.  Did you participate in the case?

14        PROSPECTIVE JUROR:  Yes.

15        THE COURT:  Okay.  Did you recognize any of the names

16   on the list of witnesses?

17        PROSPECTIVE JUROR:  No.

18        THE COURT:  I think I maybe asked you -- I didn't ask

19   you this.  Are there any attorneys in your family?

20        PROSPECTIVE JUROR:  There are not.

21        THE COURT:  Okay.  Do you have any religious,

22   philosophical, or moral beliefs that would make it difficult

23   for you to sit in judgment of another person?

24        PROSPECTIVE JUROR:  No.

25        THE COURT:  What is your source for news?

1          PROSPECTIVE JUROR:  Just regular TV.

2          THE COURT:  Will you follow the law that I give to

3    you even if you disagree with it?

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  Any reason you can't be fair?

6          PROSPECTIVE JUROR:  No.

7          THE COURT:  Okay.  I'll give you a few minutes, and

8    then we'll have a sidebar.

9        (Proceedings heard at sidebar:)

10          THE COURT:  Any objection to Mr. Herman?

11          MS. BABU:  None from the government.

12          MR. PISSETZKY:  No.

13          THE COURT:  He'll be alternate number one.

14          What about Tyler May?

15          MR. PISSETZKY:  No.

16          MS. BABU:  The government moves to strike him.

17          THE COURT:  Steve Martinez?

18          MR. PISSETZKY:  No.

19          THE COURT:  Government -- well, you used yours.  So

20    he'll be two.  And then so --

21          MR. HYMAN:  We're going to strike Ms. Dunmore.

22          THE COURT:  You were going to.

23        (Proceedings heard in open court:)

24          THE COURT:  All right.  We've completed our selection

25    here this morning.  Mr. William Herman is alternate number

1 one, and Mr. Martinez is alternate number two.  Mr. May and

2 Ms. Dunmore are excused as is the rest.

3 Can you take them to the jury room?  And then we'll

4 be with you in a few minutes -- oh, they have to be sworn in.

5 Wait.  Mr. Herman and Mr. Martinez need to be sworn in.

6 THE CLERK:  Everyone else can go back to 2, on the

7 second floor where we started at, except for Mr. Herman and

8 Mr. Martinez.

9 Can you stand and raise your right hand?

10 (Alternate jurors sworn.)

11 THE COURT:  Thank you.  We'll be with you in a few

12 minutes.  We'll get organized.

13 (Proceedings heard in open court.  Jury out.)

14 THE COURT:  All right.  Are we ready for opening

15 statements?

16 MS. BABU:  We are, your Honor.  If we can test the

17 computer and also just put up our map.

18 THE COURT:  Okay.  Then we'll proceed and then hear

19 from you.

20 MR. HYMAN:  Your Honor, will you give us a couple

21 minutes just to use the washroom?

22 THE COURT:  Yes.  We have a few minutes now.

23 MR. HYMAN:  I appreciate it.

24 THE COURT:  All right.  How long will the opening

25 take?

1          MS. BABU:  Your Honor, I expect to be around ten

2    minutes.

3          THE COURT:  Okay.  How long?

4          MR. HYMAN:  Much longer.

5          THE COURT:  All right.  Take whatever -- well, I

6    won't say that.

7          (Recess from 10:41 a.m. to 10:50 a.m.)

8          (Proceedings heard in open court.  Jury in.)

9          THE COURT:  You can sit wherever you want.  You are

10   not sitting where you were selected, so wherever you feel

11   comfortable.  As soon as you get to a seat, you may be seated.

12   Everybody can be seated.

13         We're ready to start the case now.  And the official

14   start of the case is the opening statements.  This is an

15   opportunity the lawyers for each side has to acquaint you in

16   advance what they believe the facts will be during the course

17   of the trial.

18         And they're designed to be helpful to you to give you

19   an overview because oftentimes, the specific pieces of

20   evidence, the testimony of witnesses does not -- do not come

21   in in a completely chronological or logical order.  So it's

22   helpful to have an overview so that you can know what the

23   specific relevance of an item of evidence is.

24         One word of caution is, an attorney is not a witness

25   in the case.  They cannot give evidence.  So all they can do

1  is predict to you at this stage what they believe the evidence

2  will be.  If after the conclusion of the case any assertion of

3  fact that they -- an attorney makes that you as a jury do not

4  believe was justified by the evidence, then you follow your

5  view of the evidence and not what the attorneys say.  But

6  again, it's designed to be helpful.

7       And the government, who has the burden of proof in

8  the case, will go first and then followed by the defense.  And

9  then we will start with evidence produced by the government,

10  and then we'll hear evidence from the defense.

11       Ms. Babu, you may give the opening statement for the

12  government.

13       OPENING STATEMENT ON BEHALF OF THE PLAINTIFF

14       MS. BABU:  Thank you, your Honor.

15       "I feel good.  Fuck that flake."  That's what the

16  defendant said minutes after shooting a federal agent in the

17  head, a federal agent that the defendant thought was a rival

18  gang member.  The defendant is charged with the assault of a

19  federal officer, inflicting bodily injury, and using and

20  discharging a gun during that assault.  Through the evidence

21  that you will see and hear during the course of this trial, we

22  will prove beyond a reasonable doubt that the defendant is

23  guilty of these charges.

24       I expect that the judge will instruct you that the

25  government doesn't have to prove that the defendant knew that

1  the person he was shooting was a federal agent.  In fact, the

2  evidence at trial will show that the defendant thought he was

3  shooting a rival gang member, or a flake, when he shot the

4  agent.

5          This shooting happened on May 4th, 2018.  The agent

6  is Special Agent Kevin Crump, and he still works for the

7  Bureau of Alcohol, Tobacco, Firearms, and Explosives, or ATF.

8  Agent Crump and his colleagues met early on the morning of May

9  4th to plan for an undercover operation in the Back of the

10 Yards neighborhood which is a neighborhood here in Chicago

11 just a few miles south.

12         The agents were planning to place court-authorized

13 GPS tracking devices on cars that were parked near the

14 intersection of 44th and Hermitage, which on this map is right

15 about here.  Agent Crump was tasked with replacing one of

16 those tracking devices.  That intersection is also squarely

17 within the territory of the Latin Saints street gang.

18         In planning for that operation, some of the agents

19 went out and set up a perimeter around where the cars were

20 parked.  And before Agent Crump and the others in his car

21 entered the neighborhood, two of the agents conducted

22 surveillance.

23         So around 3:00 a.m., the surveillance agents went out

24 and drove slowly through the territory of the Latin Saints at

25 about 10 to 15 miles an hour.  They circled the blocks

1    multiple times to make sure that there weren't people out in

2    the street, there weren't people out to see the agents when

3    they were placing the trackers.

4           They didn't see anyone out there, and so when they

5    were finished with their surveillance, they went back and --

6    excuse me, they called back and they reported to the others

7    that the streets were clear and it was safe for them -- for

8    the agents who were placing the trackers to enter.

9           The agents reported back that there was no one out on

10   the streets, but the defendant, Ernesto Godinez, he was out

11   that morning.  The defendant was also circling the blocks of

12   his neighborhood at 3:00 a.m.  He was also driving slowly

13   through the territory of the Latin Saints.  And the evidence

14   at trial will show that the defendant was a member of the

15   Latin Saints.

16          When the defendant saw the surveillance officers

17   circling his blocks, he ran quickly back to his house on Wood

18   Street.  This is Wood Street right here.  The defendant ran to

19   his house on Wood Street, came out seconds later, and ran

20   north up Wood.  He crossed over through the alley that runs

21   between Wood and Hermitage and into the path between two

22   houses or a gangway, and there the defendant waited.

23          Moments later, Agent Crump and the others in his car

24   drove down Hermitage in an unmarked car to begin the operation

25   of placing the trackers.  They didn't know it at the moment at

1  that time, but they drove right past the defendant hiding in
2  that gangway.

3        As the agents drove down Hermitage Avenue, they were
4  looking around, looking to see if there were people out to see
5  them when they got out of the car to place the trackers, and
6  they didn't see anybody.  So their car stopped just short of
7  the intersection of 44th of Hermitage, and Agent Crump and two
8  other agents dressed in plain clothes with the hoods of their
9  sweatshirts up got out of the car.

10       They started to cross through the intersection.  And
11 just as Agent Crump got to the other side of the street, the
12 defendant fired five gunshots.  Defendant -- Agent Crump's
13 colleague returned fire twice, and then two of the agents ran
14 up the street in the direction of the gunshots.  The agents
15 quickly realized, though, that Agent Crump wasn't with them.
16 They turned back to find Agent Crump on the ground bleeding
17 from the neck and face and moaning in pain.

18       Meanwhile, seconds after the shooting, the defendant
19 ran out of the gangway, back across the alley, and back into
20 his house on Wood Street.  He then messaged his girlfriend and
21 asked her to come pick him up.  You'll hear from the
22 defendant's girlfriend during this trial.  You'll hear that
23 the defendant, when he got into her car, he was sweating and
24 he said, "I feel good.  Fuck that flake."

25       In addition to the defendant's girlfriend's

1  testimony, you will hear and see a lot of other evidence

2  during the course of this trial, so let me walk you through

3  some of that evidence.

4         You will see surveillance video from all over the

5  neighborhood on that morning of May 4th.  The police

6  surveillance cameras will capture the police surveillance

7  units that drove around in their unmarked cars driving through

8  the neighborhood circling the blocks of the Latin Saints

9  territory to make sure that there was no one out.  Those same

10 cameras also capture the defendant driving around those same

11 blocks, circling those same blocks of the territory.

12        In one of those videos, you'll see the defendant

13 running into his house just as the surveillance officers are

14 circling his block.  The police surveillance camera also

15 captures the exact moment when Agent Crump was shot.  You'll

16 see him stumble to the ground, try to get up, and try to take

17 cover.

18        The cameras don't capture the defendant pulling the

19 trigger because he's hidden from the view of two private

20 surveillance cameras that are on Hermitage Avenue, but you'll

21 see the rest of the footage from those cameras.  And I expect

22 that you'll see a video about 30 minutes before the shooting

23 of an individual in a light-colored T-shirt in the alley

24 between Wood and Hermitage.

25        And you'll also see a video about 30 seconds before

1   the agents drive down Hermitage Avenue of the defendant

2   walking into the gangway.  And then you'll see the video, mere

3   seconds after Agent Crump is shot, of the defendant bolting

4   out of that gangway and back across the alley.

5        And then you'll see another video of the defendant

6   running down Wood Street and into his house.  And in that same

7   video, you'll see the defendant come out of his house and get

8   into his girlfriend's car.  And the defendant's girlfriend,

9   she identifies the defendant as the person in that video.

10       In addition to the videos, you'll hear about the

11  ballistics evidence in this case.  You'll hear that law

12  enforcement recovered five shell casings from the gangway.

13  You'll hear that -- you'll hear that when they found the five

14  shell casings in the gangway, the CPD forensic investigator

15  who found the fire shell casings in the gangway, he also found

16  about a half a block down a bullet in a tree.

17       And then a half a block down from that bullet in the

18  tree, he found blood on the street and at the curb and in the

19  grass right about here in the intersection.  And about a half

20  a block down from the blood in the intersection, he also found

21  a bullet in the grass.  And you'll hear through the evidence

22  in this case that that is the bullet that went through Special

23  Agent Kevin Crump's head, and you'll hear that that bullet has

24  Agent Crump's DNA on it.

25       You will also hear from a firearms expert who

1  determined that the five shell casings in the gangway, they

2  were all fired from the same gun.  And the bullet in the tree

3  and the bullet in the grass that had Agent Crump's DNA on it,

4  they were fired from the same gun.  And this witness will

5  explain to you that the five casings and the two bullets, they

6  could have been used in the same type of gun, a .9 millimeter

7  semiautomatic handgun.

8  You'll also hear from -- you'll also hear evidence

9  about ShotSpotter which is a system of sensors and microphones

10  set up around the city of Chicago that are used to detect and

11  locate gunshots.  You'll hear from an employee of ShotSpotter

12  who will tell you that the system recorded the sounds of seven

13  gunshots that morning.  You'll hear the audio from those

14  gunshots.

15  This witness will also explain to you that the system

16  located the sounds of the first five gunshots to an area

17  within 25 meters of the gangway where law enforcement

18  recovered the five shell casings and the gangway that the

19  defendant ran out of seconds after Agent Crump was shot.

20  You'll also hear testimony about the Latin Saints

21  street gang from a former member of the gang.  This witness is

22  cooperating with the government in hopes of immigration and

23  other benefits.

24  You'll hear that 44th and Hermitage where Agent Crump

25  was shot and 44th and Wood where the defendant lived are

1  squarely within the territory of the Latin Saints.  You'll

2  hear and see that the defendant is a member of the Latin

3  Saints.  And you'll hear that being in the Latin Saints, there

4  are rules.  And you'll hear that one of those rules is to

5  protect the territory of the Saints and that you protect Latin

6  Saints territory by patrolling the territory.  And if you see

7  rival gang members in Latin Saints territory, members of the

8  Saints are supposed to shoot them up.

9          Finally, you will hear the testimony of the agents

10  who were there that morning.  You'll hear that they didn't see

11  anyone out that morning.  When they were out in the Back of

12  the Yards, they thought it was safe to get out of their cars

13  to conduct their operation and replace the tracking devices on

14  those cars.  You'll hear that they were in plain clothes with

15  the hoods of their sweatshirts up driving unmarked cars.

16          You'll hear from the two agents who ran in the

17  direction of the gunshots and then turned quickly back when

18  they realized that Agent Crump wasn't with them.

19          And you'll hear from Agent Crump.  He will tell you

20  that a bullet went through his head making a hole in his neck

21  at the base of his jaw and a hole right between his eyes.

22  He'll describe how serious the injuries were and the surgeries

23  that he endured in the days immediately following the

24  shooting.

25          And after you have seen all of this evidence -- the

1   surveillance cameras including the video of the defendant

2   running out of the gangway seconds after the shooting, the

3   ballistics evidence including the five shell casings that were

4   recovered in the gangway, the ShotSpotter evidence that puts

5   the sounds of those five gunshots in the area of the gangway,

6   the testimony of the defendant's girlfriend, the testimony

7   regarding the Latin Saints and the street gang itself, and the

8   testimony of the agents who were there that day -- ladies and

9   gentlemen, after you hear all of this evidence, we will come

10  back to you, and we will ask you to return the only verdict

11  that's consistent with the evidence:   Guilty.

12          THE COURT:  Thank you.

13          Mr. Hyman?

14          MR. HYMAN:  Yes.  Thank you, Judge.  If it please the

15  Court.

16      (Pause.)

17          MR. HYMAN:  Judge, can we have a sidebar?  There's

18  just some PowerPoint work that they haven't seen, they wanted

19  to see before we get started.  It's everything as we talked

20  about, everything that the government has given us.

21          THE COURT:  Usually the stuff works.

22          MS. BABU:  I believe it's working fine, your Honor.

23  If we could just have a quick second, we haven't seen the

24  PowerPoint presentation.

25          MR. HYMAN:  It's just the pictures and the videos.

1          THE COURT:  Let's go ahead.  Whatever they can write

2    on the blackboard, they can do ahead of time.  So go ahead.

3          MR. HYMAN:  Okay.  May it please the Court.

4          THE COURT:  Yes.

5          OPENING STATEMENT ON BEHALF OF THE DEFENDANT

6          MR. HYMAN:  Good morning, ladies and gentlemen.

7    First, I want to acknowledge that the shooting of Officer

8    Crump was horrible.  We all have emotions for what this

9    officer and his family went through.  However, your job as you

10   swore to do yesterday and today is to well and truly try the

11   facts of this case.  It is for you to look deeply and

12   dispassionately into the facts.  The facts, members of this

13   jury, do not directly point to Ernesto Godinez as the shooter

14   of Agent Crump.  The facts do not suggest or circumstantially

15   imply that Mr. Godinez was the shooter of Agent Crump.  The

16   facts do not implicate Mr. Godinez as the shooter of Agent

17   Crump.

18         Ladies and gentlemen, this case is about the power of

19   observation.  And it's often said by people that are more

20   interesting or smarter than I that you can observe a lot just

21   by watching.  And for those of you who have an interest in

22   sports, that was from Yogi Berra, an old baseball player who

23   is also on the AFLAC commercials.

24         And the truth of the story lies in the details.

25   That's the power of observation.  Now, not only is that power

1  of observation by the agents and witnesses who will tell you

2  what they saw in this case but also by you, the members of the

3  jury.

4         So what was your first power of observation?  I think

5  you will notice -- or maybe we'll use the term "observe" --

6  that I did not interrupt Ms. Babu.  I didn't get up.  I didn't

7  object.  I didn't want to cause any distractions.  I wanted

8  the prosecution on behalf of their client to have a fair

9  opportunity to present every bit of evidence they're going to

10  present.  I hope that they will give me the same courtesy

11  during my opening statement because mine will be a little

12  longer, I'll tell you right now, and because I have something

13  to say to you, ladies and gentlemen.  I have some facts to

14  give you, and I want to give them to you to the best of my

15  ability right now.

16         The opening statement, as the judge may have

17  mentioned the other day and even today, is where the lawyer

18  gets a chance to honestly tell you what his evidence will be.

19  It's our statement of what I confidently expect to prove to

20  you during the course of this trial.  I don't know how this

21  case will unfold, but I will tell you everything that has to

22  do with this trial.  I'm not going to hold back.  I'm going to

23  tell you everything, knowing the burden that I carry to prove

24  to you what I say I'm going to prove.

25         So what about the government's case?  We are not

1  going to dispute to you that Ernest Godinez was not a gang

2  member.  He was.  We're not going to dispute to you that he

3  didn't have a tattoo.  He does.  We're not disputing that

4  Ernesto was out at 3:00 o'clock in the morning.  He was

5  driving -- like the prosecutors say, he was driving a car.  He

6  was driving actually his girlfriend Destiny Rodriguez's car.

7  Destiny is the mother of his child.

8          We're not disputing that he comes home around 3:15 in

9  the morning.  He left his home about then.  He leaves about

10  3:16.  And you will see for yourselves through these videos

11  that he walks down the street.  And then there is a -- these

12  are videos that come from the police, the Chicago cams and

13  their pods.  And you'll see Mr. Godinez.

14          Now, Mr. Godinez at the time had a different

15  hairstyle.  He had a long, black ponytail and he had some

16  facial hair.  We're not going to dispute that.  But what you

17  will see Mr. Godinez wear in the power of your observation is

18  that he was wearing a dark shirt, dark cutoff jeans, and a

19  baseball cap.

20          Ladies and gentlemen, Ernie, Ernest Godinez was in

21  those videos.  We are not disputing that.  Yes, he's seen

22  walking.  You will see a series of videos as Ms. Babu talked

23  about.  They will be a collection that one of these witnesses

24  will talk about how they put them together, but they're a

25  collection of both private videos and City videos.  And yes,

1  Mr. Godinez is in those videos.  He's seen walking across this
2  alley.
3          May I use that?
4          So he's seen walking across the alley from Wood
5  Street where his home is through the alley and over to this
6  area around 4332 South Hermitage, the next street over.  We're
7  not going to dispute that.  You can see him.
8          He is seen then, after these shots are heard by
9  everyone in the neighborhood, he's seen running across the
10 alley.  That's Mr. Godinez.  He returns to his house.  The
11 videos will show that he returned to his house.  The videos
12 will show that he then had communication -- or the Snapchats
13 will show that he had communications with another woman, a
14 young girl who was in the neighborhood, Victoria
15 Jean-Baptiste.  And she came and picked him up in her car.
16 You'll see the video.  You'll see it.
17         He's still wearing the same clothes.  He gets into
18 her car.  And the evidence in this case will prove that they
19 drove to a Shell gas station.  And you'll see Mr. Godinez at
20 the Shell gas station wearing the same hat, the same shirt,
21 the same pants.
22         They then drive and pick up another woman by the name
23 of Adriana Oropeza.  The Court mentioned her name to you, if
24 you had known, if you were familiar with that name earlier.
25 Ms. Oropeza was going to go to the airport, and Mr. Godinez

1   and Ms. Jean-Baptiste were going to drive her.  She had a 6:00

2   o'clock a.m. flight, and they were up early to take her there.

3           They go to the airport, but before they go pick her

4   up, Mr. Godinez does, in fact, change his shirt.  He puts on a

5   white T-shirt over the black shirt.  They go to the airport.

6   He returns, drops off Ms. Baptiste so she can go to work.

7   Then he goes to his friend's house.  You heard the name Jose

8   "Manny" Segoviano.  He goes to that house which is on the

9   north side, comes back, picks up Destiny Rodriguez and his

10  child, and they go to a -- they then go to a doctor's

11  appointment for the baby.  We're not going to dispute that.

12  You will hear that evidence from the government's witness,

13  Ms. Rodriguez and Ms. Baptiste.

14          When he's at the friend's home, Segoviano's home,

15  there is social media that shows that Mr. Godinez is wanted

16  for a shooting in the neighborhood.  He gets into a fight with

17  Ms. Rodriguez, and he leaves.  He gets into this fight over a

18  relationship, the relationship between himself and

19  Ms. Rodriguez and himself and Ms. Jean-Baptiste who is with

20  him earlier in the day.

21          And ladies and gentlemen, despite what may come out,

22  Mr. Godinez surrendered to these officers, these authorities,

23  on Monday, May 7th.

24          What we have here is a dispute.  The government's

25  theory of these facts, those facts, are that Mr. Godinez went

1  across the alley as you heard, down the gangway, fired the

2  shots at people he believed to be other rival gang members,

3  and then left the neighborhood avoiding his arrest.

4          Those facts, however, have been, with all due respect

5  to the prosecution, distorted.  It is like Mark Twain used to

6  say:  Get your facts first and then distort them as much as

7  you please.

8          Ladies and gentlemen, the shooter in this case wore

9  white.  Evidence gathered, it's the evidence that was gathered

10  by these agencies, the Chicago Police Department, the ATF

11  agencies, that actually show Ernest -- Ernesto Godinez was not

12  the shooter.

13          What you will observe, you, the triers of fact, the

14  people who decide his fate, you will -- you will observe

15  and -- from their videos evidence of a man wearing a white

16  T-shirt in the alley, in the alley closer to 44th Street.  It

17  was about 20 minutes before Ernesto crosses the alley.  This

18  man in the white T-shirt from the evidence from these videos

19  is heading towards the back of the house where one of the

20  officers returns fire and where his bullet is found in the

21  side of that house, so the man in the white T-shirt.

22          Now, the times that you see on these videos -- this

23  is videos that were presented to us by the government.  These

24  times are on the private video camera, so they don't synch

25  really to the camera from the City, those pods that are up in

1  the light posts.  But you will see there is a man walking and

2  circled in red with a white T-shirt.  And you will see him

3  walking back across into an area that is not where Mr. Godinez

4  crosses.  It is further south of there, closer to 44th Street.

5  And why do I say, did the shooter wear white?  Well,

6  it is expected you will hear from an Officer Spratte.

7  Mr. Spratte is actually a Chicago police officer assigned to

8  this unit, this gang unit.  And he was part of this team that

9  morning that first met at a police station, figured out

10  everybody's role.  And as the prosecution said, they were

11  going to put a tracker on some cars that they were under

12  surveillance with.

13  And it was Officer Spratte, Officer Spratte who was

14  with Mr. Crump and his fellow officers who drove to the area

15  in a car, it's not -- it's just a regular automobile, and gets

16  out.  And as you will see in later evidence, again, what you

17  will actually observe is the officers walking across 44th and

18  Hermitage.

19  And as they walk across 44th and Hermitage, which is

20  right here, as they're crossing this, there's a little

21  turnaround.  As they're walking across, you will hear the

22  sound of gunshots.  There will be five shots, and then you'll

23  hear two more shots.  Those two shots came from Officer

24  Spratte.

25  Now, Officer Spratte is someone who has been trained.

1  He's just not a layman like us.  He's actually trained through

2  both the Chicago Police Department, through the ATF.  So they

3  have to know when they walk out of their homes and putting and

4  strapping on a gun, there's more to police work than that.

5  You have to know exactly the importance of looking before you

6  fire a shot.  And if you're firing a shot, you have to know,

7  in fact, that you are doing that to preserve your life or the

8  life of someone else.  That's what they're trained to do.

9         He's been trained to know that he shoots only when he

10  sees someone shooting at him.  And when you hear this, when

11  you see that Officer Spratte fires his weapon in that

12  subsequent shots that are heard after the first five, you'll

13  see from the position, the position that he takes, and this is

14  looking -- again, this is a photograph taken by the Chicago

15  Police Department's technicians.

16         This is about where the officer is when he fires his

17  shot.  And that sort -- and that corresponds, ladies and

18  gentlemen, to right, almost just a little bit to the east of

19  the corner here at 44th and Hermitage.  So he hears the shots,

20  he turns.  And that photo that's in your screen is just about

21  there.

22         And what Officer Spratte, before he fires his weapon,

23  he looks, and he sees from that position an unknown, an

24  unknown.  This is what he tells his brother -- this is what he

25  tells the police that morning, that morning, his power of

1  observation.  He sees an unknown wearing a white T-shirt and

2  muzzle flashes.  That's it.  That's the description that

3  morning.

4          He does not see from this position where the

5  government is saying Ernesto Godinez stood at 4332 South

6  Hermitage, came out of this gangway, looked down, and from 300

7  feet away fired his weapon.  That's not what Officer Spratte

8  shows -- or saw.

9          Officer Spratte, you will learn, when he turned and

10  fired, he fired in the direction of the muzzle flashes, right.

11  And those muzzle flashes because they were where they were --

12  here is another picture from where he stood -- end up in the

13  side of this building.  That building, you can see there's a

14  little hole in the lower left-hand corner there under the

15  siding.  That's where his bullet ended up.

16          But before it got there -- can we go back to the

17  first photo -- it hit the fence.  It hit the corner of the

18  fence, went through the fence, and strikes that building.

19  That's in the direction of where he saw the muzzle flashes.

20  That, ladies and gentlemen, again goes back to the power of

21  observation.  Where his bullets landed in that fence and in

22  the side of that house are consistent with him firing where he

23  saw the muzzle flashes.  He did not see the muzzle flashes

24  from 4332 South Hermitage.

25          Ladies and gentlemen, Ernesto Godinez, as I told you,

1  wore black.  We don't dispute that.  In fact, we're going to

2  show you again where Mr. Godinez is actually crossing the

3  alley.  I'm sorry we can't get this any bigger, but this is

4  what we get.  This is, again, the times are over two minutes

5  fast compared to what the actual happenings are in the regular

6  street pods.  But you'll see Ernesto walking across the alley,

7  and you will also see that he's walking across the alley.

8  It's just -- you'll get there.

9       There it is.  He's walking.  Did he walk across?

10 Okay.

11      And you will also see Ernesto Godinez wore the same

12 outfit when he went to the Shell station because that's where

13 they went first, he and Victoria Jean-Baptiste, really for the

14 purposes of getting rolling papers so they could get a little

15 water, get a little rolling papers, and they were just going

16 to smoke some dope.

17      So here is Mr. Godinez.  Again, these are all videos

18 that have been collected by the government.  And there he is.

19 He's wearing the same dark shirt, same dark hat.  Ernesto

20 Godinez wore black.  Members of the jury, the shooter wore

21 white.

22      So you say, okay, well, what was Ernesto Godinez

23 doing out?  What was Ernesto doing out at 3:00 in the morning?

24 So we will prove to you that he was driving this Kia.  We

25 don't dispute that.  This is a white car that's actually

1  owned, you will learn, by Destiny Rodriguez.  She gives him

2  the chance to use that, that truck, that SUV, that's for her

3  and for their child.  And you will learn that Ernesto Godinez

4  used many cars.  He drove everybody's car he could.  He didn't

5  own one.

6         He wanted to be in the neighborhood with his friend,

7  his neighborhood friend Victoria.  And they Snapchatted with

8  each other.  They Snapchatted starting about 1:30 in the

9  morning.  So I have learned this through people younger than

10  me.  "WYA" stands for, "Where you at?"  And she -- and by the

11  way, his handle or nickname, whatever they use on Snapchat, is

12  ebird Wood Street, and Victoria is vicky0730.  And you can

13  see, members of the jury, there's a whole discussion on

14  Snapchat what they were going to do, when they were going to

15  meet.

16         And finally, at about 3:18 and 55, it is Victoria --

17  or 3:15 and 59 before he begins to walk down the street to the

18  gangway, she's inquiring, "Going?"  In other words, are they

19  going to go together?  "Where you at?"

20         And he responds, "Where you at" at 3:21.

21         And then she says, "By the corner," but she really

22  wasn't at the corner at quite that time.  She was still at

23  home, but she told him "by the corner," which is, here's where

24  Ms. Baptiste lived, just down the street on -- closer to 45th

25  Street but down Hermitage Street.

1    So you will see, and the government is going to show

2   you, that there was a video of Ms. Baptiste coming out of her

3   house.  And she can't get down the street because this whole

4   area now has been blocked off by the police.  So she makes a

5   U-turn, goes down 44th Street, and there you will see that

6   Ernesto Godinez is picked up from in front of his house.

7    But before he went there, ladies and gentlemen,

8   before she got there, Ernesto goes someplace else.  He crosses

9   the alley.  He does cross the alley.  We said that.  We're not

10  disputing that.  He crosses the alley.  And where does he go?

11  He goes to this old abandoned house that some kids have

12  labeled the trap house.  And there, he has his marijuana.

13  There, he stores the marijuana, whatever he wanted to hide.

14  And this gangway in the photo is what the off -- this

15  government, the prosecution claims that Mr. Godinez went to

16  the mouth of that gangway and fired down that street.

17   Ladies and gentlemen, there is a video of the front

18  of this area at the time that the officers drove by and the

19  time of this alleged shooting.  Members of the jury, there is

20  no video of Ernesto Godinez standing out and firing a weapon

21  or a hand reaching out and you see a hand firing a weapon.

22  There is no such evidence.

23   Here is the front.  Again, this is what was given to

24  us by the government.  That was the car that the agents were

25  in.  You'll see it sort of stopping at the -- you'll see the

1  backup lights.  And where they are stopping, members of the

2  jury, is just about at the corner of Hermitage and 44th

3  Street.  And that's where these officers get out and begin

4  their walk.

5       Again, you watch the video.  And the area that they

6  are claiming where Mr. Godinez would have stood out, would

7  have fired from, is if you can see just at the top right-hand

8  corner there is a little -- yes, there is the officers' car.

9  Just as the tree is swaying, the bushes are swaying, there's a

10 little overhang that's jutting out.  That's the front of 4332

11 South Hermitage.  There is no one that walks out and fires

12 that way.

13      Ladies and gentlemen, you will -- we will prove to

14 you that that night, Ernesto Godinez and his friend Victoria

15 did, in fact, use the rolling papers for what they wanted to

16 do.  They smoked marijuana.  They smoked marijuana before they

17 picked up Adriana, and that's -- they went to the -- they took

18 her to the airport.  She will tell you they took her to the

19 airport.

20      In fact, when they left, they had to come back to the

21 airport because Ms. Baptiste had put her phone -- she didn't

22 have a bag.  She put it actually in Ms. Oropeza's bag, and she

23 found it and called her and said, "Come back and get your

24 phone."  You even see a video of the Kia.  The government has

25 a video of the Kia coming up, and there's Ms. Oropeza.

1    We don't dispute that.  We dispute is that there is

2  no physical evidence that points to Ernesto Godinez firing

3  this gun.  Ladies and gentlemen, no gun was recovered, none.

4  There are five cartridge casings that are found in the

5  gangway.  These are what you will be told are .9 millimeter

6  cartridge casings.  They come from different manufacturers.

7  They have different what are called head stamps.  The

8  manufacturers put these on.

9    And yes, these five casings that are found are found

10  by someone we don't know.  We don't know which officer found

11  them.  We don't know if the ATF found them.  We don't know if

12  the Chicago Police Department found them.  We know from the

13  photographs because that's what this man Mr. Presnell is going

14  to testify -- he's the evidence technician, he collects the

15  stuff -- what he's going to see, what he saw when he got

16  there.

17    All right.  So he first finds four casings.  They

18  said, oh, here are the four casings found in the gangway.  But

19  then after they all leave, all of a sudden there's another

20  casing found.  Well, ladies and gentlemen, again, through your

21  own powers of observation, you will see that that fifth

22  casing, that fifth casing was right there.

23    How did they miss it?  How did this experienced crime

24  technician miss these two -- these two casings because the

25  number 8 is, you can see where that bullet is.  And this on

1   the top video is what was taken the first time around.  It's

2   in the same spot.  Where did that bullet come from?  I'm just

3   telling you that those are the powers of observation that you

4   have to make to make a determination in this case.

5          Now, when they collect those casings, those casings

6   are of metal.  They're of a substance that if they want, they

7   can determine just by the dusting of those casings if there's

8   even an impression of a thumb, of a finger, of a nail to

9   determine, is Mr. Godinez's prints on that bullet.  And we

10  will prove to you that was not done in this case.  There's

11  no -- you're not going to hear anybody say, "Oh, yeah, we

12  compared the fingerprints of Godinez.  We found a partial

13  impression."  It doesn't exist.

14         The bullets that are fired, these two bullets that

15  are fired and recovered, the one in the tree, the one in

16  the -- from Agent Crump, those bullets are a different caliber

17  than the .9 millimeter casings.

18         Now, they came from the same weapon.  And how weapons

19  operate is that as the bullet goes through the chamber, it

20  creates a rifling on the bullet.  So you can say whether these

21  technicians -- and you'll hear it from the ATF expert, a

22  firearms examiner, that there are certain riflings.  These two

23  bullets had the same rifling, but these two bullets, he will

24  not say and he cannot say that those bullets were from those

25  casings.

1          Spot shotter -- or, I'm sorry, ShotSpotter.  You just

2    can't say it very quick too many times.  But the spot shotter

3    picks up sounds and sensors.  That's what it does.  But you

4    will see again and you will hear from their representative of

5    this company -- which is, by the way, it's a company that's on

6    the NASDAQ:  SST.  That company has its own proprietary

7    software, and they -- they respond by determining the sounds

8    from the sensors.

9          If you ever look up sometimes in neighborhoods,

10   you'll see these long poles with these sensors, that's from

11   the ShotSpotter.  This neighborhood had them.  They were in

12   different places, but they had them.

13         Interesting, but you will see again from your

14   observations is that the spot shotter picked up the shots of

15   the officer, of Officer Spratte, because there was on the

16   northwest corner a spot shotter, and down here on Marshfield

17   on, that would be, southeast -- southeast corner a spot

18   shotter.  They picked those sounds up, and they report those

19   sounds.

20         There's no question those were picked up and detected

21   because that's where the officer was when he fired it.

22   However, they did not initially pick up these five bullets of

23   five sounds or recordings that were initially fired at the

24   officers.  They had to go back to the ShotSpotter company and

25   say, "Hey, do a manual reevaluation of the data" as opposed to

1　the realtime calculations.

2　　　　Ladies and gentlemen, we will prove to you by the

3　company's own data, their own data, there is a 10 to 20

4　percent inaccuracy in detectable incidents.  The spot shotter

5　does not point to Ernesto Godinez as the shooter.  All it

6　proves is they caught the sounds, and the actual shooter has

7　not been caught.

8　　　　I want to briefly talk to you about the witness who

9　is an alleged gang informant.  His Honor spoke to you, spoke a

10　lot actually yesterday and briefly today about the credibility

11　of witnesses and the evidence that the lawyers, when we put on

12　a witness, we're vouching for their credibility.  We're going

13　to put them on, we're going to put everybody on and say these

14　are our witnesses, and this is who we want you to believe.

15　　　　The government in this case is vouching for a -- and

16　putting a man on this witness stand whose credibility is of

17　the greatest suspect.  And ladies and gentlemen, you don't

18　have to consider his testimony as you would anybody else

19　because Mr. Ruiz, that's his name, Hector Ruiz, he has a stage

20　name.  He has a name that he uses that the government has

21　given him.

22　　　　Now, it's not the ATF.  Yes, it's not the ATF.  I

23　will agree, they didn't hire him.  They didn't say, "Okay, we

24　want you to work for us."  Homeland Security did.  And they

25　gave him -- they gave him an assumed name, right, and -- the

1   stage name, if we like, because they caught Mr. Ruiz,

2   Mr. Diaz, in a crime.  And they said, "We won't deport you if

3   you work for us."  And this was in 2017.

4          Ladies and gentlemen, this man signed an agreement,

5   not one agreement, multiple agreements.  Those agreements, you

6   will see, say, "I'm not going to commit another crime.  I'm

7   not going to carry a gun.  I'm not going to sell drugs."

8          But you will see, you will see by your own

9   observations that that form that he signed was just an empty

10  piece of paper for this witness because no sooner than this

11  shooting happened on May 4th of 2018 that Mr. Ruiz, Mr. Diaz,

12  is arrested:  June 28th of 2018.

13         And he's arrested where?  Around 48th and Wood.  So

14  it's, go down the street and just keep on going and you'll get

15  to 48th Street.  And what did he do?  Did he tell his

16  handlers, the agents from Homeland Security, "Oh, by the way,

17  I've got some drugs in the house, and I've got some guns, but

18  I'm still working for you.  I'm still straight.  I'm still --

19  I'm going to get everybody and give you the information you

20  need."

21         No, he didn't tell them that.  They found out after a

22  search warrant was issued by the Chicago Police Department,

23  and they went to his home.  That's when he called them.

24  That's when he used his "get out of jail card free."  And you

25  will hear that.  And it will sicken you to learn as we will

1  prove that this man is going to be their witness who is going

2  to allege that Ernest Godinez who was in a gang, his role was

3  to stand there and fire a shot at an unknown person driving an

4  unknown car.

5         Ladies and gentlemen, consider the distortion to fit

6  the theory in this case.  That's what it is.  I said to you

7  that this case turns on observation.  That's what this case is

8  all about.  Mr. Godinez was not the shooter that night of

9  Agent Crump.  The evidence will prove that as it did then and

10  today.

11         Ladies and gentlemen, at the end of this proceeding

12  after I've shown you everything that we have talked about and

13  everything that I promised you I would show, we will come back

14  and ask you for a verdict of acquittal for Ernest Godinez.

15  Thank you very much.

16         THE COURT:  Thank you.

17         The government, you may call your first witness.

18         MS. BABU:  Thank you, your Honor.  We call Special

19  Agent Daniel Winter.

20         THE COURT:  Right up here.  Please raise your right

21  hand.

22     (Witness sworn.)

23         THE WITNESS:  Yes, I do.

24         THE COURT:  Please be seated.

25         Ms. Babu, you may question the witness.

1    MS. BABU:  Thank you, your Honor.

2         DANIEL WINTER, GOVERNMENT'S WITNESS, SWORN

3              DIRECT EXAMINATION

4    BY MS. BABU:

5    Q.   Would you please state and say your name for the record?

6    A.   Daniel, last name Winter, W-i-n-t-e-r.

7    Q.   Mr. Winter, where do you work?

8    A.   I'm currently employed with the Bureau of Alcohol,

9    Tobacco, Firearms and Explosives.

10   Q.   Also known as the ATF?

11   A.   Yes, ma'am.

12   Q.   And is the ATF an agency of the United States government?

13   A.   Yes, it is.

14   Q.   And that's the federal government?

15   A.   Yes.

16   Q.   And what is your title with ATF?

17   A.   I'm currently a criminal investigator, special agent.

18   Q.   And how long have you been a special agent with ATF?

19   A.   With ATF, since December of 2013.

20   Q.   And in May of 2018, where -- where physically were you

21   working?

22   A.   In May, I was in Chicago, Illinois.

23   Q.   And could you please tell the jury generally, what are

24   your responsibilities as a special agent?

25   A.   As a special agent, we investigate federal firearms

1    violations and other narcotics and violent felonies.

2    Q.   And what are some of the investigative tools that you use

3    when investigating as a special agent?

4    A.   Throughout our investigation, to further the

5    investigation, we use multiple resources:  Vehicle tracking

6    devices, social media, cell phone analysis, interview

7    techniques.

8    Q.   And you mentioned a vehicle tracking device.  What exactly

9    is that?

10   A.   This is a device that we would install on a subject's --

11   typically, a vehicle that would monitor -- it's a GPS locater,

12   so it would monitor their patterns in a vehicle.

13   Q.   And do you have permission to put these devices on cars?

14   A.   We do.

15   Q.   And who gives you that permission?

16   A.   A judge does.

17   Q.   And do -- the people who use or own the cars, do they know

18   that these devices are being placed on their cars?

19   A.   Our intention is for them not to, so no.

20   Q.   Agent Winter, do you have any law enforcement experience

21   before you joined ATF?

22   A.   Yes, I do.

23   Q.   And what is that?

24   A.   I was a United States Park police officer in Washington,

25   D.C.

1  Q.  And how long were you with the park police?

2  A.  Just over three years.

3  Q.  And so that was immediately prior to ATF?

4  A.  Yes, it was.

5  Q.  Do you have any military experience, Agent Winter?

6  A.  I do.

7  Q.  And what is that?

8  A.  I was a commissioned officer in 2005 into the United

9  States Army.

10  Q.  And do you have any specialized, qualified specialties in

11  the Army?

12  A.  I do.

13  Q.  And what are those?

14  A.  I was an Airborne Ranger qualified infantry officer.

15  Q.  And you joined the Army in 2005, you said?

16  A.  Yes, I did.

17  Q.  And are you still serving in the Army?

18  A.  I'm not in the Army now.  I'm in the Inactive Reserves.

19  Q.  Agent Winter, were you ever deployed as part of your

20  service in the Army?

21  A.  Yes, I was.

22  Q.  And when was that?

23  A.  In 2008 and 2009.

24  Q.  And where were you deployed to?

25  A.  Eastern Afghanistan.

1  Q.  Agent Winter, if I could direct your attention to May 4th

2  of 2018.

3  A.  Yes.

4  Q.  Were you working on May 4th?

5  A.  I was.

6  Q.  And what specifically were you working on?

7  A.  The morning of May 4th, myself combined with other task

8  force officers with ATF, we were going to emplace vehicle

9  tracking, covert vehicle tracking devices on three separate

10  vehicles related to the -- associated with the Latin Saints.

11  Q.  And Agent Winter, the tracking devices you mentioned, are

12  those the same tracking devices you talked about earlier?

13  A.  Yes, ma'am, they are.

14  Q.  And I'm sorry if you mentioned this earlier.  About where

15  were these cars -- actually, before that, how many cars were

16  you placing tracking devices on?

17  A.  We had three separate vehicles we were going to emplace

18  the trackers on.

19  Q.  Agent Winter, the map is all the way over here, so I'll

20  just have you explain, where were the first two cars that you

21  were placing the tracking devices on?

22  A.  The first two vehicles --

23  Q.  Don't worry about the map.

24  A.  Okay.  In the Back of the Yards community which is on the

25  south side of Chicago.

1   Q.   And what street were they on?

2   A.   The first two vehicles were on Hermitage, and the third

3   was on Wood.

4   Q.   And what were the cross streets on Hermitage they were

5   between?

6   A.   44th and 45th.

7   Q.   So they were on the 4400 block of Hermitage Avenue between

8   44th and 45th?

9   A.   That's correct.

10  Q.   And was this part of a federal investigation?

11  A.   It was.

12  Q.   Agent Winter, were you working by yourself that morning on

13  May 4th?

14  A.   I was -- no, I was not.

15  Q.   Who were some of the agents you were working with?

16  A.   We had a combined law enforcement group that was doing

17  that operation that night.  It was comprised of ATF agents;

18  CPD, Chicago Police Department police officers; Illinois State

19  Police; and Illinois Department of Corrections officers.

20          And some of the individuals, it was myself, Special

21  Agent Winter; Special Agent Kevin Crump; TFO Kevin O'Neill;

22  TFO Thomas Spratte; Special Agent David Lopez; Special Agent

23  Ryan Holcomb; TFO Jason Schoenecker; TFO Matt Daquilante; TFO

24  Louis Hopkins; and TFO Edward Nowak.  There was 11 of us.

25  Q.   And were all of these individuals working with ATF?

1  A.   They were -- yes, they were.  They were assigned to our --

2  they're task force officers with us.  We were special agents.

3  Yes.

4  Q.   And about what time did you start working on May 4th?

5  A.   Approximately 3:15 in the morning.

6  Q.   And what happened at about 3:15 in the morning?

7  A.   Myself and TFO Jason Schoenecker led a brief at Chicago

8  Police Department's 9th District.  We briefed all the agents

9  and law enforcement officers that were going to be involved in

10  installation of those tracking devices on those separate

11  vehicles.

12  Q.   So you were leading the meeting along with Detective

13  Schoenecker?

14  A.   That's correct, yes.

15  Q.   And what generally was the plan?

16  A.   The intended plan for this operation was to -- the first

17  vehicle we were going to install, again, in the vicinities

18  that I discussed, was to have what we call in law enforcement

19  surveillance units that are usually comprised of approximately

20  two law enforcement officers.  They would set up.

21       So our first intended vehicle, the surveillance units

22  would set up north, south, east, and west of that actual

23  vehicle prior to the installation team coming in.  The

24  installation team in this scenario was comprised of myself,

25  TFO Thomas Spratte, and Special Agent Kevin Crump.

1        So the surveillance units that were set up, their

2   role was to have observation, constant observation on the

3   vehicle we were going to initially install it on so they can

4   monitor any activity that's around that vehicle.

5        And additionally, Task Force Officer Jason

6   Schoenecker and Matt Daquilante were supposed to go out into

7   the vicinity.  They were supposed to confirm that the vehicle

8   was actually in the location that we thought it was going to

9   be in and make sure that no one was in the vicinity of that

10  vehicle.

11  Q.  And Agent Winter, why do -- why did you that morning have

12  the other agents conduct the surveillance?

13  A.  Based on our investigation with this area, it's prevalent

14  with a lot of shootings in that vicinity just in the Back of

15  the Yards community.  So we wanted to isolate and kind of

16  keep -- we obviously wouldn't want to be seen as we were

17  emplacing the tracking device, so we wanted those surveillance

18  units to be able to give me and the other agents that were

19  installing the tracking device a warning that either people

20  are in the vicinity of or we were going to be compromised.

21  Q.  So after the meeting at the 9th District concluded, what

22  happened next?

23  A.  After the meeting, the surveillance units I discussed

24  previously set up north, south, east, and west of that target

25  vehicle.  And as they were moving into positions, TFO

1   Schoenecker, I was on the radio and phone with him.  TFO

2   Schoenecker and Matt Daquilante drove past the vehicle,

3   confirmed it was in the location and that no one else was in

4   the vicinity of that vehicle that they could see.

5   Q.  And what did you then do?

6   A.  We made our -- the vehicle I discussed, the installation

7   team, we made our way from the Chicago Police Department's 9th

8   District to that location.

9   Q.  Agent Winter, could you remind the jury again who was in

10  that car?

11  A.  In -- driving the vehicle was TFO Kevin O'Neill.  I was in

12  the front passenger seat.  Behind me was Task Force Officer

13  Thomas Spratte, and directly behind Kevin O'Neill was Special

14  Agent Kevin Crump.

15  Q.  And what were you wearing that morning?

16  A.  Dark-colored sweatshirt and dark-colored pants.

17  Q.  Were you wearing anything with a police marking or law

18  enforcement marking?

19  A.  We were not.

20  Q.  Was the car that Officer O'Neill was driving, was that a

21  marked police car?

22  A.  It was an unmarked.

23  Q.  And why were you wearing -- why were you not wearing

24  marked police clothing and driving in an unmarked car?

25  A.  Again, because we didn't want anyone to know that we were

1    law enforcement.  We just wanted to blend in with the

2    community.

3    Q.   So I'm sorry.  You said that Officer O'Neill entered the

4    neighborhood.  And then where did you go from there?

5    A.   So we were southbound from Ashland to 43rd, and then we

6    went southbound on Hermitage, and we stopped just north of the

7    traffic circle.

8    Q.   And were you looking for anything as Officer O'Neill was

9    driving?

10   A.   We were.  Again, the same thing the surveillance units

11   were, the same thing that TFO Schoenecker were looking for:

12   Any activity in the area, any personnel in the area that we

13   could observe.

14   Q.   And did you see anyone?

15   A.   I did not.

16   Q.   Once Officer O'Neill stopped the car, what did you do

17   next?

18   A.   As soon as he stopped the car, myself and TFO Spratte

19   along with Kevin Crump exited the vehicle.

20   Q.   And once you exited the car, where did you go?

21   A.   The intended plan -- I'll go back to that.  The intended

22   plan was for us to, as when Kevin O'Neill, the TFO dropped us

23   off, Kevin Crump, Special Agent Crump was going to be on the

24   west side of the street, and he was going to parallel myself

25   and Thomas Spratte who was a couple steps in front of me to

1   emplace the tracking device so Kevin could have observation

2   from one side of the street.  I could kind of be there as

3   Thomas -- TFO Spratte was emplacing the tracking device.  And

4   we'd be able to have as much observation in that vicinity for

5   personnel as possible.

6            So once we got -- that was the intended plan.  Once

7   we got to that vehicle, myself, Thomas Spratte, and Special

8   Agent Crump exited the vehicle.  And shortly after that, I --

9   we were -- myself and -- I heard gunshots, and we received

10  gunfire.

11  Q.  So how many gunshots did you hear?

12  A.  The first volley was five.

13  Q.  And when -- about where were you in the street when you

14  heard the gunshots?

15  A.  I was to -- as you're looking at the map, I was to the --

16  so it would be the east side of that traffic circle in the

17  middle of the intersection.

18  Q.  And you were crossing the street?

19  A.  Yes.

20  Q.  And how did you know that they were gunshots?

21  A.  Based on my 14 years combined of training and experience

22  through combat and military, I know what gunshots sound like.

23  Q.  And did you hear any additional gunshots?

24  A.  I did.  There was two more fired by TFO Thomas Spratte.

25  Q.  And where did the first five gunshots sound like they were

1   coming from?

2   A.   The first five originated to my back, which would have

3   been northwest of my location.

4   Q.   So which direction were you facing?

5   A.   I was facing south.

6   Q.   And did you see anything when you heard the gunshots?

7   A.   I did not.

8   Q.   After you heard the gunshots, Agent Winter, what did you

9   do next?

10  A.   Myself and TFO Spratte, TFO Spratte immediately returned

11  fire exactly in the direction where the gunshots were

12  originating from, I believe, and then we immediately took

13  cover.

14  Q.   And after you took cover, what did you do after that?

15  A.   We took cover at a vehicle in the vicinity of 44th and

16  Hermitage just at the corner.  I checked on Spratte because he

17  was right next to me.  We communicated to each other.  And

18  then we immediately started to aggress on the location that we

19  believed the shots were coming from.

20  Q.   So you and Officer Spratte then ran up the street?

21  A.   That's correct.

22  Q.   And where was --

23  A.   Northbound.

24  Q.   I'm sorry?

25  A.   I'm sorry.  Northbound on Hermitage.

1   Q.  And where was Agent Crump?

2   A.  At this point, Agent Crump was shot.

3   Q.  And how did you know that?

4   A.  I didn't at this point.  We ran northbound.  And as I was

5   running northbound, as I was running northbound, I remember

6   turning back to see where Crump was to have him come towards

7   us, and he had a muffled response.  And I could see a dark

8   figure, silhouette, hunched over by a vehicle.

9   Q.  And was Agent Crump speaking?

10  A.  It was muffled, but he was trying to respond, yes.

11  Q.  And what did Agent Crump -- based on your observations,

12  what did Agent Crump look like?

13  A.  He was -- I just saw a dark figure.  This is when we're

14  still kind of pressing towards northbound on Hermitage, and I

15  kind of glanced back.  I just observed like a dark figure

16  hunched over by that vehicle on the corner.

17  Q.  And what did you do once you saw the dark figure?

18  A.  Myself and TFO Spratte immediately ran to his location.

19  Q.  And what did you find when you ran to that location?

20  A.  That Special Agent Crump was shot.

21  Q.  How could you tell that he had been shot?

22  A.  He was muffled.  His hands were over his face, and I could

23  feel the blood when I put my hands on Special Agent Crump's

24  face.

25  Q.  And was Agent Crump then taken to the hospital?

1    A.   He was, yes.

2    Q.   And did you go to the hospital with Agent Crump?

3    A.   I did not.  We -- the intended plan was to put him in a

4    vehicle, one of our own, and get him to the hospital.  So we

5    loaded him in that vehicle, and I remained on screen.

6    Q.   And you remained on scene?  I'm sorry?

7    A.   Yes.

8         MS. BABU:  Your Honor, I'd like to read stipulation

9    number one into the record.

10        MR. HYMAN:  We have no objection, your Honor.

11        THE COURT:  All right.  A stipulation, members of the

12   jury, is -- are designed to speed things along where there is

13   a fact or testimony, where there is no dispute that the fact

14   is correct or that the witness would testify in a certain way,

15   then the parties can agree that either the fact exists or that

16   the witness would testify as in accordance with the -- with

17   the stipulation.  So you should accept this as evidence.

18        You may read the stipulation.

19        MS. BABU:  Thank you, your Honor.

20        Government Exhibit 100 is a true and accurate copy of

21   a portion of video taken on May 4th, 2018, from a police

22   observation device located at 4358 South Hermitage Avenue in

23   Chicago, Illinois.

24        Government Exhibit 101 is a true and accurate copy of

25   a portion of video taken on May 4th, 2018, from a police

1   observation device located at 1701 South 44th Street in

2   Chicago, Illinois.

3           Government Exhibit 102 is a true and accurate copy of

4   a portion of a video taken from May -- taken on May 4th, 2018,

5   from a police observation device located near 45th Street and

6   south Hermitage Avenue in Chicago, Illinois.  The events

7   depicted in the surveillance videos occurred at or near the

8   times visible in the surveillance videos.

9   BY MS. BABU:

10  Q.  Agent Winter, in front of you is a stack of disks.  Could

11  you please pull out Government Exhibits 100, 101, and 102?

12  A.  Yes.

13  Q.  Have you seen these exhibits before?

14  A.  Yes, I have.

15  Q.  And how do you know that?

16  A.  I reviewed these disks, and my -- I'm sorry.  My initials

17  and date are on these disks.

18  Q.  And what do these disks contain?

19  A.  These disks contain surveillance footage from police

20  observation devices located in the Back of the Yards

21  community.

22          MS. BABU:  Your Honor, I would move to admit

23  Government's Exhibit 100, 101, and 102.

24          THE COURT:  Without objection, they're admitted.

25          (Government Exhibits 100 through 102 received in

1     evidence.)

2         MS. BABU:  Your Honor, I would like to read

3  stipulation number two into the record.

4         THE COURT:  Go ahead.  You may.

5         MS. BABU:  Government Exhibits 103 and 104 are true

6  and accurate copies of portions of video taken from a pole

7  camera from 4359 South Wood Street in Chicago, Illinois, on

8  May 4th, 2018.  The events depicted in the surveillance video

9  occurred at or near the times visible in the surveillance

10  video.

11  BY MS. BABU:

12  Q.  Agent Winter, could you please take out from that stack

13  Government Exhibits 103 and 104?

14  A.  Yes.

15  Q.  Have you seen these exhibits before?

16  A.  I have.

17  Q.  And how do you know that?

18  A.  My initials and date are on them after I reviewed them.

19  Q.  And so you've reviewed the footage on these disks?

20  A.  Yes, I have.

21  Q.  And what do the -- generally, what does the footage

22  depict?

23  A.  The footage on these disks depict a pole camera,

24  surveillance.  Again, it's surveillance from a fixed position

25  inside the Back of the Yards community.

1    Q.   And what generally is a pole camera?

2    A.   A pole camera is a camera that's installed typically on a

3    public place in a fixed position that can observe that -- it's

4    surveillance footage.

5    Q.   And going back to Government Exhibits 100, 101, and 102,

6    you mentioned that this is a police observation device?

7    A.   That is correct.

8    Q.   What is that?

9    A.   A police observation device is, it's a police camera.

10   Again, it's surveillance footage that can be viewed remotely

11   by law enforcement or people with access to that.

12          MS. BABU:   Your Honor, I would move to admit

13   Government's Exhibits 103 and 104.

14          THE COURT:   They're admitted subject to stipulation.

15          (Government Exhibits 103 and 104 received in evidence.)

16          MS. BABU:   Your Honor, I'd like to read stipulation

17   No. 13 into the record.

18          THE COURT:   Proceed.

19          MS. BABU:   Government Exhibit 200 is a true and

20   accurate copy of ShotSpotter audio recordings from near the

21   area of 44th Street and Hermitage Avenue on May 4th, 2018, at

22   approximately 3:18 a.m.

23          Government Exhibit 201 is a true and accurate copy of

24   the audio recording from ShotSpotter sensor 3160 from near the

25   area of 44th Street and Hermitage Avenue on May 4th, 2018, at

1  approximately 3:18.

2  BY MS. BABU:

3  Q.  Agent Winter, you have in front of you Government's

4  Exhibit 201?

5  A.  I do, yes.

6  Q.  Have you seen that exhibit before?

7  A.  I have.

8  Q.  And what is it?

9  A.  201, I actually don't recall.  I don't recall what this

10  was.  I've got 200 and 201 here, and my signature is on this

11  one.  I know I reviewed it.

12  Q.  On 201?

13  A.  Yes.  Is this the ShotSpotter?  Sorry.

14       MS. BABU:  Yes.  Your Honor, based on the

15  stipulation, Government Exhibit 201 is the true and accurate

16  copy of the audio recording from ShotSpotter Sensor 3160.

17       THE WITNESS:  Yes, I have reviewed it.

18       THE COURT:  They're admitted --

19       MS. BABU:  Thank you, your Honor.

20       THE COURT:  -- subject to stipulation.

21    (Government Exhibits 200 and 201 received in evidence.)

22       MS. BABU:  Thank you, your Honor.  Your Honor, may I

23  publish Government Exhibit 201?

24       THE COURT:  You may.

25       MS. BABU:  Agent Winter, I'm going to play the audio

1  contained on Government Exhibit 201 first.

2      (Said audio recording played in open court.)

3  BY MS. BABU:

4  Q.  Agent Winter, what is this a recording of?

5  A.  This is a recording of the ShotSpotter that was -- that

6  picked up the audio of the gunshots.  The first volley was the

7  gunshots that we received, and then the second volley of shots

8  were TFO Spratte's returning fire.

9  Q.  And how many gunshots were in that first volley that you

10 were describing?

11 A.  Five shots.

12 Q.  And the second volley?

13 A.  The second volley was TFO's.  It was two.

14 Q.  And how do you know that the last two shots were TFO

15 Spratte's shots?

16 A.  I can recall the instance and the pause where he was

17 returning fire.  Additionally, listening to the audio, myself

18 and TFO Spratte are communicating.

19 Q.  Those are the voices you heard at the end of the

20 recording?

21 A.  Yes.

22      MS. BABU:  Your Honor, may I publish Government

23 Exhibit 100?

24      THE COURT:  Yes, you may.

25 BY MS. BABU:

1  Q.  And Agent Winter, before I start the video, when it shows

2  up, you'll see the initial screen of the video.  Could you

3  remind the jury what camera this is?  And --

4  A.  Yes.  This camera is --

5  Q.  Agent Winter, before you begin, I'm going to bring this

6  map up there for you.

7          Sorry.  Agent Winter, could you remind the jury, the

8  view from the camera now, where is that camera located?

9  A.  This camera that's on the screen right now is located at

10  44th and Hermitage in the vicinity right here.

11  Q.  In what direction is that camera facing?

12  A.  Southbound, southbound on Hermitage from 44th.

13  Q.  So on the map, it's looking down?

14  A.  That's correct.

15  Q.  And where the first two cars that the agents were planning

16  on placing the tracking devices on, where were those cars

17  parked?

18  A.  Those vehicles were parked on Hermitage in between 44th

19  and 45th in the vicinity halfway down the block.  The vehicles

20  were parked in this vicinity.

21          MS. BABU:  Agent Winter, I'm now going to play

22  this -- the 90-second clip from Government Exhibit 100.

23      (Said video recording played in open court.)

24  BY MS. BABU:

25  Q.  Agent Winter, right about here, you saw a car turn right

1  in the video?

2  A.  Yes, I did.

3  Q.  Do you recognize that car?

4  A.  I do.

5  Q.  Whose car was that?

6  A.  That was the vehicle that dropped myself, TFO Spratte, and

7  Kevin Crump off at that was driven by TFO Kevin O'Neill.

8          MS. BABU:  We can start the video again.

9      (Said video recording played in open court.)

10  BY MS. BABU:

11  Q.  And Agent Winter, right about here, who is on the screen

12  in front of you?

13  A.  So on your left side is -- we'll start on the right,

14  actually.  On the right side, that is Special Agent Kevin

15  Crump.

16  Q.  And Agent Winter, if you'd like, you can motion on the

17  screen.

18  A.  Yep.  So Special Agent Kevin Crump.  And then this one is

19  TFO Thomas Spratte where he's -- he's taking cover at this

20  point.  You can see he's hunching over.  And then right here

21  is, you can see a portion of my body as I'm taking cover

22  behind that vehicle.

23          MS. BABU:  We can start the video again.

24      (Said video recording played in open court.)

25  BY MS. BABU:

1   Q.  And at this point, Agent Winter, where are you on the

2   screen?

3   A.  I am off the screen to the east side of the street.  At

4   this point, I'm behind a vehicle with TFO Spratte.

5   Q.  And where were you going at that point?

6   A.  At that point is when we checked each other.  We did not

7   know that Special Agent Crump was hit or shot at this time.

8   So we were checking each other.  And then we were moving

9   forward to where the threat originated from north of our

10  location.

11          MS. BABU:  And Agent Winter, we'll play the video all

12  the way through here.

13      (Said video recording played in open court.)

14  BY MS. BABU:

15  Q.  Who is that?  What car is that that just pulled into the

16  video?

17  A.  That's TFO Kevin O'Neill's sedan that dropped us off.

18  Q.  Agent Winter, two figures just ran on to the screen.  Who

19  are those individuals?

20  A.  Myself and TFO Thomas Spratte.

21  Q.  What are you running towards?

22  A.  This is when we looked back and saw that something was

23  wrong with Kevin Crump, and we -- we were running to his

24  location.

25  Q.  And where are you -- who is running back and forth in the

1   middle of the street?

2   A.   That's Thomas Spratte.

3   Q.   And where are you?

4   A.   I am with Special Agent Kevin Crump right now on the

5   ground.

6   Q.   And was Agent Crump then transported to the hospital in

7   one of the vehicles on the screen?

8   A.   He was.

9   Q.   Agent Winter, if I can now turn your attention to May 6th

10  of 2018, were you working on that, the Sunday, May 6th, 2018?

11  A.   Yes, I was.

12  Q.   What were you -- what were you tasked with doing?

13  A.   May 6th, I was at Chicago Police Department's 9th District

14  coordinating leads in trying to apprehend the defendant,

15  Ernesto Godinez.

16  Q.   And Agent Winter, why at this point were you looking for

17  the defendant?

18  A.   We had an active arrest warrant for Ernesto Godinez on

19  that Saturday, the Saturday, the day before on Saturday.

20  Q.   So approximately 24 hours after Agent Crump was shot?

21  A.   That's correct.

22  Q.   So as part of your search for the defendant on Sunday, did

23  you participate in the search of an apartment located near the

24  intersection of Cicero Avenue and Belmont Avenue?

25  A.   I did.

1  Q.  Do you recall the address of that location?

2  A.  3106 North Cicero.

3  Q.  And approximately how far is 3106 North Cicero Avenue from

4  the Back of the Yards if you were driving?

5  A.  If you were driving, about 15 miles.

6  Q.  And in what direction generally?

7  A.  Northwest of the Back of the Yards community.

8  Q.  So on the map, it would be well off?

9  A.  It would be well off, yes.

10  Q.  And who or what were you looking for at this apartment?

11  A.  At this time, again, we had an active arrest warrant for

12  Ernesto Godinez, so through our investigation and coupled with

13  the U.S. marshals who had a GPS tracking -- GPS location off

14  of a cell phone that belongs to Ernesto Godinez was pinging at

15  this residence.

16  Q.  And did you ultimately search that apartment?

17  A.  We did.

18  Q.  And did you search the apartment with the consent of the

19  resident?

20  A.  Yes, we did.

21  Q.  And did you find the defendant in the apartment?

22  A.  We did not.

23  Q.  Did you find the -- did you find anything that you

24  believed was related to the defendant?

25  A.  We did.

1    Q.   What did you find?

2    A.   We found the cell phone that led us to that address in

3    that vicinity.  Additionally, we found a vehicle that belonged

4    to the defendant's -- the defendant's baby's mother.

5    Q.   And what vehicle was that?

6    A.   It was a white Kia SUV.

7    Q.   And how did -- how did you know that the white Kia was

8    owned by the defendant's -- the mother of the defendant's son?

9    A.   Throughout our investigation, we observed that vehicle

10   throughout our investigation in the Back of the Yards

11   community.

12   Q.   And where specifically was this car found?

13   A.   In an attached garage in the rear of that residence that

14   we searched.

15   Q.   And I'm sorry.  You may have mentioned this.  What was

16   the -- what type of car was it?

17   A.   It was a white SUV.  Kia was the make.

18         MS. BABU:  Your Honor, I'd like to read Stipulation

19   No. 6 into the record.

20         THE COURT:  Fine.  You may read it.

21         MS. BABU:  Government Exhibit 108 is a true and

22   accurate copy of a portion of surveillance video from 4819

23   West Fletcher Street in Chicago, Illinois, on May 4th, 2018.

24   The events depicted in the surveillance video occurred at or

25   near the times visible in the surveillance video.

1  BY MS. BABU:

2  Q.  Agent Winter, in front of you should be Government Exhibit

3  108.  Do you see that?

4  A.  Yes, I do.

5  Q.  And what is Government Exhibit 108?

6  A.  Government 108, this is a disk that contains surveillance

7  footage from a private security camera located next to the

8  residence we were searching at 4819.

9  Q.  And how do you know that that's what the disk contains?

10 A.  I reviewed this, and my initials and date are on this,

11 this disk.

12         MS. BABU:  Your Honor, I'd move to admit Government

13 Exhibit 108.

14         THE COURT:  It's admitted based on the stipulation.

15     (Government Exhibit 108 received in evidence.)

16         MS. BABU:  Your Honor, may I publish Government

17 Exhibit 108?

18         THE COURT:  You may.

19 BY MS. BABU:

20 Q.  And Agent Winter, before we start the video, let me show

21 you the first screen here.  Could you read the date and

22 timestamp on that video?

23 A.  Yes, I can.

24 Q.  And what is that?

25 A.  5/4/2018 at 10:18 a.m.

1  Q.  And is May 4th, 2018, the same day that Agent Crump was

2  shot?

3  A.  Yes, it is.

4  Q.  And about how many hours after this shooting is the

5  timestamp on this video?

6  A.  The timestamp associated is approximately seven hours

7  after the shooting.

8          MS. BABU:  Agent Winter, I'm now going to play this

9  video.

10     (Said video recording played in open court.)

11 BY MS. BABU:

12 Q.  Agent Winter, what type of car is in the video here?

13 A.  It's a white Kia SUV.

14 Q.  And how can you tell that it's a Kia?

15 A.  Based on our investigation, we've seen this vehicle

16 multiple times, and in the front where the front grille area

17 is, this was -- sorry.  That symbol is a Kia.  Additionally,

18 you can make out 42043, AQ 42043, which is associated to

19 Destiny Rodriguez, which is the vehicle that we seen -- that

20 we had previously seen the defendant in.

21 Q.  And Agent Winter, can you -- do you recognize the

22 individual driving the car?

23 A.  I do not.

24 Q.  Can you tell what the individual driving the car is

25 wearing?

1    A.   It appears to be a white, light-colored shirt.

2    Q.   Agent Winter, is this the same car that you and the other

3    ATF agents found in the garage of 3106 North Cicero Avenue on

4    May 6th, 2018?

5    A.   Yes, it is.

6              MS. BABU:   Thank you.

7              THE COURT:   Is that it?

8              MS. BABU:   Yes, your Honor.

9              THE COURT:   Cross-examine.

10             MR. HYMAN:   Thank you, your Honor.

11                         CROSS-EXAMINATION

12   BY MR. HYMAN:

13   Q.   Agent Winter, this was emotional for you on May 4th of

14   2018, true?

15   A.   Yes, sir.

16   Q.   In fact, it was even emotional for you today, correct?

17   A.   That's correct.

18   Q.   Now, I want to talk to you first about training, your

19   training and -- as in the military and as well throughout your

20   law enforcement career if we could for a moment.  One of the

21   things you do is you train for a situation where someone's

22   firing at you, right?  You would agree with that?

23   A.   We have trained for that, yes.

24   Q.   Right.  And one of the things that you want to do is

25   before -- you have learned in your training is before you just

1  fire your weapon, you want to make sure that you are firing at

2  someone who is visible or something such as, in this case,

3  muzzle flashes, right?  You want to -- you're trained to do

4  that, right?

5  A.   That's part of some of the things that we would look for.

6  Q.   You're just not going to turn and fire away not knowing

7  what you're firing at, true?

8  A.   I wouldn't, no.

9  Q.   But that's the training that officers get?

10  A.   That's correct.

11  Q.   Now, one of the things that you did or what your role was

12  that night was to be watching sort of the backs of Spratte and

13  Crump while they put the -- they put the trackers on that car,

14  true?

15  A.   No.  I was -- for the first vehicle was me and Spratte.

16  Kevin was watching us from across the way.

17  Q.   So it was actually Officer Crump who was supposed to be

18  watching you?

19  A.   He was assisting me and watching Spratte, yes.

20  Q.   So as either way, someone was supposed to watch you as you

21  were walking down the street, right, one of those brother

22  officers, either Spratte or Crump?

23  A.   Me --

24  Q.   Yes.

25  A.   -- individually?

1   Q.  As you're walking down the street --

2   A.  Yes.

3   Q.  -- someone's got to -- you've got to turn around and see,

4   make sure that everybody is okay, true?

5   A.  Yes.

6   Q.  Who did that?

7   A.  We all did.

8   Q.  Everybody was looking around making sure that no one was

9   around?

10  A.  That we could see, yes.

11  Q.  Who turned back and looked northbound on Hermitage?

12  A.  I did, and TFO Spratte did.

13  Q.  Okay.  At what point did you do that?

14  A.  After we took fire.

15  Q.  Okay.  Maybe it's the way I asked the question, and I

16  apologize.  Did you -- before you heard the shots, did anybody

17  turn around to see if anybody was behind them?

18  A.  Yes.

19  Q.  Did you do that?

20  A.  Yes, I did.

21  Q.  Okay.  Did you see anybody?

22  A.  I did not.

23  Q.  When you started in the morning, it wasn't at 3:15, it was

24  earlier, was it not?

25  A.  It was, yes.

1  Q.  And you started up at the 9th District over there on

2  Halsted Street?

3  A.  That's correct.

4  Q.  And you and Spratte and Crump and all these others that

5  you have mentioned, everybody had a role that night, right?

6  A.  They did, yes.

7  Q.  And that role was very specific, true?

8  A.  We had specific roles, but we also had broader roles, yes.

9  Q.  But for that project that night, some officers were in a

10 surveillance car, right?

11 A.  Yes, that's correct.

12 Q.  And you and O'Neill and Spratte and Crump, you were in

13 this car that's going to put these trackers on --

14 A.  Yes.

15 Q.  -- right?

16       So you had a role, true?

17 A.  Yes.

18 Q.  And you told the members of the jury that there was an

19 installation team that was out there to put these specific GPS

20 trackers on a car --

21 A.  Yes.

22 Q.  -- right?

23 A.  That's correct.

24 Q.  By the way, the camera that we saw, that's a Chicago

25 Police pod, true?

1 A.  Yes, it is.

2 Q.  As part of your arrangements or part of your meeting, do

3 you notify the Chicago Police Department at that particular

4 location that you're going to be there?

5 A.  I think -- I believe -- we had members of the Chicago

6 Police Department on our team, so I don't know if we

7 specifically did, but I'm assuming we did, yes.

8 Q.  So the man or woman who's behind the camera, who is

9 operating the camera in this case, they turned it, did they

10 not?  You saw that in the videos?  You've reviewed the videos?

11 A.  Yes, I have reviewed.

12 Q.  That individual, are they notified as well as part of the

13 team?

14 A.  No.

15 Q.  Now, also, before you set out on this particular morning,

16 you were not going to participate in the surveillance of

17 driving around the neighborhood, right?

18 A.  No, I was not.

19 Q.  So you and Crump and Spratte and -- O'Neill, is it?

20 A.  Yes.

21 Q.  You leave from the 3rd -- from the 9th District, right?

22 A.  Yes.

23 Q.  You drive down -- oh, we need the HDMI.

24         So again, this is an aerial view.  And it starts --

25 if you can see, Agent, it starts at the top where the 9th

1   District is and you drive down.  Do you see it?

2   A.  I see it, yes.

3   Q.  Okay.  And then you drive down --

4           MS. BABU:  Your Honor, just for the -- just for the

5   record here, this has not been introduced into evidence and

6   has been published to the jury.  We don't have an objection.

7           THE COURT:  Well, you -- okay.  But it's just a map,

8   right?

9           MR. HYMAN:  Yes.

10          THE COURT:  There's no objection, so you may use it.

11          MR. HYMAN:  Okay.  Thank you.

12  BY MR. HYMAN:

13  Q.  And this direction shows that you're traveling -- what is

14  the main line of road that you were traveling down?  Is that

15  Ashland?

16  A.  Ashland south, yes.

17  Q.  Ashland south.  You go from Halsted.  Was it Halsted or --

18  A.  Actually, I don't remember the route.  We might not have

19  taken Pershing.  Sometimes we switch the route up, but we did

20  end up on Ashland, yes.

21  Q.  Okay.  And from Ashland, you go to --

22  A.  43rd.

23  Q.  -- 43rd Street.  And 43th Street --

24  A.  Turned --

25  Q.  -- you go down to Hermitage, right?

1   A.   That's correct.

2   Q.   So you never drive past Wood Street, right?  You never go

3   down Wood Street?

4   A.   Me specifically?

5   Q.   Yes, your car.

6   A.   No.

7   Q.   You just went right to where you wanted -- had to go,

8   true?

9   A.   That's correct, yes.

10  Q.   Now, when you went down that street, you told -- told us

11  that you were also looking around as well making sure nobody

12  was out on the street that night --

13  A.   Yes.

14  Q.   -- right?

15       And as you drove down that street, did you see anyone

16  that you can -- if you remember, that was in the area from

17  43rd Street, any of these houses as you drove by?

18  A.   When we made our approach, I didn't see anybody, no.

19  Q.   And that's part of your training, is to make sure that you

20  observe and watch what's going on, right, because you don't

21  want this to fail; you don't want someone to see you put this

22  tracker on the car, right?

23  A.   Yes.

24  Q.   So as you drove down that street, did you see -- you saw

25  no one?

1  A.  I did not.

2  Q.  Okay.  Can we get to that video?

3       You've reviewed a lot of these videos, true?

4  A.  The ones that I signed off on, yes.

5  Q.  All right.  Did you see or review the video of the front

6  house at 4324 South --

7  A.  I have seen --

8  Q.  -- Hermitage?

9  A.  I have seen portions of that.

10  Q.  I want to show you what the government has given us, the

11  prosecution has given us.  And this is the front of 4324 --

12  432' -- this is taken from the front of 4324 South Hermitage.

13       Now, that car is going by.  Is that the car that

14  looked like yours?

15  A.  It's a sedan, a four-door vehicle, yes.

16  Q.  Just a little bit back more.

17       Did that look like the car that you were in?

18  A.  It's a four-door sedan, and we were in a four-door sedan.

19  I don't know if that was --

20  Q.  And when it gets to -- when it gets to the top right

21  portion of that video, you see the lights, the taillights,

22  like a stop.

23  A.  Okay.

24  Q.  That's what you were doing; you were getting out, right?

25  A.  That could be ours, yes.

1  Q.  Yes.  And then O'Neill, who is driving, takes a right, and

2  you continue to walk down?

3  A.  That's correct.

4  Q.  Let's just see.  You'll see sort of like the lights leave,

5  which they are.  And then you described to the members of the

6  jury that as you were crossing the street -- and you circled

7  it and we heard the shots -- that Officer Crump fell.

8  A.  Yes.

9  Q.  You didn't know he fell at first --

10  A.  I did not.

11  Q.  -- did you?  No.

12          And once you got to the point where you were

13  protected, you did not fire your weapon, did you?

14  A.  I did not.

15  Q.  The gunshots that -- and I want to talk to you if I can

16  now about the sound of gunshots.

17  A.  Yes.

18  Q.  You -- we were just played those sounds.  The sounds of a

19  gun being fired has certain decibels to it, right?

20  A.  Yes.

21  Q.  The decibels we heard of the first four shots were a

22  little -- seemed to be a little softer than the last two, and

23  then there was -- there was a pause, a final shot.  That

24  appears to be what hit Mr. Crump, right?

25  A.  It could be.

1  Q.  You don't know whether or not that -- where that shot came

2  from?

3  A.  I'm assuming it was that.

4  Q.  You're just assuming, you don't know?

5  A.  No, I don't know.

6  Q.  And the fire or the two sounds, the recordings that we

7  hear after the fifth sound, those are from Spratte, right?

8  A.  Yes.

9  Q.  And then there was some -- briefly, it picked up the sound

10  of your voices, right?

11  A.  That's correct.

12  Q.  That's what you've told us?

13      Now, Spratte, you and Spratte, as you mentioned, go

14  to behind an area right off of the -- off of the corner,

15  right?  You go to this car?

16  A.  To a vehicle.

17  Q.  Right behind the car, right?

18  A.  To the south.  I believe we took cover on the south side

19  of that vehicle.

20  Q.  And that's when Spratte fires his weapon, right?

21  A.  I -- I think it was kind of all at the same time as we

22  were moving to that because I was behind Spratte a couple

23  steps so -- and I was also on the phone with SA Lopez.  So he

24  was -- he was kind of in front of me because I was supposed to

25  be watching him.

1  Q.  And as Spratte -- as Spratte is in front of you, he turns,

2  and he tells you he's firing in the direction of muzzle

3  flashes, doesn't he?

4  A.  No.

5  Q.  Did you see the muzzle flashes?

6  A.  I did not.

7  Q.  So Agent or Officer Spratte was the only one who saw the

8  muzzle flashes, and he fired in the direction of those muzzle

9  flashes, didn't he?

10  A.  I -- I don't know, but he fired in the direction where I

11  believe the shots were coming from.

12  Q.  But he certainly, as you told the members of the jury just

13  a moment ago, I wrote this down, that he fired exactly in the

14  direction where the gunshots came from?

15  A.  Where I believe the gunshots came from, yes, that's

16  exactly right.

17  Q.  And the direction that he fired from was based upon what

18  he could see and where you were as well from this position --

19        MS. BABU:  Objection, your Honor.

20        MR. HYMAN:  -- true?

21        THE COURT:  Overruled.  He can answer.

22        THE WITNESS:  I --

23        THE COURT:  I'm not sure it's clear where you can say

24  where he can see.  I think you pointed at something.

25  BY MR. HYMAN:

1  Q.  Could he -- you were right behind him, right?

2  A.  I had a different perspective, yes.

3  Q.  And from where he shot, he shot -- you learned from him

4  and through your investigation that he shot where he saw the

5  muzzle flashes, true?

6  A.  I believe -- where I believe that the shots were coming

7  from, yes.

8  Q.  He fired -- maybe it's the way I asked the question.  I

9  apologize.

10  A.  Yeah.

11  Q.  When Officer Spratte fired his weapon, he fired it in the

12  direction where the muzzle flashes came from.  You learned

13  that from this discovery, true?

14  A.  From your discovery?

15  Q.  From your -- from what you have read and what you have

16  learned what Officer Spratte did that morning in front of you,

17  he fired in the direction of muzzle flashes, true?

18  A.  I don't know.

19        MS. BABU:  Objection, your Honor.

20        THE COURT:  He's answered the question.  Let's move

21  on.

22  BY MR. HYMAN:

23  Q.  I want to talk to you about May 6th if we can.

24  A.  Yes.

25  Q.  As part of the team now looking for the individual who

1  fired the shots, you told the members of the jury you had a

2  warrant for the arrest of Ernesto Godinez, right?

3  A.   That's correct.

4  Q.   And one of the ways that -- the reason that you got to the

5  area of 3106 North Cicero was because through the use of the

6  marshal service, they actually were able to ping his -- a

7  phone attributable to him, right?

8  A.   Yes, that's correct.

9  Q.   And that number, of course, had come up through learning

10  and talking to all types of people in the neighborhood, right?

11  A.   That's correct.

12  Q.   You had talked to Victoria Jean-Baptiste, true?

13  A.   I believe agents did, yes.  I did not.

14  Q.   Other agents did.  You learned, you talked to other people

15  that were in that -- in that area, right?

16  A.   In the area of --

17  Q.   Of where the shooting happened.

18  A.   Yes.

19  Q.   A thorough investigation done, you went and talked to

20  everybody, as many people as you could talk to.  You know

21  other agents talked to them and officers, true?

22  A.   We attempted, yes.

23  Q.   Yes.  Now, when you got to the address at 3106 North

24  Cicero, you found Destiny Rodriguez, right?

25  A.   I did not, but other agents did, yes.

1  Q.  In fact, she wasn't actually at that address, she was

2  stopped by your agents at a Walgreens on the corner about a

3  block away?

4  A.  I believe she was leaving that address, yes.

5  Q.  She was leaving the Walgreens with --

6  A.  I think they observed --

7  Q.  -- a child --

8  A.  I believe --

9  Q.  -- right?

10 A.  I believe -- they did, yes, but I believe they observed

11 her exiting the residence at 3106, yes, that's correct.

12 Q.  And so that was -- so the shooting was Friday.  Saturday,

13 now this is Sunday.  So about two and a half days later --

14 A.  Yes.

15 Q.  -- Ms. Rodriguez is at that address, right?

16 A.  Yes.

17 Q.  And she's there with a baby, true?

18 A.  She is, yes.

19 Q.  Yes.  And the Kia that is found is, in fact, the Kia that

20 is titled and owned by Ms. Rodriguez, right?

21 A.  It is, yes.

22 Q.  Now, after -- and, of course, you did not find Mr. Godinez

23 there, did you?

24 A.  No.

25 Q.  And later that day or early the next day, you and I spoke,

1    did we not?

2    A.   Probably midafternoon, but we did, yes.

3    Q.   And Mr. Godinez was surrendered to you and your brother

4    officers on the evening of May 7th of 2018?

5    A.   Yes --

6    Q.   Or May 7th.

7    A.   Three days -- yes, approximately three days after.

8    Q.   So the day after, you went to the Godinez house, an

9    attempt was made to surrender Mr. Godinez, and that happened,

10   true?

11   A.   The -- a day after, yes.

12   Q.   The next day?

13   A.   That's right.

14   Q.   Within 12 hours, 14 hours, something like that?

15   A.   Yes.

16            MR. HYMAN:  Your Honor, may I have just a moment?

17            THE COURT:  All right.

18        (Pause.)

19   BY MR. HYMAN:

20   Q.   I'd like to just go briefly back to after -- the late

21   afternoon, early morning of May -- the late afternoon, early

22   evening of May 6th.

23   A.   Yes.

24   Q.   Did you learn from your fellow agents that we had

25   attempted -- I had attempted to reach out to surrender

1   Mr. Godinez?

2   A.  This is on the 6th or the 7th?

3   Q.  The evening of the 6th.

4   A.  I did not know that.  I thought it was the 7th.

5   Q.  Our conversations or the connection that we had was the

6   next day, true, the 7th --

7   A.  Yes.

8   Q.  -- right?

9           And that was a surrender to you and your agents --

10  A.  That's correct.

11  Q.  -- at the 1st District police department, right?

12  A.  Me and you had conversation.  Initially, you were

13  contacted by the family, I believe, and you did not have any

14  contact with Godinez, Ernesto.  So I think eventually, you

15  said you were meeting with him that evening on the 7th, and

16  then me and you were trying to --

17  Q.  And we did, and we surrendered him?

18  A.  The evening of the 7th, yes.

19  Q.  Right.  He gave you no resistance at all, did he?

20  A.  On the evening of the 7th?

21  Q.  Yes.

22  A.  Yes.  No.

23  Q.  No resistance?

24  A.  On the evening of the 7th, no.

25          MR. HYMAN:  That's all, Judge.

1          THE COURT:  We'll suspend until a quarter to 2:00 for

2    lunch.  So we'll be back.

3          (Recess from 12:40 p.m. to 1:45 p.m.)

| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| | FOR THE NORTHERN DISTRICT OF ILLINOIS |
| 2 | EASTERN DIVISION |

```
3   UNITED STATES OF AMERICA,        )  Docket No. 18 CR 00278
                                     )
4               Plaintiff,           )  Chicago, Illinois
                                     )  June 11, 2019
5          v.                        )  1:46 p.m.
                                     )
6   ERNESTO GODINEZ,                 )
                                     )
7               Defendant.           )
```

8                     VOLUME 2-B
                TRANSCRIPT OF PROCEEDINGS - Trial
9     BEFORE THE HONORABLE HARRY D. LEINENWEBER, and a Jury

10  APPEARANCES:

11  For the Government:    HON. JOHN R. LAUSCH, JR.
                          United States Attorney, by
12                        MS. KAVITHA J. BABU
                          MR. NICHOLAS J. EICHENSEER
13                        5th Floor
                          Chicago, IL 60604
14
    For the Defendant:    MR. LAWRENCE H. HYMAN
15                        111 West Washington Street
                          Suite 1025
16                        Chicago, IL 60602

17                              and

18                        PISSETZKY & BERLINER
                          MR. GAL PISSETZKY
19                        35 West Wacker Drive
                          Suite 1980
20                        Chicago, IL 60601

21  Also Present:         MR. BEAU JACOBSEN, ATF Agent
                          MS. MARTA KASCUBA
22
    Court Reporter:       LISA H. BREITER, CSR, RMR, CRR
23                        JUDITH A. WALSH, CSR, RDR, F/CRR
                          219 South Dearborn street, Room 2118
24                        Chicago, IL 60604
                          (312) 702-8865
25                        judith_walsh@ilnd.uscourts.gov

01:46:17  1      (Jury enters courtroom at 1:46 p.m.)

         2           THE COURT:  Please be seated.  Call your next witness.

         3           MR. EICHENSEER:  The government calls Steve Greene.

         4           THE COURT:  Right around here, sir.  Right up here.

01:46:36  5           THE WITNESS:  Okay.

         6           MS. BABU:  Your Honor, if I may, this is Special Agent

         7      Daniel Winter.  He hasn't been excused yet from --

         8           THE COURT:  Oh.

         9           MS. BABU:  The government doesn't have any more

01:46:43 10      questions.  He can be excused.

        11           THE COURT:  All right, excused.

        12      (Witness excused.)

        13           MS. BABU:  Your Honor, do we have the computer set to

        14      the government's table?

01:48:11 15           THE COURT:  Right up here, sir.  Please raise your

        16      right hand.

        17      (Witness duly sworn and takes the stand.)

        18           THE COURT:  Please be seated.  You may question the

        19      witness, Mr. Eichenseer.

01:48:30 20           STEVE CRAIG GREENE, GOVERNMENT WITNESS, SWORN

        21                       DIRECT EXAMINATION

        22      Q  Good afternoon, sir.  Could you please state and spell

        23      your name for the record.

        24      A  My name is Steve Craig Greene, S-T-E-V-E C-R-A-I-G,

01:48:41 25      G-R-E-E-N-E.

01:48:44  1    Q   Where do you work, sir?

2    A   I work for the Bureau of Alcohol, Tobacco & Firearms and

3    Explosives.

4    Q   What do you do for the ATF?

01:48:53  5    A   I work in the forensic audio/video unit.  We process audio

6    and video files.

7    Q   Okay.  And what's your title with ATF?

8    A   I am a technical surveillance specialist.

9    Q   And how long have you been a technical surveillance

01:49:07 10    specialist with the ATF?

11    A   For 15 years.

12    Q   That's about 2004?

13    A   Yes.

14    Q   What did you do before joining the digital forensic unit

01:49:15 15    at the ATF?

16    A   I worked for the U.S. Forest Service in Missoula, Montana,

17    in their national technical investigations unit.

18    Q   And how long did you work for the Forest Service?

19    A   I worked 13 years for the Forest Service.

01:49:27 20    Q   What was the -- over the last few years of the Forest

21    Service, what did you do there?

22    A   I operated their forensic video lab for the last nine

23    years.

24    Q   You mentioned that you worked for the forensic video unit

01:49:38 25    at ATF; is that right?

01:49:39  1      A   The forensic audio/video unit, yes.

       2      Q   Where is that unit located?

       3      A   That is in Sterling, Virginia.

       4      Q   Do you work out of Sterling, Virginia?

01:49:48  5      A   Yes.

       6      Q   What kind of equipment is that, the digital forensic unit?

       7      A   We have several pieces of hardware and software, computers

       8   that help us process the audio and video files.

       9      Q   Sir, if you want to move closer to the microphone, if

01:50:02  10  that's easier for you, it might be helpful.

      11      A   Thank you.

      12      Q   And so you mentioned that you're a technical surveillance

      13   specialist; is that right?

      14      A   Yes.

01:50:10  15      Q   So what are your day-to-day duties as a technical

      16   surveillance specialist?

      17      A   We process, analyze and examine surveillance, CCTV, audio

      18   and video files that come in from ATF agents from around the

      19   country.

01:50:24  20      Q   So is there just one digit forensic unit at ATF?

      21      A   Yes.

      22      Q   You are in that unit?

      23      A   Yes.

      24      Q   What's your education past high school?

01:50:33  25      A   I have a two-year degree electronic -- I'm sorry,

01:50:37  1    associated -- associated -- sorry.

2         In 1989, I received my associate's degree in electronic

3    technology.

4    Q   Have you received any training in the audio/video

01:50:47  5    forensics, Mr. Greene?

6    A   Yes, I have.

7    Q   Can you describe for the jury what kind of training you

8    received?

9    A   I've attended training throughout my career.  I just

01:51:01 10    recently achieved my certification in forensic video technician

11    from the Law Enforcement Emergency Services Association.

12         I also attend usually annual trainings on audio and

13    video forensics.

14    Q   And what was the name of the certification you just

01:51:21 15    received?

16    A   It's a forensic video technician certification.

17    Q   Okay.  So is that certification current?

18    A   Yes, it is.

19    Q   Do you have any other professional certifications in the

01:51:30 20    area of video forensics?

21    A   I have several certifications from the hardware and

22    software that we use in the forensic audio/video unit.

23    Q   Okay.  Are those certifications from the providers of that

24    software?

01:51:43 25    A   Yes, the vendors.

Greene - Direct by Eichenseer

01:51:44 1    Q  So those are private companies, correct?

2    A  Yes.

3    Q  Mr. Greene, do you teach in the area of video forensics at

4    all?

01:51:50 5    A  Yes, I do.

6    Q  What do you teach and where?

7    A  I teach DVR retrieval courses, which DVR is digital video

8    recorders.  Teach the proper procedures of downloading,

9    exporting and analyzing the videos from DVRs.

01:52:07 10        I've taught for ATF.  I also taught at the Federal Law

11    Enforcement Training Center down in Glynco, Georgia, and that's

12    a five-day course that teaches state, local and federal agents

13    how to properly download surveillance videos.

14    Q  So have you received any awards in the area of video

01:52:27 15    forensics?

16    A  Yes.  In 2003, I received the U.S. Forest Service

17    Director's Award for outstanding administrative support for law

18    enforcement and investigations.

19    Q  Between your time at the video forensics lab and the

01:52:42 20    Forest Service and your time in the video forensic unit at ATF,

21    how many years experience do you have in the forensic video?

22    A  24.

23    Q  About how much -- so in those 20 odd years of experience,

24    Mr. Greene, how many pieces of audio and video evidence have you

01:53:09 25    processed?

Greene - Direct by Eichenseer

01:53:09  1    A   Over 2,000 pieces of evidence.

2    Q   Have you testified in court before?

3    A   Yes, I have.

4    Q   How many times?

01:53:15  5    A   Four times.

6        MR. EICHENSEER:   Your Honor, the government would move

7    to tender Mr. Greene under 702 as a witness in the field of

8    video forensics.

9        MR. PISSETZKY:   Absolutely no objection.

01:53:29  10        THE COURT:   Okay.   No objection.   He's recognized he

11    may give opinions.

12    BY MR. EICHENSEER:

13    Q   Mr. Greene, did you review any video evidence in this

14    case?

01:53:36  15    A   Yes, I did.

16    Q   So if you look in front of you, there should be six CDs

17    that are lined up.   They're marked Government Exhibits 100, 101,

18    102, 103, which are already in evidence, and there's also 105

19    and 106.   Do you see those?

01:53:51  20    A   Yes, I do.

21    Q   Do you recognize those exhibits?

22    A   Yes, I do.

23    Q   What are they?

24    A   They are the videos from the in and around the incident

01:53:59  25    that occurred on May 4th.

Greene - Direct by Eichenseer

01:54:01 1    Q  Did you review those videos before testifying today.

2    A  Yes, I did.

3    Q  How can you tell?

4    A  I have initialed the inner hub of all the discs.

01:54:10 5         MR. EICHENSEER:  At this point, Your Honor, I'd like to

6    read stipulation No. 3?

7         THE COURT:  You may.

8         MR. EICHENSEER:  "Government Exhibit No. 105 is a true

9    and accurate copy of a portion of video from a south-facing

01:54:20 10   surveillance camera on the front of 4324 South Hermitage Avenue

11   in Chicago, Illinois, on May 4th, 2018.  The events depicted in

12   the surveillance videos occurred at or near the time visible in

13   the surveillance video."

14        I'd also like to read Stipulation 4, Your Honor.

01:54:39 15        THE COURT:  You may.

16        MR. EICHENSEER:  "Government Exhibit 106 is a true and

17   accurate copy of a portion of video from a south-facing

18   surveillance camera in the alley behind 4324 South Hermitage

19   Avenue in Chicago, Illinois, on May 4th, 2018.  The events

01:55:01 20   depicted in the surveillance videos occurred at or near the time

21   visible in the surveillance videos."

22   BY MR. EICHENSEER:

23    Q  Mr. Greene, did you review any audio evidence in this

24   case?

01:55:11 25   A  Yes, I did.

Greene - Direct by Eichenseer

01:55:13  1    Q  In front of you, there's an exhibit marked 201.  Do you

2    see that one, which is already in evidence?

3    A  (No response.)

4    Q  To your right, Mr. Greene, at all?

01:55:31  5    A  I'm sorry, I don't see 201.

6        MR. EICHENSEER:  May I approach, Your Honor?

7        THE WITNESS:  107, 104.

8    BY MR. EICHENSEER:

9    Q  Mr. Greene, you did review audio evidence in this case,

01:56:04  10   correct?

11   A  Yes, I did.

12   Q  Can you tell the jury what the audio evidence was you

13   reviewed?

14   A  The audio was audio file from ShotSpotter.

01:56:13  15   Q  How long was that audio file?

16   A  Around 10 seconds.

17   Q  Did you -- what, if anything, did you do with those six

18   video exhibits we just talked about?

19   A  I reviewed, processed them and then entered -- imported

01:56:28  20   them into my video software program so I could begin to

21   synchronize the videos as well as -- and then align them and

22   to -- for the end result trying to make a multiple camera view

23   video of several different videos to show at one time.

24   Q  Okay.  And so you said you you synchronized the videos.

01:56:54  25   What do you mean by that?

Greene - Direct by Eichenseer

01:56:55  1    A  Yes.  Synchronize the videos so all the different camera

2    angles are to be shown at the same time.  Sometimes the

3    timestamps that are on the video recordings are incorrect.

4    Q  Okay.  And so after you synchronized the videos, what did

01:57:10  5    you do after that?

6    A  Then I put them into a multiple camera view like in a quad

7    view of all the different -- of the video files so they played

8    back in synchronized fashion.

9    Q  Okay.  When you say combined, does that mean you put all

01:57:26  10   the video footage on one screen?

11   A  Yes.

12   Q  And then what about the audio -- what, if anything, did

13   you do with the audio you just mentioned, the ShotSpotter?

14   A  I placed that on to -- in the timeline in the video

01:57:40  15   software program to reflect when I where -- a place where it

16   seemed to be most accurate when I witnessed the agent being

17   shot.

18   Q  Okay.  Did you add the audio to that, to the video footage

19   you created?

01:57:56  20   A  Yes, I did.

21   Q  Okay.  So I'm going to ask you some more questions about

22   those six pieces of video footage that are in front of you,

23   Exhibits 100 through 106 okay?

24       Did you personally review all the footage in those

01:58:07  25   exhibits?

01:58:07  1    A  Yes, I did.

        2    Q  Does all the footage have date and time stamps?

        3    A  Yes, they do.

        4    Q  Approximately what time period is that footage from?

01:58:15  5    A  From around 2:56 to 3:26.

        6    Q  At what day?

        7    A  Oh, I'm sorry, May 4th, 2018.

        8    Q  Okay.  And was that 2:56 to 3:26 a.m.?

        9    A  Yes.

01:58:26 10    Q  Is the footage in those six exhibits from the same camera?

       11    A  No.  They're from multiple camera views.

       12    Q  Did you have understanding as to where each of those

       13  cameras was?

       14    A  Yes, I do.

01:58:38 15    Q  And what is your understanding based on?

       16    A  Based on Google Maps.  I understood where the incident

       17  occurred, at the intersection of 44th and Hermitage.  Looked up

       18  in Google Maps, got an idea of the area and then went on --

       19  looked at the individual camera views and located them using the

01:58:56 20  street view on Google Maps.

       21    Q  Okay.  And are the techniques you just mentioned, are

       22  those techniques you typically use when you forensically review

       23  videos?

       24    A  Yes.

01:59:07 25    Q  You mentioned an agent getting shot earlier.

01:59:10  1        Is it your understanding, Mr. Greene, that an incident

      2   took place in the neighborhood on the left-hand side there,

      3   Government Exhibit 400, on May 4th of last year?

      4        A   Yes.

01:59:18  5        Q   And to your knowledge, what was that incident?

      6        A   An ATF agent was shot at the intersection of 44th and

      7   Hermitage.

      8        Q   Okay.  Can you please just point to the jury again where

      9   the intersection is on Exhibit 400?

01:59:32 10        A   (Indicating).

     11        Q   And about what time did the shooting happen to your

     12   knowledge?

     13        A   About 3:18 a.m. on May 4th.

     14        Q   Okay.  So I want to ask you some questions about

01:59:41 15   Government 100, okay?

     16        Can you show the jury on the map next to you where

     17   Government Exhibit 100 was located?

     18        A   (Indicating).

     19        Q   What kind of camera was Government Exhibit 100?

02:00:06 20        A   That is a Chicago PD -- Police Department POD video.  POD

     21   standing for police observation device.

     22        Q   Okay.  What direction was that camera facing?

     23        A   That was facing south.  That was located on the northwest

     24   corner of the intersection of 44th and Hermitage facing south.

02:00:23 25        Q   Government Exhibit 101, what kind of camera was that?

Greene - Direct by Eichenseer

02:00:26  1    A   That is also a POD video from the Chicago PD.  It was

2    located on the intersection of Paulina and 44th.

3    Q   Can you please show the jury where that was?  And which

4    direction was that camera was facing?

02:00:42  5    A   That camera is facing in a westerly direction towards the

6    intersection of 44th and Hermitage.

7    Q   Government Exhibit 102, where was that camera located?

8    A   102 was located at 45th and Hermitage.  Let me make sure

9    I've got the -- yes, it is also a POD video.

02:01:02  10   Q   And which direction was Government Exhibit 102, that

11   camera facing?

12   A   At the beginning of the -- at around the 3:00 a.m. time

13   frame, that camera view was pointing in the southern direction

14   towards 46.  And at about 3:18 in the morning, the camera was

02:01:20  15   rotated to a northerly direction towards the intersection of

16   44th and Hermitage.

17   Q   Okay.  Moving on to Exhibit 103, where was that camera

18   located?

19        For the record, where was that camera located?

02:01:45  20   A   103 is located at the -- near the intersection of 44th and

21   South Wood.  That camera is facing north.  It was in the

22   northeast corner of that intersection.

23   Q   Okay.  What type of camera was that?

24   A   That is a pole camera.

02:01:59  25   Q   That's different from the last three cameras --

02:02:01  1    A   Yes.

       2    Q   -- you talked about?

       3        Government Exhibit 105, what type of camera was that?

       4    A   This camera is from a residence at 4324 North Hermitage.

02:02:12  5  This camera was pointing south on the street view of Hermitage.

       6    Q   Then finally Government Exhibit 106, where was that camera

       7  located?

       8    A   This camera was on the back of the residence at 4324 South

       9  Hermitage on the alley facing south.

02:02:37 10    Q   So Government Exhibits 105, 106, if I understand you

      11  correctly, Mr. Greene, they're both located at the same

      12  property?

      13    A   Yes.

      14    Q   But one of the cameras was on the front of the property,

02:02:48 15  one of the cameras was at the rear of the property?

      16    A   Yes.

      17    Q   Is it fair to say that all the six cameras you just

      18  testified about, they're all in about a one- or two-block

      19  radius?

02:02:58 20    A   Correct.

      21    Q   You said you watched those -- each of those six pieces of

      22  footage yourself, correct?

      23    A   Yes.

      24    Q   About how many times did you watch that footage?

02:03:06 25    A   A dozen or more.

Greene - Direct by Eichenseer

02:03:07  1    Q   Each piece of footage a dozen or more times?

2    A   Yes.

3    Q   And why did you do that?

4    A   To understand the activities that we were seeing, it was

02:03:16  5    at night.   And to try to help determine the time offset between

6    the different video sources.

7    Q   So some of the video sources had different time stamps; is

8    that correct?

9    A   Correct.

02:03:30  10   Q   So what -- Government Exhibit 100, the POD cam there in

11   the middle of 44th and Hermitage, did you do anything to alter

12   that video or edit that video in any way?

13   A   No.   That video imported directly into my software

14   program.

02:03:42  15   Q   What about Government Exhibit 101, the other POD cam on

16   44th Street, did you do anything to edit that footage?

17   A   101 also imported directly into my software program.   The

18   only thing I did on that was to zoom in on to the -- near the

19   intersection of 44th and Hermitage.

02:03:58  20   Q   Okay.   What about 102, did you make any changes to that

21   exhibit?

22   A   That camera was in a -- that POD video was in a propriety

23   format, so I had to screen capture that video so I could import

24   it into my software program.

02:04:14  25   Q   Did that process change the footage itself?

02:04:17  1    A   No, it does not.

2    Q   Government Exhibit 103, did you do anything to change that

3    footage?

4    A   That camera was also in a propriety format, so I also

02:04:26  5    screen-captured that video file.  After screen capturing, I

6    realized the -- that video was recorded in a variable frame

7    rate.

8    Q   Before you begin -- before you go any farther, can you

9    tell the jury what a variable frame rate is?

02:04:46  10   A   A variable frame rate basically says or when you watch it,

11   a minute of video plays back at possibly 50 seconds, the next

12   minute plays back at 51 seconds, 48.  So it varies from time to

13   time.

14   Q   Okay.  So did you make any adjustments to that video to

02:05:02  15   compensate for the variable frame rate?

16   A   Yes, I did.  Looking at that video, realizing the variable

17   frame rate, I chose to edit in one-minute increments the video

18   and then stretch that video so it played back in a minute's

19   time.

02:05:21  20   Q   The purpose of those adjustments was to make sure that 60

21   seconds was played back in 60 seconds of actual time?

22   A   That is correct.

23   Q   What exactly were those adjustments?

24   A   The software basically duplicates select frames to stretch

02:05:36  25   the video to reflect the one-minute time frame.

Greene - Direct by Eichenseer

02:05:40  1    Q   Are those adjustments visible to the naked eye when --

2    A   No --

3    Q   -- you're watching it?

4    A   -- it plays back seamlessly.

02:05:47  5    Q   So aside from those variable frame rate adjustments, did

6    you make any other edits to Government Exhibit 103?

7    A   On Exhibit 103, I also adjusted the brightness and

8    contrast to improve the video.

9    Q   So it sounds like over the -- I'm forgetting 105 and 106.

02:06:03  10       Did you make any changes to those exhibits, Mr. Greene?

11   A   In 105 and 106, yes.

12   Q   What did you --

13   A   On Exhibit 105, the camera was placed on its side.  So I

14   had to rotate the video 90 degrees to show what would be a

02:06:16  15   normal view so the sky's on the top and the ground's on the

16   bottom.  I also adjusted -- improved the brightness and contrast

17   on that, video on 105.

18       106, the camera was also on its side.  I rotated that

19   90 degrees and also adjusted the brightness and contrast of it.

02:06:36  20   And with that camera view, I also zoomed in on that view.

21   Q   So is it accurate to say that for 105 and 106, you made

22   level adjustments, rotated the footage and adjusted the

23   brightness?

24   A   Yes.

02:06:51  25   Q   So it sounds like for those last six exhibits that you

02:06:54  1    just testified about, you made one of several changes depending
        2    on the exhibit.

        3            You rotated some images, you zoomed in on some footage,
        4    you made levels adjustments in some cases, and you compensated
02:07:06  5    for the variable frame rate; is that correct?

        6        A   Correct.

        7        Q   Other than those things, did you do anything else to
        8    change the footage on Government Exhibits 100 to 106?

        9        A   No.

02:07:14 10        Q   Okay.  So after you made those changes to the videos, did
       11    you do anything else with them?

       12        A   Then after doing them, I put them in my software program
       13    so I could then synchronize the videos together while watching
       14    the videos looking for common events that would be seen on two
02:07:33 15    or more cameras.

       16        Q   Okay.  So that you then took all the videos and tried to
       17    synchronize them, correct?

       18        A   Correct.

       19        Q   And then what did you do after you tried to synchronize
02:07:41 20    them?

       21        A   Then after synchronizing them, I put them in a multiple
       22    camera view so you could review the multiple cameras at the same
       23    time on one video.

       24        Q   Okay.  And Government Exhibit 110 in front of you and 109,
02:07:53 25    do you recognize those?

Greene - Direct by Eichenseer

02:07:59  1    A   Yes.

2    Q   What are they?

3    A   These are the multiple -- I call it multi-cam edit views

4  of the videos that I combined from the time frame of 2:56 to

02:08:12  5  3:26.   That is Exhibit 109.

6        Exhibit 110 is the same video with highlighted circles

7  over persons and vehicles.

8    Q   Okay.   So Exhibits 109 and 110, those are the multi-view

9  exhibits you created after watching that footage?

02:08:33 10    A   Correct.

11    Q   And is the footage in those multi-cam views syncronized?

12    A   Yes, they are.

13    Q   And in front of you is also Government Exhibit 111.   Do

14  you see that?

02:08:44 15    A   Yes.

16    Q   What is that?

17    A   This is a single cam edit view with circles.   This video,

18  I made after the multi-cam view that would -- that shows one

19  video camera at a time of the activity of interest from one

02:09:00 20  camera to the next in a syncronized fashion.

21    Q   So is the main difference between that single cam view and

22  the multi-cam view is it's one screen at a time?

23    A   Yes.

24        MR. EICHENSEER:   At this point, Your Honor, I'd like to

02:09:14 25  read Stipulation No. 11.

Greene - Direct by Eichenseer

02:09:15  1      THE COURT:  Read.

      2      MR. EICHENSEER:  "Government Exhibits 109, 110 and 110A

      3  are true and accurate summaries of video and audio contained in

      4  Government Exhibits 100, 101, 103, 105, 106 and 201.  Government

02:09:31  5  Exhibit 111 is a true and accurate summary of 100, 101, 102,

      6  103, 104, 105, 106 and 201.

      7      "Government Exhibit 112 is a true and accurate summary

      8  of Government Exhibit 107, and Government Exhibit 113 is a true

      9  and accurate summary of Government Exhibit 104.

02:10:08 10      "Government Exhibits 109, 110, 110A, 111, 112 and 113

      11  are admissible into evidence."

      12      At this point, Your Honor, the government moves into

      13  evidence Exhibits 109, 110, 110A, 111, 112 and 113.

      14      THE COURT:  They're admitted based on the stip.

02:10:29 15      (Government Exhibits 109, 110, 110A, 111, 112 and 113

      16      admitted in evidence.)

      17      MR. EICHENSEER:  Okay.  So at this point, Your Honor,

      18  I'd ask to publish Government Exhibit 109, which is already in

      19  evidence.

02:10:40 20      THE COURT:  You may.

      21  BY MR. EICHENSEER:

      22   Q  Okay.  Mr. Greene, can you see the exhibit that's on the

      23  screen in front of you?

      24   A  Yes, I can.

02:10:47 25   Q  This is 109.  Earlier you testified this was one of the

Greene - Direct by Eichenseer

02:10:49  1    multi-cam views you created?

2         A  Yes, it is.

3         Q  Okay.  So could you explain to the jury -- there appears

4    to be five panes to this exhibit, correct?

02:10:55  5    A  Correct.

6         Q  Could you explain to the jury what the five panes

7    represent?

8         A  The -- in the upper left corner is the POD video that is

9    located at the intersection of 44th and Hermitage facing south.

02:11:11  10        The upper right corner video is the POD video from the

11    1701 44th, Paulina and 44th looking in the western direction.

12         In the lower left corner is the camera views from the

13    residence at 4324, the left camera view showing the street view

14    pointing south towards 44th.

02:11:41  15        And the camera to the right of that is the alley cam

16    view from 4324 South Hermitage residence, and that is also

17    pointed in a southerly direction.

18         Q  Okay and --

19         A  And the camera on the right is the pole camera that is

02:12:00  20    located at 44th and South Wood pointing in a northern direction.

21         Q  And then what time period is covered by Exhibit 109?

22         A  This is covered from 2:56 a.m. to approximately 3:26 on

23    May 4th.

24         Q  Okay.  This is the period before and after the shooting

02:12:29  25    on --

02:12:29  1    A   Yes.

        2    Q   -- May 4th?

        3    A   Yes, it is.

        4    Q   You mentioned earlier that you synchronized the footage,

02:12:36  5   correct?

        6    A   Yes, I did.

        7    Q   And does that mean to play back at a common speed?

        8    A   It plays back -- all the cameras are syncronized so they

        9   are playing back at the same time frame.

02:12:48 10    Q   And how did you do that?  What types of things did you do

       11   to synchronize the footage?

       12    A   My understanding is the what the -- the time frame of the

       13   shooting being at 3:18, watching the videos, notice that the

       14   shooting was around at 3:18 and also the knowledge based on the

02:13:06 15   systems, the POD videos, that they are usually time accurate.

       16    Q   And time accurate, what does that mean?

       17    A   That that is the real time that the events occurred.   So

       18   when it shows -- on here it's 2:56:23 a.m. it is approximately

       19   2:56:23.

02:13:22 20    Q   But I think my question was how did you actually

       21   syncronize the footage between the cameras?

       22    A   So then after looking at the two POD videos that were --

       23   were the time accurate, I then reviewed the videos from the

       24   different camera views looking for activities of interest.   For

02:13:44 25   example, it would be a vehicle driving down South Hermitage

Greene - Direct by Eichenseer

02:13:48  1  towards the intersection of Hermitage and 44th.  When that

2  vehicle is seen by the other camera views at the same time, they

3  would be visually synced up.  So that would be, like, one visual

4  sync.

02:14:05  5  I would do that throughout the time frame of interest,

6  which is around this time frame, which is around 3:00 a.m. to

7  3:30, finding multiple visit -- visual cues, visual syncs to

8  make sure that the time offset from the other videos could be

9  accurately depicted.

02:14:22  10  Q  You mentioned that you focused on visual cues to

11  synchronize the footage?

12  A  Yes.

13  Q  And does that mean you would focus on activity that

14  appears in multi -- multiple different panes?

02:14:33  15  A  Yes.

16  Q  You tried to synchronize the footage by using those cues?

17  A  Yes.

18  Q  Some examples of cues would be like people and cars?

19  A  Correct.

02:14:45  20  Q  Is there any audio in this clip, Government Exhibit 109?

21  A  Yes, there is.

22  Q  And is that the ShotSpotter audio you testified about

23  earlier?

24  A  Yes.

02:14:52  25  Q  And where did you insert that into this video?

02:14:55  1     A   At about 3:10 to 3:18.

2     Q   I'm sorry, 3...

3     A   3:10 in the morning through -- it was about a 10-second

4     clip.

02:15:05  5     Q   Okay.  So what time did the shooting happen?

6     A   At 3:18:13, sir.

7     Q   Okay.  So about what time did you insert the audio of the

8     ShotSpotter?

9     A   That would be about 3:18:05.

02:15:18  10    Q   And what did you use to determine when to splice the audio

11    into the video?

12    A   By watching the reaction of the agent that was being

13    shot -- that was shot, seeing his reaction and putting the audio

14    to visually match it.

02:15:34  15        MR. EICHENSEER:  At this time, Your Honor, I'd like to

16    publish Government Exhibit 110 which is already in evidence.

17        THE COURT:  You may.

18      (Said video recording played in open court.)

19    BY MR. EICHENSEER:

02:15:44  20    Q   Mr. Greene, in front of you is Exhibit 110.  How is this

21    different from the last exhibit we just saw?

22    A   110 has colored circles over persons or vehicles.

23    Q   Okay.  And why did you add -- did you add those circles?

24    A   Yes, I did.

02:16:00  25    Q   Why did you add those?

02:16:01  1      A   Those are persons or vehicles of interest.

       2          MR. EICHENSEER:   At this point I'd like to publish

       3   Exhibit 110A which is already in evidence.

       4          THE COURT:   You may.

02:16:10  5      (Exhibit published to the jury.)

       6   BY MR. EICHENSEER:

       7      Q   Mr. Greene, there are several pages, 20 odd pages to

       8   Exhibit 111 or 110A.   Do you recognize those?

       9      A   Yes, I do.

02:16:20 10      Q   What are they?

      11      A   These are basically frame grabs from the video, from the

      12   multiple camera view with the circles that I made showing the

      13   persons in vehicle interest.

      14      Q   Are these still frame grabs of Exhibit 110?

02:16:35 15      A   Yes, they are.

      16      Q   I'll go through a couple of pages here.   So is this first

      17   page a screen grab from 2:56:31 a.m.?

      18      A   Yes.

      19      Q   The second page is a screen grab from 2:56:55 a.m.?

02:16:51 20      A   Yes.

      21          MR. EICHENSEER:   At this point I'd like to publish

      22   Government Exhibit 111.

      23          THE COURT:   You may.

      24          MR. EICHENSEER:   Which is already in evidence.

02:17:01 25      (Said video recording played in open court.)

Greene - Direct by Eichenseer

BY MR. EICHENSEER:

02:17:01  Q  Can you explain what Government Exhibit 11 shows,
Mr. Greene?

A  This is the single-cam edit video that shows one camera at
02:17:09  a time during this time frame.

Q  Okay.  I noticed the time stamp at the top of this says
3:15:26, a.m.; is that correct?

A  That's correct.

Q  So what time period is covered by Exhibit 111, the single
02:17:19  cam?

A  This is from 3:15:26 to 3:26 approximately.

Q  Okay.  So this is -- this is a shorter time span than the
multi-cam --

A  Yes.

02:17:28  Q  -- view we saw, correct?

A  Yes.

Q  I want to go back to Government Exhibit 110, which I'll
publish in a second.  But before I do that, I want to ask you
some questions about the time stamps there.

02:17:41  Do you see it looks like there are time stamps in each
pane of footage there; is that right?

A  That is correct.

Q  Do they all play back at the same time?

A  No, they do not.

02:17:49  Q  Okay.  You mentioned the POD cams, the one -- the two

02:17:53  1    panes on top.  Those were -- those were the correct time,

2    correct?

3        A   Correct.

4        Q   So the other three panes below, were those -- were those

02:18:01  5    times off?

6        A   Yes, they were.

7        Q   By how much for which cameras?

8        A   The camera views on the -- on the left-hand side, the

9    Hermitage camera view in the alley were 2 minutes and 47 seconds

02:18:14 10    ahead of the POD videos.  And the pole camera to the right -- I

11    mean, the lower right corner that was seven seconds -- or 13

12    seconds behind.

13        Q   So the two on the left were 2 minutes 47 seconds fast?

14    The one on the right was 13 seconds slow, correct?

02:18:36 15        A   Correct.

16            MR. EICHENSEER:  At this point, Your Honor, I'm going

17    to play Government Exhibit 110 in its entirety.  I just want to

18    let the Court know it's about 30 minutes of footage, and we'll

19    play it straight through.

02:18:50 20            THE COURT:  All right.

21    BY MR. EICHENSEER:

22        Q   So Mr. Greene, as the footage plays for the jury, if you

23    see any examples of the visual cues that you used to synchronize

24    some of the footage, would you mind pointing those out to the

02:19:03 25    jury?

02:19:04   1    A  Yes, I will.

           2      (Said video recording played in open court.)

           3    BY MR. EICHENSEER:

           4    Q  So at about 2:56 a.m. here, what activity did you just

02:19:07   5    circle with the yellow circles?

           6    A  A person wearing dark-colored shirt and dark shorts walks

           7    in -- gets into a -- it appears to be a white SUV, backs out and

           8    starts to drive north on South Wood.

           9    Q  And are you able to determine where that white SUV goes

02:19:31  10    after it pulls out of South Wood?

          11    A  It goes back in reverse and parks back in the same spot it

          12    was in.

          13    Q  So Mr. Greene, I know these are just five cameras that

          14    we're looking at here.

02:19:45  15          Did you review other cameras in the course of your work

          16    for this case?

          17    A  Yes, I did.

          18    Q  More than just the six cameras that we see on Exhibit 400?

          19    A  Yes, I did.

02:19:51  20    Q  Approximately what locations were some of those cameras?

          21    A  The -- can I print on the map?

          22    Q  Sure, please do.

          23    A  The camera is at this intersection, 40 --

          24          THE COURT:  Keep your voice up, sir.

02:20:03  25          THE WITNESS:  The intersection of 43rd and South

02:20:05  1   Hermitage, there were several residence videos that I reviewed.

2   Also there were business videos along 43rd that I reviewed that

3   were multiple POD videos that were located up and down Ashland

4   that I reviewed, and also another POD video that was on 46th and

02:20:24  5   South Wood.

6   BY MR. EICHENSEER:

7       Q  Okay.  And so in the course of compiling this exhibit

8   here, 110, did you use those video cameras at all, the other

9   cameras?

02:20:33 10       A  Not in this video, no, but...

11       Q  Did you rely on them in any way when you created 110?

12       A  Yes.

13       Q  How so?

14       A  I -- to try to determine the offset and understand the

02:20:45 15   activities of interest, I created an Excel spreadsheet that

16   listed different camera views, the different times and to

17   understand the activities that we were seeing.

18       Q  So, for example, if you were trying to follow the

19   direction of a car, would you use some of the other cameras that

02:21:02 20   are outside the area --

21       A  Yes.  If a car went north on Hermitage towards 43rd, I

22   looked at those cameras views, too, to also see that vehicle and

23   which way it turned.

24       Q  Mr. Greene, could you just let the jury know which --

02:21:16 25   earlier you mentioned kind of the changes you made to some of

02:21:19  1    the footage.

        2          Which two did you have to rotate and make adjustment

        3    for?

        4      A   The lower left quadrant on the 4324 Hermitage.

02:21:30  5      Q   Okay, so --

        6      A   The Exhibit 105 and 106, those were rotated.

        7      Q   The bottom two left-hand panes?

        8      A   Yes.

        9      Q   And which -- and when you made what's you called it the

02:21:38 10    variable frame rate adjustment to make sure 60 seconds played

       11    back in a minute, which one is that?

       12      A   That is in the lower right corner, 44th and Wood.

       13      Q   Okay.  And you also mentioned that you zoomed in one of

       14    the POD cams; is that right?

02:21:54 15      A   Yes, that was in the upper right corner.

       16      (Said video recording played in open court.)

       17    BY MR. EICHENSEER:

       18      Q   Okay.  That is now a circle again on the screen at 2:59,

       19    approximately 2:59 in this exhibit.

02:22:17 20          What's shown at this point, Mr. Greene?

       21      A   It's a person in a dark shirt, dark shorts walking towards

       22    that white SUV.  Appears to get in the vehicle.

       23          And the white SUV then drives north on South Wood

       24    towards 43rd.  And the vehicle turns left going westbound on

02:23:20 25    43rd out of camera's view.

Greene - Direct by Eichenseer

02:23:23  1    Q  Can you show the jurors on the map, 43rd and what?

       2    A  (Indicating).

       3    Q  So the car just turned west on 43rd?

       4      (Video recording played in open court.)

02:24:11  5  BY MR. EICHENSEER:

       6    Q  Mr. Greene, are there stretches of this video where you

       7  don't observe any activity that you can see?

       8    A  Yes.  There was several minutes of no activity seen.

       9      (Said video recording played in open court.)

02:24:23 10  BY MR. EICHENSEER:

      11    Q  Okay.  Now, a yellow circle appears in the upper left-hand

      12  pane.  What is that at 3:01?

      13    A  It's a -- it appears to be a white SUV coming -- going

      14  eastbound on 44th towards South Wood at this approximate

02:24:36 15  location.

      16    Q  And does that -- does that white SUV turn at all from

      17  44th?

      18    A  I'm sorry?

      19    Q  Does that white SUV turn at all off 44th?

02:24:48 20    A  Yes.  It turns left on Wood.  And you will -- as the

      21  camera leaves that view, you will then see the vehicle going

      22  north on south Wood in the lower right corner, and it continues

      23  going north towards 43rd.

      24    Q  Are you able to see, Mr. Greene, which direction the white

02:25:31 25  SUV goes after --

02:25:32  1      A   Yes.   It turns left going westbound on 43rd.

          2        (Said video recording played in open court.)

          3   BY MR. EICHENSEER:

          4      Q   Mr. Greene, do you notice any activity coming up in the

02:26:20  5   upper right-hand pane from that 44th Street POD cam?

          6      A   Yes.   A vehicle appears at somewhere near Honore.   You can

          7   see it turning right going westbound on 44th.   It appears to be

          8   somewhere in the area between Honore and Wolcott in this area.

          9      Q   Are you able to determine what kind of car that was?

02:26:45 10      A   No, I'm not.

         11      Q   Can you determine the color at all?

         12      A   It looked -- it appeared to be white in color.

         13        (Said video recording played in open court.)

         14   BY MR. EICHENSEER:

02:27:54 15      Q   Mr. Greene, direct your attention to the lower left-hand

         16   pane.   Is there any activity that you saw coming up here at

         17   3:05 a.m.?

         18      A   Yes.   It appears to be a white SUV driving south on

         19   Hermitage coming from the direction of 43rd going -- driving

02:28:10 20   south towards the intersection of 44th and Hermitage.

         21      Q   And for the record, that exhibit hasn't showed that

         22   vehicle yet, correct?

         23      A   Correct.   It's --

         24      Q   Showing right now at 305:53?

02:28:25 25      A   Yes.   And as it gets to the end of that street, end of

02:28:28 1    that -- the top of that view, it will begin to enter the two top

2    POD videos that are -- that you can see, the intersection of

3    44th and Hermitage.

4       Q  Is that an example of a visual cue you used to sync the

02:28:41 5    footage?

6       A  Yes, it is.

7       Q  So you just saw the -- you saw the white Kia in the

8    left-hand pane, and then you saw it in the two top panes,

9    correct?

02:28:48 10      A  Correct.

11      Q  Can you tell where the white Kia goes after turning on to

12   Wood Street -- or 44th Street?

13      A  It turns left going south on Wood and then out of view.

14      Q  And do you see that white SUV again on the footage on this

02:29:05 15   footage?

16      A  No, I do not.

17         And another vehicle is driving south.  It looks like a

18   mini-van on Wood in the lower right corner, and then the upper

19   right corner, you'll see it crossing 44th.  That's another

02:29:20 20   example of a visual sync.

21      Q  Did you document these syncs or cues as you saw them,

22   Mr. Greene?

23      A  Yes.

24      Q  About how much -- how much activity did you document on

02:29:32 25   this footage?

Greene - Direct by Eichenseer

02:29:34 1    A   In that time frame of about over 100 items that we

2   documented of activities of interest.

3    Q   If you look in the upper right-hand pane, Mr. Greene,

4   there appeared to be some object or person moving across 44th

02:30:05 5   Street.  Did you see that?

6    A   Yes.

7    Q   What, if anything, did you determine that thing to be?

8    A   It appears to be a person wearing dark clothing.

9    Q   And do you see that person in any other panes after this

02:30:21 10  one?

11   A   Yes.  After the person appears to be walking eastbound on

12  the sidewalk, and then in the upper left corner, you see him

13  turn right going south on Hermitage.  Appeared to have a cell

14  phone in his hand.

02:30:36 15   Q   Could you tell it was the person wearing pants or shorts?

16   A   It looked like he was wearing long dark pants and dark

17  shirt.

18   Q   What direction is this person walking?

19   A   He's heading south.  I can point it on the map.

02:30:50 20       Down this direction towards 46th -- 45th and Hermitage.

21    (Said video recording played in open court.)

22  BY MR. EICHENSEER:

23   Q   And at 3:08 a.m., is that person walking towards or away

24  from the shooting scene?

02:31:16 25   A   He's walking away.

Greene - Direct by Eichenseer

02:31:21 1    Q  And again, just to orient the jury, you said the shooting

2    happened at about 3:18, correct?

3    A  3:18, yes.

4    Q  So right now we're at about 3:09.  So we're at about nine

02:31:36 5    to ten minutes before the shooting, correct?

6    A  Correct.

7    Q  Do you see several cars driving north on Wood Street at

8    about 3:09, Mr. Greene?

9    A  Yes.

02:31:49 10   Q  Did you see those cars cross 44th Street?

11   A  No, I did not.

12   Q  What, if anything, did you conclude from that?

13   A  They were most likely parked below the camera and so they

14   would not be seen by the upper right corner.  They were parked

02:32:07 15   out of view and then drove north on Wood towards 43rd.

16   Q  And the person we just mentioned earlier who was walking

17   south on Hermitage, can you just show the jury on the map what

18   direction that person was walking?

19   A  Walking south on Hermitage towards this intersection of

02:32:23 20   45th and Hermitage.

21   Q  And after seeing that person walk south toward

22   45th Street, did you see that person again in the footage?

23   A  Yes.  I reviewed the Exhibit 102 from that POD video at

24   45th and Hermitage and observed that what appeared to be the

02:32:41 25   same person in dark clothing, dark pants in that area and

02:32:44  1   walking away from -- walking away, yeah.

2       Q  And on Exhibit 110 on these five cameras, did you see that

3   person again after 3:08?

4       A  No.

02:32:56  5     (Said video recording played in open court.)

6   BY MR. EICHENSEER:

7       Q  So I now note, Mr. Greene, we're at 3:10 or 3:11 here.

8           Is this one of those stretches where you don't see any

9   activity in the videos?

02:33:28  10      A  Yes.  Yes, and then we have a vehicle driving north past

11   46th -- I'm sorry, past 45th heading north on South Hermitage

12   towards the intersection of 44th and Hermitage.

13      Q  And again, just so the jury, understands can you show what

14   direction that car is traveling?

02:33:47  15      A  The vehicle is seen driving northbound along here coming

16   to the intersection of 44th and Hermitage.

17      Q  And do you have any understanding as to what type of car

18   that is?

19      A  In reviewing the videos, I believe it was a police

02:34:05  20   vehicle.

21      Q  Was that marked or unmarked?

22      A  Unmarked.

23      Q  Is that why you put a circle around it?

24      A  Correct.

02:34:15  25     (Said video recording played in open court.)

02:34:15  1  BY MR. EICHENSEER:

2  Q  So we're approaching 3:12.  The vehicle is driving north

3  on Hermitage.  What does the vehicle do?

4  A  The vehicle drives around the traffic circle, as you can

02:34:32  5  see on both cameras on the two POD videos, and then the vehicle

6  drives south on Hermitage back towards 45th.

7  Q  Can you tell if the car in the white circle turns off of

8  Hermitage at all at this point at the footage at 3:12 a.m.?

9  A  It appears to turn right on to 45th going westbound.

02:35:10  10  Q  How can you tell that?

11  A  Just watching the headlights turn.

12   (Said video recording played in open court.)

13  BY MR. EICHENSEER:

14  Q  So I note for the record we're now at 3:13 a.m. in this

02:35:59  15  exhibit.

16       How long before the shooting is that, Mr. Greene?

17  A  Just under five minutes.

18  Q  Okay.  What's the next activity you documented?

19  A  Here, and then a what I believe is another police vehicle

02:36:40  20  driving north on Wood across the intersection of 44th and then

21  is seen again driving north on Wood towards 43rd.

22  Q  Is that an unmarked car?

23  A  I believe it is, yes.

24   (Said video recording played in open court.)

02:37:19  25       THE WITNESS:  And that vehicle turns right going

02:37:21   1   eastbound on 43rd.

        2   BY MR. EICHENSEER:

        3       Q   Can you show the jury on the map where the car just

        4   turned?

02:37:27   5       A   It turns right on 43rd going eastward.

        6       Q   Do you see that car get in the footage, Mr. Greene?

        7       A   Yes.   I believe I seen on the lower left corner camera.

        8       Q   Is that it right there at 3:15:23?

        9       A   Yes, it is.   It's heading south on Hermitage towards the

02:37:56  10   intersection of --

       11       Q   What's the yellow circle on the top of the screen?

       12       A   It appears to be the person running across the 44th Street

       13   near the alleyway.

       14       Q   And I paused it briefly at 3:15:33, Mr. Greene.   How can

02:38:12  15   you tell that appears to be a person running?

       16       A   By just -- by reviewing the video many times, just seeing

       17   the activity of what a person looks like at that distance.

       18       Q   Do you see somebody running as the video progresses?

       19       A   Yes.

02:38:27  20       Q   Play it again, please.

       21         (Said video recording played in open court.)

       22   BY MR. EICHENSEER:

       23       Q   What do you see next at the bottom right-hand of the

       24   screen?

02:38:33  25       A   In the lower right-hand corner, I see a person in dark

02:38:38  1  shirt, dark shorts walking quickly and then disappears to the

2  right.

3  Q  Okay.  And as that person in the dark shorts disappears to

4  the right, where is the what you call the unmarked law

02:38:53  5  enforcement car?

6  A  That is now driving down 40 -- or driving down Hermitage

7  between 44th and 45th.

8  Q  The person in the dark shorts that you just saw running in

9  the lower right-hand pane, do you see anybody else emerge from

02:39:06  10  the area where that person went into?

11  A  No.

12  Q  You see anybody emerge later on in the footage?

13  A  I'm sorry?

14  Q  Can you pause it here.  Pause it at 3:16:24.

02:39:18  15  What's circled in the lower right-hand pane,

16  Mr. Greene?

17  A  That's a person wearing dark shorts, dark shirt walking

18  north on Wood and then disappears to the right.

19  Q  Can you show the jury quickly where -- whereabout that

02:39:39  20  person just disappeared from?

21  A  The person appeared to be walking northbound around here

22  and then disappears to the right out of the camera's view.

23  Q  Okay.  Now, in the footage, Mr. Greene, I direct your

24  attention to the second left-hand pane on the lower corner.

02:39:58  25  You got a circle there.  What's shown?

Greene - Direct by Eichenseer

02:40:01  1    A  A person in a dark shirt, dark shorts appears in the alley

2    and is walking eastbound and then out of view.

3    Q  Does the person appear to step down as he approaches the

4    other side of the alley?

02:40:15  5    A  Yes.

6    Q  What time is this on the footage?

7    A  3:17.

8     (Said video recording played in open court.)

9    BY MR. EICHENSEER:

02:40:37  10    Q  What's the next thing that you observe on the footage,

11    Mr. Greene?

12    A  An unmarked police vehicle driving south on Hermitage

13    towards the intersection of 44th and Hermitage.  It is seen in

14    the lower right corner and then in the upper right corner.

02:40:56  15    Q  If we could pause here at 3:17:51.  I know, Mr. Greene,

16    you said the shooting happened at about 3:18, correct?

17    A  Correct.

18    Q  And you also said that you added audio to this footage?

19    A  Correct.

02:41:09  20    Q  And you added that audio at about 3:18?

21    A  Correct.

22    Q  So are we about to hear the audio that you added?

23    A  Yes.

24     (Said audio recording played in open court.)

02:41:42  25    BY MR. EICHENSEER:

02:41:43   1    Q   Directing your attention to the lower left-hand pane

        2   second from the corner.

        3    A   The person in dark shirt, dark shorts seems running going

        4   westbound through the alley.

02:41:53   5     (Said video recording played in open court.)

        6   BY MR. EICHENSEER:

        7    Q   And the yellow circle in the right-hand pane, what is

        8   that?

        9    A   Yes, person wearing dark shirt, dark shorts walking south

02:42:19  10   on Wood and then disappears to their left.

       11    Q   Okay.  I now notice this exhibit, Mr. Greene, went from

       12   five panes to three.  Why is that?

       13    A   To show the area of -- the area of interest of the alley

       14   of Hermitage and the camera on Wood.  In the top of the video,

02:42:38  15   there's the time stamp that was continuing on from the POD video

       16   so we can have a -- or understand what real time was.

       17    Q   Okay.  So the time stamp that begins Friday, May 4th,

       18   2018, is that the actual time here?

       19    A   Correct.

02:42:53  20    Q   And again, I think you testified earlier that the time

       21   stamp in those two surveillance cameras on the left-hand side

       22   was 2 minutes 47 seconds fast, correct?

       23    A   Correct.

       24     (Said video recording played in open court.)

02:45:53  25   BY MR. EICHENSEER:

02:45:53  1     Q   The circle's reappeared at 3:22:33.   What's shown in

        2   Exhibit 110?

        3     A   A person wearing dark shirt, dark shorts is standing in

        4   that area.

02:46:04  5     Q   What does that person appear to be doing at 3:22:44?

        6     A   He appears to be lifting his shirt or their shirt.

        7     Q   You see the circle is still there at this point.   Why is

        8   that, Mr. Greene?

        9     A   The person appears to be going in and out of the camera

02:46:31 10   view.

       11       (Said video recording played in open court.)

       12   BY MR. EICHENSEER:

       13     Q   Okay.   What does the person appear to be doing now?

       14     A   The person is now working -- walking northbound on Wood up

02:46:49 15   the sidewalk, then turns right and goes out of view.   A

       16   dark-colored, four-door sedan is now parked.

       17     Q   When the person in the dark shorts walked out of view,

       18   what direction did that person head?

       19     A   He was walking eastbound.

02:47:21 20     Q   Can you show the jurors approximately on the map

       21   approximately where that person went out of view?

       22     A   Northbound here in this general area and walked to the

       23   right eastbound.

       24     Q   And do you see anybody emerge from that location in this

02:47:39 25   footage?

Greene - Direct by Eichenseer

02:47:41　1　　A　Yes.　In several more seconds, the person appears --

2　reappears.

3　　Q　Okay.　It appears to be the same person to you --

4　　A　Yep.

02:47:49　5　　Q　-- that went in and disappeared in the first place?

6　　A　Yes.

7　　Q　And for about how long in this footage is that person out

8　of view?

9　　A　Possibly another, in a minute.　Oh, sorry, a few seconds.

02:48:03　10　And the person in the dark shirt, dark shorts is now walking

11　south on Wood on the sidewalk and walks to the passenger side of

12　the vehicle, of the dark colored four-door sedan.

13　　　　The vehicle backs up and then drives north on Wood

14　towards 43rd.　The vehicle turns left going westbound on 43rd

02:49:14　15　and then out of view.

16　　Q　And then does Government Exhibit 110 end at 3:25:52?

17　　A　Yes.

18　　Q　And it began at about approximately 2:56 in the morning,

19　correct?

02:49:30　20　　A　Correct.

21　　Q　Before you created Government Exhibit 110, did you review

22　footage from before and after that period?

23　　A　Yes, I did.

24　　Q　How far back did you review?

02:49:39　25　　A　Approximately about 2:45 a.m.

Greene - Direct by Eichenseer

02:49:40   1    Q   2:45 a.m.?

         2    A   Yes.

         3    Q   Did you document the activity that you saw?

         4    A   Yes, I did.

02:49:45   5    Q   Did you miss anything doing your initial review of that

         6  footage?

         7    A   Yes, I did.

         8    Q   What did you miss?

         9    A   I missed a person walking in the general area of the

02:49:57  10  alleyway near 44th at around on the time stamp was about in the

        11  2:54.   On the time stamp from my camera review, which would be

        12  about 2:51 to 2:52 a.m. in real time.

        13    Q   So you saw a person at 2:52 a.m.; is that right?

        14    A   Correct.

02:50:17  15    Q   Can you show the jury approximately where you saw that

        16  person?

        17    A   That person was in this general area seen around here in

        18  the video around in real time between 2:51 and 2:52.

        19    Q   Okay.   How long was that before the shooting?

02:50:33  20    A   27 minutes.

        21    Q   And when did you realize that you had missed that

        22  activity?

        23    A   I realized it last Friday.

        24    Q   That would be a couple days ago?

02:50:43  25    A   Yes.

Greene - Direct by Eichenseer

02:50:44 1    Q  Had you seen that activity in your initial review, would
2    you have included it in Exhibit 110?
3        A  Yes, I would have.
4            MR. EICHENSEER:  Can you publish Government Exhibit
02:50:56 5    111, please.
6        (Said video recording played in open court.)
7    BY MR. EICHENSEER:
8        Q  So I noticed, Mr. Greene, this exhibit starts at 3:15:25
9    or so.  Can you remind the jury what this exhibit is?
02:51:07 10   A  This is the single cam view taken from the multiple cam
11   review.  So it shows that persons in vehicles of interest at one
12   cam review at a time.
13       Q  So has the jury already seen what they're about to see on
14   this exhibit?
02:51:22 15   A  Yes, they have.
16       Q  Is that everything, or is there anything different on this
17   exhibit?
18       A  The only thing that's been added to this is the video from
19   the -- the POD video from 4501 South Hermitage at around 3:18,
02:51:34 20   and that camera location is down here.
21       Q  So this exhibit, before I play it, it plays back and syncs
22   time, correct?
23       A  Correct.
24       Q  Did you toggle back and forth between different angles?
02:51:46 25   A  Yes.

02:51:49  1    MR. PISSETZKY:  I'm sorry, what number was it?

2    MR. EICHENSEER:  111.

3    MR. PISSETZKY:  Thank you.

4    MR. EICHENSEER:  And for the record, this exhibit is

02:52:03  5  about 11 minutes long.

6    (Said video recording played in open court.)

7  BY MR. EICHENSEER:

8    Q  Mr. Greene, here we are at the alley cam.  We're about to

9  see a person cross the alley.  Can you tell what, if anything,

02:53:02  10  that person does before they cross the alley?

11    A  They open the gate and then walking across the alley going

12  eastbound.

13    MR. PISSETZKY:  Your Honor, can we have a sidebar for

14  just one second, please.

02:53:42  15    (At sidebar outside the hearing of the jury.)

16    MR. PISSETZKY:  There is a show of force by ATF agents,

17  which is exactly what we were talking about when we started the

18  case.

19    MR. HYMAN:  They're coming in.  They're coming in,

02:53:53  20  they're coming out.  The jury is distracted.  You see the jury

21  look to all these people.

22    MS. BABU:  Your Honor, we can't --

23    THE COURT:  You can't all talk at once.  Go ahead.

24    MR. HYMAN:  So I think the government can control this.

02:54:05  25  If there's a number that would like to sit in and watch it,

02:54:08  1  that's fine, but it's very clear that these are agents.  They're

2  all underdressed in their -- just in plainclothes.

3  MS. BABU:  If I may --

4  THE COURT:  Before you talking about "here," they're

02:54:20  5  not in the videos.

6  MR. HYMAN:  Yeah, yeah, here.

7  MS. BABU:  Your Honor, the U.S. Attorney's office also

8  comes to watch these -- watch court proceedings and --

9  THE COURT:  Plus there's a lot of --

02:54:28  10  MR. HYMAN:  Yeah, but they're in coats and ties, not

11  in -- not in --

12  MS. BABU:  Your Honor, I have been in court in jeans

13  and T-shirts, so I don't know --

14  MR. HYMAN:  They're all -- they're all ATF agents.  I

02:54:41  15  know them.  You know them.  I've crossed plenty of them.

16  MS. BABU:  Your Honor, Your Honor, I can't guarantee

17  that these are all ATF agents.

18  THE COURT:  There are a lot of students here who are

19  working including a grandson of mine.  So he's not an ATF agent.

02:54:49  20  MS. BABU:  Your Honor, we have told ATF -- we have told

21  the ATF --

22  THE COURT:  All right.  Let's proceed.

23  All right.  You can go on.  Proceed.

24  (In open court in the hearing of the jury.)

02:55:09  25  MR. EICHENSEER:  We'll resume playing 111.

Greene - Direct by Eichenseer

02:55:11  1       (Said video recording played in open court.)

       2   BY MR. EICHENSEER:

       3       Q   Again, Mr. Greene, the time stamp here, it says 3:20 on

       4   the time stamp exhibit.   What is this in actual time?

02:55:22  5       A   This is 2 minutes and 47 seconds ahead, so it's 3:17.

       6       Q   It's about a minute before the shooting?

       7       A   Yes.

       8           And that's the unmarked police vehicle driving south on

       9   Hermitage towards the intersection of 44th and Hermitage.

02:55:52 10       Q   Did you add audio to this exhibit as well, Mr. Greene?

      11       A   Yes.

      12       Q   The same audio as before?

      13       A   The same audio, yes.

      14       (Said video recording played in open court.)

02:57:15 15           MR. EICHENSEER:   Your Honor, for the record, we're

      16   fast-forwarding the clip a little bit because the jurors have

      17   already seen this --

      18           THE COURT:   All right.

      19           MR. EICHENSEER:   -- in a different format.

02:58:01 20       Q   Yeah, Mr. Greene, the time stamp in the corner of this

      21   footage here says 3:21:07.   Is that actual time or is that off?

      22       A   That is 13 seconds behind real time.

      23       Q   So now the video has shifted, Mr. Greene.   What camera is

      24   being shown at 3:21:31?

02:58:21 25       A   This is the POD video at 45th and Hermitage in this area.

Greene - Direct by Eichenseer

02:58:28  1  In the intersection of 45th and Hermitage, the camera is
        2  pointing north towards 44th and Hermitage.
        3     Q  So is that the shooting scene behind the camera view here?
        4     A  Yes, where the --
02:58:34  5     Q  What have you circled in this part of the footage?
        6     A  A person walked across from the street and enters a
        7  vehicle.
        8     Q  Can you tell what kind of vehicle it is, Mr. Greene?
        9     A  It's a dark-colored, four-door sedan.  The vehicle turns
02:59:01 10  around and then heads south on Hermitage back towards 45th, then
       11  turns right going westbound on 45th.
       12     Q  At this point in the vehicle, is the vehicle heading
       13  towards Wood Street?
       14     A  Towards Wood.
02:59:16 15     (Said video recording played in open court.)
       16  BY MR. EICHENSEER:
       17     Q  And now a car pulled into the footage at about 3:23:30 on
       18  this time stamp; is that right?
       19     A  Correct.
03:00:32 20     Q  Can you tell what type of car that is?
       21     A  It appears to be a dark-colored four-door sedan.
       22     Q  Is this the point in the footage, Mr. Greene, where the
       23  person in those dark shorts is out of view?
       24     A  Yes, it is.
03:02:01 25     Q  And does this Exhibit 111 also end with the black

03:02:05  1    four-door car turning left on to 43rd from Wood?

       2        A  Yes.

       3            MR. EICHENSEER:  At this point, Your Honor, the

       4    government would move to publish or ask to publish Exhibit 112

03:02:44  5    which is already in evidence.

       6            THE COURT:  All right, you may.

       7          (Said video recording played in open court.)

       8    BY MR. EICHENSEER:

       9        Q  Mr. Greene, do you recognize Exhibit 112 at all?

03:02:52 10        A  Yes.

      11        Q  What is it?

      12        A  It is a video from a Shell gas station showing that

      13    dark-colored four-door sedan arrive and a person getting out and

      14    entering the convenient store of the gas station and purchasing

03:03:06 15    some items.

      16        Q  Okay.  Did -- do you have any understanding of where this

      17    gas station is located?

      18        A  I believe it was 3510 South Ashland which is several miles

      19    north of this location -- of the shooting incident.

03:03:20 20        Q  Okay.  And what's the time stamp on this exhibit?

      21        A  It's 3:32:46.

      22        Q  Did you review this gas station footage before preparing

      23    this exhibit?

      24        A  Yes.

03:03:30 25        Q  And how many different cameras were in that footage?

03:03:35  1      A  I believe there was 15.

       2      Q  So what did you do to make Exhibit 112?

       3      A  I edited this video to show the camera views of interest

       4   of the vehicle and the persons.

03:03:47  5           MR. EICHENSEER:  At this point we'll play 112.

       6        (Said video recording played in open court.)

       7   BY MR. EICHENSEER:

       8      Q  It was the person in the dark shorts who just left the gas

       9   station.  Does that person reappear in the footage at all?

03:05:43 10      A  Yes, he comes back in several seconds.

      11      Q  The time stamp is 3:34, correct?

      12      A  Correct.

      13        (Said video recording played in open court.)

      14   BY MR. EICHENSEER:

03:07:39 15      Q  So what time does the footage show a black four-door sedan

      16   leaving the gas station?

      17      A  3:36:38.

      18      Q  So, Mr. Greene, on the screen in front of you is

      19   Government Exhibit 105A which is not yet in evidence.

03:08:15 20      A  Yes.

      21      Q  Do you recognize Exhibit 105A?

      22      A  Yes, I do.

      23      Q  What is it?

      24      A  It is an image taken from the Exhibit 105 camera view.  It

03:08:26 25   is a super high resolution image of that camera view.

03:08:31   1      Q   Did you create Exhibit 105A?

          2      A   Yes, I did.

          3      Q   Can you show the jury what camera view on the map there

          4   this is?

03:08:41   5      A   105 pointing south towards down Hermitage.

          6      Q   When you said super high resolution, what do you mean by

          7   that?

          8      A   I used a technique called frame averaging.  I took 100

          9   frames of video that during the time frame of no activity and

03:08:55  10   then stacked them together to create a higher resolution, better

         11   image of that -- of the camera view.

         12      Q   So this image is an average of those 100 frames together?

         13      A   Correct.

         14      Q   And just how long in real time is 100 frames?

03:09:09  15      A   A little over three seconds.

         16      Q   So this is basically an average photo from three seconds

         17   of footage?

         18      A   Correct.

         19      Q   Is Government Exhibit 105A a true and accurate frame

03:09:22  20   average still image of Exhibit 105?

         21      A   Yes.

         22          MR. EICHENSEER:   The government moves to admit 105A and

         23   publish.

         24          THE COURT:   Any objection?

03:09:33  25          MR. PISSETZKY:   No.

03:09:34  1        THE COURT:  It's admitted.

         2     (Government Exhibit 105A admitted in evidence.)

         3        THE COURT:  You may publish it.

         4     (Said video recording played in open court.)

03:09:50  5  BY MR. EICHENSEER:

         6     Q  All right.  Mr. Greene, so this is a -- we're looking at

         7  about three seconds of elapsed time on Exhibit 105A; is that

         8  right?

         9     A  I'm sorry?  Repeat that.

03:09:59 10     Q  We're looking at about three seconds of elapsed time on

        11  Exhibit 105A; is that right?

        12     A  Yeah, I guess.

        13     Q  I don't want -- I don't want you to guess.  Is that -- is

        14  that -- am I accurate in how you put together this exhibit or

03:10:12 15  no?

        16     A  It's just -- it's an image stacked of all those frames

        17  together, and it's just a super high resolution image taken from

        18  those three seconds.

        19     Q  So is this image of Exhibit 105A, is this clear than if

03:10:24 20  you just take one frame from 105 and put that on the screen?

        21     A  Yes, this is a better image than that.

        22        MR. EICHENSEER:  The government asks to publish Exhibit

        23  113 which is already in evidence.

        24        THE COURT:  All right.  You may.

03:10:37 25     (Said video recording played in open court.)

03:10:39   1   BY MR. EICHENSEER:

2        Q   Mr. Greene, what is Exhibit 113?

3        A   It is the pole camera of video, the time frame of 4:41 to

4   approximately 4:44.

03:10:49   5        Q   So this is the same camera -- this is the same camera view

6   we saw in Exhibits 110 and 111, correct?

7        A   Yes, it's --

8        Q   But it's a different time period?

9        A   Yes.

03:11:00  10        Q   What's the time period?

11        A   Approximately 4:41 to 4:44 a.m. on May 4th.

12        Q   Okay.   And how long was that after the shooting?

13        A   (No response.)

14        Q   How long was that after the shooting?

03:11:16  15        A   Just under an hour and a half.

16        Q   An aside, did you add the circles to this footage?

17        A   Yes, I did.

18        Q   And aside from behind the circles, did you do anything to

19   change the original?

03:11:26  20        A   I -- I -- I brightened and increased the contrast to

21   improve the image, the video.

22            MR. EICHENSEER:   At this point we would play Government

23   Exhibit 113.

24        (Said video recording played in open court.)

03:11:39  25   BY MR. EICHENSEER:

Greene - Direct by Eichenseer

03:11:40 1    Q   Okay.  And what's circled in the street there, Mr. Greene?

2    A   I see a person wearing a white -- it looks -- appears to

3    be wearing a white T-shirt and dark shorts crossing Wood going

4    in an eastbound direction.

03:11:51 5    Q   You still got a circle there on the screen on 4:41:49.

6    Why is that?

7    A   The person appears to be still standing on the sidewalk

8    and then goes out of view walking to the  eastern direction.

9    Q   Is that about the same area where the person in the dark

03:12:10 10   shorts disappeared from view on the screen in Exhibit 110?

11   A   Yes.

12   Q   And now the circle's reappeared at 4:42:40.  Why is that,

13   Mr. Greene?

14   A   It appears the person in the white T-shirt and dark shorts

03:12:52 15   is back in view along on the sidewalk on Wood.

16     (Said video recording played in open court.)

17   BY MR. EICHENSEER:

18   Q   Now we're at 4:43:40.  What does the footage show now?

19   A   The person wearing -- appears to be wearing a white

03:13:53 20   T-shirt and dark shorts walks westbound across 44th and then

21   south on the sidewalk.

22   Q   Mr. Greene, I'm going to go back and ask you about some of

23   the still images from Exhibit 110 that you talked about.

24        The government moves to publish Exhibit 110A, which is

03:14:11 25   already in evidence?

03:14:13   1        THE COURT:  You may.

           2     (Said video recording played in open court.)

           3   BY MR. EICHENSEER:

           4     Q  Is this a still frame from Exhibit 110, Mr. Greene?

03:14:19   5     A  Yes.

           6     Q  And what's the time period shown on this exhibit?

           7     A  At 3:17 a.m. on May 4th.

           8     Q  And then what's circled there on the lower left-hand pane?

           9     A  A person in dark T-shirt, dark shorts walking across the

03:14:39  10   alley.

          11     Q  Let me show you another page -- a still image from 110.

          12        This is another still image.  What time is this still

          13   image, Mr. Greene?

          14     A  This is at 3:18:28.

03:15:22  15     Q  Okay.  And what's shown in the lower left-hand pane?

          16     A  A person in dark shirt, dark shorts, appears to be running

          17   east -- westbound across the alley.

          18     Q  What time period did Exhibit 110 cover again?

          19     A  2:56 to 3:26 approximately.

03:15:43  20     Q  Did you review the alley cam surveillance footage for that

          21   entire time period?

          22     A  Yes, I did.

          23     Q  Did you see anybody else in the alley aside the person in

          24   the dark shorts?

03:15:50  25     A  I did not.

Greene - Direct by Eichenseer

03:15:51   1    Q   Did you review the sidewalk footage from 2:56 to 3:26

2  a.m.?

3    A   Yes, I did.

4    Q   Did you see anybody in that footage at all?

03:16:01   5    A   No.

6        MR. EICHENSEER:   No further questions, Judge.

7        Judge, no further questions from the government.

8        THE COURT:   We'll take a 15-minute recess and then

9  we'll have the cross-examination.

03:16:36  10    (Substitution of reporters.)

11    (Recess taken.)

1    (Proceedings heard in open court.  Jury out.)

2        MR. HYMAN:  Your Honor, before we start, there's

3    another -- Mr. Greene is going to be this afternoon.  It's a

4    Steven Greene, right?

5        MS. BABU:  Paul.

6        THE COURT:  Paul.

7        MR. HYMAN:  Paul Greene from this company

8    ShotSpotter.  And --

9        MS. BABU:  You got it right that time.

10        MR. HYMAN:  And I think before he is permitted to

11    testify as an expert, we would like to voir dire him, and we'd

12    like to do it outside the presence of the jury.  So --

13        MS. BABU:  Your Honor, you've already ruled on their

14    *Daubert* motion and denied the motion.

15        THE COURT:  Right.

16        MS. BABU:  There's no need for the *Daubert*.

17        MR. HYMAN:  But only as to -- only as to the science,

18    only to the science of the ShotSpotter, not as to whether or

19    not Mr. Greene is qualified to testify in this case.

20        THE COURT:  Well, they'll put his qualifications on

21    the record, and you make an objection if you don't think

22    they're adequate, and I'll rule on it.

23        MS. BABU:  Correct, your Honor.

24        MR. HYMAN:  Okay.

25        THE COURT:  All right.  Bring the jury in.

1          And Mr. Pissetzky, are you cross-examining?

2          MR. PISSETZKY:  I'll attempt to.

3          THE COURT:  How long?  Five minutes, ten?

4          MR. HYMAN:  20, 30.

5          MR. PISSETZKY:  Not too long.

6          MR. HYMAN:  In and out, Judge.

7          MR. PISSETZKY:  I will try to --

8          THE COURT:  That's all right.  Go ahead.

9       (Proceedings heard in open court.  Jury in.)

10          THE COURT:  Please be seated.

11          Mr. Pissetzky, you may cross-examine the witness.

12          MR. PISSETZKY:  Thank you, your Honor.

13                          CROSS-EXAMINATION

14  BY MR. PISSETZKY:

15  Q.  Good afternoon.

16  A.  Good afternoon.

17  Q.  So you started your video editing at approximately, what

18  you said, 2:56, correct?

19  A.  That was my -- the final edited video was at that -- about

20  that timeframe, yes.

21  Q.  And you reviewed the other videos as counsel asked you for

22  timeframe before and after?

23  A.  Correct.

24  Q.  And you told us that you reviewed them dozens of times?

25  A.  Correct.

1  Q.  To find anything of interest, correct?

2  A.  Correct.

3  Q.  And then when you edited the videos, you put certain

4  circles --

5  A.  Correct.

6  Q.  -- around cars of interest, and a yellow circle to

7  indicate a person or a certain car of interest?

8  A.  Correct.

9  Q.  In fact, two different cars had a yellow circle on them --

10 the four-door sedan and the Kia -- towards the end of the

11 video?

12 A.  That is correct.

13 Q.  Okay.  Now, before doing that, you obviously had

14 conversation with either other agents or the government about

15 what it is that they're looking for?  You had to have had the

16 lay of the land, right?

17 A.  Correct.

18 Q.  Who did you speak to?

19 A.  I spoke to several ATF agents.

20 Q.  And they specifically told you what they're looking for?

21 A.  They pointed out to certain things during the timeframe of

22 interest, yes.

23 Q.  So when you watched the videos, at least the first couple

24 of times, you watched it with other agents?

25 A.  No.

1  Q.  So they just told you pretty much what they were -- what

2  to look for?

3  A.  They -- I received the videos.  It was either hand

4  delivered from an agent or Fed Exed to me from the Chicago

5  field office.

6  Q.  Right.  And then you were told, okay, these are the cars,

7  the covert cars that the agents drove.  How did you know to

8  circle purple or white, a car?

9  A.  After -- during the review of the video, looking at the

10  timeframe of the shooting at 3:18:13, I reviewed the videos

11  going forward and backward from that timeframe and basically

12  deducting what vehicles were what, which vehicles.

13  Q.  Right.  But the vehicle that is, for example, the white --

14  let me back up.  The purple vehicle, you don't see anybody

15  going in or out of that vehicle, right?

16  A.  I'm trying --

17  Q.  Let me back up for you.  Okay.  There's a yellow circle,

18  correct?

19  A.  Correct.

20  Q.  And the yellow circle circles either the person or a Kia

21  or a four-door sedan, correct?

22  A.  Correct.

23  Q.  Okay.  Now, there's a white vehicle, correct?

24  A.  A vehicle, a white SUV or a white circle on a --

25  Q.  A white circle around a vehicle.

1  A.  Correct.

2  Q.  Okay.  And that is, the white circled vehicle is the

3  vehicle that agents come out of, correct?

4  A.  Correct.

5  Q.  Then there's a purple circle around a vehicle?

6  A.  Correct.

7  Q.  You don't see anybody going in or out of that vehicle?

8  A.  No, I do not.

9  Q.  How do you know it's a vehicle of interest?

10 A.  It was our understanding that there were one or more

11 police vehicles in that area during that timeframe.

12 Q.  So did you just arbitrarily -- because we see other

13 vehicles drive around the same timeframe.  So you just

14 arbitrarily picked that vehicle to call it a vehicle of

15 interest?

16         MR. EICHENSEER:  Objection.  Argumentative.

17         THE COURT:  Overruled.  You can answer.

18 BY THE WITNESS:

19 A.  The vehicle, the purple -- with the purple circle, that

20 vehicle parked on Hermitage between 45th and 44th right before

21 the shooting, and my understanding is that was one of the

22 unmarked police vehicles, part of the surveillance.

23 BY MR. PISSETZKY:

24 Q.  So somebody told you that?

25 A.  We -- I don't know if we were told.  I saw it on the

1  video, and it made sense to me.

2  Q.  Okay.  So you see a car parked, and you believed it to

3  be -- is that what you're telling, you just --

4  A.  My understanding is that there were unmarked police

5  vehicles regarding this operation that were in the area

6  driving around.  And part of my process of trying to determine

7  who was -- what vehicle is what, what person is, you know, of

8  interest, I reviewed that video and real -- and basically

9  deducted that that vehicle is one of the unmarked vehicles.

10 Q.  Okay.  So that was your educated guess?

11 A.  Yes, and from my experience, yes.

12 Q.  Okay.  Now, on Friday, you told us this past Friday, June

13 7th --

14 A.  Correct.

15 Q.  -- is the day that you discovered that there was a person

16 walking in the alley at 2:54 approximately or realtime, you

17 told us, at 2:2 -- 2:51.

18 A.  Yes, correct.

19 Q.  Did you -- after finalizing your other video, did you go

20 back and edit it to add that part into your video?

21 A.  No.  The video had already been submitted.

22 Q.  Well, you can submit -- resubmit videos.

23 A.  Correct.  That --

24 Q.  Did you do that?

25 A.  I did not.

1    Q.   Okay.  Now, at that time, you knew from other fellow

2    officers and conversations because by -- let me back up.

3         By June 7th, you already spoke to the government as

4    well, correct?

5    A.   Yes.

6    Q.   In preparation for trial?

7    A.   Correct.

8    Q.   So at that point, you knew that the shooter actually --

9    based on other agents' information, the shooter wore white, or

10   there was a person of interest that had a white shirt, correct?

11   A.   No.

12   Q.   No.  Okay.  Did you ask the government whether or not they

13   wanted a new version that included that video from 2:51 or

14   2:52?

15   A.   No.

16   Q.   And you are familiar with that video, right?

17   A.   I reviewed it Saturday evening, yes.

18        MR. PISSETZKY:  Okay.  Your Honor, we're going to

19   submit Godinez Video 1.  And I believe there's no objection to

20   its admission.

21        MR. EICHENSEER:  No, your Honor.

22        THE COURT:  All right.

23     (Godinez Video 1 received in evidence.)

24        MR. PISSETZKY:  May we play it to the jury?

25        THE COURT:  You may.

1  BY MR. PISSETZKY:

2  Q.  You can watch it on your -- and tell me if that is the

3  video that you viewed.

4  A.  I believe so.

5  Q.  And if you look on the top --

6      MR. HYMAN:  Wait.

7      MR. PISSETZKY:  Just one second.  We might need you

8  to help us fix the stuff there.

9    (Pause.)

10   (Said video recording played in open court.)

11 BY MR. PISSETZKY:

12 Q.  And so if you watch the video, you can see the red circle

13 on the top there?

14 A.  Correct.

15 Q.  And you identify -- if you look within that circle, do you

16 identify the individual that you saw when you viewed that

17 video on June 7th or 10th?

18 A.  I reviewed the video last Saturday.

19 Q.  Okay.  Last Saturday.  And can you see the person in

20 there?

21 A.  Yes.

22 Q.  And he appears to be wearing a white shirt?

23 A.  No, he does not.

24 Q.  What does he appear to be wearing?

25 A.  He -- it's hard to tell the color of his clothing because

 1  he looks like he walks under what appears to be a streetlight.

 2  Q.  Let's play it again, and we'll pause it for you.

 3      (Said video recording played in open court.)

 4          Do you see him on the corner there --

 5  A.  Yes.

 6  Q.  -- if we pause it?

 7  A.  Yes.

 8  Q.  Does it seem like he's wearing a light shirt?

 9  A.  Yes.

10  Q.  Okay.  Maybe off-white?

11  A.  Yes, a light-colored shirt.

12  Q.  Okay.  But you did not add that to the video, right?

13  A.  No, I did not.

14  Q.  Okay.  And that is at 2:51, so just a few minutes before

15  your video starts?

16  A.  About five minutes before my video started, yes.

17  Q.  About five minutes.  Okay.  Now, when you edited the

18  video, and I believe the video from the front that you

19  uprighted, that's of --

20  A.  Rotated 90 degrees.

21  Q.  Correct.  So that's a private video, right, or a

22  private --

23  A.  From a home residence.

24  Q.  Right.

25  A.  I understand, yes.

1  Q.  Okay.  And the video here in the back is the same -- comes

2  from the same building, right?

3  A.  Correct.

4  Q.  One is from the front, and one is from the back?

5  A.  Correct.

6  Q.  When you uprighted the video from the front, you watched

7  it numerous times?

8  A.  I did.

9  Q.  And the shooting, you said, happened around what time?

10  A.  3:18:13, is the timeframe.

11  Q.  Right.  At that point of time, you looked at the video

12  very carefully, correct?

13  A.  Correct.

14  Q.  And you've looked up and down the street on both sides of

15  the street to see if you identify anything that you can circle

16  in yellow?

17  A.  Can you repeat that question?

18  Q.  Yes.  When you viewed that video right when the shooting

19  was happening, you looked also not only at the top of the

20  video but up and down the street as -- in every, anywhere in

21  that video, right?

22  A.  Correct.

23  Q.  As it's playing?

24  A.  Correct.

25  Q.  To see if you can identify another individual or another

1  car?

2  A.  Correct.

3  Q.  Did you?

4  A.  Yes, I -- did I see anything?

5  Q.  Yes.

6  A.  No, I did not, not at the timeframe on the street view

7  from Government Exhibit 105.

8  Q.  Right.

9  A.  I did not see --

10  Q.  Anything?

11  A.  No.

12  Q.  Okay.  And can you bring up --

13       And I'm going to just put on the screen the front

14  view of that video.

15  A.  From --

16  Q.  105?

17  A.  -- 105?

18  Q.  Yes, Government 105.

19       Now, you see on the right-hand corner some trees,

20  correct?  There's some fences all the way on the right-hand

21  side?

22  A.  To the right of the sidewalk?

23  Q.  Right.

24  A.  Along where the residences would be next to the homes?

25  Q.  Correct.  So there's some fences going on the right-hand

1  side?

2  A.  Yes.

3  Q.  And then there's some shrubbery, evergreens?

4  A.  It appears to be, yes.

5  Q.  And then there's like an awning there or something that

6  appears to be?

7  A.  Yes.

8  Q.  And then a little bit more shrubbery, it seems like it,

9  right?

10  A.  Yes.

11  Q.  And you looked through that area specifically to see if

12  you can recognize anything during the shots?

13  A.  Yes.

14  Q.  And you did not recognize anything there?

15  A.  I did not see anything, no.

16  Q.  Okay.  Now, when you viewed the -- thank you.

17          When you viewed the videos originally that are on

18  Wood Street, remember the very first at about 2:56 a.m., you

19  see an individual coming out and getting into the white Kia?

20  A.  Correct.

21  Q.  It does not appear when you look down that street that

22  there are any parking spaces for that Kia to park, correct?

23  A.  As -- I couldn't tell that, no.

24  Q.  You couldn't tell if there were, or you don't -- or you

25  didn't look?

1  A.  I did not look to see -- from the view, if we can show the

2  view again.

3         MR. PISSETZKY:  Can you switch it to the government's

4  multi-view, please?

5  BY MR. PISSETZKY:

6  Q.  And so you see down on the very bottom right, that's Wood

7  Street, right?

8  A.  Correct.

9  Q.  And there are cars parked up and down that street?

10  A.  It appears to be, yes.

11  Q.  Right.  And the Kia is parked in what appears to be a

12  driveway or something --

13  A.  Correct.

14  Q.  -- to that sort?

15         And that's -- when the Kia comes out of that, that's

16  when it drives down Wood but then reverses back and then

17  drives back out after a few minutes?

18  A.  Correct.

19  Q.  Okay.  Do you see any parking spots that are open on Wood

20  Street based on your view here?

21  A.  Based on my view, it does not -- there could be a spot

22  across the street in front of that white vehicle about one,

23  two, three, four, five -- between like the fifth and sixth

24  car, there could be a space to park there.

25  Q.  Or it could be -- or it could be an area where the alley

1  goes into Mobile possibly?

2  A.  Yes.  I don't know.

3  Q.  And then if you look at the top of the street down on the

4  top right-hand corner, there are cars on both sides of the

5  street parked as well, correct?

6  A.  Correct.

7  Q.  And then if you look at the view of Hermitage on the top

8  left side, there are cars parked up and down the street,

9  correct?

10  A.  Which camera view are you speaking of?

11  Q.  The top left one.

12  A.  Top left?  Yes, there appears to be cars parked on that

13  street, yes.

14  Q.  Okay.  Now, when you play this video and you view that

15  video, there was never a point in time that you had your

16  yellow circle in the same frame or the same camera with

17  another circle of white or purple, correct?

18      Do you understand my question?

19  A.  I don't believe, not at the exact same frame, no.

20  Q.  Not in the same frame, correct.  And when you had -- when

21  you viewed the camera, the only time that there was the

22  same -- the white and a purple or the yellow and white circle

23  was when the person was going into the house and the white

24  circle was driving on Hermitage, correct?

25  A.  I'd have to see the video again to see which section --

1  Q.  So if we --

2  A.  -- the seconds that you're showing, you're speaking of.

3  Q.  Can we watch?  Can we go to 3:14?  3:14 time.  Sorry.

4       So this is 3:13 and 40 -- and 50 seconds, correct?

5  A.  Correct.

6    (Said video recording played in open court.)

7  Q.  And there's a purple car, right?

8  A.  Correct.

9  Q.  And it's driving where?

10 A.  Going northbound on Wood past 44th as you see it in the

11 lower right corner heading towards 43rd.

12 Q.  Right.  And there's no yellow circle, correct, anywhere in

13 the --

14 A.  Correct.

15 Q.  And then the car turns where?

16 A.  I believe it turns right on 43rd going eastbound.

17 Q.  And then the car is driving down Hermitage?

18 A.  Correct, going south on Hermitage towards the intersection

19 of 44th and Hermitage.

20 Q.  And then you see the yellow circle.  A person was running

21 across what street?

22 A.  That would be near the alleyway between -- on 44th between

23 Wood and Hermitage.

24 Q.  Right.  And then he is in the frame, right?  And can you

25 pause it?

1  A.  Yes.

2  Q.  So this is the only time that you see the yellow and

3  another circle in the -- in the same four-frame video you

4  created, right?

5  A.  Okay.  Correct.

6  Q.  And can you tell us, where is the yellow -- the person

7  surrounded by the yellow circle?

8  A.  On the map?

9  Q.  On the map, right.

10  A.  It would be in the -- the person circled in yellow would

11  be in the area, the direction here going -- walking northbound

12  here.

13  Q.  And he is right by the house that he goes into, right?

14  A.  Yes.

15  Q.  Right.

16  A.  Approximately about right here, yes.

17  Q.  And the car?

18  A.  The car is driving, the purple circled car is driving

19  south around the intersection and going south on Hermitage.

20  Q.  So there's no way for that person to see the car from this

21  point of view?

22          MR. EICHENSEER:  Objection as to foundation.

23          THE COURT:  Overruled.  He can answer.

24          THE WITNESS:  State that again.

25  BY MR. PISSETZKY:

1  Q.  From that point of view as you explained to us, there's no

2  way for that person to see the car driving down that street;

3  it's a block away?

4  A.  Correct.

5  Q.  Okay.  When the Kia was driving, the white Kia was

6  driving, by the way, you saw it obeying the rules of the road.

7  It had the turn signal when they turned, correct?

8  A.  I would say that, yes, correct.

9  Q.  It seems that it was driving in approximately the speed

10 limit of the streets of Chicago?

11 A.  Correct.

12 Q.  When the person in the yellow, around the yellow circle,

13 he is wearing -- you identified him wearing black clothes and

14 a black hat.

15 A.  I referred to him as a person wearing dark clothes, dark

16 T-shirt and dark shorts.

17 Q.  Dark T-shirt and dark shorts?

18 A.  Yeah.

19 Q.  After the shooting happened, that person, based on the

20 videos, goes back to that same house that we see here on the

21 bottom right corner, correct?

22 A.  Correct.

23 Q.  And he is in there for some time?

24 A.  Yes, a minute or so, two -- several minutes.

25 Q.  Several minutes, right?  And when he comes out, he comes

1  out with the exact same clothes?

2  A.  It appears, yes.

3  Q.  You're aware that that was his house where he lived,

4  correct?

5  A.  I believe -- I believe that was his residence.

6  Q.  Right.  And he went to the residence based on the video,

7  correct?

8  A.  Correct.

9  Q.  He came out of the residence with the exact same clothes

10  that he wore right before the shooting?

11  A.  It appears to be wearing the same clothing.

12  Q.  When you were watching the -- all the videos and you see

13  the person in the yellow circle, did you ever recognize what

14  appears to be him holding a gun?

15  A.  Due to the resolution of the video, I could not determine

16  if he had anything in his hands.

17  Q.  So my question was:  Did it appear to you that he was

18  holding a gun?

19  A.  I could not determine the fact if he was holding anything

20  in his hands.

21  Q.  So you didn't see a gun in any of the videos?

22  A.  Due to the resolution of the video, I could not make out a

23  gun or anything, any object in the person's hands.

24  Q.  And finally, Exhibit 113, so if we play that, you see on

25  the -- at the bottom of the -- if you can pause it for me for

1  just a second, please.

2     (Said video recording played in open court.)

3        You see blue lights, right?

4  A.  Correct.

5  Q.  These are police lights?

6  A.  They appear to be reflections of police lights.

7  Q.  And then the person in the -- in the yellow circle is

8  crossing the street, correct?

9  A.  Correct.  It looks like he's walking eastbound on across

10 44th.

11 Q.  So he's walking towards those police lights and into the

12 house that he used to work -- he went in before, right?

13 A.  No, I don't believe -- he did not appear to go back

14 towards that house that he came in and out of.  That is just

15 near where he -- the white SUV was parked.

16 Q.  Okay.  So he's walking --

17 A.  He appeared to be a few, maybe if you want to say,

18 residences north of what the residence he went into.

19 Q.  Right.  And he was walking across the street, right?

20 A.  Correct.

21       MR. PISSETZKY:  Can we play it?

22     (Said video recording played in open court.)

23 BY MR. PISSETZKY:

24 Q.  And then if we -- so he's outside, right?

25 A.  Yes.  He appears to be on the sidewalk.

1  Q.  He's on the sidewalk.  He's walking towards --

2  A.  I would say south and then disappears --

3  Q.  Right.

4  A.  -- to his left or eastbound.

5  Q.  Right.  So he was outside for over a minute there?

6  A.  I didn't --

7  Q.  From 4:41 to about 4:42?

8  A.  Yeah.  I'd have to look at the time again but...

9     (Said video recording played in open court.)

10 Q.  And then he's coming back out at 4:42:22, correct?

11 A.  Correct.

12 Q.  And he is standing outside on the sidewalk?

13 A.  Correct.

14 Q.  Going back and forth on the sidewalk there, correct?

15 A.  Correct.

16 Q.  And all along, the blue lights are down on the bottom,

17 right?

18 A.  Correct.

19 Q.  And then at 4:43 and some seconds, you'll see him crossing

20 the street walking which way?

21 A.  Walking westbound across Wood towards the sidewalk and

22 then walk south.

23 Q.  And walking south is walking towards the blue lights?

24 A.  Towards the -- yes, towards that intersection, yes.

25 Q.  Towards where the police is?

1  A.  The police lights, it appears to be, yes.

2  Q.  So from 4:41 to about 4:43:50, aside from just a few

3  seconds that he is out of the picture in that house or

4  whatever, he is out in the street right on Wood Street,

5  correct?

6  A.  It appears, yes.

7  Q.  Right where the police -- at least it appears that there's

8  a bunch of police lights there?

9  A.  Yes, below the camera, behind the camera, yes.

10  Q.  Right.  And he's not -- he's just standing on the street,

11  not hiding, correct?  It doesn't appear that he's hiding?

12  A.  No, it does not appear to be.

13  Q.  It doesn't appear that he's in a rush?

14  A.  No.

15  Q.  It doesn't appear that he does not want to be seen?

16  A.  That, I can't tell.

17        MR. PISSETZKY:  I have nothing else.

18        THE COURT:  Anything further?

19        MR. EICHENSEER:  No redirect, your Honor.

20        THE COURT:  You can step down.

21     (Witness excused.)

22        THE COURT:  Call your next witness, please.

23        MS. BABU:  Your Honor, the government would call Paul

24  Greene.

25        THE COURT:  All right.

1          Please raise your right hand.

2       (Witness sworn.)

3          THE WITNESS:  I do, sir.

4          THE COURT:  Please be seated.

5          You may question the witness.

6          PAUL GREENE, GOVERNMENT'S WITNESS, SWORN

7                    DIRECT EXAMINATION

8    BY MS. BABU:

9    Q.   Good afternoon.

10   A.   Good afternoon, ma'am.

11   Q.   Could you please state and spell your name for the record?

12   A.   My name is Paul Greene, spelled P-a-u-l, G-r-e-e-n-e.

13   Q.   Mr. Greene, where do you work?

14   A.   I work for ShotSpotter, Incorporated.

15   Q.   And what is your title with ShotSpotter?

16   A.   I am a senior forensic engineer at ShotSpotter.

17   Q.   And how long have you been a senior forensic engineer?

18   A.   I have held this specific job title for the last three

19   months, but I have worked at ShotSpotter in multiple technical

20   and forensic capacities for the last 12 years.

21   Q.   I'm going to walk you through your experience at

22   ShotSpotter.  Prior to being a senior forensic engineer, what

23   was the title you held?

24   A.   Initially, I was part of a military training team, and

25   that was tasked with developing instructions and

1  documentations for the military so that the soldiers and

2  airmen could install and operate and interpret the output from

3  a ShotSpotter system.

4  Q.  And what was your title in that position?

5  A.  Pardon?

6  Q.  What was your title in that position?

7  A.  Simply, military training team.

8  Q.  And how long were you on the military training team?

9  A.  Approximately a year.

10 Q.  And prior to being on the military training team, what was

11 your position?

12 A.  Prior to that, I was employed by New Mexico Tech in

13 Playas, New Mexico.

14 Q.  I'm sorry, Mr. Greene.  Let's first focus on your

15 experience at ShotSpotter.

16 A.  Yes, ma'am.

17 Q.  So prior to being -- were you on the military training

18 team at ShotSpotter?

19 A.  That was my initial -- my initial job title there, yes,

20 ma'am.

21 Q.  I see.  And then after that first year, what was your next

22 title?

23 A.  I became a customer support technician.

24 Q.  And what were your responsibilities as a customer support

25 technician?

1  A.  As a customer support technician, it was, all of my

2  responsibilities were for customer-facing issues.  I would be

3  responsible for the maintenance and upkeep of all of our

4  customer servers, installation and troubleshooting of all

5  software, installation and troubleshooting of ShotSpotter

6  sensors, ShotSpotter servers, all of the hardware elements of

7  the ShotSpotter system, as well as working with our software

8  and hardware engineers to resolve any problems or bugs or any

9  issues that were reported by the customer or even issues that

10  I identified myself.

11        I spent a lot of time doing research and development

12  testing with the -- with the engineering team, taking

13  ShotSpotter systems out into the field and firing hundreds and

14  hundreds of rounds of ammunition against them; testing the

15  hardware, testing the software, and reporting back on any

16  findings.

17  Q.  And how long were you in that position?

18  A.  For that position, I held concurrently with others for

19  roughly three years.

20  Q.  And then following that three-year period, what was your

21  role at ShotSpotter?

22  A.  My role changed from a simple support technician to the

23  lead customer support technician.  I became the senior support

24  technician at that time.  Concurrently, I was also tasked as a

25  forensic engineer performing forensic analysis of ShotSpotter

1  incidents and creating and preparing reports for use as

2  evidence for these incidents and testifying as expert witness.

3  Q.  And how long were you in that role?

4  A.  Technically, I'm still in that role.

5  Q.  Did you add on another role then during -- while you were

6  a senior support technician?

7  A.  Yes, ma'am.

8  Q.  And what's --

9  A.  I -- after years of being the customer support lead

10  technician, I then became the manager of forensic services.  I

11  held that position for roughly a year until we hired a trial

12  attorney as a senior director, and then I took an

13  administrative demotion, so to speak, a title change back to a

14  senior forensic engineer.

15  Q.  And that is where we are today?

16  A.  Yes, ma'am.

17  Q.  And Mr. Greene, I realize I still haven't asked you yet.

18  What, in a few words, is ShotSpotter?

19  A.  ShotSpotter is an acoustic gunshot detection and location

20  system.  It is a series of hardware sensors that are installed

21  in a geographic area that listen specifically for the sound of

22  gunfire.  When they detect, those sensors detect the sound of

23  gunfire, they report the time that the gunfire was heard along

24  with some measurements of that sound back to a central

25  location server application, some software that then uses

1  those measurements and those times to calculate the geographic

2  location of where that gun was fired as well as trying to

3  label or classify that -- the sound of that as either a

4  gunfire event or a non-gunfire event.  And then we report that

5  to our law enforcement customers.

6  Q.  And Mr. Greene, going back to your education history, you

7  mentioned, prior to ShotSpotter, you were at New Mexico Tech?

8  A.  Yes, ma'am.

9  Q.  What was -- what did you do there?

10  A.  At New Mexico Tech, I was the IT manager, the information

11  technology services manager at Playas Research and Training

12  Center in Playas, New Mexico.  I was also the command and

13  control supervisor for that facility.

14       As IT manager, I was responsible for all of the

15  computer and network systems on that facility.  As the command

16  and control manager, it was my responsibility to, what we

17  call, instrument our training ranges.  The facility ran live

18  fire and -- live fire activities regarding homeland defense,

19  military, and fire and EMS response to terrorist situations.

20       So we had training ranges where live ammunition was

21  being discharged, Simunitions were being discharged,

22  pyrotechnics were being discharged.  As a result, we had a

23  number of vendors who would bring in separate technologies,

24  many different technologies, sensor technologies.  And my job

25  was to integrate those technologies into our ranges so they

1  could be tested during these training cycles and evaluated

2  afterwards.

3  Q.   And what is the Playas training center?

4  A.   The Playas Training and Research Center is a facility that

5  used to be a Phelps Dodge mining town in southern New Mexico.

6  It was purchased by New Mexico Tech in 1999 and turned into

7  a -- again, a Homeland, Department of Homeland Security and

8  EMS training center.

9  Q.   And you mentioned you worked with multiple vendors while

10  you were at New Mexico Tech?

11  A.   Yes, ma'am.

12  Q.   And was one of those vendors ShotSpotter?

13  A.   Yes, ma'am, they were.

14  Q.   And prior to your work with New Mexico Tech, do you have

15  any other relevant employment history?

16  A.   Yes, ma'am.

17  Q.   And what is that?

18  A.   Prior to that, I was employed by the U.S. military, the

19  United States Joint Forces Command; specifically, the joint

20  operational testbed systems project.  I was tasked with

21  integrating multiple separate sensor systems into a single

22  command and control unit where a unit commander or an incident

23  commander could view all of the sensor systems he had at his

24  command to be able to see their output, to be able to do so

25  without information overload.

1    In order to do that, I had to learn about all of the

2  different sensor systems that were brought to us by different

3  vendors and integrate it into our networks.

4  Q.  And how long were you with the United States Joint Force

5  Command?

6  A.  For two years, ma'am.

7  Q.  And prior to that, did you have any relevant experience

8  that's relevant to your time at ShotSpotter?

9  A.  Yes, ma'am.  Prior to that, roughly ten years of IT

10  contract work as a network engineer, as a database maintainer.

11  Prior to that, I spent eight years active duty, United States

12  Marine Corps.  My MOS was 1141 as an electrician, but during

13  that time, I was trained with multiple, multiple heavy weapons

14  systems and shot competition rifle and pistol.

15  Q.  And how long were you with the military?

16  A.  For eight years, ma'am.

17  Q.  In what branch of the military were you in?

18  A.  In the United States Marine Corps.

19  Q.  And did you have a rank in the Marines?

20  A.  Yes, ma'am.

21  Q.  What rank was that?

22  A.  I separated from the Marine Corps as an E-5, a sergeant.

23  Q.  And Mr. Greene, in your current role as a senior forensic

24  engineer, generally what are your responsibilities?

25  A.  Typically, my primary responsibility is still to perform

1   analysis of ShotSpotter incidents, gunfire incidents as

2   captured by the ShotSpotter system to analyze them for the

3   number of shots fired, exact location of where the shots were

4   fired from, the exact discharge time of those rounds; to

5   report on -- report on those findings back to our customers;

6   to act as an expert witness as I am today; to -- I also train

7   my team of technicians to be forensic engineers.

8          I have a team of four -- five now, five technical

9   support engineers that I'm training to use our forensic

10  analysis tools.  Our trial lawyer is training them in

11  courtroom etiquette, so to speak.  I also have a hand in

12  developing policies and procedures as to how we conduct our

13  forensic businesses.

14  Q.  Mr. Greene, you explained very generally sort of what

15  ShotSpotter is.  Could you explain in a few sentences how it

16  works?

17  A.  When a weapon is fired, the sound of the muzzle blast, the

18  bang, travels outward in all directions at the speed of sound.

19  As it travels outward in all these directions, it is detected

20  by different ShotSpotter sensors that are installed in an

21  area.  So as it travels outward, it takes time to travel.

22         So when the sensors detect the sound of that gunfire

23  or the sound of anything impulsive, for that matter -- and we

24  define "impulsive" as anything that goes "bang," "boom," or

25  "pop" -- the sensor then looks at its internal GPS clock.

1  Every sensor has its own GPS built into it.  It timestamps the

2  exact time that we -- that the sensor detected that sound, and

3  it reports that time back to the location server application.

4     The location server application will then collect all

5  of these timestamps, pulses, find the ones that are close

6  enough to be matched up, and then we use a mathematical

7  process called multilateration.  Multilateration is simply

8  using multiple known geographic points to identify or find an

9  unknown geographic point.  Multilateration can be performed

10 using many different techniques.  The one that we use is

11 called time difference of arrival.

12    So, for instance, we might have three sensors that

13 detect a given gunshot:  Sensors A, B, and C.  We take the

14 time that sensor A heard the shot.  We call this the arrival

15 time.  We take the arrival time from sensor B, and we find the

16 difference between those times.  We subtract one from the

17 other.

18    We take the result of that, and we calculate it

19 against the known speed of sound.  And we take the result of

20 that calculation, and we plot it as a curve, call this a

21 hyperbolic curve.

22    We then take the next pair of sensors, sensors B and

23 C.  We perform this operation again.  We generate yet another

24 hyperbolic curve.  And then sensors A and C, we generate yet a

25 third curve.  Since we know the exact geographic location of

1  all of the sensors involved, we are able to plot all of these

2  hyperbolic curves onto a geographic map.

3  So we take the first curve, the second curve, and the

4  third curve, and we lay them flat.  We plot them on a

5  geographic map.  At some point, all three of these curves,

6  they're going to cross.  They're going to intersect.  And we

7  look at the spot where that intersection lays on the

8  geographic map, and we get the latitude and longitude from

9  that spot, which is a geographic coordinate.

10  We take the geographic coordinate, the latitude and

11  longitude.  We use a piece of software called a geocoder, or

12  in this case, I believe Chicago, we use a parcel file.  And we

13  try to translate or convert that latitude and longitude into a

14  street address which we then report the street address to our

15  law enforcement customers along with the time that the weapon

16  was fired and along with the number of rounds that were fired.

17  MS. BABU:  Your Honor, at this point, the government

18  would offer Paul Greene under federal rule of evidence 702 to

19  testify as to his specialized knowledge about ShotSpotter gun

20  detection location system.

21  THE COURT:  I take it, there is an objection.

22  MR. HYMAN:  There is, your Honor.

23  THE COURT:  Okay.  Overruled.  I'll recognize him as

24  an expert.

25  BY MS. BABU:

1  Q.  Mr. Greene, is there a ShotSpotter system installed in

2  Chicago?

3  A.  There are 21 ShotSpotter systems installed in Chicago.

4  Q.  And were you asked to analyze data collected by the

5  ShotSpotter system on the morning of May 4th, 2018, near the

6  area of 44th and Hermitage Avenue in Chicago?

7  A.  Yes, ma'am, I was.

8  Q.  What exactly did you analyze?

9  A.  Pardon?

10  Q.  What exactly did you analyze?

11  A.  I was able to -- my analysis consisted of retrieving all

12  of the available audio clips that were automatically gathered

13  by the system and a number of audio clips that were manually

14  downloaded by our technicians from the system.  I then used

15  our own internal, internally developed post-process analysis

16  software called the ShotSpotter browser to load all of the

17  clips in simultaneously.

18        The ShotSpotter browser allows us to isolate just the

19  sounds of the actual gunfire, and it allows us to step through

20  the incident and identify and locate, actually put a

21  geographic location on where each of the rounds are fired.

22        The browser software uses the exact same internal

23  software program algorithms that the live system uses, but

24  it's off-board, and it allows us -- again, it allows us to do

25  it in a slow, controlled manner so that we can analyze each

1  and every bit of the incident, where the live system would

2  simply report all of it once and put a single dot on the map.

3  Q.  And on the incident on May 4th in Chicago, how many data

4  points did you have?

5  A.  Could you clarify?

6  Q.  Sure, yes.  How many -- were there audio files associated

7  with the incident that you reviewed on May 4th in Chicago?

8  A.  Yes, ma'am.

9  Q.  And how many files were there?

10  A.  Well, there were three files that were automatically

11  collected by the system, automatically saved, and then there

12  were four audio clips that were downloaded by our review

13  technicians.

14  Q.  And why is there a difference in those two numbers?

15  A.  Shortly -- well, shortly after the incident in question,

16  within an hour of the incident in question, we were contacted

17  by Officer Joseph Jacobo from the Chicago Police Department.

18  And he queried us, asking if we had detected additional shots

19  or shots at a different location.

20        The initial automatic detection was only two rounds.

21  It was on the corner of Hermitage and 44th Street, I believe.

22  And he contacted us, asked if there were additional shots

23  fired that ShotSpotter did not automatically detect.  This

24  caused our review technicians to go back into the system,

25  identify a timeframe, identify likely sensors that may have

1    been able to detect that.  They were able to find four audio

2    clips that contained potentially the sounds of --

3            MR. HYMAN:  Your Honor, I'm going to -- I must object

4    to this type of testimony as hearsay.  As to what?  All this

5    was done --

6            MS. BABU:  Your Honor, Mr. Greene is testifying

7    directly as to what ShotSpotter did that morning.

8            THE COURT:  Well, he's an expert, so he can rely on

9    information furnished to him, so overruled.

10   BY THE WITNESS:

11   A.   So the -- the audio clips that were manually downloaded by

12   the review technicians contained audio that potentially would

13   be seven shots or seven audio pulses.  I was able to take

14   those four audio clips, use our analysis software, and find

15   the locations of seven gunshots.

16   BY MS. BABU:

17   Q.   And Mr. Greene, in front of you, you have Government

18   Exhibit 200?

19   A.   Pardon?

20   Q.   You have Government Exhibit 200 in front of you?

21   A.   Yes, ma'am.

22   Q.   Government Exhibit 200 has already been admitted into

23   evidence, but have you seen this disk before?

24   A.   Yes, ma'am, I have.

25   Q.   And how do you know that?

1    A.  I created this disk.  It is a recordable compact disk.  It

2    contains four audio clips, the four audio clips that were

3    manually downloaded by our review technicians.  I recorded

4    this and signed and dated it on June 7th, 2019.

5    Q.  Mr. Greene, also in front of you is Government Exhibit

6    201 --

7    A.  Yes, ma'am.

8    Q.  -- do you see that?

9         And that has also been admitted into evidence.  Do

10   you recognize that disk?

11   A.  Yes, ma'am, I do.

12   Q.  And what do you recognize this as?

13   A.  This is also a recordable CD-ROM.  It has a single audio

14   clip that originates from a single ShotSpotter sensor.  I

15   listened to this yesterday evening and signed and dated it

16   6/10/2019.

17   Q.  And Mr. Greene, before I publish Government Exhibit 201,

18   we talked about seven gunshots and four audio files.  Do each

19   of the audio files contain the same, essentially the same

20   recording?

21   A.  Yes, ma'am, they do.

22        MS. BABU:  Your Honor, I'd like to publish Government

23   Exhibit 201 at this time.

24        THE COURT:  All right.  You may.

25      (Said audio recording played in open court.)

1    BY MS. BABU:

2    Q.   Mr. Greene, is this one of the audio files, audio clips

3    that you analyzed?

4    A.   Yes, ma'am, it is.

5    Q.   And before we get to what you did in your examination,

6    could you explain to the jury why the voices cut out at the

7    end of that recording?

8    A.   That is specifically due to ShotSpotter's privacy policy.

9    We have a published policy where in order to minimize or

10   eliminate the amount of voices that are captured by the

11   ShotSpotter system, we will provide no audio -- we will

12   provide audio that contains no more than two seconds' worth of

13   ambient street noise before the first shot and no more than

14   four seconds of ambient street noise after the last shot of

15   the clip.

16            So in this case, we do have voices that are

17   coincidentally captured by the system, but we cut the capture

18   off well ahead -- well enough ahead of time and well behind or

19   close enough behind the last shot so that we minimize or

20   eliminate the voices that we catch.

21   Q.   And this is one of the four clips that you analyzed?

22   A.   Yes, ma'am, it is.

23   Q.   And each of the clips, do they come from a different

24   sensor?

25   A.   Yes, ma'am, they do.  Every clip originates from a

1  different ShotSpotter sensor.

2  Q.  And were each of those sensors and the data that's

3  associated with those clips used to identify the location of

4  the gunshots?

5  A.  Yes, ma'am, they were.

6  Q.  And were you -- were you able to determine the location of

7  the gunshots in that audio clip?

8  A.  Yes, ma'am, I was.

9  Q.  And did you use the process that you previously explained

10  to the jury?

11  A.  Yes, ma'am.  I used the process of loading the audio clips

12  into the ShotSpotter browser software which then calculated

13  the latitude and longitudes of each of the shots.  And then I

14  used a third party software to attempt to identify a closest

15  street address.

16  Q.  And previously, you said you identified the location of

17  the gunshots based on latitude and longitude?

18  A.  That's correct.

19  Q.  And did you do that in this instance?

20  A.  Yes, ma'am.

21  Q.  And did you create a summary of the latitude and longitude

22  coordinates for each of those shots?

23  A.  Yes, ma'am, I did.

24  Q.  Mr. Greene, I'm showing you what's been marked as

25  Government Exhibit 614 but it's not yet been admitted, so I'd

1  like to not publish it to the jury.

2       Mr. Greene, do you see Exhibit 614 in front of you?

3  A.  Yes, ma'am, I do.

4  Q.  Do you recognize this?

5  A.  Yes, I do.

6  Q.  And how do you recognize this?

7  A.  This is a -- this is Table 1 from my detailed forensic

8  report that you had asked me to prepare for this incident.  It

9  is the detail of seven shots, the calculated discharge time of

10  all seven of those shots, and the calculated location,

11  geographic location of where those shots were fired listed as

12  a latitude and a longitude.

13  Q.  And is this a fair and accurate summary of the data that

14  you analyzed to determine the location of those gunshots?

15  A.  Yes, ma'am, it is.

16       MS. BABU:  Your Honor, we would move to admit

17  Government Exhibit 614.

18       THE COURT:  I'm going to assume there's an objection,

19  so I'll overrule the objection.

20       MR. HYMAN:  Yes.

21       THE COURT:  You can have a -- I'll give you a

22  standing objection.

23       All right.  Proceed.

24       MS. BABU:  Your Honor, can we publish Government

25  Exhibit 614?

1          THE COURT:  You may.

2       (Government Exhibit 614 received in evidence.)

3  BY MS. BABU:

4  Q.  Mr. Greene, could you now describe for the jury what

5  they're looking at?

6  A.  Certainly.  It is a spreadsheet table listed as "Flex ID"

7  across the top, shot, shot number, discharge time, latitude,

8  and longitude.  The first five shots -- the first shot being

9  fired at 03:18:10 and 6.45 seconds.  That's 3:18 in the

10  morning, 10 seconds, 10.645 seconds.  It's located at a

11  latitude of 41.814733 and a longitude of dash 87.668907.

12          Would you like me to detail every one of these?

13  Q.  No, thank you, Mr. Greene.

14  A.  As an example.  There are five, five of these that were

15  not automatically detected by the ShotSpotter system.  They

16  are simply listed as shots 1 through 5.  The final two shots,

17  6 and 7, have a listing with a flex ID.  That is a unique

18  identifier that ShotSpotter issues to each incident that it

19  automatically detects.

20          In this case, it would be incident ID or flex ID

21  34128.  And it's a detail of the final two shots of the --

22  that were -- that you listened to on the audio.

23  Q.  Mr. Greene, did you then locate the gunshots using the

24  latitude and longitude and the geographic sets?

25  A.  I did, ma'am.

1  Q.  If we could, Mr. Greene, I'd like to show you what's been

2  marked as Government Exhibit 615 that has not been placed into

3  evidence yet.

4      Mr. Greene, do you see before you Government Exhibit

5  615?

6  A.  Yes, ma'am, I do.

7  Q.  And do you recognize this exhibit?

8  A.  Yes, ma'am.

9  Q.  And how do you recognize it?

10 A.  This is also an image that I generated for a -- for the

11 detailed forensic report that I produced for you.  It is a

12 satellite image that comes from Google Earth.  And

13 superimposed on that satellite image are icons and labels for

14 seven shots fired.

15     They're a stack of icons near the top.  They seem to

16 be labeled 1, 2, 3, and 5.  Shot number 4 is also in that

17 stack.  They're on top of each other stacked like Pringles,

18 and the software didn't have room to label No. 4.  At the

19 bottom right is the labels and icons for an additional two

20 shots, 6 and 7.

21 Q.  So Mr. Greene, is -- Government Exhibit 615, is this a

22 fair and accurate summary but a visual summary of the process

23 that you went through to locate the -- to locate the gunshots?

24 A.  Yes, ma'am.  Each of the red icons that are represented on

25 this -- in this image correspond to a latitude and longitude

1    in the table that you showed me prior.

2            MS. BABU:  Your Honor, we would move to admit

3    Government Exhibit 615.

4            THE COURT:  It's admitted.  You may publish it.

5         (Government Exhibit 615 received in evidence.)

6            MR. PISSETZKY:  Your Honor, for the record --

7            THE COURT:  Pardon?

8            MR. HYMAN:  He said there's a continuing objection.

9            THE COURT:  I said you have a standing objection.

10           MR. HYMAN:  Yes.

11           MR. PISSETZKY:  Yes.

12           MR. HYMAN:  Thank you.

13           THE COURT:  So you don't need to raise it.

14           MS. BABU:  Your Honor, now that Mr. Greene -- I'm

15   sorry.

16   BY MS. BABU:

17   Q.  Mr. Greene, now that the jury has the exhibit in front of

18   it, could you explain where the fourth gunshot is again?

19   A.  Again, the -- in the top of the image, you see a group of

20   red icon labels.  They look like targets.  And they are

21   stacked on top of each other.  And currently, what you see are

22   labels 1, 2, 3, and 5, but shot number -- they represent shots

23   1, 2, 3, and 5.

24           Shot No. 4 is in that stack, but as I was -- as I

25   desired to display all of the shot locations in one image, the

1  software would not allow me to display the label for shot

2  No. 4, but it is within that stack at the top.  And at the

3  bottom are the two icons and the labels for shots 6 and 7.

4  Q.  And -- I'm sorry.  You said that the labels for shots 6

5  and 7 are where?

6  A.  At the bottom of the image.

7  Q.  And are these visual depictions of the latitude and

8  longitude for the seven shots that we heard in the audio file?

9  A.  Yes, ma'am, they are.

10  Q.  Mr. Greene, is there a margin of error associated with

11  ShotSpotter's analysis?

12  A.  There is, ma'am.

13  Q.  What is that?

14  A.  ShotSpotter publishes to our customer a limited

15  performance guaranty.  That limited performance guaranty

16  states that ShotSpotter will accurately -- will detect and

17  accurately locate at least 90 percent of all outdoor

18  detectable gunfire.  And we define "accurately" as a circle

19  whose radius is 25 meters.

20          Now, we do this, and we are essentially understating

21  the performance of the system.  We are telling the customer

22  that -- we're giving ourselves wiggle room.  In my own

23  personal experience from many days of --

24          MR. HYMAN:  Your Honor, I'm going to object to this

25  personal --

1    THE COURT:  Yes.  I think he's answered the question.

2    BY THE WITNESS:

3    A.  My own personal experience from firing, test firing

4    against this system both in research and development and

5    validating new customer systems, ShotSpotter typically has an

6    accuracy of about 10 to 12 feet.

7    MS. BABU:  I have no further questions, your Honor.

8    THE COURT:  Cross-examine.

9    CROSS-EXAMINATION

10   BY MR. HYMAN:

11   Q.  Mr. Greene, ShotSpotter is a company that is listed on the

12   NASDAQ, true?

13   A.  That is correct, sir.

14   Q.  They have investors?

15   A.  Yes, sir, they do.

16   Q.  And like any company listed on the Board of Trade or the

17   NASDAQ or the New York Stock Exchange, you -- your company has

18   to produce a dividend for them, true?

19   A.  That's correct, sir.

20   Q.  Right.  Now, do you get a dividend from your employment?

21   Do you have -- let me rephrase the question.

22   Do you have shares in that stock?

23   A.  I do, sir.

24   Q.  Okay.  So the shares in your stock that you have are going

25   to be, of course, dependent upon how many cities or

1    institutions purchase your programs, right?

2    A.   That would be correct, sir.

3    Q.   Now, the program in and of itself has been contested many

4    times, right?

5    A.   It has, sir.

6    Q.   And there have been times that you, being with this

7    company for at least 12 years -- 13 years, I think you said?

8    A.   12 years.

9    Q.   12.  Okay.  There have been other jurisdictions that have

10   found that this is not a reliable system, a reliable science,

11   true?

12   A.   There have been cities that we have lost as customers,

13   yes, sir.

14   Q.   But not only cities, there have been cases in other

15   jurisdictions that the courts have found that this system is

16   not reliable, true?

17            MS. BABU:  Objection, your Honor.  Foundation.

18            THE COURT:  Well, he can answer yes or no.

19            Go ahead.  You can answer.

20   BY THE WITNESS:

21   A.   At least one that I know of, yes.

22   BY MR. HYMAN:

23   Q.   Well, you're -- are you aware of the case involving the

24   *People of the State of California versus Todd Gillard* from

25   2014?

1    A.   Yes, sir, I am.

2    Q.   And in that particular case, the judge -- that's a state

3    case, right?

4    A.   Yes, sir.

5    Q.   And there was a full hearing before any system could be --

6    this information could be admitted into evidence, right?

7    A.   There were actually two, sir.

8    Q.   All right.  And I presume from your -- the way you're

9    answering, you were probably part of that, right?

10   A.   I was part of the team that gathered information for that,

11   sir.

12   Q.   And that was for the prosecutors on that case?

13   A.   Yes, sir, it was.

14   Q.   In that particular case, Judge Kennedy ruled that that

15   would not come into evidence, right?

16   A.   He did, and then subsequently, a year later, he reversed

17   his decision.

18   Q.   All right.  Well, I know you wanted to say that,

19   Mr. Greene, but that's not the question I asked.  The question

20   I asked was:  On that -- in that courtroom, that -- this

21   system was rejected, true?

22   A.   In that particular courtroom, yes.

23   Q.   Are you also aware that there was a case in the state of

24   New York called the Silvon Simmons case.  Are you familiar

25   with that?

1  A.  I am, sir.

2  Q.  In that particular case, the ShotSpotter system was used

3  and it was found, in fact, that it was unreliable, correct?

4  A.  I am not at liberty to discuss that case.  It is currently

5  being litigated.

6  Q.  All right.  So ShotSpotter was sued by the person who was

7  charged in that case, true?

8  A.  I'm unable to comment on that, sir.

9  Q.  Well, they were sued, were they not, Spot Shotter?

10  A.  I don't know who Spot Shotter is.

11  Q.  I'm sorry.  ShotSpotter.

12  A.  We are being sued, yes.

13  Q.  SST, correct?

14  A.  That's correct.

15  Q.  I want to talk to you now, if I can, a little bit just

16  briefly about your qualifications.  You've told the members of

17  the jury that you have a qualification as a forensic engineer,

18  right?

19  A.  That is my job title, yes.

20  Q.  It's your job title, but it is not your education.  You do

21  not have a degree in engineering, do you?

22  A.  That is correct.

23  Q.  You do not have a degree in any of the applied sciences,

24  do you?

25  A.  I have no degree at all.

1  Q.  So you are not an expert in the field of acoustical

2  engineering, true?

3  A.  Not as an engineering field but as regards to ShotSpotter,

4  yes.

5  Q.  But you're not a -- you don't have a degree in acoustical

6  engineering --

7  A.  No, I do not.

8  Q.  -- right?

9       You don't have a degree in sound propagation,

10  engineering in sound propagation?

11  A.  I don't believe there is a degree program for sound

12  propagation, but no.

13  Q.  How about, do you have any background in wave propagation?

14  A.  No, sir, I do not.

15  Q.  Nor, as we said, in general engineering, true?

16  A.  That is correct.

17  Q.  The technology that you talk about, you talked about and

18  for which you reviewed is, much of it is proprietary, right?

19  A.  Actually, the technology and the mathematics involved are

20  all open source.

21  Q.  But the data that is collected is proprietary?

22  A.  Yes, sir, it is.  ShotSpotter owns the data that we

23  collect.

24  Q.  And you won't give it away, you can't -- you won't

25  disclose it to anyone, true?

1    A.   Correct.

2    Q.   Now, you just mentioned a moment ago that there, on the

3    shots -- oh, Exhibits 200 and 201, the government exhibits,

4    those were these audio clips, right?

5    A.   That's correct, sir.

6    Q.   And I think I got it correct that you -- there was this --

7    these were voices at the end of those shots that were cut off,

8    right?

9    A.   Yes, sir.

10   Q.   All right.

11   A.   There were voices included in the audio clip that was

12   played.

13   Q.   But there are voices that are recorded that you have not

14   released, true?

15   A.   There are voices that were recorded in this audio clip

16   that were not released.  Anything else that may have been

17   recorded has been irretrievably deleted or overwritten.

18   Q.   So what -- if there was any follow-up beyond the four

19   seconds because --

20            MR. HYMAN:  Could we play those, that last clip

21   again, that 201, I think it was?

22       (Said audio recording played in open court.)

23   BY MR. HYMAN:

24   Q.   There was a -- I think I heard, "Where's -- where's he

25   at?"  Did you hear that in that last few words?

1  A.  That may have been what was said.

2  Q.  Okay.  Cutting it off at that point, we don't -- you

3  don't -- we don't know what else was said --

4  A.  That's correct.

5  Q.  -- except Spot Shotter would -- ShotSpotter would know,

6  true?

7  A.  We don't know either.

8  Q.  Well, you don't know because it's been deleted?

9  A.  ShotSpotter deals with gunshots, not voices.

10  Q.  Well, you pick up the voices.

11  A.  We pick up as few as we possibly can.

12  Q.  But Mr. Greene, the voices are picked up, true?

13  A.  True.

14  Q.  They were picked up in this case, right?

15  A.  That is correct.

16  Q.  And there were more -- there was more voices or could --

17  that were picked up, but you haven't released -- you didn't

18  release them, true?

19  A.  That is correct.

20      MR. HYMAN:  Your Honor, I'm going to mark these two

21  reports as Godinez Spot Shotter 1 and Godinez Spot Shotter 2.

22      THE COURT:  Okay.

23    (Said exhibits marked for identification.)

24      MR. HYMAN:  I want to show these to --

25  BY MR. HYMAN:

1 Q. Mr. Greene, there were two reports made in this case,

2 true?

3 A. That's correct, sir.

4 Q. One report was actually made on May 4th of 2018, right?

5 A. That is correct.

6 Q. That particular report was prepared by -- and I'll let you

7 tell us the last name because I will not pronounce it right.

8 A. That would be my colleague, Ronald Cayabyab.

9 Q. So that's C-a-y-a-b-y-a-b?

10 A. That is correct, sir.

11 Q. And is this -- I'm going to leave this with you. This is

12 report No. 1. And then this is a report that you prepared on

13 April 8th of 2019, true?

14 A. Yes, sir.

15 Q. All right. And you're familiar, of course, with that

16 report?

17 A. Yes, sir, I am.

18 Q. And you're familiar with Mr. --

19 A. Cayabyab.

20 Q. -- Cayabyab's report?

21 A. I'm familiar with -- I have not read his report. I am

22 familiar with the fact that he produced one.

23 Q. And, of course, you wanted, before you got into this

24 courtroom, to make sure you had all the information available

25 to you to testify in this case, right?

1  A.  All of the audio available and be able to report on that

2  audio, yes.

3  Q.  And you certainly knew that your colleague had a report

4  out there as well --

5  A.  Yes, sir, I did.

6  Q.  -- right?

7  A.  Yes, sir.

8  Q.  You would agree, and I think you told us that you have

9  sort of a -- not quite a -- the term used was a

10  limited guaranty that you give out, right?  Is that the term?

11  A.  Limited performance guaranty.

12  Q.  Limited performance.  That means you are not assuring --

13  or not you, but ShotSpotter, SST, says, "We can't ensure

14  that -- with 100 percent accuracy that this sound and where we

15  put the shooting is correct," true?

16  A.  That is correct, sir.

17  Q.  And in this particular case, there are -- there is, as you

18  said, a sort of a radius from the point of the -- where you

19  put the shot of 25 meters, or 82 feet, approximately?

20  A.  That is correct, sir.

21  Q.  That the shot could have come within this space, true?

22  A.  According to our performance guaranty, yes, sir.

23  Q.  So that means that if -- and if you could put up Exhibit

24  615, is it?  The map.  Okay.

25       So within this map, within -- within the red circles,

1  what you are saying to your customers and to this courtroom,

2  people in this courtroom, is that if you took a circle of --

3  and it would show 25 meters, that shot could have come within

4  that circle, right?

5  A.   If that circle was on that, yes.

6  Q.   Okay.  In fact, in your own report, you prepared a circle,

7  did you not?

8  A.   I don't believe I did.

9  Q.   Well, let's take a look.

10 A.   Yes, sir, I did.  It's on Page 4.

11 Q.   All right.  Within Exhibit Godinez ShotSpotter report

12 No. 2, that was a report prepared by you, true?

13 A.   I don't see a label on this but --

14 Q.   It doesn't have a label on it but --

15 A.   But I did prepare the report, and the report is dated 8

16 April 2019, yes.

17 Q.   Okay.  And within that report includes a page that shows

18 the detailed -- the address and location of where the spot --

19 where the officer fired his weapon, true?

20 A.   I have no idea who fired the weapon, but that was the

21 location of where the final two shots were fired.

22 Q.   The last two shots?

23 A.   The last two shots.

24      MR. HYMAN:  Your Honor, I'm asking leave to admit

25 this report as Exhibit Godinez 1 --

1          THE COURT:  All right.  You may --

2          MR. HYMAN:  -- 2.

3          THE COURT:  It's admitted.  You may publish it.

4       (Said exhibit received in evidence.)

5   BY MR. HYMAN:

6   Q.  So the red circle, as you say, indicates a 25 meter, or

7   for us old-timers, 82 feet, around 82 feet of accuracy radius

8   for these gunshots, right?

9   A.  That is correct, sir.

10  Q.  And the same would apply, would it not, to that area with

11  the overall map which was shown in Government's Exhibit 615,

12  was it?  615, the satellite image.

13  A.  Yes, sir, it would.

14  Q.  So individually, if you drew a circle around the 1, 2,

15  3 -- you can't see the 4, but from your testimony that there

16  are actually, that's where five shots, if you drew a circle

17  around that -- those -- that dot on the top, that would

18  include an area of 25 meters, correct?

19  A.  A radius of 25 meters, yes, sir.

20  Q.  A radius.  So it could be below the dot and it could be

21  above the dot?

22  A.  That is correct, sir.

23  Q.  In particular, however, you came to a conclusion, did you

24  not, Mr. Greene, as to where you believed the shots were

25  fired?

1    A.   Yes, sir, I did.

2    Q.   The conclusion you reached was that after analysis, that

3    five undetected preceding shots were located at 4338 Hermitage

4    Avenue, true?

5    A.   Yes, sir, that's the street address that I reported.

6    Q.   And that's going to be based upon the coordinates of what

7    you talked about as the longitude and latitude descriptions

8    that you saw, true?

9    A.   That's actually the street address that's the product of a

10   conversion process from a latitude and longitude.

11   Q.   And as you said, in order to get that information, you

12   first had to get -- ShotSpotter personnel got a call from the

13   Chicago Police Department and asking them to manually look at

14   where these five shots could have come from, true?

15   A.   That is correct.

16   Q.   So it wasn't within that field of where those shots were

17   very visible or the sounds were visible that you had the

18   first -- shots 6 and 7, right?  So you had -- and let me

19   rephrase that.

20   A.   Can you repeat the question?

21   Q.   I'm all tongue tied here.

22        The four of the five undetected shots, those were

23   not -- when we say "undetected," they were not picked up

24   initially, true?

25   A.   Well, they were picked up.  Otherwise, we would not have a

1 recording of them, but they were not automatically identified

2 as gunshots by the ShotSpotter system.

3 Q.   That's because there are a lot of things that go and could

4 affect the identification of a sound in your system, true?

5 A.   That could be true, yes.

6 Q.   Right.  So some of the things that -- where your

7 limitations are is you have a weather affects an accuracy of

8 where, if it's a sound of a gun or not, true?

9 A.   Well, the weather can affect whether -- our classification

10 of whether it sounds like a gun or not, yes.

11 Q.   The location such as if you have buildings, trees, the

12 gradient sound, any sort of the gradient sound?

13 A.   I can actually break that down for you.  Any element in

14 the environment that can either prevent the sound of gunfire

15 from reaching a ShotSpotter sensor or sensors in the first

16 place altogether or any element in the environment that can

17 change, modify, or muffle that sound so the sensor no longer

18 recognizes it as being impulsive enough to be gunfire.

19       Yes, we operate in a very dynamic environment.  We

20 freely admit that anything and everything in the environment

21 can affect location and detection and accuracy.

22 Q.   Okay.  And so when your staff gets the call from the

23 Chicago Police Department and they go and calculate using the

24 logarithms and determine by these hyperbolic curves where they

25 meet, that's done manually, right?  That's done at -- in this

1   case, that was done manually?

2   A.  Well, let me clarify.  Forensic examination of an incident

3   is always done at a customer's request, only at a customer's

4   request.  It's not something we do on a regular basis.

5          In this case, ShotSpotter only detected the final two

6   shots that you heard in the audio clip.  An hour or so after

7   the incident occurred, we were contacted by Chicago PD and

8   asked to search for -- essentially, search for additional

9   audio clips.  And this does happen on a semiregular basis with

10  all of our customers.

11         THE COURT:  How much longer is your cross?

12         MR. HYMAN:  Just -- I don't want to say the

13  proverbial "few questions," but just a little bit more, Judge,

14  just to clear a few things up.

15         THE COURT:  Yes, that's fine.  I'm not trying to shut

16  you off.

17         MR. HYMAN:  No.  I'm aware of the time.

18         THE COURT:  Yes.

19  BY MR. HYMAN:

20  Q.  Beyond your report -- I mean, in your report, you have

21  claimed that ShotSpotter will pick up about 90 percent of the

22  noises in the -- that are located from -- that are fired,

23  right?

24  A.  At least 90 percent.

25  Q.  At least 90 percent.

1   A.  Yes, sir.

2   Q.  There are others that are in your company that even

3   believe there are a less amount or a lesser percentage.  Do

4   you agree with that?

5   A.  No, sir, I do not.  Actually, what you refer to is our

6   older agreement, which was 80 percent.  Back in January of

7   2018, we voluntarily made the guaranty more stringent and

8   upped that rate to 90 percent.

9   Q.  Okay.  Would you look at your associate's report of May

10  4th of 2018?  This was after the January 2018 upping.

11  A.  Yes, sir.  His report does still state the 80 percent

12  number.

13  Q.  Right.  And that was at the time of this shooting, he

14  indicated that Spot Shotter detects and properly geo locates,

15  provides -- in other words, latitude and longitude, 80 percent

16  of detectable outdoor incidents within the coverage area,

17  accurate within a circle whose radius is 25 meters.

18  A.  That's what it says.

19  Q.  He found -- that's right.  And he said back then it was,

20  in fact, 20 percent could have been undetected, true?

21  A.  That's what his report says, yes, sir.

22          MR. HYMAN:  Judge, let me just talk to Mr. Pissetzky.

23          THE COURT:  Sure.

24      (Pause.)

25  BY MR. HYMAN:

1   Q.  Mr. Greene, this system of yours does not identify a

2   shooter, true?

3   A.  That is absolutely correct.

4   Q.  There are no videos that are used with the sensors?

5   A.  No, sir, there is not.

6   Q.  All you --

7   A.  Actually, in some cases, there are, but I don't believe so

8   in this part of Chicago.

9   Q.  In this case, you reviewed the videos from the Chicago pod

10  cams?

11  A.  No, sir, we do not.  Actually, ShotSpotter personnel don't

12  have any access and don't want to access the video.

13  Q.  Did you?

14  A.  No, sir, I did not.

15  Q.  All you did was provide -- you just interpreted or

16  provided the sound on this case, true?

17  A.  That is correct, sir.

18  Q.  And in this particular case, there is no -- there is no

19  video of anyone firing a weapon, right?

20          MS. BABU:  Objection, your Honor.  Foundation.

21          THE COURT:  Well, he can --

22          MR. HYMAN:  I'll withdraw the question.  I'll

23  withdraw the question.

24          THE COURT:  Anything further?

25          MS. BABU:  Your Honor, I do have just two questions.

1  THE COURT:  All right.  Two questions, did you say?

2  REDIRECT EXAMINATION

3  BY MS. BABU:

4  Q.  Mr. Greene, in your personal experience in working for

5  ShotSpotter for 12 years, what is the range or the margin of

6  error in detecting the location of gunshots?

7  A.  Well, aside from our -- aside from our limited performance

8  guaranty, again, from my own experience and personal testing,

9  I typically see accuracies of around 10 to 20 -- or excuse me,

10  10 to 12 meters, which is -- 10 to 12 feet, excuse me, not 10

11  to 12 meters, 10 to 12 feet, which is four meters or four

12  yards.

13  Q.  And with regards to the voices that we heard in the

14  recording, could you explain why again the recording cuts off?

15  A.  Again, it's part of our privacy policy.  ShotSpotter does

16  not -- we don't want to deal in voices or voice data.  We have

17  in -- we have done a couple of court cases where voice data

18  has been captured.

19  We -- from a business standpoint, it's a bad thing

20  for us.  We want nothing to do with it.  So we focus on

21  gunshots and gunshots alone.  Any voices that are

22  coincidentally captured during that two-second window prior to

23  the gunshot or gunshots, in the middle of the gunshot incident

24  or four seconds afterwards, we really can't help that, but we

25  will do everything in our power to minimize or eliminate any

1    voice capture.

2          MS. BABU:  Nothing further, your Honor.

3                    RECROSS-EXAMINATION

4    BY MR. HYMAN:

5    Q.  Mr. Greene, does the address of 4344 fall within the 25

6    meters that is guaranteed within Spot Shotter's --

7    ShotSpotter's radius?

8    A.  I personally don't know.  I'm simply reporting what the

9    software spit out when I tried to convert the latitude and

10   longitude.

11   Q.  And that spit out 43 -- 4338, true?

12   A.  4338 Hermitage Avenue.

13   Q.  And do you know whether or not that would also fall within

14   that radius of 4344?

15         MS. BABU:  Objection, your Honor.  Asked and

16   answered.

17         THE COURT:  He can answer.  Go ahead.

18   BY THE WITNESS:

19   A.  I personally don't know.

20         THE COURT:  All right.  You can step down.

21         Members of the jury, we're going to suspend until

22   10:00 o'clock tomorrow morning.  Try to get here about five

23   minutes to 10:00 so we can start promptly at 10:00.  Have a

24   nice evening.  Please don't discuss the case.

25         MS. BABU:  Your Honor, is the witness excused?

1          THE COURT:  Yes, the witness can leave.

2      (Witness excused.)

3          THE COURT:  You can take the jury out.

4      (Proceedings heard in open court.  Jury out.)

5          THE COURT:  Does anybody want to put anything on the

6  record now that we're -- in the absence of the jury?  If

7  not --

8          MR. PISSETZKY:  Your Honor, I know that we didn't

9  originally with the first witness ask to admit a couple of

10  pictures and -- a picture and a map.  I don't think the

11  government had any objection.

12          THE COURT:  All right.  Whatever they are, if they've

13  been used, we'll -- I haven't heard any objections to anything.

14          MS. BABU:  There's no objection to the map and the

15  photo, your Honor.

16          MR. PISSETZKY:  So I'm just going to call them

17  Godinez Picture 1 and Godinez Map 1 just for the record.

18          THE COURT:  All right.

19          MR. PISSETZKY:  Thank you.

20          THE COURT:  How are we coming?  Are we coming all

21  right?

22          MS. BABU:  We're moving, your Honor.

23          THE COURT:  Okay.  All right.  10:00 o'clock

24  tomorrow.  Remember, we're breaking early tomorrow.

25          MR. HYMAN:  Judge, I think -- I thought you were

1    starting earlier for the juror.

2          THE COURT:  Not -- we're quitting earlier, but we're

3    starting at 10:00 because I've got my call in the morning.

4    Possibly Friday -- we'll see how we're coming, if we're moving

5    along.  It may not be necessary.  If it is, we'll attend to

6    it, but we will quit at 4:00 tomorrow.

7          Have a nice evening, everybody.

8          (Proceedings adjourned from 5:06 p.m. to 10:00 a.m.)

9                        * * * * * * *

10                    C E R T I F I C A T E

11         We, Judith A. Walsh and Lisa H. Breiter, do hereby

12   certify that the foregoing is a complete, true, and accurate

13   transcript of the proceedings had in the above-entitled case

14   before the Honorable HARRY D. LEINENWEBER, one of the judges

15   of said court, at Chicago, Illinois, on June 11, 2019.

16   /s/ *Judith A. Walsh, CSR, RDR, F/CRR*_____    February 18, 2020

17   /s/ *Lisa H. Breiter, CSR, RMR, CRR*_____    February 18, 2020

18   Official Court Reporters

19   United States District Court

20   Northern District of Illinois

21   Eastern Division

22

23

24

25