1          IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3   UNITED STATES OF AMERICA,        )
                                     )
4              Plaintiff,            )
                                     )
5       v.                           )  No. 18 CR 00278
                                     )
6   ERNESTO GODINEZ,                 )  Chicago, Illinois
                                     )  June 12, 2019
7              Defendant.            )  10:00 a.m.

8                         VOLUME 3-A
                TRANSCRIPT OF PROCEEDINGS - Trial
9       BEFORE THE HONORABLE HARRY D. LEINENWEBER and a Jury

10  APPEARANCES:

11  For the Plaintiff:        HON. ZACHARY T. FARDON
                              United States Attorney
12                            BY:  MS. KAVITHA J. BABU
                                   MR. NICHOLAS J. EICHENSEER
13                            Assistant United States Attorneys
                              219 South Dearborn Street, Suite 500
14                            Chicago, Illinois 60604
                              (312) 353-5300
15
    For the Defendant:        MR. LAWRENCE H. HYMAN
16                            111 West Washington Street
                              Suite 1025
17                            Chicago, Illinois 60602
                              (312) 346-6766
18
                              PISSETZKY & BERLINER
19                            BY:  MR. GAL PISSETZKY
                              35 West Wacker Drive, Suite 1980
20                            Chicago, Illinois 60601
                              (312) 566-9900
21

22  Court Reporter:           Judith A. Walsh, CSR, RDR, F/CRR
                              Official Court Reporter
23                            219 South Dearborn Street, Room 2118
                              Chicago, Illinois 60604
24                            (312) 702-8865
                              judith_walsh@ilnd.uscourts.gov
25

I N D E X

| WITNESS | DX | CX | RDX | RCX |
|---|---|---|---|---|
| JASON SCHOENECKER | | | | |
|    By Mr. Eichenseer | 418 | | 445 | |
|    By Mr. Hyman | | 430 | | |
| KEVIN O'NEILL | | | | |
|    By Mr. Eichenseer | 446 | | | |
|    By Mr. Hyman | | 456 | | |
| THOMAS SPRATTE | | | | |
|    By Mr. Eichenseer | 471 | | 512 | |
|    By Mr. Hyman | | 490 | | 515 |
| ARNOLD ESPOSITO | | | | |
|    By Ms. Babu | 521 | | 566 | |
|    By Mr. Pissetzky | | 554 | | |
| VICTORIA JEAN-BAPTISTE | | | | |
|    By Mr. Eichenseer | 570 | | | |
|    By Mr. Pissetzky | | 610 | | |

E X H I B I T S

| NUMBER | RECEIVED |
|---|---|
| Government Exhibit | |
|    No. 600 | 601 |
| Defendant Exhibit | |
|    Video 2 | 464 |

1    (Proceedings heard in open court.  Jury out.)

2         THE COURT:  Please be seated.

3         I received a phone call this morning from the first

4    alternate.  He is --

5         MS. BABU:  Your Honor, we're missing some of the

6    counsel.

7         THE COURT:  Oh, yes.  Let's --

8         MR. HYMAN:  Judge, I just want you to know, this

9    young lady, her name is Shelby Hyman, my daughter.  And

10   because Marta has to go to orientation down at the U of I

11   tomorrow and Thursday, Shelby will just be sitting in her

12   place.

13        THE COURT:  All right.

14        MR. HYMAN:  Just so you understand who the new faces

15   are.  All right.  Thanks.

16        THE COURT:  Very good.  Welcome.

17        MS. BABU:  We're all here, your Honor.

18        THE COURT:  I received a phone call from William

19   Herman who is the alternate number one.  He has fallen victim

20   to panic attacks and he cannot come in.  And if he needs a

21   doctor's, he said he could get one.  So I'm going to have to

22   excuse him, I think, unless you want to not have court today

23   and he may have a panic attack tomorrow, so you never know.

24        MR. PISSETZKY:  He's an alternative?

25        THE COURT:  Yes.  He's alternate number one.

1      MS. BABU:  That's fine with the government, your

2  Honor.

3      MR. HYMAN:  No objection.  That's fine.

4      THE COURT:  So everybody else is here.  So are we

5  ready?

6      MR. EICHENSEER:  Judge, one thing.  Last night --

7  this morning actually, the government did file a motion in

8  limine.  It's a premature motion at this point.  The

9  government just filed it, mostly to notify the Court and the

10 defense that in the event some of the witnesses today testify

11 inconsistently with their grand jury testimony, the government

12 will likely be seeking to introduce the testimony as

13 substantive evidence.

14     MR. PISSETZKY:  Judge, I mean, that is the rule of

15 evidence.  So if their witness that testified to the grand

16 jury testifies inconsistently, I can -- I can use the grand

17 jury as well as substantive evidence.  I think that's --

18     THE COURT:  Unless he's a witness identified with the

19 opposition.  Is that the case?

20     MR. EICHENSEER:  Your Honor, the witnesses that we're

21 referring to are both close with the defendant.  We have no

22 reason to believe that at this point they're going to testify

23 inconsistently, but there's a possibility, and so we just

24 wanted to flag for the Court and the defense at this point

25 what we would be doing in that event.

1          THE COURT:  All right.  I think it's -- we're going

2     to have to speed up, I think, because we're down to one

3     alternate now.  So are we moving relatively quickly?

4          MS. BABU:  We are, your Honor.  We have -- we are

5     moving quickly, your Honor.  I don't -- I would not be able to

6     estimate as to when, if we would be able to rest this week,

7     but we may be able to do so.

8          THE COURT:  All right.  We're down to one extra

9     juror.  So I've been in that position before.  So let's get

10    started then.  Have the witness in here and swear him in.

11         And tell him to bring the jury in.  You can bring

12    them in.  Thanks.

13         Who is the next witness?

14         MR. EICHENSEER:  The government calls Jason

15    Schoenecker.

16         (Pause.)

17         THE COURT:  I should add one more thing.  I had a

18    note from another juror who is taking classes and wanted to be

19    off on Monday and Wednesday, and I said we couldn't.  That was

20    alternate number two.

21         (Proceedings heard in open court.  Jury in.)

22         THE COURT:  Good morning, members of the jury.  You

23    may be seated.

24         Sir, would you raise your right hand.

25         (Witness sworn.)

1      THE WITNESS:  I do.

2      THE COURT:  Please be seated.

3      You may question the witness, Mr. Eichenseer.

4      JASON SCHOENECKER, GOVERNMENT'S WITNESS, SWORN

5                      DIRECT EXAMINATION

6   BY MR. EICHENSEER:

7   Q.   Good morning, sir.  Could you state and spell your name

8   for the record, please?

9   A.   Jason, J-a-s-o-n, last name Schoenecker,

10  S-c-h-o-e-n-e-c-k-e-r.

11  Q.   And where do you work, sir?

12  A.   Chicago Police Department.

13  Q.   And how long have you been with the Chicago Police

14  Department?

15  A.   22-1/2 years.

16  Q.   And what's your current rank?

17  A.   Detective.

18  Q.   Okay.  Are you assigned to anywhere else besides Chicago

19  Police?

20  A.   The ATF office.

21  Q.   Okay.  What do you do with the ATF?

22  A.   I work gang, narcotic, and firearms investigations.

23  Q.   And what's your title with ATF?

24  A.   Task force officer.

25  Q.   How long have you been a task force officer with ATF?

1   A.  Approximately 12 years.

2   Q.  I want to direct your attention to May 4th of last year,

3   Officer Schoenecker.  Were you on duty that morning?

4   A.  Yes.

5   Q.  What was your assignment?

6   A.  We were going to conduct pre-surveillance.

7   Q.  Can you explain to the jurors what pre-surveillance is?

8   A.  Sure.  We were going to go out prior to placing trackers

9   on vehicles to locate the cars and to also see how safe the

10  neighborhood was.

11  Q.  What's a tracking device?

12  A.  It monitors the vehicle when it's in movement so we can

13  know in live time where the vehicle's at.

14  Q.  Do you need permission to install those on cars?

15  A.  Yes.

16  Q.  Where do you get permission from?

17  A.  From the court.

18  Q.  And so what exactly was your role on pre-surveillance?

19  A.  Me and my partner, Officer -- or Detective Daquilante went

20  out prior to locate the vehicles and to drive around the

21  neighborhood.

22  Q.  Okay.  Where were -- the cars with the tracking devices,

23  where were those located?

24  A.  Two of the vehicles were located on Hermitage, and one was

25  located on Wood.

1  Q.  Do you see the area on Hermitage on the map to your left

2  there, Exhibit 400?

3  A.  Yes.

4  Q.  Can you show the jurors where the vehicles you were going

5  to replace the trackers on were?

6  A.  Approximately this area here.

7  Q.  Just for the record, what block did you -- were the

8  vehicles on?

9  A.  They were in approximately like the 43 to 4400 block of

10  South Hermitage.

11  Q.  And can you show the jurors which is the 4400 block of

12  South Hermitage?

13  A.  Sure.  This one right here.

14  Q.  Were the trackers -- was the car with the trackers on that

15  block?

16  A.  It was not.  It would be actually to the south of that

17  location.

18  Q.  Okay.  Can you show the jurors about where the cars with

19  the trackers were?

20  A.  Sure.  Roughly this area here.

21  Q.  Officer -- Officer Schoenecker, you met with us before

22  testifying today, correct?

23  A.  Yes.

24  Q.  And when you met with us, did you explain where you saw

25  the -- or where the cars with the trackers were that morning?

1  A.  Correct.

2  Q.  And did you tell us that they were located south of 44th

3  Street on Hermitage?

4  A.  Correct.

5  Q.  Okay.  Can you -- you may be a little mistaken there.  Can

6  you show the jurors where south of 44th Street on Hermitage

7  is?

8  A.  It would be this area here.

9  Q.  Okay.  So you're now pointing to the south of 44th Street,

10  correct?

11  A.  Yes.

12  Q.  And so you mentioned that you and Detective Daquilante

13  were working together that morning?

14  A.  That's correct.

15  Q.  Okay.  Did you -- was there anybody else on the team

16  besides you and Detective Daquilante?

17  A.  Yes.

18  Q.  Who else was on the team?

19  A.  It would be Police Officer Tom Spratte, Police Officer

20  Tara Murphy, Police Officer Kevin O'Neill, Special Agent Dan

21  Winter, Special Agent Dave Lopez, Special Agent Kevin Crump,

22  Task Force Officer Lou Hopkins.  And I believe that was it.

23  Q.  Did you meet with the team at all that morning before

24  going out in the field?

25  A.  Yes.

1   Q.   Where did you meet?

2   A.   We met in the 9th District.

3   Q.   What's the 9th District?

4   A.   It's a police station located approximately like 3120

5   South Halsted.

6   Q.   So that's not on the map area, correct?

7   A.   Correct.

8   Q.   About what time did you meet with the team at the 9th

9   District?

10  A.   Approximately 3:00 a.m.

11  Q.   Okay.  And did you go anywhere from there?

12  A.   Yes.  Myself and Detective Daquilante drove from the 9th

13  District into the area that I just pointed out to you.

14  Q.   Did you two leave first before the rest of the team?

15  A.   Yes.

16  Q.   Okay.  And what route did you and Detective Daquilante

17  take to the area of 44th and Hermitage?

18  A.   Drove southbound Halsted to 47th Street, 47th Street to

19  Hermitage, north on Hermitage.

20  Q.   What kind of car were you driving?

21  A.   A dark colored Impala.

22  Q.   Okay.  Was it a police vehicle at all?

23  A.   No.

24  Q.   Was it a rental vehicle?

25  A.   Yes.

1  Q.  Were there any police markings whatsoever on the car?

2  A.  No.

3  Q.  Where were the other members of the team at this point?

4  A.  They were still in the 9th District parking lot.

5  Q.  Were you in contact with them?

6  A.  Yes.

7  Q.  How so?

8  A.  Radio communication.

9  Q.  What were you wearing that morning?

10  A.  Jeans and a T-shirt.

11  Q.  Okay.  Would you have any police markings on your

12  clothing?

13  A.  No, I did not.

14  Q.  What was Detective Daquilante wearing?

15  A.  Jeans and a T-shirt as well.

16  Q.  Did he have any police markings on his clothing?

17  A.  No.

18  Q.  And so can you explain to the jurors, as you went south

19  down Ashland, where you went from there?

20  A.  Sure.  Southbound on Ashland to -- I mean, southbound down

21  Halsted to 47th Street, 47th Street to Hermitage, and then

22  northbound on Hermitage.

23  Q.  Okay.  So you went northbound on Hermitage.  Can you show

24  the jurors approximately where that would have been?

25  A.  It doesn't show 47th Street, but from this area up this

1  way.

2  Q.  So you drove up toward 44th Street on Hermitage?

3  A.  That's correct.

4  Q.  And were you looking for anything as you did that?

5  A.  Yes.  We were trying to locate the two vehicles that we

6  believed to be on Hermitage.

7  Q.  And did you locate those vehicles on Hermitage?

8  A.  Yes.

9  Q.  And after you drove up the 4400 block of Hermitage, where

10  did you go next?

11  A.  Made a U-turn here in this circle area.

12  Q.  You're pointing to the traffic circle at 44th and

13  Hermitage?

14  A.  That's correct.

15  Q.  You made a U-turn and went where?

16  A.  Went back southbound down Hermitage, back to 47th Street,

17  and then up Wood Street heading back north.

18  Q.  Okay.  So then you drove down Hermitage and then you went

19  west to Wood?

20  A.  That's correct.

21  Q.  Can you show the jurors which direction you traveled on

22  Wood?

23  A.  It would be this way.

24  Q.  Okay.  How far north did you travel on Wood?

25  A.  On Wood, we traveled to 43rd Street and then went back up

1  43rd back down Hermitage.

2  Q.  Okay.  Can you show the jurors that -- trace that route

3  for them on the map?

4       And as you drove around that block between Wood and

5  Hermitage and 43rd and 44th, how fast were you driving?

6  A.  Approximately 10 to 15 miles an hour.

7  Q.  Was that below the published speed limit?

8  A.  Yes.

9  Q.  Why were you driving so slow?

10  A.  We were looking for both -- all three of the vehicles to

11  include anybody out on the street.

12  Q.  Did you see anybody out on the street?

13  A.  No, we did not.

14       MR. EICHENSEER:  At this point, your Honor, I'd like

15  to publish Government Exhibit 110 which is already in

16  evidence.

17       THE COURT:  You may.

18     (Said video recording played in open court.)

19  BY MR. EICHENSEER:

20  Q.  So Detective Schoenecker, this is a clip from Government

21  Exhibit 110 that begins at 3:11 a.m.  Did you watch this video

22  before testifying today?

23  A.  Yes.

24  Q.  Do you see the car circled in white there?

25  A.  Correct.

1  Q.  Do you recognize that car?

2  A.  Yes.  That would be my vehicle.

3  Q.  And at this point, where are you driving?

4  A.  I'm going northbound down Hermitage towards 44th.

5      MR. EICHENSEER:  Play the video, please.

6      (Said video recording played in open court.)

7  BY MR. EICHENSEER:

8  Q.  And at about 3:12, did you just make a U-turn around the

9  traffic circle at 44th and Hermitage?

10 A.  That's correct.

11 Q.  And you're heading south down Hermitage at this point?

12 A.  Yes.

13     (Said video recording played in open court.)

14 Q.  Then you said you turned west at the end of Hermitage here

15 someplace to cut over to Wood?

16 A.  Yes.

17     MR. EICHENSEER:  All right.  Publish the next clip,

18 please, which is another clip of Exhibit 110.

19     (Said video recording played in open court.)

20 BY MR. EICHENSEER:

21 Q.  Okay.  The timestamp there is 3:14.  Did you watch this

22 video before testifying today, Officer Schoenecker?

23 A.  Yes.

24 Q.  Do you recognize your car in this clip?

25 A.  Yes.

1  Q.  Where is it?

2  A.  Circled in the purple.

3      MR. EICHENSEER:  Okay.  You can play the clip, please.

4      (Said video recording played in open court.)

5  BY MR. EICHENSEER:

6  Q.  Does this clip at 3:14 show you driving northbound on

7  Hermitage -- northbound on Wood, sorry, and then taking a

8  right on 43rd?

9  A.  That's correct.

10  Q.  And again, you said you were driving about 10 to 15 miles

11  an hour?

12  A.  Yes.

13  Q.  And where were you looking for people as you drove down

14  Wood Street?

15  A.  On the street itself, in the alley, on porches.

16  Q.  Did you see anybody?

17  A.  No, I did not.

18  Q.  You testified earlier that after taking a right on 43rd,

19  then you took another right southbound on Hermitage, right?

20  A.  That's correct.

21  Q.  Is that your car in the purple circle there at 3:15:24?

22  A.  Yes.

23  Q.  And then did you stop at the intersection of 44th and

24  Hermitage here?  Are those are your headlights in the upper

25  left-hand corner?

1  A.  Yes.

2  Q.  Okay.  The clip stops at 3:15:48, Office Schoenecker --

3  Detective Schoenecker, I'm sorry.  Where did you go from this

4  location right here at the end of the clip?

5  A.  Parked the vehicle approximately 4430 South Hermitage and

6  set up.

7  Q.  So you parked on the block that you're driving on right

8  now in this clip?

9  A.  That's correct.  It's going to be a little bit further to

10  the south there on the west side of the street.

11  Q.  Okay.  About how far south?  Is it halfway down the block,

12  more than that?

13  A.  About a quarter down the block.

14  Q.  Okay.  Which direction were you facing when you parked?

15  A.  Facing southbound.

16  Q.  And why did you park in that location?

17  A.  It was the only parking that was available at that time.

18  Q.  Okay.  And did you communicate with anybody at that point?

19  A.  Yes.  I put over the radio that the block looked clear and

20  we were able to locate two of those vehicles and gave the okay

21  for the team to go.

22  Q.  Okay.  When you said "okay for the team to go," what team

23  are you referring to?

24  A.  The team that I was working with that day, the ATF team.

25  Q.  Okay.  What was that team's job?

1  A.  That team's job was to also do surveillance and to place

2  the trackers on the vehicle.

3  Q.  Okay.  So it wasn't your job to replace the trackers,

4  right?

5  A.  That's correct.

6  Q.  Just to make sure the area was clear?

7  A.  Yes.

8  Q.  Okay.  And what happened next after you were parked

9  southbound on the 4400 block of Hermitage?

10  A.  When I was parked southbound, shortly thereafter, I

11  observed out of my driver's side mirror Special Agent Dan

12  Winter and Task Force Officer Tom Spratte.  They would have

13  been on the side where the park is at right there on the east

14  side of the street on the corner.

15  Q.  Okay.  So you didn't see them with your eye, you saw them

16  in the mirror?

17  A.  Correct.  I seen them in my driver's side mirror.

18  Q.  Okay.  What happened next?

19  A.  Then I began to focus on the cars where the trackers were

20  going to be replaced.  A few seconds later, I heard a volley

21  of shots.

22  Q.  And was your car window open?

23  A.  Yes.  The window was cracked.

24  Q.  How many shots did you hear?

25  A.  At the time, I believe I heard 10 to 15 shots.

1  Q.  Could you tell where those shots were coming from?

2  A.  Directly behind us to the north.

3  Q.  Okay.  And what did you do next?

4  A.  At that time, someone put on the radio, "Shots fired."  I

5  had then seen emergency equipment coming our way.  My car is

6  not equipped with lights, so I let the two ATF vehicles pass

7  us.  Then I made a U-turn and followed behind those two

8  vehicles.

9  Q.  Okay.  And then did you -- so you arrived at the scene

10  where those vehicles were shortly thereafter?

11  A.  I arrived shortly after the vehicles, yes.

12  Q.  Okay.  And was Agent Crump on the scene when you arrived?

13  A.  Yes.

14  Q.  What condition was he in?

15  A.  He was laying behind a vehicle covered in blood.

16       MR. EICHENSEER:  No further questions, your Honor.

17       THE COURT:  Cross.

18                    CROSS-EXAMINATION

19  BY MR. HYMAN:

20  Q.  Good morning, Agent.

21  A.  Good morning.

22  Q.  I want to talk to you about first the preparation that's

23  done for this particular mission that morning.  It was

24  planned, was it not?

25  A.  Correct.

1 Q. And one of the things that everybody does in this -- in a

2 mission is they have an assignment, true?

3 A. Yes, sir.

4 Q. And as you told the members of the jury, your assignment

5 was to make sure the area was clear before anything happened,

6 right?

7 A. That's correct.

8 Q. And when once you give the okay sign, then the people who

9 had the responsibility of placing the tracker on, they then

10 can get to where they're going, right?

11 A. Yes, sir.

12 Q. So the route that you told us about started up in the 9th

13 District which was on Halsted Street --

14 A. Yes, sir.

15 Q. -- right?

16     You went down Halsted to 47th Street, correct?

17 A. That's correct.

18 Q. And then from 47th Street you went --

19 A. Westbound.

20 Q. -- westbound to Wood Street?

21 A. No, that's not correct.

22 Q. Or Hermitage. I'm sorry.

23 A. That's correct.

24 Q. All right. And then Hermitage, you go up -- let's move

25 this out a little bit. You go up Hermitage. From way down

1  here, you go up Hermitage and then you go around to Wood

2  Street?

3  A.   That's incorrect.

4  Q.   Okay.  Why don't you correct it.

5  A.   Well, I stop approximately at 44th there.  I make a turn

6  in that circle right here.

7  Q.   Yes.

8  A.   And then I go back towards 47th Street and then over one

9  block and then up Wood Street.

10 Q.   Wood Street.  Okay.  So I stand corrected.  I'm sorry.  So

11 you go down.  You make that turn.  And that's -- as you say,

12 that was you in that car, right?

13 A.   Yes, sir.

14 Q.   And if you go down Wood Street, you then go which way?

15 Back around to --

16 A.   Take a right to head east and then go back down Hermitage

17 back south.

18 Q.   And that's when you park?

19 A.   That's correct.

20 Q.   All right.  So let's talk about that mission that you did

21 when you went down Wood Street.  And you've marked on the

22 video your car.

23      MR. HYMAN:  If we could, if you could get to about

24 the time that he goes down Wood and passes 44th Street.

25      MR. PISSETZKY:  3:11.

1  BY MR. HYMAN:

2  Q.  3:11.  So on the upper right-hand corner of this Exhibit

3  110, that's -- you've identified the purple car circled -- or

4  the car that's circled in purple to be your car, right?

5  A.  That's correct.

6  Q.  All right.  When you drove down Wood Street, did you see

7  anybody?

8  A.  I did not, no.

9  Q.  Did you see any white Kia van or SUV?

10 A.  No.

11 Q.  Did you see an individual wearing a black shirt and black

12 jeans -- or black shorts walking?

13 A.  No.

14 Q.  Did you see an individual who had a white shirt on walking

15 through a gangway --

16 A.  No.

17 Q.  -- an alleyway?

18     So you're continuing to drive down Wood Street, right?

19 A.  Correct.  Wood Street north, yes.

20 Q.  And as you head north, you turn right on 43rd Street and

21 then go to Hermitage and then head south, correct?

22 A.  That's correct.

23 Q.  Now, when you get to the intersection of 44th and

24 Hermitage at 3:15, I think, and 48 seconds, did you see,

25 before you got to the corner of 44th -- before you actually

1   entered into the intersection of 44th and Hermitage, did you

2   see the individual who in this upper clip -- if you just pull

3   it back a little bit -- circled in yellow cross the street?

4   A.   No, I did not.

5   Q.   So that's you.  Did you see an individual before you got

6   to that intersection run across the street?

7   A.   No.

8   Q.   As you were driving around this approximately four,

9   five-block area between 47th to 46th to 45th to 44th to 43rd

10  down Wood Street, down Hermitage, back around, this area is

11  residential, is it not, but for the park?

12  A.   That's correct.

13  Q.   And you would agree that as you drove around, you yourself

14  found it difficult to find a place to park, true?

15  A.   Yes.

16  Q.   And, in fact, it appeared to you in your observations that

17  the streets were filled with parked cars, true?

18  A.   Yes.

19  Q.   And specifically, however, you were looking for two parked

20  cars that were going to put trackers on, right?

21  A.   That's correct.

22  Q.   Now, as an officer -- I want to leave that subject now.  I

23  want to talk to you about what you heard.  As an officer of 22

24  years, you have been trained in the use of firearms, true?

25  A.   Yes.

1  Q.  And for the Chicago Police Department, it requires that

2  you have a certain amount of testing and retesting of your

3  abilities to fire a weapon, true?

4  A.  That's correct.

5  Q.  And so you know what the sounds -- over 22 years, I'm sure

6  you have heard the sound of a gunshot, right?

7  A.  Yes.

8  Q.  And from where you were, the sounds that you heard sounded

9  like there were 10 rounds fired, correct?

10  A.  Roughly, yes.

11  Q.  And you subsequently learned that, in fact, there were

12  only five shots, true -- or seven, seven shots?

13  A.  That's correct.

14  Q.  From where you were and from where you were looking, could

15  you see, as the agents were walking, agents you described,

16  both Winter and Spratte, I believe, you could see them, right?

17  A.  When they first got dropped off, yes.

18  Q.  Okay.  So could you see them as they walked across the

19  street and before the shots were fired?

20  A.  I couldn't tell if they were on the street or on the

21  sidewalk.  All I can know is that they were the two guys that

22  were us, and I never saw Special Agent Crump either.

23         MR. HYMAN:  Could we just play that to almost -- when

24  they're dropped off.  So that's 3:18 and 10 seconds -- oh,

25  that doesn't...

1    MS. BABU:  No, that's another clip.

2    (Pause.)

3    BY MR. HYMAN:

4    Q.  Could you -- did you know that car that just made the turn

5    on 44th Street was the car driven by Officer O'Neill?

6    A.  Yes.

7    Q.  And in that car were Crump, Winter, and Spratte, true?

8    A.  That's correct.

9    Q.  On the -- again, on the upper right-hand video is looking

10   east down 44th Street, true, is that correct, from this

11   camera?

12   A.  That's correct.

13   Q.  All right.  And you can see two people walking on that

14   side, on the east side of the street, right?

15   A.  Actually, the one body that I see on my screen here, he's

16   dressed in a black hoody with jeans, and that's actually on

17   the west side of the street.  I do not see anybody on the east

18   side of the street right now.

19   Q.  Okay.  Maybe we can pull it back.  Oh, I apologize.

20       The upper right-hand corner, could you see -- all

21   right.  Do you see, on the upper right-hand screen, can you

22   see the two people that are walking?  Does it appear that

23   there are two people walking?

24   A.  No.  I just see one person in the upper right-hand screen

25   walking.

1  Q.  You don't see two people walking?  Maybe we'll let the

2  rest of it -- do you see those?  Does it look like there's two

3  guys?

4  A.  Now I've got one coming into frame on my left-hand side in

5  the screen right here.

6  Q.  Let me just take a look at what you're looking at because

7  I seem to be looking at something different.

8  A.  I'm looking right here.  I believe this is Special Agent

9  Crump, and I see one other person on the screen here.

10  Q.  I'm talking about this screen.  I apologize.

11  A.  I can't make that out.

12  Q.  Okay.  So those -- if Spratte and Winter were walking,

13  that's where they would have been, true?

14  A.  That's correct.

15  Q.  Okay.  And you could see them from your side-view mirror,

16  right?

17  A.  My driver's side-view mirror, that's correct.

18  Q.  All right.  When you heard the sound of the shot or the

19  recording, I guess sometimes it's called, could you see the --

20  from your vantage point looking into your side-view mirror,

21  could you see any muzzle flashes?

22  A.  No.

23  Q.  Could you see the muzzle flash from Officer Spratte's gun?

24  A.  No.

25  Q.  You don't, as you sit here today, know where that -- where

1   those muzzle flashes were, true?

2       MR. EICHENSEER:  Objection, your Honor.  The witness

3   testified he didn't see any muzzle flashes.

4       THE COURT:  Overruled.  He can answer.

5   BY THE WITNESS:

6   A.  Correct.

7   BY MR. HYMAN:

8   Q.  When you immediately -- and I want to leave that subject

9   and talk to you about what you told the members of the jury,

10  that when you left -- when you heard those sounds of gunshots,

11  you knew they were gunshots, true?

12  A.  That's correct.

13  Q.  And you got out of your parking space, and you headed

14  northbound on Hermitage, right?

15  A.  Not immediately, no.

16  Q.  You waited for the other cars to come that had the

17  emergency lights?

18  A.  That's correct, and plus I didn't believe those shots were

19  meant for us at that time.

20  Q.  I'm sorry?

21  A.  I didn't believe those gunshots were meant for us at that

22  time.  There's a lot of gunshots in the area.  I didn't

23  believe those were meant for us.

24  Q.  Okay.  So when you say there are a lot of gunshots in the

25  area, that means that was an area that you had in your past

1   experience known to have other shootings, true?

2   A.   Correct.

3   Q.   And one of the reasons of this mission was to try to find

4   someone that you thought may be involved with shootings,

5   right, or have guns?

6   A.   The mission was replace trackers on vehicles.

7   Q.   Right.  And that was all?

8   A.   That's correct.

9   Q.   All right.  And the people that you were tracking as an

10  ATF task force agent would have been, in your -- at that point

11  someone that you were looking to -- may have been dealing in

12  guns or involved with shootings, right?

13  A.   Correct.

14  Q.   So you hear these shots.  You wait.  You hear this

15  emergency call, "Shots fired."  Do you also hear that there's

16  an officer been shot?

17  A.   No.

18  Q.   But you wait until the other officers come down the

19  street, and then you pull over to that area, true?

20  A.   The two with the emergency lights passed me, and then I

21  followed and made a U-turn and got directly behind them, yes.

22  Q.   All right.  And so looking at the screen on the upper

23  left-hand corner, that's the circle, that's the corner that

24  you responded to, true?

25  A.   Yes.

1   Q.  All right.  When you got to that corner, did you see

2   Spratte, Officer Spratte?

3   A.  I seen a bunch of people, yes.

4   Q.  All right.  Well, did Spratte tell you that he had fired

5   his weapon?

6   A.  No.

7   Q.  Did you know -- did you learn as you stood there with

8   other officers that Spratte had fired his weapon?

9   A.  Yes.

10  Q.  Did you -- did Spratte tell you that he saw two muzzle

11  flashes?

12  A.  No.

13  Q.  Did Spratte tell you that when he heard the muzzle -- he

14  heard the gunfire that he turned, saw an unknown person in a

15  white shirt, and he saw muzzle flashes?

16  A.  No.

17  Q.  Did anybody know where those muzzle -- where those sounds,

18  where those fire -- I'm sorry.  I'm tying my tongue.

19        Did anybody know in that group that was there when

20  you got there where those shots were fired from?

21        MR. EICHENSEER:  Objection to foundation, "anybody."

22        MR. HYMAN:  I'll rephrase it.

23  BY MR. HYMAN:

24  Q.  The only people that were out there after those shots that

25  you heard were your fellow officers, true?

1   A.  Correct.

2   Q.  They were the ATF officers, right, and the officers from

3   the Chicago Police Department that were assigned there, right?

4   A.  Yes.

5   Q.  Did anyone know where those shots came from?

6   A.  Yes.

7   Q.  Where did the shots come from?

8   A.  From the north.

9   Q.  Did they know specifically where those shots came from?

10  A.  You'd have to ask them specifically.  I didn't fire my

11  weapon.

12  Q.  I understand that, but that's not the question I asked

13  you, and I apologize to you.  The question I asked you was:

14  Did anyone know where the shots were fired from specifically?

15          MR. EICHENSEER:  Your Honor, I'm going to object

16  again.

17          THE COURT:  I'm going to sustain the objection,

18  "anyone know."

19  BY MR. HYMAN:

20  Q.  All right.  Did you know, did you know specifically where

21  that shots -- those shots were fired from?

22  A.  No, sir.

23  Q.  Did you -- let's talk about after the shooting.  After the

24  shooting, did you search the area for an offender?

25  A.  Yes.

1  Q.  What description did you have?

2  A.  Didn't have much of a description at the time.

3  Q.  Who would you have -- who did you have the description

4  from?

5  A.  From the officers that were in the area.  I don't remember

6  what the description was.

7  Q.  Was it Officer Spratte?

8  A.  No.  He left the scene when he was taken to the hospital.

9  Q.  How about Officer Winter?

10  A.  Winter was on the scene, yes.

11  Q.  Did they tell you -- did he tell you what -- who to look

12  for?

13  A.  We were just searching the immediate area for an offender.

14  Q.  So you're just looking for someone who is out on the

15  street?

16  A.  Correct, knocking on doors, talking to the neighbors, yes,

17  seeing if anybody saw anything.

18  Q.  People heard the shots, true?

19  A.  Sure.

20  Q.  But no one saw who fired the shots?

21  A.  That's correct.

22  Q.  And you certainly didn't know who fired the shots, true?

23  A.  That's correct.

24  Q.  So you were just looking to find someone to stop and talk

25  to to see if they fired a handgun?

1   A.   Looking for shell cases, looking for evidence, and trying

2   to talk to witnesses, yes.

3   Q.   All right.  By the way, when you -- a moment ago, you told

4   us that that area, there's a lot of gunshots, so you didn't

5   think that those were in your direction or for you, I think

6   that's the term you used.  You didn't think those gunshots

7   were for you.

8   A.   Correct.

9   Q.   When -- in these areas, these guns that are mostly used

10  are automatic weapons, automatic pistols, not the old

11  revolver?

12  A.   They use everything:  Shotguns, revolvers, automatic

13  weapons.

14  Q.   Automatic weapons leave casings?  They are fired -- when

15  you fire that gun, the casing is ejected, true?

16  A.   Yes.

17  Q.   And you can find casings all over that area, can't you?

18  A.   That's correct.

19        MR. HYMAN:  Your Honor, may I just have a moment?

20     (Pause.)

21  BY MR. HYMAN:

22  Q.   When you were -- when you heard those shots,

23  Mr. Schoenecker, you thought they were shooting -- there was

24  another shooting in the area, true?

25  A.   No.  I just thought the shots that were fired were shots

1  in the area.

2  Q.  But you thought that those shots came from gang, other

3  gang members, right?

4        MR. EICHENSEER:  Objection.  Misstates the testimony.

5        THE COURT:  Objection sustained.

6  BY MR. HYMAN:

7  Q.  Did you think those shots could have come from other gang

8  members, from gangs?

9        MR. EICHENSEER:  Objection to the opinion.

10        THE COURT:  Objection sustained.  I don't see what...

11 BY MR. HYMAN:

12 Q.  Have you ever heard of the term "flake"?

13 A.  Yes.

14 Q.  That means the opposing gang, right, an opposing gang

15 member, true?

16 A.  Could mean that, yes.

17 Q.  Does it -- does it have another meaning other than the

18 opposing gang member, of a flake that's used in the -- used in

19 the sense of criminal investigations of gang members?

20 A.  It means from the opposite gang.

21 Q.  Opposite gang, the other guys, right?

22 A.  Correct.

23 Q.  Did you think to yourself when you heard those shots that

24 those were just some dumb gangbangers shooting away at night?

25        MR. EICHENSEER:  Objection, your Honor.

1    THE COURT:  Objection sustained.

2    MR. HYMAN:  Judge, I have nothing further.

3    THE COURT:  Okay.  Anything further?

4    MR. EICHENSEER:  Just a few, your Honor.

5                    REDIRECT EXAMINATION

6    BY MR. EICHENSEER:

7    Q.  Detective Schoenecker, Mr. Hyman just asked you a series

8    of questions about whether or not you asked Officer Spratte a

9    bunch of questions at the scene.  Do you remember those

10   questions?

11   A.  Yes.

12   Q.  Were you the only other detective there or other officer

13   there besides Officer Spratte?

14   A.  There was other officers on the scene.

15   Q.  About how many officers had arrived on the scene after you

16   got there?

17   A.  After we had got on the scene, they were arriving from all

18   over the place.  You had 9th District arriving, tac officers,

19   other beat officers.

20   Q.  Was it your job to interview Agent Spratte -- or Officer

21   Spratte?

22   A.  No.

23   Q.  What were you most concerned with at that point in time?

24   A.  Safety in the area and to look for the shooter.

25           MR. EICHENSEER:  Nothing further, your Honor.

1          THE COURT:  You can step down.  You're excused.

2      (Witness excused.)

3          THE COURT:  Call your next witness.

4          MR. EICHENSEER:  Your Honor, the government calls

5   Kevin O'Neill.

6          MS. BABU:  Your Honor, may I clear the screen from

7   the stand?

8          THE COURT:  Yes.

9          Right over here, sir.  Please raise your right hand.

10      (Witness sworn.)

11         THE WITNESS:  I do.

12         THE COURT:  Please be seated.

13         You may question the witness.

14         MR. EICHENSEER:  Thank you, your Honor.

15          KEVIN O'NEILL, GOVERNMENT'S WITNESS, SWORN

16                      DIRECT EXAMINATION

17  BY MR. EICHENSEER:

18  Q.  Good morning, sir.  Could you please state and spell your

19  name for the record?

20  A.  Kevin O'Neill, K-e-v-i-n, O-n-e-i-l-l.

21  Q.  And where do you work, sir?

22  A.  I work for Chicago Police Department, Unit 193 detailed to

23  the ATF task force.

24  Q.  Okay.  So how long have you been with the Chicago Police

25  Department?

1    A.    This is my 14th year.

2    Q.    And what unit are you assigned to again?

3    A.    It's Unit 193, gang investigations division.

4    Q.    And how long have you been a task force officer assigned

5    to ATF?

6    A.    Close to two years now.

7    Q.    I want to direct your attention to May 4th of last year,

8    Officer O'Neill.  Were you on duty that evening?

9    A.    Yes.

10   Q.    And what was your assignment?

11   A.    My assignment was to assist three other officers on

12   replacing and installing tracking devices on vehicles.

13   Q.    Okay.  And what specifically was your job?

14   A.    I was to drive the three other officers to the target

15   location.

16   Q.    And when you say "target location," does that mean the

17   spot where the vehicles with the trackers were?

18   A.    That's correct.

19   Q.    And who else was on your team?

20   A.    Inside the vehicle with me was Special Agent Dan Winter,

21   Special Agent Kevin Crump, and CPS Officer Thomas Spratte.

22   Q.    Were there other members of your team that were part of

23   the operation that morning?

24   A.    Yes.

25   Q.    Was Detective Schoenecker one of those members?

1  A.  Yes.

2  Q.  What was his role that morning?

3  A.  His role along with Officer Daquilante was to

4  pre-surveillance the block and let us know if the vehicles

5  were parked on Hermitage that night.

6  Q.  Okay.  So the plan was for Detective Schoenecker and

7  Daquilante to drive to the area first to make sure it was

8  clear?

9  A.  Yes.

10  Q.  And then am I right that then you would drive the other

11  three agents to actually replace the trackers themselves?

12  A.  That's correct.

13  Q.  Did you meet with the team that morning to go over the

14  plan?

15  A.  Yes.

16  Q.  Where did you meet?

17  A.  On the rooftop of the 9th District police station.

18  Q.  Okay.  And that's -- and that's not shown on the map next

19  to you to the left, is it?

20  A.  No, it's not.

21  Q.  Officer O'Neill, if you wouldn't mind moving that map a

22  little bit closer to yourself, I'll be asking you some

23  questions about that in a second.  Thank you.  Just pivot it

24  toward the jury so they can see as well.  Thank you.

25        At some point -- about what time did you meet, by the

1    way, at the 9th District with the team members?

2    A.   It was roughly 2:00 or 3:00 in the morning.

3    Q.   Okay.  And at some point, did you leave the 9th District?

4    A.   Yes.

5    Q.   How did you leave?

6    A.   We left in my Nissan Altima that night.

7    Q.   And is this a police vehicle at all?

8    A.   Yes.

9    Q.   Did it have any markings at all?

10   A.   No.  It's an unmarked Nissan Altima with regular plates.

11   Q.   So not like municipal plates or law enforcement plates?

12   A.   That's correct.

13   Q.   It was a four-door Nissan Altima, you said?

14   A.   Yes.

15   Q.   What color was it?

16   A.   Brown in color.

17   Q.   What were you wearing that morning?

18   A.   Civilian dress.

19   Q.   And can you describe what that means?  Plain clothes, you

20   mean?

21   A.   Plainclothes officer, yes.

22   Q.   Did you have any police markings on your clothing?

23   A.   No, I did not.

24   Q.   Who was in the car with you?

25   A.   Special Agent Dan Winter, Special Agent Kevin Crump, and

1    CPD Thomas Spratte.

2    Q.   Okay.  Where were they sitting in the car?

3    A.   Special Agent Winter was in the front passenger seat, and

4    Special Agent Crump and CPD Crump were in the back seat.

5    Q.   Did any of them have -- were they all wearing plain

6    clothes, too?

7    A.   Yes.

8    Q.   Did any of them have visible police markings on their

9    clothing?

10   A.   No.

11   Q.   So after you left the 9th District, where did you go?

12   A.   From the 9th District, we took Halsted southbound to 39th

13   Street, 39th Street westbound to Ashland, Ashland southbound

14   to 43rd Street.

15   Q.   Am I right that the corner of the map next to you, Ashland

16   and 43rd, that intersection is shown in the upper right-hand

17   corner?

18   A.   Yes.

19   Q.   And where did you go from there?

20   A.   From Ashland, westbound to Hermitage, 4300 block of

21   Hermitage.

22   Q.   Okay.  And why were you heading towards Hermitage?

23   A.   We were -- we were informed that the vehicles we were

24   placing the trackers on were parked on the 4400 block of

25   Hermitage.

1    Q.   Okay.  And who informed you of that?

2    A.   Officer Schoenecker and Officer Daquilante informed us on

3    the way to Hermitage.

4    Q.   Was that over the radio?

5    A.   Yes.

6    Q.   Okay.  Was that a signal that the coast was clear, so to

7    speak, to go and replace the trackers?

8    A.   Yes.

9    Q.   So after driving west down 43rd, where did you and the

10   team go?

11   A.   Made a left-hand, which would be southbound, on Hermitage

12   from 43rd Street towards 44th Street.

13   Q.   Okay.  And did you cross 44th Street?

14   A.   I did not.

15   Q.   What did you do?

16   A.   I parked my vehicle roughly 4350 South Hermitage.

17   Q.   Could you show the jury on the map about where you parked

18   your vehicle?

19   A.   Somewhere in this, by this house right here.

20   Q.   And as you drove down Hermitage before you parked, were

21   you looking for anybody?

22   A.   Not really looking for anybody, just making sure if there

23   was somebody out there, we'd make note of it.

24   Q.   Did you see anybody on the 4300 block of Hermitage?

25   A.   No, I did not.

1  Q.  Okay.  So after you pulled over, what happened?

2  A.  Once I parked the vehicle, the three officers exited the

3  vehicle.

4  Q.  Okay.  Where were the cars that the trackers were on?  Was

5  it that block or a different block?

6  A.  I was told, we were told that they were both parked on the

7  4400 block of Hermitage.

8  Q.  Okay.  So that would be one block south of where you

9  pulled over?

10  A.  That's correct.

11  Q.  Okay.  Why did you pull over a block away from where the

12  cars were?

13  A.  Just it would be easier to let them walk, the officers

14  walk.  It's less suspicious, I guess you could say.

15  Q.  And where did Crump go after he got out of the car?

16  A.  Crump exited the vehicle and walked on the west sidewalk

17  of the 4300 block of Hermitage towards 44th Street.

18  Q.  Okay.  And where did Spratte go?

19  A.  Spratte exited the vehicle and walked to the middle of the

20  street about right to the intersection.

21  Q.  And what about Winter?  Where did he go?

22  A.  Winter was alongside Spratte.

23  Q.  Okay.  What did you do then?

24  A.  As soon as the officers exited the vehicle, I made a

25  westbound turn on 44th Street.

1  Q.  Okay.  And so you dropped them off and you drove away?

2  A.  Yes.

3  Q.  Did you make it to Wood Street on 44th?

4  A.  I made it about halfway from 44th between Wood and

5  Hermitage.

6  Q.  Okay.  Was your window open at all?

7  A.  Yes.

8  Q.  What happened between Hermitage and Wood when you were

9  driving?

10  A.  Shortly after I turned, I heard about five gunshots from

11  my -- from the northeast from me.

12  Q.  Okay.  So can you show the jurors about where you were

13  when you heard the gunshots?

14  A.  I turned here.  I made it to about right here.

15  Q.  So right about where the alley between Wood and Hermitage

16  is?

17  A.  Just about the alley, yes.

18  Q.  And you said you heard gunshots?

19  A.  Yes.

20  Q.  You heard about five?

21  A.  That's correct.

22  Q.  And you said you heard them from a direction?

23  A.  From the northeast of my location, yes.

24  Q.  So what did you do after you heard about five shots?

25  A.  I immediately got on the ATF handheld radio to notify my

1  teammates as well as the CPD radio.

2  Q.  Okay.  What did you say over the radio?

3  A.  I notified there were shots fired in the area of our

4  location.

5  Q.  Okay.  What did you do after that?

6  A.  I reversed my vehicle to the roundabout here.

7  Q.  Back toward the intersection?

8  A.  Yes.

9  Q.  And what did you do from there?

10  A.  That's -- I parked my vehicle on the 4401 side of

11  Hermitage.

12  Q.  Okay.  And what happened after that?

13  A.  That's when Officer Spratte came up to my vehicle and

14  informed me that Officer Crump has been shot.

15  Q.  And did you -- did you see Officer Crump after that?

16  A.  I never saw him, no.

17  Q.  Was he removed from the scene before you got there?

18  A.  Yes.

19        MR. EICHENSEER:  At this point, your Honor, I would

20  like to publish Government Exhibit 111 which is already in

21  evidence.

22        THE COURT:  All right.

23        MR. EICHENSEER:  One second, Judge.  We've just got

24  some technical difficulties.

25     (Said video recording played in open court.)

1              MR. EICHENSEER:  The timestamp on this exhibit says

2    3:17:47, if we can pause it for a second there.

3    BY MR. EICHENSEER:

4    Q.  Officer O'Neill, do you recognize your car or at least

5    recognize your location in this still frame?

6    A.  Yes.

7    Q.  Can you tell the jurors where that is?

8    A.  That is the 43 -- that's Hermitage, 4300 South Hermitage.

9    Q.  Is that -- are those your headlights that are circled

10   there in the upper right-hand corner?

11   A.  Yes.

12             MR. EICHENSEER:  Can you play the video?

13        (Said video recording played in open court.)

14   BY MR. EICHENSEER:

15   Q.  At this point, are the three agents getting out of your

16   car?

17   A.  Yes.

18   Q.  Is that you making a westbound turn on 44th?

19   A.  That's correct.

20        (Said video recording played in open court.)

21   Q.  It looks like backup lights on your car.  Is that you

22   reversing there?

23   A.  Yes.

24        (Said video recording played in open court.)

25   Q.  And the clip ends here at 3:18:36.

1      I believe you testified that you drove around the

2  traffic circle, and then Officer Spratte came over to let you

3  know that Agent Crump had been shot?

4  A.  Yes.

5        MR. EICHENSEER:  Nothing further, your Honor.

6        THE COURT:  Cross-examine.

7                  CROSS-EXAMINATION

8  BY MR. HYMAN:

9  Q.  Mr. O'Neill, good morning.

10  A.  Good morning.

11  Q.  This is not the first time you've ever done this type of

12  mission, true?

13  A.  That's correct.

14  Q.  You yourself have actually gone and put on trackers, I

15  believe?

16  A.  That's not correct.  I've always been driving the vehicle,

17  sir.

18  Q.  So you're only the driver?

19  A.  Yes.

20        MR. HYMAN:  Okay.  Could you switch us to the USB?

21  BY MR. HYMAN:

22  Q.  When you met up there in the 9th District, you were with a

23  whole bunch of other policemen, right, and agents?

24  A.  Yes.

25  Q.  And everybody had their role, true?

1    A.   True.

2    Q.   And everybody that was there, they were all dressed just

3    as you would -- it's called civilian clothes.  No one is in a

4    police uniform or has the marking that in any way

5    distinguishes you from anyone else that's out on the street,

6    true?

7    A.   True.  Civilian dress, no markings.

8    Q.   Right.  So the agents that were out there that night that

9    were going to put on the tracker, their role was also to make

10   it appear as if they were just part of the neighborhood, right?

11   A.   That's correct.

12   Q.   Were any of those -- and the neighborhood, by the way, the

13   neighborhood that you were going to put these trackers on,

14   where the cars were, was mostly a Latino neighborhood or

15   Hispanic neighborhood, true?

16          MR. EICHENSEER:  Objection, your Honor.

17          THE COURT:  Overruled.  He can answer.

18   BY THE WITNESS:

19   A.   That's correct.

20   BY MR. HYMAN:

21   Q.   And the agents who were with you and who were walking were

22   not Hispanic, true?

23   A.   That's true.

24   Q.   Now, in your -- I apologize.  It was 12 years that you've

25   been on the Chicago Police Department?

1  A.  Close to 14, sir.

2  Q.  Oh, 14.  Okay.  So close to the 14 years that you've been

3  on that department, you've done cases involving gangs, true?

4  A.  Yes.

5  Q.  Gangs wear colors, right?  Certain gangs wear certain

6  colors?

7  A.  Some do, I guess you could say, not what it used to be.

8  Q.  But everybody -- every gang area has a different color or

9  a different sign, right?

10  A.  Yes.

11  Q.  Okay.  And you know that gang people wear hoodies, true?

12  A.  Not specifically just gang members, sir.

13  Q.  That's true.  I mean, the founder of Facebook made hoodies

14  very popular.  But certainly, when you deal with gang members

15  and you're in a gang neighborhood, they often wear hoodies,

16  true?

17  A.  At times, yes.

18  Q.  Okay.  And when Officer Crump was walking across that

19  parkway, he was wearing a hoody, wasn't he?

20  A.  I believe so.

21  Q.  Right.  So he was -- the point was for him to be sort of

22  look like he was part of the neighborhood, right?

23  A.  In civilian dress, yes.

24  Q.  Okay.  Now, you mentioned to the members of the jury --

25  and I don't mean to jump back and forth, but I wanted to first

1  talk to you about, as I started to, where you met your other

2  officer, brother officers was at the 9th District.  Would you

3  take a look at Godinez Exhibit 1 Map in front of you?

4  A.  Yes.

5  Q.  That starts up in the upper right-hand corner.  And the

6  route as I understand you took was from Halsted Street, which

7  is on the top, correct?

8  A.  Yes.

9  Q.  Down to -- what street is that?  39th Street?

10  A.  Yes.

11  Q.  And the long purple marking is 39th Street?

12  A.  Yes.

13  Q.  And then you make a left on to Ashland, true?

14  A.  Yes.

15  Q.  From Ashland, then you go down and you turn right on 43rd

16  Street?

17  A.  Yes.

18  Q.  And then you turn down and you head down Hermitage, right?

19  A.  Yes.

20  Q.  You never drove around that area beforehand, did you?

21  A.  Not that night, no.

22  Q.  All right.  So you had a direct route, true?

23  A.  True.

24  Q.  And when you drove down Hermitage before you got to 44th

25  Street, everyone was looking out to see whether or not there

1  were people out on the street as well, true?

2  A.  We had surveillance cars, yes.

3  Q.  But you yourself, your other -- you guys are driving down,

4  and if someone happens to be standing on the corner or coming

5  out of a house, you don't want to be seen walking and putting

6  the tracker on, right?

7  A.  That's correct.

8  Q.  So everybody's doing their own -- you're doing your own

9  surveillance on top of what Schoenecker and the others had

10  done already, true?

11  A.  Yes.

12  Q.  Okay.  When you -- as you get to that corner, you make the

13  turn and you stop, you let the officers off, you make the

14  turn, and then you hear the shots, right?

15  A.  Yes.

16      MR. HYMAN:  Okay.  Can we use the exhibit, the video,

17  Defendant Godinez Video 1 in front of 4324 South Hermitage?

18      (Said video recording played in open court.)

19      MR. HYMAN:  Can you stop it there, Marta?

20  BY MR. HYMAN:

21  Q.  Does that appear to be your car that you were driving?

22  A.  I can't tell based on that video.

23      MR. HYMAN:  Can you back it up a little bit?  Just

24  back it up.

25  BY MR. HYMAN:

1  Q.  You get to about the corner of 44th -- okay.  Stop.

2         Does that look like your car that you were driving

3  that night?

4  A.  Somewhat similar, yes.

5  Q.  Nothing special, it was just a Toyota Camry, right?

6  A.  Nissan Altima.

7  Q.  Oh, Nissan Altima.  Okay.  Blending in with the

8  neighborhood?

9  A.  Yes.

10 Q.  As you drove down the street, you're looking into gangways

11 or other -- the officers are also looking around to make sure

12 no one is watching, true?

13 A.  True.

14        MR. HYMAN:  Okay.  You can let it play.

15     (Said video recording played in open court.)

16 BY MR. HYMAN:

17 Q.  Do you see the back taillights?

18 A.  Yes, sir.

19 Q.  So that's where, the point that you had left them off,

20 true?

21 A.  True.

22 Q.  Okay.  And then you make your turn and literally within

23 seconds, you hear shots?

24 A.  Yes, sir.

25 Q.  When you heard those shots, Mr. O'Neill, did you know

1  where they were coming from?

2  A.  Not the exact location, but I could narrow it down to a

3  certain area.

4  Q.  I'm sorry?

5  A.  I could narrow it down to a direction.

6  Q.  You could not narrow it down?

7  A.  I could, sir.

8  Q.  Oh, you did.  Okay.  So where did you think those shots

9  were coming from?

10 A.  From the northeast behind me.

11 Q.  You immediately pulled back?

12 A.  Yes.

13 Q.  And when you pulled back, there was a reason for you to

14 pull back, true?

15 A.  True.

16 Q.  And that was to find out what happened, right, because you

17 heard shots were fired?

18 A.  Yes.  The officers that I dropped off were in that area.

19 Q.  Did you think that those shots were fired -- were from

20 somebody else?

21        MR. EICHENSEER:  Objection to the opinion question.

22        THE COURT:  I'll overrule it.  He can answer.

23        THE WITNESS:  Could you repeat the question, sir?

24 BY MR. HYMAN:

25 Q.  Sure.  Did you think those shots that were fired were

1  fired from someplace -- for somebody else, or were they aimed

2  at the officers?

3  A.  At the time, I wasn't sure who they were -- who they were

4  coming from.

5  Q.  You know where they were coming from, you didn't know who

6  they were -- who the shots were fired at, true?

7  A.  True.

8  Q.  And certainly, in the neighborhoods that you are there to

9  put these trackers on and for which you are investigating,

10  there's shots fired all the time, correct?

11  A.  Yes, you could say that.

12  Q.  All -- day and night, right?

13  A.  I don't work the area that regularly, but I could assume

14  so, yes.

15  Q.  All right.  In fact, in the areas that you have worked or

16  the places that you've been, you could probably find shotgun

17  shells -- shotgun casings all over the place, true:  Fields,

18  sidewalks, alleyways?

19  A.  If I looked hard enough, yes.

20  Q.  I'm sorry?

21  A.  If I look hard enough, yes.

22  Q.  All right.  When you pulled back, you pulled forward.  And

23  then did you see where Spratte and Winter were when you turned

24  around as we saw in the video and you were facing northbound

25  on Hermitage?

1   A.  I could see the officers in my rearview mirror before I

2   made the turn.

3   Q.  Did you see the muzzle flashes of Officer Spratte's gun?

4   A.  No, I did not.

5   Q.  Did you know at the time that he had fired his weapon?

6   A.  No, I did not.

7   Q.  When you pulled back and you were now facing northbound on

8   Hermitage --

9          MR. HYMAN:  Your Honor, the video that was just

10  previously shown that the officer identified as his car is

11  actually our Video 2, and we'd ask that it be admitted.

12         THE COURT:  Any objection?

13         MS. BABU:  Your Honor, I'm sorry.

14         MR. HYMAN:  Video 2.

15         MS. BABU:  This is new.

16         MR. HYMAN:  Yes, that we just saw.

17         THE COURT:  Without objection --

18         MS. BABU:  No objection, your Honor.

19         THE COURT:  -- it's admitted.  All right.

20     (Defendant's Exhibit Video 2 received in evidence.)

21  BY MR. HYMAN:

22  Q.  I want to talk to you, Agent O'Neill -- or Officer

23  O'Neill, about what you're going to see, what we are going to

24  see.  That's you in the white circle, correct, as you earlier

25  identified, true?

1   A.   That's correct.

2   Q.   And you go around the block.  As you were driving down the

3   block, were you looking back or just looking straight ahead?

4   A.   I could maintain visual.

5        (Said video recording played in open court.)

6   Q.   Now, did you hear whoever that was in the video said,

7   "Where is he at?  He's right there."  And then it's cut off.

8   Did you hear that yourself when you were sitting in the car?

9   A.   No, sir.

10  Q.   Okay.  As part of these teams, because you are a Chicago

11  police officer, are the people who monitor these cameras also

12  notified that you're going to be out there?

13  A.   I don't believe we notified the people in charge of the

14  cameras, no.

15  Q.   Those are just cameras that are running 24/7?

16  A.   Yes.

17  Q.   And there's somebody sitting there monitoring this?

18  A.   I don't know if they're watching every camera, but I know

19  there's someone in the building, yes.

20  Q.   Okay.  Did you watch the full video before you came in

21  today?

22  A.   I've seen it in the past, yes.

23          MR. HYMAN:  Okay.  Can you keep it going?

24       (Said video recording played in open court.)

25  BY MR. HYMAN:

1  Q.  Now, at that point, you're looking north on Hermitage,

2  true?

3  A.  Yes.

4  Q.  Could you see where Officers Spratte and Winter went when

5  you were looking down the street?

6  A.  They ran across my path towards where Kevin, Agent Crump

7  was on the ground.

8  Q.  Okay.  But before they do that, when you were looking --

9  and in that map as you're looking northbound down Hermitage,

10  could you see where they went when your lights are directed

11  down the street?

12  A.  Could you replay the video, sir?

13  Q.  I'm sorry?

14  A.  Can you rewind the video?

15     (Said video recording played in open court.)

16  Q.  "He's right" -- we don't know.  Did he tell you where --

17  did either of those officers tell you where the person was who

18  was right there?

19        MR. EICHENSEER:  He's asking the witness about

20  something the witness said he didn't hear in person at the

21  time, he's just hearing on the video.

22        MR. HYMAN:  I'm asking -- I'll rephrase the question.

23  I withdraw it, and I'll rephrase the question.

24  BY MR. HYMAN:

25  Q.  When you heard those shots and you backed your car up, did

1  you have your window down?

2  A.  My driver's side window was down, yes.

3  Q.  Okay.  Did you hear either Mr. Spratte or Winter say,

4  "He's right there"?

5  A.  No, sir.

6  Q.  When you pulled your car back so it is now facing

7  northbound on Hermitage, did you see in what direction, where

8  Mr. Spratte and Mr. Winter were?

9  A.  Yes.

10  Q.  Were they on the west side of Hermitage or on the east

11  side of Hermitage?

12  A.  East side, sir.

13  Q.  All right.  Did they point out or did they shout where

14  specifically those shots were fired from?

15  A.  I don't recall, sir.

16  Q.  Well, did you -- before you came here, did you read

17  anything to -- in preparation of your testimony?

18  A.  Yes, sir.

19  Q.  All right.  In your preparation, did you see anything that

20  would help you refresh or remember better about whether or not

21  they told you where he was -- where the shots were fired from?

22  A.  I don't remember reading that, sir, no.

23  Q.  It wasn't in there, right?  It wasn't discussed, true?

24  A.  I don't believe so, no.

25        MR. HYMAN:  Okay.  Can we keep rolling the video?

1      (Said video recording played in open court.)

2    BY MR. HYMAN:

3    Q.  You go around the circle, and then you're right there.

4    That's you, true?

5    A.  Driving, yes.

6    Q.  And who is coming -- who had come up to you at that point?

7    A.  Officer Spratte.

8    Q.  And what did he tell you?

9    A.  That's when he informed me that Officer -- Agent Crump had

10   been shot.

11   Q.  Okay.  And did you then get out of your car at that point

12   and start looking for an offender?

13   A.  Yes, sir.

14   Q.  What description did you have?

15   A.  At that time, I had no description.

16   Q.  So you were just looking for some -- was it a male?

17   A.  I had no description, sir.

18   Q.  No.  White, was he wearing white, was he wearing black,

19   anything?

20   A.  No description.

21   Q.  You just were looking for somebody that may be standing

22   around with a gun?

23          MR. EICHENSEER:  Objection.  Asked and answered.

24          THE COURT:  Yes, I think we've been through this.

25          MR. HYMAN:  Okay.  I'll withdraw it.

1  BY MR. HYMAN:

2  Q.  You had no idea who this individual was, true?

3  A.  True.

4  Q.  Did Spratte tell you what he saw?

5  A.  No, sir.

6  Q.  Did you ask Spratte, "What did you see?"

7  A.  No, sir.

8  Q.  Did you know that Spratte had fired two shots?

9  A.  No, sir.

10 Q.  Did you have any idea based upon the sound of the shots or

11 the recordings that you heard where those -- other than it was

12 in the general area, where specifically the shots were fired

13 from?

14 A.  Not until I exited my vehicle and walked.

15 Q.  Did you see when you walked, by the way, that the fence,

16 there's a fence on a house right here on this corner, the

17 fence on the house had a bullet in it?

18 A.  I don't remember seeing that at that time, sir.

19 Q.  Did you see whether or not there was a bullet hole in the

20 side of a house at 4344 South Hermitage?

21 A.  I never made it down that far that night.

22 Q.  Did anybody that you know go over to Wood Street?

23 A.  I can't speak for those officers.

24 Q.  Did you see any officers going down the alley between

25 Hermitage and Wood Street?

1  A.  I don't recall.

2  Q.  Is there anything that would help you remember better, any

3  document that you need to review?

4  A.  If you have one, I could look at it, but I can't...

5  Q.  Well, other than your own statement, anything that you

6  would -- that you think of that could tell you whether or not

7  anybody went down Wood Street?

8  A.  No, sir.

9         MR. HYMAN:  Judge, may I have just a moment?

10      (Pause.)

11         MR. HYMAN:  Your Honor, I have no further questions.

12         THE COURT:  Anything further?  If not --

13         MR. EICHENSEER:  Nothing from the government, your

14  Honor.

15         THE COURT:  You're excused.

16      (Witness excused.)

17         THE COURT:  Call the next witness.

18         MR. EICHENSEER:  Your Honor, the government calls

19  Thomas Spratte.

20         THE COURT:  Please raise your right hand.

21      (Witness sworn.)

22         THE WITNESS:  Yes, sir.

23         THE COURT:  Please be seated.

24         You may question the witness.

25         MR. EICHENSEER:  Thank you, your Honor.

1    THOMAS SPRATTE, GOVERNMENT'S WITNESS, SWORN

2                    DIRECT EXAMINATION

3    BY MR. EICHENSEER:

4    Q.   Good morning, sir.  Could you please state and spell your

5    name for the record?

6    A.   Hi.  My name is Thomas Spratte.  T-h-o-m-a-s, last name is

7    Spratte, S-p-r-a-t-t-e.

8    Q.   And where do you work, Mr. Spratte?

9    A.   I'm currently employed by the Chicago Police Department.

10   Q.   And how long have you been with the police department?

11   A.   It will be seven years in August.

12   Q.   Okay.  And what's your current position with the CPD?

13   A.   I'm a task force officer with ATF.

14   Q.   Okay.  How long have you been assigned as a task force

15   officer with ATF?

16   A.   It will be two years in July.

17   Q.   And before you joined the task force with ATF, what did

18   you do at the Chicago Police Department?

19   A.   I was working out of the tactical office in the 7th

20   District, Englewood community.

21   Q.   You were a tactical officer?

22   A.   Yes, sir.

23   Q.   How long were you a tactical officer in Englewood?

24   A.   Approximately three, four years.

25   Q.   And what did you do before joining the Chicago Police

1   Department?

2   A.   I was a part-time police officer in the city of Blue

3   Island.

4   Q.   So overall, about how many years of law enforcement

5   experience do you have?

6   A.   Roughly around eight years, sir.

7   Q.   Officer Spratte, I'm going to direct your attention to May

8   4th of last year.  Were you on duty that morning?

9   A.   Yes, sir.

10  Q.   What was your assignment?

11  A.   I was assigned to replace GPS trackers on vehicles.

12  Q.   Okay.  And the cars that you were going to put the

13  trackers on, did you know where they were at the time?

14  A.   Yes, sir.

15  Q.   And where were those cars?

16  A.   Located in the 4400 block of South Hermitage.

17  Q.   Can you show the jurors on the map where that block is?

18  A.   Yes, sir.  Right down here.

19  Q.   Did you plan to replace the tracker by yourself?

20  A.   No, sir.

21  Q.   Were you part of a team?

22  A.   Yes, sir.

23  Q.   Who else was on the team with you that day?

24  A.   Task Force Officer Kevin O'Neill, Special Agent Daniel

25  Winter, and Special Agent Kevin Crump.

1    Q.   There were four of you altogether?

2    A.   Yes, sir.

3    Q.   And what were each of your roles?

4    A.   Task Force Officer Kevin O'Neill was going to drive us,

5    drop us off, and then pick us up.  Myself, I was going to

6    replace one of the trackers, the first tracker.  Special Agent

7    Crump had a tracker he would replace, and then Special Agent

8    Winter was our communication in charge of us.

9    Q.   So a four-member team, right?

10   A.   Yes, sir.

11   Q.   Did you and the team meet that morning to go over the

12   plan?

13   A.   Yes, sir.

14   Q.   Where did you meet?

15   A.   The 9th Chicago police district.

16   Q.   At what time did you leave the 9th District?

17   A.   Approximately around 3:00 a.m.

18   Q.   And what were you driving?

19   A.   I believe it was a Nissan Altima.

20   Q.   And just to be clear, were you driving?

21   A.   No, sir.

22   Q.   Who was driving that car?

23   A.   Task Force Officer Kevin O'Neill.

24   Q.   Okay.  And the car you were driving, any police markings

25   at all?

1 A. No, sir.

2 Q. What were you wearing?

3 A. I had on gym shoes, my blue pants, and a blue zip-up hoody

4 and my bulletproof vest.

5 Q. Okay.  Was your bulletproof vest over or under your hoody?

6 A. It was under my hoody.

7 Q. Did you have any visible police markings on your clothing?

8 A. No, sir.

9 Q. Did any of the other three team members in your car have

10 any visible police markings?

11 A. I don't believe so.

12 Q. Were you armed that morning?

13 A. Yes, sir.

14 Q. Armed with what?

15 A. My Glock 17 handgun.

16 Q. Is that your service weapon?

17 A. Yes, sir.

18 Q. Were you in contact with other team members that day?

19 A. Yes, sir.

20 Q. How were you in contact with them?

21 A. Via ATF radio.

22 Q. Okay.  So when you left the Chicago police district, 9th,

23 the 9th District station, rather, where did you go from there?

24 A. We traveled to the area of 43 and Ashland.

25 Q. Okay.  And what did you do there?

1   A.   We pulled over to the side to wait for communications with

2   our surveillance team that all was clear.

3   Q.   Okay.  And who was on the surveillance team?

4   A.   Detective Schoenecker, Daquilante, Officer Murphy, Trooper

5   Nowak.

6   Q.   So were you waiting for an all-clear from Detective

7   Schoenecker?

8   A.   Yes, sir.

9   Q.   And did you, in fact, get that all-clear?

10  A.   Yes, sir.

11  Q.   Okay.  And what did you do next?

12  A.   We continued westbound down 43rd Street.

13  Q.   And where did you go after you went westbound down 43rd?

14  A.   We made a southbound turn on to Hermitage.

15  Q.   Okay.  Why did you go south on Hermitage?

16  A.   Because we were going to be let out of the vehicle about a

17  block short of our targeted location, and we were going to

18  approach on foot.

19  Q.   Okay.  And as you turned left on to Hermitage from 43rd,

20  did you see anybody on either 43rd or Hermitage?

21  A.   No, sir.

22  Q.   So you didn't see anybody on the 4300 block of Hermitage,

23  correct?

24  A.   No, sir.

25  Q.   Were you looking for anyone?

1  A.  Yes, sir.

2  Q.  Why was that?

3  A.  It's a covert operation.  We don't want to be seen.  We're

4  trying to replace trackers unknowingly.

5  Q.  Okay.  And so you said that Officer O'Neill pulled the car

6  over at some point?

7  A.  Yes, sir.

8  Q.  Can you show the jury about where Officer O'Neill pulled

9  over?

10  A.  Yes, sir.  Approximately this area right down here.

11  Q.  Okay.  Is that about a block north of where the cars with

12  the trackers actually were?

13  A.  Yes, sir.

14  Q.  And why did you get dropped off that far away from the

15  cars?

16  A.  So we could approach on foot and hopefully not draw

17  attention to ourselves.

18  Q.  Okay.  Does driving up to a car with a tracker draw more

19  attention than approaching on foot?

20  A.  Yes, sir.

21  Q.  So what happened after Officer O'Neill pulled the car

22  over?

23  A.  Myself, Special Agent Winter, and Special Agent Kevin

24  Crump exited the vehicle.

25  Q.  Okay.  Where did you go when you left the car?

1   A.  I started walking southbound on the east side of the

2   intersection.

3   Q.  What about Agent Crump?  Where did he go?

4   A.  He was -- he was walking southbound through the

5   intersection on the west side.

6   Q.  Okay.  So you and Agent Crump were on opposite sides of

7   the street?

8   A.  Yes, sir.

9   Q.  Where did Agent Winter go?

10  A.  Agent Winter was on the southeast side as well.

11          MR. EICHENSEER:  At this time, your Honor, I'd like

12  to publish Government Exhibit 100 which is already in

13  evidence.

14          THE COURT:  Okay.  You can.

15          MR. EICHENSEER:  At this point, we'll play the

16  exhibit.  The timestamp is 3:18:08.

17     (Said video recording played in open court.)

18  BY MR. EICHENSEER:

19  Q.  Do you recognize that footage, Officer Spratte?

20  A.  Yes, sir.

21  Q.  Do you see yourself in the footage?

22  A.  Yes, sir.

23  Q.  Can you kind of circle on the screen in front of you where

24  you are?

25          And you said you're wearing a hooded sweatshirt,

1  right?

2  A.  Yes, sir.

3  Q.  Is your hood up there?

4  A.  Yes, sir.

5  Q.  Okay.  And can you show the jury where Agent Crump was?

6      And what was Kevin -- what was Agent Crump wearing?

7  A.  Dark clothing and a, it looks like a hooded sweatshirt.

8  Q.  Was his hood up as well?

9  A.  Yes, sir.

10 Q.  Okay.  What happened next?

11 A.  I heard multiple gunshots from behind me.

12 Q.  About how many shots did you hear?

13 A.  Originally, I thought I heard closer of five to ten.  I'm

14 not sure if it was echoing or...

15 Q.  And where were you when you heard the shots?

16 A.  In the area where I've circled on the -- by the traffic

17 circle in the intersection.

18 Q.  Okay.  So this frame right here that we're looking at on

19 the screen, is this about the time when you first heard the

20 shots?

21 A.  Yes, sir.

22 Q.  Could you tell, Officer Spratte, where the shots were

23 coming from?

24 A.  Yes.  I knew they were coming from behind me, like north

25 and west.

1  Q.  Okay.  What did you do when you heard the shots behind

2  you?

3  A.  I immediately started to move towards cover, like run

4  south and east, and looked over my shoulder and observed

5  multiple muzzle flashes.

6  Q.  So you headed east first, is that -- so that would be off

7  screen here on the clip we're looking at?

8  A.  Yes, sir.

9  Q.  What were you trying to take cover behind?

10 A.  Parked vehicle.

11 Q.  Okay.  Were there several vehicles lined up on the south

12 side of 44th Street there?

13 A.  Yes, sir.

14 Q.  Which vehicle did you take cover behind?

15 A.  The first one.

16 Q.  The first one toward the intersection?

17 A.  Yes, sir.

18 Q.  Okay.  And did you turn around at all?

19 A.  Yes, sir.

20 Q.  What did you see?

21 A.  That's when I observed the muzzle flashes.

22 Q.  And when you say "muzzle flashes," you mean the muzzle of

23 a gun?

24 A.  Yes, sir.

25 Q.  Where did you see those muzzle flashes?

1 A.  Approximately halfway down the block on the northwest

2 side.

3 Q.  Halfway down which block?

4 A.  43rd and Hermitage.

5 Q.  And did you see them on a particular side of the 4300

6 block of Hermitage?

7 A.  Yes, sir.  The west side up by the sidewalk.

8 Q.  And you saw them about halfway up that block?

9 A.  Yes, sir.

10 Q.  So could you please show the jurors the approximate area

11 where you saw the muzzle flashes?

12 A.  Approximately this location.

13 Q.  And could you tell what part of the street the muzzle

14 flashes were on?

15 A.  The west side.

16 Q.  The west side.  Were they on -- could you tell if they

17 were on the street or the sidewalk?

18 A.  Up on the sidewalk.

19 Q.  How many muzzle flashes did you see?

20 A.  Approximately two.

21 Q.  Did you see anyone near those muzzle flashes?

22 A.  At some point, I saw an individual with a white shirt down

23 the block.

24 Q.  But you're -- are you not sure exactly when you saw that

25 person?

1  A.  No, sir.

2  Q.  Did you do anything when you saw those muzzle flashes?

3  A.  Yes, sir.

4  Q.  What did you do?

5  A.  I immediately returned fire to suppress the threat to try

6  to save my life and the life of the agents I was with.

7  Q.  How many times did you fire?

8  A.  Two times, sir.

9  Q.  How long between the shots?

10  A.  I'm sorry?

11  Q.  How long between your two shots?

12  A.  Instantly.

13  Q.  Pretty quickly, right?

14  A.  Yes, sir.

15  Q.  So about where were you when you fired those shots?

16  A.  I was in the southeast side of the intersection of 44th

17  and Hermitage.

18  Q.  And when you fired your weapon, did you see anybody in the

19  area of the muzzle flashes?

20  A.  Just the muzzle flashes.

21  Q.  And were you firing at the muzzle flashes or at a person?

22  A.  I was firing at the muzzle flashes.

23  Q.  After you returned your two shots, did you hear any

24  more -- did you hear any more gunshots after that?

25  A.  No, sir.

1  Q.  I know I just asked you a long series of questions, but

2  how much time passed between when you first heard gunshots and

3  when you returned those two shots?

4  A.  Just a few seconds.

5  Q.  Did you yell anything or say anything during the shooting?

6  A.  Yes, sir.

7  Q.  What did you say?

8  A.  I yelled out, "Shots fired."

9  Q.  Why did you yell that out?

10  A.  To notify the agents I was with that we were being fired

11  upon.

12  Q.  Did anybody else yell anything?

13  A.  You know, I heard Special Agent Crump yell out.  I don't

14  know what was said.  I could never make it out.  And Special

15  Agent Winter was asking where it was coming from.

16  Q.  And where what was coming from?

17  A.  The muzzle flashes.

18  Q.  And what -- did you respond at all?

19  A.  "Right there, over there."

20  Q.  And did you gesture at all as you responded?

21  A.  Yes, sir.

22  Q.  And where did you gesture?

23  A.  I pointed towards about midway down the block, 43rd and

24  Hermitage.

25  Q.  And what did you do after gesturing toward the 4300 block

1  of Hermitage?

2  A.  Myself and Special Agent Winter started to move towards

3  the threat to see if we could find an offender.

4  Q.  So did you -- did you and Winter move north on Hermitage?

5  A.  Yes, sir.

6  Q.  How far did you go on Hermitage?

7  A.  Not very far.

8  Q.  Can you show the jury about how far you got?

9  A.  Yes, sir.  Probably right around this area here.

10 Q.  And at that point, did you see anybody within the area of

11 the muzzle flashes?

12 A.  Not in the area of the muzzle flash, no, sir.

13 Q.  And did you keep going up Hermitage?

14 A.  No, sir.

15 Q.  Why not?

16 A.  It's when myself and Special Agent Winter realized that

17 Special Agent Crump had been wounded.

18 Q.  And so what did you do after that?

19 A.  Myself and Special Agent Winter immediately returned to

20 the area where we last saw Special Agent Crump.

21 Q.  Okay.  Did you find Agent Crump?

22 A.  Yes, sir.

23 Q.  Where was he?

24 A.  He was laying on the ground on the parkway between a

25 vehicle and the sidewalk.

1  Q.  Can you show the jurors about where Agent Crump was

2  located?

3  A.  Yes, sir.  Right in this area right here.

4  Q.  What condition was Agent Crump in?

5  A.  Very critical.

6  Q.  Okay.  Was he wounded?

7  A.  Yes, sir.

8  Q.  Could you see where he was wounded?

9  A.  Yes, sir.

10  Q.  Where was he wounded?

11  A.  He was holding his neck and his face.

12  Q.  Was he bleeding?

13  A.  Yes, sir.

14  Q.  What did you do then?

15  A.  I immediately went to try to get us help.  We didn't have

16  a radio, so I ran to the first vehicle I saw that was ours.

17  Q.  And whose vehicle was that?

18  A.  That was Task Force Officer Kevin O'Neill's.

19  Q.  What did you do when you ran to Officer O'Neill's vehicle?

20  A.  I was yelling at him to call a 10-1, Kevin Crump has been

21  shot.

22  Q.  What's a 10-1?

23  A.  10-1 is something we use in the Chicago Police Department

24  over the radio which means, "Everybody come.  Please help.  We

25  need your help."

1   Q. And after asking Officer O'Neill to radio in a 10-1, what

2   did you do?

3   A. I immediately saw one of our other vehicles approaching

4   with flashing -- emergency equipment lights, so I put my arms

5   up to flag it down to let them know what area we were at.

6   Q. Okay. What happened after that?

7   A. They -- the teams stayed with Special Agent Crump, and

8   they started, you know, to look after him as I'm still looking

9   down the block. I'm not sure if the threat is coming at us.

10   And they load him into the vehicle.

11   Q. So did you help load Agent Crump into the vehicle?

12   A. I was part -- I was there, yes.

13   Q. And after Agent Crump is loaded into the car, what

14   happened next?

15   A. I was looking down the street again looking for a threat.

16   I saw another vehicle traveling westbound on 44th Street, at

17   which time I was yelling at it to stop.

18   Q. Okay. So then did you move back north toward the

19   intersection of 44th and Hermitage after helping with Agent

20   Crump?

21   A. Yes, sir.

22   Q. And you said that a vehicle was on 44th Street. What was

23   that car doing?

24   A. I'm sorry, sir?

25   Q. You said there was a car that you saw on 44th Street. I'm

1  sorry.  What was that car doing?

2  A.  It was just traveling westbound.

3  Q.  Okay.  And then what did you do after running past that

4  car or walking past that car?

5  A.  I believe we just pushed the car back and was in the

6  intersection area looking, went a little bit further up

7  Hermitage.

8  Q.  And how far did you make it up Hermitage?

9  A.  Not far, sir.

10  Q.  Okay.  As you were going up Hermitage, did you see anybody

11  out on that block of the 4300 block of Hermitage?

12  A.  Yes, sir.

13  Q.  What did you see?

14  A.  I saw an individual in a white shirt.  I saw people coming

15  out of their houses now, too.

16  Q.  Okay.  So you saw an individual in a white shirt after

17  Agent Crump had been loaded into the car?

18  A.  I -- yes, sir.

19  Q.  And did you continue looking for the shooter at that

20  point?

21  A.  Not for very long.

22  Q.  Why not?

23  A.  I was -- a CPD supervisor, she said, you know, I had to

24  come talk to them.  I was out -- and wanted me to go in a

25  ambulance to the hospital.

1    Q.   So Officer Spratte, how were you feeling at that moment?

2    A.   Very nervous, scared for -- I don't know what's going on

3    with my friend and teammate.  I'm very -- my blood is -- I'm

4    very emotional.  My blood is pumping.

5         MR. HYMAN:  Your Honor, I'm going to object as to

6    relevance as to this officer.

7         THE COURT:  Well, I'll let it stand, but let's move

8    on.

9    BY MR. EICHENSEER:

10   Q.   After you sat down, did you stay on the scene?

11   A.   Just for a little bit.

12   Q.   Okay.  So did you -- how long after that did you leave the

13   scene?

14   A.   I'm not sure approximately.  I left with the ambulance.

15   Q.   So were you taken away in the ambulance?

16   A.   Yes, sir.

17   Q.   Where did you go from there?

18   A.   Stroger Hospital.

19   Q.   And did you return to the scene at all that morning?

20   A.   Yes, sir.

21   Q.   About what time?

22   A.   A couple hours later.

23   Q.   Okay.  Was it light out at that point?

24   A.   It was starting to get light out, yes, sir.

25   Q.   Okay.  Had you slept at all the night before?

1   A.  No, sir.

2   Q.  Were you interviewed at the scene when you returned after

3   that hospital?

4   A.  Yes, sir.

5   Q.  Who interviewed you?

6   A.  Detective Evans.

7   Q.  And did the detective ask you about what happened that

8   morning?

9   A.  Yes, sir.

10  Q.  And did you tell him?

11  A.  Yes, sir.

12  Q.  What did you tell Detective Evans?

13          MR. PISSETZKY:  Objection, Judge.  It's hearsay.

14          MR. EICHENSEER:  Your other witness is on the stand.

15          MR. PISSETZKY:  He hasn't been impeached.  He's

16  trying to prevent him from being impeached.

17          THE COURT:  Well, I'm not sure --

18          MR. PISSETZKY:  What's the purpose of this?

19          THE COURT:  If it's for the truth, it would be

20  hearsay.  If it's not, for some other reason -- why don't you

21  just move on.

22  BY MR. EICHENSEER:

23  Q.  Okay.  So but you were interviewed by a detective,

24  correct?

25  A.  Yes, sir.

1          MR. EICHENSEER:  At this point, your Honor, I'd like

2    to publish Government Exhibit 100 which is already in

3    evidence.

4          THE COURT:  All right.

5       (Said video recording played in open court.)

6    BY MR. EICHENSEER:

7    Q.  Officer Spratte, on this clip, did you just run out of the

8    scene there on the left-hand side?

9    A.  Yes, sir.

10   Q.  And what did you do after -- can you show the jury

11   approximately where you took cover when you ran out of the

12   screen there?

13   A.  On the screen?

14   Q.  Uh-huh.

15   A.  It would be just off the screen, the top left.

16         MR. EICHENSEER:  At this point, your Honor, I'd like

17   to publish Exhibit 201 which is already in evidence.

18         THE COURT:  Go ahead.

19      (Said audio recording played in open court.)

20   BY MR. EICHENSEER:

21   Q.  Do you recognize your voice on that clip, Officer Spratte?

22   A.  Yes, sir.

23   Q.  What are you yelling on that clip?

24   A.  "Shots fired."

25   Q.  Do you hear somebody else yelling something about, "Right

1  there"?

2  A.  Yes, sir.

3  Q.  Who is that?

4  A.  That's also me.

5  Q.  And you hear somebody saying kind of, "Where is it at" or

6  something like that?

7  A.  Yes, sir.

8  Q.  And who is that?

9  A.  Special Agent Winter.

10        MR. EICHENSEER:  Your Honor, no further questions.

11        THE COURT:  Cross-examine -- why don't we take a

12  15-minute recess before we have the cross.

13     (Recess from 11:32 a.m. to 11:50 a.m.)

14        THE COURT:  Please be seated.

15        You may cross-examine the witness.

16        MR. HYMAN:  Thank you.  May it please the Court.

17                    CROSS-EXAMINATION

18  BY MR. HYMAN:

19  Q.  Mr. Spratte, good morning.

20  A.  Good morning, sir.

21  Q.  Mr. Spratte, was this the first time you ever fired your

22  weapon on the street?

23  A.  Yes, sir.

24  Q.  And before you fired that weapon, you made sure that you

25  were -- you saw something or someone that you were going to

1   shoot at, true?

2   A.   I saw muzzle flashes.

3   Q.   So you saw something, which was a muzzle flash, right?

4   A.   Yes, sir.

5   Q.   Okay.  When you started as a Chicago police officer, you

6   went through a whole training -- I'm going to -- let's talk

7   about that first.  I'll give you a heading, and we'll talk

8   about it, and we'll go on to the next.

9        When you were trained, you went through the Chicago

10  police academy, true?

11  A.   Yes, sir.

12  Q.   And then as you went through the academy, one of the

13  things that they teach you is the use of and instruction in

14  the use of a firearm, your firearm, right?

15  A.   Yes, sir.

16  Q.   And you had fired a weapon before you became a policeman?

17  A.   Yes, sir.

18  Q.   All right.  And one of the things that they teach you at

19  the academy is that you can return fire to protect yourself or

20  someone else, in defense of someone else if you see where that

21  fire is coming from, that's flashes or the person that you see

22  firing at you, true?

23  A.   Yes, sir.

24  Q.   So before you got out on the street that morning, early in

25  the morning, you had that training, right?

1   A.  Yes, sir.

2   Q.  You would agree with me, would you not, Mr. Spratte, that

3   being a police officer, being involved with investigations, to

4   do that is more than just getting up in the morning and

5   strapping on a gun, right?

6   A.  Yes, sir.

7   Q.  And as you told the members of the jury, there was this

8   team that you were part of, and that was not the first time

9   that you were part of a team like that, true?

10  A.  Yes, sir.

11  Q.  Now, it's -- you do not plan that -- those operations, do

12  you?

13  A.  No, sir.

14  Q.  Those are -- already someone else has that plan in place,

15  and you're just there to effectuate it, to make sure it gets

16  done, true?

17  A.  Yes, sir, part of a team.

18  Q.  And that was what you were supposed to do that day?

19  A.  Yes, sir.

20  Q.  All right.  The other thing that -- in terms of your

21  training and what you need to do when you walk out of your

22  home in the morning is that your training teaches you that you

23  make sure that before you fire at someone that you're just not

24  firing at will, that you have a specific target to fire at,

25  true?

1   A.   Yes, sir.

2   Q.   So I want to leave that subject and talk to you now about

3   the early morning hours of May 4th.  We have all seen the

4   video.  You've seen the video before you came in to court,

5   right?

6   A.   Yes, sir.

7   Q.   You've seen it multiple times, right?

8   A.   I've seen the video, yes, sir.

9   Q.   And as the group that's walking out of that car, you and

10  Mr. Winter on one side of the street and Mr. Crump is on the

11  other, right?

12  A.   Yes, sir.

13  Q.   So as you're walking, we heard the shots, and you turn to

14  run, correct, or you turn to -- bless you, your Honor.

15          You duck and you turn to cover, to get cover, right?

16  A.   I've looked over.  I've turned -- as I'm running, I'm

17  turning looking back at, I hear where the shots are coming

18  from.

19  Q.   So the shots are coming from behind you, right?  They're

20  coming from the north of -- on Hermitage?

21  A.   Yes, sir.

22  Q.   Where they are at that point, you don't know, true?

23  A.   Well, I observed the muzzle flashes.

24  Q.   Before you see the muzzle flash, you hear a recording,

25  correct?

1   A.  Yes, sir.

2   Q.  You hear several shots, right?  You hear -- you hear the

3   four shots or you hear two shots certainly, and you turn and

4   you see a muzzle flash.  You see the muzzle flash, right?

5   A.  Yes, sir.

6   Q.  Now, you've heard those -- the shots that were recorded,

7   you heard those, right?

8   A.  Yes, sir.

9   Q.  All right.  There are four shots, and then there's a fifth

10  shot, right?  There's like a pause, am I right?  Do you want

11  to hear it again?

12  A.  Sure.  I'm not -- yes, sir, I'd like to hear it again.

13          MR. HYMAN:  Okay.  Can we --

14      (Said video recording played in open court.)

15  BY MR. HYMAN:

16  Q.  There was the car that you were in, right?

17  A.  Yes, sir.

18  Q.  That's you and Mr. -- that's Mr. Crump on the right.

19          Okay.  When you heard -- you heard four shots and

20  then a pause and then a fifth shot, right?

21  A.  Sir, I heard multiple gunshots.

22          MR. HYMAN:  All right.  Let's play that again.

23      (Said video recording played in open court.)

24  BY MR. HYMAN:

25  Q.  So did you hear four shots and then the fifth shot?

1    A.   Yes, sir.

2    Q.   Okay.  And then we heard two recordings of two shots.

3    Those were yours, right?

4    A.   I believe so, yes, sir.

5    Q.   Well, did anyone else besides you fire their weapon?

6    A.   No, sir.

7    Q.   All right.  When you say you saw the muzzle flashes, did

8    you see the muzzle flashes in the last shot or any of the four

9    shots?

10   A.   I'm not sure, sir.  I saw multiple muzzle flashes.

11   Q.   You saw two, right?

12   A.   That's multiple, yes, sir.

13   Q.   Okay.  Well, it's more than one.  I agree.  So you see two

14   shots.  Did you see the muzzle flash in the last of the four

15   shots, in the fifth shot, or any of the four shots only?

16   A.   I just saw the two, so I'm assuming they'd be the last

17   two, sir.

18   Q.   You're assuming, but you don't know?

19   A.   No.

20   Q.   You don't know when you saw those shots?  Of the shots

21   that were fired, you're not -- you don't know today which of

22   those five you saw, true?

23   A.   No, sir.

24   Q.   So that's true, correct?

25   A.   True.  I'm sorry.  Yes.

1   Q.  Okay.

2   A.  I'm sorry.

3   Q.  Now, you told the members of the jury that after your

4   shots that you fired -- after you returned fire, you and

5   Officer -- or Winter, Mr. Winter, ran towards the direction

6   that the shots were being fired from, right?

7   A.  Yes, sir.

8   Q.  But you didn't go on the west side of the street, you went

9   to the east side of the street --

10   A.  Yes, sir.

11   Q.  -- correct?  Okay.

12        Before you began to run, before you began running

13   towards where you heard the -- where you saw those muzzle

14   flashes, you were behind a car, right?

15   A.  I was running for that car.  I don't recall if I made it

16   to that car.

17   Q.  And then you turned and you -- but you were certainly --

18   you didn't stand in the middle of that intersection and fire

19   your weapon, did you?

20   A.  No, sir.

21   Q.  You went behind, you went to a place of safety so you

22   could fire the shots at the person who was firing at you,

23   true?

24   A.  I was firing shots to protect my life.

25   Q.  I understand that, and that's -- that's what you were

1   trained to do.

2   A.  Yes, sir.

3   Q.  But you were also trained to fire only in the direction

4   where those shots were coming from, true?

5   A.  Yes, sir.

6   Q.  Okay.  So when you did that, you fired those -- your

7   weapon from a place not standing out in the open but behind

8   some form of coverage, true?

9   A.  I -- I don't know if that's true or not, sir.

10  Q.  Were you behind a car?

11  A.  I don't know where I was when I fired, sir.  I was making

12  my way up towards the car.

13  Q.  So you had no idea -- you ran behind some protection,

14  right?

15  A.  Sir, I was making my way towards anything I could find.

16  Q.  And when you went to anything you could find, that was a

17  car, right, on 44th Street?

18  A.  Yes, sir.

19  Q.  All right.  And behind that car, you fired your weapon?

20  A.  I don't know if I fired it behind the car, sir.

21  Q.  But certainly --

22          MR. EICHENSEER:  Objection.  Asked and answered.

23          THE COURT:  Yes.  Objection sustained.

24          MR. HYMAN:  All right.

25          THE COURT:  He's told you he doesn't know, so...

1    MR. HYMAN:  You were -- we can put up Godinez

2  Exhibit -- or Godinez Picture 1.

3  BY MR. HYMAN:

4  Q.  Mr. Spratte, is this approximately where you were when you

5  returned fire?

6  A.  I don't believe so, no.

7  Q.  All right.  Where were you within this picture when you

8  returned fire?

9  A.  I believe I would be to the left off -- can I draw on

10  this, sir?

11  Q.  Yes, of course.

12  A.  I believe I'd be, like, this way.

13  Q.  Closer to the intersection?

14  A.  I believe so, yes.

15  Q.  But you're not sure?

16  A.  I'm not sure, sir.

17  Q.  It happened so quickly, true?

18  A.  Yes, sir.

19  Q.  And it was the first time you've ever fired your weapon,

20  true?

21  A.  Yes, sir.

22  Q.  And your pulse is racing, right?

23  A.  Yes, sir.

24  Q.  And you don't know what's happening behind you, do you?

25  A.  Well, I know I'm being fired upon.

1   Q.   Shot at?

2   A.   Yes, sir.  Yes.

3   Q.   So you want to get to a place before you returned fire

4   that you don't get shot, right?

5   A.   I don't -- I don't think that's true, sir.  I'm going to

6   try to do what I can to survive, and if that's --

7   Q.   And that's not standing out in the open, that's going

8   behind a car, true?

9   A.   True, but it's also returning fire upon -- when I'm being

10  fired upon.

11  Q.   Well, I know you -- I know you wanted to say that,

12  Mr. Spratte, but that's not the question I asked of you, with

13  all due respect.

14  A.   The --

15  Q.   The question I asked is, did you want to make sure that

16  you got behind someplace where you were not hit?

17  A.   I don't know, sir.

18  Q.   All right.  Your reaction was a natural reaction, are you

19  telling us then?

20  A.   Yes, sir.

21  Q.   Okay.

22  A.   Training.

23  Q.   Trained, natural reaction?

24  A.   Yes, sir.

25  Q.   Fire only at what you see and who you see, right?

1  A.  I fired at the threat, sir, which was muzzle flashes.

2  Q.  All right.  Now, when you finished firing your weapon, did

3  you know that your weapon hit the corner of that fence?

4        MR. EICHENSEER:  I'm going to object to foundation on

5  this question, your Honor.

6        THE COURT:  I don't know if he knows what you're

7  talking about.  He can answer.

8  BY MR. HYMAN:

9  Q.  There's a fence -- there's a fence in this photo --

10 A.  Yes, sir.

11 Q.  -- right?

12        Did you know that your bullet, that one of the

13 bullets you fired hit that fence?

14 A.  No, sir.  Do we know that's my bullet that hit that fence?

15 Q.  I'm sorry?

16 A.  I said, no, sir.  Do we know that that's my bullet?  I

17 don't know.  I don't know if that's my bullet.  I've never

18 been told that's my bullet that hit that fence.

19 Q.  Okay.  So you don't know whether or not your bullet hit

20 that fence?

21 A.  No, sir.  No idea.

22 Q.  Okay.  Do you know whether or not your bullet hit the side

23 of a house?

24 A.  No, sir, I don't know.

25 Q.  You just turned and you fired at the guy with the

1  muzzle -- with the -- at the muzzle flashes, right?

2      MR. EICHENSEER:  Objection.  Misstates testimony.

3      THE COURT:  I think, yes, we've been over this.

4      MR. HYMAN:  All right.  I'll move on.

5  BY MR. HYMAN:

6  Q.  Mr. Spratte?

7  A.  Yes, sir.

8  Q.  When you finished firing your weapon, you ran down the

9  street, true?

10 A.  I ran towards the direction the muzzle flashes came, yes,

11 sir.

12 Q.  And that was down on Hermitage?

13 A.  Northbound, yes, sir.

14 Q.  Did you have a description of the person who shot at you?

15 A.  No, sir.

16 Q.  Did you see a person who shot at you?

17 A.  No, sir.

18 Q.  Did you ever tell someone before today that you saw --

19 that you saw an unknown person wearing a T-shirt, a white

20 T-shirt down the street and saw muzzle flashes?  Did you ever

21 tell that to anybody?

22 A.  I don't recall.

23 Q.  All right.  At some point in time, you were -- you were

24 interviewed by a detective from the Chicago Police Department

25 by the name of Neil Evans, true?

1   A.   Yes, sir.

2   Q.   And Detective Evans met you at Cook County Hospital or

3   Stroger Hospital?

4   A.   I don't believe I met Detective Evans at the hospital.

5   Q.   Where did you meet him?

6   A.   I believe it was when I was brought back on scene a few

7   hours later.

8   Q.   So you went to the hospital, came back, and you spoke with

9   Mr. Evans, Detective Evans, true?

10   A.   Yes, sir.

11   Q.   And he was taking notes as he was talking to you?

12   A.   Yes, sir.

13   Q.   Right. And that's what you understand the detectives do:

14   They take notes and then they transcribe those notes, right?

15   A.   Yes. They write down a summary of what was said.

16   Q.   Right. And what you told Mr. Evans was that you tried to

17   run toward cover, a vehicle parked on the south side of 44th

18   Street, true?

19   A.   Yes, sir.

20   Q.   And then you told him, as you did so, you saw an unknown

21   person wearing a white T-shirt down the street and saw muzzle

22   flashes northbound on the west side, west sidewalk in the 4300

23   block. Did you tell him that?

24   A.   Yes, sir.

25   Q.   And then you told Mr. Evans, Detective Evans, that you

1  fired two rounds in the direction of the muzzle flashes,

2  right?

3  A.  In the direction of the muzzle flashes, yes, sure.

4  Q.  Okay.

5  A.  Sir.  Sorry.

6  Q.  Before you spoke to Mr. -- Detective Evans, did you tell

7  any of your other brother officers that were on the scene that

8  you saw a man wearing a white shirt?

9  A.  I don't recall.

10  Q.  Well, did you write any report in this case?

11  A.  No, sir.  Maybe a TRR, I think I signed my name on.

12  Q.  What is a -- that's a firearm use report, in effect, isn't

13  it?

14  A.  It's a --

15  Q.  Tactical --

16  A.  -- tactical response report, yes, sir.

17  Q.  Did you write that report, or did you have -- or someone

18  that you talked to write that report?

19  A.  I don't recall.

20  Q.  Did you ever write your own report in this case that said

21  that you saw muzzle flashes, you saw a man with a white shirt

22  and muzzle flashes?

23  A.  No, sir.

24  Q.  Now, when you saw this person in the white shirt, he was

25  down the block, correct?

1    A.   Yes, sir.

2    Q.   It was a white shirt, it wasn't a black shirt, true?

3    A.   True.

4    Q.   And while you and your brother officers, before you got to

5    that intersection, you were -- and you drove down Hermitage,

6    you were also looking around to make sure no one was out --

7    A.   Yes, sir.

8    Q.   -- right?

9    A.   Yes, sir.

10   Q.   The whole purpose of this is so that no one sees you.  As

11   you called it, it's covert.  No one is supposed to know about

12   it, right?

13   A.   Yes, sir.

14   Q.   So when you -- going down that block, you see no one

15   standing outside, you see no one in the gangways, no one

16   standing on steps, true?

17   A.   True.  I didn't observe anybody, sir.

18   Q.   And, I mean, it's 3:18 in the morning.  Everyone is

19   probably asleep or you're thinking they're asleep, right?

20   A.   I don't know, sir.

21   Q.   That's why you do it early in the morning, not at noon,

22   true?

23   A.   Lower level of foot traffic, traffic in general, yes, sir.

24   Q.   Okay.  So when you then get out of the car and you hear

25   the shots and you fire and you see the muzzles and you see

1 this person in the white shirt, is that person in the white

2 shirt holding a gun?

3 A.  No, sir.

4 Q.  Was that person who was standing in the white shirt two

5 houses down?

6 A.  I don't recall where he was out there.  I just know that I

7 saw someone with a white shirt.

8 Q.  Do you remember giving a statement to an organization

9 called COPA about three weeks after this incident?

10 A.  Yes, sir.

11 Q.  And that's required of you as part of the city -- as an

12 officer of the city of Chicago, true?

13 A.  Yes, sir.

14 Q.  And that's, you have -- for some reason, you have a lawyer

15 there, he's a union rep, right?

16 A.  Yes, sir.

17 Q.  Is anybody forcing you to give that statement?

18         MR. EICHENSEER:  Your Honor, can we have a sidebar?

19         THE COURT:  I'll sustain the objection if you're

20 objecting to that.

21 BY MR. HYMAN:

22 Q.  You weren't under duress to give that statement, were you?

23 A.  I'm sorry?

24 Q.  When you spoke to the representative of COPA with a lawyer

25 there, you weren't under any duress, coercion to give it?

1  A.  No.

2       MR. EICHENSEER:  Your Honor, I'm going to object

3  again and ask for a sidebar.

4       THE COURT:  Let's move on.  I don't think that's

5  relevant.

6  BY MR. HYMAN:

7  Q.  Okay.  Well, that statement was recorded, true?

8  A.  Yes, sir.

9  Q.  Okay.  And you've heard that statement, you've listened to

10  the statement?

11  A.  Yes, sir.

12  Q.  All right.  And in that statement, the question that was

13  asked was whether or not you saw what you saw.  And you

14  responded to that, "I don't remember if I saw it right then

15  and there, if he was with him, uh, or down.  Maybe I saw him,

16  house two down.  I just remember seeing a white shirt out

17  there."

18       Do you remember that?

19  A.  Yes, sir.

20  Q.  And then again, you followed up by saying, "Um, I remember

21  seeing a white shirt down the block," correct?

22  A.  Yes, sir.

23  Q.  Now, that statement was not made at or near the time of

24  the shooting when you first talked to Detective Evans, right?

25  A.  Correct.

1    Q.  So when you talked to Detective Evans, everything was

2    certainly clear in your mind what was going on that night,

3    right?

4    A.  Sir, nothing was clear in my mind that --

5    Q.  Well, it's clear that you --

6    A.  There was a lot going on.

7    Q.  Okay.  It was clear certainly that you saw the person, an

8    unknown person in a white shirt and muzzle flashes.  That's

9    the way you told it to Officer Evans, true?

10   A.  Sir, I saw muzzle flashes and I saw an individual with a

11   white shirt, yes.

12   Q.  Okay.  And you told Detective Evans in this order, that

13   you saw an unknown person in a white shirt and muzzle flashes.

14   That's the order that you told him you saw?

15           MR. EICHENSEER:  Objection.  It's been asked and

16   answered.

17           THE COURT:  I thought that's what he said.

18           But you can answer the question once more.  Is that

19   correct?

20           THE WITNESS:  I don't -- I don't recall.

21           THE COURT:  Okay.

22   BY MR. HYMAN:

23   Q.  Well, did you read the report that Detective Evans wrote?

24   A.  I did see the report, yes, sir.

25   Q.  All right.  And you saw -- and you read that report?

1  A.  That's not my report, sir.  That's something that he

2  wrote.

3  Q.  I understand that, but you read it, true?

4  A.  Yes, sir.

5  Q.  If you thought it was wrong, you would have told Detective

6  Evans, "That's not what I told you," true?

7  A.  I don't recall seeing that statement before it was ever

8  submitted.  I don't know when he submitted that report, sir.

9  Q.  Okay.  When did you read that, the first time you read

10  that statement?

11  A.  I don't recall.

12  Q.  Mr. Spratte, you used that report to help remember what

13  you saw that night, true?

14  A.  Yes, sir.

15  Q.  All right.  And when you spoke to Mr. -- Detective Evans,

16  as you say, at the scene, things were a lot more fresh in your

17  mind as to what happened, right?

18       MR. EICHENSEER:  Objection, your Honor.  Misstates

19  testimony.

20       THE COURT:  Yes -- well, he's already said that it --

21       MR. HYMAN:  I'll rephrase the question, your Honor.

22  BY MR. HYMAN:

23  Q.  When you spoke to Mr. -- Detective Evans, did you tell him

24  that --

25       MR. EICHENSEER:  Your Honor, I'm going to object to

1   this.  He's showing the witness a report the witness did not

2   write.

3           THE COURT:  Yes.  Were you going to use it to refresh

4   his recollection?

5           MR. HYMAN:  Yes, to refresh his recollection.

6           THE COURT:  Well, have him read it and then ask your

7   question.

8           MR. HYMAN:  Why don't you read that.

9           THE WITNESS:  Can I read the whole statement, sir?

10   This is not -- this isn't the whole statement, though.

11           MR. HYMAN:  Read the statement that's --

12           THE COURT:  The one portion, just read the one

13   portion.

14           MR. HYMAN:  The one portion.

15           THE WITNESS:  Just my statement?

16   BY MR. HYMAN:

17   Q.  Yes.

18   A.  Okay.

19   Q.  Just your statement because that's what you used to

20   refresh your memory, right?

21   A.  "RD," reporting detective --

22   Q.  You don't have to read it out loud.  Just read it to

23   yourself.

24           THE COURT:  All right.  Just ask him then.

25   BY MR. HYMAN:

1  Q.  Does that help refresh your recollection as to what you

2  told Mr. -- Detective Evans?

3  A.  Yes, sir.

4  Q.  You told him that you saw an unknown wearing a white

5  shirt, and then you told him then you saw, and the muzzle

6  flashes, right?  That's what you -- that's what you told him?

7  A.  I saw them both, sir, yes.

8          MR. HYMAN:  May I have a moment, your Honor?

9          THE COURT:  Yes.

10    (Pause.)

11  BY MR. HYMAN:

12  Q.  Mr. Spratte, you did not tell Officer -- or Detective

13  Evans that you saw the flashes, the muzzle flashes and the

14  person in the white shirt in two separate places, did you?

15  A.  I don't recall.  I just said that I saw a white shirt down

16  the street and muzzle flashes on the northwest sidewalk.

17  Q.  You saw -- that's not what you told the -- Detective

18  Evans, did -- is it?

19          MR. EICHENSEER:  Objection.

20  BY MR. HYMAN:

21  Q.  That's what your report says?

22          THE COURT:  We've been through this over and over.

23  BY MR. HYMAN:

24  Q.  Mr. Spratte, the first time that you remembered seeing

25  someone standing in the street with a white shirt is when you

1    went and prepared with these prosecutors, true?

2    A.  Can you say it again, sir?  I'm sorry.

3    Q.  Sure.  The first time that you remembered or that you told

4    anybody, the first time you told anybody that the person

5    wearing the white shirt was somewhere down the street standing

6    in the street but you couldn't recall when you saw the

7    individual is when you prepared with these prosecutors, true?

8    A.  No, sir.  It says in the Detective Evans report that I saw

9    a white shirt down the street, so I did see a white shirt down

10   the street.

11   Q.  No, the detective's report doesn't say that, Mr. Spratte.

12   The detective's report says, "an unknown person with a white

13   shirt and muzzle flashes."

14           MR. EICHENSEER:  Your Honor, I'm going to object to

15   this.

16           THE COURT:  Yes.  You've been through this.  That's

17   basically what he said.  He saw a guy in a white shirt and a

18   muzzle flash.

19           MR. HYMAN:  Right.

20           THE COURT:  So that's --

21   BY MR. HYMAN:

22   Q.  The first time you told anybody that they were somewhere

23   down the street and you're not sure, you saw people coming

24   out, you saw someone in a white shirt, is when you prepared

25   with the prosecutors, true?

1  A.  I don't recall that, sir.

2  Q.  You didn't write a separate report about that, did you?

3  A.  No, sir.  I didn't write any reports --

4  Q.  You never --

5  A.  -- about this.

6  Q.  You never supplemented the reports about this at all, did

7  you?

8  A.  Sir, I never wrote any report about this.

9  Q.  Correct.  You never wrote a thing.

10         MR. EICHENSEER:  Objection.  Argumentative.

11  BY MR. HYMAN:

12  Q.  And your statements have changed each time, true?

13  A.  Not true.

14         MR. HYMAN:  Okay.  I don't have --

15         THE COURT:  Is that it?

16         MR. HYMAN:  Yes.

17         THE COURT:  Anything further?

18         MR. EICHENSEER:  Yes, your Honor.

19         THE COURT:  Quick.

20                   REDIRECT EXAMINATION

21  BY MR. EICHENSEER:

22  Q.  Officer Spratte?

23  A.  Yes, sir.

24  Q.  Mr. Hyman on cross-examination, he asked you about an

25  interview that you went through a couple weeks after the

1  shooting; is that right?

2  A.  Yes, sir.

3  Q.  That was the interview that was recorded that Mr. Hyman, I

4  believe, is reading from, correct?

5  A.  Yes, sir.

6  Q.  And he asked you some questions about questions you were

7  asked during that interview, correct?

8  A.  Yes, sir.

9  Q.  And he -- and you answered -- and he read some answers

10  that you gave; is that right?

11  A.  Yes, sir.

12  Q.  Were those the only things that you said about the person

13  in the white T-shirt during that interview?

14  A.  No, sir.

15  Q.  Did they also ask you -- did the investigators in that

16  interview ask you if the person in the white shirt could be

17  shooting at you?

18  A.  Yes, sir.

19  Q.  And did you -- how did you respond to that?

20  A.  "No, I don't believe so."

21  Q.  Did those investigators ask you if you fired at the person

22  after the -- in the white shirt?

23  A.  Yes, sir.

24  Q.  And what did you say then?

25  A.  "No, sir."

1  Q.  Did they ask you, those investigators, where the person in

2  the white shirt was standing?

3  A.  Yes, sir.

4  Q.  And what did you say?

5  A.  "Down the street."  I wasn't sure exactly where.

6  Q.  Sitting here today, Officer Spratte, do you know exactly

7  when you saw the person in the white T-shirt?

8  A.  No, sir.

9  Q.  Did you fire your gun at the person in the white T-shirt?

10 A.  No, sir.

11 Q.  Did you see the person in the white T-shirt next to the

12 muzzle flashes when you fired?

13 A.  No, sir.

14 Q.  Mr. Hyman asked you some questions on cross-examination

15 about whether the event was clear in your mind when you gave

16 that interview that morning.

17 A.  Yes, sir.

18 Q.  I believe you said you had been up all night; is that

19 right?

20 A.  Yes, sir.

21 Q.  You had been shot at five times?

22 A.  Yes, sir.

23 Q.  You had held your colleague's wounded body in your hand,

24 is that right, or wounded head?

25 A.  Yes, sir.

1  Q. Were you in clear mind at that point?

2  A. No, sir.

3  Q. One last question: Your Glock pistol that you fired, what

4  side did the casings eject?

5  A. They eject from the right side, sir.

6  Q. About how far do those casings eject when they -- when you

7  fire?

8  A. I would guess anywhere from 5 to 15 feet, sir.

9       MR. EICHENSEER: No further questions, your Honor.

10      THE COURT: Is that it?

11                 RECROSS-EXAMINATION

12  BY MR. HYMAN:

13  Q. Mr. Spratte?

14  A. Yes, sir.

15      MR. HYMAN: Would you stand up?

16  BY MR. HYMAN:

17  Q. Did you see this gentleman out there that night?

18  A. No, sir.

19  Q. Mr. Spratte, when you fired your weapon, you were calm

20  enough to do that, right?

21  A. I don't -- I don't think that's being calm, being fired at

22  or firing my weapon, sir.

23  Q. Well, you fired -- you didn't just turn and fire at will,

24  did you?

25  A. No, sir.

1   Q.   You had a specific place that you were going to fire at --

2   A.   Yes, sir.

3   Q.   -- true?

4   A.   Yes, sir.

5   Q.   And that takes control, true?  It takes eye coordination?

6   It takes breathing?  All those are factors that you as a

7   policeman are trained to do before you fire your weapon, true?

8   A.   Yes, sir.

9   Q.   Now, after you went to Stroger Hospital, you were checked

10  out and you were given the okay to go back to the scene,

11  right?

12  A.   Yes, sir.

13  Q.   Did you tell Detective Evans, "Listen, I've been through a

14  lot this morning.  Can we talk later?"

15  A.   I don't recall saying that, sir, no.

16  Q.   Well, you didn't say that to him, did you?

17  A.   I have to give a statement within X amount of hours, sir.

18  Q.   Well, you talked to the detective, right?

19  A.   Yes, sir.

20  Q.   And you talked to him freely and voluntarily, true?

21  A.   Sir, it's my job to give a statement to the best of my

22  knowledge.

23  Q.   I understand it's your job, but you gave him that

24  statement freely and voluntarily that morning?  You didn't

25  tell him, you know, "I'm too upset, I can't talk to you right

1  now," did you?

2  A.  Sir, I don't know what I said to him.

3  Q.  Well, you certainly told him about the man in the white

4  shirt, true?

5  A.  And the muzzle flashes, yes, sir.

6          THE COURT:  You can step down.  You're excused.

7          THE WITNESS:  Thank you, sir.

8      (Witness excused.)

9          THE COURT:  We'll suspend until 1:30 for lunch.

10      (Recess from 12:24 p.m. to 1:30 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  IN THE UNITED STATES DISTRICT COURT
   FOR THE NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3  UNITED STATES OF AMERICA,        )
                                    )
4              Plaintiff,           )
                                    )
5       v.                          )  No. 18 CR 00278
                                    )
6  ERNESTO GODINEZ,                 )  Chicago, Illinois
                                    )  June 12, 2019
7              Defendant.           )  1:30 p.m.

8                        VOLUME 3-B
              TRANSCRIPT OF PROCEEDINGS - Trial
9      BEFORE THE HONORABLE HARRY D. LEINENWEBER and a Jury

10  APPEARANCES:

11  For the Plaintiff:        HON. ZACHARY T. FARDON
                              United States Attorney
12                            BY:  MS. KAVITHA J. BABU
                                   MR. NICHOLAS J. EICHENSEER
13                            Assistant United States Attorneys
                              219 South Dearborn Street, Suite 500
14                            Chicago, Illinois 60604
                              (312) 353-5300
15
    For the Defendant:        MR. LAWRENCE H. HYMAN
16                            111 West Washington Street
                              Suite 1025
17                            Chicago, Illinois 60602
                              (312) 346-6766
18
                              PISSETZKY & BERLINER
19                            BY:  MR. GAL PISSETZKY
                              35 West Wacker Drive, Suite 1980
20                            Chicago, Illinois 60601
                              (312) 566-9900
21

22  Court Reporter:           Judith A. Walsh, CSR, RDR, F/CRR
                              Official Court Reporter
23                            219 South Dearborn Street, Room 2118
                              Chicago, Illinois 60604
24                            (312) 702-8865
                              judith_walsh@ilnd.uscourts.gov
25

1    (Proceedings heard in open court.  Jury in.)

2        THE COURT:  Call your next witness, please.

3        Please be seated.

4        MS. BABU:  Your Honor, the government calls Douglas

5    Reilly.

6        THE COURT:  Please raise your right hand.

7    (Witness sworn.)

8        THE WITNESS:  Yes, sir.

9        THE COURT:  Please be seated.

10       You may question the witness.

11       MR. PISSETZKY:  Judge, before we have any questions,

12   I would like to make something on the record.

13   (Proceedings heard at sidebar:)

14       THE COURT:  What's the problem?

15       MS. BABU:  It's a booking photo from April 2nd, 2017,

16   booking photo of the defendant and one of the photos of his

17   arms.  This is the same symbol that's in the gangway.  This is

18   just the custodian of records for CPD.  He's going to put it

19   in as a business record.

20       MR. PISSETZKY:  I have a general objection to

21   entering this into evidence and his tattoo and to publish it

22   and enter it.  I don't have a problem with the custodian.

23       MS. BABU:  We don't need to publish it.

24       THE COURT:  Why don't you --

25       MR. PISSETZKY:  How is it relevant?  I don't

1  understand how --

2        THE COURT:  It's an issue -- anyway, why don't you

3  stipulate to it.  Is that all he's going to testify to?

4        MS. BABU:  Yes.

5        THE COURT:  You object to it?

6        MR. PISSETZKY:  I object to it, but I would stipulate

7  to it.

8        THE COURT:  Then you don't need him, so call your

9  next witness.

10     (Proceedings heard in open court:)

11        THE COURT:  This witness is excused.  It's my

12  understanding that there's an agreement concerning his

13  testimony.

14        MR. EICHENSEER:  That's correct, your Honor.

15        MR. PISSETZKY:  That's correct, Judge.

16        THE COURT:  So you're excused, sir.  Thank you.

17     (Witness excused.)

18        MS. BABU:  Your Honor, we call Arnold Esposito.

19        THE COURT:  All right.  Bring him in here.

20     (Pause.)

21        MS. BABU:  Your Honor, the witness is available.

22        THE COURT:  Pardon?

23        MS. BABU:  The witness is here.

24        THE COURT:  Oh, excuse me.

25        Raise your right hand, sir.

1      (Witness sworn.)

2           THE WITNESS:  Yes, I do.

3           THE COURT:  Please be seated.

4           THE WITNESS:  Thank you.

5           THE COURT:  You may question the witness.  Sorry.

6           MS. BABU:  Thank you, your Honor.

7           ARNOLD ESPOSITO, GOVERNMENT'S WITNESS, SWORN

8                     DIRECT EXAMINATION

9  BY MS. BABU:

10 Q.  Good afternoon.

11 A.  Good afternoon.

12 Q.  Would you please state and spell your name for the record?

13 A.  Yes.  My name is Arnold Esposito.  It's spelled

14 E-s-p-o-s-i-t-o.

15 Q.  Mr. Esposito, who are you employed by?

16 A.  Employed by the Bureau of Alcohol, Tobacco, Firearms, and

17 Explosives.

18 Q.  Is that also known as ATF?

19 A.  Yes.

20 Q.  What is your current title with ATF?

21 A.  I'm a firearms and toolmark examiner at the national

22 laboratory center located at 6000 Ammendale Road in Ammendale,

23 Maryland.

24 Q.  Sir, at a very high level, could you explain what firearms

25 and toolmark identification is?

1  A.   Yes.   Firearms and toolmark identification is a discipline

2  of forensic science that has as its primary concern to

3  determine whether or not ammunition components such as bullets

4  and fired cartridge cases were fired in or from a particular

5  firearm.

6  Q.   And are cartridge cases sometimes referred to as shell

7  casings?

8  A.   Incorrectly, but yes, they are.

9  Q.   And how long have you been a firearms and toolmark

10  examiner?

11  A.   I've worked in the firearms and toolmark field for over 20

12  years.

13  Q.   And how long have you been at ATF as a firearms and

14  toolmark examiner?

15  A.   For 10 years.

16  Q.   Mr. Esposito, what type of examinations do you specialize

17  in?

18  A.   Firearms and toolmark identification involves the

19  examination of fired bullets and ammunition components,

20  firearms; to perform operability function examinations;

21  examinations to determine for gunshot residue, for distance

22  determination; toolmark examinations and identification;

23  shooting incident reconstruction; and serial number

24  restoration exams as well.

25  Q.   And, sir, at ATF, what are your primary duties?

1    A.   My primary duties are to perform firearm and

2    toolmark-related examinations.

3    Q.   Prior to working at ATF, where did you work?

4    A.   Prior to working for the ATF, I spent 27 years in law

5    enforcement working for two different police agencies:   The

6    Prince Georges County, Maryland, Police Department where I

7    retired after 20 years, and then seven years with the Maryland

8    State Police.

9    Q.   When you were with the Prince Georges County Police

10   Department, what were -- what roles did you hold?

11   A.   After I did my time or served my time in the field, I

12   worked in crime scene investigation, burglary prevention.  And

13   in 1994, our agency started a firearms and toolmark section,

14   so I was selected for a position, a training position in the

15   laboratory.  And I worked in the laboratory in Prince Georges

16   County for the last eight years of my 20 years with Prince

17   Georges County.

18   Q.   And about when did you leave Prince Georges County?

19   A.   June of 2002.

20   Q.   And in June of 2002, did you continue working?

21   A.   Yes, I did.

22   Q.   And where was that?

23   A.   I was off for about two weeks and then was hired by the

24   Maryland State Police.  I started off as a road trooper.  Upon

25   completing the police academy, I worked in uniform patrol,

1    fugitive apprehension, criminal investigation.  And because of

2    my background in firearms and toolmarks, I was offered an

3    opportunity to work at the Maryland State Police crime

4    laboratory in Pikesville, Maryland.

5    Q.   And when did you join -- when did you start to work in

6    Pikesville, Maryland?

7    A.   2006, early 2006.

8    Q.   And were you there immediately prior to joining ATF?

9    A.   That's correct, yes, I was.

10   Q.   Mr. Esposito, you briefly mentioned your training for

11   firearms and toolmark examination.  What sort of training have

12   you received?

13   A.   Yes.  Upon taking the position as a firearms examiner

14   trainee with the Prince Georges County, Maryland, Police

15   Department, I received training under the direction of Gerald

16   Styers, a senior firearms and toolmark examiner.  This

17   training was conducted in the laboratory as well as in the

18   field.  The training lasted just over two years.

19          The training involved following the Association of

20   Firearm and Toolmark Examiners training syllabus.  It involved

21   areas such as comparison microscopy, firearm function and

22   familiarization, trajectory analysis, incident reconstruction,

23   gunshot residue for distance determination, toolmark

24   identification, as well as serial number restoration.

25          During my training with Mr. Styers, I accompanied him

1  for a seven-month project at the FBI academy's forensic

2  science and research center to work a special project at that

3  time.

4  Q.  And then did you receive additional training after that?

5  A.  Yes.  I've attended over 35 specialized schools and

6  training seminars including the FBI's gunshot residue for

7  distance determination; the ATF's serial number restoration

8  class; the FBI's firearms, specialized techniques for firearms

9  and toolmark examiner; and the FBI incident or shooting

10  incident reconstruction class, just to name a few.

11  Q.  Do you have a -- are you associated with any professional

12  organizations that are relevant to your work experience?

13  A.  Yes.

14  Q.  And what are those?

15  A.  I'm a distinguished member of the Association of Firearm

16  and Toolmark Examiners.  The association has members that work

17  in the firearms and toolmark field.

18  Q.  And Mr. Esposito, what is the scientific basis for

19  firearms toolmark -- firearms and toolmark identification?

20  A.  Yes.  The basis behind firearms and toolmark

21  identification is that when two objects come together with

22  some kind of force or movement, the harder object will mark

23  the softer object.  And in firearms identification, the

24  firearm parts, the parts that make up a firearm are harder

25  than the ammunition components that are loaded into the gun.

1    When the gun is fired, there's a transfer of these

2   markings due to the force and motion that takes place.  So

3   these marks are carried over and transferred on to the

4   fired -- fired components.

5   Q.  And are you sometimes through your -- through your

6   processes, which we'll talk about in a moment, are you able to

7   determine if multiple bullets have been fired from the same

8   firearm?

9   A.  That's correct.

10  Q.  And similarly, are you able to determine if multiple

11  cartridge cases have been expelled from the same firearm?

12  A.  That's right.

13  Q.  Mr. Esposito, I think you may have mentioned this, but

14  where is your lab located?

15  A.  The lab is located at 6000 Ammendale Road in Ammendale,

16  Maryland, A-m-m-e-n-d-a-l-e.

17  Q.  And is that an accredited lab?

18  A.  Yes, it is.

19  Q.  And what does that mean?

20  A.  Accreditation applies to laboratories that follow

21  policies, protocols that are accepted within the field.  We

22  are accredited by ASCLD lab.  That's A-S-C-L-D, laboratory

23  accrediting body.  The accrediting bodies also perform

24  periodic examinations of our laboratory to ensure compliance.

25  Q.  Sir, how many firearm and toolmark examinations have you

1  conducted in your time at ATF?

2  A.   Several hundred, I would say.

3  Q.   And have you also participated in the peer review process?

4  A.   That's correct, yes.

5  Q.   And how many peer reviewed -- how many examinations have

6  you peer reviewed?

7  A.   I peer review my coworkers' examinations that result in

8  identifications or inconclusive results.

9  Q.   And would those be included in the several hundred you

10 just mentioned?

11 A.   That would probably add a few more to that.

12 Q.   And how many -- prior to your time at ATF in your -- when

13 you were a firearms and toolmark examiner with the Maryland

14 State Police and prior to that, how many -- approximately how

15 many examinations have you conducted?

16 A.   Probably another 5', 600.

17 Q.   Have you been previously qualified in federal court to

18 render an opinion in the area of firearms identification and

19 comparison?

20 A.   Yes, I have.

21      MS. BABU:  Your Honor, the government would tender

22 this witness under federal Rule 702 as an expert in the field

23 of firearms and toolmark identification.

24      MR. HYMAN:  We have no objection.

25      THE COURT:  Okay.  He's recognized.  He may give

1   opinions.

2            MS. BABU:  Thank you, your Honor.

3   BY MS. BABU:

4   Q.  Sir, if we could, let's, if we could, start with the

5   basics here.  What are the various types of handguns?

6   A.  Well, there are several types of handguns.  There are

7   autoloading handguns which are broken down into two

8   categories:  The semiautomatic version and the fully automatic

9   version.  The main difference is that when the guns are fired,

10  the semiautomatic version requires a single pull of the

11  trigger each time the gun is fired.

12           It's referred to as an autoloading firearm because

13  when the gun is fully loaded and chambered, meaning that the

14  cartridge of ammunition is loaded into the barrel, it's

15  designed to load.  Once the gun is fired, it's designed to

16  extract the fired cartridge case and then eject it out on to

17  the location, typically where it's fired.

18           With a fully automatic firearm, the firearm is

19  designed the same way when it's loaded.  The cartridge is

20  chambered, but it will fire once the trigger is pulled and

21  held to the rear until the trigger is released or until the

22  gun empties with ammunition.

23  Q.  And what are the various features of a semiautomatic

24  handgun?

25  A.  The semiautomatic was the first version.  It requires that

1  once the gun is loaded, ammunition is typically loaded into a

2  magazine that's inserted into the grip portion of the firearm.

3  The cartridges are held under spring tension.  Once the

4  magazine's inserted and the slide, a portion of the top of the

5  firearm that surrounds the barrel, once the slide is pulled

6  rearward and let go forward, that will chamber or load a

7  cartridge into the chamber.

8         Once the firearm is loaded, if the trigger is pulled,

9  it's designed to fire.  And at the same time, everything's

10  happening fast, the cartridge case starts to come rearward and

11  it's -- through the action of the extractor, it strikes the

12  ejector, another piece inside the firearm, that actually kicks

13  the cartridge case, the fired cartridge case out of the

14  firearm.

15         And then another cartridge, if the magazine is

16  loaded, will feed up into the chamber to be ready to -- ready

17  to fire again, but that will require a second pull of the

18  trigger.

19  Q.   Mr. Esposito, the cartridge case, is this part of the

20  ammunition?

21  A.   Yes.

22  Q.   Can you describe to the jury what the different parts --

23  excuse me, the different parts of a piece of ammunition are?

24  A.   Yes.  A cartridge is a single unit of ammunition.  Often,

25  it's mischaracterized as a bullet.  So the cartridge is the

1    whole unit of ammunition.  It consists of a primed cartridge

2    case.  It has a primer at the base of it.  It has propellant

3    gunpowder loaded inside of it.  And then the bullet is loaded

4    into the mouth or the opening of that cartridge case.

5           Once they're fired, once a cartridge is loaded into a

6    firearm and fired, it separates into two different pieces.

7    The bullet will travel down the barrel and engage the rifling.

8    Rifling is a series of spiral grooves inside the barrel

9    designed to give the bullet a gyroscopic spin.

10          If it didn't spin, it wouldn't be accurate.  It would

11   be the equivalent of throwing a football without spinning it.

12   So various manufacturers use different direction of twist,

13   right hand or left hand, in their rifling.

14          At the same time the bullet is traveling down the

15   barrel, the cartridge case comes back, is pulled out of the

16   chamber, and it is impressed on the breech face of the firearm

17   slide.  The breech face is the area where the firing pin, it

18   surrounds the area where the firing pin strikes the ammunition

19   component.

20   Q.  And what piece, what part of the gun leaves a mark on the

21   cartridge case?

22   A.  Well, there are several areas.  The main area we look for

23   to determine if an ammunition component has been fired is the

24   breech face markings.  And those are the markings I just

25   talked about, that they're physically on the slide of the

1  firearm, and they're completely surrounding -- they surround

2  the area where the firing pin protrudes.

3  Q.  And going back to the bullet, to the bullet, what part of

4  the handgun leaves the mark on the bullet?

5  A.  The bullet is marked by the rifling inside the barrel

6  because once the barrel -- once the gun has been fired, the

7  firing pin strikes the primer on the cartridge case.  The

8  cartridge case creates a small explosion inside the cartridge.

9  This explosion ignites gunpowder, propellant gunpowder.

10        Pressure starts to build which forces the bullet out

11 of the case mouth of the cartridge case into the barrel to

12 engage the rifling, and it's fired on target at that point.

13 Q.  And Mr. Esposito, you mentioned the cartridge case is

14 ejected from the firearm?

15 A.  That's right.

16 Q.  Could you describe the -- how that process works and where

17 typically a cartridge case is ejected from?

18 A.  Okay.  So once a semiautomatic firearm fires, for example,

19 the bullet travels out of the barrel.  The extractor pulls the

20 fired cartridge case out of the chamber because it's expanded

21 a little bit and needs some pressure to pull it out.  Once the

22 extractor grabs it, it lines up with the ejector which is

23 another portion of the inside of the firearm which kicks the

24 cartridge case out.

25        Regarding ejection pattern, firearm manufacturers

1   determine, prior to manufacture when they make their firearms,

2   what direction the cartridge case is going to be ejected.

3   Firearms can be ejected to the left.  The majority of them

4   eject to the right, some of which reject at the 12:00 o'clock

5   position.  And what I mean by that is, that's the direction

6   that the cartridge case comes out of the firearm when the

7   firearm is being held in a conventional -- in a conventional

8   way.

9   Q.  And sir, I'm sorry.  What did you say is -- the majority

10  of semiautomatic handguns, where is the majority of ejection

11  ports located?

12  A.  The majority of injection ports that I see, that I've

13  examined and test fired, the ejection port is cut out of the

14  slide to allow the cartridge cases to eject to the rear.

15  Q.  And --

16  A.  Or to the right and to the rear.

17  Q.  And this may be simplifying it.  So this is essentially a

18  hole in the gun, correct?

19  A.  It's an area that's cut out on the top of the slide.  The

20  slide is the portion of the firearm that moves at the same

21  time.

22  Q.  And in your training and experience, sir, in the

23  examinations that you've conducted during the course of your

24  career, how far does a cartridge case typically travel once

25  it's been ejected from a semiautomatic handgun?

1  A.  It can vary depending on the firearm, depending on the --

2  how the shooter is holding the firearm, whether they're

3  holding it in a conventional way or holding it sideways or

4  whether they're moving and shooting at the same time.  And

5  what -- another factor is that we have to factor in the

6  location where the cartridge case is landing because they can

7  bounce.

8          And if I were to hold the gun still with a bench rest

9  or whatever, I could fire five or six times, but the cartridge

10  case would land in the general same location but not in the

11  exact location.  So there is some variation that occurs.

12  Q.  And typically, how far would a cartridge case travel?

13  A.  I would say six to ten feet on average.

14  Q.  And you said that a majority of -- in a majority of

15  semiautomatic handguns, the ejection port is on the right-hand

16  side?

17  A.  That's correct.

18  Q.  And so in that situation, in what direction would the

19  cartridge case travel once ejected?

20  A.  Again, if the firearm is being held in a conventional way

21  with the shooter standing pointing it toward the target, the

22  cartridge cases in the majority of firearms would eject to the

23  right and slightly rearward.

24  Q.  Mr. Esposito, if I can now switch directions slightly,

25  what -- and talk about your examination methods and the

1  processes you use, what are some of the steps you take when

2  examining bullets to determine if they were fired from the

3  same firearm?

4  A.  Okay.  When we examine bullets in the laboratory, the

5  first thing we do is we complete worksheets noting the

6  different characteristics of the bullet.  Bullets are broken

7  down into a caliber.  The caliber generally refers to the

8  diameter of the projectile.

9      Upon completing these worksheets, we're noting

10  characteristics such as the jacket material on the bullet, the

11  weight of the bullet, the diameter of the bullet, and things

12  like that.

13      We also go and note the rifling impressions, these

14  impressions that occur as the bullet travels down the barrel.

15  These rifling impressions are very important because, again,

16  they'll either be to the right-hand -- they'll rotate to the

17  right or rotate to the left, but they also, the dimensions of

18  these rifling impressions can help the examiner provide a list

19  of firearms that may have fired the particular fired bullet.

20  Q.  And how do you then -- how do you then compare two bullets

21  together?

22  A.  So if I'm examining more than one bullet, what I would

23  next -- what I would do next is I'm noting the different

24  characteristics, mainly the class characteristics because what

25  I'm trying to do is break the evidence into categories.  And

1   what I mean by that is if I had bullets of different calibers

2   that came in with the same shooting case or homicide case

3   then, obviously, I would not compare them to each other

4   because they are of a different caliber.  So I'm kind of

5   breaking things up into groups and categorizing them.

6          If I had two bullets that shared the same class

7   characteristics -- and what I mean by that again is

8   characteristics that are unique to a group of firearms such as

9   the caliber, that's a class characteristic; the rifling twist,

10  right-hand or left-hand, that's a class characteristic.

11         Additionally, the rifling dimensions that are on the

12  fired bullet also contain class characteristics that are

13  unique to a group.  So as I'm examining these two bullets, for

14  example, if they all share the same class characteristics, the

15  next step would be to move to the comparison microscope.

16         The comparison microscope is a large microscope with

17  an optical bridge that allows me to mount two bullets on it

18  and examine those bullets simultaneously to see if the

19  individual markings -- these are markings that I observed

20  during my examination -- appear to be of the same features.

21         I will conduct a side-by-side comparison in an

22  attempt to either identify or eliminate or, in some cases,

23  there may not be sufficient markings for me to say one way or

24  another.

25  Q.  Do you use a similar process for examining cartridge

1  cases?

2  A.  Yes.

3  Q.  And are you able to determine if two cartridge cases were

4  fired from the same firearm or ejected from the same firearm?

5  A.  Depending on the value of the markings on the cartridge

6  case and bullet, yes.

7  Q.  And what are some of the class features you look for in a

8  cartridge case?

9  A.  The cartridge case, we're looking again at class

10  characteristics.  So if I receive two fired cartridge cases,

11  the first thing I'm going to look at is the caliber.  The

12  caliber on cartridge cases is stamped on the headstamp.

13          If I have the same caliber, then I'll move to the

14  next step, and I'll look at the firing pin impression, the

15  impression that's placed on the cartridge at the time it's

16  fired, and I'll see if they share the same features.  If they

17  do, then I'll move to the next step, would be to look under a

18  stereoscope which allows me to look at the markings under

19  magnification.

20          And then if they still share the same features, I'll

21  move into the comparison microscope and conduct the

22  side-by-side markings of the -- of these fired markings that

23  occurred during firing.

24  Q.  Mr. Esposito, as part of this case, were you asked to

25  conduct a comparison of cartridge cases?

1    A.   Yes, I was.

2    Q.   Mr. Esposito, I'm going to hand you -- Mr. Esposito, I'm

3    handing you what's previously been marked Government Exhibits

4    300, 301, and 302.   I'm going to start with Government Exhibit

5    300.

6    A.   All right.

7    Q.   Would you take a look at Government Exhibit 300, please?

8    And you can open it, sir, if you'd like.

9    A.   I can open it?

10   Q.   Yes, please.

11   A.   Okay.   I've opened all but the coin envelopes.   This is

12   still sealed with my initials and markings.   Would you like me

13   to open it?

14   Q.   No, that's fine, sir.   So starting with the coin envelope,

15   sir, do you -- I guess the first coin envelope, how do you

16   recognize this envelope?

17   A.   Yes.

18   Q.   Actually, Mr. Esposito, before you begin, within

19   Government Exhibit 300, there were five coin envelopes; is

20   that correct?

21   A.   That's right.

22   Q.   Okay.   So starting with the -- starting with the first

23   coin envelope, do you recognize that envelope?

24   A.   Yes, I do.

25   Q.   And how do you recognize it?

1   A.   Yes.  I recognize it with my initials, the item number,

2   and my laboratory number on here as well.

3   Q.   And is that same -- are your initials, item number, and

4   laboratory number on each of the five --

5   A.   Yes, they are.

6   Q.   -- coin envelopes?

7          Mr. Esposito, do you recall when you first received

8   Government Exhibit 300, about when?

9   A.   I'm not sure exactly.  I would have to look at my report

10  or notes.

11  Q.   Would you -- did you write a report in this matter?

12  A.   Yes, I did.

13  Q.   Would handing you your report help refresh your

14  recollection?

15  A.   Yes, it would.

16         Thank you.  Yes, the five fired cartridge cases I

17  received for examination -- actually, I need to look at one

18  other document.

19  Q.   Sure.  Is this -- did you prepare notes that went along

20  with this report?

21  A.   Yes.  There was an inventory form I filled out when I

22  received the evidence.  And the date I received the evidence

23  is on the inventory form.

24         Thank you.  Yes, I received these items on November

25  the 13th of last year.

1  Q.  Thank you, sir.  If I can take the reports back from you.

2  A.  Yes, you sure can.

3  Q.  Thank you.

4       Mr. Esposito, I know you haven't opened up the

5  individual coin envelopes, but when you received the exhibits

6  that were in the coin envelope, did you mark them in any

7  fashion?

8  A.  Yes, I did.

9  Q.  And how did you mark them?

10 A.  The inside of the cartridge case, case mouth, is marked

11 with my initials as well as the exhibit number and the

12 laboratory number.

13 Q.  And Mr. Esposito, what condition were the exhibit -- what

14 condition was the exhibit in when you first received them?

15 How did you receive them?

16 A.  I received them in the packaging that I opened up here.

17 And I recognize the packaging because each of the containers

18 has my markings on it as well as exhibit numbers.

19 Q.  And is the condition of the package in a similar condition

20 to when you received them?

21 A.  Yes.

22 Q.  And is the packaging inside similar to when you received

23 them?

24 A.  Yes, it is.

25 Q.  Mr. Esposito, when Government Exhibit 300 was in your

1   custody at the lab, what steps did you take to safeguard the

2   exhibit?

3   A.   I examined this evidence physically in the laboratory at

4   the ATF laboratory.  And then when I would close for the day

5   or at the end of the day, I would lock it in a storage

6   container that's assigned to me only.

7   Q.   And did anyone else have access to that storage container?

8   A.   No.

9   Q.   While you had custody of the -- of Government Exhibit 300,

10  what did you do with those cartridge cases?

11  A.   I conducted an examination, a physical examination as well

12  as microscopic examination using notes and worksheets to

13  complete and note all the different characteristics.

14  Q.   And what methods did you use to examine the -- examine

15  Government Exhibit 300?

16  A.   I used a microscopic comparison as well as a comparison

17  comparing each of the cartridge cases to each other.  When I

18  received these items, because there were five fired cartridge

19  cases, I sub-designated each of the cartridge case so I could

20  differentiate between each of the cartridge case.

21          And this is important because if you receive

22  cartridge cases that could have been fired from more than one

23  firearm, you want to be able to distinguish between those

24  cartridge cases.

25  Q.   And did you make any findings as to the five cartridge

1    cases in Government Exhibit 300?

2    A.   I'm sorry?

3    Q.   Did you make any findings as to Government Exhibit 300?

4    A.   Yes.

5    Q.   And what findings were those?

6    A.   Using the side-by-side comparison method in the

7    laboratory, I determined that each of these fired, five fired

8    cartridge cases were -- was fired in one firearm, the same

9    firearm.

10   Q.   And did you determine any of the class characteristics of

11   the cartridge cases?

12   A.   I did note the class characteristics on my worksheet or my

13   notes page, yes.

14   Q.   And what were some of those class characteristics?

15   A.   Some of the class characteristics, again, they were all of

16   the same caliber.  So that's a class characteristic.  That

17   allowed me to move to the next step.  Then I looked at

18   different markings, the location of the markings.  For

19   example, the extractor marking that I was talking about, how

20   it pulls the cartridge out of the chamber and the ejector

21   mark, those were in the relatively same position on each of

22   the fired cartridge cases.  That's another class

23   characteristic.  The shape of the firing pin impression,

24   another class characteristic.

25            So then I moved to the next step, which is the

1  side-by-side comparison using the comparison microscope.

2  Q.  And you said, you mentioned that you determined that these

3  cartridge cases were of the same caliber?

4  A.  Yes, they were.

5  Q.  And what caliber is that?

6  A.  .9 millimeter Luger.

7  Q.  And what does .9 millimeter refer to?

8  A.  Well, .9 millimeter is, for these cartridge cases, how the

9  caliber is expressed.  It doesn't necessarily mean the same

10 when you move from caliber to caliber.  So there's different

11 ways that the manufacturer, whoever designs the caliber, comes

12 up with the term.

13          But the .9 millimeter Luger is also properly

14 expressed as a 9 by 19, meaning 9 by 19 millimeters.  So it

15 has a .9 millimeter diameter within the .38 caliber class but

16 the cartridge case is 19 millimeters long.  So there's a

17 little -- sometimes it can be confusing trying to understand

18 caliber, things like that.

19 Q.  So Mr. Esposito, so this is -- these were .9 millimeter

20 cartridge cases within the .38 class?

21 A.  Well, these were .9 millimeter cartridge cases.

22 Q.  Got it.  Understood.  And Mr. Esposito, I think you

23 already mentioned this.  Did you form an opinion based on your

24 examination of Government Exhibit 300?

25 A.  Yes.

1  Q.  And what was that opinion?

2  A.  I determined or I concluded that all five of these were

3  fired in one firearm.

4  Q.  And is your conclusion based on your training and

5  experience using the practices and procedures that are

6  commonly accepted in the field of firearm identification?

7  A.  Yes, they are.

8  Q.  And Mr. Esposito, do -- cartridge cases, during the

9  process of being extracted and ejected, do they indicate

10  whether or not they've been fired from a semiautomatic

11  handgun?

12  A.  They can, yes.

13  Q.  And did you notice any of those indications on these

14  cartridge cases?

15  A.  Yes.  Examining the five fired cartridge cases, I noted on

16  my worksheets that there was a presence of an extractor and

17  ejector mark on there as well, that class feature I was

18  talking about.  And all five of these contained an extractor

19  and ejector mark.

20  Q.  So these five cartridge cases were fired from a

21  semiautomatic handgun?

22  A.  Well, I can't say that conclusively, but they were fired

23  from a firearm, a semiautomatic or fully automatic possible

24  firearm.

25  Q.  Sir, can .9 millimeter caliber cartridge cases be used in

1   a gun that is not a .9 millimeter gun?

2   A.   There are occasions where we receive casework in the

3   laboratory where ammunition not designed for a particular

4   firearm was fired in the firearm, but there are obvious

5   features that we can observe when that happens.

6   Q.   And what are some of those features?

7   A.   Typically, the -- if, for example, you were to fire a .9

8   millimeter in a .40 caliber, the only way you're going to get

9   that gun to chamber properly is to load it into a magazine.

10  And it has to come up beneath the extractor to catch the hook

11  in time because if not, it would drop into the barrel.

12       But you can fire a .9 millimeter into a .40.

13  Typically, you can only do it one time, the gun will lock up

14  and it has to be manually cleared.  But that's an example.

15  Q.   And did -- when a .9 millimeter cartridge case is used in

16  a gun, for example, a .40 caliber gun, does it leave any sort

17  of marking on the cartridge case when it's ejected?

18  A.   Yes.  It also leaves very obvious indications because the

19  .40 caliber is a larger caliber than a .9 millimeter.  And

20  when a -- when a cartridge is fired, pressures generate inside

21  the cartridge, and that cartridge expands.  And if the chamber

22  is too large, the cartridge case will expand or bulge and

23  sometimes split.  And it usually renders the bullet -- the

24  bullet will travel down the barrel, but it's not going to have

25  the same pressures that you would have firing a .9 millimeter

1   in a .9 millimeter.

2   Q.  And did you see any indications that the casings in

3   Government Exhibit 500 were used in anything other than a .9

4   millimeter gun?

5   A.  No, I saw no indications of that.

6   Q.  So what did you do once you had completed the examination

7   of the five casings in Government Exhibit 300?

8   A.  I sealed them back in the containers that they were

9   received in and submitted this evidence back to our evidence

10  vault.

11  Q.  And do you similar -- do you mark the packaging in any

12  manner?

13  A.  Yes, I did.

14  Q.  And how do you mark it?

15  A.  I typically mark all my packaging in blue so I can

16  recognize it immediately.  In this case, it's marked in blue:

17  The laboratory number, the submission number, the exhibit

18  number, my initials, the sub-designation I gave them, and the

19  date that the evidence was received.

20  Q.  And what are your initials, sir?

21  A.  AJE.

22  Q.  And were the casings or the packaging in any different

23  condition when you returned them --

24  A.  No.

25  Q.  -- from when you received them?

1    A.   No.

2    Q.   Mr. Esposito, turning to a second part of your

3    examination, were you asked to conduct a comparison of bullets

4    in this -- in this case?

5    A.   Yes.

6    Q.   You should have in front of you Government Exhibits 301

7    and 302.  You can open those packages, please.

8    A.   Do you want me to open both of the exhibits?

9    Q.   Sure.  We'll go through both of them individually, but you

10   can open them both now.

11   A.   I think I have it here.  Okay.

12   Q.   Sir, if we could start with Government Exhibit 301.

13   A.   Okay.  I have it here.

14   Q.   Do you recognize this exhibit?

15   A.   Yes, I do.

16   Q.   And how do you recognize it?

17   A.   It's marked as Exhibit 4.  Again, it has my -- the

18   laboratory number on here and my initials.

19   Q.   And what does Exhibit 4 reference?

20   A.   One fired bullet.

21   Q.   And is that an internal exhibit number that you gave it?

22   A.   The Exhibit 4?

23   Q.   Yes.

24   A.   No.  It was received on an evidence transmittal form, ATF

25   transmittal form with that number already designated.

1  Q.  And sir, did you open the coin envelope here?

2  A.  No, I did not.  It's still sealed with my initials.  If

3  you'd like me to, I will.

4  Q.  No, it's not necessary, sir.  Did you mark the -- mark the

5  bullet inside the coin envelope?

6  A.  Yes, I did.

7  Q.  And how did you mark it?

8  A.  I mark it typically on the ogive, which is the curved

9  portion up toward the nose of the bullet.  Sometimes I mark it

10  on the base.  I'd have to refer to my notes to see the exact

11  location, but it is marked.

12  Q.  Would you like to see your report, sir?

13  A.  Please -- or my notes, yes.  Thank you.

14         Yes.  Both of these bullets were marked on the ogive,

15  that curved portion of the bullet close to the nose.

16  Q.  And sir, how exactly do you mark the bullet?

17  A.  What's that?

18  Q.  How do you mark the bullet?  With a pen or --

19  A.  I use a small scribe, and I use a microscope to see what

20  I'm doing.

21  Q.  So you etch your initials into the bullet itself?

22  A.  Yes.  I etch the item number, the laboratory number, and

23  my initials.

24  Q.  And sir, when did you first receive Government Exhibits --

25  before I ask you that question, did you go through the same

1  process with Government Exhibit 302?

2  A.  Yes.

3  Q.  And is Government Exhibit 302 also marked with your

4  initials, the laboratory number, and the exhibit number?

5  A.  Yes, it is.

6  Q.  And is the packaging for Government Exhibit 302 also

7  marked with your initials, laboratory number, and exhibit

8  number?

9  A.  Yes.  All the packaging is marked.

10  Q.  And when did you first receive Government Exhibits 301 and

11  302?

12  A.  They came in at different times.  I'll have to look at my

13  notes to refer to that, please.

14  Q.  Sure.

15  A.  Thank you.

16       THE COURT:  Why don't you leave the notes with him in

17  case he needs to look at them again.

18       MS. BABU:  Sure, your Honor.

19       THE WITNESS:  Exhibit 4, I received on 5/29 of 2018.

20  And Exhibit 13, I received on November the 13th of 2018.

21  BY MS. BABU:

22  Q.  And Exhibit 4 is Government Exhibit 301?

23  A.  Yes, it is.

24  Q.  And Exhibit 5 is Government Exhibit 302?

25  A.  Yes, it is.

1    Q.   And how did you receive Government Exhibit 301?

2    A.   Government Exhibit 301 I received from my supervisor,

3    Charles Coleman.

4    Q.   So he -- do you have an understanding of how Mr. Coleman

5    received Government Exhibit 301?

6    A.   Yes.  When I went to see my supervisor to get custody of

7    the evidence, we walked over to the fingerprint section.  The

8    bullet was in that section at that point.  The fingerprint

9    examiner was not in, so my supervisor signed the item over to

10   me.

11   Q.   And when your supervisor took custody of the -- I'm sorry.

12   Did your supervisor take custody of the exhibit?

13   A.   He took custody of it and handed it to me, and we signed

14   the chain of custody.

15   Q.   And are your supervisor's initials also on the exhibit?

16   A.   No.

17   Q.   And was that because it was immediately transferred over

18   into your custody?

19   A.   That's right.  Because I was doing the examination on it,

20   yes.

21   Q.   And what about Government Exhibit 302?  How did you

22   receive Government Exhibit 302?

23   A.   This was received from the evidence vault.

24   Q.   And where is that evidence vault?

25   A.   In the laboratory.

1  Q.  And is the condition of the package before you today the

2  same, about the same as when you received them?

3  A.  Yes.

4  Q.  Mr. Esposito, when Government Exhibits 301 and 302 were in

5  your custody, what steps did you take to safeguard the

6  exhibits?

7  A.  Well, they remained in my care and custody the whole time.

8  When I closed for the day, they were secured in my evidence

9  locker.

10 Q.  And does anyone else have access to that evidence locker?

11 A.  No.

12 Q.  While the -- while Exhibits -- while Government Exhibits

13 301 and 302 were in your custody, what did you do with them?

14 A.  I performed an examination using the same methods that I

15 used in the examination of the cartridge cases.  I used a

16 worksheet noting the different characteristics of both

17 bullets.  I determined the caliber, and that's done by

18 weighing the bullet, measuring the bullet, noting the

19 different characteristics and features; and then also

20 measuring the rifling impressions, those impressions, those

21 spiral grooves that are placed on the bullet at the time the

22 bullet is fired.

23 Q.  And did you make any findings in doing those comparisons?

24 A.  Yes, I did.

25 Q.  And what were those findings?

1  A.  I determined that both of these bullets were fired from

2  one firearm.

3  Q.  And did you make any findings as to the class

4  characteristics of the bullets?

5  A.  I determined that when I was examining the bullet, I could

6  not narrow it down specifically for the caliber, to determine

7  a caliber, but I was able to conclude that it was within the

8  .38 caliber family of firearms, which encompasses a couple

9  different calibers.

10  Q.  And is -- Mr. Esposito, is your conclusion based on your

11  training and experience using the practices and procedures

12  commonly accepted in the field of firearms identification?

13  A.  Yes.

14  Q.  And what did you do with the bullets once you completed

15  your examination?

16  A.  I sealed them back up into the containers and then

17  submitted this evidence back to the evidence vault.  I did

18  return Exhibit 4 back to the assigned examiner, latent print

19  examiner, Derek Weems.

20  Q.  Sir, were the casings -- I'm sorry, the bullets or the

21  packaging for the bullets in any different condition after you

22  returned them?

23  A.  No.

24  Q.  Other than your initials on the bullet?

25  A.  No.

1  Q.  Sorry.  You did -- did you initial the bullets?

2  A.  Yes, I did initial the bullets, yes.

3  Q.  Mr. Esposito, could a .38 class bullet be fired from a .9

4  millimeter cartridge case?

5  A.  Yes.  Within the .38 caliber family, .9 millimeter is one

6  of the calibers.  And I talk about this family because I don't

7  have the cartridge case.  The cartridge case has, of course,

8  the caliber on the bottom of it.  Bullets do not.  So it's up

9  to the examiner to weigh the bullets, measure them, look at

10  the different characteristics.

11        And I determined that they were within the .38

12  caliber family, one of which includes .9 millimeter.

13  Q.  And sir, you did not examine a firearm in this case,

14  correct?

15  A.  I did not receive one, no.

16  Q.  Based on the rifling impressions from the bullets, did you

17  form any other opinions?

18  A.  I determined that based on a side-by-side comparison using

19  the comparison microscope -- because both of these bullets had

20  the same class features, they had the same rifling dimensions,

21  so I moved to the next phase, which is the comparison

22  microscope and conducted a side-by-side comparison and

23  concluded they were both fired from one firearm.

24  Q.  And did you form any other opinions about the two bullets?

25  A.  No.

1  Q.  Did you -- were you asked to determine the types of

2  firearms that these two bullets could have been fired from?

3  A.  Well, I wasn't asked, but always in casework when I

4  receive a bullet, if I can determine the caliber or a range of

5  calibers and the rifling impressions are measurable, meaning

6  the bullet's in suitable condition, then I will take these

7  measurements and then enter them into an FBI rifling

8  characteristics database.  It's a culmination of firearms from

9  all over the world.  It's updated constantly.

10         With the information that I have from my examination,

11  I can enter this information into the database and come out

12  with a list of firearms that could have been used to fire

13  these two bullets.

14  Q.  And without going through the list of the firearms, what

15  types or categories of firearms did you determine that these

16  two bullets could have been fired from?

17  A.  Well, there were different calibers.  So within the .38

18  caliber class, based on the rifling dimensions that I entered

19  into the database, it came back with a list of firearms that

20  were of the .9 millimeter semiautomatic, .9 millimeter fully

21  automatic, and then the .38 Special which is another caliber,

22  and the 357 Magnum, .357 Magnum.

23         MS. BABU:  Nothing further, your Honor.

24         THE COURT:  Cross-examine?

25         MR. PISSETZKY:  Thank you.

1    THE COURT:  Mr. Pissetzky, you may question the

2  witness.

3                    CROSS-EXAMINATION

4  BY MR. PISSETZKY:

5  Q.  Good afternoon.

6  A.  Good afternoon, sir.

7  Q.  So you prepared a final report, a final laboratory report

8  in this case, correct?

9  A.  Yes, I did.

10  Q.  And that report was prepared based on certain notes that

11  you took after making the certain comparisons that you had?

12  A.  That's right.

13  Q.  In that report, the final report, you list your bottom

14  line conclusions?

15  A.  Yes.

16  Q.  And there's nowhere in your reports or in your notes that

17  you conclude or even come to a close conclusion that the

18  bullets, Exhibit -- I think it's Government Exhibit 301, if

19  I'm not mistaken.

20  A.  Yes.  301 and 302, sir.

21  Q.  -- were fired from Exhibit -- or were part of the same

22  bullet that originated from the casing in Exhibit, Government

23  Exhibit 300?

24  A.  That's right.  I can't -- without a firearm, because the

25  component separates into two different pieces, I can't

1    associate the bullet with the cartridge case, that's correct.

2    Q.   Now, let's go a step further.  There is a difference

3    between -- you told us that there is a family of .38 caliber

4    bullets, right?

5    A.   That's right.

6    Q.   Okay.  Within that family, there are .38 Special caliber

7    bullets, right?

8    A.   That's right.

9    Q.   And there's .9 millimeter bullets?

10   A.   That's right.

11   Q.   They're two different types of bullets?

12   A.   That's -- well, they have the same physical features, and

13   that's why I included those in my list.

14   Q.   Right.  But they're not the same bullet?

15   A.   Well, they were loaded into a different cartridge.

16   Q.   Correct.

17   A.   That's right, yes.

18   Q.   So it's a different cartridge.  And even the nose of --

19   can you -- let me back up for a second.

20        Can you explain to the ladies and gentlemen of the

21   jury how -- what does a bullet look like and what's the

22   component of a bullet?

23   A.   Well, the bullet, it's properly referred to as the

24   cartridge which is the single unit of ammunition.  Is that

25   what you're referring to?

1 Q. Correct.

2 A. Again, it consists of a primed cartridge case or shell

3 casing. It has a primer at the base of it. It also has

4 gunpowder, propellant gunpowder loaded into it, and then the

5 bullet which eventually becomes the projectile is loaded into

6 the mouth of the cartridge case.

7 Q. So the bullet itself is what's on the top of the head?

8 A. That's right.

9 Q. And the difference between -- there is a difference

10 between a .9 millimeter and a .38 Special, the head, the

11 actual bullet in the shape that they are shaped, correct?

12 A. Not necessarily, no.

13 Q. So some of them are identical?

14 A. Some -- some of the calibers, when they're manufactured,

15 for example, .9 millimeter and .38, use bullets that have a

16 very similar design. And that's why that was included because

17 based on my rifling search, it came up. I had to search the

18 .38 caliber family, and that's why those other calibers were

19 listed in my report.

20 Q. There are -- there is a way for you at times to identify

21 if a bullet is a .38 or a .9 millimeter?

22 A. I would have -- ordinarily, I'd want to have the gun

23 because there again, the .38 caliber, the .357, and the .9

24 millimeter, the bullets can share the same class features

25 meaning the bullet is the same design, the same diameter, it

1  has the same jacketing, copper jacket, jacket material.

2  Q.  Right.  I understand that.  However, the actual bullet,

3  the nose, the trajectory, okay, there can be a difference

4  between a .9 millimeter and a .38 Special where the .38

5  bullets are sometimes more rounded at the top?

6  A.  That can happen, yes.

7  Q.  And when you receive a bullet to do a comparison, you look

8  for that?

9  A.  Yes.

10 Q.  Did you find in your comparison here -- did you look for

11 that in your comparison here?

12 A.  Yes.  I noted the characteristics of both bullets.  They

13 were of a full metal jacket design.  That's noted in my

14 worksheet as well.  But those features alone do not allow me

15 to distinguish that this is definitively -- definitively a .9

16 millimeter.

17         So I had to include the .38 caliber as well as the

18 .357 because .357 and .9 millimeter do manufacture bullets

19 that have similar features to the .9 millimeter.

20 Q.  Right.  So if you look at what was, I guess, Exhibit --

21 was given to you as Exhibit 13 and you -- your worksheet says

22 that it was a copper total metal jacket design bullet,

23 correct?

24 A.  That's right.

25 Q.  What does that mean?

1   A.   That means that the bullet is totally encapsulated or the

2   lead -- the core is typically made of lead, but the jacket

3   material is the material that surrounds the core. A total

4   metal jacket means that the entire bullet, before it's

5   fired -- because when it's fired, it does become damaged -- is

6   completely covered with jacket material.

7   Q.   And then when you compared it to -- or when you looked at

8   Exhibit 4, your conclusion was, "copper, comma, full metal

9   jacket design bullet with a flat, open base"?

10   A.   Yes.

11   Q.   What is the difference?

12   A.   There is -- the only difference is that the bullets are of

13   the same class characteristics, but the features on the

14   bullet, for example, one is a total metal jacket which is

15   completely covered with jacket material, and one is a full

16   metal jacket, which means that the nose and the side is

17   completely covered with copper jacket. But a full metal

18   jacket bullet has an open base. And that's what I had in

19   Exhibit 3, I think it was.

20   Q.   So these are two different bullets?

21   A.   That's right.

22   Q.   And you cannot tell us from what gun they were fired?

23   A.   I don't understand the question.

24   Q.   Can you tell us the type of gun that they were fired from?

25   A.   Yes. Yes, I can.

1  Q.  The specific type of gun?

2  A.  Well, I can provide a list based on the rifling

3  dimensions.

4  Q.  Right.  And you provided a list that contained 49

5  different types of guns, correct?

6  A.  That's right.

7  Q.  Right.  So and you cannot narrow it down any further?

8  A.  No, I cannot.

9  Q.  Now, if you look at the casings, can you tell us what

10  gun -- can you narrow down the type of gun it was fired from?

11  A.  Not in this case, no.

12  Q.  And so you cannot tell us the type of gun specifically,

13  correct?  And you cannot tell us whether the bullet and the

14  casing or the cartridge were fired from -- even narrow down

15  the type of gun that they were both fired, if they were fired

16  from the same gun?

17  A.  No, because in this case, I did not receive a firearm.

18  When a gun is fired, the bullet and the cartridge case

19  separate at that point.

20  Q.  Now, you did conclude the casings -- or the cartridges,

21  I'm sorry, came from a .9 millimeter bullet, right?

22  A.  Yes.

23  Q.  Which is within the .38 family?

24  A.  Yes, it is.

25  Q.  You cannot conclude the same for the bullets themselves?

1    A.   No, I cannot.

2    Q.   You told us that you received or you picked up the bullets

3    from the fingerprint lab?

4    A.   I picked up one of the exhibits.  I think it was Exhibit

5    3, yes.

6    Q.   Exhibit --

7    A.   Or Exhibit 4, rather.

8    Q.   Exhibit 4?

9    A.   ATF Exhibit, 4, yes.

10   Q.   Do you know whether or not all of them were in that

11   fingerprint lab prior to you picking them up or receiving

12   them?

13   A.   All of what?  I'm sorry.  I don't understand the question.

14   Q.   Before you received Exhibit -- the other exhibit that you

15   had, Exhibit 12 and 13, were they also at the fingerprint lab?

16   A.   No.  Exhibit 4 was the first item that came into the

17   laboratory, one of the first items.  When I prepared to do my

18   examination, I had to retrieve that exhibit from my supervisor

19   who got the evidence from the fingerprint section.

20   Q.   And you made sure before your supervisor retrieved it that

21   the fingerprint analyst already worked on it, correct, or

22   analyzed it?

23   A.   Yes, that's correct.

24   Q.   Now, when you received the cartridges, did you make sure

25   that the fingerprint analyst worked on those already as well?

1   A.   Yes.  When the submission form comes in, the laboratory

2   submission form, it has blocks checked on what examinations

3   have to be done first.  And we follow an order in which that

4   happens.

5          And in this case, when I went to receive the

6   cartridge cases, there was no request on them at that point

7   for a fingerprint exam --

8   Q.   So nobody --

9   A.   -- in the laboratory.

10  Q.   I'm sorry?

11  A.   There was no request for a fingerprint examination on the

12  fired cartridge cases by the ATF laboratory.

13  Q.   And so what kind of requests were they, can you tell us?

14  Do you have the --

15  A.   I'll have to look at my notes again.

16  Q.   Go ahead.

17  A.   Thank you.

18         Okay.  Exhibit 4 just has "fingerprints" checked on

19  it.  Now, Exhibit 4 contains that one bullet which is

20  Government's Exhibit 301.

21  Q.   Correct.  What about the casings?

22  A.   The casings which were contained in Exhibit 13, 12 and 13,

23  were just checked for firearms examination.

24  Q.   So that means that nobody asked for the fingerprints to

25  be -- tried to be lifted from them, right?

1  A.  I don't know that.  I just know that when it came to the

2  laboratory, there was no ATF request for that examination.

3  Q.  Now, of course, when you receive it, you handle it and you

4  manipulate it and you put it under the microscope, correct?

5  A.  Yes, I do.

6  Q.  And so it would be very difficult -- had there been actual

7  detectable or any other fingerprints or DNA, it possibly would

8  have been destroyed or contaminated by you?

9  A.  Yes.

10  Q.  You talked a little bit about the bullet and the -- and

11  the ejection of the cartridge, correct?

12  A.  Ejection pattern, yes.

13  Q.  Correct.  And you told us that the majority of the

14  firearms that you have, the semiautomatic or automatic

15  firearms, the bullets eject to the right and slightly to the

16  back?

17  A.  That's right.

18  Q.  How high would it eject in the air, or would it go

19  directly sideways?  What's the angle?  I'm sorry.

20  A.  Without having a gun for some testing, I really couldn't

21  determine that.

22  Q.  And you're -- and again, like you told us, it depends on

23  how the individual holds the gun, which angle the gun is

24  pointing or which -- correct?

25  A.  Well, if you orient the ejection port in a different

1    location other than the conventional way you would hold a

2    firearm, it's going to eject the cartridge case in that

3    direction.

4    Q.  And if the cartridge, if it's ejecting, obviously the

5    cartridge will -- if you're standing by a wall, it would hit

6    the wall.  If you are standing by a fence, it would hit the

7    fence.  So it really depends on where you stand as well?

8    A.  Yes, that's correct.

9    Q.  And when you say "to the back," how -- did you find --

10   what is -- based on your experience, when you put a firearm in

11   a position that you fire for examination, how much to the back

12   would it go?

13   A.  Typically, I think a good estimate would be six to ten

14   feet.  Again, if I fire a gun five times, the cartridge case

15   doesn't land in the same spot, so it lands in an area, a

16   general area.  And that's why I use that bracket, six to ten

17   feet.

18   Q.  And the area could be varied to what degree?

19   A.  I mean, that -- I think that's a good estimate, six to ten

20   feet, but it would depend on the terrain, again, what the

21   surface material is.  Asphalt and concrete, the cartridge case

22   is going to bounce.  If it hits grass, it typically stays

23   there.

24   Q.  And when you fire -- typically fire a bullet that is -- or

25   a bullet that is in the characteristic that you found it to

1  be, which is within the .38 caliber family, how far would it

2  travel?

3  A.   The bullet travel?

4  Q.   Yes.

5  A.   How far would -- I can't give you an estimate on that

6  without the gun for any kind of testing.

7  Q.   And a bullet that is a .9 millimeter compared to a .38

8  Special would have different travel pattern as well because it

9  has -- it's packed differently with the -- it's packed

10  differently, correct?

11  A.   Yes.   The .38 Special, for example, has a larger cartridge

12  case and typically has a little bit more gunpowder in it.

13  Q.   And so if a bullet -- can you tell, if a bullet hits a

14  fence or a bullet hits an individual and it keeps on

15  traveling, would you be able to estimate if you're asked as to

16  the type of bullet it was or what gun it could have been fired

17  from?

18  A.   There are cases when a bullet strikes something, impacts

19  something like concrete, glass, even a body.   There are cases

20  where we are able to make comparisons, we find marks of value

21  and can do suitable comparisons.

22  Q.   And if I'm not mistaken, did you say that you also worked

23  at some point on -- in the field of shooting reconstruction?

24  A.   I have received training in that field, yes, I have.

25  Q.   Have you ever asked -- been asked by the ATF in this case

1  or the prosecutors to come to the scene or to work

2  reconstruction of the scene here?

3  A.  No.

4  Q.  Have you been asked to estimate or try, based on your

5  expertise, to determine where a shooter would have been or

6  should have been standing or could have been standing when he

7  fired a certain gun if --

8  A.  Well, again, my shooting incident reconstruction training

9  involved examining fixed bullet strikes.  When you have

10  targets that can move, there's a lot of other variables that

11  have to be factored into this.

12  Q.  But have you been asked to do something in this case

13  besides doing the comparisons?

14  A.  No, I have not.

15         MR. PISSETZKY:  May I have a moment, Judge?

16     (Pause.)

17  BY MR. PISSETZKY:

18  Q.  I was reminded, these are the only exhibits that you were

19  provided to compare?

20  A.  Yes.

21  Q.  You were not asked to compare any exhibits that came from

22  bullets or a gun that came from Agent Strap, right, or --

23  Spratte, Agent Spratte, correct?

24  A.  This is the only evidence I received.

25  Q.  Okay.  And finally, the -- in your -- I don't know if it's

1  within your experience or knowledge, but you have had

2  incidences where you have seen that fingerprints have been

3  lifted from bullets before, any -- you know, from the

4  cartridge or the tip of the bullet?

5        MS. BABU:  Objection, your Honor.  This is outside of

6  the scope of his testimony.

7        MR. PISSETZKY:  If he knows, Judge.

8        THE COURT:  I don't think it's in the scope.  I'll

9  sustain the objection.

10       MR. PISSETZKY:  Thank you.

11       THE COURT:  Anything further?  If not --

12       MS. BABU:  A few more questions, your Honor.

13       THE COURT:  All right.  Quickly.

14       MS. BABU:  Thank you.

15                      REDIRECT EXAMINATION

16  BY MS. BABU:

17  Q.  Mr. Esposito, you were asked by defense counsel about the

18  distance a bullet could travel?

19  A.  Yes.

20  Q.  And the distance a bullet could travel if it traveled

21  through an object?

22  A.  You asked me what?  I'm sorry.

23  Q.  I'm sorry.  Defense counsel asked you if you could

24  determine the distance a bullet would travel if it traveled

25  through an object?

1    A.   Yes.

2    Q.   Are there different -- based on the type of ammunition,

3    does that make a difference in how far a piece of ammunition

4    could travel?

5    A.   I mean, there are so many variables that a lot of factors

6    would -- it would depend on the type of gun and things like

7    that.

8    Q.   The ammunition here, the two bullets here, what type of

9    ammunition were those?  Were those round nosed?  Was it round

10   nosed ammunition or was it hollow point ammunition?

11   A.   Well, they are -- one of them was a total metal jacket

12   design, meaning the entire bullet comes, before it's fired,

13   encapsulated in copper.  And then the other bullet is a full

14   metal jacket, which means that it's a round nosed design, the

15   nose and the sides, but the base is open.

16   Q.   And in your experience, do -- going to the hollow point

17   ammunition, how is that different from round point ammunition?

18   A.   Well, from what I read about hollow point and what I know

19   about hollow point ammunition, hollow point ammunition is --

20              MR. PISSETZKY:  Objection, Judge, to relevance.

21              THE COURT:  Yes, objection sustained.  This is

22   improper redirect.

23              MS. BABU:  Your Honor --

24   BY MS. BABU:

25   Q.   Mr. Esposito, does -- round nosed ammunition, when it

1    strikes an object, does it travel through the object, or does

2    it stay within the object?

3    A.   What kind of ammunition?

4    Q.   Round nosed ammunition.

5              MR. PISSETZKY:  Objection.

6              THE COURT:  That's beyond the scope of the cross, so

7    I'm going to sustain the objection.

8    BY MS. BABU:

9    Q.   Mr. Esposito, you were also asked about the number of

10   types of guns you determined that the two bullets, Government

11   Exhibits 301 and 302, could have been fired from?

12   A.   Yes.

13   Q.   And you testified that they could have been fired from 49

14   different types of guns, correct?

15   A.   That may be the number.  I didn't count all of them.

16   Q.   Of those types, there were four categories, correct?

17   A.   Yes.

18   Q.   And what were those four categories?

19   A.   The .9 millimeter semiautomatic, .9 millimeter fully

20   automatic, .38 Special, and .357 Magnum.

21   Q.   And in your report, what of those 49 --

22             THE COURT:  He testified to those questions on your

23   direct examination, so you don't need to go over that again.

24             MS. BABU:  Your Honor, I have one more point.

25             THE COURT:  All right.  Quickly.

1    BY MS. BABU:

2    Q.  Of the 49 types of guns, Mr. Esposito, how many were .9

3    millimeter semiautomatic handguns?  And it's in your report if

4    you'd like to refresh your recollection.

5    A.  I didn't count them, but the .9 millimeter was the larger

6    group within the firearm, listing of firearms that could have

7    been used to fire.

8    Q.  Could you count those here for the jury, please?

9            MR. PISSETZKY:  Objection.

10           THE COURT:  Is it -- go ahead.  Count them quickly.

11           THE WITNESS:  Yes, sir.

12           It looks like there's 36 of the .9 millimeter

13   semiautomatic.  And the .9 millimeter fully automatic, it

14   looks like seven.

15           THE COURT:  Thank you.  Is that it?

16           MS. BABU:  That's it, your Honor.

17           THE COURT:  You can step down.  You're excused.

18           THE WITNESS:  Thank you, your Honor.

19      (Witness excused.)

20           THE COURT:  You can call your next witness.

21           MR. EICHENSEER:  Your Honor, the government calls

22   Victoria Jean-Baptiste.

23           THE COURT:  Right up here.  Please raise your right

24   hand.

25      (Witness sworn.)

1          THE WITNESS:  Yes.

2          THE COURT:  Please be seated.  Speak directly into

3   the microphone so we can hear you.  Thank you.

4          You can question the witness.

5      VICTORIA JEAN-BAPTISTE, GOVERNMENT'S WITNESS, SWORN

6                  DIRECT EXAMINATION

7   BY MR. EICHENSEER:

8   Q.  Good afternoon, ma'am.  Could you please state and spell

9   your name for the record?

10  A.  Victoria Jean-Baptiste.  V-i-c-t-o-r-i-a, J-e-a-n,

11  B-a-p-t-i-s-t-e.

12  Q.  How old are you, ma'am?

13  A.  20.

14  Q.  And where do you live?

15  A.  On 4448 South Hermitage.

16  Q.  And how long have you lived at that address?

17  A.  At that address, for about two years now.

18  Q.  Ms. Jean-Baptiste, do you mind if I move that map closer

19  to you?  I'm going to ask you some questions about it?

20  A.  That's fine.

21         THE COURT:  Why don't you do it.

22  BY MR. EICHENSEER:

23  Q.  Do you recognize the neighborhood on the map,

24  Ms. Jean-Baptiste?

25  A.  Yes.

1   Q.   Can you show the jury where you lived in about May of last

2   year?

3            That's on Hermitage between 44th and 45th, correct?

4   A.   Yes.

5   Q.   Do you know Ernesto Godinez?

6   A.   Yes.

7   Q.   How long have you known Ernesto Godinez?

8   A.   For several years now.

9   Q.   Were you with Mr. Godinez on May 4th of last year?

10  A.   Yes.

11  Q.   Do you see Mr. Godinez in the courtroom today?

12           MR. HYMAN:  Your Honor, we will stipulate.

13           THE COURT:  All right.  It's stipulated that she can

14  identify the defendant.

15           MR. EICHENSEER:  Okay.  Can the record reflect that

16  the witness identified the defendant.

17  BY MR. EICHENSEER:

18  Q.   Ms. Jean-Baptiste, you've met with me and Ms. Babu before;

19  is that right?

20  A.   Yes.

21  Q.   And you met with us several times last year?

22  A.   Yes.

23  Q.   Did you have a lawyer with you at some of those meetings?

24  A.   Yes.

25  Q.   And during those meetings, did you sign an agreement with

1  the government?

2  A.  Yes.

3  Q.  You read that agreement before you signed it?

4  A.  Yes.

5  Q.  What kind of -- what kind of agreement is that?

6  A.  It was an immunity.

7  Q.  And what does immunity mean to you?

8  A.  I had told false statements to a police officer.  That

9  wasn't going to be used against me.

10  Q.  Okay.  And then did the government promise anything in

11  exchange for not using your statements against you?

12  A.  I don't remember.

13  Q.  Is the immunity what you got from the government?  Is that

14  what you received?

15  A.  Yes.

16  Q.  And did you have to do anything to get that immunity?

17  A.  Tell the truth.

18  Q.  And that was in your immunity agreement?

19  A.  Yes.

20  Q.  And besides the immunity agreement, has the government

21  made any other promises to you in this case?

22  A.  No.

23  Q.  I'm going to ask you some more questions about

24  Mr. Godinez.  You said that you've known him for several

25  years; is that right?

1   A.  Yes.

2   Q.  Are you friends with Mr. Godinez?

3   A.  Yes.

4   Q.  Are you still friends with Mr. Godinez?

5   A.  Yes.

6   Q.  When is the last time you spoke to him?

7   A.  I don't remember.

8   Q.  Was it this month?

9   A.  Yes.

10  Q.  Is your relationship with Mr. Godinez romantic?

11  A.  Not anymore.

12  Q.  When was it romantic?

13  A.  Last year.

14  Q.  Okay.  Were you in a romantic relationship with

15  Mr. Godinez on May 4th of last year?

16  A.  Yes.

17  Q.  Okay.  And how long had you been in a relationship with

18  Mr. Godinez on May 4th of last year?

19  A.  A few months, not long.

20  Q.  Do you know where the defendant lived, Mr. Godinez, on May

21  4th of last year?

22  A.  Yes.

23  Q.  Where did he live?

24  A.  On 43rd and Wood.

25  Q.  Is that close to your house?

1   A.  Yes.

2   Q.  Do you recognize where Mr. Godinez lived on the map next

3   to you?

4   A.  Yes.

5   Q.  Can you show the jurors about where his house is?

6           And you're pointing to Wood Street between 43rd and

7   44th?

8   A.  Yes.

9   Q.  Did Mr. Godinez drive a car last year in May?

10  A.  Yes.

11  Q.  What kind of car did he drive?

12  A.  A white Kia.

13  Q.  Was that his car?

14  A.  No.

15  Q.  Who did it belong to, to your knowledge?

16  A.  Destiny.

17  Q.  And who is Destiny?

18  A.  His wife or girlfriend.

19  Q.  Did Mr. Godinez use a phone in May of last year?

20  A.  Yes.

21  Q.  Did he use more than one phone?

22  A.  Yes.

23  Q.  Do you know what phone number he used last year?

24  A.  I don't remember.

25  Q.  Is there something that might help you refresh your

1  memory?

2  A.  What was that?

3  Q.  Is there something that might help you refresh your

4  memory?

5  A.  Is there something?

6  Q.  Yes.

7  A.  I don't remember the number.

8      MR. EICHENSEER:  Your Honor, may I approach?

9  BY MR. EICHENSEER:

10 Q.  Would you please take a look at what I've handed you now,

11 in the third paragraph?  And if that refreshes your memory,

12 please hand it back to me.

13 A.  Yes.

14 Q.  Is your recollection refreshed, Ms. Jean-Baptiste?  In

15 other words, is your memory refreshed having seen that

16 document?

17 A.  Yes.

18 Q.  What was Mr. Godinez's phone number last year?

19 A.  I don't remember it.

20 Q.  Was it 708-314-1541?

21 A.  That's the one that's on the paper, yes.

22 Q.  Did you and Mr. Godinez ever text each other last year?

23 A.  Just through Snapchat.

24 Q.  Okay.  Is Snapchat an application for your phone?

25 A.  Yes.

1  Q.  And does Snapchat allow you to send text messages to

2  people?

3  A.  Yes.

4  Q.  Did you have a Snapchat account yourself?

5  A.  Yes.

6  Q.  What was your Snapchat user ID?

7  A.  Vicky0730.

8  Q.  What about Mr. Godinez?  What was his Snapchat user ID?

9  A.  I don't remember.

10 Q.  Was it "Ebird Wood Street," e-b-i-r-d-w-d-s-t?

11 A.  Yes.

12 Q.  Did the defendant have an older brother at all?

13 A.  What was that?

14 Q.  Did the defendant have an older brother?

15 A.  Yes.

16 Q.  Do you know where the older brother lived?

17 A.  Yes.

18 Q.  Did he live close to Mr. Godinez?

19 A.  Yes.

20 Q.  How close?

21 A.  Like two houses down.

22 Q.  Two houses up toward 43rd or two houses down toward 44th?

23 A.  Towards 43rd.

24 Q.  Are there any gangs that are active in your

25 neighborhood --

1  A.  Yes.

2  Q.  -- Ms. Jean-Baptiste?

3      What gangs?

4  A.  Latin Saints.

5  Q.  Is the defendant a member of the Latin Saints, to your

6  knowledge?

7  A.  Yes.

8  Q.  I want to ask you some more questions about May 4th of

9  last year.  Were you awake around 3:00 o'clock that morning?

10  A.  3:00 in the morning?

11  Q.  Yes.

12  A.  Yes.

13  Q.  What were you doing?

14  A.  I had just woke up like around --

15  Q.  You were at your house?

16  A.  Yes.

17  Q.  Were you doing anything on your phone?

18  A.  Yes.

19  Q.  What were you doing?

20  A.  I was messaging Ernesto.

21  Q.  Mr. Godinez?

22  A.  Yes.

23  Q.  Were you messaging him on Snapchat?

24  A.  Yes.

25  Q.  And what were you guys chatting about on Snapchat?

1  A.  Hanging out together.

2  Q.  Did you guys have plans for that morning?

3  A.  Yes.

4  Q.  What were those plans?

5  A.  To hang out and then take Adriana to the airport.

6  Q.  And who is Adriana?

7  A.  A close friend of ours.

8  Q.  Did Adriana live nearby?

9  A.  A few blocks away, yes.

10 Q.  Does she live on the other side of the park?

11 A.  Yes.

12 Q.  And what time did you and Mr. Godinez have to take your

13 friend to the airport?

14 A.  At 5:00 in the morning.

15 Q.  So what were you and the defendant texting about

16 specifically at 3:00 a.m.?  You said you were texting him

17 about hanging out.  What specifically were you texting him?

18 A.  We were going to either meet up or I pick him up to just

19 drive around for a little while before we picked up Adriana to

20 smoke.

21 Q.  You said you were going to pick up -- you said you were

22 going to smoke.  What does that mean?

23 A.  Smoke weed.

24 Q.  Just to be clear, are you -- did you smoke any weed before

25 testifying today?

1  A.  No.

2  Q.  Did Mr. Godinez text you to come pick him up at any point?

3  A.  Yes.  I asked him whether to meet him up or to pick him

4  up.

5  Q.  And how did he respond?

6  A.  To meet him and then to pick him up.

7  Q.  Okay.  Did he say where to pick him up by?

8  A.  44th and Wood.

9  Q.  Is that -- that's not his house, that's just down from his

10  house, correct?

11  A.  Yes.

12  Q.  What happened next after the defendant told you to pick

13  him up by 44th and Wood?

14  A.  I heard gunshots outside.

15  Q.  Okay.  Were your windows open?

16  A.  Yes.

17  Q.  So what did you do then?

18  A.  Then I ran to my phone to message Godinez to see where he

19  was at.

20  Q.  Were you worried?

21  A.  Yes.

22  Q.  Why were you worried?

23  A.  Because our area's, like, high gun violence area, so I was

24  worried because he was outside.  He told me he was on 44th and

25  Wood so...

1  Q.  So you understood that he was outside?

2  A.  Yes.

3  Q.  Did you text him at all after hearing -- I'm sorry.  Did

4  you Snapchat him at all after hearing those gunshots?

5  A.  Yes.

6  Q.  What did you Snapchat him?

7  A.  I asked him where he was at.

8  Q.  Did he respond?

9  A.  Yes.

10  Q.  What did he say?

11  A.  By his house.

12  Q.  And did you respond to him after that?

13  A.  Yes.

14  Q.  What did you say?

15  A.  That I was going.

16  Q.  That you were leaving to come get him?

17  A.  Yeah.

18  Q.  Okay.  And when you texted him that you were coming to get

19  him, were you actually on the way at that point?

20  A.  No.

21  Q.  Where were you when you texted him that you were about to

22  come get him?

23  A.  I was at home.

24  Q.  Okay.  So you hadn't left yet?

25  A.  Yes.

1  Q.  So where were you -- you were still in your house down on

2  44 -- on the 4400 block of Hermitage at that point, correct?

3  A.  Yes.

4  Q.  And did you then leave the house?

5  A.  Yes.

6  Q.  And how did you leave?  Did you walk or get in the car?

7  A.  I got in my car.

8  Q.  What kind of car do you drive?

9  A.  Ford Focus.

10  Q.  Is that a four-door?

11  A.  Yes.

12  Q.  What color is it?

13  A.  Black.

14  Q.  Where was your black Focus parked?

15  A.  Right across the street from my house.

16  Q.  Okay.  So what did you -- did you get in the Focus, and

17  you drove where?

18  A.  I got in my car, and then I made a U-turn because the cops

19  were blocking off the other side of my house, the other side

20  of the block.

21  Q.  So you're saying there was police by the 44th and

22  Hermitage intersection, so you had to go the other direction?

23  A.  Yes.

24  Q.  So you headed south.  And then where did you go from

25  there?

1  A.  Then I went up towards 45th Street, and then I went down

2  Wood.

3  Q.  Okay.  And when you went -- you said you went down Wood,

4  but you meant you went up toward 43rd, right, north?

5  A.  Yes.

6  Q.  And did you stop anywhere?

7  A.  No.

8  Q.  What about when you crossed 44th Street?  Did you then

9  stop anywhere?

10  A.  Like --

11  Q.  Did you stop at the defendant's house?

12  A.  Yes.

13  Q.  And did you pull into a driveway, pull in the street?  How

14  did you stop?

15  A.  I pulled into the driveway of the factory next door to his

16  house.

17  Q.  Did you send him any texts or Snapchats after you arrived?

18  A.  I told him that -- well, when I arrived to his house, I

19  told him I was there.

20  Q.  Did he come out right away?

21  A.  Yes.

22  Q.  Did you have to wait at all for him to come out?

23  A.  Like a minute or so, just until he got to the car.

24  Q.  Okay.  And did he come out of his house to get to your

25  car, or did he come out of someplace else?

1   A.   No.  He came out of a gangway.

2   Q.   Okay.  What gangway did he come out of?

3   A.   By his brother's house.

4   Q.   Okay.  That was the house about two doors up from his

5   house that you said earlier?

6   A.   Yes.

7   Q.   And when he came out of the gangway by his brother's

8   house, what was he wearing?

9   A.   All black clothes.

10  Q.   And how was he wearing his hair that day?

11  A.   Up --

12  Q.   Was it --

13  A.   -- in a ponytail.

14  Q.   -- different than he does today?

15  A.   Uh-huh.

16  Q.   Did he have any facial hair?

17  A.   I don't remember.

18  Q.   And so after he came out of the gangway by his brother's

19  house, where did he go from there?

20  A.   He came into my car.

21  Q.   Okay.  And did he get in your car?

22  A.   What was that?

23  Q.   Did he get in your car?

24  A.   Yes.

25  Q.   What side of the car did he get in?

1    A.   The passenger side.

2    Q.   Okay.  What was his state when he came in your car?

3    A.   What was what?

4    Q.   What was his condition?

5    A.   Just normal, just sat down.

6    Q.   Was he sweating at all?

7    A.   Had a little bit.

8    Q.   Did he say anything when he got in the car?

9    A.   I don't remember exactly what he said, but he did say

10   something.

11   Q.   And what do you remember him saying?

12   A.   "I feel good, fuck," and something about "flake."

13   Q.   So is it -- is your testimony today that you remember him

14   saying, "I feel good, fuck," something "that flake"?

15   A.   Something about "flake," yes.  I don't remember exactly.

16   Q.   Is there anything that would refresh your memory?

17   A.   Sure.

18   Q.   Showing you this document, look at the highlighted portion

19   and let me know if that refreshes your memory as to what

20   Mr. Godinez said when he got in the car.

21   A.   It was something like "fuck" and then something about

22   "flakes."

23   Q.   This isn't the first time that you've testified in this

24   building, is it, Ms. Jean-Baptiste?

25   A.   No.

1  Q.  When's the last time you testified?

2  A.  I think like a year ago.

3  Q.  Okay.  Was that in a courtroom, or was it in a different

4  room?

5  A.  It was in a different room.

6  Q.  It was in the grand jury?

7  A.  Yes.

8  Q.  And in the grand jury, were you under oath?

9  A.  Yes.

10  Q.  You were -- did you raise your hand and swear to tell the

11  truth?

12  A.  Yes.

13  Q.  And you understood that your testimony in the grand jury,

14  if you lied, the penalty is potentially perjury?

15  A.  Yes.

16  Q.  And you -- did you have a statement read into the grand

17  jury?

18  A.  What was that?

19  Q.  Did you prepare a statement to read in the grand jury?

20  A.  Yes.

21  Q.  And did you review that statement before it was read to

22  the grand jury?

23  A.  Yes.

24  Q.  Did you initial every page of it?

25  A.  Yes.

1  Q.  Did you have a chance to review it beforehand?

2       Did you have a chance to review it before going in

3  the grand jury?

4  A.  Yes.

5  Q.  And in that statement, did you say, "He leaned back in the

6  passenger seat and said, 'I feel good,' and something like,

7  'fuck that flake' or 'fuck those flakes'"?

8       Did you testify to that in the grand jury?

9  A.  Yes.

10 Q.  What does a flake mean to you?

11      MR. PISSETZKY:  Your Honor, I object that it was not

12 impeaching.

13      THE COURT:  Overruled.  It will stand.

14      Go ahead.  Next question.

15 BY MR. EICHENSEER:

16 Q.  What does the term "flake" mean to you?

17 A.  Rival gang member, any gang outside of the neighborhood.

18 Q.  So after Mr. Godinez got in the car, where did you guys go

19 from there?

20 A.  We went to 35th and Ashland.

21 Q.  Okay.  Why did you go there?

22 A.  To buy water and blunts.

23 Q.  And how far is that from Mr. Godinez's house?

24 A.  It's, like, almost ten blocks away, like eight blocks or

25 ten.

1  Q.  And what are blunts?

2  A.  Like Rollos, cigars.  I don't know how to explain.

3  Tobacco products.

4  Q.  What were you going to use the blunts for?

5  A.  For weed, just --

6  Q.  Had you smoked weed before you bought the blunts with

7  Mr. Godinez at that point?

8  A.  No.

9  Q.  So were you sober at that point at a little after 3:00 in

10  the morning?

11  A.  Was I what?

12  Q.  Were you still sober before you bought the blunts?

13  A.  Yes.

14  Q.  Who bought the blunts, you or Mr. Godinez?

15  A.  Godinez.

16  Q.  How did he pay for that?

17  A.  I gave him money.

18  Q.  Why did you give him money?

19  A.  He forgot his wallet.

20  Q.  And as you were in the gas station, were you doing

21  anything with your phone?

22  A.  While we were in front of the gas station?

23  Q.  Or just before or after the gas station, were either of

24  you doing anything with your phone?

25  A.  We were looking for the scanner app.

1    Q.   What's the scanner app?

2    A.   It's like an application, like, for -- like, say, if the

3    cops are around, like, you're able to hear what's going on

4    around the neighborhood as well.

5    Q.   Okay.  So does "scanner" mean a police scanner?

6    A.   Yes.

7    Q.   And why were you talking about getting the scanner

8    application on your phone?

9    A.   We were trying to see what was going on in the

10   neighborhood.

11   Q.   Okay.  Whose idea was it to download the scanner app?

12   A.   Both of ours.

13   Q.   Who -- who was listening to the scanner application?

14   A.   I didn't have it on my phone.  He had it on his, so he had

15   it by his ear.

16   Q.   So he was listening to the scanner?

17   A.   Yes.

18   Q.   Was he relaying any information to you about what he heard

19   on the scanner?

20   A.   I believe that a cop had got shot.

21   Q.   And do you know at what point Mr. Godinez relayed that

22   information to you?

23   A.   The same time that he heard it on the scanner.

24   Q.   Do you know if that was before or after you went to the

25   gas station?

1  A.  That was when we were in front of the gas station.

2  Q.  In front of the gas station.  And about what time were you

3  at the gas station?

4  A.  I don't remember.

5      MR. EICHENSEER:  At this point, your Honor, I'd like

6  to publish Government Exhibit 12 which is already in evidence.

7      THE COURT:  All right.

8  BY MR. EICHENSEER:

9  Q.  So ma'am, on the screen in front of you, you're about to

10 see an exhibit.

11     Do you see the black car that just pulled into the

12 parking lot there?

13 A.  Yes.

14 Q.  Do you recognize that car?

15 A.  Yes.

16 Q.  Whose is it?

17 A.  Mine.

18 Q.  And is anybody in the passenger seat with you?

19 A.  Godinez.

20 Q.  And what time is the timestamp on this footage, can you

21 see that?

22 A.  3:33.

23 Q.  Is that about the time that you and Mr. Godinez stopped at

24 the gas station?

25 A.  Yes.

1  Q.  And the person that you see on the screen right now in the

2  gray shirt and the dark baseball hat, do you recognize that

3  person?

4  A.  Yes.

5  Q.  Who is that?

6  A.  Godinez.

7  Q.  Are those the same clothes he was wearing when he got in

8  your car --

9  A.  Yes.

10  Q.  -- in front of his house?

11       And what kind of baseball hat is that?  Is it a black

12  hat?

13  A.  Yeah.

14  Q.  Do you know what the logo in front is, do you remember?

15  A.  No.  I can't really see it.

16  Q.  Okay.  And he had his hair in a ponytail like that; is

17  that right?

18  A.  Yes.

19  Q.  And how did you know that Mr. Godinez had forgot his

20  wallet?

21  A.  He told me.

22  Q.  Did he come back out of the gas station?

23  A.  I don't remember, but I know he told me that he didn't

24  have his wallet.

25  Q.  So ma'am, after this gas station, did you go someplace

1  else?

2  A.  We drove around for a little while, and then we headed

3  towards the neighborhood.

4  Q.  Okay.  As you were driving around, what were you doing?

5  A.  Smoking.

6  Q.  You were smoking weed, right?

7  A.  Yes.

8  Q.  Did you stop at any other gas stations after this one?

9  A.  Yes, but that was, like, I believe like an hour after

10 this.

11 Q.  So this would have been sometime before -- around 4:30; is

12 that fair?

13 A.  I don't remember.

14 Q.  But it was after this gas station?

15 A.  Not right after.

16 Q.  So you drove around a little bit before stopping at the

17 second gas station?

18 A.  We drove by his house.

19 Q.  Your friend who needed to go to the airport, that was at

20 5:00 a.m. that you needed to be there, correct?

21 A.  Yes.

22 Q.  So did you need to be back in the neighborhood around 5:00

23 a.m.?

24 A.  Yes.

25 Q.  Now, that second gas station you stopped at, where was

1  that?

2  A.  On Garfield.

3  Q.  Garfield Boulevard?

4  A.  Yes.

5  Q.  Is that -- is that shown on this map here?

6  A.  No.

7  Q.  Is that south of that location?

8       That's south of what we're looking at --

9  A.  Oh, yes.

10 Q.  -- here, right?

11      Do you remember the cross street at all with

12 Garfield?

13 A.  No.

14 Q.  Do you remember what color the gas station was?

15 A.  Blue.

16 Q.  And why did you stop at that gas station?

17 A.  To get a shirt.

18 Q.  To get a shirt for who?

19 A.  For Godinez.

20 Q.  For the defendant?

21 A.  Yes.

22 Q.  And whose idea was it for him to get a shirt?

23 A.  His idea.

24 Q.  Okay.  So did you stop at that gas station just to get a

25 shirt?

1  A.  Yes.

2  Q.  How did Mr. Godinez pay for the shirt?

3  A.  With the change he had left from my money.

4  Q.  From the 20 -- or the money that you loaned him?

5  A.  Yes.

6  Q.  What color was the T-shirt that he bought?

7  A.  White.

8  Q.  What did he do with that white T-shirt after he bought it?

9  A.  He put it over his black shirt.

10  Q.  So after Mr. Godinez bought the white T-shirt and put it

11  on over his black shirt, where did you go from there?

12  A.  Towards his house.

13  Q.  Did you drop him off at his house?

14  A.  At Destiny's house.

15  Q.  So where did you -- so you dropped him off back in the

16  neighborhood?

17  A.  Yes.

18  Q.  Where did you drop him off, what street intersection?

19  A.  43rd and Honore.

20  Q.  Was it -- did Mr. Godinez ask to get dropped off there?

21  A.  Yes.

22  Q.  Is that a block over from where he lives?

23  A.  Yes.

24  Q.  And where did you drop him off by 43rd and Honore; in the

25  street?

1   A.   On the corner.

2   Q.   On the corner?

3   A.   Yes.

4   Q.   And where did Mr. Godinez go after you dropped him off at

5   the corner?

6   A.   I didn't see.

7   Q.   What was he wearing when he got out of the car?

8   A.   A white shirt and black pants.

9   Q.   So the same outfit as you saw in the gas station except a

10  white T-shirt instead of a black T-shirt?

11  A.   Yes.

12  Q.   And you couldn't see where he went from there?

13  A.   I wasn't paying attention.

14  Q.   Did he tell you where he was going at all?

15  A.   No.

16  Q.   So after you dropped off Mr. Godinez at 43rd and Honore --

17  by the way, about what time was that?

18  A.   Like almost -- I think it was 5:00 o'clock.

19  Q.   Okay.  So now you're close to the time that you need to be

20  picking up your friend, right?

21  A.   Yes.

22  Q.   By the way, before Mr. Godinez got out of your car, did he

23  leave anything in your car?

24  A.   A hat.

25  Q.   Was it the black hat that he was wearing at the gas

1  station and when you picked him up?

2  A.  Yes.

3  Q.  So after you dropped him off at 43rd and Honore, where did

4  you go?

5  A.  I went to McDonald's.

6  Q.  Just to grab food or a coffee or something?

7  A.  Coffee.

8  Q.  Okay.  And where did you go after McDonald's?

9  A.  To Adriana's house.

10  Q.  And Adriana is your friend, correct?

11  A.  Yes.

12  Q.  And can you just show the jurors about where she lived?

13  A.  She lives...

14  Q.  Are you pointing toward kind of the southeast corner of

15  the park there --

16  A.  Right here.

17  Q.  -- in that area?

18       Okay.  And did you -- and what time did you get to

19  your friend Adriana's house?

20  A.  At around -- I don't remember exactly.

21  Q.  Did you see the defendant again at all?

22  A.  When they arrived, yes.

23  Q.  Who's -- when you say "when they arrived," what do you

24  mean?

25  A.  Him and Adriana.

1  Q.  So they arrived at her house about the time that you got

2  there?

3  A.  A few minutes after.

4  Q.  A few minutes after.  And were they in a car?

5  A.  Yes.

6  Q.  What kind of car?

7  A.  The white Kia.

8  Q.  Okay.  Was that the white Kia that Mr. Godinez drives?

9  A.  Yes.

10  Q.  Okay.  And had you seen that white Kia, by the way, when

11  you dropped him off at 43rd and Honore?

12  A.  I don't remember.

13  Q.  Had you seen that white Kia when you picked him up from

14  his house at 3:18?

15  A.  I don't remember.

16  Q.  So after Adriana and the defendant arrived at your friend

17  Adriana's house and you were there, what happened next?

18  A.  I got in her car.

19  Q.  Okay.  And where did you guys go?

20  A.  We left towards the airport.  We drove down Ashland.

21  Q.  Which airport?  O'Hare or Midway?

22  A.  O'Hare.

23  Q.  And who was driving the car?

24  A.  Ernesto.

25  Q.  Who else was with you in the car?

1  A.  Adriana.

2  Q.  And so you took your friend Adriana to the airport; is

3  that right?

4  A.  Yes.

5  Q.  And do you remember about what time you dropped her off?

6  A.  I don't remember.

7  Q.  But you drove straight from the neighborhood to O'Hare?

8  A.  No.

9  Q.  Where did you stop?

10  A.  By Dunkin' Donuts.

11  Q.  How long did you stop there for?

12  A.  I don't remember.

13  Q.  But after that, did you go to O'Hare?

14  A.  She left by herself to O'Hare.

15  Q.  Did you and Mr. Godinez actually make it to O'Hare at any

16  point?

17  A.  Yes.

18  Q.  And why was that?

19  A.  To pick up my phone.

20  Q.  Did Adriana accidentally take your phone with her?

21      Did Adriana accidentally take your phone with her?

22  A.  Yes.  I left it in her bag.

23  Q.  So after you and Mr. Godinez went back to O'Hare to get

24  your phone, where did you go from there?

25  A.  We left.  We headed towards, back towards the house.

1  Q.  Towards your house or his house?

2  A.  Well, we were heading back towards the neighborhood.

3  Q.  Did you need to be back in the neighborhood for anything?

4  A.  Work.

5  Q.  What time did you start work?

6  A.  9:00.

7  Q.  9:00 a.m.?

8  A.  Yes.

9  Q.  And so where did you and Mr. Godinez go after you left

10  O'Hare?

11  A.  We -- I had -- I called one of my cousins.  I called my

12  sister-in-law first, and then I called my cousin to pick me up

13  from Mariano's parking lot.

14  Q.  You said a Mariano's parking lot?  Let's back up a little

15  bit.

16          When you left O'Hare, where did you and Mr. Godinez

17  go from there?  Did you stop anyplace?  Did you take the

18  highway?

19  A.  We took the highway, I believe.  I don't remember exactly

20  where we went from there.

21  Q.  Did you drive straight to that Mariano's?

22  A.  Yes.

23  Q.  That Mariano's is at what street intersection?

24  A.  Archer and Ashland.

25  Q.  And Archer and Ashland is about how far from your house

1  and Mr. Godinez's house?

2  A.  Like five minutes away or so.

3  Q.  But it's not in the neighborhood, is it?

4  A.  No.

5  Q.  And how were you going to get to work that morning?

6  A.  With my car.

7  Q.  And where was your car?

8  A.  In front of Adriana's house.

9  Q.  And so why did you get dropped off at a Mariano's that was

10 outside the neighborhood?

11 A.  So in the morning, like, everybody takes their kids to

12 school.  So I didn't -- down the street from Adriana lives

13 Destiny's uncle, so we didn't want anybody, like, to see us

14 together, so we had my cousin drop me off at my car.

15 Q.  So it's your testimony that you had Mr. Godinez drop you

16 off at the Mariano's so that you wouldn't have Destiny's uncle

17 see the two of you together?

18 A.  Or family members, yes.

19 Q.  Or family members.  Okay.  So did Mr. Godinez, in fact,

20 drop you off at Mariano's?

21 A.  Yes.

22 Q.  And what was he driving when he dropped you off?

23 A.  The Kia.

24 Q.  And do you know where he went from there?

25 A.  No.

1  Q.  Did you see him again that day?

2  A.  No.

3         MR. EICHENSEER:  At this point, your Honor, I'd like

4  to publish Government Exhibit 111.

5         THE COURT:  All right.

6         MR. EICHENSEER:  I'm sorry.  It's going to be Exhibit

7  600 first.

8         MR. PISSETZKY:  What is it?

9         MR. EICHENSEER:  600.  It's not in evidence yet so...

10  BY MR. EICHENSEER:

11  Q.  Ms. Jean-Baptiste, in front of you is what's been marked

12  as Government Exhibit 600.  Do you see that?

13  A.  Yes.

14  Q.  Do you recognize that?

15  A.  Yes.

16  Q.  What is it?

17  A.  Conversation between me and Godinez.

18  Q.  What kind of conversation?

19  A.  Of us talking that night.

20  Q.  Yes.  Is this from Snapchat?

21  A.  Yes.

22  Q.  Okay.  Is Government Exhibit 600 a transcript of the

23  Snapchats that you and the defendant were sending to each

24  other on the morning of May 4th?

25  A.  Yes.

1      MR. EICHENSEER:  At this point, your Honor, the

2  government would move to admit Government Exhibit 600 and

3  publish.

4      MR. PISSETZKY:  No objection.

5      THE COURT:  Any objection?

6      MR. PISSETZKY:  No, your Honor.

7      THE COURT:  It's admitted.  You may publish it.

8    (Government Exhibit No. 600 received in evidence.)

9  BY MR. EICHENSEER:

10 Q.  And just to remind the jurors, ma'am, which user name is

11 yours again?

12 A.  Vicky0730.

13 Q.  And which is the -- which is Mr. Godinez's?

14 A.  Ebirdwdst.

15 Q.  Okay.  And I want to direct your attention to the text --

16 or the Snapchat, rather, that was sent to you at 3:05:32.

17 What does that Snapchat say?

18 A.  "Come get me."

19 Q.  And who is texting who in that one?

20 A.  Ernesto to me.

21 Q.  So he was texting you, "Come get me"?

22 A.  Yes.

23 Q.  And did you respond?

24 A.  Yes.

25 Q.  What did you write?

1   A.   If he was at home.

2   Q.   You were asking him if he was at home?

3   A.   Yes.

4   Q.   And that was at 3:06 a.m.?

5   A.   Yes.

6   Q.   And did he respond to that?

7   A.   Yes.

8   Q.   And what did he write?

9   A.   "44th and Wood."

10  Q.   And I think you testified earlier that that's -- he asked

11  you to come get him at 44th and Wood, right?

12  A.   Yes.

13  Q.   So this is the text that you were referring to when you

14  made that testimony?

15  A.   Yes.

16  Q.   And then how did you respond to that at 3:12?

17  A.   I asked him if it was cold outside.

18  Q.   Did Mr. Godinez write back?

19  A.   No.

20  Q.   Okay.  So the next time, the next chat in the conversation

21  is you again, correct?

22  A.   Yes.

23  Q.   And this is at 3:15:59.  And what did you text the

24  defendant at that time?

25  A.   "Going."

1  Q.  And what did you mean by that?

2  A.  I was going to his house already or to 44th and Wood.

3  Q.  And was that true?

4  A.  No.

5  Q.  You hadn't left the house yet, correct?

6  A.  Yeah, no.

7  Q.  Was this before you heard the gunshots?

8  A.  Before.

9  Q.  And then the next text is also from you, correct?

10  A.  Yes.

11  Q.  And that's at 3:18:55?

12  A.  Yes.

13  Q.  Do you see that?  And what did you write?

14  A.  Where he was at.

15  Q.  "WYA" means "where you at," right?

16  A.  Yes.

17  Q.  Did the defendant reply to that text?

18  A.  He asked where I was at.

19  Q.  And what time did he write that?

20  A.  3:21.

21  Q.  Okay.  That's several minutes after you texted him, "where

22  are you at"?

23  A.  Yes.

24       MR. EICHENSEER:  At this point, your Honor, I'd like

25  to publish Government Exhibit 111 which is already in

1   evidence.

2           THE COURT:  All right.

3       (Said video recording played in open court.)

4   BY MR. EICHENSEER:

5   Q.  So ma'am, do you recognize yourself in this footage at

6   all?

7   A.  Yes.

8   Q.  Where are you?

9   A.  In the circle in the middle of the street.

10  Q.  What are you doing?

11  A.  Getting in my car.

12  Q.  And is the footage we're watching right now where you get

13  in your car to go pick up Mr. Godinez as you mentioned in

14  those texts?

15  A.  Yes.

16  Q.  And behind you, you notice the flashing lights.  Is that

17  on the corner of 44th and Hermitage?

18  A.  Yes.

19          MR. EICHENSEER:  At this point, your Honor, I'd like

20  to publish another clip of Government Exhibit 111 which is

21  already in evidence.

22          THE COURT:  All right.

23      (Said video recording played in open court.)

24  BY MR. EICHENSEER:

25  Q.  Ma'am, do you recognize your vehicle in this frame?

1  A.  Yes.

2  Q.  Where is it?

3  A.  Pulling into the driveway of the factory next door to his

4  house.

5  Q.  Is that north or south of Mr. Godinez's house?

6  A.  South.

7  Q.  Did you turn off your lights there?

8  A.  Yes.

9  Q.  And no one else is in the car with you, correct --

10 A.  No.

11 Q.  -- at this point?

12      I think you mentioned earlier that when you arrived,

13 did you send the defendant a text that you were there?

14 A.  Yes.

15 Q.  And you see a person in the yellow circle there?

16 A.  Yes.

17 Q.  Do you recognize that person?

18 A.  Yes.

19 Q.  Who is that?

20 A.  Ernesto.

21 Q.  Mr. Godinez, correct?

22 A.  Yes.

23 Q.  You said that he was a little sweaty when he got in your

24 car?

25 A.  He was what?

1   Q.  You said he was a little sweaty when he got in your car?

2   A.  Just a little bit right here.

3   Q.  And he said, "I feel good"?

4   A.  "I feel good."

5   Q.  He said, "Fuck that flake"?

6   A.  He said "fuck," and then something about "flake."

7   Q.  So ma'am, I want to fast forward now to the afternoon of

8  May 4th.  This is in the morning, correct?

9   A.  Yeah.

10  Q.  And did you actually go to work that day?

11  A.  Yes.

12  Q.  Were you interviewed by Chicago police after you got home

13 from work?

14  A.  Yes.

15  Q.  Did they ask about what you did early that morning?

16  A.  Yes.

17  Q.  Did you tell them the truth?

18  A.  No.

19  Q.  What did you tell them that wasn't true?

20  A.  I told them that I went directly to Adriana's house.

21  Q.  From where?

22  A.  From my house.

23  Q.  So you didn't tell them that you left your house and went

24 to the defendant's house and picked him up?

25  A.  Yes, I didn't tell them.

1   Q.  And that was -- and that was true, you actually went to

2   pick him up, correct?

3   A.  Yes.

4   Q.  And you didn't tell the police that at the time, right?

5   A.  No.

6   Q.  Do you -- is there anything else that you told the Chicago

7   police that day that wasn't true?

8   A.  I don't remember.

9   Q.  Is it your testimony that you don't remember whether you

10  told anything else to the Chicago police that wasn't true on

11  the afternoon of May 4th?

12  A.  I don't remember.

13          MR. PISSETZKY:  Your Honor, I would object.  She

14  admitted she didn't tell the truth.  Today she's telling the

15  truth.  There's no reason to impeach her with --

16          THE COURT:  Well --

17          MR. PISSETZKY:  -- what she didn't say.  She's being

18  truthful today.

19          THE COURT:  It's possibly true.

20          MR. EICHENSEER:  Your Honor --

21          THE COURT:  Is this necessary?  I guess that's the

22  question.  Is it necessary to show her other --

23          MR. EICHENSEER:  I can move on, your Honor.

24          THE COURT:  Yes.

25  BY MR. EICHENSEER:

1   Q.  And several days after being interviewed by Chicago

2   police, were you interviewed by more law enforcement officers?

3   A.  Yes.

4   Q.  Were you truthful with them?

5   A.  I don't remember how that interview went actually.  I

6   don't remember everything from that interview.

7   Q.  Okay.  But it is clear that -- you do remember not being

8   truthful with law enforcement in the days following the

9   shooting; is that fair?

10          MR. PISSETZKY:  Your Honor, asked and answered.

11          THE COURT:  That's what she said.

12          You can answer it.

13          THE WITNESS:  What was your question again?

14  BY MR. EICHENSEER:

15  Q.  So you do remember not being truthful with law enforcement

16  in the days after the shooting; is that fair?

17  A.  Yes.

18  Q.  So at the beginning of your testimony today, ma'am, I

19  asked you about whether you met with me and Ms. Babu last

20  year.  Do you remember those questions?

21  A.  Yes.

22  Q.  Did you meet with us again this year?

23  A.  Yes.

24  Q.  And did you meet with us last month?

25  A.  Yes.

1   Q.  And during that meeting, did you walk out?

2   A.  Yes.

3           MR. PISSETZKY:  Your Honor --

4   BY MR. EICHENSEER:

5   Q.  Did you tell the government that you didn't want to meet

6   again?

7           MR. PISSETZKY:  Your Honor, I would ask that you

8   either give a limiting instruction to the jury that a witness

9   does not have to speak to the lawyers of a case, or I object

10  to this line of questioning because it's absolutely proper for

11  a witness not to speak to --

12          MR. EICHENSEER:  Judge, we can discuss this at

13  sidebar if you want.

14          THE COURT:  Well, it is -- you're right, they don't

15  have to, but it's a fact, apparently, they want to put this

16  in.  So I don't see any reason why you can't ask her about

17  that.  So overruled.  You can ask the question.

18  BY MR. EICHENSEER:

19  Q.  Okay.  And when you walked out of that meeting -- by the

20  way, were you there voluntarily at that meeting?

21  A.  What was that?

22  Q.  Were you there voluntarily at the meeting?  Did anybody

23  make you show up?

24  A.  Well, that was, like, the last meeting we had, yes.

25  Q.  Right.  But, I mean, you came on your own, correct, to the

1  office?

2  A.  Yes.

3  Q.  And as you were leaving, did you tell Ms. Babu and I that

4  you didn't want to meet with us again?

5  A.  Yes.

6  Q.  And by the way, during that meeting in May when you walked

7  out, your lawyer was present with you, correct?

8  A.  Yes.

9         MR. EICHENSEER:  Nothing further, your Honor.

10        THE COURT:  Cross-examine.

11        MR. PISSETZKY:  Your Honor, can I have five minutes

12  to go to the bathroom?

13        THE COURT:  Pardon?

14        MR. PISSETZKY:  Can I have a bathroom break for a

15  second?

16        THE COURT:  Well, we're going to quit in a half hour

17  so we can get in as much as we can.

18        MR. PISSETZKY:  Just hold it?

19                    CROSS-EXAMINATION

20  BY MR. PISSETZKY:

21  Q.  Good afternoon.

22  A.  Hello.

23  Q.  So you're 20 years old, right?

24  A.  Yes.

25  Q.  And you have a child?

1   A.   No.

2   Q.   No.  Are you -- you're not married?

3   A.   No.

4   Q.   And when you met with the government and your attorney,

5   you spoke of an immunity agreement, correct?

6   A.   Yes.

7   Q.   Do you know what an immunity agreement is really?

8   A.   Just based off of what they told me, yes.

9   Q.   So you hadn't -- you don't know what an immunity agreement

10  is, right?  You're not a lawyer?

11  A.   No.

12  Q.   You had to have it explained to you by your lawyer and the

13  government?

14  A.   Yes.

15  Q.   And it was -- it's a document that was written by the

16  government and showed to you by your lawyer and the

17  government?

18  A.   Yes.

19  Q.   Did you do anything wrong on May 4th, 2018?

20  A.   No.

21  Q.   Aside from smoking some weed, did you shoot anyone?

22  A.   No.

23  Q.   Did you help anyone escape from shooting someone?

24  A.   No.

25  Q.   Did you lie to a federal agent when you spoke to them or

1  just to some Chicago police officers?

2  A.  Just to Chicago police officers.

3  Q.  Are you aware that lying to a Chicago police officer is

4  not a federal crime?

5  A.  I didn't know that.

6  Q.  Okay.  So if you lie to a federal agent, it might be a

7  federal crime, but you didn't commit a crime, correct?

8          MR. EICHENSEER:  Objection to foundation, your Honor.

9          THE COURT:  Objection sustained.

10 BY MR. PISSETZKY:

11 Q.  Did you lie to a federal agent?

12 A.  No.

13 Q.  Okay.  So what is the purpose of the immunity agreement?

14 A.  I thought it was so they wouldn't arrest me because I

15 lied.

16 Q.  But if that's not a crime, did you commit anything else,

17 any other crimes?

18 A.  No.

19 Q.  But the advice that you received from your lawyer is that

20 you needed an immunity agreement?

21 A.  Yes.

22 Q.  An immunity agreement the government presented to you?

23 A.  Yes.

24 Q.  Are you telling us the truth today?

25 A.  Yes.

1  Q.  As far as you know, did you see Mr. Godinez shoot anyone?

2  A.  No.

3  Q.  Did you -- did Ernie -- do you call him Ernie?

4  A.  Ernie, yes.

5  Q.  Did Ernie ask you to help him commit a crime?

6  A.  No.

7  Q.  You and Ernie hang out a lot during that time?

8  A.  Yes.

9  Q.  You've known him for some time?

10 A.  Yes.

11 Q.  How long have you known him for?

12 A.  Years.

13 Q.  Since you were kids?

14 A.  Yes, around there.

15 Q.  You are pretty close?

16 A.  Yes.

17 Q.  And at some point, you had an intimate relationship?

18 A.  Yes.

19 Q.  Sometime around May of 2018?

20 A.  Yes.

21 Q.  At the same time, he had -- do you know Destiny Rodriguez?

22 A.  Yes.

23 Q.  Who is Destiny?

24 A.  His son's mother.

25 Q.  Or what we call "baby mama"?

1    A.    Baby mama.

2    Q.    Okay.  And did Destiny know that you had an intimate

3    relationship with Ernie?

4    A.    She found out.

5    Q.    Is it something that you did not want her to find out?

6    A.    Yes.

7    Q.    Why?

8    A.    Because that was her baby daddy, so --

9    Q.    And so this is something that you tried to keep on the

10   down-low?

11   A.    Yes.

12   Q.    Now, you told counsel that you asked -- or you discussed

13   and Ernie actually dropped you off by Mariano's at the end of

14   the night?

15   A.    Yes.

16   Q.    Why is that?

17   A.    So her family wouldn't see me in the neighborhood with

18   him.

19   Q.    And what's the concern about that?

20   A.    They're going to tell her.

21   Q.    And you did not want that to happen?

22   A.    No.

23   Q.    Okay.  Now, since you've known Ernie for many years, did

24   you learn to know him personally and his moods?

25   A.    Yes.

1  Q.  Did you know when he was mad?

2  A.  Yes.

3  Q.  Did you know when he was happy?

4  A.  Yes.

5  Q.  How about when he was high on weed?

6  A.  Yes.

7  Q.  Did you get high with him sometimes?

8  A.  Yes.

9  Q.  Did you know when he was concerned?

10 A.  Yes.

11 Q.  Afraid?

12 A.  Yes.

13 Q.  Worried about something?

14 A.  Yes.

15 Q.  And you confided in him, and he confided in you, right?

16 A.  Yes.

17 Q.  So before I start talking more about what happened on May

18 4, 2018, can you please tell the ladies and gentlemen of the

19 jury, when Ernie entered your car around 3:30 a.m. on May 4,

20 2018, after those shots were fired, did Ernie appear to you in

21 a rush to leave the area?

22 A.  No.

23 Q.  Did he appear to you that he wanted to hide somewhere?

24 A.  No.

25 Q.  Did he appear to you that he was concerned about

1  something?

2  A.  No.

3  Q.  You told us that he appeared to you normal, right?

4  A.  Yes.

5  Q.  Did he appear to you relaxed?

6  A.  Yes.

7  Q.  Let's talk about your neighborhood.  You lived in the

8  neighborhood for over six years?

9  A.  More than that.

10  Q.  More than that.  Since you were six years old?

11  A.  Since I was six years old, yes.

12  Q.  And where did you live?  All the whole time, you lived

13  where you told us?

14  A.  No.  I used to live on Honore and 45th -- no, this was

15  44th.  I used to live on 45th and Honore and then we moved,

16  like, to 45th and Wood, and then we moved to Hermitage.

17  Q.  And 44th and Hermitage, between 44 and 45th?

18  A.  Yes.

19  Q.  So when you leave the house, when you left the house that

20  morning and you looked up your street on Hermitage, you saw

21  all those lights?

22  A.  Yes.

23  Q.  And, in fact, your car was pointing in the direction of

24  the lights?

25  A.  Yes.

1  Q.  Did you recognize those lights?

2  A.  Yes.

3  Q.  And what did you recognize them to be?

4  A.  Cops.

5  Q.  Did you go to that -- into that direction?

6  A.  No.

7  Q.  Why not?

8  A.  Somebody had just got shot that way, so...

9  Q.  And how do you know that?

10  A.  Because I heard the gunshots.

11  Q.  And when you see -- when you hear gunshots and then you

12  see a lot of police, does that just -- you assume somebody got

13  shot?

14  A.  Yes.

15  Q.  Were you able to -- did it look to you like you would be

16  able to drive through 44th and Hermitage there, or was the

17  street blocked?

18  A.  It was blocked.

19  Q.  So when somebody gets shot in your neighborhood, is it

20  often that police block streets?

21  A.  Yes.

22  Q.  So car traffic cannot pass through?

23  A.  Yes.

24  Q.  You might be able to walk somewhere but not drive?

25  A.  Yes.

1  Q.  Now, 44th and Hermitage is just around the corner from

2  44th and Wood?

3  A.  Yes.

4  Q.  And so for you to get to Ernie's house, you would have to

5  go on Hermitage to 44th, turn left, and then turn right on

6  Wood?

7  A.  Yes.

8  Q.  You were not able to do that based on what you saw?

9  A.  Yes.

10  Q.  Okay.  And that's the reason you went the other -- the

11  opposite direction?

12  A.  Yes.

13  Q.  During the time, all the years that you lived all around

14  this area, you've driven down Hermitage numerous times?

15  A.  Yes.

16  Q.  Down Wood?

17  A.  Yes.

18  Q.  Down 44th, 43rd, and 45th Street?

19  A.  Yes.

20  Q.  You know the neighborhood pretty well?

21  A.  Yes.

22  Q.  And you drive there during the day and during the night,

23  correct?

24  A.  Yes.

25  Q.  Did you ever see anyone standing post or standing guard in

1  a gangway between 4332 and 4333 South Hermitage?

2  A.  No.

3  Q.  Did you ever see anybody there, a gang member standing

4  there with all black clothes just looking around?

5  A.  No.

6  Q.  In fact, do you know that the house on 4332 South

7  Hermitage was an abandoned home?

8  A.  Yes.

9  Q.  What is a trap house?  Do you know what a trap house is?

10 A.  An abandoned building.

11 Q.  Now, you had plans on May -- specific plans on May 4th,

12 2018, correct?

13 A.  Yes.

14 Q.  And you made -- those plans, did you make them that night

15 at 3:00 o'clock a.m. or did you preplan them?

16 A.  To take her to the airport?

17 Q.  Right.

18 A.  Yes, we preplanned them.

19 Q.  And when you say "her," you mean who?

20 A.  Adriana.

21 Q.  And also, you had plans to hang out with Ernie that night,

22 correct?

23 A.  Yes.

24 Q.  You didn't make those plans at 3:00 o'clock in the morning

25 to hang out?

1  A.  No.

2  Q.  To chill?

3  A.  No.

4  Q.  Okay.  Now, first, let's talk about Adriana.  Adriana is a

5  friend of yours?

6  A.  Yes.

7  Q.  And back in 2018 May, you were closer?

8  A.  Yes.

9  Q.  Because she lived here?

10  A.  Yes.

11  Q.  And you said she lived in the neighborhood but somewhere

12  around a little further on the park?

13  A.  Yeah, a little more down from the park.

14  Q.  So do you see where -- can you point where she lives or

15  no, you don't see it on the map?

16  A.  I don't see it on the map.

17  Q.  Was she Ernie's friend as well?

18  A.  Yes.

19  Q.  Was she close to Ernie?

20  A.  Yes.

21  Q.  Do you know how old Adriana is?

22  A.  42?

23  Q.  42.

24  A.  Yeah.

25  Q.  Now, when I asked you if Ernie and her were friends and

1   close, you had a little smirk.  Why is that?

2   A.   Just the age difference.

3   Q.   Is Ernie a ladies man?

4   A.   Yes.

5   Q.   Does he have a lot of female friends?

6   A.   Yes, he does.

7   Q.   All ages?

8   A.   Yes.

9   Q.   Does he discriminate?

10  A.   No.

11  Q.   Does he hang out with his lady friends?

12  A.   Yes.

13  Q.   Does he like that?

14  A.   Yes.

15  Q.   When you have been with Ernie, has he ever hung out with

16  you along with his male friends?

17  A.   No.

18  Q.   His gang friends?

19  A.   No.

20  Q.   Did you ever see him gang-bang?

21  A.   No.

22  Q.   Did you ever see him throw signs or yell at somebody any

23  gang slogans?

24  A.   No.

25  Q.   Does he involve you in any gang activity?

1   A.   No.

2   Q.   You and Ernie were going to take Adriana to the airport?

3   A.   Yes.

4   Q.   That was planned when?

5   A.   I believe the day -- like two days before that I was going

6   with them.  They had it planned out way before.

7   Q.   So Ernie was supposed to take Adriana to the airport on

8   May 4th early in the morning?

9   A.   Yes.

10   Q.   And then you tagged along?

11   A.   Yes.

12   Q.   You didn't want Ernie alone with her?

13   A.   Not that I cared, but...

14   Q.   This is not something Ernie just planned?  Like you said,

15   it's been planned for a while?

16   A.   It's been planned, yeah.

17   Q.   In fact, at some point, was there talk of Ernie going out

18   to California with you possibly to be with Adriana there?

19   A.   Yes.

20   Q.   He wanted to possibly even move there, correct?

21   A.   Possibly, yes.

22   Q.   Now, that day on May -- the day before, May 3rd, did you

23   work?

24   A.   Yes.

25   Q.   And where did you work?

1  A.  Timberwolf.

2  Q.  Do you still work there?

3  A.  Yes.

4  Q.  What time did you get off work that day?

5  A.  Around 5:00, 4:30.

6  Q.  And what did you do?

7  A.  Went home.

8  Q.  At home, what did you do?

9  A.  Sleep.

10  Q.  So you went to sleep?

11  A.  Yes.

12  Q.  Did you wake up at some point during the night?

13  A.  Yes.

14  Q.  Around what time?

15  A.  Midnight, 1:00 o'clock.

16  Q.  And is that when you and Ernie actually started texting?

17  A.  Yes.

18  Q.  Through Snapchat?

19  A.  Yes.

20  Q.  And is that when -- why would you text with him so late at

21  night?

22  A.  I had a message from him, so I just replied.  We were

23  talking already before that.

24  Q.  So before you went to bed?

25  A.  Yes.

1  Q.  And you were going to hang out?

2  A.  Yes.

3  Q.  And why do you hang out at night?

4  A.  So nobody sees us together.

5  Q.  Is it common for you to hang out with him during the

6  nighttime?

7  A.  Yes.

8  Q.  Where would you hang out with him?

9  A.  In the car.

10 Q.  And what would you do?

11 A.  Drive around and smoke.

12 Q.  And when you drive around, do you drive around your

13 neighborhood?

14 A.  No.

15 Q.  Do you leave the neighborhood?

16 A.  Yes.

17 Q.  Did you ever go to that gas station you'd been to that

18 night, the Shell gas station?

19 A.  Yes.

20 Q.  Do you buy blunts?

21 A.  Yes.

22 Q.  Do you drive down Garfield Avenue or Boulevard?

23 A.  Hardly ever.

24 Q.  Do you drive around the lake?

25 A.  Yes.

1   Q.  So you drive anywhere in Chicago basically --

2   A.  Yeah.

3   Q.  -- and just hang out?

4          Yes?

5   A.  Yes.

6   Q.  And so when you woke up around midnight or 1:00 o'clock,

7   you started a conversation with Ernie, right?

8   A.  Yes.

9          MR. PISSETZKY:  Can I have that exhibit?  I think it

10  was 6 -- please.  Thank you.

11  BY MR. PISSETZKY:

12  Q.  Can you see that exhibit?

13  A.  Yes.

14  Q.  Is that your Snapchat with Ernie that morning?

15  A.  Yes.

16  Q.  And can you tell us, the first entry on that Snapchat on

17  May 4, 2018, about 1:36 a.m., who is that from?

18  A.  Ernie.

19  Q.  And what did -- who is it to?

20  A.  Me.

21  Q.  What is he saying?

22  A.  Where am I.

23  Q.  And Y -- "WYA" we established is "where you at"?

24  A.  Yes.

25  Q.  Okay.  And what do you text him?

1   A.   "Home."

2   Q.   And does he reply right away?

3   A.   A few minutes later.

4   Q.   About -- more than ten minutes later, correct?

5   A.   Yes.

6   Q.   And he says, "Wanna chill," correct?

7   A.   Yes.

8   Q.   What did that mean to you?

9   A.   To hang out.

10  Q.   Smoke?

11  A.   Smoke.

12  Q.   And you pretty much right away tell him, "Okay"?

13  A.   Yes.

14  Q.   And then "Where," correct?

15  A.   Yes.

16  Q.   Did you have a plan of where at 2:09 a.m.?

17  A.   No.

18  Q.   And so you -- he asked you, "What you wanna meet up or

19  pick me up," correct?

20  A.   Yes.

21  Q.   And what do you tell him?

22  A.   That I can pick him up or meet him, it really didn't

23  matter.

24  Q.   It didn't really matter, right?

25  A.   No.

1  Q.  And then between 2:12 and 2:59, there are no texts, right?

2  A.  No.

3  Q.  And so for close to 40 minutes, there's no communication?

4  A.  No.

5  Q.  And then who texts who at 2:59?

6  A.  He texts me.

7  Q.  And what does he say?

8  A.  "Yoo."

9  Q.  And you say, "Yea"?

10 A.  Yes.

11 Q.  And at 3:05, what does Ernie tell -- ask you to do?

12 A.  To come get him.

13 Q.  Is that before or after the shooting?

14 A.  Before.

15 Q.  It's almost 13 minutes before the shooting, right?

16 A.  Yes.

17 Q.  Did you fall back asleep at some point?

18 A.  Yes.

19 Q.  So between 2:00 and 3:00 at some point, you kind of fell

20 asleep and lost track?

21 A.  Yes.

22 Q.  And what woke you up?

23 A.  The gunshots.

24 Q.  Well, before the gunshots, you were texting with Ernie,

25 "Yo, yea, come and get me," and then ask him at 3:06, "You're

1  at home," correct?

2  A.  Yes.

3  Q.  Did you fall asleep before that, or were you up throughout

4  the whole time between 2:12 and 2:59?

5  A.  I believe I fell asleep during that time.

6  Q.  And then there was a text.  Is that the text that woke you

7  up or something else woke you up at 2 --

8  A.  Text, because I was already up when the gunshots.

9  Q.  So at 2:59, the text woke you up?

10 A.  Yes.

11 Q.  And then you started texting with him?

12 A.  Yes.

13 Q.  Now, when he said, "Come and get me," did you right away

14 get ready?

15 A.  No.

16 Q.  What were you doing?

17 A.  I'm laying down.

18 Q.  And so you asked him at 3:06, "You're at home," and a

19 question mark, correct?

20 A.  Yes.

21 Q.  And he pretty much at 3:08 told you "44th and Wood," right?

22 A.  Yes.

23 Q.  What does that mean?

24 A.  Where he was at, like 44th and Wood.

25 Q.  Was that his house?

1  A.  No.

2  Q.  Is it the corner of where he lives, right, like, 100 --

3  A.  Yes.

4  Q.  Basically, a house over?

5  A.  Yes.

6  Q.  So on the corner of 44th and Wood, you see it on the map,

7  what is there right on the corner?

8  A.  Here?

9  Q.  Right.  What is it?  What's there?  You said a factory.

10  There's a factory, right?

11  A.  Yes.

12  Q.  What kind of factory?

13  A.  A trucking factory.

14  Q.  And is that the first building on the corner of 44th and

15  Wood?

16  A.  43rd.

17  Q.  43rd --

18  A.  Yes.

19  Q.  -- and Wood.

20  A.  Right there.

21  Q.  Right.  So this is 44th, right?

22  A.  Yes.

23  Q.  And this is Wood?

24  A.  Yes.

25  Q.  And what is the first building here?

1   A.   It's the factory.

2   Q.   That's the factory.  And Ernie's house is this one right

3   here?

4   A.   Yes.

5   Q.   Right past that factory --

6   A.   Yes.

7   Q.   -- correct?

8          So 44th and Wood is pretty much close to his house?

9   A.   Yes.

10  Q.   And you said -- incidentally, you said that when you

11  pulled up, you pulled on the driveway of the factory, correct?

12  A.   Yes.

13  Q.   That's not a driveway for Ernie's house?

14  A.   No.

15  Q.   This is not a place that you can actually park a car?

16  A.   No.

17  Q.   This is a place where you would leave the car for a few

18  minutes if you wanted to run in and out?

19  A.   Yes.

20  Q.   And so he tells you he's at 44th and Wood, and a couple of

21  minutes later, you say, "Okay," correct?

22  A.   Yes.

23  Q.   And then a couple of minutes later, you ask him, "Is it

24  cold out," and a question mark, correct?

25  A.   Yes.

1  Q.  And at 3:15, you said, "Going."

2  A.  Yes.

3  Q.  What does that mean?

4  A.  I was going to his house already.

5  Q.  Did you leave at 3:15?

6  A.  Nope.

7  Q.  You were still in the house?

8  A.  Yes.

9  Q.  You just wanted him to feel good --

10 A.  Yes.

11 Q.  -- that you were leaving?

12 A.  Yes.

13 Q.  And then a couple of minutes later, you asked him, "Where

14 you at," right?

15 A.  Yes.

16 Q.  And about three minutes later, he asks you, "Where are you

17 at" because you told him you were going, right?

18 A.  Yes.

19 Q.  And you told him that you were at the corner of 44th and

20 Wood at 3:21.

21 A.  Yes.

22 Q.  Were you there?

23 A.  No.

24 Q.  You were just getting to your car?

25 A.  Yes.  I was still inside my house.

1  Q.  Excuse me?

2  A.  I was still inside my house.

3  Q.  Oh, you're still inside your house.  So right, because we

4  saw the video when you left your house, right?  Right.

5       So he's waiting for you, and you're not there yet,

6  right?

7  A.  Yes.

8  Q.  And so at 3:22 when you tell him that you are on the

9  corner, he tells you, "My crib"?

10  A.  Yes.

11  Q.  What does that mean?

12  A.  His house.

13  Q.  "Crib" is a house?

14  A.  Yes.

15  Q.  And you say, "Okay," right?

16  A.  Yes.

17  Q.  And you arrive there about a minute later at 3:23 or so?

18  A.  Yes.

19  Q.  And you told us that he came out of a gangway, right?

20  A.  Yes.

21  Q.  That is his brother's house?

22  A.  Yes.

23  Q.  So if you look at the map, if Ernie's house is the first

24  house after the factory, where is his brother's house?  Is it

25  the next one or the following?

1  A.  It's right here.

2  Q.  You've got to speak up.

3  A.  It's somewhere between those houses.

4  Q.  So it's somewhere around where this silver-looking car is?

5  A.  Yes.

6  Q.  So it's just a few houses down?

7  A.  Yes.

8  Q.  And he came out of the gangway?

9  A.  Yes.

10  Q.  Is the entrance to the house there as well?

11  A.  On the side of it, yes.

12  Q.  Right.  So it's close, next to each other?

13  A.  Yes.

14  Q.  Ernie's house also has a gangway that you have to go in

15  through a gate and then you can go down a gangway?

16  A.  Yes.

17  Q.  So the gangway is connected also to the entrance of the

18  house?

19  A.  Yes.

20  Q.  So when you say he came out of a gangway, you don't know

21  if he came out from his brother's house and came out, or he

22  just appeared to you coming out of the gangway?

23  A.  Yes, I don't -- I don't know exactly where he came from.

24  I just seen him come out of the gangway.

25  Q.  Right.  And so -- and then was he running towards you?

1   A.   No.

2   Q.   Was he walking in a hurried manner?

3   A.   No.

4   Q.   Were there police officers or police presence right there

5   on the corner of 44th and Wood at the time?

6   A.   Yes.

7   Q.   Was he still -- was he wearing all-black clothes?

8   A.   Yes.

9   Q.   And then when he -- then he got into your car, correct?

10  A.   Yes.

11  Q.   To the passenger, front passenger seat?

12  A.   Yes.

13  Q.   When he got into the car, to your car, did he -- was he

14  trying to wipe his hands off?

15  A.   No.

16  Q.   Was he trying to brush his hands with anything?

17  A.   No.

18  Q.   Did you see him with a gun?

19  A.   No.

20  Q.   Aside from some sweat -- where was the sweat; on his face?

21  A.   Right here.

22  Q.   Like over his brow?

23  A.   Yeah, like by his eyebrow.

24  Q.   Have you seen him sweat before?

25  A.   Yes.

1  Q.  Is that something that he does?  Does he sweat a lot?

2  A.  Yes.

3  Q.  Do you know why?

4  A.  Probably his hair.

5  Q.  And so he was -- he brushed off his sweat?

6  A.  Yes.

7  Q.  Now, you told us that he got into the car and said, "I

8  feel good"?

9  A.  Yes.

10 Q.  He said the word "fuck"?

11 A.  Yes.

12 Q.  And he said either something with "flakes":  "Fuck those

13 flakes," "fuck them flakes," "fuck flakes," something with

14 "flakes"?

15 A.  Yes.

16 Q.  Do you know exactly what he said?

17 A.  I don't remember exactly.

18 Q.  Do you -- what was your goal that night; just to hang out

19 with Ernie?

20 A.  Just to hang out.

21 Q.  You're not a gang member?

22 A.  No.

23 Q.  You're not involved in gangs?

24 A.  No.

25 Q.  Did Ernie ever bring you along to a gang meeting?

1  A.  No.

2  Q.  Did Ernie ever help -- did you ever help Ernie in any gang

3  capacity?

4  A.  No.

5  Q.  Did you ever go along with Ernie to pull a burn?

6  A.  No.

7  Q.  Do you know what a burn is?

8  A.  Like a drive-by?

9  Q.  I'm asking you.

10  A.  I think.  I don't know.

11  Q.  Okay.  Did you ever help him sell drugs?

12  A.  No.

13  Q.  Did you ever help -- see him with a gun?

14  A.  No.

15  Q.  Would you ever -- would Ernie ever involve you with any of

16  his gang activity?

17  A.  No.

18  Q.  Did you ever see Ernie become -- become violent?

19  A.  No.

20  Q.  Now, counsel asked you about some grand jury statements

21  that you went and testified about, correct?

22  A.  Yes.

23  Q.  Now, did you actually testify to those statements, or were

24  they read to you and you just said "yes, yes, yes"?

25  A.  The paper wasn't typed out by me.  They were just -- they

1  just handed me the paper --

2  Q.  Right.

3  A.  -- to look over it.

4  Q.  I'll get to that in a minute.  Okay.  When you were

5  actually sitting in the room and giving answers as a witness.

6  A.  Yes.

7  Q.  You remember counsel asked you about that, right?

8  A.  I --

9  Q.  Did you -- did they ask you an open-ended question and you

10  gave them answers, or were they reading to you from a

11  preprinted statement?

12  A.  From a preprinted.

13  Q.  Did you type up that preprinted statement?

14  A.  No.

15  Q.  Did you have -- did you -- you said you initialed it,

16  right?

17  A.  Yes.

18  Q.  But who prepared it?

19  A.  The government.

20  Q.  And your lawyer was there?

21  A.  When they prepared it?

22  Q.  Yeah.

23  A.  Yes.

24  Q.  Did you -- were they your words in that statement or were

25  the government's words when they typed it up?

1  A.  The government's words when they typed it up.

2  Q.  So when you, in fact, testified in front of the grand

3  jury, did you say to the grand jury how you heard what Ernie

4  said, or was it something that counsel told you and you just

5  said "yes"?

6  A.  It was off the paper, yes.

7  Q.  Okay.  So it was read to you?

8  A.  Yes.

9  Q.  Did you ever use the infliction of your voice in how Ernie

10  actually said it to the grand jury?

11  A.  No.

12  Q.  So if you don't mind, can you tell us what you remember

13  from that night on how and what happened when Ernie said --

14  came into the car?

15  A.  He just got in my car.  He sat down.  He, like, leaned

16  back a little like this, and then he went like that.  He said,

17  "I feel good."  And he was going like, then he said, "Fuck."

18  He's like, "Flake."  He said something about "flake."  I don't

19  remember exactly, but I know he said "fuck" and then he said

20  "flake."

21          And I was like, "Okay.  I don't want to hear it."

22  Q.  And what did he say right after that?

23  A.  After what?

24  Q.  Did he say anything about going to the gas station?

25  A.  Yes.

1    Q.   What did he tell you?

2    A.   To buy blunts from the gas station.

3    Q.   So it was in the same breath that he said, "I feel good,

4    fuck, flakes, let's go to the gas station and get some

5    blunts"?

6    A.   Not all together.  Separate, yes.

7    Q.   Right.  But it was part of -- that was the succession of

8    the statement?

9    A.   Yes.

10           THE COURT:  Is this a good time to break?

11           MR. PISSETZKY:  Sure, Judge.

12           THE COURT:  All right.  We'll suspend until 10:00

13   o'clock tomorrow, members of the jury.  Please don't discuss

14   the case.  Don't perform any personal investigation.  Have a

15   nice evening.

16       (Proceedings adjourned from 3:55 p.m. to 10:00 a.m.)

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2           I, Judith A. Walsh, do hereby certify that the

 3    foregoing is a complete, true, and accurate transcript of the

 4    proceedings had in the above-entitled case before the

 5    Honorable HARRY D. LEINENWEBER, one of the judges of said

 6    Court, at Chicago, Illinois, on June 12, 2019.

 7

 8    /s/ Judith A. Walsh, CSR, RDR, F/CRR_____    February 18, 2020

 9    Official Court Reporter

10    United States District Court

11    Northern District of Illinois

12    Eastern Division
```