1          IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION

3   UNITED STATES OF AMERICA,        )
                                     )
4              Plaintiff,            )
                                     )
5       v.                           )  No. 18 CR 00278
                                     )
6   ERNESTO GODINEZ,                 )  Chicago, Illinois
                                     )  June 13, 2019
7              Defendant.            )  10:00 a.m.

8                      VOLUME 4-A
            TRANSCRIPT OF PROCEEDINGS - Trial
9      BEFORE THE HONORABLE HARRY D. LEINENWEBER and a Jury

10  APPEARANCES:

11  For the Plaintiff:        HON. ZACHARY T. FARDON
                              United States Attorney
12                            BY:  MS. KAVITHA J. BABU
                                   MR. NICHOLAS J. EICHENSEER
13                            Assistant United States Attorneys
                              219 South Dearborn Street, Suite 500
14                            Chicago, Illinois 60604
                              (312) 353-5300
15
    For the Defendant:        MR. LAWRENCE H. HYMAN
16                            111 West Washington Street
                              Suite 1025
17                            Chicago, Illinois 60602
                              (312) 346-6766
18
                              PISSETZKY & BERLINER
19                            BY:  MR. GAL PISSETZKY
                              35 West Wacker Drive, Suite 1980
20                            Chicago, Illinois 60601
                              (312) 566-9900
21

22  Court Reporter:           Judith A. Walsh, CSR, RDR, F/CRR
                              Official Court Reporter
23                            219 South Dearborn Street, Room 2118
                              Chicago, Illinois 60604
24                            (312) 702-8865
                              judith_walsh@ilnd.uscourts.gov
25

I N D E X

| WITNESS | DX | CX | RDX | RCX |
|---|---|---|---|---|
| VICTORIA JEAN-BAPTISTE | | | | |
| By Mr. Eichenseer | | | 663 | |
| By Mr. Pissetzky | | 648 | | 672 |
| DESTINY RODRIGUEZ | | | | |
| By Ms. Babu | 674 | | 709 | |
| By Mr. Pissetzky | | 686 | | 711 |
| HECTOR RUIZ | | | | |
| By Mr. Eichenseer | 713 | | 762 | |
| By Mr. Pissetzky | | 733 | | 764 |
| PAUL PRESNELL | | | | |
| By Ms. Babu | 766 | | | |
| | 792 | | 844 | |
| By Mr. Hyman | | 816 | | |
| NICHOLAS RYAN BROWN | | | | |
| By Mr. Eichenseer | 846 | | | |
| By Mr. Pissetzky | | 870 | | |
| BEAU JACOBSEN | | | | |
| By Ms. Babu | 875 | | | |

E X H I B I T S

| NUMBER | RECEIVED |
|---|---|
| Government Exhibit | |
| No. 515 | 726 |
| No. 516 | 727 |
| No. 403 | 779 |
| Nos. 500 through 504, 506, and 507 | 780 |
| Nos. 508 through 528, 530 through 552, 554 | 781 |
| Nos. 603, 606, 608, 609, and 610 | 854 |
| Nos. 300 through 302 | 892 |
| No. 303 | 883 |
| No. 557 | 902 |
| No. 611 | 863 |
| No. 612 | 866 |
| No. 613 | 869 |

1          (Proceedings heard in open court.  Jury out.)

2          THE COURT:  As I understand, the motion is seeking to

3    prohibit the defense from cross-examining a confidential

4    informant who apparently will testify of an arrest that did

5    not -- by the Chicago police in a state arrest that did not

6    lead to conviction.  The indication is that the government,

7    U.S. government had no part in -- it wasn't part of a deal.

8          MR. EICHENSEER:  That's right, your Honor.

9          Nick Eichenseer and Kavitha Babu for the record, your

10   Honor.

11         THE COURT:  What basis would be that admissible, the

12   fact that he was arrested?

13         MR. PISSETZKY:  Well, Judge, it's not for impeachment

14   purposes.

15         THE COURT:  What's it for?

16         MR. PISSETZKY:  It's for truth and veracity actually.

17         THE COURT:  An arrest?  For truth and veracity, an

18   arrest --

19         MR. PISSETZKY:  Yes, absolutely.

20         THE COURT:  -- that doesn't lead to a conviction?

21         MR. PISSETZKY:  No, it does not because he signed an

22   agreement with the -- if I may give you a little background.

23         THE COURT:  Yes.

24         MR. PISSETZKY:  He signed an agreement with the

25   government saying -- written agreement, three times, that he

1   is not going to commit a crime.  And he lied to them.  He's

2   been selling cocaine.  He promised that he will not sell

3   cocaine.

4           THE COURT:  What's the proof that he was selling

5   cocaine?

6           MR. PISSETZKY:  There's --

7           MR. HYMAN:  The arrest --

8           MR. PISSETZKY:  Not only his arrest, they went to his

9   house with a confidential source who gave the Chicago police

10  information that he bought cocaine from him.  I have the

11  search warrant affidavit.  They went to his house.  They

12  arrested him.  And they found cocaine in the house, and they

13  arrested him.

14          I can ask him about it because I can confront him

15  with that with the fact that he was selling cocaine while he

16  is -- while he promised the government not to sell cocaine.

17  If he's going to deny it, I can prove it up later on.

18          THE COURT:  Well, you can't.  You definitely can't --

19  you couldn't do that.

20          MR. EICHENSEER:  And, Judge, the charges were

21  dismissed and the --

22          THE COURT:  But it seems to me that you definitely

23  can't prove it up.  If he denies it, if you say, "Did you sell

24  cocaine," he says, "No," that's it.  You cannot under Rule 608

25  prove up such a thing because otherwise, you're going to end

1  up with mini trials going on and on and on.

2  Now, the fact that there was no conviction seems to

3  me to foreclose it, too.  If he's arrested and convicted, then

4  you can put it in like any witness.

5  MR. PISSETZKY:  But I can still ask him if he sold

6  cocaine while he was under the agreement.  It's not for -- I

7  can ask him and he -- I mean, if he's telling the truth, he's

8  going to say yes and, therefore, it goes to his truth and

9  veracity, Judge, not to --

10  THE COURT:  Okay.  But if he says no, that's the end

11  of it.

12  MR. PISSETZKY:  Then I'll have --

13  THE COURT:  You cannot --

14  MR. PISSETZKY:  -- to figure out what to do next.

15  THE COURT:  Pardon?

16  MR. PISSETZKY:  Then I'll have to figure out what to

17  do next.  I'll tell you another thing, your Honor, if I may.

18  MR. EICHENSEER:  Judge --

19  MR. PISSETZKY:  If I may, Judge, before they cut me

20  off.  His --

21  THE COURT:  They're not -- nobody is going to cut you

22  off.  Everything goes through me.

23  MR. PISSETZKY:  If his arrest -- his arrest was

24  dismissed in court under very peculiar circumstances.  And I

25  am not too sure how it happened because they --

1    THE COURT:  Well, have you any indication that the

2  government had anything to do with it?

3    MR. EICHENSEER:  No, your Honor.  In fact, we

4  interviewed the officer that was involved in the warrant this

5  morning.  He came to our office.  He testified that -- or he

6  told us that the powder that they found in the apartment was

7  protein powder or baby powder or something.  It wasn't

8  cocaine.  So there's --

9    THE COURT:  Whatever it is, I think you're entitled

10  to ask him that, but if he says no, that's it.  You cannot

11  prove it up.

12    MR. PISSETZKY:  They also found ammunition in his

13  apartment, not only powder of what appears to be cocaine.

14    THE COURT:  That would be -- assuming he did contrary

15  to his agreement with the government, I think you can ask him

16  that if you have a good faith, and apparently you do.  I don't

17  know.  If they say it wasn't cocaine, then -- unless if you

18  have -- the question would be, you can't ask somebody just out

19  of the blue, "Are you drunk" when you don't have any basis for

20  saying it.

21    MR. PISSETZKY:  We have basis.

22    THE COURT:  All right.  Then you can ask him the

23  question, but if he says no, then that's it.  You cannot prove

24  it up.

25    MR. PISSETZKY:  Okay.

1          THE COURT:  All right.  So are we ready to go?

2          MS. BABU:  We are, your Honor.

3          THE COURT:  Do you want to get the --

4          MR. EICHENSEER:  Your Honor, one other note.  So far

5   we've asked little to no redirect of the witnesses.  The

6   particular witness that's on the stand right now, there are

7   some things that she said during her cross with Mr. Pissetzky

8   yesterday.  The government will want to redirect her, but I

9   think we can get it done in about five minutes based on --

10          THE COURT:  How much longer do you have,

11  Mr. Pissetzky, on the --

12          MR. PISSETZKY:  Your Honor, honestly, I'm not sure.

13  Maybe half an hour.

14          THE COURT:  All right.  Let's go.  Let's get it going

15  then.

16          Bring the jury in.  And bring the witness in so we're

17  ready to go.

18      (Proceedings heard in open court.  Jury in.)

19          THE COURT:  Please be seated.

20          Ms. Jean-Baptiste was being cross-examined when we

21  concluded yesterday, and that's where we'll pick up.

22          Ms. Jean-Baptiste, you're still under oath from

23  yesterday.  Do you understand that?

24          THE WITNESS:  Yes.

25          THE COURT:  Okay.  Mr. Pissetzky, you may question

1  the witness.

2          MR. PISSETZKY:  Good morning, your Honor.

3          Good morning.

4  VICTORIA JEAN-BAPTISTE, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

5                  CROSS-EXAMINATION (Resumed)

6  BY MR. PISSETZKY:

7  Q.  Good morning.

8  A.  Good morning.

9  Q.  To follow up on what we talked about yesterday, when Ernie

10 is with you, does he talk about gang stuff?

11 A.  No.

12 Q.  Does he -- when he's with you, does he worry about flakes

13 or talk about flakes?

14 A.  No.

15 Q.  Do you care about that kind of talk?

16 A.  No.

17 Q.  So you just heard shots.  You came to pick Ernie up, and

18 he told you when he got into the car, "Let's go get some

19 blunts," right?

20 A.  Yes.

21 Q.  You heard him say "fuck" and "flake" or "flakes,"

22 something to that effect?

23 A.  Yes.

24 Q.  And based on your knowledge of him, did he say -- did you

25 hear him say, "I shot a flake, I killed a flake," anything

1    like that?

2    A.   No.

3    Q.   When he said to you "fuck flake, fuck them flakes,"

4    whatever it is, did he seem to you like he was caring about

5    those flakes, or did it seem to you based on your knowledge of

6    him that he was dismissing it and says, "Let's go get some

7    blunts"?

8    A.   Dismissing it.

9    Q.   Did he raise it again?

10   A.   No.

11   Q.   Did he appear stressed to you?

12   A.   No.

13   Q.   He did not appear full of adrenaline or hype?

14         THE COURT:   I think you asked her all those questions

15   yesterday.

16         MR. PISSETZKY:   I can move on.

17         THE COURT:   All right.   Please do.

18   BY MR. PISSETZKY:

19   Q.   And so all that you and Ernie wanted to do is hang out and

20   smoke some weed before you go and pick up Adriana to the

21   airport?

22   A.   Yes.

23   Q.   After you picked up Ernie, did you change any of your

24   plans at all to hang out?

25   A.   No.

1  Q.  Did you change your plans to take Adriana to the airport?

2  A.  No.

3  Q.  In fact, when you were hanging out at some point, you were

4  driving around the neighborhood itself, right?

5  A.  Yes.

6  Q.  Until about 4:45, 5:00 o'clock in the morning?

7  A.  Yes.

8  Q.  You followed a paddy wagon at some point?

9  A.  Yes.

10  Q.  And you parked in front of Ernie's house at some point?

11  A.  Double-parked, yes.

12  Q.  And you were driving and smoking weed?

13  A.  Yes.

14  Q.  By the way, is your car -- you drive what kind of car

15  again?

16  A.  A Ford Focus.

17  Q.  Are the windows tinted at all?

18  A.  No.

19  Q.  So anybody who looks into your car can see what's going on

20  in the car?

21  A.  Yes.

22  Q.  And at some point, you told us, I think, on direct that

23  you were trying to listen to some free phone -- free app on

24  your phone about a police scanner app?

25  A.  Yes.

1  Q.  And that was when you were in front of the gas station?

2  A.  The Shell gas station, yes.

3  Q.  Right.  Before or after Ernie went inside?

4  A.  After.

5  Q.  After.  So you watched a video yesterday, right?

6  A.  Yes.

7  Q.  And he is inside the gas station looking for his wallet,

8  right?

9  A.  Yes.

10  Q.  Okay.  Is that Ernie?

11  A.  Yes.

12  Q.  And why is that?

13  A.  Forgetful.

14  Q.  He's forgetful?

15  A.  Yes.

16  Q.  Now, when you were in the car listening to that scanner

17  app or Ernie was listening to it, at some point, he told you

18  that a cop was shot?

19  A.  Yes.

20  Q.  Did he freak out?

21  A.  No.

22  Q.  Did he become concerned?

23  A.  No.

24  Q.  Did his demeanor change?

25  A.  No.

1    Q.   Did he -- did your plans change?

2    A.   No.

3    Q.   In fact, that is when you made the decision to return into

4    the neighborhood?

5    A.   Yes.

6    Q.   And why was that?

7    A.   To see what was going on.

8    Q.   And is that when you decided to -- when you drove into the

9    neighborhood to follow that paddy wagon?

10   A.   Yes.

11   Q.   Now, after the shooting, did the neighborhood get -- or

12   did more police come to the neighborhood from the first time

13   that you were there when you went to pick him up?

14   A.   Yes.

15   Q.   So the neighborhood was getting a little hotter, right?

16   A.   Yes.

17   Q.   And when you say "hotter," that means that cops are in the

18   neighborhood?

19   A.   Yes.

20   Q.   And when you see a paddy wagon, does that mean anything to

21   you?

22   A.   Usually, they're going to raid somebody's house.

23   Q.   So that means that people are going to get put in cuffs, a

24   house will get raided, possibly arrests?

25   A.   Yes.

1  Q.  Because that's the wagon that they put people in?

2  A.  Yes.

3  Q.  When the neighborhood is hot, is it typical for you and

4  Ernie to drive around actually?

5  A.  Be nosy, yes.

6  Q.  Excuse me?

7  A.  To be nosy, yes.

8  Q.  And do the cops in your neighborhood know Ernie?

9  A.  Yes.

10  Q.  Do they recognize him?

11  A.  Yes.

12      MR. EICHENSEER:  Object to foundation, your Honor.

13  BY MR. PISSETZKY:

14  Q.  Have you ever been with him when a police officer stopped

15  and harassed you and him?

16  A.  Yes.

17  Q.  Tell us what happened.

18      MR. EICHENSEER:  Objection, your Honor.

19      THE COURT:  Objection sustained.

20  BY MR. PISSETZKY:

21  Q.  Was it unusual for him to leave his home when the

22  neighborhood was hot so he won't get harassed?

23  A.  Yes.

24  Q.  Now, earlier in the morning while you were driving around,

25  you told us that you stopped at a different gas station,

1  right?

2  A.  Yes.

3  Q.  And that was closer to what time?  Closer to 4:30, after

4  4:00 o'clock?

5  A.  After 4:00 o'clock.

6  Q.  He didn't buy the white shirt any time prior to that,

7  right?

8  A.  No.

9  Q.  He didn't tell you that he needed to change his clothing?

10  A.  No.

11  Q.  And he did not buy the shirt when you were sitting in

12  front of the house smoking weed, his house?

13  A.  No.

14  Q.  Did he run inside the house to change?

15  A.  No.

16  Q.  And before buying the shirt, did he seem -- did his

17  demeanor look any different?  Did he seem concerned?

18  A.  No.

19  Q.  Was he anxious to find a place that is open that early in

20  the morning to buy a shirt?

21  A.  No.

22  Q.  When he bought the shirt, did he take off his black shirt

23  and put on the new shirt so nobody can recognize him?

24  A.  No.

25  Q.  Did he put on any Groucho Marx glasses?

1  A.  No.

2  Q.  After he bought that shirt, what happened?

3  A.  After he bought the shirt, he -- we headed towards, like,

4  the neighborhood, and that's when I ended up dropping him off.

5  Q.  And that's when you dropped him off?

6  A.  Yes.

7  Q.  Okay.  And you dropped him off somewhere around 43rd and

8  Honore?

9  A.  Yes.

10  Q.  And who lives around there?

11  A.  His baby mama.

12  Q.  That's Destiny?

13  A.  Yes.

14  Q.  And when -- do you know whether or not -- or you said

15  Ernie drives the Kia, right?

16  A.  Yes.

17  Q.  And the Kia belongs to Destiny, right?

18  A.  Yes.

19  Q.  And is the Kia at times parked by Destiny's house?

20  A.  Yes.

21  Q.  And did he ask -- what did he specifically ask you?  Did

22  he just tell you, "Drop me here," or did he say anything about

23  "Drop me by Destiny's" or anything like that?

24  A.  No.  He just said, "Drop me off right there on Honore."

25  Q.  Was there police presence at that corner of Honore and

1  43rd?

2  A.  No.

3  Q.  Which means that the place -- that you didn't see any

4  police activity there, right?

5  A.  Right there, no.

6  Q.  After you dropped him off, do you know exact -- do you

7  know where he went?

8  A.  No.

9  Q.  Do you know where you were supposed to meet him again?

10  A.  Adriana's house.

11  Q.  And you went to get coffee?

12  A.  Yes.

13  Q.  Did you, in fact, meet him again at Adriana's house?

14  A.  Yes, I did.

15  Q.  And what car was he driving?

16  A.  The white Kia.

17  Q.  The white Kia.  And Adriana was there?

18  A.  Yes.

19  Q.  Did you learn that he was with Adriana for the 15 minutes

20  that you were not with him?

21  A.  Yes.

22  Q.  Did you learn at all where he was with Adriana?

23  A.  Saying good-bye to her dad.

24  Q.  So he went with her to say good-bye to her dad?

25  A.  Yes.

1  Q.  Did you know if he -- did he change his clothes then at

2  all?

3  A.  No.

4  Q.  Now, I think you told us you left your car by Adriana's

5  house?

6  A.  Yes.

7  Q.  And where is that?

8  A.  On 45th and Marshfield.

9  Q.  And when you drove to the airport with Adriana, did you

10 guys smoke any marijuana?

11 A.  I don't remember.

12 Q.  Did Ernie act any different at that time?

13 A.  No.

14 Q.  Did you stop at any gas stations while you were driving

15 the Kia to fill it up?

16 A.  No.

17 Q.  During the ride to the airport, at some point, did Adriana

18 receive a phone call?

19 A.  Yes.

20 Q.  And what happened at that time?

21 A.  She received a phone call from one of Ernesto's sisters,

22 and they told Adriana that there was --

23        MR. EICHENSEER:  Your Honor, I'm going to object to

24 the hearsay here.

25        MR. PISSETZKY:  I can rephrase it, Judge.

1          THE COURT:  All right.

2  BY MR. PISSETZKY:

3  Q.  Without telling us what people said, I'm asking you, what

4  did you learn in general?

5  A.  There was police and helicopters in the neighborhood.

6  Q.  And did -- Adriana at that point, did her demeanor change?

7  A.  Yes.

8  Q.  Would you say she kind of freaked out?

9  A.  She freaked out.

10  Q.  And so what happened after the phone call?

11  A.  She wanted us to drop her off.

12  Q.  On the way to O'Hare?

13  A.  She wanted us to drop her off anywhere so an Uber could

14  pick her up and take her to O'Hare.

15  Q.  And what was the reason for that?

16  A.  She wanted Ernesto to go back to the neighborhood to make

17  sure everybody in his house was fine.

18  Q.  Okay.  And did that actually happen?

19  A.  I don't know.

20  Q.  No.  I'm saying, did you drop her off?

21  A.  Yes.

22  Q.  And where was that that you guys dropped her off?

23  A.  At a Dunkin' Donuts.

24  Q.  Do you remember how close to O'Hare were you?

25  A.  No.

1  Q.  And she -- did she get into an Uber to go to --

2  A.  Yes.

3  Q.  -- O'Hare?

4  A.  Yes.

5  Q.  And at that time after she left, did you guys start

6  driving back to the neighborhood?

7  A.  Yes.

8  Q.  But I think you told us you received a phone call --

9  A.  Yes.

10 Q.  -- right, from Adriana?

11 A.  Yes.

12 Q.  Because you realized that you -- did you receive a phone

13 call, or did you call Adriana?

14 A.  I received a -- I believe I called her because I left the

15 phone in her bag.

16 Q.  So you used Ernie's phone to call her?

17 A.  I had another phone.

18 Q.  Okay.

19 A.  I have two phones.

20 Q.  And what happened when you called her?

21 A.  We headed back to O'Hare.

22 Q.  Now, did Ernie get mad at you that you had to drive back,

23 that he had to drive back to O'Hare?

24 A.  No.

25 Q.  Did he seem concerned or worried about it?

1  A.  No.

2  Q.  Was he in a rush to go anywhere?

3  A.  No.

4  Q.  Now, once you received that phone back, where did you go?

5  A.  We headed towards the house.

6  Q.  Towards the neighborhood?

7  A.  Towards the neighborhood.

8  Q.  Now, did he drop you off by your car?

9  A.  No.

10  Q.  And I think you told us yesterday that he -- that was

11  around 7:00, 7:30 in the morning that he dropped you off by

12  Mariano's?

13  A.  Yes.

14  Q.  And can you remind us, why did he drop you off there?

15  A.  Because of where my car was parked by -- near family of

16  his baby mama.

17  Q.  So there's -- specifically, there's an uncle named Lalo

18  that lives there?

19  A.  Yes.

20  Q.  And until that point, you didn't see Ernie fill up that

21  Kia at all with gas?

22  A.  No.

23  Q.  Is it unusual for Ernie to drive different cars?

24  A.  No.  He drives different cars.

25  Q.  Does he drive other people's car all the time?

1  A.  Yes.

2  Q.  Does he drive just the Kia or any car that has gas in it?

3  A.  Any car that has gas.

4  Q.  Now, counsel asked you yesterday and talked to you about

5  not telling the Chicago police the truth, correct?

6  A.  Yes.

7  Q.  Can you tell us why you didn't tell them the truth?

8  A.  Because I didn't know what was going on.  They walked up

9  to me with handcuffs and told me I was being arrested for a

10  shooting that happened yesterday.

11  Q.  And how did you feel at that --

12          MR. EICHENSEER:  I object to this.

13          MR. PISSETZKY:  Counsel opened the door yesterday for

14  it.

15          MR. EICHENSEER:  We didn't ask why she was untruthful

16  to the Chicago police.

17          MR. PISSETZKY:  I can ask that then.  They asked

18  about it.  The jury has the right to hear.

19          THE COURT:  She can -- her answer can stand.

20          THE WITNESS:  Because I was scared.  I didn't know

21  what was going on.  I have a lot going for myself.  Someone is

22  going to walk up to you and say you're arrested for a shooting

23  that happened yesterday, I freaked out.  I didn't know.  I

24  actually screamed for my mom.

25  BY MR. PISSETZKY:

1  Q.  And how old were you again?  How old were you at the time?

2  A.  19.

3  Q.  And they put you in cuffs?

4  A.  Yes.

5  Q.  Are you telling us the truth today?

6  A.  Yes, I am.

7         MR. EICHENSEER:  Objection, your Honor.  Vouching is

8  the jury's job.

9         THE COURT:  Overruled.

10  BY MR. PISSETZKY:

11  Q.  Did you commit any crime on May 4th, 2018?

12  A.  No.

13  Q.  To your knowledge, did Ernie commit any crime on May 4th,

14  2018?

15  A.  No.

16         MR. EICHENSEER:  Objection.  Foundation.

17         THE COURT:  Objection sustained on that one.

18  BY MR. PISSETZKY:

19  Q.  Did you meet with the government lawyers, as counsel told

20  you, in the past?

21  A.  Yes.

22  Q.  Was there an incident with them as well?

23  A.  Yes.

24  Q.  What happened?

25  A.  They didn't let me out of the room.

1 Q. You wanted to leave?

2 A. Yes.

3 Q. And they didn't let you out?

4 A. No.

5 Q. Would Ernie ask you to pick him up and hang out with you

6 had you -- had he shot someone?

7 A. No.

8 Q. Why?

9         MR. EICHENSEER: Objection. Foundation, your Honor.

10         THE COURT: Objection sustained.

11         Anything further?

12         MR. PISSETZKY: Thank you, your Honor. Can I have

13 one moment, please?

14         THE COURT: All right.

15      (Pause.)

16         MR. PISSETZKY: Thank you, your Honor.

17         THE COURT: Redirect?

18         MR. EICHENSEER: Yes, your Honor. Thank you.

19                 REDIRECT EXAMINATION

20 BY MR. EICHENSEER:

21 Q. Ma'am, I'm going to ask you some questions about what you

22 told Mr. Pissetzky yesterday. Okay?

23 A. Okay.

24 Q. You remember your testimony yesterday?

25 A. Yes.

1  Q.  Mr. Pissetzky, he asked you about the grand jury statement

2  that you made last year.  Do you remember those questions?

3  A.  Not exactly, but somewhat, yes.

4  Q.  You remember him asking you about that, right?

5  A.  Yes.

6  Q.  And you remember that you testified in front of the grand

7  jury in July of last year; is that right?

8  A.  Yes.

9  Q.  And Mr. Pissetzky specifically asked you about the

10  statement that was read into the grand jury when you

11  testified, right?

12  A.  Yes.

13  Q.  And he asked you whether the statement was your words or

14  the government's words.  Do you remember that question?

15  A.  Yes.

16  Q.  And your answer was that it was the government's words,

17  right?

18  A.  Yes.

19  Q.  So you were asked questions in the grand jury about whose

20  words those were; is that right?

21  A.  What was that?

22  Q.  You were asked questions in the grand jury about whose

23  words those were?

24  A.  I don't remember everything from the grand jury.

25  Q.  Do you remember Ms. Babu asking you questions in the grand

1  jury?

2  A.  I don't remember from the grand jury.

3  Q.  Your lawyer was outside the grand jury when you testified;

4  is that right?

5  A.  I don't remember from the grand jury.

6  Q.  You don't remember your lawyer being outside with you?

7  A.  I don't remember that day.

8  Q.  You were under oath when you gave that testimony, right?

9  A.  Yes.

10  Q.  You remember standing like this and swearing to tell the

11  truth?

12  A.  Yes.

13  Q.  Just like you did today?

14  A.  Yes.

15  Q.  And Ms. Babu asked you who provided the information in the

16  statement, and you answered, "Me."  Is that right?

17  A.  Yes.

18        MR. PISSETZKY:  Your Honor, I'm going to object.

19  That's not impeaching.  He said it's not her words.  It's not

20  who provided the information.

21        MR. EICHENSEER:  Your Honor, there's a colloquy here.

22        THE COURT:  It's impeaching.  Overruled.

23  BY MR. EICHENSEER:

24  Q.  And Ms. Babu asked you whether you understood this was

25  your statement even though she typed it up, and your answer

1  was "yes;" is that correct?

2  A.  I don't remember that day.

3  Q.  Ms. Babu asked you if you reviewed drafts of the statement

4  before testifying, and you answered "yes;" is that right?

5  A.  I don't remember the grand jury.

6  Q.  Ms. Babu asked you if you made changes to that grand jury

7  statement, and you answered "yes," correct?

8  A.  I don't remember the grand jury.

9  Q.  Ms. Babu asked you if you read the statement word for word

10  and if it was accurate, and you answered "yes"?

11  A.  I don't remember the grand jury.

12  Q.  And you signed the statement at the end, correct?

13  A.  I did.

14  Q.  And you initialled each page of that statement while you

15  were testifying --

16  A.  I did.

17  Q.  -- is that correct?

18          So Mr. Pissetzky asked you some more questions about

19  your grand jury statement.  He asked you about the part where

20  the statement says, "fuck that flake" or "fuck those flakes."

21  Do you remember that question?

22  A.  From yesterday, yes.

23  Q.  And he asked you some questions about the intonation.  Do

24  you remember those questions?

25  A.  Not fully.

1  Q.  Well, he asked you about whether the statement was written

2  down or whether you said that statement, correct?

3  A.  Yes.

4  Q.  And he asked you whether there was any intonation on the

5  written statement.  In other words, when you read something,

6  is there any intonation there?

7  A.  Yes.

8  Q.  In the grand jury, Ms. Babu, she read the statement out

9  loud to you; is that right?

10 A.  I don't remember the grand jury.

11 Q.  She read you the line in your statement that said, quote,

12 "He leaned back in the passenger seat and said, 'I feel good,'

13 and something like 'fuck that flake or fuck those flakes.'"

14      She read that line to you out loud, correct?

15 A.  I don't remember the grand jury.

16 Q.  And then she asked you if everything in that paragraph

17 that she just read was accurate.  Do you remember that?

18 A.  I don't remember the grand jury.

19 Q.  And you said "yes"?

20 A.  I don't remember the grand jury.

21 Q.  Did you ask Ms. Babu or did you tell her that your

22 intonation, the intonation was wrong?

23 A.  I don't remember the grand jury.

24 Q.  Did you tell Ms. Babu that there should have been a comma

25 in "fuck that flake"?

1   A. I don't remember the grand jury.

2   Q. Did you tell Ms. Babu that anything in that statement that

3   she read was incorrect or inaccurate?

4   A. I didn't tell her. I don't remember the grand jury.

5   Q. So do you remember testifying yesterday, Mr. Pissetzky

6   asked you whether now you remember what Mr. Godinez said in

7   the car that night. Do you remember those questions?

8   A. Somewhat.

9   Q. You don't remember what you testified yesterday?

10   A. Yes, I did.

11   Q. Do you remember you testified that now you remember that

12   what the defendant said in the car that night was "fuck"

13   something, something about flakes. Is that your testimony

14   today?

15   A. Yes.

16   Q. How long has it been since the shooting?

17   A. A year.

18   Q. How many times have you met with Mr. Godinez's lawyers?

19   A. Twice.

20   Q. When did you testify in the grand jury?

21   A. July.

22   Q. Of last year, right?

23   A. Yes.

24   Q. So you didn't remember "fuck something, something flakes,"

25   July of last year, did you?

1  A.  No, I did not.

2  Q.  You didn't tell Chicago police about that statement when

3  they interviewed you on the morning of May 4th, is that right,

4  or the afternoon of May 4th?

5  A.  Correct.

6  Q.  Now you remember that what Mr. Godinez said was, "fuck

7  something, something flakes," correct?

8  A.  Yes.

9  Q.  And Mr. Pissetzky, he just asked you this morning whether

10  Ernie ever said in the car that he shot a flake.  And your

11  answer was what?

12  A.  "No."

13  Q.  No, he never said that, that's your testimony, correct?

14  A.  Yes.

15  Q.  Did you think on the morning of May 4th that any flakes

16  had been shot?

17  A.  No.

18  Q.  It's your testimony today that you didn't think that any

19  flakes had been shot on the morning of May 4th?

20  A.  I didn't know who got shot.

21  Q.  The question was:  Did you think on the morning of May 4th

22  that flakes had been shot?

23  A.  Yes.

24  Q.  Why did you think that?

25  A.  Because of gunshots and nobody called me that somebody

1  either close to me or that I knew got shot.

2  Q.  Okay.  But you were -- you listened to a police scanner

3  that morning at 3:30, correct?

4  A.  After I picked him up, yes.

5  Q.  Okay.  And you said that Ernie -- Mr. Godinez relayed to

6  you that he heard over the scanner that a cop had been shot,

7  right?

8  A.  Yes.

9  Q.  He didn't tell you that a flake had been shot on the

10 scanner, did he?

11 A.  No.

12 Q.  How did you know that a flake had been shot?

13 A.  I said I thought a flake got shot.

14 Q.  Okay.  Were you texting your sister-in-law that morning?

15 A.  Yes.

16 Q.  And those texts were part of your grand jury statement,

17 weren't they?

18 A.  I don't remember.

19 Q.  Well, you testified under oath that "Exhibit G is a copy

20 of texts between me and my sister-in-law, Stephanie Cortez,

21 from May of 2018."

22 A.  I don't remember the texts.

23 Q.  On 5:06 on the morning of May 4th, did you text your

24 sister-in-law that, "They just shot a cop and some flakes on

25 the corner of 44th and Hermitage"?

1   A.   I don't remember.

2         MR. PISSETZKY:  Your Honor, can we have foundation

3   for the time, for the time of that?

4         THE COURT:  Go ahead.

5   BY MR. EICHENSEER:

6   Q.   Do you want to see the texts, ma'am?

7   A.   Yes.

8   Q.   Showing you what's been marked for identification as

9   Government Exhibit Texts, do you see that?

10  A.   Yes.

11  Q.   There's a grand jury sticker up in the corner.  Do you see

12  that?

13  A.   Yes.

14  Q.   Whose initials are on that grand jury statement -- or that

15  grand jury sticker?

16  A.   Mine.

17  Q.   So this is the -- these are the texts that you initialed

18  that day on July of last year?

19  A.   Yes.

20  Q.   Would you turn to the second page of the exhibit?

21        Do you see the text at the top from phone number

22  1-773-997-4527?

23  A.   Yes.

24  Q.   That's you texting, right?

25  A.   Yes.

1    Q.   And this is about 5:06 a.m. on May 4th --

2    A.   Yes.

3    Q.   -- is that right?

4         And you text -- over several strings here, you text

5    your sister-in-law, "They shut a cop," and then you correct it

6    to say "shot," "and some flakes on the corner of H and 44th --

7    I mean, the beginning of 44th."

8         Did you text that statement to your sister-in-law at

9    5:00 o'clock in the morning on May 4th?

10   A.   Yes.

11        MR. PISSETZKY:   Your Honor, how is that impeaching?

12   I would object.

13        MR. EICHENSEER:   No further questions, your Honor.

14        MR. PISSETZKY:   May I --

15        THE COURT:   Cross-examine.

16        MR. PISSETZKY:   Thank you.

17                         RECROSS-EXAMINATION

18   BY MR. PISSETZKY:

19   Q.   Let's start with the text message.  It was at 5:06 a.m.,

20   right?

21   A.   Yes.

22   Q.   After you already drove around the neighborhood and after

23   you heard the scanner, right?

24   A.   Yes.

25   Q.   Okay.  And you still at that point thought that some

1  flakes were shot?

2  A.  Yes.

3  Q.  And the reason you thought that is because if it was

4  somebody you knew or from the neighborhood, you told us, you

5  just said you would receive a phone call?

6  A.  Yes.

7  Q.  It's a tight-knit neighborhood?

8  A.  Yes.

9  Q.  And so somebody would tell you or you would receive a

10 text, so-and-so got hurt, shot, whatever it is?

11 A.  Yes.

12 Q.  And if you didn't, you assumed automatically flakes got

13 shot?

14 A.  Yes.

15 Q.  So when Ernie got into your car and he said "fuck" and

16 "flakes," and it could have been "fuck them flakes," "fuck

17 those flakes," correct?

18 A.  Yes.

19 Q.  He said the same -- he had the same thought as you do

20 possibly?

21      MR. EICHENSEER:  Objection.  Foundation.

22      THE COURT:  Objection to that question --

23 BY MR. PISSETZKY:

24 Q.  Well, when he said those, what did you understand it to

25 mean?

1    A.   That a flake had got shot.

2    Q.   Because you heard shots?

3    A.   Yes.

4    Q.   And that's how you took him to mean as well?

5    A.   Yes.

6              THE COURT:  Is that it?

7              MR. PISSETZKY:  Thank you, Judge.

8              THE COURT:  All right.  You can step down.  You're

9    excused.

10       (Witness excused.)

11             THE COURT:  Call your next witness.

12             MS. BABU:  Your Honor, the government calls

13   Destiny Rodriguez.

14             THE COURT:  Right up here.

15             MS. BABU:  Your Honor, I'm going to set up the map.

16             THE COURT:  Please raise your right hand.

17       (Witness sworn.)

18             THE WITNESS:  I do.

19             THE COURT:  All right.  You may question the witness.

20          DESTINY RODRIGUEZ, GOVERNMENT'S WITNESS, SWORN

21                      DIRECT EXAMINATION

22   BY MS. BABU:

23   Q.   Would you please state and spell your name for the record?

24   A.   Destiny Rodriguez, D-e-s-t-i-n-y, R-o-d-r-i-g-u-e-z.

25   Q.   Ms. Rodriguez, I'm going to start with some background

1    questions first.  What is your address?

2    A.  My address is -- well, right now, I just moved, so it's

3    4545 -- 4345 South Wood.

4    Q.  Is that currently the defendant's -- or was that the

5    defendant's address in May 2018?

6    A.  Yes.

7    Q.  Where did you -- where did you live in May 2018?

8    A.  4325 South Honore.

9    Q.  Could you show the jury on the map that's right next to

10   you where that was?

11   A.  I think it's this house -- yes, it's this house right

12   there.

13   Q.  Right there on Honore?

14   A.  Yeah.

15   Q.  And where is the defendant's house on that map?

16   A.  Right here.

17   Q.  Thank you.  Ms. Rodriguez, do you know the defendant?

18   A.  Yes.

19   Q.  Do you see the defendant here in the courtroom?

20   A.  Yes.

21         MR. HYMAN:  Your Honor, we'll stipulate.

22         MR. PISSETZKY:  We'll stipulate.

23         THE COURT:  It's been stipulated that she can

24   identify him and he's been identified.

25         MS. BABU:  Thank you.

1  BY MS. BABU:

2  Q.  Ms. Rodriguez, how do you know the defendant?

3  A.  He's my son's father.

4  Q.  How old is your son?

5  A.  He turned two yesterday.

6  Q.  Ms. Rodriguez, do you have a Snapchat account?

7  A.  Yes, I do.

8  Q.  And did you have that -- what is the name of your -- or

9  the ID for your Snapchat account?

10  A.  D-e-s, underscore, t-i-n-y 21.

11  Q.  And did you have that same account in May 2018?

12  A.  Yes.

13  Q.  And did you communicate with the defendant using Snapchat?

14  A.  Yes.

15  Q.  And what was his Snapchat account?

16  A.  I believe Doe John 45 or John Doe 45.

17  Q.  Doe as in d-o-e?

18  A.  Yes.

19  Q.  J-o-h-n?

20  A.  Yes.

21  Q.  Ms. Rodriguez, in May of 2018, you said the defendant

22  lived at 4345 South Wood Street; is that right?

23  A.  Yes.

24  Q.  And in May of 2018, did you own a car?

25  A.  Yes.

1  Q.  What car was that?

2  A.  It was a Kia.

3  Q.  Do you know the type of car?

4  A.  No.

5  Q.  Was it like a small car, a big car?

6  A.  It was like an SUV, like a small SUV.

7  Q.  And what color was it?

8  A.  White.

9  Q.  How long did you have that car?

10  A.  I think October of 2017.

11  Q.  And did you drive it often?

12  A.  Not that often.

13  Q.  Who drove it?

14  A.  Ernie.

15  Q.  And is Ernie the defendant?

16  A.  Yes.

17  Q.  And how often did the defendant drive your white Kia?

18  A.  Maybe every day usually.

19  Q.  Ms. Rodriguez, if I can, I'd like to turn your attention

20  to May 3rd of 2018.

21  A.  Yes.

22  Q.  Were you working on May 3rd?

23  A.  Yes.

24  Q.  Where did you work?

25  A.  I worked at Metro PCS on 81st and Pulaski.

1   Q.  And did you see the defendant on May 3rd?

2   A.  Yes.

3   Q.  About what time?

4   A.  I seen him that morning.  He dropped me off at work.  And

5   later on that night as well, he picked me up.

6   Q.  And what did he -- did he pick you up by driving?

7   A.  Yes.

8   Q.  What was he driving?

9   A.  My Kia.

10  Q.  And where did he take you after he picked you up?

11  A.  We went to go get something to eat.

12  Q.  And then where did he take you after that?

13  A.  We went home -- well, I went home.

14  Q.  And did the defendant stay with you at home?

15  A.  No.

16  Q.  When was the next time you saw the defendant?

17  A.  The next morning.

18  Q.  At about -- that's on May 4th?

19  A.  Yes.

20  Q.  At about what time?

21  A.  At about 12:00.

22  Q.  12:00 p.m.?

23  A.  Yes, 12:00 p.m. noon.

24  Q.  And under what circumstances did you see the defendant?

25  A.  He had to take me and my son -- well, our son to the

1    doctor's.

2    Q.   And where is the doctor's?  Where was the doctor's

3    appointment?

4    A.   On 47th and Wolcott.

5    Q.   And how far is that from your house?

6    A.   Less than a five-minute drive.

7    Q.   And what time did the defendant come get you to go to the

8    doctor's appointment?

9    A.   About 12:01, maybe around 12:05.

10   Q.   Were you upset with him for showing up at 12:01?

11   A.   Yeah.

12   Q.   And what -- how did he pick you up?

13   A.   He was driving a car.

14   Q.   He was driving -- I'm sorry?

15   A.   He was driving a car.

16   Q.   What kind of car was that?

17   A.   It was like a charcoal gray, kind of like the Kia, like a

18   small SUV.

19   Q.   It was a small SUV, you said?

20   A.   Uh-huh.

21   Q.   And what color was it?

22   A.   A charcoal gray.

23   Q.   And had you ever seen that car before?

24   A.   No.

25   Q.   And did the defendant take you and your son to the

1    doctor's appointment?

2    A.   Yes.  He dropped us off.

3    Q.   And did the defendant go into the appointment with you?

4    A.   No.

5    Q.   Did he pick you up after the appointment?

6    A.   No.

7    Q.   How did you -- did you go home after the appointment?

8    A.   No.

9    Q.   Where did you go immediately after the appointment?

10   A.   I took an Uber to Mariano's.

11   Q.   Why did you take an Uber to Mariano's?

12   A.   He told me to take an Uber to Mariano's and he'll pick me

13   up from there.

14   Q.   And why did he tell you to take -- why did he tell you to

15   do that?

16   A.   I have no idea.

17   Q.   Ms. Rodriguez, do you remember testifying before the grand

18   jury last year?

19   A.   Yes.

20   Q.   Would it -- in testifying before the grand jury, did you

21   testify under oath?

22   A.   Yes.

23   Q.   Did you raise your right hand?

24   A.   Yes.

25   Q.   And your testimony today is you don't remember why the

1  defendant told you to go to Mariano's?

2  A.  No.  He just told me to go to Mariano's, that he didn't

3  want to be driving around.

4  Q.  And why didn't he want to be driving around?

5  A.  The neighborhood -- the neighborhood had a high police

6  presence.

7  Q.  And did -- so you ultimately went to the Mariano's?

8  A.  Yes.

9  Q.  And where is that Mariano's?

10  A.  By, like, Archer and Ashland.

11  Q.  And did the defendant pick you up at Mariano's?

12  A.  Yes.

13  Q.  What was he driving?

14  A.  The same car that he was in when he picked us up.

15  Q.  The gray SUV?

16  A.  Yes, the gray SUV.

17  Q.  After the Mariano's, where did the defendant take you?

18  A.  We had to go back to my house because I forgot my ID.

19  Q.  And your house is on 44th and Honore or on Honore

20  between --

21  A.  43rd and Honore.

22  Q.  43rd and Honore.  And why did you need to get your ID?

23  A.  My son had pinkeye.  I needed my ID for his prescription.

24  Q.  So did the defendant drop you off in front of your house?

25  A.  No.

1  Q.  Where did he drop you off?

2  A.  He dropped me off in the alley between Wolcott and --

3  yeah, and Wolcott.

4  Q.  So could you show the jury where -- where, about where the

5  defendant dropped you off?

6  A.  Like somewhere around here.

7  Q.  And so that's not the alley behind your house, right?

8  A.  No.  The alley behind my house is there, and he dropped me

9  off on this alley.

10  Q.  And did he stay in the alley while -- did he come with

11  you?  Did he park?

12  A.  No.  He -- I got out of the car.  I had just been to the

13  house.  When I came back out the house, he was pulling up back

14  into the alley.

15  Q.  So he didn't stay in the alley?

16  A.  I'm assuming not.

17  Q.  Ms. Rodriguez, I'd like to fast forward a few hours on May

18  4th.

19  A.  Uh-huh.

20  Q.  Did you and the defendant go to someone else's house later

21  on on May 4th?

22  A.  Yes.

23  Q.  Whose house was that?

24  A.  His cousin Manny's.

25  Q.  Do you know Manny's full name?

1  A.  No.

2  Q.  And where is Manny's house?

3  A.  I'm not too sure.

4  Q.  Is it close to your house?

5  A.  No.

6  Q.  If you had to drive there, about how long would it take

7  you to get there?

8  A.  I'm not too sure.  We drove around before we got to

9  Manny's house.

10  Q.  Is it, like, north and west of your house in the city?

11  A.  I would assume north.

12  Q.  And how did you -- you drove there, you said?

13  A.  He drove.

14  Q.  And what was he driving?

15  A.  The same charcoal gray SUV.

16  Q.  So this was not your white Kia?

17  A.  No.

18  Q.  Do you know, where was your white Kia?

19  A.  I have no idea.

20  Q.  Did you eventually find out where it was?

21  A.  Yes.

22  Q.  Where was it?

23  A.  It was at Manny's house.

24  Q.  And when did you find that out?

25  A.  On May 6th.

1  Q.  While you were at Manny's house, did you receive a phone
2  call?
3  A.  Yes.
4  Q.  And where was the defendant when you received that phone
5  call?
6  A.  Sitting across from me.
7  Q.  And without telling us what was said in the phone call,
8  generally, what happened?
9  A.  Didn't really understand what they were talking about.
10 Q.  Who called you?
11 A.  My grandmother.  And because she wasn't making sense, my
12 cousin then got on the phone.  She said there was a picture.
13 I told her to send it to me.  And she sent it to me.
14 Q.  And what was this picture of?
15 A.  It was a picture of a "wanted" sign with Ernie's face on
16 it.
17 Q.  And did the defendant receive a phone call about the same
18 time?
19 A.  Yes.
20 Q.  And this "wanted," you said it was a "wanted" picture?
21 A.  Yes.
22 Q.  And what -- it was a picture of the defendant's face?
23 A.  It was previous mugshots.
24 Q.  And did it say what he was wanted for?
25 A.  I don't recall.

1    Q.   And what did you do after you received the photo?

2    A.   I looked at it, put my phone down.  My son was in my lap.

3    And I --

4    Q.   You can take a minute.

5    A.   My son was sitting on my lap, so I kind of hugged him.

6    And my head was buried in his face because I was crying.

7         Thank you.

8    Q.   I'm sorry, Ms. Rodriguez.  Could you repeat that again?

9    A.   My son was sitting on my lap.  And then I hugged him.

10   Q.   Take your time.

11   A.   I just buried my head, and I just started crying.

12   Q.   So you buried your head in your son's -- in your son's

13   face and started crying?

14   A.   Yes.

15   Q.   And what did the defendant say to you?

16   A.   I felt his arms around us, and he was just saying, "I love

17   you" and was saying that he was sorry for everything that he's

18   ever done to me and ever hurt me.  After about a minute, I

19   didn't feel his arms anymore.  And I went and I looked up.  He

20   was gone.

21   Q.   Did you see or speak to the defendant after that?

22   A.   No.

23        MS. BABU:  No further questions, your Honor.

24        THE COURT:  Cross-examine.

25        MR. PISSETZKY:  Thank you, Judge.

1              CROSS-EXAMINATION

2    BY MR. PISSETZKY:

3    Q.   Good morning.

4    A.   Good morning.

5    Q.   What's your child's name?

6    A.   Ernesto.

7    Q.   And he's two?

8    A.   Yeah.

9    Q.   Yesterday?

10   A.   Yeah.

11   Q.   Happy birthday.

12            When did you meet Ernie?

13   A.   The summer of 2016.

14   Q.   When did you start dating him?

15   A.   The summer of 2016.

16   Q.   Was that when your child was conceived as well?

17   A.   He was conceived in October of 2017.

18   Q.   How long were you dating Ernie, together?

19   A.   Together, we were together for two years.

20   Q.   And when was -- when did things become a little shaky?

21   A.   In March of 2018.

22   Q.   What happened?

23   A.   We were just constantly arguing.  We were constantly

24   arguing for months, though.  A lot has happened between us.

25   And that was it really.  We just were constantly arguing, and

1  we were just not on good terms.

2  Q.  There were some issues with other women?

3  A.  Yeah.

4  Q.  Before breaking up with Ernie or having those issues, did

5  you used to hang out a lot --

6  A.  Yeah.

7  Q.  -- together?

8  A.  Yeah.

9  Q.  And when you were together, were there times that you

10  spent pretty much all the time together?

11  A.  Yeah.  The majority of the summer of 2016, I was with

12  Ernie.

13  Q.  And how about into 2017?

14  A.  Into 2017 as well.  I mean, I was away at school for a

15  year, so --

16  Q.  Where?

17  A.  In Springfield, Illinois.  Ernie would go and visit me at

18  times, especially after he found out I was pregnant.  And then

19  after we had our child, we were always together still.

20  Q.  And he would go out to Springfield and stay with you

21  there?

22  A.  Yeah.

23  Q.  Days at a time?

24  A.  Yeah.

25  Q.  And is it fair to say you know him very well?

1    A.    Yeah.

2    Q.    Do you -- are you in a gang?

3    A.    No.

4    Q.    When Ernie is with you, do you see him gang-bang?

5    A.    No.

6    Q.    Did he ever bring you to any gang meetings?

7    A.    No.

8    Q.    Did he ever take you or did you see him do any gang

9    activities?

10   A.    No.

11   Q.    You know that Ernie does sell drugs sometimes?

12   A.    Yes.

13   Q.    Does he ever take you to help him sell the drugs?

14   A.    Maybe to drop off some weed to somebody, but that was

15   really it.

16   Q.    That was it.  Did you ever see him carrying a gun?

17   A.    No.

18   Q.    Would you allow that?

19   A.    No.

20   Q.    Why?

21   A.    Because we have a son, and I know from his previous past

22   that he wasn't allowed to, so that was automatically no.

23   Q.    Did you ever see Ernie become violent physically?

24   A.    There were times that he would get angry but it -- he was

25   never physical.

1  Q. And so for the time that you've known him as you were

2  telling us, you know when he would get angry or mad,

3  obviously?

4  A. Uh-huh.

5  Q. You have to say "yes."

6  A. Yes.

7  Q. When he was concerned or afraid?

8  A. Yes.

9  Q. Or worried about something?

10 A. Yes.

11 Q. And when your relationship was good, obviously, you

12 confided with each other?

13 A. Yes.

14 Q. And when the relationship was rocky, you would argue and

15 try to make up?

16 A. Yeah.

17 Q. When Ernie came to pick you up from -- to go to the doctor

18 on May 4th, 2018, around noontime, how did he appear to you at

19 that time?

20 A. Normal, relaxed.  He was -- well, I got him upset because

21 I was yelling at him, telling him why was he late.

22 Q. Did he seem a little high to you, too?

23 A. A little what?

24 Q. High.

25 A. No, not really.  He was just kind of, like, "I don't want

1  to hear it right now," like, "We're just going to hurry.  I'm

2  trying to get you to the doctor's as fast as possible."

3  Q.  Okay.  And you lived in that neighborhood since when?

4  A.  All my life.

5  Q.  All your life.  So you know it pretty well?

6  A.  Yeah.

7  Q.  You've been driving up and down all the streets throughout

8  your life?

9  A.  Yeah.  I walked them as well.

10 Q.  Did you ever -- do you know the house on 4332 South

11 Hermitage?

12 A.  I don't know addresses.  If you can give a description,

13 like, how does it look.

14 Q.  It's an abandoned house.

15 A.  Yes, there's an abandoned house on that block.

16 Q.  Did you ever see Ernie stand post in that house?  Did you

17 ever meet him there?

18 A.  No.

19 Q.  Did you ever -- when you would drive around, did you see

20 him stand there?

21 A.  No.

22 Q.  Did you see any other young men standing there?

23 A.  No.

24 Q.  Let's talk about May 3rd.  Okay.  You told us that you saw

25 Ernie in the morning when he took you to work?

1  A.  Yes.

2  Q.  And then he picked you up?

3  A.  Yes.

4  Q.  And when he picked you up, where did you go?

5  A.  We went to get something to eat, and then we went -- well,

6  he dropped me off at home.

7  Q.  And he had your Kia?

8  A.  Yes.

9  Q.  And he continued to drive the Kia?

10 A.  Yes.

11 Q.  Did you fill it up at all?

12 A.  No, I don't think so.

13 Q.  And then you told us that the next time that you saw Ernie

14 was the next day?

15 A.  Yes.

16 Q.  On May 4th around noontime?

17 A.  Yes.

18 Q.  And that's when you saw him with a silver SUV, correct?

19 A.  Yeah.

20 Q.  And that SUV, did you know whether or not it belonged to

21 his friend Manny?

22 A.  No.

23 Q.  Do you know whether or not -- do you know today whether or

24 not it belonged to his friend Manny?

25 A.  No.

1  Q.  You're not sure.  Now, was it unusual for you to see him

2  in other cars except for the Kia?

3  A.  No.

4  Q.  Why not?

5  A.  Because anybody's car that he could get his hands on, he

6  would drive.

7  Q.  So it was not something out of the ordinary for you to see

8  him coming up, pulling up with a different car?

9  A.  No.

10 Q.  Now, you went to the doctor around noontime, correct?

11 A.  Yes.

12 Q.  That was the plan that you guys made or you made earlier

13 in the morning?

14 A.  Yes.

15 Q.  You didn't make it days in advance, right?

16 A.  No.

17 Q.  You called him in the morning and told him -- initially,

18 around 9:11 or so, did you call him and have a conversation

19 with him?

20 A.  Yeah.  I -- I know I had to schedule the appointment at

21 9:00, so I called him maybe around 9:30, 10:00 or so, and I

22 let him know that we had a doctor's appointment at 12:00 for

23 the baby.

24 Q.  And you explained that the baby was sick and possibly has

25 a pinkeye?

1   A.   Yes.

2   Q.   Did he tell you he did not want to come?

3   A.   No.  He said he'll be there.

4   Q.   And he, in fact, came, right?

5   A.   Yes.

6   Q.   You did call him shortly before noon to find out where he

7 was at?

8   A.   Yes.

9   Q.   And he did show up around -- I mean, five minutes late?

10   A.   Yeah.

11   Q.   When you were talking to him on the phone, did he seem

12 disturbed to you?

13   A.   No.

14   Q.   Did something seem unusual with him?

15   A.   No.

16   Q.   You know how to recognize his voice on the phone?

17   A.   Yeah.

18   Q.   When he entered your car -- or when you entered his -- the

19 car with the baby, did he say anything to you?

20   A.   No.

21   Q.   Did you tell the grand jury or is your memory exhausted --

22 if I showed you something, would it refresh your recollection?

23   A.   Yeah.

24         MS. BABU:  Your Honor, the witness just testified

25 that she -- the defendant said nothing to her.  Her

1  recollection doesn't need to be refreshed.

2      THE COURT:  Well --

3      MR. PISSETZKY:  I can --

4      THE COURT:  -- if you've got some information --

5      MR. PISSETZKY:  I do.

6      THE COURT:  -- contrary to that, if you want to

7  refresh her recollection, you know how to do it, so go do it.

8      (Pause.)

9      THE COURT:  Do it seasonably.

10  BY MR. PISSETZKY:

11  Q.  I'm going to show you your grand jury testimony.  And I'll

12  just ask you to review it without saying anything.  Okay?

13      Is your memory refreshed?

14  A.  Yes.

15  Q.  So when he got into your car, did he say anything to you?

16  A.  Not really, just about the police in the neighborhood.

17  Q.  Okay.  So he did say that the neighborhood is hot?

18  A.  Yeah.  Well, while we were driving to the doctor's, he was

19  telling me.

20  Q.  Okay.  And when the neighborhood is hot, that means that

21  there's police in the neighborhood?

22  A.  Yeah.

23  Q.  And that was, did you hear -- prior to him saying that to

24  you, did you hear something that happened, about something

25  that happened in the neighborhood?

1  A.  Yes.  In the morning as I was scrolling through Facebook,

2  I seen a news article, and it said that there was an ATF agent

3  shot in the neighborhood.

4  Q.  So when he said the neighborhood is hot, it kind of

5  corresponded to what you had learned earlier?

6  A.  I kind of just figured that was the reason why.

7  Q.  Okay.  And you also learned that there was -- later on,

8  you learned there was heavy police presence in the

9  neighborhood, right?

10  A.  Yes.

11  Q.  And when the neighborhood is hot and police is all over

12  the neighborhood, do people get stopped sometimes?

13  A.  Yes.

14  Q.  Houses get raided?

15  A.  Not that often, but depending on the situation, sometimes,

16  yeah.

17  Q.  It's not a good time to be in the neighborhood?

18  A.  No.

19       MS. BABU:  Objection, your Honor.

20       THE COURT:  Overruled.  I'll let her answer stand.

21  BY MR. PISSETZKY:

22  Q.  Did Ernie tell you that he shot someone?

23  A.  No.

24  Q.  Did he ask you to help him get away in any way?

25  A.  No.

1  Q.  Did his demeanor change at all when he said it to you that

2  the neighborhood is hot?

3  A.  No.

4  Q.  When Ernie dropped you off at the doctor's by 47th and

5  Wolcott, did he tell you to take an Uber to Mariano's?

6  A.  Yes.

7  Q.  Did he tell you why?

8  A.  No.

9  Q.  Didn't he tell you that the 'hood was hot and he didn't

10  want you to be -- he didn't want to be driving around?

11  A.  Yeah.  He said that he just didn't want to be around.  He

12  was just, like, "Just take it."  He was like, "I don't want to

13  be around here."

14  Q.  And so at about 1:18 in the afternoon, you called Ernie

15  again to pick you up from Mariano's?

16  A.  Yes.

17  Q.  By that time, you already arrived there with an Uber?

18  A.  Yes.  I called him once I got off the Uber.

19  Q.  And he was there within minutes, right?

20  A.  Yes.

21  Q.  So obviously, he was not far away?

22  A.  No.

23  Q.  He didn't send anybody else to pick you up?

24  A.  No.

25  Q.  He didn't tell you, take an Uber home?

1   A.   No.

2   Q.   Even though the doctor or Mariano's is only blocks away

3   from your home?

4   A.   No.

5   Q.   And he himself came to Mariano's, right?

6   A.   Yes.

7   Q.   Now, you told us that Ernie didn't want to go into the

8   neighborhood because it was hot, but you asked him to go back

9   into the neighborhood to get an ID, right?

10  A.   Yes.

11  Q.   Did he tell you he's not going?

12  A.   No.  He said we were going to go.

13  Q.   Okay.  Did he resist you in any way?

14  A.   No.

15  Q.   Now, you told us today that he dropped you off in -- by an

16  alleyway the next block over?

17  A.   Yes.

18  Q.   Did you have to call him to come back?

19  A.   I don't recall if I did.

20  Q.   You said that you --

21  A.   I think I might have called him because I didn't see the

22  car where he had dropped me off.

23  Q.   And then you -- and then immediately, you saw the car

24  pulling up?

25  A.   Yeah.

1   Q.  And where was it pulling up from?

2   A.  Like, it was coming back in through the alley this way.

3   Q.  So he was coming back from the actual street, right?

4   A.  Yeah.

5          MS. BABU:  Objection, your Honor.  Foundation.

6          MR. PISSETZKY:  She just said that he was --

7          THE COURT:  Overruled.

8   BY MR. PISSETZKY:

9   Q.  And then when you -- you got your ID, and Ernie -- and you

10  got back into the car, Ernie was with your son at the time?

11  A.  Yes.

12  Q.  He didn't tell you, "Take your son with you"?

13  A.  No.

14  Q.  And then you said that you continued to drive around?

15  A.  Yes.  We --

16  Q.  Where did you go?

17  A.  We started off at lake shore, and then we were just

18  driving, and we ended up at Shake Shack.

19  Q.  In the city downtown?

20  A.  Yes.

21  Q.  And you bought lunch there?

22  A.  Yes.

23  Q.  And then what did you do?

24  A.  We got the lunch.  We drove around again.  We found a

25  little park.  And we got out at the park, and we ate there.

1  Q.  Did he seem anxious?

2  A.  No.

3  Q.  Did he seem distressed or nervous?

4  A.  No.

5  Q.  Did you hear him talk to any of his guy friends on the

6  phone talking about shooting someone or laying low?

7  A.  No.

8  Q.  Or planning on running away or getting away?

9  A.  No.

10  Q.  Did it -- did he seem to you as usual?

11  A.  Yeah.  Seemed happier, actually.

12  Q.  He was happy?

13  A.  Yeah.

14  Q.  You had a good talk?

15  A.  Yeah.  We were having a really good time in the park with

16  our son.  It was one of the first times he was truly

17  experiencing grass.

18  Q.  Oh, your son?

19  A.  Yeah.  We were playing in the park with our son.

20  Q.  And were you talking a little bit about your past

21  problems?

22  A.  Yeah, we were.  He was just telling me "sorry" the

23  majority of the time.  And I was just telling him, "Let's

24  forget about it.  We have other things to be worrying about,

25  which is our son."

1    Q.   Does Ernie ask for forgiveness a lot?

2    A.   Yes.

3    Q.   Is that what he does?

4    A.   Yeah.

5    Q.   Now, when the neighborhood is hot, is it typical for Ernie

6    and you to drive around?

7    A.   Out of the neighborhood, yes.

8    Q.   Why is that?

9    A.   Because if we're in the neighborhood and there's a high

10   police presence, most likely we'll be pulled over.

11   Q.   Have you been pulled over before?

12   A.   Multiple times.

13   Q.   By -- while you were committing a crime?

14   A.   No, just driving.

15   Q.   Because they know Ernie?

16           MS. BABU:  Objection, your Honor.  Foundation.

17           THE COURT:  I'll let it stand.  Let's move on.

18   BY MR. PISSETZKY:

19   Q.   Is that because you know -- because they recognize Ernie

20   and you?

21   A.   Yeah.  Some know him by a first-name basis as well.

22   Q.   So he would just get harassed?

23           MS. BABU:  Objection, your Honor.

24           THE COURT:  Objection sustained.

25           Anything further?

1     MR. PISSETZKY:  Oh, yes.

2  BY MR. PISSETZKY:

3  Q.   Now, at some point, I think you told us while you were

4  driving after you left the park, you fell asleep?

5  A.   Yes.

6  Q.   And then when you woke up, you were by Manny's, right?

7  A.   Yes.

8  Q.   It was still light outside?

9  A.   Yes.

10 Q.   And that was in May.  May 4th, right, 2018?

11 A.   Yeah.

12 Q.   You -- now, when you arrived, was the neighborhood getting

13 hotter as when you drove back after the doctor?

14 A.   Yeah.  We noticed -- we had gone down, like, 31st and

15 Halsted which there's a police station, and we seen, like,

16 Army trucks and tanks and men outside like preparing them and

17 kind of like starting to get in, and I later found out that

18 those tanks did end up going to the neighborhood.

19 Q.   So did you have any desire to go into the neighborhood?

20 A.   No.

21 Q.   It had nothing to do with Ernie, right?

22 A.   No.

23 Q.   Okay.  So when you came to Manny's, was it your

24 understanding that you'll be there until the neighborhood kind

25 of cools down?

1   A.   Yeah.  We were just going to stay there for an hour or so,

2   and then we were going to go back to driving around downtown.

3   Q.   Was that unusual?

4   A.   No.

5   Q.   Now, when you -- so you didn't plan to stay at Manny's,

6   right?

7   A.   No.

8   Q.   And when you arrived at Manny's, you didn't know that

9   Ernie was actually wanted by the police at that time?

10  A.   No.

11  Q.   Did he make any indications to you that -- did his

12  attitude change or anything like that to tell you that he

13  knows something that you don't?

14  A.   No.

15  Q.   Now, do you know where Ernie's father lives?

16  A.   I know he's in Mexico.

17  Q.   He lives in Mexico?

18  A.   Yes.

19  Q.   And at the time of May 4th, do you know, his mother was

20  there visiting his dad as well?

21  A.   Yes.

22  Q.   So you know that he has connections to Mexico, right?

23  A.   Yes.

24  Q.   And he actually has been to Mexico in February of 2018?

25  A.   Yes.

1 Q. And he has a valid passport?

2 A. Yes.

3 Q. Did he ever ask you to take him to the airport to run

4 away?

5 A. No.

6 Q. Did he ever attempt to go to the airport?

7 A. No.

8 Q. In fact, you learned that he was by the airport that day

9 earlier, right?

10 A. Yes.

11 Q. Did he ever tell you that he needed his passport or for

12 you to go get it for him?

13 A. No.

14 Q. By the way, do you know those police scanner apps?

15 A. Yes.

16 Q. Do you have one?

17 A. Yes.

18 Q. On your phone?

19 A. Yes.

20 Q. Do you listen to it sometimes?

21 A. Yes.

22 Q. Why?

23 A. Because I live in a crime-infested community.  I need to

24 know what's going on, and especially if I hear gunshots, that

25 could be my family member out there.

1  Q.  So you listen to it, right?

2  A.  Yes.

3  Q.  On that day on May 4th when Ernie was with you, was he

4  trying to listen to the phone app?

5  A.  No.

6  Q.  Now, you told us that at some point in the afternoon, you

7  received a call from your grandmother, right?

8  A.  Yes.

9  Q.  You told us something, that you couldn't understand what

10  she was saying.  Was she, like, distraught?

11  A.  Yeah.

12  Q.  And so what happened when you couldn't understand what she

13  was saying?

14  A.  I kind of yelled at her.  I told her to just pass the

15  phone to my cousin.  My cousin said that there's this picture

16  going around on Facebook.

17  Q.  So at some -- did she then text you that picture?

18  A.  Yeah.  I told her to send it to me because I still wasn't

19  understanding.

20  Q.  And can you tell us again what exactly that picture was?

21  A.  It was a picture.  It had a few pictures of Ernie's

22  mugshots on there, and it said "wanted" in big words.  And

23  then it kind of said, like, something about, if you have

24  information to call, like, a number.  And it was saying it was

25  the FBI, I believe.

1  Q.  Did you learn later on that that picture or that poster

2  was a fake poster, somebody made it up?

3  A.  Yeah.  Like, a long time -- like, I think maybe about May

4  6th or so because that's when the agents were asking me, and

5  they said that they didn't do that.

6  Q.  And sometime around the time that you received that

7  picture, Ernie received a phone call, you said?

8  A.  Yes.

9  Q.  And that is when you kind of started crying?

10  A.  Yeah.

11  Q.  And you said that Ernie hugged you --

12  A.  Yes.

13  Q.  -- and your son?

14  A.  Yes.

15  Q.  Did you see any change in Ernie's attitude at that time?

16  A.  No, I didn't see.

17  Q.  Well, did you feel, did you hear it in his voice?  Because

18  you said he said something to you.

19  A.  I kind of just -- it just felt genuine.  He just, what he

20  was saying, like, it just felt like he truly meant it.  He

21  didn't sound scared.  He just sounded genuine.

22  Q.  So where did you put your phone when -- did you put your

23  phone down?

24  A.  Yeah.  I seen the picture, and I kind of just threw my

25  phone on to the table that was in front of me.

1   Q.  And then Ernie came and hugged you and your son?

2   A.  Yes.

3   Q.  And he said to you that he loved you and he was sorry for

4  everything?

5   A.  Yes.

6   Q.  And what did that mean to you?

7   A.  To me, that meant everything that he's ever done to me

8  such as harmful, like the arguments, stressing me out, or

9  anything that he felt that he did wrong to me.

10  Q.  Did he -- did it sound to you as if he was apologizing for

11  shooting someone?

12  A.  No.

13  Q.  And, in fact, he did apologize earlier that day as well?

14  A.  Yes, the majority of the ride that we were doing.

15  Q.  And then you said that at some point, he left the house,

16  right?

17  A.  Well, yeah.

18  Q.  You didn't see --

19  A.  When I looked up after hugging my son, nobody was there

20  anymore.

21  Q.  And he left the house with somebody else?

22  A.  I'm assuming he did.

23  Q.  Okay.  Well, I mean --

24  A.  I mean, yeah.

25  Q.  There were other people in the house?

1  A.  There were other people in the house.

2  Q.  And then when he left, did -- all the other people were in

3  the house, or somebody else was missing?

4  A.  Somebody else was missing as well.

5  Q.  Okay.  And so only after you received the picture and then

6  put the phone down -- and the phone was by Ernie, right?

7  A.  Yeah.  Ernie was sitting next to me, so he was just kind

8  of like arm's reach from my phone.

9  Q.  And then he received a phone call.  That is the first time

10  that you felt something different in Ernie?

11  A.  Yeah.  After the phone call, like, I could hear in his

12  voice, like, while he was on the phone, like, he just -- I

13  don't want to say -- like, he just sounded like a little

14  worried, like it wasn't making sense to him what he was

15  hearing.

16  Q.  And that is the first time that he actually left you?

17  A.  Yes.

18  Q.  You learned, did he go to Mexico?

19  A.  No.

20  Q.  In fact, he stayed in the Chicagoland area?

21  A.  Yes.

22  Q.  He didn't go anywhere, right?

23  A.  No.

24  Q.  And at the time that you saw the "wanted" poster first,

25  the first time, you told us you didn't know if it was real,

1    right?

2    A.   No, I didn't know if it was real.

3    Q.   And Ernie left to lay low to find out what was going on?

4    A.   Yeah.

5    Q.   And then you learned that the police was actually looking

6    for Ernie, correct?

7    A.   Yeah.

8    Q.   "Yeah" is a yes?

9    A.   Yes.

10   Q.   And once everyone realized that Ernie was, in fact,

11   wanted, you also learned that Lucy contacted Mr. Hyman to

12   arrange for his surrender?

13   A.   Yes.

14   Q.   Ernie didn't run away, did he?

15   A.   No.

16   Q.   Ernie did, in fact, turn himself in because he wanted to

17   clear his name?

18   A.   Yes --

19            MS. BABU:   Objection, your Honor.  Foundation.

20            THE COURT:   Objection sustained.

21   BY MR. PISSETZKY:

22   Q.   Did Ernie turn himself in?

23   A.   Yes.

24            MR. PISSETZKY:   May I have a moment?

25            THE COURT:   You may.

1      (Pause.)

2            THE COURT:  Anything further?

3            MR. PISSETZKY:  No, thank you.

4            MS. BABU:  Your Honor, just a few questions.

5            THE COURT:  Okay.  You can step down -- you do have

6      more?

7            MS. BABU:  I do have just a few, your Honor.

8            THE COURT:  Okay.

9                     REDIRECT EXAMINATION

10     BY MS. BABU:

11     Q.  Ms. Rodriguez?

12     A.  Yes.

13     Q.  Mr. Pissetzky just asked you a few questions about the car

14     that the defendant was driving on May 4th.  Do you remember

15     those?

16     A.  I'm sorry.  Can ask you that again?

17     Q.  Sure.  Mr. Pissetzky was just asking you some questions

18     about the car that the defendant was driving on May 4th.

19     A.  Yes.

20     Q.  Do you remember those questions?

21     A.  Not all of them.

22     Q.  Just now, he was asking you those questions.

23     A.  Yeah.

24     Q.  What was the defendant driving on May 4th?

25     A.  He was driving a charcoal gray SUV.

1  Q.  And what was the defendant driving on May 3rd?

2  A.  My white Kia.

3  Q.  And how often did the defendant drive your white Kia?

4  A.  Usually every day.

5  Q.  And where would he usually park the car?

6  A.  Depending on where he found parking, sometimes he would

7  park it on Honore but usually on Wood.

8  Q.  And where on Wood?

9  A.  In front of his house.

10  Q.  And defense counsel also asked you a few questions about

11  the phone call that the defendant received when you were at

12  Manny's house.

13  A.  Yes.

14  Q.  What did the defendant do with the phone after -- after he

15  left Manny's house?

16  A.  I'm not too sure what he did with his phone.

17  Q.  Did the defendant have more than one phone?

18  A.  Yes, he did.

19  Q.  And did the defendant leave one of his phones at Manny's

20  house?

21  A.  Yes, he did.

22  Q.  And why did he do that?

23  A.  I have no idea.

24  Q.  Did he normally do that?

25  A.  He usually misplaces stuff all the time.

1  Q.  Did he normally get rid of phones?

2  A.  Yes.

3  Q.  Why would he do that?

4  A.  I have no idea.

5         MS. BABU:  Nothing further, your Honor.

6         THE COURT:  You can step down.

7         MR. PISSETZKY:  Your Honor, may I, just a couple

8  questions, please.

9         THE COURT:  Two.

10        MR. PISSETZKY:  Well, "a couple" is not two, Judge.

11        THE COURT:  Yes, it is.  You can check it out in the

12 dictionary.

13                    RECROSS-EXAMINATION

14 BY MR. PISSETZKY:

15 Q.  Is it hard to find parking in the evening at around your

16 neighborhood?

17 A.  Yes.

18 Q.  There are times that you have to just drive around and

19 around until you find it?

20 A.  Yes.

21 Q.  And sometimes you won't find parking by Wood or by your

22 house?

23 A.  Yes.

24 Q.  Okay.  Counsel asked you about the phone.  You said that

25 Ernie changes phones?

1  A.  Yes.

2  Q.  You also told us that he sells drugs, right?

3  A.  Yes.

4  Q.  It's -- could it be part of his business to change phones,

5  too?

6  A.  Yeah.

7           MR. PISSETZKY:  Thank you.

8           THE COURT:  You can step down.  You're discharged.

9           Correct?

10          MS. BABU:  That's correct, your Honor.  I have no

11  more questions.

12      (Witness excused.)

13          THE COURT:  Call your next witness.

14          MS. BABU:  Could we have a short break?

15          THE COURT:  All right.  We'll take a 15-minute recess.

16      (Recess from 11:09 a.m. to 11:25 a.m.)

17      (Proceedings heard in open court.  Jury out.)

18          THE COURT:  What's the name of the next witness?

19          MR. EICHENSEER:  The government calls Hector Ruiz.

20          THE COURT:  I'll swear you when the jury gets in.

21      (Proceedings heard in open court.  Jury in.)

22          THE COURT:  Sir, would you stand and raise your right

23  hand?

24          Please be seated.

25      (Witness sworn.)

1          THE WITNESS:  Yeah.

2          THE COURT:  Please be seated.  Speak directly into

3   the microphone, sir.

4               HECTOR RUIZ, GOVERNMENT'S WITNESS, SWORN

5                         DIRECT EXAMINATION

6   BY MR. EICHENSEER:

7   Q.  Sir, can you please state and spell your name for the

8   record?

9   A.  My name is Hector Ruiz, H-e-c --

10          THE COURT:  Do you want to sit closer to the mike so

11  you can speak directly into that?

12          THE WITNESS:  Hector Ruiz, H-e-c-t-o-r, R-u-i-z.

13  BY MR. EICHENSEER:

14  Q.  Where did you live in May of last year, sir?

15  A.  In Back of the Yards.

16  Q.  In Chicago?

17  A.  Chicago, Back of the Yards.

18  Q.  And how long had you lived in Back of the Yards before May

19  of last year?

20  A.  Ten years.

21  Q.  More than ten years?

22  A.  More than ten years.

23  Q.  Do you know someone named Ernesto Godinez?

24  A.  Yes, I do.

25  Q.  How long have you known Ernesto Godinez?

1    A.   Ten years.

2    Q.   More than ten years?

3    A.   More than ten years.

4    Q.   Do you see him in the courtroom today?

5    A.   Yes.

6    Q.   Can you identify him by a piece of clothing, please?

7    A.   He has a white T-shirt.

8    Q.   He's sitting at the defense table?

9    A.   Yes.

10   Q.   Okay.  Which one is he at the defense table?

11        You need to say it.

12   A.   Oh, he's on the right side with a white T-shirt.

13   Q.   I'm sorry.  In the white?

14   A.   With a white T-shirt, is it, or striped shirt.

15   Q.   Is he wearing glasses?

16   A.   He has a suit on.

17   Q.   He has a suit on?

18   A.   Yes.

19   Q.   Is he wearing glasses?

20   A.   Yes, he is.

21   Q.   Is he sitting at the far end closer to the judge at the

22   defense table?

23   A.   Yes.

24        MR. EICHENSEER:  Okay.  Can the record reflect that

25   the witness identified the defendant?

1          THE COURT:  It will.

2    BY MR. EICHENSEER:

3    Q.  Sir, are you cooperating with law enforcement?

4    A.  Yes, I am.

5    Q.  When did you first start cooperating?

6    A.  December 2017.

7    Q.  Why did you start cooperating?

8    A.  I got pulled over by ICE, Homeland Security.

9    Q.  ICE, are those the immigration police?

10   A.  Yeah, immigration police.

11   Q.  And did they pull you over because you were in the country

12   illegally?

13   A.  Yes.

14   Q.  Do you have a written cooperation agreement --

15   A.  Yes.

16   Q.  -- with the federal government?

17   A.  Yes.

18   Q.  You signed that agreement?

19   A.  Yes, I did.

20   Q.  Has the government given you anything in exchange for your

21   cooperation?

22   A.  Yes.  Relocation, on status, and money.

23   Q.  You said relocation, status, and money; am I right?

24   A.  Yes.

25   Q.  What kind of relocation benefits did the government give

1  you?

2  A.  They moved me out of Chicago and money, and money

3  expenses.

4  Q.  They paid expenses to move you; is that right?

5  A.  That's right.

6  Q.  Have they also paid you for information?

7  A.  Yes.

8  Q.  About how much has the government paid you for the

9  information since you started cooperating?

10  A.  Over 10,000.

11  Q.  Over $10,000?

12  A.  Yes.

13  Q.  And is that since 2017 when you began cooperating?

14  A.  Yes.

15  Q.  You also mentioned status, correct?

16  A.  Yes.

17  Q.  Do you mean immigration status?

18  A.  Immigration status.

19  Q.  Has the government allowed you to stay in the country in

20  2017?

21  A.  Yes, they have.

22  Q.  You also get a work authorization from the government; is

23  that right?

24  A.  That's right.

25  Q.  And did you receive another work authorization in 2018?

1    A.  Yes, I have.

2    Q.  Has the government made you any promises about whether you

3    can stay in the country permanently?

4    A.  No.

5    Q.  Are you hoping that because of your cooperation that you

6    can stay in the country permanently?

7    A.  Yes.

8    Q.  Sir, before you started cooperating with the government,

9    did you sell drugs?

10   A.  Yes, I did.

11   Q.  What kind of drugs did you sell?

12   A.  Marijuana and cocaine.

13   Q.  For about how long were you selling marijuana and cocaine?

14   A.  Over five years.

15   Q.  Over five years.  Before you started cooperating, did you

16   sell guns?

17   A.  Yes.

18   Q.  Has the government made any promises to you about whether

19   you're going to be charged for your past drug dealing?

20   A.  No.

21   Q.  Has the government made any promises to you about whether

22   you're going to be charged for your past involvement with

23   guns?

24   A.  No.

25   Q.  Before testifying today, did you meet with members of the

1  government?

2  A.  Yes, I did.

3  Q.  Did you meet with some of the people at this table?

4  A.  Yes, I did.

5  Q.  Did you meet with the government several times before

6  testifying today?

7  A.  Yes, I did.

8  Q.  I want to go back to the Back of the Yards neighborhood

9  where you lived in May of last year.  When did you first move

10  into the Back of the Yards neighborhood?

11  A.  When I was, like, in fifth grade.

12  Q.  Fifth grade.  Was there a street gang that was active in

13  Back of the Yards when you moved in?

14  A.  Yeah.  The Almighty Saints.

15  Q.  Is there another name for The Almighty Saints?

16  A.  The Almighty Saints.

17  Q.  Do they also go by Latin Saints?

18  A.  Latin Saints.

19  Q.  Were the Saints active in your neighborhood the whole time

20  you lived there?

21  A.  Yes.

22  Q.  Were you a member of the Saints?

23  A.  Yes, I am.

24  Q.  When did you join?

25  A.  When I was 15.

1    Q.   Are you still a member now?

2    A.   Yes.

3    Q.   Do you know other Latin Saints members?

4    A.   Yes, I do.

5    Q.   Have you hung out with other Latin Saints members during

6    the time you've been a member of the Saints?

7    A.   Yes, I have.

8    Q.   Was the defendant a member of the Saints?

9    A.   Yes.

10   Q.   Did he go by a nickname at all?

11   A.   Ernie.

12   Q.   Did you go by a nickname?

13   A.   Yes, I did.

14   Q.   What was your nickname?

15   A.   DK.

16   Q.   Did DK stand for anything?

17   A.   Disciple Killer.

18   Q.   Disciple, what does that mean?

19   A.   Rival gang.

20   Q.   What rival gang does "disciple" refer to?

21   A.   SDs, Disciples, Satán Disciple.

22   Q.   Satan Disciple, is "Satán" Spanish for Satan?

23   A.   Diablo, yes.

24   Q.   How did you become a Saint, sir?

25   A.   When I was 15 when I got shot.

1  Q.  So by virtue of being shot, you got -- you got into the

2  gang?

3  A.  Yeah, I got into the gang.

4  Q.  Is there a word for getting into the gang that way?

5  A.  I mean, you get blessed in if you --

6  Q.  You got blessed into the gang?

7  A.  Yeah.  You don't really got to do what you're supposed to

8  do, turn.

9  Q.  So being blessed into the gang is different from another

10  way of getting into the gang?

11  A.  Yes.

12  Q.  So you mentioned the SDs, the Satan Disciples, right?

13  A.  Yes.

14  Q.  By the way, who shot you, sir?

15  A.  A rival gang.

16  Q.  You mentioned the SDs.  They're a Saint rival.  Is that

17  what you testified to?

18  A.  Yes.

19  Q.  Do the Saints have other rivals?

20  A.  Yes.  La Razas and the 2-6.

21  Q.  La Raza and 2-6; is that right?

22  A.  That's right.

23  Q.  Have you ever used the term "flake," sir?

24  A.  Yes.  A rival gang.

25  Q.  Do other members of the Saints use the term "flake"?

1    A.   Yes.

2    Q.   So to be clear, you just said that "flake" means a rival

3    gang member?

4    A.   Yeah, a rival gang member.

5    Q.   Do the Saints have territory?

6    A.   Yes.  We --

7    Q.   What neighborhood is that territory?

8    A.   From 43rd Street to 45th, from Ashland to Wolcott.

9    Q.   Okay.  So the map on your left, Government Exhibit 400, is

10   that whole area in Saints territory?

11   A.   Yes, it is.

12   Q.   And what are the boundaries for Saints territory?

13           MR. PISSETZKY:  Your Honor, it's hard to hear the

14   witness.

15           MR. EICHENSEER:  Sir, could you move up closer to the

16   microphone a little bit?

17           THE COURT:  Yes.  Speak a little louder and into the

18   mike.

19           MR. EICHENSEER:  You can move the microphone, too, if

20   that's easier, closer to your mouth.

21           MR. PISSETZKY:  And I apologize.  He said Ashland

22   to --

23           MR. EICHENSEER:  I'll ask it again.

24           MR. PISSETZKY:  Thank you.

25   BY MR. EICHENSEER:

1  Q.  Sir, do you know the boundaries for Saints territory?

2  A.  Yes.  From 43rd Street to 45th Street, from Ashland to

3  Damen.

4  Q.  So it would be Ashland in the east, Damen in the west; is

5  that right?

6  A.  That's right.

7  Q.  43rd to the north, 47th to the south?

8  A.  That's right.

9  Q.  Is that territory subdivided at all?

10  A.  Yeah.  It's divided by streets, by blocks.

11  Q.  Okay.  How many blocks is Saints territory subdivided

12  into?

13  A.  Six.

14  Q.  So each of those blocks has separate factions of the gang?

15  A.  Yes.

16  Q.  What block were you part of?

17  A.  Hermitage.

18  Q.  The Hermitage block.  Can you show the jury on the map

19  about what area the Hermitage block was in?

20        Could you actually point to the map, sir?  You might

21  have to stand up.

22        What other blocks?  The Hermitage block is one of six

23  blocks.  Where are the other blocks in the Saints?

24  A.  Wolcott, Honore, Wood, Hermitage, Paulina, Marshfield.

25  Q.  So they corresponded to street names; is that right?

1  A.  Yes.

2  Q.  So the Wood block is in charge of kind of the Wood Street

3  area; is that fair?

4  A.  Yes.

5  Q.  Were there any particular Saints members who were in

6  charge of each of those blocks?

7  A.  We had different chiefs from different blocks.

8  Q.  "Chiefs," you mentioned that word.  What does that mean?

9  A.  The people that controls the blocks.

10 Q.  The kind of leaders of the block?

11 A.  The leaders of the block.

12 Q.  Was the defendant a chief?

13 A.  Yes.

14 Q.  What block was the defendant a chief of?

15 A.  From Wood Street.

16 Q.  Did the defendant have brothers, to your knowledge?

17 A.  Yes, he had.

18 Q.  Were they Saints members?

19 A.  Yes.

20 Q.  Where did they live, to your knowledge?

21 A.  Wood Street, 43rd Street.

22 Q.  Can you show the jury about where the defendant and his

23 brothers lived?

24         You pointed toward Wood Street between 43rd and 44th?

25 A.  Yes.

1    Q.   Are both the defendant's brothers still alive?

2    A.   No.  One passed away.

3    Q.   What was the name of the one who passed away?

4    A.   Biscuit.

5    Q.   How did he pass away?

6    A.   He got shot by a rival.

7    Q.   Where was he shot?

8    A.   43rd and Honore.

9    Q.   When was he shot?

10   A.   2018, '17.

11   Q.   Late 2017 or early 2018?

12   A.   Late '17, early '18.

13   Q.   Overall, Mr. Ruiz, about how many Saints members are

14   there?

15   A.   Over 100.

16   Q.   Do the Saints have any gang colors?

17   A.   Yes, we do.

18   Q.   What are they?

19   A.   Black and baby blue.

20   Q.   Black and baby blue?

21   A.   Yes.

22   Q.   Are you -- the shirt you're wearing now, is that the

23   Saints' colors?

24   A.   No.

25   Q.   No, it's not.  It's black, right?

1  A.  It's a black T-shirt.

2  Q.  It's a black shirt.  Do the Saints have any gang symbols?

3  A.  Yes.

4  Q.  What are their symbols?

5  A.  A halo and a stickman figure.

6  Q.  A stickman figure.  Okay.  At this point, Mr. Ruiz, if you

7  look at the screen in front of you, it's Government Exhibit

8  515 which is not in evidence yet.  Do you see that photo?  Oh,

9  not yet.

10  A.  Yes, I do.

11  Q.  Do you recognize that photo?

12  A.  Yes.

13  Q.  What is it?

14  A.  That's the stickman figure for the Saints.

15  Q.  Is it graffiti?

16  A.  Graffiti.

17  Q.  Is it light blue?

18  A.  It's baby blue.

19  Q.  Does Exhibit 515 truly and accurately show a Saint

20  stickman figure in baby blue?

21  A.  Yes.

22       MR. EICHENSEER:  The government would move to admit

23  Government Exhibit 515 and publish.

24       MR. PISSETZKY:  No objection.

25       THE COURT:  It's admitted.  You may publish it.

1          (Government Exhibit No. 515 received in evidence.)

2    BY MR. EICHENSEER:

3    Q.   Sir, the stickman is the figure on the right-hand side

4    there in the blue, in light blue, correct?

5    A.   Yes.

6    Q.   Does that stickman figure appear to be holding anything?

7    A.   A pitchfork going down.

8    Q.   Does the pitchfork pointing down mean anything?

9    A.   Yes.   Disrespecting a rival gang, the Satan Disciples.

10   Q.   It's a sign of disrespect to the Satan's Disciples?

11   A.   Yes, it is.

12   Q.   And how is it a sign of disrespect?

13   A.   It's upside down.

14   Q.   The Satan's Disciples, is their symbol the pitchfork?

15   A.   Yes.   They've got it going up.

16   Q.   The upside-down pitchfork is a symbol of disrespect?

17   A.   Yes.

18   Q.   Sir, if you look at the screen in front of you, I'm going

19   to show you another exhibit which is not in evidence yet.

20          So if we can take down the jury's screen.

21          Can you see that photo in front of you, sir?

22   A.   Yes, I do.

23   Q.   What does that show?

24   A.   The name of the Saints from 45th Street.

25   Q.   Okay.   Is that graffiti?

1   A.   That's a graffiti.

2   Q.   Does it appear to say, it looks like, "Saints 4500"?

3   A.   Yes, it is.

4   Q.   What does -- 4500, what's that a reference to?

5   A.   4500 means for the street that we're from, the

6   neighborhood.

7   Q.   45th Street?

8   A.   45th Street.

9        MR. EICHENSEER:  Your Honor, the government moves to

10  admit and publish Exhibit 516.

11       MR. PISSETZKY:  No objection.

12       THE COURT:  It's admitted.  You may publish.

13     (Government Exhibit No. 516 received in evidence.)

14  BY MR. EICHENSEER:

15  Q.   So the -- if you notice there, Mr. Ruiz, that in the

16  "Saints," the "A" is upside down.  Does that have any

17  significance?

18  A.   Yes.  Disrespect for the rival gang.

19  Q.   Okay.  Which rival gang is that disrespect?

20  A.   The Ambrose.

21  Q.   The Ambrose, is that another rival gang?

22  A.   That's another rival gang.

23  Q.   Do Saints members have tattoos?

24  A.   Yes.

25  Q.   What kind of tattoos do they have?

1  A.  Halos and stickmens.

2  Q.  A halo and a stickman?

3  A.  Yes.

4  Q.  Do you have a stickman --

5  A.  Yes.

6  Q.  -- tattoo?

7       Do you have a halo tattoo?

8  A.  Yes.

9  Q.  How do you know that other members in the Saints have

10  those tattoos?

11  A.  I have done a few tattoos to members of the Saints.

12  Q.  You gave tattoos to Saints members?

13  A.  Yes.

14  Q.  Sir, do the Saints have rules that members have to follow?

15  A.  Yes.

16  Q.  Do they have rules about protecting the territory that you

17  see up on the map there?

18  A.  Yes, we do.

19  Q.  Do those rules have a name at all?

20  A.  Posting up.

21  Q.  Posting up?

22  A.  Yes.

23  Q.  What does "posting up" mean?

24  A.  We got to be outside on the neighborhood on the blocks

25  protecting for rivals to come in.

1  Q.  And if rivals come in, is the rule that Saints are

2  supposed to do anything when they're on post?

3  A.  I mean, chase the enemies out of the neighborhood.

4  Q.  Just chase them, is that the only rule?

5  A.  Chase them or shoot at them.

6  Q.  Chase and shoot at them.  This rule about posting up, does

7  that apply to all Saints members?

8  A.  Yes.

9  Q.  Does it apply 24/7?

10  A.  Yes.

11  Q.  In other words, it doesn't matter if you're outside 3:00

12  in the afternoon or 3:00 in the morning?

13  A.  Right.

14  Q.  Did you ever stand post or post up?

15  A.  Yes, I have.

16  Q.  Where did you post up, sir?

17  A.  On Hermitage and 45th.

18  Q.  Can you show the jury about where Hermitage and 45th is?

19         It would be south of there.  You're pointing to

20  Hermitage and 44th.  That area?

21  A.  Yes.

22  Q.  How many times did you stand post or post up on Hermitage?

23  A.  A few times.

24  Q.  More than a few?

25  A.  More than a few.

1  Q.  When was the last time you posted up on Hermitage?

2  A.  Three years ago.

3  Q.  Do the Saints have any more specific rules about what you

4  do when you post up?

5  A.  You've got to be three people or more, and you've got to

6  have a gun on you.

7  Q.  Okay.  So you said some of the rules involve three people

8  or more?

9  A.  Yes.

10  Q.  What are those rules?

11  A.  Just got to be on the street with a gun.

12  Q.  Okay.  And why do you have to be on the street with a gun?

13  A.  To protect the neighborhood.

14  Q.  Okay.  And what are members who are posted up in groups of

15  three supposed to do if the -- to protect the neighborhood?

16  A.  Just got to be on the block with a gun and got to shift it

17  around for a certain time.

18  Q.  Okay.  Why do you shift it around for a certain amount of

19  time?

20  A.  Everybody got to carry around for a little bit.

21  Q.  Okay.  Does that mean each person in the group has to take

22  a shift holding the gun?

23  A.  Yes.

24  Q.  And if those members who are on post see a rival, what are

25  they supposed to do?

1    A.   Got to chase them out of the neighborhood and shoot at

2    them.

3    Q.   So that was -- that's a group of people, right?  Three or

4    more people, you said?

5    A.   Right.

6    Q.   Do the Saints have rules about posting up alone?

7    A.   You just got to be closer, yes.  You've got to be close on

8    a gun or so.

9    Q.   So yes, there are rules about posting up alone?

10   A.   Yes.

11   Q.   And you said you have to have access to a gun?

12   A.   Yes.

13   Q.   You don't -- so a Saint posted up alone doesn't have to

14   have a gun on him?

15   A.   Right.

16   Q.   Why is that?

17   A.   So the police can come and get you.

18   Q.   All right.  It's risky to carry a gun; is that fair?

19   A.   It's risky to have a gun on you.

20   Q.   Okay.  So the Saints are on post?  Do -- the members on

21   post, do those guns belong to them?

22   A.   No.  It's Nation guns.

23   Q.   What are Nation guns?

24   A.   Guns that they buy for all Saints.

25   Q.   So they're kind of -- are there communal guns amongst the

1    Saints?

2    A.   Yes.

3    Q.   Who is in charge of the Nation guns?

4    A.   The chiefs.

5    Q.   Sir, are there consequences if Saint members don't follow

6    the rules about posting up?

7    A.   Yeah.   They get -- there's a punishment for a certain

8    time.   You get beat up head to toe.

9    Q.   There's a punishment?

10   A.   Yes.

11   Q.   First of all, do chiefs enforce the post-up rules at all?

12   A.   Yes.

13   Q.   How do they do that?

14   A.   They tell you to bust out and be outside.

15   Q.   Okay.   Do they monitor the neighborhood to make sure that

16   members are posting up?

17   A.   Yeah.   They cruise around.

18   Q.   They cruise around?

19   A.   And make sure you go out there.

20   Q.   So you mentioned that you can get a beating if -- a Saint

21   can get a beating if he doesn't follow the post-up rules,

22   right?

23   A.   Right.

24   Q.   Is there a name for the type of discipline that that is?

25   A.   Violation.

1  Q.  A violation.  And are there other rules that you can get a

2  violation for, not just post-up rules?

3  A.  That's it.

4  Q.  When you are -- are there other rules besides just posting

5  up?

6  A.  You've just got to be close to a gun and be able to chase

7  people out of the neighborhood.

8  Q.  Have you ever been violated yourself?

9  A.  Yes, I have.

10  Q.  Okay.  And what does a violation entail?

11  A.  Punishment.  They hit you head to toe for a certain time.

12  Q.  Is it for a set amount of time?

13  A.  Yes.

14  Q.  Okay.  Is that a punishment for the breaking the rules?

15  A.  For breaking the rules, yes.

16          MR. EICHENSEER:  Nothing further, your Honor.

17          THE COURT:  Cross-examine.

18                      CROSS-EXAMINATION

19  BY MR. PISSETZKY:

20  Q.  You're a free man today, right?

21  A.  Yes.

22  Q.  You just told us that ICE stopped you the summer of 2017

23  as you were leaving 51st and Wentworth, the courthouse there,

24  right?

25  A.  Right.

1  Q.  And that during that time as you told us, you were selling

2  cocaine, right?

3  A.  Right.

4  Q.  You had guns?

5  A.  Right.

6  Q.  You were selling guns?

7  A.  Right.

8  Q.  And after ICE arrested you, that's when you started

9  cooperating?

10  A.  Right.

11  Q.  Because you did not want to be charged with anything or

12  deported?

13  A.  Right.

14  Q.  It has been three years since your arrest by ICE, and you

15  are still here in the United States, obviously?

16  A.  Right.

17  Q.  Despite the fact that you committed crimes, they allowed

18  you to become a cooperator, right?

19  A.  Right.

20  Q.  And you have not been charged with any crime to this day?

21  A.  Right.

22  Q.  Now, you signed a confidential source agreement with the

23  government, right?

24  A.  That's right.

25  Q.  In fact, you signed it three -- on three separate

1   occasions?

2   A.  Right.

3   Q.  You sounded -- you signed the first one July 27, 2017,

4   correct?

5   A.  Correct.

6   Q.  The second one you signed on February 23rd, 2018, correct?

7   A.  Correct.

8   Q.  February of 2018.  And the final one you signed on

9   February 28, 2019, just a few months ago?

10  A.  Correct.

11  Q.  And you made a promise when you signed it, right?

12  A.  Correct.

13  Q.  You made a promise to help them, assist them?

14  A.  Correct.

15  Q.  And when you signed them, you signed it not under your

16  name, correct?

17  A.  Correct.

18  Q.  You signed it under the name of Alejandro Diaz?

19  A.  That's right.

20  Q.  So your name is Hector Ruiz?

21  A.  Yes, it is.

22  Q.  And you signed it under Alejandro Diaz, right?

23  A.  Correct.

24  Q.  And you also told us that you have a third name, which is

25  DK, correct?

1    A.   That's correct.

2    Q.   And that is "Disciple Killer"?

3    A.   Correct.

4    Q.   Because that's a respectful -- respectable name in your

5    gang?

6    A.   Right.

7    Q.   You were respected?

8    A.   Right.

9    Q.   On your block?

10    A.   Correct.

11    Q.   And you shot at SDs before?

12    A.   I might have.

13    Q.   You'd know if you did or you did not, so you did?

14    A.   Yes.

15    Q.   And you went by other nicknames when you sold drugs,

16    correct?

17    A.   No.

18    Q.   You never went by the name of Danny?

19    A.   No.

20    Q.   You never told anybody your name is Danny?

21    A.   That's my name.

22        MR. EICHENSEER:   Objection.   Asked and answered.

23    BY MR. PISSETZKY:

24    Q.   That's your name?

25    A.   Yes.

1  Q.  Danny?

2  A.  Yes.

3  Q.  Oh, okay.  So is it Hector Danny Ruiz?

4  A.  Yes.

5  Q.  Okay.  And you would sell out of your house?

6  A.  Right.

7  Q.  Cocaine, right?

8  A.  Correct.

9  Q.  And you would sell -- you'd have, possess guns and

10  ammunition in your house?

11  A.  Correct.

12  Q.  And by the way, I want to ask you, what is a speed loader

13  magazine?

14  A.  To reload a gun.

15  Q.  It's a what?

16  A.  To reload a gun.

17  Q.  How do you -- what does a speed loader does -- do?

18  A.  It speed loads the load.

19  Q.  The load.  So it makes it quicker to load a gun?

20  A.  Right.

21  Q.  And you possessed a speed loader?

22  A.  Yes, I have.

23  Q.  And you possessed it with ammunition that is .38 Special

24  ammunition, right?

25  A.  Correct.

1    Q.  Now, Ernie is just "Ernie"?

2    A.  Right.

3    Q.  That's his name, right?

4    A.  That's right.

5    Q.  You told us he's a chief, right?

6    A.  That's right.

7    Q.  He's got no fancy names?

8    A.  Right.

9    Q.  Now, when you read the agreements with the government, you

10   initialed every paragraph, right --

11   A.  Right.

12   Q.  -- in that agreement?

13   A.  That's right.

14   Q.  And that meant that you read it --

15   A.  That's correct.

16   Q.  -- yes?

17          That you understood it, correct?

18   A.  Correct.

19   Q.  You promised to follow it?

20   A.  Correct.

21   Q.  It was your word that you gave the government when you

22   signed the agreement?

23   A.  Right.

24   Q.  That you will follow their rules?

25   A.  Right.

1  Q.  That you will not violate the rules?

2  A.  Correct.

3  Q.  The word -- your word is your bond?

4  A.  Correct.

5  Q.  And you don't break your bond?

6  A.  Correct.

7  Q.  And if you broke your bond, you cannot be trusted, right?

8  A.  Correct.

9  Q.  Now, when you signed the agreement on -- the first

10  agreement in July of 2017, sir, you continued to sell drugs?

11  A.  No, I didn't.

12  Q.  In fact, you continued to sell drugs into 2018?

13        MR. EICHENSEER:  Objection.  Misstates the testimony.

14        THE COURT:  What?

15        He can answer the question.  Did you sell drugs in

16  2018?

17        THE WITNESS:  No.

18        THE COURT:  All right.

19  BY MR. PISSETZKY:

20  Q.  You didn't sell drugs out of your house?

21  A.  No.

22  Q.  Did you pretend to sell drugs out of your house?

23  A.  I pretend.

24  Q.  So you sold what appeared to be drugs out of your house?

25  A.  I don't understand your question.

1  Q.  You pretended to be selling drugs, right?  That's what you

2  told us?

3  A.  Because I was working for ICE.

4  Q.  Right.  Did ICE ask you to do that?

5  A.  No, they didn't.

6  Q.  Did the ICE instruct you to do that?

7  A.  No.

8  Q.  Isn't it true that in your rules, ICE specifically told

9  you that you were not permitted to act or induce people into

10  pretending like you're doing a crime?

11  A.  Right.

12  Q.  So you broke your word to them?  You broke the agreement,

13  right?

14  A.  Correct.

15  Q.  And you also possessed in 2018 around June a speed loader

16  still in your home, right?

17  A.  Correct.

18  Q.  And you had a gun, too?  You possessed guns after you

19  signed the agreement with ICE, correct?

20  A.  Incorrect.  I had no gun.

21  Q.  But you were also instructed and you promised ICE that you

22  will not possess any firearm or other weapons, correct?

23  A.  Right.

24  Q.  And you did possess the speed loader and the ammunition?

25  A.  I had ammunition in the house, yes.

1   Q.  And you were not supposed to?

2   A.  Right.

3   Q.  So you broke your bond?

4   A.  I mean, they were not mine, but...

5   Q.  You knew it was there?

6   A.  Yes.  I know they were there because I found them on the

7   floor when I got shot at.

8   Q.  So and what happened?

9   A.  I found them on the floor when I got shot at, so I picked

10  them up and called my agency, the ICE, and told them that I'd

11  been shot at and they had dropped the bullets, and he told me

12  to pick them up.

13  Q.  So did they also drop the speed loader?

14  A.  Yes, when they jumped out of the car.

15  Q.  When they jumped out of the car and you picked it up?

16  A.  Yes.

17  Q.  And you turned it to your handler?

18  A.  Yes.  I was supposed to turn it to the handler.

19  Q.  And the handler wrote a report about it?

20  A.  No.

21         MR. EICHENSEER:  Objection.  Foundation.

22  BY MR. PISSETZKY:

23  Q.  Do you know that -- if whether or not the handler wrote a

24  report about it?

25  A.  Yes, I don't know.

1 Q. You don't know. So you were upfront with them?

2 A. Yes.

3 Q. And you were shot by who?

4 A. By the rival gang.

5 Q. By a rival gang. Right outside your house?

6 A. Yes.

7 Q. Now, when you break the rules, they are permitted to

8 prosecute you, right?

9 A. Right.

10 Q. And they are permitted to deport you, right?

11 A. That's right.

12 Q. They give you your status, correct?

13 A. The department, yes.

14 Q. Because you were here illegally?

15 A. Right.

16 Q. Now, as long as you are cooperating with them, though,

17 they will not charge you?

18 A. No, that's incorrect.

19 Q. That is incorrect?

20 A. Right.

21 Q. Okay. And you are not being deported, correct?

22 A. Correct.

23 Q. As long as you are fulfilling their wishes, assisting

24 them?

25 A. I'm assisting them because I'm just telling what I know.

1    Q.  What you know.  And as long as you tell them that, you

2    feel that you're safe here and your family is safe?

3    A.  Correct.

4    Q.  Correct.  Now, today you came to testify, and you knew why

5    you were coming here, right?

6    A.  Correct.

7    Q.  You knew that you were going to testify against Ernie?

8    A.  Correct.

9    Q.  And you knew that you were going -- that is, the goal of

10   the prosecutor is to prosecute Ernie?

11   A.  Correct.

12   Q.  And that is why you are here helping them today, correct?

13   A.  Correct.

14   Q.  And in exchange for that and in the past, you received a

15   status here, that's deportation -- against deportation,

16   correct?

17   A.  Right.

18   Q.  And you also received status to work, right?

19   A.  Correct.

20   Q.  What do you do today?  Do you work?

21   A.  I work.

22   Q.  And you work only because the government has -- gave you

23   that permission?

24   A.  Correct.

25   Q.  But they also supported you financially, you told us,

1  correct?

2  A.  Right.

3  Q.  And they paid you over $10,000 in just you helping them

4  out?

5  A.  To move, yes.

6  Q.  And to move, right?

7  A.  Yes.

8  Q.  So it is very important for you, based on your

9  understanding, that you would continue to work for them so you

10 can stay in the country and maybe get paid?

11 A.  Correct.

12 Q.  In a way, they are holding the -- your ticket for

13 deportation?

14 A.  Correct.

15 Q.  And they are holding in the other hand the ticket to your

16 jail cell?

17 A.  Correct.

18 Q.  And somewhat your financial future?

19 A.  Correct.

20 Q.  Now, you told us -- did you tell us that no other promises

21 were made to you?

22 A.  That's correct.

23 Q.  But in your grand jury -- do you remember testifying in a

24 grand jury in this courthouse regarding this case?

25 A.  Correct.

1  Q.  You testified on March 27, 2019?

2  A.  Right.

3  Q.  You raised your right hand and swore to tell the truth?

4  A.  Correct.

5  Q.  And in the grand jury, you stated that you are cooperating

6  with the government in exchange for immigration benefit,

7  money, and relocation expenses, right?

8  A.  Correct.

9  Q.  And so your cooperation is in exchange for important

10  benefits to you, right?

11  A.  Correct.

12  Q.  Immigration benefit, money benefit, and relocation

13  benefits?

14  A.  Correct.

15  Q.  These benefits are important to you and your family?

16  A.  Correct.

17  Q.  You will do anything to protect your family?

18  A.  Yes.

19  Q.  You will not do -- you will do anything to make sure that

20  you receive the benefits or your family won't get deported

21  along with you?

22  A.  They're from here, so --

23  Q.  But you don't want to be separated from them?

24  A.  Yes.

25  Q.  And in exchange, you will do anything to make sure the

1  government is always happy with your cooperation?

2  A.  Correct.

3  Q.  Now, and today, you know that your -- that they need your

4  assistance to get a conviction?

5  A.  Correct.

6  Q.  And you promised them to assist?

7  A.  Yes.

8  Q.  Now, you also knew, as you told us, that your assistance

9  was specifically needed against Ernesto Godinez, right?

10  A.  Yes.

11  Q.  And you are from -- you told us you're from the Hermitage

12  block?

13  A.  Right.

14  Q.  And Ernie is from the Wood block?

15  A.  Yes.

16  Q.  It's not the same block, right?

17  A.  That's right.

18  Q.  And his brothers were also at the Wood block?

19  A.  That's right.

20  Q.  And, in fact, you don't like the Godinez family?

21  A.  Never said that.

22  Q.  Well, you had a fight with Little Snoop?

23  A.  Yes, I have.

24  Q.  And you refused to follow their orders?

25  A.  Yes.

1  Q.  And they don't like you and you don't like them?

2  A.  Correct.

3  Q.  So not only you're avoiding deportation by telling us what

4  you are today, you'll also benefit by getting back at the

5  Godinez family in somewhat of a way, right?

6  A.  Incorrect.

7  Q.  Now, you talked to us about rules, right?

8  A.  Correct.

9  Q.  The rules of your gang, are they written down somewhere?

10  A.  No, they are not.

11  Q.  Do you have a copy of them to show us?

12  A.  No.

13  Q.  So we have to believe your word as far as what the rules

14  are, right?

15  A.  Right.

16  Q.  Your word is your bond?

17  A.  Right.

18  Q.  And you said that there are chiefs, correct?

19  A.  Correct.

20  Q.  The chiefs give the orders?

21  A.  Right.

22  Q.  And you testified in the grand jury, and during your

23  testimony to the grand jury, you identified some pictures,

24  correct?

25  A.  Right.

1  Q.  And they asked you to identify, the government asked you

2  to identify a picture of Mr. Godinez, right?

3  A.  Yes.

4  Q.  And you, in fact, identified him, right?

5  A.  Correct.

6  Q.  And when you identified him, they asked you to write on

7  the piece of paper with your words the name, where are they

8  from, and what you believe they do in the gang, right?

9  A.  Right.

10 Q.  And when you identified Ernie, you did not write "chief,"

11 right?  If you need to refresh your recollection, I have the

12 picture.

13 A.  Correct.

14 Q.  On other pictures, you did write "chiefs" when you thought

15 they were chiefs?

16 A.  Correct.

17 Q.  But Ernie is not a chief?

18 A.  If that's what I wrote on the paper.

19 Q.  You didn't write "chief," right?

20 A.  Correct.

21 Q.  Now, you said that the chief gives an order and then

22 there's soldiers, right?

23 A.  Correct.

24 Q.  There's soldiers post, you said they post -- stand post?

25 A.  Yes, stand post.

1  Q.  Okay.  Stand post.  And they -- and the chiefs control who

2  stands post?

3  A.  Right.

4  Q.  And then there are also other roles in the gang, correct?

5  A.  Correct.

6  Q.  Counsel only asked you about people that post, right,

7  stand post?

8  A.  Right.

9  Q.  But there are those that sell drugs --

10  A.  Correct.

11  Q.  -- right?

12        And they sell drugs, and then they pay tax to the

13  gang --

14  A.  Correct.

15  Q.  -- correct?

16        They make money for the gang?

17  A.  Correct.

18  Q.  That's how the gang pays for funeral expenses, possibly

19  lawyers and things like that?

20  A.  Correct.

21  Q.  Right.  And when a lower gang member does something wrong,

22  they get violated?

23  A.  Correct.

24  Q.  It's not only when they don't stand post, you can be

25  violated for a number of reasons?

1   A.   Correct.

2   Q.   Right.  You didn't -- you were not violated for not

3   standing post, were you?

4   A.   Yes.

5   Q.   Is that why you were violated?  Okay.  And when you stand

6   post, you stand post in your block?

7   A.   Right.

8   Q.   You don't stand post in the Wood block?

9   A.   Yes, I do.

10  Q.   You do?

11  A.   Yes.

12  Q.   You drive in to the Wood block to stand post?

13  A.   You walk to the other block.

14  Q.   Doesn't the Wood block have their own soldiers?

15  A.   We all Saints.

16  Q.   You intermingle?

17  A.   We all Saints.

18  Q.   You all stand what?

19  A.   We all Saints.  We're all the same gang.  That's our

20  neighborhood.

21  Q.   Right.  So you would go to the Wood block to stand post?

22  A.   Right.

23  Q.   And where would you stand post on the Hermitage block?

24  A.   The same block I would stand on on Hermitage or Paulina

25  block.

1  Q.  Where; in the corner of the block?

2  A.  The corner and the middle of the block.

3  Q.  Anywhere, to be seen so nobody can screw with you?

4  A.  Right.

5  Q.  And you would stand three strong --

6  A.  Right.

7  Q.  -- right?

8  A.  Correct.

9  Q.  And you wanted to be seen?

10  A.  Right.

11  Q.  So other rival gang members know that this is your block?

12  A.  Correct.

13  Q.  Right.  Now, and when you have those rules, you have the

14  soldiers and you have the drug sellers, right?

15  A.  Anybody can be.

16  Q.  Excuse me?

17  A.  Anybody can be a drug dealer or --

18  Q.  Well, didn't you tell the grand jury that you could be

19  either a soldier, meaning someone who protects the gang

20  territory or did burns, or you could be a drug seller?

21  A.  Right.

22  Q.  You're one or the other?

23  A.  Right.

24  Q.  Okay.  And based on what you told your handlers and based

25  on what you told the grand jury -- and if you need to refresh

1  your recollection, I have those statements -- you told them

2  that Ernie, Ernie Bird is a street-level cocaine dealer,

3  right?

4  A.  Correct.

5  Q.  You didn't tell them that he was a shooter, right?

6  Correct?

7  A.  Correct.

8  Q.  He is a cocaine and marijuana dealer?

9  A.  Correct.

10  Q.  You bought cocaine from him in the past?

11  A.  Yes.

12  Q.  You also used marijuana yourself?

13  A.  Yes.

14  Q.  You used cocaine yourself?

15  A.  No.

16  Q.  But you bought cocaine?

17  A.  Yes.

18  Q.  To sell to others?

19  A.  Just for parties, yes.

20  Q.  For parties.  And on April 5th, 2018, do you remember you

21  talked to your handlers from -- government agents, they

22  questioned you?  Do you remember that?

23  A.  Yes.

24  Q.  You talked to Agent Dennewitz, D-e-n-n-e-w-i-t-z, and HSI

25  Task Force Officer Bennett.

1  A.  Right.

2  Q.  And during that conversation, they talked to you about

3  Ernesto Godinez, correct?

4  A.  Correct.

5  Q.  And that was April 5th, which is just 30 days before

6  May -- just about May 4th, right?

7  A.  Correct.

8  Q.  30 days, give or take, right?

9  A.  Right.

10  Q.  And on that day, you specifically told them that Ernesto

11  Godinez is a street-level distributor of cocaine for his

12  brother?

13  A.  Correct.

14  Q.  You did not mention he was a chief, right?

15  A.  Correct.

16  Q.  You did not mention he was a soldier, right?

17  A.  Correct.

18  Q.  You did not mention that he stands post?

19  A.  Correct.

20  Q.  You did not mention that he has any guns?

21  A.  Correct.

22  Q.  Now, is there a difference between the block of Hermitage

23  and the block from 45th and Wood?

24  A.  They're all the same.

25  Q.  Well, didn't you tell us that you're all Latin Saints,

1  right?

2  A.  Yes.

3  Q.  But it is divided into six blocks, right?  And you said

4  you're from Hermitage?

5  A.  Right.

6  Q.  Where does that go?  What is your territory?

7  A.  Hermitage.

8  Q.  So it's the entire block from 43rd all the way down to

9  4 --

10  A.  Yes.

11  Q.  -- to 45th?

12  A.  Yes, it is.

13  Q.  Yes.  And what about the block of 45th and Wood?  Is that

14  the Wood block?

15  A.  Yes.

16  Q.  Did you ever tell anybody that you were from the Wood

17  block?

18  A.  Certain times, a few times.

19  Q.  A few times.  So today, you're telling us from the

20  Hermitage block but at other times, you would tell people

21  you're from the Wood block?

22  A.  Yeah, because it's my neighborhood.

23  Q.  But you're divided into different territories, right?

24  A.  I'm a Saint, yes.

25  Q.  What are those tattoos on your head?

1  A.  Tattoos.

2  Q.  Saint tattoos?

3  A.  Regular tattoos, my name.

4  Q.  Your name?

5  A.  Right.

6  Q.  So not every tattoo is a Saint tattoo?

7  A.  Right.

8  Q.  And not every black shirt is a Saint black shirt?

9  A.  Right.

10  Q.  And isn't it true, when you have Wood block business, it's

11  the business of the Wood block?

12  A.  Correct.

13  Q.  And when there's Hermitage business, it's the business of

14  the Hermitage block?

15  A.  Correct.

16  Q.  And each block has their own chiefs?

17  A.  Correct.

18  Q.  And each block has their own soldiers?

19  A.  Correct.

20  Q.  And each block has their own people that deal with the

21  drugs?

22  A.  Right.

23  Q.  And if their blocks are going to mingle and commingle, you

24  first have to go to the chief?

25  A.  Correct.

1  Q.  If you want to stand post at the Wood block, you're going

2  to have to get the okay from the chiefs to do that?

3  A.  No.

4  Q.  You're going to get a violation if you're not on your

5  block and you're on somebody else's block?

6  A.  You could be anywhere in the neighborhood.

7  Q.  Is that written down somewhere?

8  A.  No.

9         THE COURT:  Is that it?

10        MR. PISSETZKY:  No, Judge.  I'm looking for

11 something.

12        THE COURT:  Okay.

13        MR. PISSETZKY:  Sorry.  I'll find it in a minute.

14 BY MR. PISSETZKY:

15 Q.  When you sold drugs, would you keep all the drugs in your

16 house?

17 A.  No.

18 Q.  You'd stash them somewhere else, right?

19 A.  Yes.

20 Q.  You'd find abandoned homes or other places to stash them?

21 A.  Another friend that has them.

22 Q.  Excuse me?

23 A.  Another friend.

24 Q.  Another friend would have it?

25 A.  Yes.

1  Q.  But you would keep it close by to where you live?

2  A.  Yes.

3  Q.  So you can go and get it?

4  A.  Correct.

5  Q.  And hopefully, when -- if and when your house is raided,

6  you have nothing there, right?

7  A.  Correct.

8  Q.  Now, when you learned that your neighborhood is hot, what

9  does that mean to you?

10  A.  The police's presence.

11  Q.  There's police there, right?

12  A.  Yes.

13  Q.  Would you stay in the neighborhood when it's hot?

14  A.  I don't understand your question.

15  Q.  Excuse me?

16  A.  I don't understand your question.

17  Q.  Well, would you stay or would you drive -- try to stay out

18  of the neighborhood so the police won't bug you?

19  A.  Oh, yeah, you leave so they won't bug you.

20  Q.  You leave, right?

21  A.  Right.

22  Q.  You drive around?

23  A.  Right.

24  Q.  You cruise or you go somewhere else outside the

25  neighborhood?

1  A.  Correct.

2  Q.  It's not because you did anything wrong, it's just because

3  you don't want to be messed around with the police?

4  A.  Correct.

5  Q.  And you told us that the neighborhood itself is surrounded

6  by other gang members -- other gangs?

7  A.  Right.

8  Q.  The La Raza gang is somewhere on the other side of the

9  park?

10  A.  Correct.

11  Q.  So when there are shootings, if it's a shooting that

12  happened, something happened to one of the Latin Saints, you

13  would know pretty much right away?

14  A.  Correct.

15  Q.  You'd get a phone call, text message, social media, right?

16  A.  Right.

17  Q.  But if it's a shooting that is out -- that is not related

18  to your gang, some other flakes got shot, you wouldn't get the

19  text right away as to what happened, right?

20  A.  You get a text, though.

21  Q.  You learn later as you learn, right?

22  A.  You get a text.

23  Q.  You get a text.  And you'd get a text that a flake got

24  shot?

25  A.  Yes.

1  Q.  "Fuck them flakes" --

2  A.  Right.

3  Q.  -- right?

4         Because they got shot?

5  A.  Right.

6  Q.  And when you hear gunshots in the neighborhood, you

7  basically think to yourself or say to yourself, "Fuck them

8  flakes," right?

9  A.  Right.

10 Q.  When flakes drive in the neighborhood or when there's

11 anybody that seems to be driving in the neighborhood and does

12 not belong, you'd get a text as well, right?

13 A.  Yeah.

14 Q.  To come out, stand post?

15 A.  Something like that, yes.

16 Q.  On May 4, 2018, did you ever get any text from anyone or

17 from Ernie or anybody from the Wood Street that there's flakes

18 on the streets?

19 A.  No.

20 Q.  You told us that you've been a Saint since you were about

21 15 years old?

22 A.  Right.

23 Q.  About -- and you're about 28 today?

24 A.  Right.

25 Q.  You have friends in that gang?

1  A.  Yes.

2  Q.  You lived in that neighborhood until recently?

3  A.  Right.

4  Q.  People talk, and you hear things when gang-related stuff

5  is happening in the neighborhood?

6  A.  Right.

7  Q.  You've been cooperating since 2017, right?

8  A.  Right.

9  Q.  Over two years now?

10  A.  Right.

11  Q.  Since that time, you provided information to your

12  handlers?

13  A.  Right.

14  Q.  You provided them with important information about Saints

15  activity, right?

16  A.  Right.

17  Q.  You told them about certain gang members and their

18  activities?

19  A.  Right.

20  Q.  Some information you had from first knowledge, firsthand

21  knowledge?

22  A.  I don't understand the question.

23  Q.  About the information that you provided.  Some of it, you

24  knew personally, right?

25  A.  Right.

1  Q.  And some other information is because the neighborhood

2  talks?

3  A.  Right.

4  Q.  You provided agents with important information, right?

5  A.  Right.

6  Q.  Yet you never told any agent or anyone else that you heard

7  that Mr. Godinez ever shot a police officer on May 4, 2018?

8  A.  That's right.

9  Q.  You did not tell any agent that you ever heard him

10  conducting lookout duties that night?

11  A.  That's right.

12  Q.  You did not tell any agent that Mr. Godinez shot a flake

13  on May 4, 2018?

14  A.  That's right.

15  Q.  You did not tell agents that you heard from anyone else

16  that Mr. Godinez was out there that night looking for flakes

17  and then shot a cop?

18  A.  Correct.

19  Q.  Or even that there were rumors that Mr. Godinez did it?

20  A.  Correct.

21  Q.  Despite being a flake -- despite being a Saint for over 12

22  years and living in the neighborhood since you were 15, you

23  could not provide any intelligence whatsoever to the

24  government or its agents that Ernesto Godinez shot anyone on

25  May 4th?

1   A.  Correct.

2   Q.  You did not have information that he possessed a gun on

3   that day?

4   A.  Correct.

5   Q.  Or that he was trying to flee from the neighborhood after

6   the shooting?

7   A.  Correct.

8   Q.  The only information that you had of Ernesto Godinez that

9   came about a month earlier was that he was a low-level drug

10  seller?

11  A.  Correct.

12          MR. PISSETZKY:  Thank you, Judge.

13          THE COURT:  Anything further?

14          MR. EICHENSEER:  Yes, Judge.

15                  REDIRECT EXAMINATION

16  BY MR. EICHENSEER:

17  Q.  Sir, Mr. Pissetzky just asked you about the name Alejandro

18  Diaz.  Do you remember that question?

19  A.  Yes.

20  Q.  That was the name that you signed the -- your cooperation

21  agreement under?

22  A.  Yes.

23  Q.  Whose idea was it to use that name?

24  A.  The agency.

25  Q.  The agency, right?  They told you to use an assumed name;

1    is that right?

2    A.   That's correct.

3    Q.   Your understanding is that was for your safety?

4    A.   Yes, it was.

5    Q.   Mr. Pissetzky also asked you about you pretending to sell

6    drugs; is that right?

7    A.   That's right.

8    Q.   Is there a reason that you had to pretend to sell drugs?

9    A.   To -- so they wouldn't know that I was working with

10   immigration.

11   Q.   Yes.  So that's to make you look legit in the

12   neighborhood; is that right?

13   A.   That's right.

14   Q.   Because if you stopped selling drugs, is that suspicious?

15   A.   Correct.

16   Q.   So you've got to keep up appearances in order to be an

17   informant; is that right?

18   A.   That's correct.

19   Q.   Mr. Pissetzky also asked you about a photo that you

20   initialed of Mr. Godinez in your grand jury statement.  Do you

21   remember that question?

22   A.   Yes.

23   Q.   And he asked you whether you identified Mr. Godinez as a

24   chief in that photo, right?

25   A.   Correct.

1  Q.  And you answered, no, you didn't identify him as a chief?

2  A.  I don't remember.  Yes.

3  Q.  Did you identify him as something else in that photo?

4  A.  I can't recall.

5  Q.  Would seeing the photo help refresh your memory?

6  A.  All right.

7  Q.  Look at the photo, and when you're done, hand it back.

8          Is your memory refreshed?

9  A.  Yes.

10 Q.  Sir, in that photo, did you provide a description of

11 Mr. Godinez?

12 A.  Yes.

13 Q.  What did you write?

14 A.  "Shooter."

15         THE COURT REPORTER:  I'm sorry?

16         THE WITNESS:  "Shooter."

17         MR. EICHENSEER:  Nothing further, Judge.

18                    RECROSS-EXAMINATION

19 BY MR. PISSETZKY:

20 Q.  You knew -- you knew, sir, that when you were testifying

21 in that grand jury, the government was asking you questions

22 about Ernesto Godinez shooting an ATF agent, right?

23 A.  I don't understand the question.

24 Q.  You knew that your testimony in the grand jury was against

25 Ernesto Godinez?

1   A.   No.

2   Q.   You knew that you were going to be part of the case,

3   right?  That's the reason why they called you?

4   A.   Not until that last day.

5   Q.   Okay.  But you -- that's what you knew, right, that day?

6   A.   No.

7   Q.   "No" what?

8   A.   I didn't know that I was going to testify against Godinez.

9   Q.   But you knew that they were going to call you to

10  testify -- to testify about the shooting of Latin Saints,

11  right?  They asked you about it?

12  A.   They asked, yes.

13  Q.   And you wrote "shooter" on that picture, right?

14  A.   Right.

15  Q.   But Ernesto Godinez was a low-level drug dealer as you

16  told them before?

17  A.   What I did on the paper.

18           MR. PISSETZKY:  Yes.

19           THE COURT:  That's the end?

20           MR. EICHENSEER:  Yes.

21           THE COURT:  Okay.  You can step down.

22       (Witness excused.)

23           THE COURT:  Call your next witness.

24           MS. BABU:  Your Honor, the government would call Paul

25  Presnell.

1    THE COURT:  Right around here, sir.  Please raise

2  your right hand.

3    (Witness sworn.)

4    THE WITNESS:  Yes, your Honor.

5    THE COURT:  Please be seated.

6    You may question the witness.

7    MS. BABU:  Thank you, your Honor.

8    PAUL PRESNELL, GOVERNMENT'S WITNESS, SWORN

9    DIRECT EXAMINATION

10  BY MS. BABU:

11  Q.  Sir, would you please state and spell your name?

12  A.  Paul Presnell, P-r-e-s-n-e-l-l.

13  Q.  Mr. Presnell, where do you work?

14  A.  Chicago Police Department.

15  Q.  And what is your title with the Chicago Police Department?

16  A.  Police Forensic Investigator 1.

17  Q.  And when did you begin working with CPD?

18  A.  May 17, 1993.

19  Q.  And what was your first role with CPD?

20  A.  Police officer, probationary police officer.

21  Q.  How long were you a probationary police officer?

22  A.  For one year.

23  Q.  And then after -- after that year, what role did you take?

24  A.  Working in a beat car.

25  Q.  And what district was that in?

1    A.    That was in the 14th police district.

2    Q.    And generally, what were your responsibilities as a beat

3    cop?

4    A.    Prevent crime.

5    Q.    And how long were you -- were you also on patrol during

6    that time?

7    A.    I was.

8    Q.    And how long were you a patrol officer?

9    A.    In the 14th District?

10   Q.    Yes.

11   A.    For probably about six months.

12   Q.    And then did you move to a different district from there?

13   A.    I did.

14   Q.    And what district was that?

15   A.    16th District.

16   Q.    And how long were you in the 16th District?

17   A.    Until 1996.

18   Q.    And what happened in 1996?

19   A.    I transferred.

20   Q.    To where?

21   A.    I mean, I became a -- from beat officer, I became a

22   tactical officer.

23   Q.    And how long were you a tactical officer?

24   A.    Approximately three years.

25   Q.    And generally, what are your responsibilities as a

1  tactical officer?

2  A.  Prevent robberies, burglaries, narcotics, arrests.

3  Q.  And you said you were a tactical officer about three

4  years?

5  A.  Yes.

6  Q.  And so that's about 2001; is that right?

7  A.  Yes.

8  Q.  And what happened in 2001?

9  A.  2001, I became an evidence technician.

10  Q.  And what is an evidence technician?

11  A.  Evidence technician handles burglaries, robberies,

12  domestic battery photos, things like that.

13  Q.  And what does an evidence technician do during those

14  certain crimes?

15  A.  Take photographs, search for fingerprints, collect

16  evidence, collect blood.

17  Q.  And when did you become a forensic investigator?

18  A.  In 2005.

19  Q.  What is the difference between a forensic investigator and

20  an evidence technician?

21  A.  Forensic investigator handles aggravated batteries,

22  likelihood of death, homicides, death investigation, and

23  police-involved shootings.

24  Q.  And you said you became a forensic investigator in 2005?

25  A.  I did.

1  Q.  And did you have to have any training or take a test?

2  A.  Yes.  There was a test, and then when I passed that test,

3  I had classroom training from other forensic investigators.

4  And then after that training, then went with and worked the

5  street with other forensic investigators.

6  Q.  Okay.  If we can talk quickly about this test, what was --

7  what did the test entail?

8  A.  It was a mocked crime scene, and then they would grade you

9  on what you did, what you missed, things like that.

10  Q.  And I assume you passed the test?

11  A.  I did.

12  Q.  And the classroom training, what sort of training did that

13  entail?

14  A.  A lot of things that evidence technician did, like

15  photographs, collection of blood, collection of fingerprints,

16  things like that.

17  Q.  And who ran that training?

18  A.  The Chicago Police Department.

19  Q.  And did you receive -- in addition to taking photographs

20  and collecting blood and fingerprints, did you learn how to do

21  other things in the CPD training?

22  A.  Yes.

23  Q.  Did you learn how to make a plat?

24  A.  Yes.

25  Q.  And could you explain to the jury what a plat is?

1    A.   A plat is a diagram of the area, and it documents cars,

2    houses, parks, different things like that.

3    Q.   And did you also learn techniques of evidence collection

4    generally?

5    A.   Yes.

6    Q.   And is some of the evidence that's often collected

7    ballistics evidence?

8    A.   It is.

9    Q.   And so did you learn the techniques to collect different

10   types of ballistics?

11   A.   Yes.

12   Q.   And what do you understand ballistics to mean?

13   A.   Firearms evidence, fired bullets, cartridge cases.

14   Q.   In addition to your training with CPD, were you trained by

15   another law enforcement agency?

16   A.   Yes.  We had further training from the Illinois State

17   Police on how to swab weapons, collection of blood, collection

18   of firearms.

19   Q.   And in addition -- so in addition to your CPD training and

20   the Illinois State Police training, did you receive training

21   from yet another law enforcement agency?

22   A.   Yes, the FBI.

23   Q.   And what did you learn from the FBI?

24   A.   Photography, additional photography; blood spatter;

25   footwear impressions.

1  Q.  Officer Presnell, you told us the difference between a

2  forensic investigator and an evidence technician.  And let me

3  know if I'm wrong about this.  It's the different types of

4  crimes that you work on?

5  A.  Yes.

6  Q.  So what are your duties when you go out to process a scene

7  as a forensic investigator?

8  A.  Videotape the crime scene, photograph the crime scene,

9  take measurements, collect evidence, and search.

10 Q.  Officer Presnell, since you -- and you said you became a

11 forensic investigator in 2005?

12 A.  Yes.

13 Q.  Since 2005, how many crime scenes have you processed?

14 A.  Thousands.

15 Q.  How many forensic investigators are at CPD?

16 A.  Now?

17 Q.  Yes.

18 A.  I believe six or seven.

19 Q.  And that's for the entire city of Chicago?

20 A.  It is.

21 Q.  And what -- what shift do you work, sir?

22 A.  I work midnights.  I work 8:00 o'clock at night until 6:30

23 in the morning.

24 Q.  Are you fairly busy during those hours?

25 A.  I am.

1  Q.  Officer Presnell, were you on duty on May 4th, 2018?

2  A.  I was.

3  Q.  Where were you working?

4  A.  Chicago Police Department, forensic services.

5  Q.  And from -- and where is -- is that where your office is?

6  A.  Yes.

7  Q.  And where is that?

8  A.  1011 South Homan.

9  Q.  And later on during the day, did you relocate to somewhere

10 else?

11 A.  Yes.

12 Q.  Where did --

13 A.  4400 South Hermitage.

14 Q.  And how -- was that to process a crime scene?

15 A.  It was.

16 Q.  And how did you receive that assignment?

17 A.  From my desk.  They call up and then they give you the RD

18 number, the address, and a short little thing saying that

19 there's a police-involved shooting.

20 Q.  So if we could get back, so someone calls your desk, or

21 you receive that from someone else?

22 A.  Yes.  Somebody made a notification to our desk.  And then

23 that's on the first floor.  And then I'm on the third floor.

24 And then they call up to me and say, "Paul, you have a

25 police-involved shooting.  You have a homicide.  You have a

1  death investigation."

2  Q.  And who -- is it usually the detective that calls in?

3  A.  I don't know who actually made the notification.

4  Q.  Okay.  And what time did you arrive at -- you said 44th

5  and Hermitage?

6       MR. PISSETZKY:  Your Honor, I'm sorry, but I believe

7  he said -- there's no homicide here.

8  BY MS. BABU:

9  Q.  Officer Presnell, you were referring to generally how you

10  receive notifications?

11  A.  Yes, the different notifications that I get, not of this.

12  Q.  Going back to May 4th of 2018, what sort of notification

13  did you receive?

14  A.  That there was a police-involved shooting at 4400 South

15  Hermitage.

16  Q.  And what time did you arrive at 4400 South Hermitage?

17  A.  5:00 o'clock in the morning.

18  Q.  Officer Presnell, when you arrived at 4400 South

19  Hermitage -- actually, and before I go further, could you

20  point out to the jury about where that is on the map next to

21  you?

22  A.  Here's south -- this is 4400 Street, and this is

23  Hermitage, so it's right by the park.

24  Q.  And when you arrived, where did you park your car, do you

25  remember?

1  A.  I do.  I parked it in the alley.  There was a short little

2  alley.  There's an alley right here, so I parked it in this

3  alley.

4  Q.  And when you arrived on scene, Officer, about how many

5  other -- were there other law enforcement officers on the

6  scene?

7  A.  There was.

8  Q.  Were there only CPD officers there?

9  A.  No.  There was --

10  Q.  What other --

11  A.  -- other officers in plainclothes with bulletproof vests.

12  Q.  And about how many other officers were on scene when you

13  arrived?

14  A.  I would say probably 30 to 40 officers.

15  Q.  And generally, could you describe what the scene looked

16  like when you arrived?

17  A.  Yes.  It was cordoned off with squad cars and then red and

18  yellow evidence tape.

19  Q.  And what does the yellow evidence tape designate?

20  A.  The outer perimeter.

21  Q.  And where was the outer perimeter set up?

22  A.  The outer -- it was quite large, so it was, I'd say, from

23  4300 South Hermitage to 4500 South Hermitage and then from, on

24  44th Street, I would say like 1700 to 1800.

25  Q.  And Officer Presnell, did you write a report of this?

1    A.    I did.

2    Q.    And would having your report -- would you have written

3    down the boundaries in your report?

4    A.    The boundaries of where the yellow tape was?

5    Q.    Yes.

6    A.    Possibly.

7    Q.    Okay.  Officer Presnell, when you first arrived at the

8    scene -- well, actually, going back to the boundaries, were

9    other -- were the public allowed within the boundaries of the

10   yellow tape?

11   A.    No.

12   Q.    When you first arrived, what do you do, or what did you do

13   that day?

14   A.    I met with the paper car to make sure that the RD -- the

15   RD number that I had, the report document number, was the same

16   as what I had.

17   Q.    What's a paper car?

18   A.    That's the officer that does the general offense case

19   report of the incident.

20   Q.    So this is one of the first reports that's written?

21   A.    Yes.

22   Q.    And the RD number is the RD -- the case number that CPD

23   assigns a case?

24   A.    For this incident, yes.

25   Q.    So you checked in with the paper car, and then what did

1   you do?

2   A.   Met with the detective, lead detective.

3   Q.   And what did you and -- after meeting with the detective,

4   what did you do after that?

5   A.   Walk the crime scene.

6   Q.   And then could you then generally walk the jury through

7   what your process was that morning just at a very high level?

8   A.   Yes.   Videotaping, photographing, a lot of searching, and

9   then marking of evidence.

10  Q.   At any point during that process, do you -- did you make a

11  plat?

12  A.   I did.

13  Q.   And when did you take the video?

14  A.   Video was the first thing that I did after I got the

15  information.

16  Q.   And that was about 5:00 o'clock in the morning?

17  A.   It was probably about 5:20 in the morning.

18  Q.   And after you took the video, then what did you do?

19  A.   Searched.

20  Q.   And where did you search?

21  A.   I started at 1721 West 44th Street.

22  Q.   Do you know about where that is on the map?

23  A.   Yes.

24  Q.   Where is that?

25  A.   That is right here.

1  Q.  Okay.  And then from there, where did you -- where did you

2  go?

3  A.  4416, in that area, and then I found a fired bullet in the

4  grass there.

5  Q.  Okay.  And we'll get to that in a moment.  This is

6  probably a good time for you to explain, Officer Presnell,

7  when you find a piece of evidence, what steps do you take?

8  A.  To mark it with a Chicago Police Department logo yellow

9  crime scene marker, and then it has a number on it.

10  Q.  And do you use -- do you have separate markers that you

11  use specifically?

12  A.  Yes.  Mine are numbered.

13  Q.  And then after you -- you say you place the marker on the

14  evidence?

15  A.  By the evidence.

16  Q.  By the evidence.  And then after you place a marker by the

17  evidence, what do you do?

18  A.  Photograph it.

19  Q.  And do you collect the evidence at this point?

20  A.  No.  I have to take my measurements for my plat before I

21  pick up the evidence.

22  Q.  So you take the photos, and then you take measurements?

23  A.  Yes.

24  Q.  And when you say you take measurements, are you taking

25  measurements of the evidence?

1 A. Measurements of from where the evidence is to, say, a fire

2 hydrant, to a tree, to a light pole, things like that.

3 Q. So some sort of fixed object --

4 A. Yes.

5 Q. -- in the area?

6   And then what do you do with those measurements?

7 A. Put them on my plat later on.

8 Q. Officer Presnell, I'd like to show you Government Exhibit

9 403, which has not yet been admitted into evidence.  It will

10 show up on your screen in front of you.

11 A. Okay.

12 Q. Officer Presnell, have you seen this before?

13 A. I have.

14 Q. And what is this?

15 A. This is the plat that I drew that morning.

16 Q. And is this -- does Exhibit 403 fairly and accurately

17 represent the area near the intersection of 44th and Hermitage

18 on May 4th, 2018?

19 A. Yes.

20 Q. And are there any inaccuracies on this -- on this exhibit?

21 A. Yes.  My markings for east and my markings for north.

22 Q. And are there any other inaccuracies besides that?

23 A. Yes.  Where I have here "4439 South Hermitage," it should

24 be "4349 South Hermitage."

25 Q. Officer Presnell, was this made at or near the time that

1  you processed the scene?

2  A.  No.  This was made after I collected all the evidence and

3  I went back to my office.  And this was the last thing that I

4  had performed.

5  Q.  And was that done on the same day?

6  A.  Yes.

7  Q.  And is the plat a record that's normally kept in the

8  course of processing a crime scene by CPD?

9  A.  I'm sorry?

10  Q.  Is -- the plat, is that something you normally do in the

11  processing of a crime scene?

12  A.  No.  For police-involved shootings only.

13  Q.  And is it your regular practice to create a plat when

14  processing a scene involved with a police-involved shooting?

15  A.  Yes.

16        MS. BABU:  Your Honor, the government would move to

17  admit Government Exhibit 403.

18        THE COURT:  Is there any objection?

19        MR. HYMAN:  No.

20        THE COURT:  It's admitted.  You may publish.

21        MS. BABU:  Thank you, your Honor.

22      (Government Exhibit No. 403 received in evidence.)

23  BY MS. BABU:

24  Q.  Officer Presnell, I'm going to have you move to some

25  different exhibits.  There should be a binder on the floor

1  near you maybe, maybe by the step.

2  A.  Oh, I see it.

3  Q.  Officer Presnell, I'm going to have you look at the 500

4  series in there, if you could turn to that, if I could have

5  you look at first Government Exhibits 500 through 507.

6  A.  Okay.

7  Q.  Let me know when you're finished, sir.

8  A.  Okay.  I'm finished.

9  Q.  Have you seen these exhibits before?

10 A.  Yes.

11 Q.  What are these exhibits?

12 A.  These are photos of the gangway of 4332 South Hermitage

13 and then the alley behind 4332 South Hermitage.

14 Q.  And do they fairly and accurately depict the areas that

15 you just described on or about May 4th, 2018?

16 A.  Yes.

17        MS. BABU:  Your Honor, the government would move to

18 admit Government Exhibits 500, 501, 502, 503, 504, 506, and

19 507.

20        THE COURT:  Objection?

21        MR. HYMAN:  No.

22        THE COURT:  They're admitted.  You may publish.

23    (Government Exhibit Nos. 500 through 504, 506, and 507

24       received in evidence.)

25 BY MS. BABU:

1  Q.  Mr. Presnell, if I can have you now turn back to the

2  binder and have you look at Government Exhibits 508 through

3  528.

4  A.  Okay.

5  Q.  Can I also have you look at 530 to 552 and 554?

6  A.  Okay.

7  Q.  Officer Presnell, what are these exhibits?

8  A.  These are the photos that I took that morning of the crime

9  scene.

10  Q.  And do these photographs, each of these photographs fairly

11  and accurately depict the area on or about -- the area near

12  44th and Hermitage on or about May 4th, 2018?

13  A.  Yes.

14          MS. BABU:  Your Honor, the government would move to

15  admit Government Exhibits 508 through 528, 530 through 552,

16  and 554.

17          THE COURT:  Any objection?

18          MR. HYMAN:  No.

19          THE COURT:  They're admitted.  You may publish at

20  some point.

21      (Government Exhibit Nos. 508 through 528, 530 through

22          552, and 554 received in evidence.)

23          MS. BABU:  Your Honor, the government would like to

24  publish Government's Exhibit 549.

25          THE COURT:  All right.  You may publish it -- wait a

1   minute.  What --

2           MS. BABU:  549, your Honor.

3           THE COURT:  Okay.

4   BY MS. BABU:

5   Q.  Officer Presnell, do you see Government Exhibit 549 before

6   you?

7   A.  I do.

8   Q.  Could you please describe this photograph to the jury?

9   A.  Yes.  This is the sidewalk, this is the area of 1721 West

10  44th Street, the sidewalk.  And there's a marker number 1 at

11  the bottom right side.

12  Q.  And what is that marker?  Is that one of the markers that

13  you referred to earlier?

14  A.  That I placed down, yes.

15  Q.  And what is the marker next to?

16  A.  There's a silver car, and then to the right of that marker

17  number 1 is the park.

18  Q.  Officer Presnell, I'm now showing you what's been marked

19  Government Exhibit 550.  And what is this photograph, sir?

20  A.  This is my close-up of marker number 1, the cartridge

21  case.

22  Q.  And this is the same marker that was in the previous

23  photo?

24  A.  Yes.

25  Q.  Showing you what's been marked Government Exhibit 551,

1    what is this a photograph of, sir?

2    A.   This is an overall of marker number 2 in the street, and

3    I'm giving a perspective of the car and then the sidewalk.

4    Q.   And Officer Presnell, where in relationship to marker

5    number 1 was number 2?

6    A.   To the left.

7    Q.   Was it close by?

8    A.   It was.

9    Q.   And Officer Presnell, I'm now showing you what's been

10   marked Government Exhibit 552.  And what is this a photograph

11   of?

12   A.   That's my close-up of the cartridge case marked with

13   number 2, marker number 2.

14   Q.   Officer Presnell, we're going to pull up Government

15   Exhibit 403 now.  Could you show the jury on the -- on the --

16   sorry, on Government Exhibit 403 where exactly markers 1 and 2

17   were?

18   A.   Yes.  Marker number 1 is right here, and then marker

19   number 2 is right there in the street.

20   Q.   Thank you.  Officer Presnell, when you recover ballistics

21   evidence, can you determine how old it is?

22   A.   Yes.  Sometimes it's weathered.  And what I mean by

23   "weathered" is sometimes it's been out there and it's raining

24   or snowing and there's like rust on it, or sometimes it's

25   raining and then there's dirt, and then dirt gets on there and

1  then there's like dried dirt.

2  Q.  And were either marked -- the evidence at marker number 1

3  or marker number 2, did they look to be weathered?

4  A.  No.  They were shiny.

5  Q.  Officer Presnell, I'm now going to show you Government

6  Exhibit 526.  And actually, Officer Presnell, if you on the

7  screen in front of you press that little arrow in the corner,

8  that will clear the -- there you go.  I think someone took

9  care of it for you.

10      Officer Presnell, what is Government Exhibit 526?

11  A.  This is a photo of -- from marker number 1 and 2 taking a

12  shot, a photo towards 4332 South Hermitage.

13  Q.  And I'm going to show you Government Exhibit 543.  What is

14  that a photo of?

15  A.  This is an entrance of a fired bullet to that wooden fence.

16  Q.  And how can you tell it's an entrance?

17  A.  Because of the circular pattern of it going in, and then

18  when the bullet, if it goes through wood, then it splinters

19  the other end of the wood.

20  Q.  Okay.

21  A.  So this is a nice, clean entrance into that wooden fence.

22  Q.  And is this the same fence that was in Government Exhibit

23  526?

24  A.  Yes.  It was on the other side of the street of markers 1

25  and 2.

1    Q.   Officer Presnell, we're going to pull up Government

2    Exhibit 403 again for you.

3    A.   Okay.

4    Q.   Oh, I'm sorry.  On the map up in front of you, could you

5    please show us where the fence that's in Government Exhibit

6    45 -- 543 is?

7    A.   Yes.  It's right here.

8    Q.   And where on the map are the government -- what you marked

9    as Exhibit 1 and 2, where did you find those exhibits?

10   A.   That was across the street.

11   Q.   Thank you.  Sir, I'm going to show you Government Exhibit

12   527 now.  And what is this a photo of?

13   A.   This is a close-up of that bullet hole.

14   Q.   The same photo --

15   A.   Yes.

16   Q.   I mean, the same bullet hole, rather?

17   A.   Yes.  So I take overall, midrange, and then close-up.

18   This is my close-up.

19   Q.   And Government Exhibit 525, what is this a photo of, sir?

20   A.   This is a photo of the opposite side of that fence.  This

21   is on the Hermitage side.  And like I explained earlier, when

22   you have -- when a bullet goes through the wood, you have it

23   splintering out, and this is a photo of it splintering out.

24   Q.   And where is this photo -- on the map next to you, where

25   is this side of the fence?

1  A.  This is on Hermitage opposite of the last photo with the

2  entrance.

3  Q.  And can you show the jury on the map next to you where

4  that is?

5  A.  Where this fence is?

6  Q.  Yes, please.

7  A.  Yes.  It's the same fence now on Hermitage.  The other was

8  on 44th.  The entrance to the fence was on 44th, and the exit

9  was on Hermitage.

10 Q.  And this is right by the corner, it appears?

11 A.  Yes.

12 Q.  Officer Presnell, we're now showing you Government Exhibit

13 544.  And what is that?

14 A.  That's my close-up of the exit of the bullet hole to that

15 wooden fence on Hermitage.

16 Q.  And how can you tell that this was the exit again?

17 A.  Because the wood had splintered out as the bullet had gone

18 through.

19 Q.  And Officer Presnell, we're now showing you Government

20 Exhibit 545.  Where is this?

21 A.  This is inside the yard at 4349 South Hermitage.

22 Q.  And where is -- on the map next to you, where is 4349?

23 A.  This is the house here, and this is the whole property.

24 So the house is here, and then this is like a front yard.

25 It's that area.  And then the fence is on Hermitage right here.

1 Q. So this is the fenced-in yard to that house?

2 A. I'm sorry?

3 Q. This is the fenced-in yard to this house?

4 A. Yes.

5 Q. And how did you get into the yard?

6 A. The family opened up the gate, the sliding gate.

7 Q. And let you in?

8 A. Yes.

9 Q. Officer Presnell, I'm now going to show you 546. What is

10 this?

11 A. So this is an entry wound -- mark into the wood brace of

12 that fence on the Hermitage side.

13 Q. On the Hermitage side. And actually, if we could go back

14 to Government Exhibit 545, Officer Presnell, do you know --

15 and it may be hard to tell on this photo. Do you know about

16 where that hole is?

17 A. Yes. The hole, I would say, is right there. Right here.

18 Q. Sorry. We keep moving the photo on you.

19 A. Yes.

20 Q. Okay. So if we could go back to the full photo, Officer

21 Presnell, could you -- I guess if you could clear the screen

22 and show us again where that hole is.

23 Now you can go ahead and show the jury where the

24 bullet hole is on the fence.

25 A. Right there.

1    Q.   Thank you.  If we can go to Government Exhibit 528 now.

2         Officer Presnell, what happened here?

3    A.   Now I'm going in to see if the bullet is lodged in that

4    piece of wood, so I'm doing damage to this, and I'm taking my

5    screwdriver, hammer, and I'm trying to chisel away at -- to

6    see if the fired bullet is in there.

7    Q.   And did you find a bullet in there?

8    A.   I did.

9    Q.   Can we go to Government Exhibit 547, please?

10        And what is this, sir?

11   A.   That is the fired bullet that was in that fence after I

12   extracted it from the wood.

13   Q.   And Officer Presnell, did you mark this exhibit on your

14   plat?

15   A.   No.

16   Q.   Did you mark the area on your plat, the wood -- I'm sorry,

17   the fenced-in yard?

18   A.   Yes.

19   Q.   If we can turn to Government Exhibit 403, can you show the

20   jury where?

21   A.   Where I recovered that fired bullet from --

22   Q.   Yes.

23   A.   -- on the fence?

24        Okay.  Approximately right there.

25   Q.   Thank you.  Officer Presnell, I'm now going to turn to

1   Government Exhibit 530.  What is this a photo of?

2   A.   This is my, what I call an address ID.  So I'm taking a

3   photograph of the structure, the house, and then the address,

4   which is 4344 South Hermitage.

5   Q.   Okay.  Now turning to Government Exhibit 531, and sir,

6   what is this a photograph of?

7   A.   This is the south side of 4344 South Hermitage.  And

8   there's a hole in the siding, the vinyl siding.

9   Q.   And did you ultimately discover what was in that hole?

10  A.   Yes.

11  Q.   If we can turn to Government Exhibit 532.

12  A.   So now I lifted up the vinyl siding, and then there's

13  asphalt siding.  So I then dug that out.

14  Q.   And what do you use to dig out the bullets?

15  A.   A screwdriver.  It could be a pliers.

16  Q.   And did you find a bullet in the siding, sir?

17  A.   I did.

18  Q.   Could we turn to Government Exhibit 548?

19       What is this a photograph of, sir?

20  A.   That is the fired bullet that I recovered from the house

21  siding at 4344 South Hermitage.

22  Q.   Officer Presnell, I'm going to show you Government Exhibit

23  403 again.  Can you...

24       Officer Presnell, where on Exhibit 403 is -- did you

25  find the bullet in the siding of the house?

1  A.  Right there.

2  Q.  Officer Presnell, after you recovered the bullet in the

3  siding, did you look for other evidence in the area?

4  A.  Yes.

5  Q.  Do you recall where you looked?

6  A.  I looked all up and down the street.  I looked inside the

7  gangways.

8  Q.  Inside the gangways near 4344?

9  A.  Yes, the parkway and then the gangway and the front of the

10  houses.

11       THE COURT:  At this point, I think you're going into

12  another area, is it not?  So is it a good time to break?

13       MS. BABU:  Your Honor, if I can ask two more

14  questions.

15       THE COURT:  All right.  Two more questions, and then

16  we'll break for lunch.

17  BY MS. BABU:

18  Q.  And Officer Presnell, did you find any other evidence near

19  4344?

20  A.  At 4348, I found a fired bullet in a tree.

21       MS. BABU:  And we will get to that momentarily, but I

22  think this is a good time to break.

23       THE COURT:  All right.  We'll suspend until 2:00

24  o'clock for lunch.

25       (Recess from 12:53 p.m. to 2:00 p.m.)

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF ILLINOIS
2                EASTERN DIVISION

3   UNITED STATES OF AMERICA,        )  Docket No. 18 CR 00278
                                     )
4              Plaintiff,            )  Chicago, Illinois
                                     )  June 13, 2019
5        v.                          )  1:57 p.m.
                                     )
6   ERNESTO GODINEZ,                 )
                                     )
7              Defendant.            )

8                        VOLUME 4-B
              TRANSCRIPT OF PROCEEDINGS - Trial
9    BEFORE THE HONORABLE HARRY D. LEINENWEBER, and a Jury

10        APPEARANCES:

11        For the Government:  HON. JOHN R. LAUSCH, JR.
                               United States Attorney, by
12                             MS. KAVITHA J. BABU
                               MR. NICHOLAS J. EICHENSEER
13                             5th Floor
                               Chicago, IL 60604
14
          For the Defendant:   MR. LAWRENCE H. HYMAN
15                             111 West Washington Street
                               Suite 1025
16                             Chicago, IL 60602

17                                   and

18                             PISSETZKY & BERLINER
                               MR. GAL PISSETZKY
19                             35 West Wacker Drive
                               Suite 1980
20                             Chicago, IL 60601

21        Also Present:        MR. BEAU JACOBSEN, ATF Agent
                               MS. MARTA KASCUBA
22
          Court Reporter:      LISA H. BREITER, CSR, RMR, CRR
23                             JUDITH A. WALSH, CSR, RDR, F/CRR
                               219 S. Dearborn street, Room 2118
24                             Chicago, IL 60604
                               (312) 702-8865
25                             judith_walsh@ilnd.uscourts.gov

Presnell - Direct by Babu

1    (In open court outside the presence of the jury.)

2    THE COURT:  Everybody ready?  Do you want to bring the

3    jury in?  How much longer on this witness?

4    MS. BABU:  Your Honor, we probably have about -- Your

5    Honor, I need to go through the chain of custody for this

6    witness, so it may take a bit.

7    (Proceedings heard in open court.  Jury in.)

8    (Witness duly sworn and takes the stand.)

9    THE COURT:  Please be seated.

10   Ms. Babu, you may continue with the witness on your

11   direct.

12                      DIRECT EXAMINATION

13   BY MS. BABU:

14   Q   Thank you, Your Honor.

15   Officer Presnell, when we last -- before we broke for

16   lunch, you were, I believe, discussing a bullet that you had

17   retrieved from the siding of a house.

18   Do you remember that?

19   A   I do.

20   Q   And do you recall what the address was again for that --

21   the address of the house from which you recovered the bullet?

22   A   Yes.  4344 South Hermitage.

23   Q   Officer Presnell, I'm going to pull up Government Exhibit

24   403 for you.

25   (Off-the-record discussion.)

1    BY MS. BABU:

2        Q   Officer Presnell, on Government Exhibit 403, can you

3    please point out on your screen where 4344 is for the jury?

4        A   It's right there.

5        Q   Is this where you recovered the bullet from the siding?

6        A   Yes.   On the south side of the house.

7        Q   And did you search in the area of 4344 for other evidence?

8        A   Yes.

9        Q   And I believe you testified to this before we broke for

10   lunch, but could you remind the jury where you searched?

11       A   Yes.   On the parkway and inside the fence and in the

12   gangways of that address.

13       Q   And what's a parkway?

14       A   The parkway is where the grass is from your sidewalk to

15   the curb is from the street.

16       Q   And did you find any other evidence in your search near

17   4344?

18       A   No.

19       Q   You did -- you did find a bullet in a tree, though,

20   correct, sir?

21       A   Correct.

22       Q   And that was at a different address?

23       A   That was --

24       Q   We'll talk about that in a moment.

25           But before we get to that, sir, I'm going to show you

1   Government Exhibit 509.  Officer Presnell, what is this a

2   photograph of?

3       A   This is a photograph of the house to the right.  Actually

4   the house in the middle is 4332 South Hermitage, and the one to

5   the left is 4336 South Hermitage.

6       Q   And so there's no 4344, correct?

7       A   Correct.

8       Q   And in between those two houses, what is that?

9       A   That is the south gangway.

10      Q   Sir, I'm now showing you Exhibit 510.  What is this a

11  photograph of?

12      A   This is a photograph of CP -- Chicago Police Department

13  markers that were placed by unit personnel finding evidence

14  before I got there.

15      Q   And how can you tell that these are -- this is evidence

16  that the unit -- the personnel found before you got there?

17      A   Because that's the one that the police department gives

18  them to mark evidence, and then we have numbered ones.

19              MR. PISSETZKY:  Your Honor, objection to foundation.

20              This is not -- he did not mark those.  He's testifying

21  about other people.  We don't know who they are.  We don't know

22  when they did it.  This is not the officer to question about

23  these.

24              THE COURT:  We've seen these before.

25              MR. PISSETZKY:  It's not in his report.  There's no

1   information about who placed those, when they were placed, how
2   they were found.
3           MS. BABU:  Your Honor, that wasn't the question I asked
4   Officer Presnell.
5           THE COURT:  Okay.  Why don't you go back and bring that
6   information forward.
7           MS. BABU:  Sure, Your Honor.
8   BY MS. BABU:
9       Q  Officer Presnell, when you arrived in the gangway, were
10  the markers already placed?
11      A  Yes.
12      Q  And are these those markers?
13      A  Yes.
14      Q  And how could you tell that they were already there?
15  Well, I'm sorry.  Are these markers that you would normally use?
16      A  These are the markers that the district personnel carry.
17      Q  And what is the difference between the markers that the
18  district personnel use and the markers that you use?
19      A  Mine are numbered, and the district ones are -- have a
20  Chicago Police Department logo on them.
21      Q  And is that your normal practice?
22      A  Yes.
23      Q  So normally when you process a crime scene, if you arrive
24  and other officers have arrived before you, will they place
25  markers with a different emblem on them?

1

2    A  Yes.

3    Q  And your markers have a number on them?

4    A  Correct.

5    Q  And is that what happened in this instance?

6    A  Yes.

7    Q  So if we could go to Government Exhibit 511.

8         Officer Presnell, what is this a photograph of?

9    A  Now this is me placing my numbered markers next to the

10  evidence and those same CPD marked logo in the gangway.

11    Q  So now you've designated that you've also seen these

12  casings and you've placed your numbers?

13    A  Yes, my markers.

14    Q  If we could turn to Government Exhibit 512.  What is this

15  a photograph of, sir?

16    A  Those are the same markers, just a different angle.

17    Q  Which direction are we facing in this photograph?

18    A  East.

19    Q  Officer Presnell, in the map that my colleague is moving

20  towards you, could you point out where the -- where this gangway

21  is on the map for the jury.

22    A  The gangway is right here between 4332 and 4336, so it's

23  right here, the gangway.

24    Q  Thank you, sir.  Officer Presnell, I'm going to have you

25  look at Government Exhibit 413 -- I'm sorry, 513.

Presnell - Direct by Babu

1    What is this a photograph of?

2

3    A   This is a photograph of a cartridge case that I found that

4    was under a leaf after I had photographed and collected the

5    other four cartridge cases.

6    Q   And how do you know that this is a casing that you found,

7    sir?

8    A   Because that's the number that I marked it with, No. 8.

9    Q   Was there another marker there with the CPD emblem on it?

10   A   No.

11   Q   If there was no other marker with the CPD emblem on it,

12   what does that mean to you?

13   A   That I had found it.

14   Q   That you personally had found this casing?

15   A   Correct.

16   Q   Officer Presnell, if we can go back to the larger picture,

17   Again, is this in the same general area that the exhibits were

18   marked 4, 5, 6 and 7 were?

19   A   Yes.

20   Q   And when did you find marker No. 8 or the exhibit marker

21   No. 8?

22   A   After I had photographed and collected the other cartridge

23   cases, I do another walk through of the gangway, kind of like

24   moving leaves, maybe moving the plastic bottles to see if

25   there's anything underneath.

Presnell - Direct by Babu

1    Q   Officer Presnell, you arrived at the scene you said at
2    5:00 o'clock; is that right?
3    A   Yes.
4    Q   And there were other officers there when you arrived?
5    A   Yes.
6    Q   Was it daylight?  Was the sun rising when you arrived?
7    A   It was nighttime, and then the sun was starting to rise.
8    So by the time I was finished, the sun had rised -- risen.
9    Q   So when you first arrived there, it was about dawn?
10   A   Yes.
11   Q   So it was still a little bit dark?
12   A   Yes.
13   Q   And by the time you completed, the sun was up?
14   A   Yes.
15   Q   But when you were searching and if it was still dark, do
16   you use anything to assist your search?
17   A   My flashlight.
18   Q   We can turn to Government Exhibit 533.
19       Officer Presnell, what is this a photograph of?
20   A   It's a photograph of the cartridge case that's on the
21   ground and marker No. 4.
22   Q   And was this one of the markers that was in the larger
23   photograph we just saw?
24   A   Yes.
25   Q   And so was this -- was this casing found in the gangway

1  between 4332 and 4336?

2

3     A  Yes.

4     Q  If you can look at Government Exhibit 434 -- 534, what is

5  this a photograph of, Officer?

6     A  That is my closeup of a cartridge case marked by marker

7  No. 5.

8     Q  And Government Exhibit 536, what is this a photograph of,

9  sir?

10    A  This is a closeup of the cartridge case in the gangway

11 with my marker No. 7.

12    Q  Officer Presnell, when you collected the casing -- I'm

13 sorry.

14       Did you ultimately collect these casings?

15    A  I did.

16    Q  And what was the appearance of the casings that you marked

17 at 4, 5, 6, 7 and 8?  What was the appearance of those casings?

18    A  They were clean.  They were shiny.

19    Q  Did they appear to be weathered, as you had said sometimes

20 ballistics evidence is?

21    A  No.

22    Q  We can turn to Government Exhibit 538.

23       Officer Presnell, what is this a photograph of?

24    A  I'm standing in the gangway, the south gangway, and I'm

25 taking a photo towards the front to Hermitage.

1

2    Q   And in this photograph -- I don't know if we can see it in

3   this photograph -- where -- approximately where in the

4   photograph did you find the casings?

5    A   About towards the front by the other four.

6    Q   Would you be able to circle on the photograph for the

7   jury.

8    A   Right there (indicating).

9    Q   Officer Presnell, what is the -- what is the marking on

10   the side there?

11    A   On the left?

12    Q   Yes, please.

13    A   It looks like gang logos.

14    Q   Just graffiti?

15    A   Yes.

16    Q   And Officer Presnell, how many casings did you find in

17   total in the gangway between 432 and 436 -- 4336, excuse me.

18    A   How many were there, or how many did I find?

19    Q   How many were there?  Thank you.

20    A   There was five.

21    Q   And you found one of those?

22    A   I did, number --

23    Q   And there were four previously identified?

24    A   Correct.

25    Q   And you recovered all five casings, correct?

1    A   Correct.

2

3    Q   Officer Presnell, you have in front of you what has been

4    marked as Government Exhibit 300 in the packaging.

5    A   Okay.

6    Q   You can go ahead and cut that open.

7    A   Okay.

8    Q   If you could retrieve the materials that are inside.

9    A   Okay.

10   Q   What do you see inside that package, sir?

11   A   These are the cartridge cases we were talking about that I

12   collected in the gangway, and they're numbered 4, 5, 6, 7 and 8.

13   Q   And how do you know those were the same casings we're

14   talking about?

15   A   Because it has my writing on there.

16   Q   What is that little package that you're holding in your

17   hand?

18   A   This is an evidence envelope.

19   Q   Can you explain to the jury your process when you process

20   a crime scene as to how you collect the evidence?

21   A   Yes.  Put on latex gloves and then put the evidence into

22   evidence envelopes or evidence bags.

23   Q   And are these the evidence envelopes?

24   A   These are.

25   Q   And do you then place these evidence envelopes into

1    anything else?

2

3       A   Yes, into a paper bag.

4       Q   And once you place it into the paper bag, what do you do

5    with it?

6       A   Then I seal it with clear plastic -- clear tape, and then

7    I put evidence tape on there.  And then I put my initials, my

8    star number and then the date.

9       Q   And then what do you do once you do that?

10       A   Then I inventory it in the Chicago Police Department

11   system eTrack, and then that gives it a unique inventory number

12   for whatever items I had inventoried.  And that's the unique

13   inventory number for these five cartridges.

14       Q   And where are the -- and where are the -- where is the

15   evidence then stored once it is at CPD?

16       A   It's on the fourth floor of my office in a locked room.

17       Q   And who has access to the locked room?

18       A   People in my office.

19       Q   To take evidence out of the locked -- that locked room, do

20   you have to sign in and out?

21       A   No.

22       Q   Is there a record kept of who takes evidence out of the

23   locked room?

24       A   Yes, through the eTrack system.  When you recover it, then

25   it's barcode scanned.

Presnell - Direct by Babu

1    Q   And, Officer Presnell, do you -- are the exhibits in front
2    of you?  Government Exhibit 300, the five envelopes, are they in
3    the same or substantially the same condition they were when you
4    first packaged them?
5    A   Yes.
6    Q   You can put those to the side, sir.
7         After -- after you recovered the casings in the
8    gangway, sir, where did you look next for evidence?
9    A   I had looked down a little bit to the north of there, and
10   then I was going to the south, heading towards the south.
11   Q   Could you show the jury on the map where you went?
12   A   Yes.  I went from 4332.  Then I went towards this way,
13   towards the north.
14   Q   And then where did you go?
15   A   Then I went and I couldn't -- I didn't find anything.  So
16   then I went to the south, started heading south.
17   Q   And did you find anything in your -- as you walked south?
18   A   Yes.
19   Q   What did you find?
20   A   I saw damage to the north side of a tree at 4348 South
21   Hermitage.
22   Q   And where is that on the map?
23   A   Right here (indicating).
24   Q   Officer Presnell, I'm now going to show you Government
25   Exhibit 542.

1      Do you recognize this photograph?

2

3    A   Yes.

4    Q   What is this a photograph of?

5    A   This is the photograph of the sidewalk and the parkway,

6    and then to the left is the tree that I'm talking about at 4348.

7    And then there's damage to the lower part of the north side.

8    Q   And Officer Presnell, I'm now showing you what's been

9    marked as Government Exhibit 522.

10     And what is this a photograph of?

11   A   That is fresh damage to the lower part of the bark to the

12   tree.

13   Q   And so as you were walking down the sidewalk, you noticed

14   this damage in the tree?

15   A   I did.

16   Q   And you personally noticed this?

17   A   I did.

18   Q   And what exactly did you find inside this damage?

19   A   Fired bullet.

20   Q   We can go to 524 -- I'm sorry, 523.

21     Officer Presnell, what is this?

22   A   This is the screwdriver that I used to just chip away at

23   the bark, and then you could see the fired bullet resting in the

24   tree, inside the tree.

25   Q   Did you essentially put the screwdriver into the tree and

1   dig it out?

2       A  I did.

3       Q  And once that you dug the bullet out of the tree, what did

4   you do with it?

5       A  I put it into an evidence envelope.

6       Q  And did you follow the same process that you followed for

7   Government Exhibit 300?

8       A  Yes.

9       Q  If we could go to Government Exhibit 524.

10          Officer Presnell, after you recovered the bullet, did

11  you make any -- did you make note of what the appearance of the

12  bullet was like?

13      A  Did I make a notation of it?

14      Q  Or did you make note?  Did you observe the appearance of

15  the bullet?

16      A  Yes, that it had looked fresh.

17      Q  Did it look weathered to you?

18      A  No.

19      Q  Officer Presnell, why is there no marker on any of these

20  photos?

21      A  Because I wouldn't -- I couldn't put a marker on the tree

22  so I just -- I don't use a marker for it.

23      Q  And Officer Presnell, did you search the area near 4348

24  South Hermitage where this tree was located?

25      A  Yes.

1    Q   And where did you search?

2    A   The parkway, the sidewalk and then inside the fence at

3    4348.

4    Q   And did you find any evidence in any of those areas?

5    A   I did not.

6    Q   Officer Presnell, on Government Exhibit 403, can you point

7    out to the jury where the tree is on this -- on this exhibit?

8    A   Right there.  It's marked with a "T."

9    Q   For tree?

10   A   Yes.

11   Q   Sir, you have -- should have in front of you what has been

12   marked Government Exhibit 302.

13   A   302, yes.

14   Q   Would you please open up that packaging.

15   A   Okay.

16   Q   Would you please take a look at the materials in there.

17   A   See what?

18   Q   What do you see inside?

19   A   Fired bullet.

20   Q   Do you recognize this bullet?

21   A   Yes.

22   Q   What is it?

23   A   This is the fired bullet that I got from the tree at 4348

24   South Hermitage.

25   Q   And how do you know that it's the same bullet?

Presnell - Direct by Babu

1    A   Because it has my evidence -- my inventory number and then
2    my -- my writing on there.
3    Q   And did you follow the same packaging process to package
4    Government Exhibit 302 as you did for Government Exhibit 300?
5    A   Yes.
6    Q   And once you recovered the bullet out of the tree, what
7    did you do with it?
8    A   Put it into the evidence envelope and then put it into a
9    paper bag, and then I locked it into my Chicago Police
10   Department van.
11   Q   And did you keep it under -- in the same process as you
12   did the evidence in Government Exhibit 300?
13   A   Yes.
14   Q   Officer Presnell, if we could turn back to Government
15   Exhibit 403 for a second, would you hit "clear" on there to
16   remove the markings.  You see -- go ahead, do that again.
17   You'll see the word "clear" halfway down.  There you go.
18        Officer Presnell, on your plat, you earlier had
19   mentioned that you had "north" facing the wrong direction; is
20   that right?
21   A   Yes.
22   Q   Which way is north on the plat currently?
23   A   To the right.
24   Q   So where the numbers start, 4325, 4327, that's actually
25   the north side of the map?

1    A   Yes.

2    Q   And on 403, where did you find the casings?

3    A   In the gangway.

4    Q   Is that about here (indicating)?

5    A   Yes.

6    Q   And is that what those numbers depict on there?

7    A   Yes.

8    Q   Going back to Government Exhibit 302, sir, did Government

9    Exhibit 302 look like it had been in the tree for a long time?

10   A   No.

11   Q   And how could you tell that?

12   A   Because it was still shiny.

13   Q   Officer Presnell, I'm now going to have you look at

14   Government Exhibit 539.

15       Officer Presnell, I'm going to have you look at this,

16   and we'll go back to the computer.  Can you see that?

17   A   Yes.

18   Q   Officer Presnell, this is Government Exhibit 5 -- I'm

19   sorry, this is Government Exhibit 539.

20       Do you see this photograph?

21   A   Yes.

22   Q   And what is this a photograph of?

23   A   This is the parkway grass at 4400 and 4402 South

24   Hermitage.

25   Q   And can you show the jury where on the larger map next to

1    you where that is?

2        A  Right here (indicating).

3        Q  And what are you taking a photograph of in this photo?

4        A  I'm taking a photograph kind of getting my bearings of

5    where the street is and the sidewalk and the parkway grass.

6            So I'm taking -- there's blood that's on the electrical

7    grate, the plastic electrical grate that's like in the middle of

8    the photo and showing a picture of the red crime scene tape.

9            MS. BABU:  Can we go back to the computer, the

10   government's computer, please.

11   BY MS. BABU:

12       Q  Officer Presnell, what is this a photograph of?

13       A  Drops of blood that's on the parkway grass and the weeds.

14       Q  And this is in Government Exhibit 517 for the record.

15           Officer Presnell, on the map next to you, could you

16   point out to the jury about where this blood was found.

17       A  Yes.  Right about there (indicating).

18       Q  So almost at the corner?

19       A  Yes.

20       Q  I'm showing you now Government Exhibit 518.

21           What is this a photograph of now, sir?

22       A  Now, this is a closeup of that plastic electrical grate

23   that I was talking about with blood on there.

24       Q  And how did you -- what was the appearance of the blood?

25       A  Wet.

1    Q   And did it appear to be old or new?

2    A   New.

3    Q   And how could you tell?

4    A   Because it was still fresh.  It hadn't dried.  There was

5    no flakes.

6    Q   So it was still wet?

7    A   Yes.

8    Q   And you arrived on the scene at about 5:00 a.m.?

9    A   I did.

10   Q   Sir, I'm showing you Government Exhibit 519.

11       What is this a photograph of?

12   A   This is the street by the curb next to the parkway, and

13   this is blood in the street.

14   Q   And is this at the -- in the earlier photograph, is this

15   at the end of the parked car there?

16   A   Yes.

17   Q   So I'm now showing you Government Exhibit 540.

18       And what is this a photograph of?

19   A   Now I'm taking a photograph of blood that's on the actual

20   sidewalk.  Then showing a reference to the car and the street

21   sign pole.

22   Q   And, sir, is this still near the southwest corner of 44th

23   and Hermitage?

24   A   Yes, and it's going -- it's a little bit south of the --

25   at the corner.

Presnell - Direct by Babu

1   Q   And, Officer Presnell, on Government Exhibit 403, could
2   you point out to the jury where this is?

3   A   Yes.   Right here is where the plastic electrical grate is.

4   Q   And again, north is to the right on the plat, correct?

5   A   Correct.

6   Q   Officer Presnell, I'm now going to show you Government
7   Exhibit 541.

8           What is this a photograph of?

9   A   So now I'm taking an address ID of 4416 South Hermitage.

10  Q   And on the map next to you, could you point out to the
11  jury where this address is?

12  A   Yes.   It's right down here marked 4416.

13  Q   Thank you.   I'm now showing you Government Exhibit 520.

14          And what is this a photograph of, sir?

15  A   Now I'm taking a view from the bottom right is my marker
16  No. 3, and now I'm taking a photo going north from that to 4332
17  South Hermitage.

18  Q   So from -- I'm sorry, so this is a photograph facing
19  north, you said?

20  A   Yes.

21  Q   And so the intersection is where that green sign is at the
22  center of the photograph?

23  A   Yes.   That's 44th Street.

24  Q   If we could go now to Government Exhibit 521.

25          Officer Presnell, what is this a photograph of?

1    A   That's a closeup of my marker No. 3, and that's a fired

2    bullet in the parkway grass at 4416 South Hermitage.

3    Q   And how did you find this bullet?

4    A   Just by looking.  I'm not sure if I had my flashlight, if

5    I needed it, but I saw it because it was pretty shiny.

6    Q   You said it was shiny.  Did it appear to be weathered at

7    all?

8    A   No.

9    Q   Sir, up in front of you, you should have Government

10   Exhibit 301.

11   A   Yes.

12   Q   Can you go ahead and open that, please.

13   A   Okay.

14   Q   Sir, do you recognize Government Exhibit 301?

15   A   Yes.

16   Q   And what is Government Exhibit 301?

17   A   This is my evidence envelope with marker -- where it says

18   3, 4416 South Hermitage parkway grass.  And then like I

19   explained earlier, then it's put into a paper bag, my initials,

20   PP, star number 17122, and then the date and then evidence tape.

21   Q   Sir, is Government Exhibit 301 in the same or

22   substantially the same condition as when you recovered it from

23   the parkway?

24   A   Yes.

25         MS. BABU:  Your Honor, I would like to read Stipulation

1  No. 8 into the record now.

2  THE COURT:  All right.

3  MS. BABU:  "If called to testify in this case, Todd

4  Bille would state that in May 2018, he was employed by the

5  Bureau of Alcohol, Tobacco, Explosives and Firearms as a DNA

6  technical leader.

7  "Mr. Bille's responsibilities included developing and

8  implementing forensic DNA analysis methods and performing

9  serological screening and DNA analysis on items of evidence.

10  "Based on his education, training, experience and

11  protocols, Mr. Bille would be qualified to render an opinion in

12  the area of forensic DNA analysis.

13  "Mr. Bille would testify that he received a bullet

14  assigned Chicago Police Department inventory No. 14163750 from

15  CPD case JB249171 and that that bullet was received in sealed

16  condition.

17  "He would further testify that the bullet was marked as

18  Government 301 in this case and that he conducted DNA analysis

19  on cellular material collected from Government Exhibit 301.

20  "He would test -- he would also testify that he

21  received a DNA swab from Special Agent Kevin Crump.

22  "Mr. Bille would testify that a male DNA profile was

23  found on the cellular material collected from Government Exhibit

24  301, and a single male contributed to the DNA profile.

25  "Mr. Bille would further testify that Special Agent

Presnell - Direct by Babu

1    Crump is a possible contributor of the DNA obtained from the

2    bullet.  Specifically, Mr. Bille would testify that the DNA

3    profile from Government Exhibit 301 is at least 1 trillion times

4    more likely if it originated from Special Agent Crump than if it

5    originated from an unknown individual.

6         "Mr. Bille would testify that, therefore, it is

7    expected that less than one person in one trillion random people

8    would provide equal or greater likelihood ratio.

9         "Mr. Bille would also testify that he received a black

10   White Sox baseball cap from law enforcement and that the

11   baseball cap was received in sealed condition.

12        "He would further testify that the bill of the baseball

13   cap was marked as Government Exhibit 303 in this case and that

14   he conducted DNA analysis on cellular material collected from

15   Government Exhibit 303.

16        "He would also testify that he received a DNA swab from

17   Ernesto Godinez.  Mr. Bille would testify that a mixture of DNA

18   from three individuals was found on the cellular material

19   collected from 303 and that at least one male contributed to the

20   DNA.

21        "Mr. Bille would further testify that Ernesto Godinez

22   is a possible contributor of the DNA obtained from the bill of

23   the baseball cap.  Specifically, Mr. Bille would testify that

24   the DNA profile from Government Exhibit 303 is at least

25   1 trillion times more likely if it originated from Ernesto

1    Godinez and two unknown individuals than if it originated from

2    three unknown individuals.

3            "Mr. Bille would further testify that, therefore, it is

4    expected that less than one person in one trillion random people

5    would provide an equal or greater likelihood ratio.

6            "The DNA analysis methods used in this case are

7    generally accepted in the forensic science community.  The

8    proper controls were run to ensure the instrumentation was

9    functioning properly while in use on this case, and a proper

10   chain of custody was maintained over the evidence at all times."

11   BY MS. BABU:

12      Q   Officer Presnell, going back to May 4th of 2018 --

13           MR. PISSETZKY:  Your Honor, just to point out that part

14   of this stipulation is for evidence that has not been

15   introduced.

16           MS. BABU:  Correct.

17           MR. PISSETZKY:  They talked about a hat and a bottle.

18   It is not in evidence yet.

19           MS. BABU:  It is not in evidence yet, but for

20   efficiency's sake, rather than have the jury hear this twice --

21           THE COURT:  All right, whatever.

22   BY MS. BABU:

23      Q   Officer Presnell, could you remind the jury of what time

24   you arrived on the scene?

25      A   5:00 o'clock in the morning.

1    Q  And how long were you on the scene?

2    A  Approximately four hours.

3    Q  And so you left at about 9:30?

4    A  Yeah, probably about 9:15.

5    Q  And what was the -- was it light out by the time you left?

6    A  Yes.

7          MS. BABU:   The government has no further questions,

8    Your Honor.

9          THE COURT:   Cross-examine.

10                     CROSS-EXAMINATION

11   BY MR. HYMAN:

12   Q  Mr. Presnell, good afternoon.

13   A  Good afternoon.

14   Q  When was the first time that you realized that there was

15   an error -- a couple errors in Government Exhibit 403 which was

16   your plat?

17   A  When my lieutenant brought it to my attention.

18   Q  And when was that?

19   A  Before she approved the report, so it would have been

20   probably after I -- probably the next day or the day after that.

21   Q  And did you correct it?

22   A  I corrected it in my crime scene processing report.

23   Q  But you did not correct it in the plat?

24   A  I did not.

25   Q  So in this direction, this is north, correct?

1    A   Correct, to the right.

2    Q   So instead of N there, we want N this way --

3    A   Correct.

4    Q   -- right?

5         And then you said there was an address of 4439, that's

6    actually 43?

7    A   49.  4349.

8    Q   Okay.  You also talked to the members of the jury about

9    the fact that you go through, you get to the scene, you

10   videotape, you photograph, you collect, and then you prepare

11   your reports and your -- and all of your particular exhibits,

12   right?

13   A   And I take measurements.

14   Q   And you take the measurements, right.

15        Now, in this particular exhibit that you prepared, you

16   have particular markings as to where you found the cartridge

17   casings, right?

18   A   Right.

19   Q   Which is here.

20        And you found, I believe, a fired bullet down in this

21   direction, right?

22   A   Nope, to the left where marker No. 3 is on the sidewalk.

23   Q   I'm sorry, I'm sorry.  And you have -- and you have the

24   marker here for where you found those shell casings?

25   A   Two cartridge casings.

1    Q   Two cartridge, I call them  We should call them cartridge
2    casings.
3          And those you learned were, in fact, from a police
4    officer's own gun, true?
5    A   Not true.  I did not know that.
6    Q   So you just found -- someone was standing there and
7    protecting these casings.  You came by and you put your numbers
8    down?
9          MS. BABU:  Objection, Your Honor, facts not in
10   evidence.
11         THE COURT:  What was the objection?
12         MR. HYMAN:  You know what, I'll rephrase it.
13   BY MR. HYMAN:
14   Q   The jury saw that you had numbers there, right?
15   A   Right.
16   Q   And those numbers were placed there by you, and you know
17   that because it doesn't have the logo of the City of Chicago or
18   the Police Department on it, right?
19   A   Right.
20   Q   So before you put those numbers there, when you got to the
21   scene, were there people protecting those casings that were on
22   the ground?
23   A   Yes.
24   Q   Did you know who actually found those casings?
25   A   No.

Presnell - Cross by Hyman

1    Q   Did anyone tell you that they found those casings?

2

3    A   No.

4    Q   You then told the members of the jury that you -- and you

5    showed us the two -- there was a bullet that was found inside a

6    fence, right?

7    A   Yes.

8    Q   And then there was a bullet in the side of a house,

9    correct?

10   A   In the siding, yes.

11   Q   Within this chart, remember your plat, do you have a

12   marking or a notation of where those bullets were found?

13   A   No.

14   Q   Did you then in any way -- is there a marking, by the way.

15   for the tree, the bullet in the tree?

16   A   Just that there's a "T" there for the tree instead of --

17   in front of 4348.

18   Q   You know and I must apologize.  I thought -- did both of

19   those bullets hit the fence?  The one went through the fence and

20   into the house, and one just went into the fence which you

21   pulled out?

22             MS. BABU:  Objection, Your Honor, compound.

23             THE COURT:  No.  He can answer the question.

24             THE WITNESS:  Yes.  There was two bullet holes in the

25   fence, and then one bullet was recovered in the fence on the

Presnell - Cross by Hyman

1  other side and one had went out on to Hermitage.

2  BY MR. HYMAN:

3  Q  So they were actually -- one bullet actually went from the

4  angle that was fired from through the corner of the fence,

5  right, and into the side of the house, true?

6           MS. BABU:  Objection, Your Honor, foundation.

7           THE COURT:  What?  What's the objection?

8           MR. HYMAN:  You know what, I think I'll make this easy

9  for the government.  Why don't we just start with the

10  photographs.  We're going to do this -- and if you can switch

11  back over for us.

12           This we will call Godinez Photo 1.

13           THE WITNESS:  Yes.

14  BY MR. HYMAN:

15  Q  And you took this photo?

16  A  I did.

17  Q  And you took it from the position where you found the

18  cartridge casings on 44th Street, or did you take it from a

19  position that someone told you that's where the officer fired?

20  A  No.  I took it from where the cartridge cases were or

21  found.

22  Q  And those cartridge casings were about six -- eight to ten

23  feet from the corner?

24  A  I would say a little bit more.  Maybe 12, 12 feet.

25  Q  So if we use this map -- and this is the circle here,

1   correct?

2      A   Correct.

3      Q   And the casings were not at the corner, they were about

4   six to eight feet from the corner?

5      A   Yes, exactly probably right about where your pen is, yeah.

6      Q   And from that point, you took a photo, that exhibit

7   looking in the direction that those casings were found, true?

8      A   True.

9      Q   And now that we've established that, I want to talk to you

10  a little bit, if we can, because you told us a lot today.

11         You had a lot of information.  So I want to give some

12  headings so we can sort of break it down, if it's okay with you.

13     A   Sure.

14     Q   I want to first talk about scene control and management.

15         When you get to the scene of, as you have said, in your

16  role for murders, police shootings, significant felony cases,

17  there's always generally -- by the time you get there, there's

18  already a detective on the scene, true?

19     A   True.

20     Q   In this case, there was a detective on the scene?

21     A   Yes.

22     Q   His name was Neil Evans, right?

23     A   It was, yes.

24     Q   Do you have your actual report in front of you?

25     A   I do not.

Presnell - Cross by Hyman

1    MR. HYMAN:  This is going to be marked, Your Honor, as

2  Godinez Exhibit 2, the police report.  Why don't you just hang

3  on to this --

4    THE WITNESS:  Okay.

5    MR. HYMAN:  -- so we can refer to it.

6  BY MR. HYMAN:

7    Q  The officers on the scene are telling you -- when you get

8  there, they tell you what happened, right?

9    A  As to what they know at that time.

10   Q  And what you learned on the scene when you got there about

11  5:00 a.m. was this shooting happened about two hours earlier,

12  right?

13   A  Correct.

14   Q  And the positioning of what you took in Godinez Exhibit 1

15  is based upon the information that that firing came from that

16  position, true?

17   A  Not true.

18   Q  This was made by your own determination?

19   A  Yes.

20   Q  So you took a look at where -- where the bullets were, and

21  you kind of gave an idea based upon your training and experience

22  of where that trajectory would go?

23   A  Correct.

24   Q  So if you took a look at this, it looks like it's a

25  straight line between where you're -- where you're standing and

1  where the edge of the -- edge of that fence is, true?

2

3      A   True.

4      Q   And it's part of your training, you told us earlier,

5  you've gone to classes and school and you continue to train,

6  right?  You have update bulletins and things?

7      A   Yes.

8      Q   And I'm sure you've also heard of this very intense

9  scientific book called "Everything I Know I Learned When I Was

10 Kindergarten"?  Did you ever hear of that one?

11     A   No.

12     Q   Well, that one talks about the shortest distance between

13 two points is a straight line, right?  That's what you know?

14     A   Yes.

15     Q   You've heard that expression, haven't you?

16          So as you stood here, the distance -- the straight

17 distance was between you and the corner of that -- of that

18 fence, right, a straight line right to it?

19     A   Yes.

20     Q   Now, after you took that shot, you took another shot.

21 I'll show you Godinez Exhibit 3.

22          Is that from the same position?

23     A   No, I'm just taking different positions.

24     Q   It appears like you're moving a little further to the west

25 closer to -- closer to the corner in this photograph, are you?

1

2     A   Correct.

3     Q   And are you trying -- at that point have you found or has

4     someone found for you the bullet in the side of 4344 South

5     Hermitage?

6     A   I do not know.  I don't remember.

7     Q   And at that point, you have then examined the -- then you

8     go and leave this position and you go and you examine the fence,

9     right?

10    A   Not sure if I examined the fence before or after.

11    Q   But you then take photographs of the fence?

12    A   Yes.

13    Q   Can I have the next exhibit -- oh, by the way, these --

14    that's okay.

15          So from this point, you're getting closer to the fence,

16    true?

17    A   True.

18    Q   In Exhibit 5, Godinez Exhibit 5, we have the closeup,

19    right?

20    A   There's another closer one, but yes, it's pretty close.

21    Q   You're basically walking across the street in that

22    straight line to that fence?

23    A   Correct.

24    Q   And then the next thing that you do is you go and you're

25    looking at the house.  It is a little bit closer, right, the

1   exhibit?  But that was the entrance of that one bullet?

2       A   Yes.

3       Q   Could you determine at that point, Mr. Presnell, that that

4   was the bullet that ended up in the side of the house?

5       A   No.

6       Q   Could you determine whether or not that was the bullet

7   that was in the back of the -- of the fence?

8       A   No.

9       Q   At what point did you determine that there was a second

10  bullet that entered the fence?

11      A   Just by examining the whole fence, inside and outside.

12      Q   And in the group of photographs that you took, where was

13  the second entrance -- the second bullet entrance in the fence?

14      A   Are you referring to this one as the first one?

15      Q   Yes, if we call that the first one.

16      A   Okay.  If you're talking that this one's the first one and

17  you're looking at that fence, it's to the right, and I believe a

18  little bit lower.

19      Q   And there's a photograph of that as well?

20      A   Yes.

21      Q   And that's the -- and that's the bullet that you dug out

22  of the -- of the back of the fence, right?

23      A   Yes.

24      Q   So you have the corner bullet, you have the corner

25  entrance, and then as you move down on the fence -- can you put

1    the fence back up.

2        A   East.

3        Q   To the east, as you're going east.  The one before,

4    please, one before, before.

5        A   Actually that's a good one.

6        Q   Oh, that's a good one, okay.

7        A   So in this -- do you want me to mark it?

8        Q   Yes.

9        A   So right here, I'll do below it because you can see where

10   it came through where it splintered.  So a little above where I

11   just marked.

12       Q   Okay.  So this -- this is on the -- on the -- when we look

13   at this photograph, the fence portion that's straight ahead,

14   that's the Hermitage side?

15       A   Correct.

16       Q   And the one that you just put the little dot, that's the

17   44th Street side?

18       A   Correct.

19       Q   And then the other bullet is -- you can't see it, but it's

20   beyond -- it would be on the other side of where that post is?

21       A   Where the bullet came through?

22       Q   Yeah.

23       A   I mean, where I recovered it from the wood?

24       Q   No, no, no, before it went through and ended up at the --

25   in the house.

1          MS. BABU:  Objection, Your Honor.  Assumes facts not in
2     evidence.
3          THE COURT:  You can answer.  I don't know if he
4     understands the question.
5          THE WITNESS:  Yeah, it would be right there.
6          MR. HYMAN:  Yeah, it would be right there.  It went
7     right through the house.
8     BY MR. HYMAN:
9       Q  So if we go to Godinez 4, that was the front of the fence?
10      A  44th Street side, yes.
11      Q  The 44th Street side, okay.
12         At some point, you walk down through -- down Hermitage
13    during your three or four hours there and get to 4344 South
14    Hermitage, right?
15      A  Right.
16      Q  4344 South Hermitage.
17         All right.  Now, if you wouldn't mind clearing that
18    like you did before.
19      A  (Complying.)
20      Q  You took a picture of the front because that was an ID for
21    you?
22      A  Address ID.
23      Q  Address ID.  And then from there, you went to the side of
24    the building -- there it is -- and then to the side at 4344, and
25    you took sort of a distance shot of where you found that hole,

1  Exhibit -- I think we can do this is Exhibit 7, and then closer

2  would be Exhibit 8, right?

3      A  Right.

4      Q  Now, if you looked from that position of that 4344 North

5  -- South Hermitage, you also took photographs looking back

6  towards the intersection of 44th and Hermitage, didn't you?

7      A  I did.

8      Q  And that's the image that you have going -- looking from

9  9, Godinez 9 from inside the gate area of 4344, and you're just

10  looking again that straight line view from where that corner of

11  the fence is, true?

12      A  True.

13      Q  And that is, again, our straight -- the shortest distance

14  between two points is that straight line, right?

15      A  Right.

16      Q  Now, when you get to that -- when you got to that scene --

17  I'm going to just leave it for a little while and go back to our

18  scene of control and management because I kind of got off my

19  direction here.  Do you ever say, "I'm in charge, move away"?

20         Do you have the power, as the forensic investigator on

21  the scene, to go in and tell everybody there's 40 -- 30 to 40

22  people here.  You don't know whether it's been contam -- the

23  scene's been contaminated or not, true?

24      A  Could you say the question again?

25      Q  Sure.  Do you take control of that scene as the forensic

1  investigator at that point?  In other words, you look confused,

2  but I'll rephrase it for you.

3       Someone -- you're the only forensic investigator on the

4  scene that morning, right?

5     A  Right.

6     Q  When you get there, you've told us there are 30 to 40

7  policemen standing around, correct?

8     A  Correct.

9     Q  It's two hours after the shooting, right?

10    A  Right.

11    Q  Do you go in and say, "Okay, I have to take control of

12  this scene, I have to preserve the evidence that is out there?"

13  And you tell people whether they can -- where they can stand or

14  move around?

15    A  No, because usually when I have my video or my camera,

16  they see that and then they start to move except for officers

17  that are like protecting cartridge casings, fired bullets or

18  evidence.  They usually stay.

19    Q  And there were a lot of policemen that were standing --

20  even in the area where you were taking photographs, they were

21  standing around, true?

22    A  True.

23    Q  Have you been to scenes, Mr. Presnell, that have been

24  contaminated?

25    A  I don't know.

1    Q  Well, in other words, have you been to a scene, in your

2  experience since 2005 as a forensic investigator, in which

3  someone has picked something up that they should not have picked

4  up?

5    A  Yes.

6    Q  It happens, doesn't it?

7    A  Yes.

8    Q  To err is human, true?

9    A  I guess.

10    Q  Okay.  And in this particular case, the scene that you

11  were called out for, did you know if whether or not anybody

12  picked up anything before you got there?

13    A  No.

14    Q  You didn't know that, did you?

15    A  I did not.

16    Q  When you look at the evidence, again getting to the scene

17  the control up the management, when you looked at those

18  cartridge casings and when you looked at those bullets, do you

19  make a determination at that time as to whether or not this

20  evidence is going to be suitable for fingerprint impressions,

21  DNA sampling, any of those types of comparisons?

22    A  No.

23    Q  When you were there, did you speak to an Officer Spratte,

24  a Chicago policeman by the name of Spratte?

25    A  No.

1    Q  Did you know that it was Officer Spratte who fired those

2  two bullets --

3           MS. BABU:  Objection, Your Honor.

4           MR. HYMAN:  -- fired two rounds from -- on 44th Street?

5           THE WITNESS: I'm not sure.

6  BY MR. HYMAN:

7    Q  Anybody tell you that?

8    A  I'm not sure.

9    Q  It sounds as if your specific job is pretty meticulous.

10  You have to be pretty meticulous about what you do, true?

11    A  True.

12    Q  I want to talk to you about the information you received

13  that there were case -- cartridge casings found in a gangway,

14  okay?  Let's talk about that.

15           Who found those cartridge casings?

16    A  I do not know.

17    Q  You have no idea?

18    A  No idea.

19    Q  All you know is when you get there, there are some

20  markings that some -- that are provided by the Chicago Police

21  Department's patrol division, the beat unit, right?

22    A  Correct.

23    Q  You don't know whether that -- some beat officer found or

24  one of the ATF officers found it.  All you know is that it's

25  there, true?

1      A   Yes.

2      Q   All right.  At that point you don't know how long those

3   casings have been there in terms of hours or days, right?

4      A   I know that they weren't weathered, but I don't know

5   exactly how long they --

6      Q   So when you say they weren't weathered, that means they

7   didn't have any rust on them?

8      A   Dirt, rust.

9      Q   Right.  But if they were there a couple days, it could be

10  there without any rust if it's a good, clean day, the weather is

11  clear, no rain, right?

12     A   Yes.

13     Q   So again, you can't tell just when you -- when you walk

14  upon that scene how long those have been there, true?  Other

15  than what you have told us, if they've been there -- if it's

16  sitting there -- if a case and a cartridge case is sitting there

17  and it looks like it's been rusted, you know from your own

18  experience, it's been there for probably years, true?

19     A   True.

20     Q   When you picked up -- and I'm going to talk again about

21  the cartridge casings in the gangway, okay?

22     A   Okay.

23     Q   If we can go to those photos.  This -- this photo taken by

24  you is looking towards the east, right?

25     A   Correct.

Presnell - Cross by Hyman

1    Q   And you found, did you not, that there was -- right on the
2    top of that photo, there's like two steps -- there's two steps
3    over there.   Yeah, or one step.

4          You got to step up to get to the sidewalk?
5    A   Yes.

6    Q   And actually in the City of Chicago, it's sort of a common
7    thing, isn't it, in the old neighborhoods like the Back of the
8    Yards, where you find these old sort of lower-than-street-level
9    gangways?

10   A   Yes.

11   Q   But in order to do that, you got to step up on that --
12   step up on the step in order to get to the sidewalk, right?

13   A   Yes, sir.

14   Q   Now, when you got there besides you have the first -- the
15   numbers from the -- from whoever put it on, and then you placed
16   your numbers there to protect the bullet or just to complete
17   your -- your activities?

18   A   To put my numbers by the evidence.

19   Q   So that way, you have that for your own file --

20   A   Correct.

21   Q   -- and your report?

22         Okay.   And then if we can go to the next Exhibit 11 or
23   4, 5, 6, these are all bullets that you found in the -- either
24   in the dirt --

25         MS. BABU:   Your Honor, I believe Mr. Hyman said bullet.

1  These are casings.

2  BY MR. HYMAN:

3  Q  Casings, I'm sorry.  Cartridge casings that you found

4  either on the dirt or in the sidewalk, true?

5  A  Yes.

6  Q  Then from this gangway, you were asked to take a picture

7  looking southbound on Hermitage; were you not?

8  A  No.

9  Q  You just -- you walked up the step and you just took a

10  picture from there down?

11  A  Yes, I did.

12  Q  Can we get to that picture.

13      okay.  there we go.

14      So we're going to take a look at what's marked as

15  Godinez Exhibit No. 12, I believe.  This is a picture that you

16  took that morning as you stepped up on to the -- from this --

17  from that gangway, can you tell?

18  A  I don't believe this is the shot from the -- standing up

19  from the sidewalk.

20  Q  Where is it from?

21  A  I don't know.  It was just a photo that I had taken.  I

22  see on the one building where all the officers are, it says

23  4343.

24  Q  So that's across the street?

25  A  Yeah.

1    Q   Well, let me -- let me show you then Exhibit 14 -- Exhibit

2    13, Godinez 13.  I'll put this back up on the ELMO.

3        You took this, right?

4    A   Yes.

5    Q   And then you took this from the gangway as you stepped out

6    of the gangway at 4332 and took a shot of it straight down,

7    right?  Does it appear to you to be there?

8    A   I'm not sure.  I'd have to see.

9    Q   Okay.  Let me show you Exhibit 14.  That's the gangway --

10   A   Yes.

11   Q   -- right?

12       It has the hedge right here?

13   A   Yes.

14   Q   And it has a fence just like this, right?

15   A   Yes.

16   Q   So it appears to you, does it not, that you have stepped

17   out and taken that photograph all the way down, true?

18   A   True.

19   Q   And this will be No. 14, Godinez 14.  And this is that,

20   again, standing from that position looking straight down the

21   street, right?

22   A   Well, down the street is to the right.

23   Q   Well, down the street, I talked about -- you're standing

24   just outside the gangway, and you're taking a shot that's

25   looking this way, right?  Right down the sidewalk?

Presnell - Cross by Hyman

1    A   Yes.

2    Q   All right.  The same as you're doing here, correct?

3    A   Correct.

4    Q   This place where the bullet was found in the side of the

5    building was up here; was it not?

6    A   It was down where those -- where --

7    Q   That's where the officers were standing?

8    A   Yes.

9    Q   That's at least a quarter of a block down, would you

10   agree?

11   A   No.

12   Q   Half a block?

13   A   It was closer than that.

14   Q   Now, when you then went to the gangway, going back to that

15   gangway with the cartridge casings, when you went back there,

16   you told us that you put your markings on it, you photographed

17   them and then you collect them by carefully putting on these

18   latex gloves and putting them in those envelopes, right?

19   A   Right.

20   Q   The reason you do that is you do not want to disturb

21   anything that could possibly show there was a fingerprint on

22   that cartridge casing, true?

23   A   Correct.

24   Q   Or if there was some sort of DNA, right?

25   A   Correct.

Presnell - Cross by Hyman

1    Q  Or if there was anything that could be used to determine

2  who was the offender in this case, right?

3    A  Correct.

4    Q  Because you were told, were you not, that that's where the

5  offender -- the officers thought that's where the offender fired

6  the shots from, true?

7    A  Not true.

8    Q  You didn't know?

9    A  No.

10    Q  Did you know anything about why you were collecting five

11  cartridge casings in a gangway?

12    A  No, just that they were found there.  So I photographed

13  them, collected them, stuff like that.  But no, I did not --

14    Q  It didn't matter to you where that thing was fired, where

15  the bullets -- where the gun was fired from.  All you knew was

16  that those casings were there and you had to collect them?

17    A  Correct.

18    Q  The first time you went through that -- that gangway and

19  collected those casings and photographed those cartridge cases,

20  did you, when you began to remove -- when you had to lift up

21  those casings, did you notice that fifth casing?

22    A  No.

23    Q  Where was it -- where was it hidden?

24    A  It was like under a leaf.  But I wasn't looking at that

25  point for it.  I was just there to collect it and then --

1  because I know that I'm going to do a further search of that.

2  So I'm not looking for that evidence, that last one.

3  Q  So when you got there, all you knew that there were just

4  four casings?

5  A  Correct.

6  Q  Did -- when you went back, was that casing at or near the

7  place that you had originally found the first four?

8  A  Yes, it was close.

9  Q  Very close?

10  A  I mean, it's a small gangway and the side there.  It was

11  close.

12  Q  It was -- it was just underneath a leaf?

13  A  Yeah.

14  Q  And it was right above or below where the other casing

15  was, true?

16  A  It was closer to the front of the other cartridge casings.

17  Q  When you collected those casings, the first four, did you

18  walk out of the gangway?  Did you leave the gangway?

19  A  Yes.

20  Q  Do you know if -- you don't know who went back in that

21  gangway, do you?

22  A  No.

23  Q  That gangway didn't have a red tape in it, across it?

24  A  No.

25  Q  That gangway didn't have the yellow tape across it, did

1  it?

2  A  No, not that I remember.

3  Q  And you didn't put it there.  You didn't put the red tape

4  or the yellow tape there, did you?

5  A  No.

6  MR. HYMAN:  Could you switch it back over to the table.

7  So let's look at 16, Godinez Exhibit 16.

8  BY MR. HYMAN:

9  Q  There is -- that's where you found that fifth casing,

10  right?

11  A  Correct.

12  Q  And you're standing at the top of the sidewalk there?

13  A  I don't know if I was on the top.

14  Q  Or on the step?

15  A  The step.

16  Q  Okay.  Can you go to the next one, please.

17  And then you go ahead and you mark that, right?

18  A  Correct.

19  Q  You put your little marker there, true?

20  A  Yes.

21  Q  All right.  Now, that -- where you found that casing is

22  actually in the same -- it is in the spot where the same white

23  piece of trash is, true?

24  A  Yes.

25  Q  That casing looked to you as if it was shiny?

Presnell - Cross by Hyman

1   A  Yes.

2   Q  It had not -- it wasn't there for very long, was it?

3   A  I would say not.

4   Q  Again, you did the same thing with that casing,

5   Mr. Presnell.  You picked it up, put it in the envelope, and you

6   submitted it to the laboratory, right?

7   A  Yes.

8   Q  Did you take measurements from that point at 4332 down to

9   the corner where you found the blood in the -- on the parkway?

10  A  I took a measurement to the fire -- what I marked as

11  fireplug, fire hydrant.

12  Q  The fireplug, right.

13  A  Which was close to the blood, but I did not take one --

14  can I look at my report?

15  Q  Sure.

16  A  I don't have my -- I don't have the plat.

17  Q  Let me give you the plat.

18  A  And your question was again?

19  Q  Did you measure the distance between the fireplug and

20  4332?

21  A  Yes.

22  Q  How far was that?

23  A  322.0 feet.

24

25  Q  And did you measure the distance between the fence and the

1  house at 4342?  In other words, if you took that straight line

2  and you went from -- from the fence to 4344 -- I'm sorry --

3  4344, do you have any measurements on that?

4     A  No.

5     Q  Do you have any measurements from where you found the

6  casing which you marked 1,2, 4344, the straight -- straight

7  across?

8     A  I have one from marker 1 -- I'm sorry, what was the

9  question again?

10     Q  Did you -- is there a calculation of distance between

11  marker 1 to 4344?

12     A  No.

13         MR. HYMAN:  Your Honor, may I have just a moment?

14         THE COURT:  All right.

15         (Counsel conferring.)

16         MR. HYMAN:

17

18     Q  Make sure you -- Mr. Presnell, another photograph.  We're

19  going to mark this as Exhibit 17 -- I lost count.  18.

20         This is the back of the house, of that abandoned house,

21  right?

22     A  4432, yes.

23     Q  You took that picture?

24     A  Yes.

25     Q  All right.  And it -- and it says on the top "trap house"?

1

2    A   Yes.

3    Q   In your experience, you were in the -- in a tac unit.

4        What's a trap house?

5    A   I don't know.

6    Q   You haven't been around that in that area?

7    A   No.

8    Q   You haven't done that type of investigation?

9    A   No.

10   Q   Did anybody ask you to take a picture of that?

11   A   No.  I'm showing the back of the house and then a

12   reference to the gangway.  No, nobody asked me to.

13   Q   When you went and looked at -- took a picture of the back

14   of the house, that screen or that area of the door, that was

15   open; was it not?

16   A   Yes.

17   Q   It was all broken?

18   A   Yes.  When I took this photo, it was --

19   Q   It looked like people were -- someone was either throwing

20   stuff there?  People could go in and out of there very easily,

21   true?

22   A   It was open, yes.

23       MR. HYMAN:  Can you put up or switch over to their 510

24   and 511.  Could you switch over to there.

25   BY MR. HYMAN:

Presnell - Cross by Hyman

1    Q  Government Exhibit 510's already been admitted.  Can you
2    mark, Mr. Presnell, where you found that, that fifth cartridge?
3    A  Right there (indicating).
4    Q  So it would have been right above, it looks like a white
5    piece of paper, true?
6    A  Yes.
7    Q  So right to your -- oops, we lost it.  That's good.  And
8    you can mark where that is.
9    A  Where the white piece of paper is?
10   Q  Yeah, or where the -- where you found the bullet
11   approximately.
12   A  (Indicating).
13   Q  Right in there.  It was just underneath a leaf, right?
14   A  Yeah.  As I'm searching, I'm moving.  With my feet, I'm
15   moving leaves and stuff like that.
16   Q  And -- but that was -- that was after you found these
17   other ones, after you had left that spot, true?
18   A  True.
19   Q  And in that comparison photograph, you had seen earlier
20   that is exactly where you had marked that -- marked that little
21   circle where you found the -- found the casing after you came
22   back, right?
23   A  Yes.
24   Q  So it was before -- so it was sort of a "before" shot when
25   you found the four, and when you came back, there was a fifth

1    little casing right there?

2        A   Correct.

3            MR. HYMAN:   Your Honor, I have nothing further right

4    now.

5            THE COURT:   Anything further from this witness?

6            MS. BABU:   Yes, Your Honor, just a few questions.

7            THE COURT:   Go ahead.

8                        REDIRECT EXAMINATION

9    BY MS. BABU:

10       Q   Let me show you again Government Exhibit 403.   Mr. Hyman

11   asked you a few questions about Government Exhibit 403.   Thank

12   you for clearing that.

13           On Government Exhibit 403, could you point out to the

14   jury where the casing that you found at marker No. 1 is?

15       A   Right there (Indicating).

16       Q   And those little boxes next to the point you just made,

17   what are those, or what do those designate?

18       A   Vehicles that were parked on the street.

19       Q   So casing number -- so marker No. 1 was found towards the

20   back of the second parked car on that corner?

21       A   Marker 1 was on the sidewalk.   Marker 2 was in the street

22   by the curb.

23       Q   So in between there?

24       A   Yes.

25       Q   Thank you.   Sir, did you make a determination as to where

1  the bullet in the siding of the house came from?

2     A  No.

3     Q  And could you make such a determination?

4     A  No.

5     Q  And finally, Officer Presnell, when you recovered the five

6  casings that were in the gangway between 4336 and 4332, did you

7  then do a further search of that gangway?

8     A  I did.

9     Q  And did you find any other cartridge cases in that

10 gangway?

11    A  No.

12          THE COURT:  You can step down.  You're excused.  We'll

13 take a 15-minute recess.

14          COURT SECURITY OFFICER:  All rise.

15    (Witness excused.)

16    (Recess at 3:26 p.m.)

17    (In open court in the hearing of the jury.)

18          THE COURT:  Please be seated, sir.  Would you raise

19 your right hand.

20    (Witness duly sworn and takes the stand.)

21          THE COURT:  Please be seated.  You may question the

22 witness.

23          MS. BABU:  Your Honor, before we begin, can we go back

24 to the government's computer?

25          THE COURT:  Pardon?

1    MS. BABU:  Can we go back to the government's computer?

2    THE COURT:  All right.

3    MR. EICHENSEER:  Good afternoon, sir.  Could you please

4    state and spell your name for the record.

5    THE REPORTER:  Wait while I change the computer.

6    THE WITNESS:  My name is Nicholas Ryan Brown,

7    N-I-C-H-O-L-A-S  R-Y-A-N, last name Brown, B-R-O-W-N.

8    NICHOLAS RYAN BROWN, GOVERNMENT WITNESS, SWORN

9    DIRECT EXAMINATION

10   BY MR. EICHENSEER:

11   Q   Where do you work?

12   A   Bureau of Alcohol, Tobacco and Firearms.

13   Q   What do you do for the ATF?

14   A   I'm an intelligence research specialist for the ATF.

15   Q   How long have you been an intelligence research specialist

16   with ATF?

17   A   I've had that position for two and a half years.  Prior to

18   that, I was an investigative analyst for another two years.  So

19   total four and a half years of analytical work at ATF.

20   Q   Did you do any analytic intelligence work before joining

21   the ATF?

22   A   Yes, sir.  I was in the military, in the U.S. Army,

23   military intelligence.  I did targeted SIGINT, signals

24   intelligence collection for four years.

25   Q   Were you deployed at all in the Army?

Brown - Direct by Eichenseer

1    A   Yes, sir.  I was in Korea.  I worked for the United

2  Nations doing security battalion in the Korean Demilitarized

3  Zone as well as I deployed to northern Iraq.

4    Q   Okay.  And what's your education past high school?

5    A   I have a bachelor's degree in history with a Middle East

6  emphasis.  And presently right now I am a graduate student at

7  Georgetown's program of applied intelligence with a focus -- I'm

8  focusing on cyber intelligence right now.

9    Q   And what do you do day-to-day as an intelligence research

10  specialist?

11    A   My day-to-day activities comprise of investigative case

12  support for two ATF enforcement groups comprising of federal

13  agents as well as task force officers.

14    Q   Okay.  And what kind of intelligence do you perform in

15  your work?

16    A   So a lot of what I do is computer-focused.  I do a lot of

17  call detail records analysis, social media analysis, basically

18  anything that has a computer nexus.

19    Q   Is it true you analyze phone records?

20    A   Yes, sir.

21    Q   You also analyze social media records?

22    A   Yes, sir.

23    Q   And where do those records come from?

24    A   Those come from telecommunications companies, cell phone

25  providers, social media, Facebook, Snapchat, Twitter.

Brown - Direct by Eichenseer

1    Q   So those aren't your records; those are from the
2  companies?

3    A   Correct.

4    Q   And how are those records -- how do those records come
5  into your possession?

6    A   Via search warrant process.  We serve -- I serve a search
7  warrant on the company, and then they produce a data production
8  in response.

9    Q   And that warrant has -- you have a Court order for that
10  warrant, correct?

11    A   Yes, sir.

12    Q   Can you give an example of some of the social media
13  companies whose records that you typically review?

14    A   So I've reviewed Facebook, Snapchat, Instagram, Twitter.
15  Pretty much all of the major social media companies, the data
16  productions I've reviewed.

17    Q   Okay.  What about phone records?  What phone companies'
18  records do you typically review?

19    A   All of the major phone companies.  Sprint, T-Mobile,
20  Verizon, AT&T, U.S. Cellular.

21    Q   Okay.  When you get data from the social media companies,
22  what kind of information comes in that data?

23    A   So typically all of the social media platforms will save
24  everything that an account user does.  So there's going to be IP
25  logs, content, text messages.  Sometimes there's a geographic

Brown - Direct by Eichenseer

1  location, latitude and longitude, videos and photos.

2      Q   Okay.  Geographic location, latitude/longitude, can you

3  explain to the jury exactly what that means.

4      A   So a lot of social media providers will track the account

5  user's location.  A lot of that is done via to provide targeted

6  ads to the account user.

7          So basically, for example, if you went to, like, a Sox

8  game, you're going to get Sox-related content versus if you went

9  to a Cubs game, you'll get a Cubs-related content.

10     Q   Okay.  So it's a way that social media companies keep

11 track of approximately where the account user is?

12     A   Correct.

13     Q   And what types of social media companies provide the

14 latitude/longitude data with the data you reviewed?

15     A   Snapchat, Facebook, Twitter.  There's usually somewhat of

16 a dataset on that, with those production records.

17     Q   Can you explain to the jury what Snapchat is?

18     A   Snapchat is a multimedia messaging app.  It's used on a

19 phone.  You can send pictures.  You can send videos.  You can do

20 instant messages.  It's another kind of ubiquitous social media

21 app like the others.

22     Q   Okay.  Have you reviewed Snapchat -- Snapchat records

23 before?

24     A   Yes, sir.

25     Q   About how many records of Snapchat account users have you

1   reviewed?

2       A   Probably 75.

3       Q   Okay.   And do your Snapchat customer records have that

4   latitude/longitude data?

5       A   Typically, yes.

6       Q   And what format is that data when it comes to you and you

7   review it?

8       A   So it is in a -- there's an account name, and then there

9   is a time and a date as well as a latitude and a longitude.

10  It's in a spreadsheet.

11      Q   And the account name, is that the user of the account?

12  That's their specific user ID?

13      A   Yes, sir.

14      Q   Were you asked to review Snapchat records in this case?

15      A   Yes, sir.

16      Q   How many Snapchat accounts were you asked to review?

17      A   Four separate accounts, sir.

18      Q   What accounts were those?

19      A   With Snapchat, you're going to get stories.   You're going

20  to get snaps.   You're going to get the geographic locations.

21  You're going to get the IP logs and you're going to get the

22  subscriber of the account going back to when it was first

23  produced or created.

24      Q   What four specific accounts did you review for this case?

25      A   E Bird WDST, Doe John 45, Vicky 730 and Destiny 21.

1    Q   In front of you, Mr. Brown, marked for identification are

2   a couple CDs.   Do you see those?

3    A   Yes, sir.

4    Q   They are marked as Government Exhibit 304, 305, 306 and

5   307.   Do you see those?

6    A   Yes, sir.

7    Q   Do you recognize them?

8    A   I do, sir.

9    Q   How do you recognize them?

10    A   My initials are on them, sir.

11    Q   Okay.   What's on those exhibits?

12    A   Those are the data productions I received from Snapchat.

13    Q   And is it one CD per each of the accounts you reviewed?

14    A   Yes, sir.

15    Q   In other words, the E Bird Wood Street account is on one

16   CD?

17    A   Yes, sir.

18        MR. EICHENSEER:   At this time, Your Honor, I'd like to

19   read Stipulation No. 9.

20        THE COURT:   You may.

21        MR. EICHENSEER:   "Government Exhibit 304 is a true and

22   accurate copy of the records maintained by Snapchat for the

23   account of E Bird Wood Street, E-B-I-R-D-W-D-S-T.

24        "Government Exhibit 305 is a true and accurate copy of

25   the records maintained by Snapchat for the account of

Brown - Direct by Eichenseer

1   D-O-E-J-O-H-N 45.

2          "Government Exhibit 306 is a true and accurate copy of

3   the records maintained by Snapchat for the account of V-I-C-K-Y

4   0730.

5          "And Government Exhibit 307 is a true and accurate copy

6   of the records maintained by Snapchat for the account of D-E-S

7   underscore T-I-N-Y 21.  These records were made at or near the

8   time of the event recorded by a person with knowledge or

9   information transmitted by a person with knowledge.

10          "These records were kept in the ordinary course of

11   business activity, and it was the regular practice of that

12   business activity to make the record."

13   BY MR. EICHENSEER:

14     Q  So back to those four exhibits, Mr. Brown.  How much data

15   is on those four exhibits?

16     A  Each disc comprises several, several gigabytes of

17   information.

18     Q  What does a gigabyte mean in terms of columns on a

19   spreadsheet?

20     A  Hundreds, if not thousands.

21     Q  Did you review those records before you testified today?

22     A  Yes, sir.

23     Q  And is there latitude and longitude data on those records?

24     A  Yes, sir.

25     Q  And you said that comes to you in a spreadsheet, correct?

Brown - Direct by Eichenseer

1    A  Yes, sir.

2    Q  And so is it -- is it actual latitude and longitude

3  coordinate?

4    A  It is an actual latitude and longitude coordinate, yes,

5  sir.

6    Q  Okay.  How many decimal places does that coordinate go to?

7    A  It's up to the third decimal place, so the thousandth

8  decimal place.

9    Q  And what does that mean?

10    A  That typically means that in decimal notation to the

11  thousandth decimal place, that grid coordinate is accurate to an

12  approximate 100 meters.

13    Q  So it's not -- it's not like a pinpoint grid --

14    A  No.

15    Q  -- it's a third decimal place is zoomed out a little bit?

16    A  Yes, sir.

17    Q  Okay.  Did you prepare summaries of those records,

18  Mr. Brown?

19    A  I did, yes, sir.

20    Q  Just generally can you explain to the jury what types of

21  summaries you prepared?

22    A  So I provided some stills as well as sort of animation.

23    Q  Okay.  And what's on those stills?

24    A  The still is the dots received from the accounts I

25  reviewed as verbatim from Snapchat, and then I drew a concentric

Brown - Direct by Eichenseer

1  circle around each dot to further contextualize the 100-meter

2  degree of accuracy.

3     Q  So are those -- are those stills, are those maps?

4     A  Yes, sir.

5     Q  And what did you plot on those maps?

6     A  I'm sorry?

7     Q  What did you plot on those maps?

8     A  I plotted the points received from the Snapchat account

9  from the Geofile that was in there.

10    Q  So you plotted the latitude, longitude --

11    A  Correct.

12    Q  -- position from the Snapchat account?

13       So in front of you is four Exhibits marked Government

14  Exhibit 603, 606, 608 -- actually, 5.  609 and 610.

15       Do you see those?

16    A  Yes, sir.

17    Q  What are those exhibits?

18    A  Those are the stills that I produced and plotted on a map.

19    Q  Okay.  Do those five exhibits fairly and accurately

20  summarize the latitude and longitude data in the Snapchat

21  records for Exhibits 304 to 307?

22    A  Yes, sir.

23       MR. EICHENSEER:  The government moves to admit Exhibits

24  603, 606, 608, 609 and 610.

25       THE COURT:  Based on the stipulation, it is admitted

1    and you may publish.

2       (Exhibit published to the jury.)

3    BY MR. EICHENSEER:

4       Q   On the screen in front of you, Mr. Brown, is Exhibit 603.

5    Do you see that?

6       A   I do, sir.

7       Q   Can you explain -- you've got some circles there in the

8    left-hand corner, correct?

9       A   Correct.

10      Q   Is that what you added to this map?

11      A   I did, yes.

12      Q   Can you explain to the jury what those circles represent?

13      A   So those circles represent a 100-meter radius to the

14   accuracy of the grid corner or the dot that is mapped in the

15   middle of those circles.  Those dots are as mapped received from

16   Snapchat.

17      Q   Okay.  So that you said the grid coordinate is the dot in

18   the center?

19      A   Yes, sir.

20      Q   Again, is that an exact location?

21      A   It's an approximate location.

22      Q   So what's -- what does the circle mean, the bigger circle?

23      A   That means that per that dot, the account user can be

24   within that circle.

25      Q   Okay.  So the dot isn't necessarily the account user, but

1  it's kind of the center of where the account user could be?

2  A  Yes, sir.

3  Q  There's some notations next to that, that red dot.  Do you

4  see those?

5  A  Yes, sir.

6  Q  What is that?

7  A  So on the dot that's to the south, that is a grid

8  coordinate as received from account E Bird W-D-S-T on May 4th,

9  2018, at 0318 in the morning and 14 seconds.

10  Q  What about the second grid point or the second dot north

11  of that one, what is -- what are the notations by that?

12  A  Again, that's the second grid corner captured by Snapchat

13  from account E Bird WDST captured May 4th, 2018, at 0318 at 59

14  seconds.

15  Q  Okay.  Do Snapchat accounts, do they capture a grid

16  coordinate every second that the account user's got the phone?

17  A  I'm sorry, say again.

18  Q  Does Snapchat capture a dot for every second that account

19  user has the phone?

20  A  No.

21  Q  Are they intermittent?

22  A  Correct.

23  Q  And when you've got the Snapchat data, was the time stamp

24  next to these grid coordinates in local time?

25  A  No.  It was in Greenwich Mean Time, sir.

Brown - Direct by Eichenseer

1    Q   And what about the time that's shown here, is that local
2    time Chicago, or is that Greenwich Mean Time?
3    A   Local time.  This is Central Standard Time, so Chicago
4    time, yes.
5    Q   Okay.  And the first grid point -- so this is two grid
6    points plotted at -- both within the same minute of each other,
7    right?
8    A   Correct.
9    Q   So there's one at 3:18:14 in the bottom, correct?
10   A   Yes, sir.
11   Q   There's one at 3:18:59 toward the top; is that right?
12   A   Yes, sir.
13   Q   Let's go to Exhibit 606, please.
14       Okay.  So what does this exhibit show, Mr. Brown?
15   A   This exhibit shows three grid coordinates captured from
16   two different accounts on Snapchat, and the reason why they are
17   layered in such a way is because the same identical grid point
18   was captured for those three account -- or for those two
19   accounts, excuse me.
20   Q   Got it.  So there looks to be a real faint white line that
21   kind of connects each of those three dots to someplace near the
22   middle of that intersection?  Do you see that?
23   A   Yes, sir.
24   Q   Is that kind of the -- is that where those three dots
25   would have mapped if they were overlapping?

Brown - Direct by Eichenseer

1    A  Yeah, like on top of each other, yes.

2    Q  Okay.  And again, what's the yellow circle represent?

3    A  Again, that's indicative of the 100-meter approximate

4    accuracy of the grid coordinates received.

5    Q  Okay.  So based on your understanding of Snapchat records,

6    those account users for those three accounts could have been

7    anywhere in that radius?

8    A  Correct, yes, sir.

9    Q  By the way, do that -- do those grid points, does that

10   show you where a person is, or does that show you where an

11   account user is?

12   A  It shows me where the account user is.

13   Q  And so if somebody leaves a phone someplace laying there,

14   it could still conceivably drop a grid point?

15   A  Yes, yes.

16   Q  Go to 608, please.  This one looks a little different,

17   Mr. Brown.  What's shown in this exhibit?

18   A  So what this is is, similar to the last exhibit, this is

19   actually three separate accounts represented in one map.  The

20   red is indicative of like last -- the last slide.  Doe John 45

21   and E Bird WDST, those grids are on top of each other.

22          The green dot is Doe John 45 Cingular.  That account is

23   being used by itself in that approximate location.  Likewise,

24   Vicky 0730 -- I can't see that.  I think it's got to be.  There

25   you go, so further on the south, those points are from Vicky

Brown - Direct by Eichenseer

1   0730.

2       Q   Right.   And by the way, the last slide we just looked at

3   with the Vicky 0730 and the E Bird Wood Street, what was the

4   time on that?  Do you remember?

5       A   I think it was 3:22 from what I remember.

6       Q   Okay.   It's 3:20 -- it looks like the first dot is at

7   3:21:46; is that right?

8       A   Correct.

9       Q   And then the last dot from Vicky 0730 is at 3:24:07?

10      A   Right.

11      Q   Okay.   So back to 308 [sic].  So what time are these grid

12  points from?

13      A   These are approximately from 4:00 in the morning to

14  approximately 5:00 in the morning.

15      Q   Okay.   How many different accounts are shown on Exhibit

16  608?

17      A   Exhibit 608 has three different accounts.

18      Q   Okay.   And where is the first grid point in chronological

19  order on this map?

20      A   In chronological order, that would be --

21      Q   In the upper right-hand corner, is that the Vicky dot...

22      A   Yeah, 0429 in the upper right-hand corner.

23      Q   Again, that's local time Chicago, right?

24      A   Correct, yes, sir.

25      Q   4:29 a.m. just to be clear?

1      A   Yes, sir.

2      Q   And then you see there's a series of green and red dots on

3   the left-hand side of the screen?

4      A   Yes, sir.

5      Q   Between 33rd and 34th.   Do you see that?

6      A   Yes, sir.

7      Q   And what do those colors represent?

8      A   So the red represents account Doe John 45 and E Bird WDST.

9   That's the same grid coordinates that was received from Snapchat

10  for the two separate accounts.

11         The green dots are Doe John 45.   That account is used

12  by itself at that specific -- or that approximate spot.   And

13  then likewise yellow, that is indicative of Vicky 0730 and that

14  account, its usage.

15     Q   Okay.   And there's no -- there's no bigger circles on this

16  grid?

17     A   No, because I had thought that by adding the bigger

18  circles, it would be too busy.   But just as the last exhibits,

19  these are approximate to 100 meters.

20     Q   Again, so those dots do not -- they do not pinpoint a

21  location, they're within 100 meters or so?

22     A   Yes, sir.

23     Q   100 meters is just how many feet?

24     A   I'm sorry?

25     Q   100 meters is what, about 300 something feet?

1    A   Approximately 328, 330 feet, thereabouts.

2    Q   If you go to 609, please.  Okay.  What's shown on Exhibit

3    609?

4    A   This is a grid coordinate from Snapchat account E Bird

5    WDST captured at May 4th, 2018, at 10:23 in the morning 16

6    seconds.

7    Q   Okay.  So this is about five or six hours after the last

8    grid points we've seen?

9    A   Yes, sir.

10   Q   We can't tell from the map, but where is this?

11   A   This is the cross street West Berry at North Cicero, so on

12   the north side.

13   Q   Okay.  So it's on a different side of the city from the

14   last grid points we've been looking at?

15   A   Yes, sir.

16   Q   I'm showing you Government Exhibit 610 on the screen in

17   front of you.

18   A   Yes, sir.

19   Q   What's that, Mr. Brown?

20   A   Again, like the other exhibits, this is two grid

21   coordinates from Doe John 45, and then one grid coordinate to

22   the south from D-E-S underscore T-I-N-Y 21.

23       The green grid coordinate was captured on May 4th,

24   2018, at 4:28 p.m. at 29 seconds.  And then the two grids on

25   top, the first one was captured -- actually those are two grids

1    captured at the same time.  Both were captured at approximately

2    1731 or 5:31 p.m. at 5 seconds.

3        Q  Okay.  Are all the three grid points on this map, are

4    those all on the North Side of Chicago, too?

5        A  Yes, sir.

6        Q  These are all between 4:00 and 6:00 p.m. on May 4th?

7        A  Yes, sir.

8        Q  Now, you mentioned earlier in your testimony that you also

9    created some animations and not just stills?

10       A  Yes, sir.

11       Q  What are the animations?  Can you explain those to the

12   jury?

13       A  So the animations, ATF has a software that I can

14   effectively make like a flipbook.  And for each minute of time

15   that I have duration-wise, I can have the software show all the

16   grid coordinates per minute.

17             So it creates -- it looks like movement basically.  So

18   for the duration of time, you can actually follow where the

19   account went.

20       Q  You basically took those dots that we saw, and you just

21   plotted them over time?

22       A  Correct, yes.

23       Q  And then animated it into one slide?

24       A  Yes, sir.

25       Q  So on the screen in front of you -- and this isn't

1    admitted into evidence yet, so if we could just have the table

2    screens, please.

3              Do you recognize what's on the screen in front of you,

4    Mr. Brown?  It's marked as Government Exhibit 611.

5        A  Yes, sir.

6        Q  What is that?

7        A  That is an animation of grid coordinates received from

8    Snapchat, from Snapchat account E Bird WDST for the hours of

9    3:00 to 3:23 a.m.

10       Q  So is Exhibit 611 a fair and accurate summary of latitude

11   and longitude locations for E Bird Wood Street between 3:00

12   o'clock and 3:23 on May 4th?

13       A  Yes, sir.

14             MR. EICHENSEER:  Government moves to admit Exhibit 611

15   and publish.

16             THE COURT:  Any objection?

17             MR. PISSETZKY:  No.

18             THE COURT:  It's admitted.  You may publish.

19      (Government Exhibit 611 admitted in evidence.)

20   BY MR. EICHENSEER:

21       Q  Before I -- before we hit "play," Mr. Brown, it's kind of

22   obscured by the icon in the right-hand corner, but what does

23   the -- what does the caption say up there on the right-hand

24   side?

25       A  The right-hand side, it's 03 to 023 hours May 4th, 2018.

1  Q  Okay.  And then there's -- this is not the satellite view,

2  it's a map view, right?

3  A  Yes, sir.

4  Q  So this is -- it's approximately 23 minutes of time that's

5  elapsed in this?

6  A  Yes, sir.

7  Q  And do you plot all of the grid points for E Bird Wood

8  Street during that period?

9  A  Yes.

10     MR. EICHENSEER:  At this time we'll play the exhibit.

11    (Said video recording played in open court.).

12  BY MR. EICHENSEER:

13  Q  Again, there are times here where there's no grid points

14  whatsoever, correct?

15  A  Yes, sir.

16  Q  So they are intermittently captured by Snapchat?

17  A  Yes, sir.

18  Q  The first grid points we're seeing some up there at 305

19  and 306, correct?

20  A  Yes, sir.

21  Q  Up by 43rd.

22     Again, there's no big circles on this animation,

23  correct?

24  A  No.  No, sir.

25  Q  And you're aware that an ATF agent was shot on this date,

1   correct?

2       A  Yes.  Yes, sir.

3       Q  Did you mark that shooting on this map?

4       A  I did, sir, yes.

5        (Said video recording played in open court.)

6   BY MR. EICHENSEER:

7       Q  Okay.  So that's the end of the animation, correct?

8       A  Yes, sir.

9       Q  Government Exhibit 612 is going to be on the screen in

10  front of you next.

11          Do you recognize Exhibit 612, Mr. Brown?

12      A  Yes, sir.

13      Q  What is it?

14      A  So like the last one, this is a time-lapsed animation.

15  With this one, though, I took the grid coordinate file from

16  Vicky 0730, from Doe John 45 and from E Bird WDST, and I placed

17  them into one document and mapped them all together.

18      Q  So this is the same type of animation as the last exhibit?

19      A  Yes, sir.

20      Q  Except there are three accounts instead of one?

21      A  Correct.

22      Q  It covers the period from 3:00 to 4:00 instead of 3:00 to

23  3:23?

24      A  Yes, sir.

25      Q  And does this animation fairly accurately show the grid

1   points for those three accounts from 3:00 to 4:00 a.m. on

2   May 4th?

3       A  Yes, sir.

4           MR. EICHENSEER:  The government moves to admit and

5   publish Exhibit 612.

6           THE COURT:  No objection.  It is admitted.  You may

7   publish.

8       (Government Exhibit 612 admitted in evidence.)

9           MR. EICHENSEER:  I'll play the exhibit once it appears.

10      (Said video recording played in open court.)

11  BY MR. EICHENSEER:

12      Q  Mr. Brown, again, did you mark off the time and location

13  of the shooting in this animation, too?

14      A  Yes, sir.

15      Q  The dots we're seeing now for the black diamonds for E

16  Bird, we saw those in the last exhibit, right?

17      A  Yes, sir.

18      (Said recording played in open court.)

19  BY MR. EICHENSEER:

20      Q  The map you just zoomed out, are you doing this now, or is

21  this part of the animation you produced?

22      A  I'm not doing this now.  This was part of the animation

23  that I produced because I was zoomed in so tightly on those

24  specific streets.  I needed to zoom out in order to capture the

25  additional dots that you're seeing now.

1    Q   Okay.  So do the black diamonds for E Bird Wood Street and

2    the red or the pink circles for Vicky, do they just appear

3    together there outside the neighborhood?

4    A   Yes.

5    Q   As with all the other exhibits, again, these are not

6    pinpoint locations.  They are 100-meter margin of error, right?

7    A   Approximate, yes, sir, 100 meters.

8    Q   That's the end of the exhibit, Mr. Brown.

9        For the last quarter of that exhibit, there were no

10   grid points for either E Bird Wood Street or Vicky 0730 in the

11   area shown in the screen now, were there?

12   A   Correct, none.

13   Q   Okay.  You testified earlier that your job is also

14   reviewing phone records, correct?

15   A   Yes, sir.

16   Q   Were you asked to review any phone records in this case?

17   A   I was, sir.

18   Q   Is Exhibit 308 in front of you, Mr. Brown?

19   A   308 is not.

20   Q   I'm handing you what's been marked as Government Exhibit

21   308.

22   A   Yes.

23   Q   Do you recognize that exhibit, Mr. Brown?

24   A   I do, sir.

25   Q   How so?

1    A   My initials are on it.

2    Q   What is Exhibit 308?

3    A   Exhibit 308 is call detail records that we received.

4    Q   Call detail records, are those phone records?

5    A   Yes, sir.

6    Q   And what kind of information are on phone records?

7    A   They could be the directional of who a specific phone is

8    calling, who is calling the phone, date and time stamp.

9    Q   Okay.  So it's basically like a call log?

10   A   Yeah.

11   Q   It doesn't have any of the content of the calls, right?

12   A   No, no content.

13   Q   And what phone number are those phone records for?

14   A   708 -- I don't remember what the phone number is off the

15   top of my head, and I can't recall.

16   Q   Is it (708) 314-1541, does that sound right?

17   A   Yes, yes.

18   Q   How much information is on Exhibit 308?

19   A   They are call records from May 2 to May 7th.

20   Q   And so does Exhibit 308 have outbound calls?

21   A   It does, yes.

22   Q   Does it have outgoing texts as well?

23   A   Yes.

24   Q   So in front of you, Mr. Brown, which is not in evidence

25   yet, is Government Exhibit 613.  It will be on the screen in a

Brown - Direct by Eichenseer

1    second.

2           Do you recognize Exhibit 613, Mr. Brown?

3        A  Yes, sir.

4        Q  What is it?

5        A  That is an analysis of the call records of outbound phone

6    calls between May 2 and May 7th for phone number (708) 314-1541.

7        Q  Okay.  Outbound contacts, what does that mean?

8        A  That's when the handset or the phone initiates a phone

9    call going up.

10       Q  Okay.  Is it just text or phone calls?

11       A  This should be outbound contacts including texts, texts

12   and phone calls.

13       Q  Okay.  And did you also graph the activity that you

14   observed in those records?

15       A  I did, yes.

16       Q  Okay.  Does Exhibit 613 fairly and accurately summarize

17   the outbound call records for phone number (708) 314-1541 from

18   between May 2nd and 7th of 2018?

19       A  Yes.

20           MR. EICHENSEER:  Government moves to admit Exhibit 613

21   and publish.

22           THE COURT:  Based on a stipulation, it's admitted and

23   you may publish.

24       (Government Exhibit 613 admitted in evidence.)

25       (Exhibit published to the jury.)

Brown - Cross by Pissetzky

BY MR. EICHENSEER:

Q   Okay, Mr. Brown, I'm going to start with the box in the
upper right-hand corner there.   What does that show?

A   Outbound voice calls and texts on May 2, 2018.

Q   Does it show that there were 26 outbound calls or texts on
May 2nd?

A   Yes.

Q   29 on May 3rd?

A   Yes.

Q   19 on May 4th?

A   Yes.

Q   And then none for May 5th, May 6th or May 7th?

A   Correct.

Q   Approximately what time did the last outbound phone
contact occur on May 4th from this number?

A   Approximately 1745, so 5:45 p.m. approximately.

          MR. EICHENSEER:   No further questions, Your Honor.

          THE COURT:   Cross-examine.

          MR. PISSETZKY:   Can I have a moment, Judge?

     (Pause in proceedings.)

                         CROSS-EXAMINATION

BY MR. PISSETZKY:

Q   Good afternoon.

A   Good afternoon, sir.

Q   Scary world we live in, huh?

1    A  It can be, sir.

2    Q  First thing first.  That three phones or accounts that you

3    were looking at and analyzing never left the Chicagoland area?

4    A  No.

5    Q  No meaning did not leave?

6    A  Yes, sir.

7    Q  Correct.  You also, at the very beginning when you started

8    explaining to us how this thing works, how your analysis works

9    and Snapchat works, you said that from the dot where you marked,

10   the user may be within a certain radius.

11   A  Yes, sir.

12   Q  So and you specifically used the word "can" or "may be,"

13   right?

14   A  Correct.

15   Q  Because it's not accurate science?

16   A  Well, I can't speak to that.  I mean, I just analyzed the

17   records from Snapchat.

18   Q  Right.  So, for example, if you look at Exhibit -- I think

19   it was 608, E Bird was within two different places within less

20   than 40 seconds, yes?

21   A  Yes.  Yes, sir.

22   Q  And you can't tell where he is actually except for within

23   a certain radius?

24   A  Yes, sir.

25   Q  And you'd agree with me that he cannot be in two places at

1   the same time?

2       A   I would agree, yes.

3       Q   So I want to ask you another question here.

4       A   Yes, sir.

5       Q   This was Exhibit 608, right?  And if we zoom in, the

6   purple is E Bird, right?

7       A   That's not the matching exhibit I have here for 608, sir.

8       Q   Which one do you have?  I'm sorry.

9       A   It has a key on it.

10      Q   May I have it?

11        (Exhibit tendered to counsel.)

12  BY MR. PISSETZKY:

13      Q   So 608 has a key, right?

14      A   Yes, sir.

15      Q   And red is for E Bird WDST, and green is for Doe John,

16  right?

17      A   Green is for Doe John by itself.  Red is for Doe John and

18  E Bird WDST together.

19      Q   And that is by 43rd -- it's around -- they're all around

20  this area that we're seeing, right?

21      A   Yes, sir.

22      Q   And it's 4:40, 4:49, around that time, right?

23      A   Yes, sir.

24      Q   And can we switch to our -- I'm going to show you what was

25  previously entered into evidence as Exhibit 113.  Can we...

Brown - Cross by Pissetzky

1          MR. EICHENSEER:  Judge, I'm just going to object to
2     this because the witness is not an eyewitness to this case, nor
3     did he do anything to produce this video.
4          MR. PISSETZKY:  It's in evidence, Judge.  I can ask him
5     a question about the time, right?
6          MR. EICHENSEER:  We're looking to renew the foundation
7     objection with this witness.
8          THE COURT:  Right.  I don't see a question yet.
9     BY MR. PISSETZKY:
10       Q  So this has previously been entered into evidence by the
11    government as their exhibit.  Can you see it on your screen?
12       A  Yes.
13       Q  What is the time stamp on it?
14       A  0441.
15       Q  You don't -- you haven't seen this before, right, this
16    video?
17       A  No.
18       Q  Do you know what street this is?
19       A  No.
20       Q  Okay.  But the time stamp is 0441 and 25, 25 a.m., right?
21          MR. EICHENSEER:  Objection.  This is asked and answered
22    with this witness, Your Honor.
23    BY MR. PISSETZKY:
24       Q  Correct?
25       A  Yes.

Brown - Cross by Pissetzky

1    MR. PISSETZKY:  Can we go back to the ELMO.

2  BY MR. PISSETZKY:

3    Q  And you have a lot of markings of 4:40:11, 4:40:09,

4  4:40:09 in different spot, in different areas on this map,

5  right?

6    A  Yes, sir.

7    Q  So you would agree with me if somebody was captured on a

8  video at a certain specific time, the video is more accurate

9  than your analysis?

10    MR. EICHENSEER:  Objection, foundation.

11    THE COURT:  Well, it's -- he's just asking the

12  question.  He can answer it if you can.

13    THE WITNESS:  Can you rephrase the question, sir.

14  BY MR. PISSETZKY:

15    Q  Yes.  If we have somebody on video with a time stamp that

16  is exact to the time of where that person, it's obviously more

17  accurate than your analysis?

18    MR. EICHENSEER:  Objection, obviously argumentative.

19    THE COURT:  You can answer.  You can disagree with him

20  if you like.

21    THE WITNESS:  These points are approximate, sir,

22  100 meters.

23  BY MR. PISSETZKY:

24    Q  Right.  It's all approximations, right?  And all these are

25  within one area within one neighborhood in Chicago, right?

1    A   They're all approximate grids, yes, sir.

2    Q   Do you have the other exhibit that was shown?

3    A   Which number, sir?

4           MR. PISSETZKY:   Thank you.

5           THE COURT:   Is that it?

6           MR. PISSETZKY:   Yes.

7           THE COURT:   Anything further?

8           MR. EICHENSEER:   No, Your Honor.

9           THE COURT:   You can step down.   Call your next witness.

10           MS. BABU:   Your Honor, the government would call

11   Special Agent Beau Jacobsen.

12      (Witness duly sworn and takes the stand.)

13           THE COURT:   Please be seated.

14           BEAU JACOBSEN, GOVERNMENT WITNESS, SWORN

15                     DIRECT EXAMINATION

16   BY MS. BABU:

17    Q   Agent Jacobsen, I'm going to walk up here with some of

18   these exhibits instead of walking back and forth.

19    A   I'll trade you.   Thank you.

20    Q   Good afternoon.

21    A   Good afternoon.

22    Q   Could you please state and spell your name for the record?

23    A   Yes, it's Beau Jacobsen.   The first name is B-E-A-U.   Last

24   name is spelled J-A-C-O-B-S-E-N.

25    Q   Where do you work, sir.

1    A   The Bureau of Alcohol, Tobacco and Firearms.

2    Q   Is that also known as the ATF?

3    A   Yes, it is.

4    Q   And what is your title with ATF?

5    A   Special agent.

6    Q   And how long have you been a special agent?

7    A   Since the spring of 2014.

8    Q   And have you been a special agent for this entire time?

9    A   Yes.

10   Q   Prior to working at ATF, do you have law enforcement

11   experience?

12   A   Yes.

13   Q   What was your first law enforcement position prior to ATF?

14   A   In 2006, I was hired by the Lakewood Police Department in

15   Lakewood, Colorado.  I served there until 2011, and then I

16   lateraled to Aurora Police Department in Colorado as well and

17   worked there until 2014.

18       Let's start with Lakewood, Colorado.  When you were a

19   police officer in Lakewood, Colorado, what generally were your

20   responsibilities?

21   A   I initially was a patrol officer and then for three years,

22   I sat on the special enforcement team.

23   Q   Did you have to undergo any special training to become a

24   police officer in Lakewood?

25   A   Yes.  I went through a 26-week academy that ranged in

1  multiple topics to include driving, investigations, shooting,

2  interviewing, all sorts of different matters that a police

3  officer would have to do.

4      Q  Did that also include evidence collection?

5      A  Yes.

6      Q  And then you said you moved from Lakewood, Colorado, to

7  the Aurora Police Department; is that right?

8      A  That's correct.

9      Q  About when was that?

10     A  2011, late summer of 2011.

11     Q  And what was your position with the Aurora Police

12 Department?

13     A  Again, I initially started as a police officer and shortly

14 after was moved to the gang intervention unit.

15     Q  And what were your responsibilities as a police officer in

16 the Aurora Police Department?

17     A  As a police officer, I would respond to calls,

18 interviewed, things of that nature.  When I was on gang

19 investigations, it was a little bit different.

20     Q  And what sort of training -- did you undergo additional

21 training with the Aurora Police Department?

22     A  Yes.  I had a lateral academy that was approximately 10

23 weeks.  And then while at Aurora, I attended multiple extra

24 classes in gangs, narcotics, tactics and things of that nature.

25     Q  And you said you became -- from the Aurora Police

1   Department, you then became an agent with the ATF?

2       A   That's correct.

3       Q   And did you have to go through training to become an agent

4   with ATF?

5       A   Yes.

6       Q   And what sort of training did you undergo?

7       A   We go through a seven-month academy.  It ranges again from

8   basics of driving, shooting, tactics and what not to

9   interviewing.  And then it gets more specific into the job of an

10  ATF agent regarding fire investigations, explosive

11  investigations, firearm investigations, things of that nature.

12      Q   And Agent Jacobsen, what is your role in this case?

13      A   I was designated the case agent.

14      Q   And prior to being the designated case agent -- well,

15  actually backing up, sir.

16          As an ATF agent, what generally are your

17  responsibilities, or what are you investigating?

18      A   I work in group 6, which primarily works the West Side of

19  Chicago, Districts 11 and 15, essentially investigating any

20  firearms crime and violent acts over there.

21      Q   And what is your role in this case?

22      A   As a case agent.

23      Q   And outside of being the case agent in this case, do you

24  have any investigations in the Back of the Yards?

25      A   I do not.

1    Q   When were you asked to become the case agent?

2    A   The evening of May 4th.

3    Q   And to your knowledge, were there other agents

4  investigating in the Back of the Yards?

5    A   Yes.

6    Q   Were you involved in those investigations?

7    A   No, I was not, ma'am.

8    Q   Agent Jacobsen, I'm now going to turn your attention to

9  May 7th, which is -- 2018, which was a Monday.

10    A   Yes.

11    Q   Were you involved in the execution of a search warrant?

12    A   Yes I was.

13    Q   And what search warrant was that?

14    A   A search warrant of a black Ford sedan.

15    Q   And who did that car belong to.

16    A   Ms. Victoria Jean-Baptiste.

17    Q   And you said that was black?

18    A   Yes.

19    Q   And did you have authority to search the car?

20    A   Yes.   We had a court search warrant.

21    Q   And what did you find?

22    A   We searched the car.  I located a black appeared to be

23  White Sox hat that was on the dashboard near the front passenger

24  seat.

25            And then I recovered two water bottles, one that was in

1    the center console area, and one that was in the right passenger

2    door area or on the floor.  And then I also located some

3    clothing that was on the front passenger floorboard.

4        Q  And the clothing on the floor, was it male's clothing or

5    female clothing?

6        A  The more that we looked at it, it appeared to be female's

7    clothing.

8        Q  What did you do with the two Evian water bottles and the

9    black White Sox baseball cap?

10       A  We seized them out of the car and they were transported

11   back to our office and placed into an outer vault area that

12   is -- has a basically -- we have an alarm in our office.

13           And then inside the outer vault area is a locked door I

14   would have to use my card to get into.  Inside that area are

15   additional lockers that are key lockers that only the agents can

16   get into.

17       Q  And did you place the water bottles and the hat into one

18   of those lockers?

19       A  Yes.

20       Q  Who had access to that locker?

21       A  All custodians and agents.

22       Q  And once the hat and two water bottles were placed in the

23   lockers, did you take them back out of that locker at any point?

24       A  Yes.

25       Q  And when was that?

1    A  I believe it was May 10th.

2    Q  And why did you take them out?

3    A  During the course of this investigation, some of the ATF

4  lab had flown out to assist with the investigation.  And inside

5  our office, they had taken a separate room and basically

6  developed a sterile area where they could examine some of the

7  items.

8    Q  And so did you take the water bottles and the hat out of

9  the temporary lockers in your office?

10   A  Yes.

11   Q  And I'm saying lockers, is that where the vault -- within

12  the vault where the evidence is kept?

13   A  Correct.

14   Q  And so once you took the evidence out of the vault, it was

15  then given to the individuals from the lab?

16   A  Yes.

17   Q  And after they had conducted whatever analysis they were

18  going to conduct, did you then take the evidence back from them?

19   A  Yes.

20   Q  What did you do with it then?

21   A  I again placed them in the temp lockers.

22   Q  And did they -- did the hat and the water bottles stay

23  within those temporary lockers within the vault for this entire

24  time?

25   A  They were eventually transported by hand by another agent

1    to Washington, DC.

2      Q   And do you know where in Washington, DC, they were brought

3    to?

4      A   The ATF lab.  I don't know the exact address off the top

5    of my head.

6      Q   And do you know who the individuals were at the lab who

7    were going to receive the water bottle -- the water bottles and

8    the hat?

9      A   One of them was Todd Bille.

10     Q   And did you -- were the two water bottles and the hat

11   returned to you?

12     A   Yes, later on they were.

13     Q   And how were they returned to you?

14     A   They were FedEx shipped back to me.

15     Q   And once you received the water bottles and the hat, what

16   did you do with them?

17     A   I again placed them in temp lockers and ultimately in the

18   vault.

19     Q   And do you have -- have you since taken the hat out of the

20   temp locker in the vault?

21     A   Yes.

22     Q   Why was that?

23     A   For the purposes of this trial.

24     Q   Agent Jacobsen, in front of you, you should have

25   Government Exhibit 303.

Jacobsen - Direct by Babu

1    A   Yes.

2    Q   Would you please open that?

3    A   Yes.

4    Q   Agent Jacobsen, first on the packaging, does the packaging

5    appear to be the same when you first recovered the hat?

6    A   Yes, it does.

7    Q   How can you tell that?

8    A   By my initials and signature and date.

9    Q   And what is inside that -- inside the packaging?

10   A   It is the black hat that I recovered from the search on

11   the vehicle.

12   Q   Is that a piece of the black hat or the entire hat?

13   A   It looks to be a large amount of the hat.  Yeah, the

14   majority of the hat, I would say.

15   Q   And does the hat appear to be in the same or substantially

16   the same -- or the piece of the hat rather substantially the

17   same condition as when you recovered them or you received them

18   in the FedEx shipment?

19   A   Yes.

20           MS. BABU:   Your Honor, the government would move to

21   admit Exhibit 303 into evidence.

22           THE COURT:   Any objections?

23           MR. PISSETZKY:   No.

24           THE COURT:   It is admitted.  You may publish it.

25     (Government Exhibit 303 admitted in evidence.)

1   BY MS. BABU:

2     Q  In addition to the baseball hat, did you collect any other

3   evidence in this case?

4     A  Yes.

5     Q  Did you collect any ballistics evidence?

6     A  Yes.

7     Q  Agent Jacobsen, in front of you, you should have

8   Government Exhibit 300.

9     A  Yes.

10     Q  Do you see that?

11     A  Yes.

12     Q  Is this a piece -- based on the markings on the outside of

13   the package, do you recognize Government Exhibit 300?

14     A  Yes.

15     Q  And what generally is Government Exhibit 300?

16     A  It's Shell casings for spent cartridges.

17     Q  Is this a piece of ballistics evidence that you received

18   in this case?

19     A  Yes.

20     Q  And who did you receive it from?

21     A  Chicago Police Department.

22     Q  And how do you go about receiving evidence from the

23   Chicago Police Department?

24     A  Typically I'd be armed with a subpoena from the U.S.

25   Attorney's Office.  I can then go to their property evidence

1  area and basically give that subpoena to whoever's working the
2  desk there, and they can give me the item.  And basically I take
3  it -- they turn it over to me at that point.
4      Q  Is then the piece of evidence in your custody?
5      A  Yes.
6      Q  Is that what happened with Government Exhibit 300?
7      A  Yes, it is.
8      Q  And once you received Government Exhibit 300 from the
9  evidence custodian at CPD, what did you do with it?
10     A  I again transported it back to my office where it was
11 booked in our packaging and then placed in the same lockers.
12     Q  And did evidence -- Government Exhibit 300, the casings,
13 did they stay in your lockers until the trial date?
14     A  No, they did not.
15     Q  Where did they go?
16     A  They were also sent out to Washington, DC, by FedEx.
17     Q  Did you send the FedEx?
18     A  Yes.
19     Q  And who specifically were you sending the FedEx to?
20     A  R D Esposito.
21     Q  And did you receive Government Exhibit 300 back?
22 Obviously you did.
23     A  Yes, I did.
24     Q  And once when you received it, how did you receive it?
25     A  By FedEx once again.

Jacobsen - Direct by Babu

1    Q   And what did you do once you received it?

2    A   I then took possession of it and placed it back in the

3    lockers.

4    Q   And have you been bringing Government Exhibit 300 to this

5    trial?

6    A   Yes, I have.

7    Q   What is your process in checking Government Exhibit 300

8    out from your offices?

9    A   I would check it out and basically bring it over here.

10   There is a vault here, but some of the days that we've been,

11   it's been too late to get back in that vault.

12         Our office is located nearby, so I just walk it back to

13   our offices, put it in the temp vault, secure it for the evening

14   and then the following day, I bring it back.

15   Q   During the course of the day, is this evidence in your

16   care and custody?

17   A   Yes.

18   Q   And when after the trial day ends, has the evidence been

19   checked back into the vault?

20   A   Yes.

21   Q   Agent Jacobsen, I'm also going to have you look at

22   Government Exhibit 301.

23         Do you recognize that?

24   A   Yes.

25   Q   What is that?

Jacobsen - Direct by Babu

1    A   This is a projectile or bullet.

2    Q   And where did you receive Government Exhibit 301 from?

3    A   From the Chicago police evidence.

4    Q   And did you receive Government Exhibit 301 in the same

5    manner that you received Government Exhibit 300?

6    A   Yes, I did.

7    Q   And did you follow the same processes in maintaining and

8    safekeeping Government Exhibit 301 as you do with Government

9    Exhibit 300?

10   A   Yes, I did.

11   Q   And for the purposes of trial, have you been following the

12   same safekeeping procedures to control custody over Government

13   Exhibit 301?

14   A   Yes, I have.

15   Q   Sir, could you look at Government Exhibit 302?

16   A   Yes.

17   Q   Do you recognize Government Exhibit 302?

18   A   Yes, I do.

19   Q   And what is Government Exhibit 302?

20   A   It is another projectile or bullet.

21   Q   Where did you receive Government Exhibit 302 from?

22   A   From the Chicago Police Department evidence.

23   Q   Did you follow the same process with Government Exhibit

24   302 to retrieve it from the Chicago Police Department?

25   A   Yes, I did.

Jacobsen - Direct by Babu

1    Q   Did you follow the same safekeeping procedures once

2   Government Exhibit 302 was in your custody?

3    A   Yes, I did.

4    Q   And for the purposes of trial, have you followed the same

5   procedures in safekeeping Government Exhibit 302?

6    A   Yes, I have.

7    Q   Agent Jacobsen, will you please open the packages for

8   Government Exhibit 301 and 302.

9    A   Sorry, we've run out of room to cut these little bits.

10   Q   Agent Jacobsen, looking at Government Exhibit 301, what is

11  inside that package?

12   A   This is one of the projectiles.

13   Q   And what is Government Exhibit 302?

14   A   This is one of the projectiles as well.

15   Q   For Government Exhibits 300, 301, 302, are they in the

16  same -- the same or substantially the same condition as they

17  were when you received them from the lab in DC?

18   A   Yes, they are.

19   Q   Agent Jacobsen, have you been here at the pendency of the

20  trial?

21   A   Yes.

22   Q   And you've been sitting at the government's table here?

23   A   Yes.

24   Q   Have you seen witnesses open these evidence bags?

25   A   Yes, I have.

Jacobsen - Direct by Babu

1    Q   And after each witness opens an evidence bag, what have

2    you been doing?

3    A   Resealing the bags.

4    Q   Why?

5    A   That just to maintain the property is safe inside of them.

6         MS. BABU:   Your Honor, the government would move to

7    admit Government Exhibit 300, 301 and 302 into evidence.

8         THE COURT:   Is there any objection?

9         MR. PISSETZKY:   Yes.

10        MS. BABU:   Your Honor, can we do this at sidebar?

11      (At sidebar outside the hearing of the jury.)

12        MR. PISSETZKY:   The explanation, Exhibit 300, the

13   government has not laid foundation as to when, how and who found

14   those shell casings.

15        MS. BABU:   Your Honor, the government, Paul Presnell,

16   the forensic investigator, who just previously testified this

17   morning, testified that he recovered Government Exhibits 300

18   from the ground.  He looked at the packaging.  He opened them

19   up.

20        THE COURT:   There's one of them he did.  I don't know.

21        MS. BABU:   He said he did not -- he could not testify

22   and he did not testify that he found those casings.  He did

23   recover, collect and put them all into individual coin bags and

24   which is what he testified to.  He identified his initials and

25   dates on each of those envelopes.

1    MR. PISSETZKY:  It's not enough.

2    MS. BABU:  This goes to the weight, not to the

3    admissibility, Your Honor.

4    MR. HYMAN:  Not true, not true.

5    THE COURT:  Wait, wait, wait.  Let's analyze this

6    again.  We don't know who actually originally discovered that,

7    correct?

8    MS. BABU:  Correct, Your Honor.  But Mr. Presnell said

9    that these are the five casings he found, he recovered those

10   casings and those are the five casings.

11   If the defense wants to argue that those casings were

12   there before or who found them and how they found them, that is

13   certainly an argument they can make.

14   MR. PISSETZKY:  He did not find them.  That's exactly

15   where she's wrong.  He said that I came there and I saw there's

16   markings from somebody who I have no idea who.

17   MS. BABU:  It's an argument they can make as to weight,

18   Your Honor.

19   MR. PISSETZKY:  No, it's not a weight issue.  It's not

20   a weight issue.  It's goes to admissibility.  Any case that you

21   look here in the Seventh Circuit, if it goes to the weight, then

22   there's testimony as to who exactly found them, how they found

23   them, and then the evidence technician can testify about it.

24   But this gentleman had no idea how these bullets

25   arrived there, who put the markings down, when they put the

Jacobsen - Direct by Babu

1    markings down.

2            THE COURT:  Well, no one would.  No one would.

3            MR. HYMAN:  Well, they would if they had the guy who

4    said, ooh, I found the casings.

5            THE COURT:  They were there before, though.  Nobody

6    knows when they got there.

7            MS. BABU:  He talked, Your Honor, and that's how it

8    goes to weight, Your Honor.  They can argue this.

9            MR. PISSETZKY:  We don't know when they got there and

10   the person --

11           THE COURT:  He wouldn't know.  The guy that originally

12   found them wouldn't know either.

13           MR. HYMAN:  No, but he would at least -- he would tell

14   you that he saw them there, but we don't know who that is.

15           MR. PISSETZKY:  In that condition?

16           THE COURT:  Yeah, but at some point they were seen

17   there.  I think their point is at some point there were seen

18   there.  And so, they were there, but, you know, how they got

19   there, we don't know.

20           MR. PISSETZKY:  But there's a --

21           MS. BABU:  Correct, Your Honor.

22           MR. PISSETZKY:  There needs to be a chain of custody.

23           THE COURT:  There's a chain of custody since they

24   picked them up.  I'll overrule your objection.

25           MS. BABU:  Thank you, Your Honor.

Jacobsen - Direct by Babu

1      (In open court in the hearing of the jury.)

2           MS. BABU:  Your Honor, the government would move to

3   admit Government's Exhibit 300, 301 and 302 into evidence.

4           THE COURT:  Okay.  They're admitted.

5           MR. PISSETZKY:  Over our objection?

6           THE COURT:  Yeah.  The record 1 clear.

7      (Government Exhibits 300, 301 and 302 admitted in evidence.)

8   BY MS. BABU:

9    Q  Agent Jacobsen, I'm now going to -- before we move to

10  this, Agent Jacobsen, was there any analysis done with the

11  casings that are in Government Exhibit 300?

12   A  Yes.

13   Q  What type of analysis was done?

14   A   Immediately after the shooting, they were transported to

15  CPD, and they were entered in the NIBIN for basically to see if

16  any other shootings had been associated to that same firearm.

17          NIBIN's a system that essentially takes images of Shell

18  casings, and you are able to determine if that shell casing is

19  possibly related to another shooting, if that makes sense.

20   Q  And is NIBIN analysis something that you use regularly in

21  investigations conducted by ATF?

22   A  Yes.

23   Q  And what is your understanding of whether fingerprinting

24  can be done on Shell casings after they had been tested in

25  NIBIN?

Jacobsen - Direct by Babu

1    A   It would be difficult because whoever is entering them in

2    the system is --

3            MR. HYMAN:   Your Honor, Your Honor, I'm going to

4    object.   This witness is not an expert.

5            MS. BABU:   Your Honor --

6            THE COURT:   I'll sustain the objection.

7    BY MS. BABU:

8    Q   And Agent Jacobsen, was any analysis done with Government

9    Exhibit 301, the bullet?

10   A   Yes.

11   Q   What analysis was done or what examination was conducted

12   on Government Exhibit 301?

13   A   There was ballistic testing and also DNA.

14   Q   And what is your -- and is that testing regularly done

15   during the course of ATF investigations?

16   A   When it can be, yes.

17   Q   And what is your understanding of whether or not

18   fingerprinting can be taken -- fingerprint testing can be done

19   if DNA analysis and ballistics evidence is done?

20   A   Again, it's kind of like you choose which way -- which

21   path you're going to go.   It's difficult to do all three and get

22   any kind of results I guess.

23   Q   And as a criminal investigator --

24           MR. PISSETZKY:   Your Honor, objection again.

25           THE COURT:   Wait, wait, wait.   There's the objection.

1    What's the objection?

2              MR. PISSETZKY:  Again, the witness is not an expert.

3              THE COURT:  No, he's just talking about the physical

4    ability to do that.  I don't think that's expertise.  So to that

5    extent, I'll overrule the objection.

6    BY MS. BABU:

7       Q  Sir, Agent Jacobsen, when you -- as a criminal

8    investigator and as an agent, do you have to make a

9    determination whether to either get fingerprints done or to

10   take -- or have a DNA examination conducted?

11      A  At times, yes.

12      Q  Similarly, do you have to make that same choice with

13   fingerprinting or NIBIN testing?

14      A  Yes.  At times, yes.

15      Q  And was that -- were those choices presented to you here?

16      A  Yes.  The NIBIN analysis was done prior to me even being

17   involved in the case, but yeah.

18      Q  And was the DNA analysis similarly for Government Exhibit

19   301, was there a choice made between doing DNA analysis and

20   fingerprinting?

21      A  Yes.

22      Q  Agent Jacobsen, I'm now going to ask you a few questions

23   about your investigation within the Back of the Yards as the

24   case agent in this case?

25      A  Yes.

1    Q  Were you in the Back of the Yards on May 14th of 2018?

2    A  Yes.

3    Q  That was approximately 10 days after the shooting?

4    A  That is correct.

5    Q  Were you -- when you were there, did you walk through the

6  alley between Hermitage and Wood Street?

7    A  Yes.

8    Q  Agent Jacobsen, could I ask you to move the map closer to

9  you and show the jury on the map where you were?

10    A  The alley we're referring to is this alley.

11    Q  And have you also been in that -- the alley between

12  Hermitage and Wood Street recently?

13    A  Yes.

14    Q  Was that about June 9th?

15    A  Yes.

16    Q  That was the Sunday before trial?

17    A  Correct.

18    Q  Agent --

19       MR. PISSETZKY:  Your Honor, can we have a sidebar for a

20  second, please.

21    (At sidebar outside the hearing of the jury.)

22       THE COURT:  This is -- she hasn't asked the question.

23       MR. PISSETZKY:  Yeah, I know, but I know where she's

24  going.  This is the video.  She wants to introduce the video

25  that he took when he went out to the scene, and that's what we

1    talked about.

2         THE COURT:   Oh, yeah, we talked about it.

3         MR. PISSETZKY:   And I don't think it's proper.   The

4    jury saw what they saw.   Now they want to introduce a video.

5         THE COURT:   What is it?

6         MS. BABU:   It's a video, Your Honor.   It's a video of

7    the alley itself, and there's an individual standing underneath

8    where the security camera is at 4324 and Agent Jacobsen simply

9    walks from the west side of the alley to the east side of the

10   alley.

11        THE COURT:   What's the -- how does that add anything to

12   what we've already have?

13        MS. BABU:   It shows, Your Honor, based on fixed items

14   in the alley such as the telephone pole and the fence.

15        THE COURT:   I know.   We've got the sketch, though.   I

16   don't think we need it.   I'll sustain the objection.

17      (In open court in the hearing of the jury.)

18   BY MS. BABU:

19     Q   Agent Jacobsen, did you take a video from the front of the

20   gangway on May 14th, 2018?

21     A   Yes.

22     Q   And do you have in front of you Government's Exhibit 114?

23     A   Yes.

24     Q   What does that appear to be?

25     A   It appears to be the video that I took on that date.

1    Q   And is this -- does this video fairly and accurately

2   depict the gangway south of 4332 South Hermitage Avenue on

3   May 14, 2018?

4    A   Yes.

5         MS. BABU:   Your Honor, we would move to admit

6   Government Exhibit 14.

7         THE COURT:   Any objection?

8         MR. PISSETZKY:   What number?

9         MS. BABU:   114.

10         MR. PISSETZKY:   One second.

11         THE COURT:   If not, I'll admit it, and you can publish

12   it.

13         MS. BABU:   Thank you, Your Honor.

14         THE COURT:   How long is it?

15         MS. BABU:   It's very short, Your Honor.

16         THE COURT:   All right.

17         Agent Jacobsen, what we're playing here is Government

18   Exhibit 114.   If we could pause it right here and actually back

19   up a little bit.

20         MR. PISSETZKY:   Your Honor...

21         MS. BABU:   Stop right here.   And if we can close up, if

22   we can zoom in on the brown house.

23   BY MS. BABU:

24    Q   Agent Jacobsen, what is -- what house is that, that brown

25   house right there?

Jacobsen - Direct by Babu

1    A  It's this house right here, 4324 South Hermitage --

2    Q  And is that the house that the surveillance cameras were

3    located on?

4    A  Yes.

5    Q  And in this zoom-in, can you identify where the

6    surveillance cameras are?

7    A  It's actually further up.  If you zoom it a little bit,

8    they're right here.

9    Q  So is it the blue circle you've drawn around on the photo

10   right there?

11   A  Yes.

12   Q  Actually we'll zoom back out again.  Well, actually... is

13   it underneath -- are the cameras underneath the windows on that

14   house --

15   A  Yes.

16   Q  -- agent Jacobsen?

17   A  Yes.

18   Q  Which direction on May 4th, 2018, do you understand the

19   cameras were focused?

20   A  I believe there was actually one focused both ways, one to

21   the north and one to the south.

22   Q  And so there was one camera facing north and one camera

23   facing west?  I'm sorry, one camera facing north and one camera

24   facing south?

25   A  That's correct.

1          MS. BABU:  And could we play that whole video through,

2    please.

3       (Said video recording played in open court.)

4    BY MS. BABU:

5       Q   Agent Jacobsen, where were you standing when you took this

6    photo.

7       A   Essentially I started on the sidewalk directly parallel to

8    where the gangway was, and then I stepped into the gangway.

9       Q   And is this the gangway where the Shell casings were

10   found?

11      A   That's correct.

12      Q   And Agent Jacobsen, were you stand -- are there steps at

13   the mouth of the gangway there?

14      A   Yes, there are.

15      Q   And when you took this video, were you standing on the

16   steps?

17      A   I don't believe I was on the steps, yes.

18      Q   So you were still at the top of the sidewalk there?

19      A   That's correct.  I wouldn't necessarily say it's the

20   sidewalk yet.  There's a small walkway in between the sidewalk

21   and steps and walk down.

22      Q   I see.  And now, Agent Jacobsen, I'm now going to show you

23   Government Exhibit 557.  This has not yet been admitted.

24          MR. PISSETZKY:  Your Honor...

25       (Counsel conferring.)

1  BY MS. BABU:

2      Q   Agent Jacobsen, do you see Government Exhibit 557 on the

3  screen in front of you?

4      A   Yes, I see a video on the --

5      Q   Do you now see Government Exhibit 557 --

6      A   Yes.

7      Q   -- in front of you?

8      A   Yes.

9      Q   What is -- what is this a photograph of?

10     A   This is me standing in the same position essentially now

11  looking southbound on Hermitage.

12     Q   And did -- and is this a photograph you took?

13     A   Yes.

14     Q   And when did you take this photograph?

15     A   Approximately a week ago.

16     Q   So this was not taken on May 4th of 2018?

17     A   That is correct.  This was not.

18     Q   So this was taken about a week ago.  And where exactly are

19  you standing?

20     A   Again, I'm standing in that area between the sidewalk and

21  the steps down the gangway, basically the mouth of the gangway.

22     Q   And is this fence right here, is this fence -- do you see

23  this fence when you're standing in the gangway?

24     A   Yes.

25     Q   And what is -- could you point out on the screen where the

1  intersection of 44th and Hermitage is?

2     A  If you -- yeah, it's basically this area.

3     Q  So you took this photograph from standing in the mouth of

4  the gangway; is that correct?

5     A  Yes.

6     Q  And this -- and this photograph is you're facing the

7  opposite direction of the direction you were facing when you

8  took the video of the security camera on 4324; is that correct?

9     A  That's correct, yes.

10    Q  Mr. Jacobsen -- or Agent Jacobsen, excuse me, is the

11 area -- the area around the mouth of the gangway both facing

12 north and south, when you took this photograph in June of this

13 year, did it appear to be in the same or similar condition as it

14 did in May of 2018 of last year?

15    A  It's similar, yes.  There was more shrubbery, I guess,

16 than I remember a year ago.

17          MS. BABU:  Nothing further, Your Honor.

18          THE COURT:  Okay.  We'll suspend.

19          MS. BABU:  I'm sorry. Your Honor.  I'm sorry, could we

20 publish this quickly?

21          THE COURT:  Any objection to publish?

22          MR. PISSETZKY:  What?

23          THE COURT:  Publish the picture.

24          They're offering it into evidence, and they want to

25 publish it.  Is that okay.

1    MR. PISSETZKY:  Yes.

2    MR. HYMAN:  Yes.

3    THE COURT:  It's admitted.

4    (Government Exhibit 557 admitted in evidence.)

5    THE COURT:  You may publish.

6    (Exhibit published to the jury.)

7    THE COURT:  And with that...

8  BY MS. BABU:

9    Q  Agent Jacobsen, if I could have you point out quickly to

10 the jury where the intersection of 44th and Hermitage is.

11   A  Yes.  That area.

12   Q  And again, you were standing between the sidewalk and

13 between the mouth of the gangway facing south?

14   A  Correct.

15   Q  And so this is a few steps from where the Shell casings

16 were recovered?

17   A  Correct.

18   Q  And this -- this is facing the opposite direction of the

19 video you took? --

20   A  Yes.

21   Q  -- showing the surveillance cameras on 4324?

22   A  That's correct?

23   THE COURT:  With that we'll suspend until 10:00 o'clock

24 tomorrow morning.  Have a nice evening.  Please don't conduct an

25 investigation on your own.  You're excused.

Jacobsen - Direct by Babu

1   MS. BABU:   Your Honor, do we start at 9:00 tomorrow or

2   10:00?

3   THE COURT:   We'll start at 10:00.

4   MS. BABU:   Thank you, Your Honor.

5   (Jury exits courtroom at 4:56 p.m.)

6   THE COURT:   You can step down, Agent.   For scheduling

7   purposes now, you have one witness left?

8   MS. BABU:   Correct, Your Honor.   He will be very short.

9   THE COURT:   Be short.   And then you guys will have your

10   witnesses tomorrow.

11   MR. HYMAN:   Hopefully they'll show up.

12   THE COURT:   How many witnesses do you have?

13   MR. PISSETZKY:   We might have two.

14   THE COURT:   Do you want to argue it tomorrow?   Why

15   don't we argue it tomorrow?   What?

16   MR. HYMAN:   We're not ready to argue it tomorrow.

17   THE COURT:   You're not?

18   MR. HYMAN:   No.

19   THE COURT:   When I was a trial lawyer, I was always

20   ready, never prepared.

21   MR. HYMAN:   I'd rather be prepared.

22   THE COURT:   What's that book again you have?

23   MR. HYMAN:   Everything I Learned I Learned From

24   Kindergarten.

25   THE COURT:   But didn't Einstein say that's wrong, it's

1    curved?  Something.

2           Can we do our instructions -- well, I guess we can do

3    them tomorrow if you want.

4           MS. BABU:  That's fine, Your Honor.  When would you

5    like to do that?

6           THE COURT:  Well, we'll do it as soon as you rest and

7    they rest.

8           MS. BABU:  That's fine, Your Honor.

9           THE COURT:  You'll have -- your two witnesses will not

10   be lengthy.

11          MR. HYMAN:  No.  You know, 20 minutes.

12          THE COURT:  We should finish the evidence in the

13   morning?

14          MR. HYMAN:  Oh, yes.

15          THE COURT:  All right.  So then we'll argue it Monday

16   morning, 10:00 o'clock, right?

17          MR. HYMAN:  Yes.

18          THE COURT:  So we'll do our instructions tomorrow then.

19          MS. BABU:  That's fine, Your Honor.

20          THE COURT:  Have a nice evening.

21          MS. BABU:  Thank you, Judge.  You, too.

22          (Proceedings adjourned to 10:00 a.m.)

23

24

25

C E R T I F I C A T E

We, Judith A. Walsh and Lisa H. Breiter, do hereby certify that the foregoing is a complete, true, and accurate transcript of the proceedings had in the above-entitled case before the Honorable HARRY D. LEINENWEBER, one of the judges of said court, at Chicago, Illinois, on June 13, 2019.

/s/ *Judith A. Walsh, CSR, RDR, F/CRR*_____    February 20, 2020

/s/ *Lisa H. Breiter, CSR, RMR, CRR*_____    February 20, 2020

Official Court Reporters

United States District Court

Northern District of Illinois

Eastern Division