1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3 UNITED STATES OF AMERICA,      )
                          )
4          Plaintiff,      )
                          )
5     v.                )  No. 18 CR 00278
                          )
6 ERNESTO GODINEZ,          )  Chicago, Illinois
                          )  June 14, 2019
7         Defendant.      )  10:00 a.m.

8                    VOLUME 5
            TRANSCRIPT OF PROCEEDINGS - Trial
9    BEFORE THE HONORABLE HARRY D. LEINENWEBER and a Jury

10 APPEARANCES:

11 For the Plaintiff:        HON. ZACHARY T. FARDON
                       United States Attorney
12                  BY:  MS. KAVITHA J. BABU
                        MR. NICHOLAS J. EICHENSEER
13                 Assistant United States Attorneys
                       219 South Dearborn Street, Suite 500
14                 Chicago, Illinois 60604
                       (312) 353-5300
15
 For the Defendant:        MR. LAWRENCE H. HYMAN
16                 111 West Washington Street
                       Suite 1025
17                 Chicago, Illinois 60602
                       (312) 346-6766
18
                       PISSETZKY & BERLINER
19                 BY:  MR. GAL PISSETZKY
                       35 West Wacker Drive, Suite 1980
20                 Chicago, Illinois 60601
                       (312) 566-9900
21

22 Court Reporter:           Judith A. Walsh, CSR, RDR, F/CRR
                       Official Court Reporter
23                 219 South Dearborn Street, Room 2118
                       Chicago, Illinois 60604
24                 (312) 702-8865
                       judith_walsh@ilnd.uscourts.gov
25

1                    I N D E X

2   WITNESS                      DX      CX      RDX     RCX

3   BEAU JACOBSEN

4        By Ms. Babu            911              958

5        By Mr. Hyman                   926              965

6   KEVIN CRUMP

7        By Ms. Babu            969

8        By Mr. Hyman                   978

9

10                  E X H I B I T S

11  NUMBER                                RECEIVED

12  Government Exhibit

13       No. 553                              923

14       No. 555                              917

15  Defendant's Exhibit

16       Nos. 19 through 23                   942

17       Nos. 24 through 26                   947

18       No. 27                               952

19

20

21

22

23

24

25

1    (Proceedings heard in open court.  Jury out.)

2    MR. HYMAN:  Your Honor, before we start, I have a

3    couple of matters.  I sort of have an idea of what the Court's

4    going to say, but I'd like to make it for the record anyhow.

5    THE COURT:  All right.  How do you know?  I have

6    surprised --

7    MR. HYMAN:  I have a sense.  I have a good sense.

8    THE COURT:  All right.

9    MR. HYMAN:  Under Federal Rule of Evidence 403, we

10   believe the testimony of Agent Crump in this case does not add

11   anything to the charge that Mr. Godinez has been -- has been

12   placed against him.  Agent Crump is the last witness after

13   Officer -- Agent Jacobsen, and I think that we -- and the

14   evidence so far in this case has been that the agent was shot,

15   that he was working that night, that he's an employee of the

16   alcohol, tobacco, and firearms unit which we stipulated is an

17   agency of the United States government.

18   And to now bring in Crump, the last witness, and I --

19   it's not my role to decide how the government puts on their

20   witnesses but he really, truly adds nothing to this case,

21   Judge.  This is not a PI case where he's talking about his

22   injuries.  This is not a case where they have brought in the

23   doctor to explain the injury.  That's not the issue for which

24   Mr. Godinez was indicted.  He was indicted for the shooting of

25   an agent in the course of his duties.  That's what the statute

1    says.

2           So I think at this point to now bring in Mr. Crump

3    who obviously will have some disfigurement and has a

4    significant -- had a significant injury and had these multiple

5    surgeries, or he certainly had an extensive surgery at

6    Stroger, does nothing of probative value in this case.  It is

7    not probative.  It is just an inflammatory, highly prejudicial

8    testimony that has -- all his injuries, all what happened has

9    been covered by four different, five different agents so far.

10           MS. BABU:  Your Honor, if I may.

11           MR. HYMAN:  So that is our position.

12           MS. BABU:  Your Honor, the indictment specifically

13   reads that the defendant is charged with using a deadly and

14   dangerous weapon, namely, a firearm, and did inflict bodily

15   injury upon Special Agent A.  Special Agent A is Special Agent

16   Kevin Crump.

17           The other agents there are certainly, as Mr. Hyman

18   pointed out, not medical professionals.  Special Agent Crump

19   is the victim in this case, and his testimony is highly

20   relevant to whether or not bodily injury was inflicted during

21   this event.

22           THE COURT:  Well, I think what he's saying is they'll

23   stipulate.

24           MR. HYMAN:  Yes.

25           MS. BABU:  Your Honor, this evidence is extremely

1  relevant and evidence that the jury is allowed to hear.  There

2  is --

3          THE COURT:  Well, I understand they're allowed to

4  hear it.

5          MS. BABU:  And under --

6          THE COURT:  He contends that -- I guess they're

7  willing to stipulate that he was a federal official and he

8  received a serious injury.

9          MR. HYMAN:  Yes.

10          THE COURT:  So --

11          MS. BABU:  Your Honor, the government is allowed to

12  put on its evidence.  And I'm happy to hear that the defendant

13  does not intend to cross Agent Crump on much of this evidence,

14  but we are allowed to put on this evidence.

15          THE COURT:  All right.  But it should be very --

16          MS. BABU:  It will be brief, your Honor.

17          THE COURT:  -- very brief.  And I'll overrule the

18  objection, but I'll, if -- but not to go into detail other

19  than say that, you know, he got shot.

20          MS. BABU:  It will not be inflammatory, your Honor.

21  And I do not expect that at all.

22          THE COURT:  All right.  All right.  Are we ready?

23          MR. HYMAN:  No.  One other issue.

24          THE COURT:  All right.

25          MR. HYMAN:  We have subpoenaed Detective Neil Evans.

1    The star number is 20988.  He's now a sergeant.

2         Is there a Sergeant Evans?

3         He was subpoenaed initially on May 31st.  We have

4    checked.  He was at that -- we believe at that time, he was at

5    Area South criminal division.  He has been promoted to a

6    sergeant.  We found out on Monday that he was promoted to a

7    sergeant in the 4th District.

8         We resubpoenaed that officer to be here this morning

9    at 10:00 o'clock a.m.  I have a copy of that subpoena.  I have

10   called that district three times, your Honor, including --

11   today is Wednesday -- Friday?  Wednesday evening, I spoke to a

12   Lieutenant Baly.  He spelled his name as B-a-l-y, who was not

13   very helpful.  And all he told me is, "Counsel, your

14   notification -- he's got his notification."

15        This morning at 8:30 this morning, I called the 4th

16   District because Sergeant Evans works as a midnight officer.

17   I checked with the desk.  They said he had left.  I asked if

18   there was a notification for him to be in this courtroom at

19   10:00 o'clock.  They said yes, there is a notification.

20        He's not here.  He's our witness as soon as they

21   finish with the officer, Agent Crump.  And we're going to ask

22   that the Court hold him in contempt of court for failure to be

23   here.

24        THE COURT:  Do you know anything about it?

25        MS. BABU:  No, your Honor.  In fact, I personally

1    reached out to Detective Evans, or Sergeant Evans now, a few

2    weeks ago and never heard back.  So we do not -- we have not

3    had any contact with Detective Evans.

4            THE COURT:  I can only assume he's coming.

5            MS. BABU:  I assume as well, your Honor.

6            THE COURT:  Maybe he's delayed or something.  Well,

7    let's finish your case, and there's some stuff --

8            MS. BABU:  Sure, your Honor.  Your Honor, we have

9    about 10 to 15 minutes left of the direct of Agent Jacobsen.

10   It will be fairly brief.

11           THE COURT:  All right.

12           Dan, do you want to get the jury?

13           He still has to be cross-examined, right, Jacobsen?

14           MS. BABU:  Correct, your Honor.

15           MR. HYMAN:  Yes.

16      (Proceedings heard in open court.  Jury in.)

17           THE COURT:  Please be seated.

18           Agent Jacobsen, you're still under oath from

19   yesterday.  Do you understand that, sir?

20           THE WITNESS:  Yes, sir.

21           THE COURT:  All right.  Ms. Babu, you may question

22   the witness.

23      BEAU JACOBSEN, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

24              DIRECT EXAMINATION (Resumed)

25   BY MS. BABU:

1  Q.  Agent, before you sit down, would you be able to move the

2  map closer to you?  Thank you.

3  A.  Yes.

4         MS. BABU:  Thank you.

5         Could we have the government's table?  Thank you.

6  BY MS. BABU:

7  Q.  Agent Jacobsen, I'm showing you what has been marked

8  Government Exhibit 557 which is previously admitted into

9  evidence.  Do you see that on your screen?

10  A.  Yes.

11  Q.  You testified yesterday that you took this photo, correct?

12  A.  That's correct.

13  Q.  And where did you take this photo from?

14  A.  Standing at the mouth of the gangway between 4332 South

15  Hermitage and 4336 South Hermitage.

16  Q.  Could you point that out to the jury on the map, please?

17  A.  Yes.

18  Q.  And taking this photo -- when did you take this photo?

19  A.  This photo was taken approximately a week ago.

20  Q.  In which direction are you facing in taking this photo?

21  A.  I'm facing south.

22  Q.  And could you point out in the photo where the

23  intersection of 44th and Hermitage is?

24  A.  Yes.

25  Q.  And where were you standing in the gangway relative to the

1  sidewalk when you took this photo?

2  A.  The sidewalk is to my left.  There's, you could call it,

3  the top step or a small walkway into the steps right there,

4  and I'm standing on top of that area directly on the fence

5  line.

6  Q.  Agent Jacobsen, I'm now going to show you Government

7  Exhibit 500 which has also previously been admitted.

8       Would you clear the -- thank you.

9       Have you seen this photo before?

10  A.  Yes.

11  Q.  And this is a photo taken by the Chicago Police Department

12  of the gangway between 4332 and 4336, correct?

13  A.  Yes.

14  Q.  And this photo was taken on May 5th, 2018?

15  A.  Yes.

16  Q.  Does the -- in this photograph, does the general

17  appearance of the gangway, the physical aspects of the gangway

18  such as the sidewalk and the houses and where they are

19  located, is that the same as when you were there on June 9th?

20  A.  Yes.

21  Q.  Could you explain to the jury using Government Exhibit 500

22  about where you were standing when you took the photograph in

23  Government Exhibit 557?

24  A.  Yes.  Should I circle or --

25  Q.  Sure.

1    A.   Is that okay?  Basically, right at this area right here.

2    Q.   So this is the little landing you were talking about?

3    A.   Yes.

4    Q.   And on the other side of the landing, are there stairs?

5    A.   Yes, there are.

6    Q.   About how many?

7    A.   I believe it's two.

8    Q.   And Agent Jacobsen, I'm now -- going back to Government

9    Exhibit 557, so you are -- in this photograph, you are

10   standing on the landing that you just -- that you just pointed

11   out?

12   A.   That's correct.

13   Q.   And you're facing south, correct?

14   A.   That's correct.

15   Q.   Agent Jacobsen, I'm now showing you what has been

16   previously marked and admitted as Government Exhibit 105-A.

17   Have you seen this photograph before?

18   A.   Yes.

19   Q.   And what is this a photograph of?

20   A.   This is the front camera, residential camera located on

21   4324 South Hermitage looking to the south.

22   Q.   And you've been at counsel's table during the course of

23   this trial, correct?

24   A.   That's correct.

25   Q.   And is this one of the exhibits that Steve Greene

1    introduced?

2    A.  Yes, that's correct.

3    Q.  And this is the high-resolution photograph of combining

4    multiple frames from the video camera at 4324 South Hermitage?

5    A.  Yes.

6    Q.  And, sir, is the location from where you took your

7    photograph in Government Exhibit 557 visible in 105-A?

8    A.  No, it's not.

9    Q.  If you could see the location from where you took the

10   photo, about where would it be on the photograph?

11   A.  It would be approximately there.

12   Q.  And is that -- if you could, clear that.

13          Is that an awning there?

14   A.  Yes.

15   Q.  So were you standing -- where in relation to the awning

16   were you standing when you took Government Exhibit 557?

17   A.  A few feet to the south of it.

18   Q.  So when you stood in that awning -- or rather, when you

19   stood and took 557 and turned to the north, could you see the

20   security cameras on 4324 South Hermitage?

21   A.  I cannot.

22   Q.  Agent Jacobsen, yesterday you testified that you had been

23   in the alley behind 4324 South Hermitage and 4332 South

24   Hermitage in the days following May 4th, 2018, correct?

25   A.  That's correct.

1  Q.  Sir, I'm showing you what's been marked Government Exhibit

2  555.  It has not been admitted yet into evidence.

3        Have you seen this photograph before?

4  A.  Yes.

5  Q.  And what is this a photograph of?

6  A.  This is a photograph that basically, I'm standing directly

7  beneath the residential cam that's facing south in the alley.

8  Q.  And who took this photograph?

9  A.  I did.

10  Q.  What did you use to take the photograph?

11  A.  My phone.

12  Q.  And when did you take it?

13  A.  I believe this was approximately ten days after May 4th,

14  so about May 14th then.

15  Q.  And --

16  A.  Of 2018.  Sorry.

17  Q.  Of 2018?

18  A.  Yes.

19  Q.  And, sir, you've seen the video surveillance of the alley

20  taken from 4324 South Hermitage Avenue?

21  A.  Yes.

22  Q.  And does -- and that video surveillance is from the early

23  morning hours of May 4th, 2018, correct?

24  A.  That's correct, yes.

25  Q.  And does the photo in Government Exhibit 555 fairly and

1    accurately depict the alley between -- behind, excuse me, 4332

2    South Hermitage?

3    A.   Yes.

4           MS. BABU:   The government would move to admit

5    Government Exhibit 555.

6           THE COURT:   Any objection?

7           Hearing none, it's admitted.   You may publish it.

8         (Government Exhibit No. 555 received in evidence.)

9    BY MS. BABU:

10   Q.   Agent Jacobsen, can you explain to the jury where you were

11   standing when you took this photograph?

12   A.   The camera hangs off of a garage so basically, I'm

13   standing directly underneath the camera at that point.

14   Q.   And what is to the left in this photograph?

15   A.   A wooden fence.

16   Q.   And right at the end of that fence?

17   A.   Is a black pipe that's protruding from the ground.

18   Q.   And what is towards the center of the photograph?

19   A.   Speed bumps.

20   Q.   And further down next to the vehicle that's in that

21   photograph, what is that?

22   A.   A light pole, a telephone pole.

23   Q.   And Agent Jacobsen, whose vehicle is that?

24   A.   I don't know.

25   Q.   And so you were facing southbound when you took this

1    photograph, correct?

2    A.   That's correct.

3    Q.   Sir, from your investigation of this case, do you know

4    where the entry to the gangway within which Officer Presnell

5    recovered Government Exhibit 300, which were the five

6    cartridge cases, is?

7    A.   Yes.  It's just south of, essentially, where those trash

8    cans are on the left side.

9    Q.   And could you point out to the grand jury -- or excuse me,

10   to the jury on Government Exhibit 555 where that entry is?

11   A.   Essentially, that would be like a line going into it

12   almost.

13   Q.   And Agent Jacobsen, you have been in this alley, correct?

14   A.   That is correct.

15   Q.   And you have -- have you walked from west to east in this

16   alley?

17   A.   Yes.

18   Q.   And where -- could you, using Government Exhibit 555,

19   explain where you started in one of the times you walked west

20   to east?

21   A.   I started between the two garages that are on the right

22   side of the screen that are just south of that -- just south

23   of this dumpster.  So can I mark?  Is that okay?

24   Q.   Please.

25   A.   Basically standing right here.

1    Q.   And then you walked in which direction?

2    A.   To the left.

3    Q.   And then you entered the gangway to the east?

4    A.   Yes.

5    Q.   Agent Jacobsen -- and I'm sorry.  And that gangway, you

6    said, is immediately behind the light pole that's marked here?

7    A.   Directly -- yes.  It's hard to tell from this vantage,

8    obviously, but there's a wooden gate that's right there to the

9    left of it, and then as you go further south, there's a garage

10   between that point and where the gangway is.

11   Q.   And are there other -- any other open entries into the

12   gangways going west to east from where you were standing to

13   that entry?

14   A.   There's a wooden fence that doesn't appear to open, but I

15   don't know.  I've never seen it open, but it may.

16   Q.   Sir, I'm now showing you a clip from Government Exhibit

17   111, which has already been admitted into evidence, with the

18   timestamp 3:19:49, if we could pause it.

19         Do you see, in this still of Government Exhibit 111,

20   what is to the very left of this on the left -- sorry, in the

21   right-hand side of the video, the --

22   A.   A wooden fence with a pole protruding on the -- from the

23   ground.

24   Q.   And based on your personal observations of the alley, is

25   that the same pole and fence that you saw?

1    A.   Yes.

2    Q.   And what is in the center of that image?

3    A.   Speed bumps.

4    Q.   And where the yellow circle is right now, there's an

5    individual, but what is to the left of the individual?

6    A.   The light pole.

7    Q.   And based on your personal observations of being in that

8    alley, is that the same telephone pole or light pole that you

9    observed?

10   A.   Yes.

11            MS. BABU:  You can continue to play the clip.

12   BY MS. BABU:

13   Q.   And Agent Jacobsen, when you -- did you walk into the

14   gangway and through the gangway when you were there on May

15   14th and earlier this week, I guess?

16   A.   Yes, I did.

17   Q.   And when you walked into the gangway, were you immediately

18   on the other side of the telephone pole or the light pole,

19   rather?

20   A.   Yes, the first opening in the line.  Again, there's a

21   garage and then there's the opening to the gangway.

22   Q.   And when you walked into the gangway, was it level ground?

23   A.   You actually step down.  There's not stairs.  It's more

24   like, I don't know, like a small ramp, I guess, down into the

25   gangway.

1  Q.  Okay.  Agent Jacobsen, I'm going to switch topics here for

2  a second.  As the case agent on this investigation, have you

3  reviewed video footage from the pole camera at 44th and Wood?

4  A.  Yes, I have.

5  Q.  And that's the camera -- to remind the jury, is this the

6  camera that faces north on Wood Street?

7  A.  Yes.

8  Q.  And have you reviewed video from before 2:55 a.m. on May

9  4th?

10  A.  Yes.

11  Q.  And in that video footage, did you observe a white SUV

12  parked in front of 4345 South Wood Street?

13  A.  Yes, I have.

14  Q.  And who lives, to your knowledge, at 4345 South Wood

15  Street?

16  A.  The Godinez family.

17  Q.  And does the defendant also live there?

18  A.  Yes.

19  Q.  Agent Jacobsen, in your investigation of this case, have

20  you searched various law enforcement databases?

21  A.  Yes.

22  Q.  And have you reviewed photographs of the defendant?

23  A.  Yes.

24          MS. BABU:  Your Honor, on Wednesday the parties

25  stipulated that Government Exhibit 553 was a business record

1    of the Chicago Police Department.

2            THE COURT:  All right.

3            MS. BABU:  We would move to -- I'd like to show the

4    photograph to Agent Jacobsen.

5            THE COURT:  All right.  You may.

6            MR. HYMAN:  I --

7            MS. BABU:  And it would not be published yet.  I'll

8    move to admit it.

9            THE COURT:  All right.  You may publish it.

10           MS. BABU:  Your Honor, it has --

11   BY MS. BABU:

12   Q.   Agent Jacobsen, have you seen this photograph yet?

13   A.   Yes.

14   Q.   Or before, rather?

15   A.   Yes.

16   Q.   Where have you seen this photograph?

17   A.   Just from querying databases.

18   Q.   So you've seen this photograph in your review of law

19   enforcement databases?

20   A.   Yes.

21   Q.   And what do you know this photograph to be?

22   A.   A booking photograph from the defendant.

23   Q.   And is this from a booking photograph from April of 2017?

24   A.   Yes.

25           MS. BABU:  Your Honor, the government would move to

1  admit Government Exhibit 553 and publish to the jury.

2          MR. PISSETZKY:  No objection.

3          THE COURT:  Any objection?

4          MR. PISSETZKY:  No.

5          THE COURT:  It's admitted.  You may publish it.

6      (Government Exhibit No. 553 received in evidence.)

7          MS. BABU:  Actually, your Honor, before we publish.

8  BY MS. BABU:

9  Q.  Agent Jacobsen, there's a second page to this, so let me

10 show you that before we publish to the jury.

11 A.  Okay.

12 Q.  Agent Jacobsen, is this the second page of these booking

13 photos?

14 A.  Yes.

15 Q.  And have you seen this photograph?

16 A.  Yes.

17         THE COURT:  Is there objection to this one?

18         MR. HYMAN:  Yes.

19         MR. PISSETZKY:  Yes.

20         THE COURT:  Okay.  Let me have a sidebar on this.

21     (Proceedings heard at sidebar:)

22         THE COURT:  Since they acknowledge that he's a member

23 of the gang, it seems -- what?  Who can hear me speak?

24         Since they acknowledge he's a gang member --

25         MR. PISSETZKY:  You can hear.  You can hear your

1    voice.

2              THE COURT:  Well, yes, I'm talking.

3              It seems to me that you don't need this, and I do

4    think that under 403, this is not necessary.

5              MS. BABU:  Your Honor, if I may.

6              THE COURT:  Yes.

7              MS. BABU:  The symbol that's on the defendant's arm

8    is the same symbol that's in the gangway of -- that he

9    entered.  It's also, there are not clear photos of the tattoo

10   in the defendant in the surveillance videos, and this is a

11   clear photo from April 2017 that has been shown to be a

12   business record of the Chicago Police Department.

13             THE COURT:  Since it's not an issue in the case, I'll

14   sustain the objection to the admission of this exhibit.

15             MS. BABU:  Your Honor, this goes to -- this goes to

16   show the defendant's membership in the Latin Saints which

17   has -- you have ruled to be an issue in this case.

18             THE COURT:  I think they acknowledged he's a member.

19             MR. HYMAN:  And two women testified that he was.

20             THE COURT:  Yes.  They have acknowledged that he --

21   they admit that, so I think it's unnecessary, so I'll sustain

22   that.

23         (Proceedings heard in open court:)

24             THE COURT:  Let's proceed.  What's --

25         (Pause.)

1    THE COURT:  Okay.

2    MS. BABU:  Sorry, your Honor.  May I begin?  May I

3  continue?

4    THE COURT:  Pardon?

5    MS. BABU:  May I continue?

6    THE COURT:  Yes, please.

7  BY MS. BABU:

8  Q.  Agent Jacobsen, going back to the white Kia, where did you

9  see it parked when you saw it in the video footage from the

10  pole camera?

11  A.  Parked on Wood Street in front of the residence.

12  Q.  And was it parked in the driveway between the residence

13  and the factory that's next door?

14  A.  The time I'm recalling, it was actually on the street

15  facing north.

16  Q.  And it's directly in front of the residence?

17  A.  Yes, it appears so.

18    MR. PISSETZKY:  Can we have --

19    MR. HYMAN:  Clarification.

20    MR. PISSETZKY:  -- foundation.

21    MR. HYMAN:  As to the time?

22    THE WITNESS:  I believe it was just before noon on

23  May 3rd or 15 minutes maybe before noon on May 3rd.

24    MS. BABU:  Your Honor, the government has nothing

25  further.

1       THE COURT:  Cross-examine.

2       MR. HYMAN:  Thank you.

3       THE COURT:  Mr. Hyman, you may question the witness.

4       MR. HYMAN:  Thank you very much.

5                        CROSS-EXAMINATION

6   BY MR. HYMAN:

7   Q.  Good morning, Agent.

8   A.  Good morning, sir.

9   Q.  I've got a few things I'd like to go over with you.

10  A.  Yes.

11  Q.  And because my number keeping isn't the best, I think I

12  gave you the photos ahead of time.

13  A.  Yes.

14  Q.  Okay.  Before we start on some of the more important

15  things, I do want to just clear up, the date of May 3rd,

16  that's when the white -- you saw the white Kia parked in front

17  of the house, right?

18  A.  That's correct.

19  Q.  But on May 4th about 3:00 o'clock in the morning after

20  your review of those videos, the Kia is in that driveway next

21  to the -- next to the Godinez home, right?

22  A.  That's correct.

23  Q.  It's not parked on the street, true?

24  A.  Correct.

25  Q.  As you mentioned to us the other day, as the case agent,

1  that means that you have the responsibility, you were

2  appointed and had the responsibility of managing the case,

3  true?

4  A.  Yes, sir.

5  Q.  And one of the things of management in a case is that you

6  are responsible for the collection of reports by your brother

7  agents, correct?

8  A.  Yes, sir.

9  Q.  And there are multiple reports written by them, correct?

10  A.  Yes, sir.

11  Q.  In fact, there were, what, 80, 70 to 80 reports, maybe

12  more?

13  A.  I don't know.

14  Q.  A lot?

15  A.  That sounds about right, though.

16  Q.  Yeah.  A lot of reports written just by the ATF officers,

17  right?

18  A.  Yes, sir.

19  Q.  And just not by you, true?

20  A.  Correct.

21  Q.  Were -- was there one report ever written by the Task

22  Force Agent Spratte for you?

23  A.  No.

24  Q.  Did you interview Mr. Spratte?

25  A.  I did not.

1   Q.  Did any of the other officers, agents of ATF, interview

2   Spratte and then write a report?

3   A.  No agent did, no.

4   Q.  Besides the writing of reports, there's a collection of

5   evidence, true?

6   A.  Yes.

7   Q.  And I just am curious if you can answer the question,

8   there was -- this is a shooting of a federal officer.  Why was

9   the Chicago Police Department so involved in this case?  Why

10   weren't there the forensic people of the ATF initially

11   involved?

12   A.  The reality of the situation was, is it was in -- it was

13   obviously in the city of Chicago, and they were the first to

14   respond.  At that point, they had evidence techs who were

15   available.  We don't have evidence techs in our division

16   necessarily, so we would have to fly people out and whatnot.

17   Q.  So you rely upon -- certainly, you relied upon

18   investigator, forensic investigator Presnell to do the

19   collection, right?

20   A.  Yes, that's correct.

21   Q.  And even though he does the collection, later on, you took

22   those items that he had collected, the cartridge casings, the

23   bullets, and then you took those and sent them to Washington,

24   D.C., true?

25   A.  That's correct.

1   Q.  All right.  The cartridge casings, I want to talk to you

2   about those.  The cartridge casings that were initially

3   collected were, in fact, based upon your review of all the

4   documents, and you also reviewed the Chicago police reports,

5   correct?

6   A.  Yes, I did.

7   Q.  You've seen Presnell's report --

8   A.  Yes.

9   Q.  -- right?

10          And there was also -- also a report prepared by

11  members of the Chicago Police Department's forensic firearms

12  lab as well, true?

13  A.  Yes.

14  Q.  And one of the things that you know in your own training

15  at ATF, there is, as Mr. Esposito told us, a sequence of what

16  to do before he finally analyzes the bullet, right?

17  A.  I -- are you -- can you clarify --

18  Q.  There's an order to, method to -- before he actually, he,

19  Esposito, the firearms guy, gets that bullet, it can go to

20  various other departments, right?  So in other words, you want

21  to take the DNA first.  You did that --

22  A.  Yes.

23  Q.  -- of this bullet.

24          If there was a fingerprint impression found on the

25  head of that bullet, it would be treated by fingerprints,

1  right?

2  A.  Yes.

3  Q.  And most fingerprinting leaves some sort of residue on it,

4  so that's why you have to do the DNA first, correct?

5  A.  Yes, but I can't speak to how Chicago PD would necessarily

6  do that.

7  Q.  Right.  But in terms of what you understand the general

8  order is going to be, it's the DNA, a fingerprint, and then an

9  analysis of the casing, cartridge casing or the bullet itself,

10  true?

11  A.  Again, I would defer to someone that works in the CPD lab.

12  I don't know how they process it.

13  Q.  But in this case, this bullet fragment that was described

14  by Mr. Esposito, that fragment was, in fact, as he said, he

15  removed it from the fingerprint division, right?

16  A.  Yes.

17  Q.  In fact, you at our request or asking the prosecutors, you

18  found there was actually a report prepared by the fingerprint

19  unit of the ATF, right?

20  A.  Yes.

21  Q.  And you, in fact, learned there was no identifiable latent

22  print with negative -- the presence of an identifiable latent

23  print with negative results.  So there was nothing on that

24  bullet head --

25  A.  That's correct.

1    Q.   -- true?

2    A.   Yes.

3    Q.   Well, getting back to the Chicago crime lab, you knew that

4    they had those casings, right?  That's where you got them

5    from?

6    A.   Yes.  I became aware, yes, that they had them.

7    Q.   And before -- when they got those casings, they also

8    tested them or examined them to determine what type of casing

9    they were, true?

10   A.   Can you clarify that question?

11   Q.   Sure.  I'll rephrase it for you.  When the firearms unit

12   of the Chicago Police Department examined those casings, they

13   determined, did they not, what was the firearm -- what the

14   type of ammunition it was?

15   A.   Like describing the caliber?

16   Q.   Yes.

17   A.   Yes, that's right.

18   Q.   And one of the other things they tested was, in order to

19   determine if it was from the same gun, they tested, as

20   Mr. Esposito talked about, the pin, the head of the cartridge,

21   true?

22   A.   The headstamp, yes.

23   Q.   Yes.  The headstamp.

24   A.   Yes.

25   Q.   Was there anything that you saw within the Chicago Police

1  Department's notes that indicated that the department tested

2  for DNA on those --

3  A.  No.

4  Q.  -- casings?

5       Is there anything that you have seen within any of

6  the notes of the forensic unit of the Chicago Police

7  Department that they tested for fingerprints?

8  A.  No, not that I've seen.

9  Q.  And you yourself when you submitted these casings to the

10  ATF lab in Washington, you yourself did not request a DNA on

11  it, did you?

12  A.  No, not at that time.

13  Q.  And you haven't requested a DNA up to today, have you?

14  A.  No, I have not.

15  Q.  And when you sent these casings to the firearms -- to the

16  lab in Washington, D.C., you did not request a fingerprint

17  impression analysis of those casings --

18  A.  No.

19  Q.  -- true?

20  A.  No, I did not.

21  Q.  Agent Jacobsen, in your training within the police

22  department -- the Alcohol Tobacco and Firearms department or

23  agency, there is a whole school of training that you go

24  through, true?

25  A.  Yes.

1  Q.  One of the things about training is you are constantly

2  taught about the techniques of evidence collection and

3  preservation, right?

4  A.  Yes.

5  Q.  And that is so that the people in the labs can help

6  identify a potential suspect in this case, true?

7  A.  Correct.

8  Q.  And all the identifications that you -- all the things

9  that you collected -- pardon me -- and that were collected,

10  was there anything that identified Mr. Godinez in this case?

11  Did you find his fingerprints?

12  A.  Find a fingerprint, no.

13  Q.  And one of the other things that you know, especially from

14  ATF, is that when a weapon is fired, it leaves gun residue on

15  a person's hand, true?

16  A.  It can -- they could be wearing gloves that would

17  obviously dictate that, but it can, yes.

18  Q.  Any indication that the shooter in this case --

19  A.  No.

20  Q.  -- wore gloves on May 4th?

21  A.  No.

22  Q.  Well, there's different terms for what's left on a -- on a

23  person's hands or clothes.  It's called a residue transfer,

24  right?

25  A.  There's -- like you said, there's different terms, gunshot

1   residue.

2   Q.   There's terms of gunshot residue, GSR, right?  You've

3   heard that term?

4   A.   Yes.

5   Q.   They also call it cartridge discharge residue, CDR?

6   A.   I have never heard that, but it's possible.

7   Q.   Or how about gunfire residue, GFR?

8   A.   Again, I've never heard that term, but it's possible.

9   Q.   But whenever there is this residue, and that happens

10  because when the bullet, and certainly in an automatic because

11  that's what this, we believe -- you believe was the weapon

12  used, an automatic weapon, true?

13  A.   I believe, if you're speaking what Mr. Esposito said.

14  Q.   Yes.

15  A.   It could be fully auto or semiautomatic.

16  Q.   But it's not a -- according to Mr. Esposito, based upon

17  the bullet or based upon the cartridges certainly, cartridge

18  casings, those were in an automatic weapon that discharges the

19  shell, the casing, correct?

20  A.   Yes, that's what he said.

21  Q.   The revolver keeps it in the casing, keeps it within the

22  tumbler?

23  A.   That's correct.

24  Q.   So when a person fires an automatic or semiautomatic

25  weapon, residue can be deposited on his hands or clothes,

1  right?

2  A.  It can be, yes.

3  Q.  You also know residue can travel a certain distance when a

4  gun is fired.  You see the smoke that comes out from the back,

5  from the discharge, right?  That could be residue, true?

6  A.  I'm sure it could.  This is outside the scope of what I'd

7  be able to tell you about probably, but yes.

8  Q.  But you certainly are trained at ATF that gunshot residue

9  is a form of testing, true, currently?

10  A.  Yes, I would say I've never used it in ATF.  When I was a

11  police officer, yes, we had gunshot residue tests.

12  Q.  And if someone shoots a gun, they can take an impression

13  or do some sort of testing of on the hands or a suspect's

14  clothes to determine whether or not he fired a weapon, true?

15  A.  They can, yes, if it's in close proximity to when the

16  shooting occurred.

17  Q.  And certainly, you would agree that this concept of

18  gunshot residue goes back many years?  It's nothing new?

19  A.  No, it's nothing new, no.

20  Q.  When a person is, if you -- when you've used the term

21  "gunshot residue," a person, in fact, can transfer gunshot

22  residue from one person to another, could they not?

23       So if I fire a weapon and I go up and I shake our

24  court personnel's hand, you could find probably the residue on

25  his hand, true?

1  A.  Again, timeframe would matter, but it's possible, yes.

2  Q.  Now, you -- you noticed in the views of the video,

3  certainly of the video that we saw earlier this week of

4  Mr. Godinez coming back to his house, and it looked like he

5  was taking off his cap and wiping his brow?

6  A.  Yes.

7  Q.  And putting his cap back on, do you remember seeing that?

8  A.  Yes.

9  Q.  That was just moments after the shooting that happened,

10 right?

11 A.  Yes.

12 Q.  So just a couple minutes.  And then Mr. Godinez gets in

13 his car, and he gets into a car, the car that was identified.

14 And Ms. Jean-Baptiste told us that was her car and she drove

15 it, and they drove it to the gas station, right?

16 A.  Yes.

17 Q.  And I think you told us yesterday, on May 7th that under a

18 warrant issued by an official, a judge in this courtroom --

19 courthouse, you seized that car and you seized items in the

20 car, true?

21 A.  That's correct.

22 Q.  And one of the items that you -- or several, a couple of

23 items that you seized were a black hat, right?

24 A.  Yes, one of the items.

25 Q.  One of the items.  And, of course, then that was sent,

1  that was sent for impressions of DNA, right?

2  A.  Yes.

3  Q.  And there was a stipulation that the DNA on the hat was

4  Mr. Godinez, right?

5  A.  That's correct.

6  Q.  Of course, then that you also in your request, you asked

7  to determine if there was any gunshot residue on that hat,

8  right?

9  A.  I did not.

10  Q.  Did anybody within the lab in Washington, D.C., do a

11  gunshot residue analysis on that hat?

12  A.  No, they did not.

13  Q.  You also found in the search these two bottles, empty

14  bottles on that -- in that car, true?

15  A.  I believe there was still some liquid in them but, yes,

16  two Evian bottles.

17  Q.  Right.  And Evian natural spring bottles.  And that

18  appears to be what Mr. Godinez purchases at the Shell station

19  that you again showed -- the prosecution showed the videos of,

20  correct?

21  A.  That's correct.

22  Q.  And those as well were processed for identifiable latent

23  prints, correct?

24  A.  Yes.

25  Q.  And those as well, the results were with negative results,

1  true?

2  A.  Correct.

3  Q.  I want to now talk to you if we can -- oh, by the way,

4  before I do, I have some notes.  I didn't want to lose this.

5       The casings that have been identified as Government's

6  Exhibit 300 --

7  A.  Yes.

8  Q.  -- do you know from all of your readings in the reports

9  and review of these documents who found those casings?

10 A.  No, I do not.

11 Q.  Do you know from all the readings and the reports what

12 time they were found?

13 A.  No, just when Officer Presnell collected them.

14      MR. HYMAN:  Would you be good enough to put up your

15 Exhibit 5 -- the photograph that he took?

16      MS. BABU:  That he took?

17      MR. HYMAN:  Yes.

18 BY MR. HYMAN:

19 Q.  Agent Jacobsen, going back to this Exhibit 557, when you

20 took this, as you said, this was in the month of June, right?

21 A.  This month, yes.

22 Q.  Yes.  And, of course, you recall looking at the photos

23 from May of last year.  There wasn't as much foliage on the

24 trees at that point, was there?

25 A.  No.  It was springtime.

1  Q.  Right.  Now, the photograph that you took, as you pointed

2  out, you took right on the top step which is really at street

3  level, correct?  The top step --

4  A.  It goes up.  There's obviously a curb line, so it's

5  sidewalk level.

6  Q.  Sidewalk level.  I'm sorry.  Not curb level, sidewalk

7  level.  And when you took this photograph, you took it holding

8  your hand up, correct?

9  A.  No.  I had the phone right in front of my face.

10  Q.  You had just stuck your camera phone in front of you and

11  you shot right down --

12  A.  Yes.

13  Q.  -- right?

14          And the position that you stood was not on the step,

15  it was outside, just a little bit outside the gate line, true?

16  A.  I don't know what you would necessarily call that.

17  There's -- the top step is about 8 to 12 inches wide, I'd say,

18  and then it leads into the sidewalk, if you want to call it

19  the top step or a small walkway.  I don't know what you would

20  prefer to call it.

21  Q.  And when you took that photograph, when you took that

22  photograph, you used your right or left hand?

23  A.  Left.

24  Q.  Left hand.  And you stuck it out, and you then took it

25  from that position right on -- it looks like you were standing

1   just sort of between the fence line there, right?

2   A.   Again, usually when I take photos, I'm going like this,

3   and I'm probably touching the button with my right hand but I

4   may be --

5   Q.   But you held your hand out to take the photograph?

6   A.   I think it's just literally in front of my face like this.

7   Q.   And indicating just in front of -- in front of your face.

8   A.   Because I want to be able to see what I'm taking a

9   photograph of, so...

10  Q.   And you were right there at the fence line?

11  A.   Yeah.   I'm essentially standing at the fence line.

12  Q.   Okay.   Now, I'd like to show you -- and you've had, if you

13  would look initially before we switch over to our computer,

14  exhibits -- Exhibit 19.

15  A.   Yes.

16  Q.   Does it appear to be to you at or about the same position

17  at the fence as yours is?

18  A.   Yes, just taken at a lower level.

19  Q.   All right.   More taken -- taken at eye level.   Does it

20  appear it was taken at an eye level?

21  A.   I guess it would depend on how tall the person was that

22  was taking the photo.

23  Q.   Okay.   And would you take a look at Exhibit 20?   Have you

24  got it there?   And that appears to be taken behind the --

25  behind the fence line and on the curb -- on the step, true?

1    A.  I can't tell exactly but, yes, you're moving towards the

2    steps now.  I can't tell if this picture was taken from the

3    steps or --

4    Q.  But it's certainly not on the sidewalk anymore?

5    A.  Yeah.  You were no longer on the sidewalk at that point.

6    Q.  Okay.  And if you look at 21, again, that's taken from

7    inside the fence level, inside the fence?

8    A.  Yes.  You're not on the sidewalk at that point.

9    Q.  And 22, that's also behind the fence line, right?

10   A.  Yes, it appears so.

11   Q.  And if you look at 23, that is also behind the fence but

12   on -- it appears that it's on -- someone's standing on the top

13   step, true?

14   A.  It's -- again, it's hard to say from the photo.

15   Q.  You give it to me?

16   A.  What's that?

17   Q.  Will you give this to me, that's where it was taken?

18   A.  I honestly can't tell where it was taken, the photo but --

19   Q.  But it appears --

20   A.  -- it appears it's closer to the fence.

21          MR. HYMAN:  Okay.  Your Honor, I ask that --

22   BY MR. HYMAN:

23   Q.  But they appear certainly in the same -- this appears to

24   be or you can say that this is where you took your photograph

25   in 557?

1  A.  It appears to be the same area, yes.

2        MR. HYMAN:  Okay.  Judge, I ask that we be able to

3  publish now these photos.

4        THE COURT:  All right.  They're not in evidence,

5  you're moving them into evidence?

6        MR. HYMAN:  Yes.

7        THE COURT:  Any objection?

8        Hearing none --

9        MS. BABU:  No, your Honor.

10        THE COURT:  -- they're admitted.  You may publish

11  them.

12     (Defendant's Exhibit Nos. 19 through 23 received in

13        evidence.)

14  BY MR. HYMAN:

15  Q.  Okay.  So Exhibit 19 shows the position right at the

16  step --

17  A.  That's correct.

18  Q.  -- right?

19        And from that position, can you -- can you see or

20  circle where 44th and Hermitage is?

21        From that position, can you see the west sidewalk at

22  the corner of 44th and Hermitage?

23  A.  No, but the camera is also right on top of the fence line.

24  Q.  Can we go to 20?

25        Behind -- behind that fence, so it appears --

1   A.   If I clear the screen, is that okay?

2   Q.   No, keep it there, if you can.

3   A.   I'm just saying, the circle on the screen.

4   Q.   Yes.

5   A.   Do you want me to clear that?

6   Q.   No.  You can keep it there.  That's fine.

7        You cannot see the corner of 44th and Hermitage, can

8   you, from there?

9   A.   It doesn't appear that I can see it from that angle.

10  Q.   How about 21?  Can you see -- can you see the west

11  sidewalk at 44th and Hermitage?

12  A.   From this angle, I cannot.

13  Q.   And 22, can you see the west sidewalk or the east sidewalk

14  at that angle?

15  A.   From this, this level, I cannot, no.

16  Q.   23, can you now see this -- the sidewalks?

17  A.   I can see the intersection.  It's hard to determine.

18  Probably, no, not at this level.

19  Q.   Okay.  Now, you also in your work as the case agent in

20  this case walked that street that evening, right?  You were

21  there?

22  A.   Which evening are you --

23  Q.   I'm sorry, not evening.  The early morning into the rest

24  of the morning of May 4th of 2018.

25  A.   Yeah.  I didn't show up until probably 9:30 or 10:00 then,

1  yes.

2  Q.  Once you got your assignment as the case agent?

3  A.  Yes.

4  Q.  And you did, and you have --

5  A.  Sorry.  Just to clarify, I wasn't -- I didn't know I was

6  going to be the case agent into well into the evening hours,

7  just to be clear.

8  Q.  But you did walk down Hermitage.  And did you walk the

9  alley at that point, if you remember, ever walk the alley?

10  A.  That day, I do not believe that I walked the alley.

11  Q.  But you certainly walked from that point where you were

12  advised or told that they found the shell casings, and you

13  walked the street, correct?

14  A.  The majority of the day, I actually spent my time up on

15  43rd, just northwest of 43rd.

16  Q.  Sometime during the course of this case, you have been

17  back and forth in that --

18  A.  Yes.

19  Q.  -- area, right?

20  A.  That is correct, yes.

21  Q.  Did you go to the house where they found the bullet in the

22  side of the house?

23  A.  I do believe I've seen it, yes.

24  Q.  And have you positioned yourself or did you see at that

25  time where that bullet was -- where that bullet hole was on

1  the side of the --

2  A.  Yes.

3  Q.  And when you are on the front of that house and you look

4  back towards 44th and Hermitage, you can see both the east and

5  the west sides of the sidewalk, can you not?

6  A.  It depends on where you say, on the front of the house.

7  Q.  Okay.  So why don't, if you would look -- before I show

8  this to the jury, would you look at Exhibits 24, 25, and 26?

9  A.  Yes.

10      (Pause.)

11        Yes.

12  Q.  So those photographs truly and accurately, sir, do they

13  truly and accurately portray this house at 433 -- 4344 South

14  Hermitage?

15  A.  Yes, they appear to.

16  Q.  That's what the front looks like, and it hasn't changed in

17  a year, true?

18  A.  Yes, I believe it's similar.

19  Q.  If you compare the photographs that you've looked at, it's

20  the same yellow shingled house with the brown stairs, correct?

21  A.  Yes, it appears so.

22  Q.  And there's a wrought iron fence there, true?  Not a

23  wrought iron -- there's a wrought iron fence next to it, but

24  there's just a chainlink fence in front of it?

25  A.  I would honestly have to -- it appears to be the same

1  house, but I would honestly have to look.

2  Q.  And if you would look at Exhibits 25 and 26, certainly

3  Exhibit 25, standing at that fence, inside the fence and

4  looking down, you can see both the east sidewalk and the west

5  sidewalk of Hermitage and 44th Street, true?

6  A.  Yes, it appears so.

7  Q.  And if you look at Exhibit 26, from that position you can

8  see the corner of the fence where they found Agent

9  Spratte's -- a hole in the fence that was made by Agent

10 Spratte, true, that fence?

11 A.  I don't believe it's been confirmed that was Agent -- or

12 Task Force Officer Spratte's bullet, but where the hole is in

13 the fence --

14 Q.  Yes.

15 A.  -- that's correct.

16       MR. HYMAN:  Okay.  Judge, at this point, I'd like to

17 introduce Exhibits 24, 25, and 26 into evidence.

18       MS. BABU:  Your Honor, I would just ask that

19 foundation be laid as to when these photos were taken.

20       MR. HYMAN:  Well, these photos certainly show the

21 area of the -- of the same building.

22       THE COURT:  Just tell us what they were taken.

23 That's all.

24 BY MR. HYMAN:

25 Q.  Can you tell that they were taken in or around the summer,

1  summertime?

2      MS. BABU:  Objection, your Honor.  Foundation.  This

3  agent didn't take these photos.

4      MR. HYMAN:  They don't have to take the photos,

5  Judge.  All he has to do is say that they truly and

6  accurately --

7      THE COURT:  I know, but she's asking if he knows when

8  they were taken.  That's all.

9  BY MR. HYMAN:

10  Q.  These were taken -- do you know when these were taken?

11  A.  I don't know when they were taken.

12  Q.  But they appear to be taken in the summertime?

13  A.  Based on leaves, I would say that, yes, they appear to

14  be --

15      THE COURT:  Okay.  I'll admit them.  You can publish

16  them.

17      (Defendant's Exhibit Nos. 24 through 26 received in

18       evidence.)

19      MR. HYMAN:  Would you put on 24?

20  BY MR. HYMAN:

21  Q.  So this is the house that I've been talking to you about,

22  Exhibit 24?

23  A.  Yes.

24  Q.  And that's the 4344 South Hermitage home, right?  That's

25  the house where the bullet ended up in the side.  It doesn't

1    show the side, but that's the house?

2    A.   I believe so, yes.

3    Q.   All right.  And then Exhibit 25, this is taken from inside

4    the home, correct -- or inside the fence, right?

5    A.   Yes.

6    Q.   And you can see, can you circle where that intersection is

7    from this position?

8         Right there.  And you can see both sides of the

9    sidewalk, true?

10   A.   Yes.

11   Q.   The sidewalk Agent Trump -- Crump was walking on and the

12   sidewalk that the other two agents, Winter and Spratte, were

13   walking on, right?

14   A.   It appears so, yes.

15   Q.   And then if you go to Exhibit 26, you can see the corner

16   of the fence and a little bit of -- it looks like there's a

17   truck in there, but there's a little bit of the other side of

18   where the park is, right?  It's a straight line?

19   A.   I can see where the fence is, yes.

20   Q.   Right.  So that's, from where that photo is taken, it

21   looks like it's a straight line through to it, correct?

22   A.   Yes, I guess so.

23        MR. HYMAN:  Excuse me.

24      (Pause.)

25        MR. HYMAN:  Your Honor, may I -- I want to show this

1  to the agent.

2  BY MR. HYMAN:

3  Q.  Agent Jacobsen, the photo which we've marked earlier that

4  we used as Exhibit 12, Godinez Exhibit 12, that was one of the

5  photos taken by Mr. Presnell that morning, right?

6  A.  I believe so, yes.

7  Q.  Right.  And that's a photo of the area that -- from

8  standing on the sidewalk in front of 4332, correct?

9  A.  It appears so, yes.

10  Q.  And Officer Presnell told us yesterday that when he takes

11  the photographs, he took it eye level, correct?

12  A.  I don't remember him saying that.

13  Q.  Does it appear to you to be eye level?

14  A.  It's honestly hard for me to determine that.

15  Q.  Okay.

16  A.  My eye level, I would probably say no.

17  Q.  Exhibit 12, Mr. Jacobsen, taken by Mr. Presnell, that look

18  is, the view that he's taken of, is looking south down

19  Hermitage, correct?

20  A.  He's looking southeast.

21  Q.  Towards the intersection?

22  A.  Towards the park.  Towards the park.

23  Q.  Correct.  From the view that Mr. Presnell took, can you

24  see the sidewalk, the east sidewalk of the intersection of

25  44th and Hermitage from that position?

1  A.  I cannot see it in this photo.

2  Q.  And certainly the trees, as you say, or it was spring, so

3  they weren't full, they weren't verdant, they weren't lush of

4  leaves, true?

5  A.  It appears, yes, it's not.

6  Q.  And this was taken by the forensic investigator for the

7  City of Chicago, correct?

8  A.  Yes, I believe so.

9  Q.  And it appears certainly that he was standing at the -- on

10  top -- at the sidewalk level when he took this?

11  A.  It's difficult for me to say.  I didn't take it but --

12  Q.  I understand.

13  A.  -- yes, he may be standing on the sidewalk level.

14  Q.  Agent Presnell -- Agent Jacobsen, you went through all the

15  various photographs taken by Mr. Presnell?

16  A.  Yes, I have seen them.

17  Q.  Okay.  Do you -- this is Godinez Exhibit 27.  Do you

18  recognize that photograph or certainly the scene in that

19  photograph?

20  A.  It seems like it's from the same general area.  I don't

21  recognize the photograph off the top of my head.

22  Q.  Okay.  Well, there were multiple sets taken --

23  A.  That's correct, there was.

24  Q.  -- right?

25         So was this photograph that you -- that's depicted in

1   Exhibit 27, Godinez 27, does it appear to be of the eave or

2   overhang at 4332 South Hermitage?

3   A.   It's hard to say without seeing -- it could be, but it's

4   hard to say, to be honest.

5   Q.   You don't think that's the 4332 overhang?

6   A.   It's -- it's hard to say for certain but yes, it appears

7   that that is the overhang.

8   Q.   And there are police officers standing around there, true?

9   A.   Yes.

10   Q.   And there's a fire department truck there, right?  It

11   looks like a Chicago --

12   A.   It's a little blurry.  It's hard to say.

13   Q.   But it's certainly a truck from the City of Chicago, an

14   emergency truck?

15   A.   It appears to be some kind of emergency vehicle, yes.

16   Q.   Okay.  And it also appears to have been taken at or about

17   May 4th of 2018, right?

18   A.   I'm not sure when it was taken.

19   Q.   Well, if this is a photograph that came from the group of

20   exhibits given to us in the discovery, then it would be from

21   that --

22   A.   Yes.

23   Q.   -- time, correct?

24   A.   Within a few days of that.

25          MR. HYMAN:  Correct.

1      Judge, I ask that we publish Defendant Godinez

2  Exhibit 27.

3      MS. BABU:  Your Honor, I don't think a foundation has

4  been laid for this photograph.

5      MR. HYMAN:  I think it's more than sufficient.

6      THE COURT:  Well, we haven't identified it, but

7  there's enough photographs around.  You can -- I'll overrule

8  the objection.  I'll admit it, and you can publish it.

9      (Defendant's Exhibit No. 27 received in evidence.)

10 BY MR. HYMAN:

11 Q.  Agent Jacobsen, there is a greenish awning that was in

12 front of 4332 South Hermitage; isn't that correct?

13 A.  Yes, I believe so.

14 Q.  And that's the same type of awning that is also in your

15 enhanced photograph, still photograph that was just -- you

16 just previously identified.  I think it's 104, is it?

17 A.  Yes, there appears to be an awning in the photograph.

18 Q.  From that position, you cannot see the camera of 4322 or

19 4324 South Hermitage, can you?

20 A.  From the position of this photograph?

21 Q.  Yes.

22 A.  Yes, I cannot see the camera from that position.

23 Q.  Now, Agent Jacobsen, I want to play for you the video of,

24 it's about 3:18 in the morning as the car driven by Agent

25 O'Neill is seen in the -- is seen on that Hermitage private

1   video at 4324 and ask you to identify some objects in there.

2   Okay?

3   A.  Okay.

4           MR. HYMAN:  If we can switch back over.

5       (Said video recording played in open court.)

6   BY MR. HYMAN:

7   Q.  Now, you've seen this video multiple times, true?

8   A.  Yes.

9   Q.  And in the video, it's, the camera is up -- that you've

10  seen, the camera is up above street level and up on top of the

11  house, right?

12  A.  It's -- it sits just below the second-level windows of the

13  house, but yes.

14  Q.  At least --

15  A.  It's high.

16  Q.  It's high --

17  A.  Yes.

18  Q.  -- correct?

19          And so you see on the upper right-hand corner, you

20  see some, it looks like some bushes swaying, right?

21  A.  Yes.

22  Q.  And behind those bushes you, in fact, see the overhang or

23  awning of 4332 South Hermitage, true?

24  A.  That's correct.

25  Q.  In fact, can you circle that for us?  And there's -- by

1  the way, there is Agent O'Neill's car driving by, right?

2  A.  Yes.

3  Q.  Did you --

4  A.  I believe so.

5  Q.  Okay.  So that, knowing where that is, right -- can you

6  clear that for us for a second?

7        You see pretty clearly his lights and then you see

8  him -- you see the car turning on to 44th Street, right?  Do

9  you see that in the upper right-hand corner?

10 A.  Yes.

11 Q.  And then you see the lights again in the upper right-hand

12 corner, correct?  You see it looks like a car?

13 A.  I don't see a car right now.  Sorry.

14 Q.  You can see some lights?

15 A.  Yes, similar.

16 Q.  So that appears to be just after the shooting, correct?

17 You would agree with me?

18 A.  I don't know.  I think his lights were more visible once

19 the shooting occurs.

20 Q.  Let's just go a little bit further, and then you can see

21 the various flashing lights.

22        Actually, that may be a little bit earlier.  There's

23 Agent Jacobsen's car.

24 A.  There you are.

25 Q.  There was another car that was there before his.  That's

1  Jacobsen's car.  You can still see the awning, can you not?

2  A.  That's Kevin O'Neill's car.

3  Q.  I mean, O'Neill's car.  Did I say Jacobsen?  I apologize.

4  A.  I wish I had as much hair as he did.

5         MR. PISSETZKY:  Same here.

6         MR. HYMAN:  Yeah, he has enough to go around.

7         THE WITNESS:  So he's just made the right on to 44th.

8  BY MR. HYMAN:

9  Q.  He just made the right.  Now you see his lights.

10 A.  Yes.  That's him reversing into the traffic circle.

11 Q.  So that's after the shooting, correct?

12 A.  I believe so, yes.

13 Q.  Well, is there any other time that he reversed other than

14 that?

15 A.  No.

16 Q.  Okay.  You still can see at that point the awning, right?

17 A.  Yes.

18 Q.  And you've studied this really fairly intensely, have you

19 not?  You've reviewed it multiple times?

20 A.  Yes.

21 Q.  Right.  You see no one standing out near the awning --

22 A.  No.

23 Q.  -- true?

24 A.  You cannot see anybody.

25 Q.  You don't see any muzzle flashes from the awning, do you?

1    A.  I cannot see a muzzle flash from the awning.

2    Q.  And then one other thing I wanted to show you which you

3    saw it during the course of this trial is, we had it marked as

4    Videotape 1, Godinez Videotape 1 which was the back, you had

5    shown us some photographs just a little earlier of that you

6    took of the back of the alley, right?

7    A.  I believe so.

8    Q.  Yes.  And the purpose of that was to show that the route

9    that is seen in the video of Mr. Godinez crossing the alley

10   and running back, exactly what point that was, true?

11   A.  I don't know.

12   Q.  Or the purpose of those shots that you took, those

13   photographs that you took in the back of the alley?

14   A.  Yes.

15   Q.  That was to show, and you marked the route or the path

16   that Mr. Godinez is seen in the video, right?

17   A.  Yes.

18   Q.  And you also took a photograph that looked down south

19   towards the mouth of the alley, true?

20   A.  Yes.

21   Q.  Now, the camera that showed us those videos of Mr. Godinez

22   running back and forth, the camera, it was higher than you,

23   true?

24   A.  Yes.

25   Q.  It was up on the -- towards the top of that garage, true?

1  A.  If you can think of a typical Chicago garage that's, I

2  don't know, maybe nine feet, it sits right on the corner of

3  it, on the underhang, I guess.

4  Q.  And certainly taller than you?

5  A.  Yes.

6  Q.  Much taller than you?

7  A.  Yes.

8  Q.  All right.  So would you play that, please?

9       This is -- this has been -- now, we have a circle of

10  an individual coming into view, the figure that has a white

11  shirt on.  It appears to be a white shirt, true?

12  A.  Yes.  It appears to be light colored for sure.

13  Q.  And then he goes across.

14  A.  It looks like he just went to the left.

15  Q.  Went to the left.  Okay.  And that is just down from where

16  you have pointed out Mr. Godinez was, correct?

17  A.  It appears to be down the alley, yes.

18  Q.  Correct.  And that, of course, was taken from the same

19  camera, right?

20  A.  Yes.

21  Q.  And there was a description that Detective or Officer

22  Spratte gave of a man with a white shirt, true?

23  A.  Yes.

24  Q.  In your time that you were out there that afternoon or

25  later in the evening, was there any other description given of

1  what Mr. Spratte saw?

2  A.  No.

3       MR. HYMAN:  Your Honor, may I have a moment?

4       THE COURT:  All right.

5    (Pause.)

6  BY MR. HYMAN:

7  Q.  Mr. Pissetzky reminded me, the camera in the front of the

8  house at 4324 South Hermitage, it's a double camera?  In other

9  words, there's one camera that points -- one of them points

10  north, one points south, right?  You've reviewed those videos?

11  A.  Yes.

12  Q.  And you see no one in a white T-shirt north looking --

13  when you view the video looking north, true?

14  A.  At any point, or are you talking in this vicinity

15  timeframe?

16  Q.  In this -- during this timeframe.

17  A.  Yes, I don't see anybody in a white shirt.

18       MR. HYMAN:  Your Honor, that's all I have.

19       THE COURT:  Anything further?

20       MS. BABU:  Yes, your Honor.

21       THE COURT:  Quickly.

22                    REDIRECT EXAMINATION

23  BY MS. BABU:

24  Q.  Agent Jacobsen, Mr. Hyman asked you a few questions about

25  your training and experience dealing with fingerprinting, DNA

1  on ballistics evidence.  Do you remember those questions?

2  A.  Yes.

3  Q.  You earlier testified that you've been an agent since

4  2014, correct?

5  A.  That's correct.

6  Q.  And since 2014, have you been working primarily firearms

7  cases here in the city of Chicago?

8  A.  I was initially stationed in Seattle but have been in

9  Chicago for the last two years.

10  Q.  So -- right.  And so for your -- during the pendency of

11  you being an agent with ATF, have you primarily been working

12  firearms cases?

13  A.  Yes, I have.

14  Q.  And approximately in those five years, how many firearms

15  cases have you worked?

16  A.  Either myself or assisted with, a lot.

17  Q.  Hundreds?

18  A.  Probably, yes.

19  Q.  And in those -- in those hundreds of cases, if you had to

20  give an estimate, about how many times have you had a case in

21  which fingerprinting -- fingerprinting a gun resulted in

22  fingerprints?

23  A.  I don't believe I have.

24  Q.  And how many times have you worked on a case in which

25  fingerprinting, ballistics evidence such as a cartridge case

1  has resulted in fingerprints?

2  A.  I don't believe I have.

3  Q.  And how many times have you worked on a case in which

4  fingerprinting a bullet has resulted in fingerprints?

5  A.  I don't believe that happened.

6  Q.  Agent Jacobsen, Mr. Hyman also asked you some questions

7  about the -- taking DNA on -- from the cartridge cases.  Do

8  you recall that?

9  A.  Yes.

10  Q.  Could you -- in this instance, was there an examination

11  done of the cartridge cases?

12  A.  For DNA or --

13  Q.  Generally, was there an examination done?

14  A.  Yes, there was.

15  Q.  What was that examination?

16  A.  On the day of the 4th, CPD lab had placed, basically

17  taking the cartridge cases and entered them into NIBIN.  I

18  think I somewhat described it yesterday, but it's basically

19  where a tech will take images of it using a high-definition

20  camera, and you can put them in a database and see if they're

21  related to any other shootings.

22  Q.  And do they need to -- based on your training and

23  experience in working firearms cases, do the CPD techs need to

24  do anything to the casings in order to be able to process them

25  in the NIBIN system?

1  A.  Yes.  They have to handle them with their hands, one, and

2  they also have to almost wash them to make it so it's a very

3  clear image for the software.

4  Q.  Agent Jacobsen, Mr. Hyman also asked you multiple

5  questions about gunshot residue testing.  Do you recall those

6  questions?

7  A.  Yes.

8  Q.  When -- if you can remind the jury, when was the shooting?

9  A.  May 4th of 2018.

10  Q.  And approximately what time?

11  A.  3:00 o'clock in the morning.

12  Q.  And what was the defendant arrested?

13  A.  May 7th of 2018.

14  Q.  And approximately what time?

15  A.  Evening hours.  I'd have to look at a report.

16  Q.  So the shooting happened about 3:00 a.m. on Friday, May

17  4th, and the defendant was arrested on the evening of Monday,

18  May 7th; is that correct?

19  A.  That's correct.

20  Q.  Was the defendant wearing the same clothes he's seen to be

21  wearing in the videos from May 4th, 2018?

22  A.  It did not appear so.

23  Q.  So when he was arrested, he was not wearing the same

24  clothes he was wearing that day, correct?

25  A.  It did not appear so.

1  Q.  And Agent Jacobsen, in your training and experience, can

2  you obtain gunshot residue from clothing that was not worn at

3  the time of a shooting?

4  A.  I would say no.

5  Q.  Agent Jacobsen, if an individual washes their hands,

6  bathes, uses hand sanitizer, cleanses their hands in any way,

7  can you obtain gunshot residue from that person's hands?

8  A.  No.

9  Q.  Mr. Hyman asked you some questions about the view from the

10  entrance to the gangway at 4332 South Hermitage.  Do you

11  remember those questions?

12  A.  Yes.

13  Q.  And some of those questions were about the foliage in the

14  area --

15  A.  Yes.

16  Q.  -- do you recall that?

17       And the photographs that Mr. Hyman showed you that

18  were defense exhibits, the trees and the bushes were full,

19  correct?

20  A.  Yes.

21  Q.  And if you have them in front of you, feel free to look at

22  them.

23  A.  That's true.  But yes, the trees -- well, there's one in

24  the back that appears to be more during winter or whatnot.

25  Q.  And is that the photograph that Mr. Hyman mentioned was

1  taken by the CPD ET?

2  A.  Yes.

3  Q.  So that was taken in 2018?

4  A.  Yes.

5  Q.  But the photographs in which Mr. Hyman couldn't tell us

6  when they were taken, do those trees look to be full?

7  A.  Yes, they do.

8  Q.  I'm going to show you Government Exhibit 509, sir.  This

9  has previously been admitted and published to the jury.

10        Approximately when was this photograph taken?

11  A.  I believe it was either the day of or within days of May

12  4, 2018.

13  Q.  And what does the tree next to -- or in front of, rather,

14  4332 look like?

15  A.  It barely has any leaves.

16  Q.  And was this -- in your review of the other photographs by

17  the ET, do the plants and the trees in the area look similar

18  to this tree?

19  A.  Yes.

20  Q.  And Agent Jacobsen, do you see the fence that runs in

21  front of 4332 there?

22  A.  Yes.

23  Q.  The photographs that you have in front of you that

24  Mr. Hyman gave you --

25  A.  Yes.

1 Q.  -- the defense exhibits, where does it appear that those

2 photographs are taken from, what level, if you look at the

3 photographs that Mr. Hyman handed you?

4 A.  Basically, at the top of the fence line.

5 Q.  Could you draw a line along where you think the -- those

6 photographs were taken?

7         So does it appear that someone placed the camera on

8 the fence line itself and took the photograph?

9 A.  Either that or close to.

10 Q.  And approximately how high would you say that fence is?

11 A.  Maybe just over a yard, three or four feet maybe.

12 Q.  And is a normal adult male three or four feet tall, sir?

13 A.  No.

14 Q.  And finally, Mr. Hyman asked you some questions about the

15 camera in the back of the house at 4324 South Hermitage.  Do

16 you remember those questions?

17 A.  Yes.

18 Q.  And you described how tall or how high up the camera was?

19 A.  Yes.

20 Q.  Sir, how tall are you?

21 A.  Just under 6, 1.

22 Q.  And how far above your head was the camera when you were

23 standing under it to take your photo?

24 A.  Maybe -- maybe a foot and a half, a foot, somewhere in

25 there.

1          MS. BABU:  Thank you, sir.

2          I have no further questions, your Honor.

3                     RECROSS-EXAMINATION

4  BY MR. HYMAN:

5  Q.  Of all the cases that you've ever worked on, the multiple

6  firearms cases, there's none, anything like this, true, where

7  another agent was shot?

8  A.  In Seattle, one of our task force officers was shot on a

9  case that I did, so yes.

10 Q.  Okay.  So this is -- in between those cases, and you've

11 worked, as you've told Ms. Babu, on hundreds of cases, there

12 is a certain significance or priority for you as an agent,

13 special agent, the case agent, to get everything necessary for

14 the prosecution of this case, true?

15 A.  Yes.

16 Q.  Right.  That's the whole purpose of that, right?

17 A.  Yes.

18 Q.  You want to find who shot your -- another agent and bring

19 them -- and bring them into a courtroom and prosecute them,

20 right?

21         MS. BABU:  Objection, your Honor.  Foundation.

22         THE COURT:  Objection sustained.

23         MR. HYMAN:  Okay.  I'll withdraw the question.

24 BY MR. HYMAN:

25 Q.  The exhibit that we just saw, what was it, 4 -- 50 --

1   MS. BABU:   '9.

2   MR. HYMAN:   509, can you put that back up?

3   BY MR. HYMAN:

4   Q.   You can still see, though very limited, on the left-hand

5   portion of this -- of this photograph, the same evergreen

6   bushes there that are in your photographs that you took this

7   month, right?

8   A.   Yes, there's a bush there.

9   Q.   And those are the same -- same evergreens that you could

10  see in the Exhibits 19, 20, 21, true?

11  A.   Yes.

12  Q.   By the way, you said you're just under 6, 1.  You knew

13  when Mr. Godinez was arrested that he's 5, 6, true?

14  A.   I don't know his exact height.

15  Q.   Well, he's not -- he's certainly not your height, true?

16  A.   I don't believe he's as tall as me.

17  Q.   The database that you've mentioned, this database is so

18  that you can compare, ATF can compare the casings to determine

19  whether or not -- and the strikes on the casing from the --

20  what's the top of it called?

21  A.   The firing pin.

22  Q.   The firing pin, that you can determine whether or not the

23  same gun was used in other cases, true?

24  A.   Yes.

25  Q.   And when you checked that you, in fact, found through your

1  database that no other gun was -- this -- no other gun fired

2  cartridges like you found there, right?  Or maybe I mis -- you

3  know what I'm talking about.

4  A.  I found that the firearm that was used to shoot the shell

5  casings that were located in that gangway --

6  Q.  Yes, were not used --

7  A.  -- had not been involved in another shooting --

8  Q.  In another shooting.

9  A.  -- at that time.

10 Q.  That's what I'm trying to say.  Okay.

11       Now, the whole issue of the gunshot residue which we

12 talked about a little bit earlier, you agreed that gunshot

13 residue can, in fact, be transferred from your hands to your

14 face, to other objects, right?

15 A.  Yes, it can.

16 Q.  In fact, it could be even transferred on to a bottle, a

17 water bottle, right?

18 A.  Yes, that's possible.

19 Q.  Did you -- again, Agent Jacobsen, did you test or have

20 requested, did you request that those two Evian bottles and

21 the cap be tested for gunshot residue?

22       MS. BABU:  Objection, your Honor.  Asked and

23 answered.

24       THE COURT:  I think you did ask that precise question

25 you asked him earlier.

1    MR. HYMAN:  Well, I mean, Ms. Babu brought it up.

2    THE COURT:  I know, but you asked that question.

3  BY MR. HYMAN:

4  Q.  It was not done, right?  No --

5    MS. BABU:  Objection, your Honor.  Asked and

6  answered.

7  BY MR. HYMAN:

8  Q.  Well, let me ask a different question.  There was -- on

9  anything that you recovered, there was no gunshot residue

10  requested?

11    THE COURT:  You asked him that question before.  You

12  went through everything, and he said no.

13    Is that it?

14    MR. HYMAN:  That's it.

15    THE COURT:  You can step down.  You're excused.

16    (Witness excused.)

17    THE COURT:  Call your next witness.

18    MS. BABU:  Thank you, your Honor.  The government

19  calls Special Agent Kevin Crump.

20    (Pause.)

21    THE COURT:  Right around here.  Please raise your

22  right hand.

23    (Witness sworn.)

24    THE WITNESS:  I do.

25    THE COURT:  Please be seated.

1      You may question the witness.

2           MS. BABU:  Thank you, your Honor.

3                KEVIN CRUMP, GOVERNMENT'S WITNESS, SWORN

4                     DIRECT EXAMINATION

5   BY MS. BABU:

6   Q.  Good morning, sir.

7   A.  Good morning.

8   Q.  Could you please state and spell your name?

9   A.  Kevin Crump, K-e-v-i-n, C-r-u-m-p.

10  Q.  Mr. Crump, where do you work?

11  A.  Bureau of Alcohol, Tobacco, Firearms and Explosives.

12  Q.  And is that also known as ATF?

13  A.  Yes, it is.

14  Q.  And what is your title with ATF?

15  A.  Special agent.

16  Q.  And how long have you been a special agent with ATF?

17  A.  Approximately two years.

18  Q.  And how long have you been -- do you work in Chicago?

19  A.  I do.

20  Q.  And how long have you been working in Chicago?

21  A.  Since January of 2018.

22  Q.  And prior to January of 2018, where were you working?

23  A.  I was attending the academy in Georgia.

24  Q.  And what academy was that?

25  A.  Federal law enforcement training academy.

1   Q.   Was that the training academy for ATF?

2   A.   Yes, it was.

3   Q.   And when did you begin that training?

4   A.   I began that training in May of 2017.

5   Q.   And prior to that, were you working with ATF?

6   A.   No, I was not.

7   Q.   So you began -- you began your time with ATF in May of

8   2017; is that right, sir?

9   A.   Yes, that's correct.

10  Q.   And then joined the Chicago office of ATF in January of

11  2018; is that right?

12  A.   Yes, that's correct.

13  Q.   And did you have any prior law enforcement experience

14  before joining ATF?

15  A.   No, I did not.

16  Q.   Agent Crump, if I could direct your attention to May 4th

17  of 2018, were you working on that Friday?

18  A.   Yes, I was.

19  Q.   And what specifically were you working on?

20  A.   We were attempting to place covert trackers on vehicles in

21  the Back of the Yards neighborhood.

22  Q.   And could you point out to the jury generally where you

23  believe those vehicles were located?

24  A.   On this map here?

25  Q.   Yes, please.

1  A.   Two of the vehicles were located down here on Hermitage

2  between 44th Street and 45th Street.

3  Q.   Thank you, Agent Crump.

4       Was this part of a federal investigation?

5  A.   Yes, it was.

6  Q.   And you were working with other individuals, correct?

7  A.   That's correct.

8  Q.   And were all these individuals employed or working with

9  ATF?

10  A.   Yes, they were.

11  Q.   And do you recall who some of those individuals were?

12  A.   Yes.

13  Q.   Who are those, who are some of those individuals?

14  A.   It was special agents David Lopez, Daniel Winter, and Ryan

15  Holcomb as well as task force officers Jason Schoenecker,

16  Matthew Daquilante, Tara Murphy, Edward Nowak, Louis Hopkins,

17  Kevin O'Neill, and Thomas Spratte.

18  Q.   And about when did you start working on May 4th?

19  A.   We met at approximately 3:00 a.m.

20  Q.   And why did you meet at 3:00 a.m.?

21  A.   We were attempting to place covert trackers, so we decided

22  that 3:00 a.m. would be the best time to do that.

23  Q.   And where did you meet?

24  A.   We met at Chicago Police, 9th District.

25  Q.   And was there a plan for that morning?

1   A.  Yes, there was.

2   Q.  And what was that plan?

3   A.  The plan was to consolidate into vehicles at the 9th

4   District, have the trackers ready to go.  We would have one

5   vehicle head out to the neighborhood prior to my vehicle which

6   had the trackers in it, and the first vehicle would scout the

7   area to see if anyone was present near the vehicles we were

8   attempting to place the trackers on.

9   Q.  And who -- who is responsible for doing the surveillance

10   and locating the cars that the tracking devices were going to

11   be placed on?

12   A.  That was a vehicle with Jason Schoenecker and Matthew

13   Daquilante.

14   Q.  And who was in the car that you were going to be driving

15   in?

16   A.  I was in a vehicle with task force officers Kevin O'Neill

17   and Thomas Spratte as well as Special Agent Daniel Winter.

18   Q.  And when -- did you eventually leave the 9th District?

19   A.  Yes, we did.

20   Q.  And when did you do that?

21   A.  I don't recall the exact time, but it was probably

22   approximately 3:10 a.m.

23   Q.  And did you -- did the other agents leave before you?

24   A.  Yes, they did.

25   Q.  And when did you enter the neighborhood?

1   A.   We entered the neighborhood approximately 3:15 a.m.

2   Q.   And did you wait before entering for any sort of signal?

3   A.   Yes.   We waited for the first vehicle to tell us that when

4   they drove through the area, if they saw anyone or not.

5   Q.   And Agent Crump, what was your specific role that morning?

6   A.   My role was to have one of the trackers on me.   Initially,

7   I would provide some cover for the other individuals

8   installing the first tracker, and then my role was to emplace

9   the second tracker on a vehicle.

10   Q.   And what were you wearing that morning, sir?

11   A.   I was wearing a black hoody, jeans, and black sneakers.

12   Q.   And did you have any police markings or law enforcement

13   markings on your clothes?

14   A.   No, I did not.

15   Q.   And who was driving your car?

16   A.   My car was driven by Task Force Officer Kevin O'Neill.

17   Q.   And do you recall what type of car he was driving?

18   A.   Yes.   It was a Nissan Altima sedan.

19   Q.   And did the car have any markings, police markings on it?

20   A.   No, it did not.

21   Q.   And why were you in plain clothes and in an unmarked car?

22   A.   We were attempting to just blend into the neighborhood so

23   people would not know that law enforcement was there

24   conducting any type of operation.

25   Q.   And where were you sitting in the car?

1    A.   I was sitting in the rear behind the driver's seat.

2    Q.   And who was driving again?

3    A.   It was driven by Kevin O'Neill.

4    Q.   And where were Agent Winter and Task Force Officer

5    Spratte?

6    A.   I believe Task Force Officer Spratte was in the front

7    seat, and Daniel Winter was in the back seat with me.

8    Q.   And what was the path that Officer O'Neill took as he

9    drove into the neighborhood, if you could show the grand --

10   the jury on the map next to you?

11   A.   We came from the north here on south Ashland, and we made

12   a westbound turn here on 43rd Street, and then we ended up

13   going south on south Hermitage Ave.

14   Q.   And as Officer O'Neill drove down Hermitage Avenue, did

15   you see anyone on the street?

16   A.   No, I did not.

17   Q.   And were you looking specifically?

18   A.   Yes, I was.

19   Q.   And why is that?

20   A.   We were attempting to just see if any residents were out

21   as we were getting ready to step out of the vehicle covertly.

22   Q.   And did Officer O'Neill eventually stop the car?

23   A.   Yes, he did.

24   Q.   And where was that?

25   A.   That was just at the corner of south Hermitage Ave. and

1    west 44th Street on the westbound side of the street.

2    Q.   And about where on the map was that?

3    A.   We stopped the vehicle approximately right there.

4    Q.   And once he stopped the car, what did you do?

5    A.   I exited the rear of the vehicle on the driver's side.  I

6    walked behind the vehicle and on to the west side of the

7    street on to the sidewalk.

8    Q.   And what happened then?

9    A.   I began walking southbound down south Hermitage Ave.  As I

10   crossed the street, I heard several loud gunshots.  I turned

11   to my left where Task Force Officer Spratte and Special Agent

12   Winter were located on the east side of the street, and I saw

13   them ducking for cover.  Then I felt, I was struck by one of

14   the bullets.

15   Q.   And what did you do once you felt like you had been struck

16   by one of the bullets?

17   A.   The initial gunshot took me to the ground.  I fell

18   immediately.  I then tried to stand up to make it to cover

19   across the street.  I lost my balance immediately and fell

20   again, and then I got up again and kind of wobbled over to a

21   vehicle on south Hermitage Ave. just at the corner of 44th

22   Street.

23   Q.   And Agent Crump, could you tell that you had been injured?

24   A.   Yes.

25   Q.   How so?

1   A.   I felt a lot of pain in my neck and my jaw, and I could

2   feel blood coming from somewhere on my face.

3   Q.   And did any of the officers that were on the scene come

4   over to you at that moment?

5   A.   After I took some cover behind one of the -- or under a

6   vehicle on the corner, only a few seconds later, I heard my

7   teammates coming and yelling over for me.

8            MS. BABU:   And, your Honor, I'd like to publish

9   Government Exhibit 111 at this time.

10           THE COURT:   What's --

11           MS. BABU:   It's already been admitted into evidence,

12  your Honor.

13           THE COURT:   Pardon?

14           MS. BABU:   It's already been -- Government Exhibit --

15           THE COURT:   Is this the shooting?

16           MS. BABU:   It's a very brief clip, your Honor.

17           MR. HYMAN:   Judge, we would have a continuing

18  objection.

19           THE COURT:   I don't think you need that, so I'll --

20  let's proceed with the --

21           MS. BABU:   That's fine, your Honor.

22           THE COURT:   I don't think we need to see that again.

23  BY MS. BABU:

24  Q.   Agent Crump, after you were shot, where were you taken?

25  A.   I was taken to Stroger Hospital.

1  Q.  And is that where you were ultimately treated?

2  A.  I was treated there initially, yes.

3  Q.  And what unit were you taken to?

4  A.  I was taken to the trauma ICU.

5  Q.  And what were you treated for?

6  A.  I was treated for a gunshot wound to my neck and a gunshot

7  wound to my face.

8  Q.  And where exactly were the wounds?

9  A.  There was one wound located on my neck just below my left

10  ear, and then the other wound was located directly between my

11  eyes on the nose bridge.

12  Q.  And Agent Crump, how long were you at Stroger Hospital?

13  A.  I was there for five nights.

14  Q.  And what medical treatment did you receive in those five

15  nights and six days?

16  A.  Initially, the trauma surgeons sewed me up, and then a few

17  days later, on Monday, May 7th, I had a surgery to repair my

18  sinuses as well as emplace a titanium plate for my left

19  orbital bone as well as titanium mesh around my nose bridge to

20  repair the fractures there.

21  Q.  And, Agent Crump, how many surgeries have you had since

22  this gunshot wound?

23  A.  I've had two surgeries since the gunshot.

24  Q.  And has the gunshot wound affected your vision?

25  A.  Yes, it has.

1  Q.  In what way?

2  A.  The --

3         MR. HYMAN:  Your Honor, before the --

4         THE COURT:  Yes, I think that's -- objection

5  sustained.

6  BY MS. BABU:

7  Q.  Agent Crump, are you back at work now?

8  A.  Yes, I am.

9  Q.  And are you still working gang investigations?

10 A.  Yes, I am.

11 Q.  In what neighborhood do you work?

12 A.  I continue to work in the Back of the Yards neighborhood

13 primarily.

14        MS. BABU:  Nothing further, your Honor.

15        THE COURT:  Any cross-examination?

16        MR. HYMAN:  Just very --

17                    CROSS-EXAMINATION

18 BY MR. HYMAN:

19 Q.  Agent Crump, good morning.

20 A.  Good morning.

21 Q.  You never saw who fired the shots at you, correct?

22 A.  That's correct.

23 Q.  Do you know where they came from?

24 A.  No, not at the time, I didn't.

25 Q.  When you -- you told the members of the jury, when you

1 were struck by the bullets, you felt this pain in your jaw and

2 neck.  As I understand it, you were only struck by one bullet,

3 correct?

4 A.  That's correct.

5 Q.  So there was an entrance wound, the bullet hole -- there

6 was an entrance wound in the jaw, and it came out through the

7 front, correct?

8      MS. BABU:  Objection, your Honor.  Foundation.

9      MR. HYMAN:  Well, if he knows.

10      THE COURT:  If he knows.

11 BY THE WITNESS:

12 A.  The way I understood it from the doctors is, yes, that the

13 entry wound was on my neck, and the exit wound was between my

14 eyes.

15 BY MR. HYMAN:

16 Q.  And that was on the left side --

17 A.  That's correct.

18 Q.  -- correct?

19      So you were only shot once?

20 A.  That's correct.

21 Q.  And as you say, you're working today?

22 A.  Yes.

23      MR. HYMAN:  Okay.  Your Honor, that's all.

24      Agent Crump, thank you for your service.

25      THE WITNESS:  Thank you.

1    THE COURT:  Okay.  You can step down.  You're

2  excused.

3      (Witness excused.)

4    THE COURT:  Call your next witness.

5    MS. BABU:  Your Honor, the government rests.

6    THE COURT:  Okay.  Members of the jury, you've heard

7  all the evidence that the government intends to present on its

8  case in chief.  So we're going to take a recess now.

9    So take the jurors out, please.

10     (Proceedings heard in open court.  Jury out.)

11    THE COURT:  Outside the -- please be seated,

12  everybody.

13    Did your witness show up, do you know?

14    MR. HYMAN:  Sergeant Evans?

15    MR. PISSETZKY:  Let me go outside.

16    THE COURT:  I take it, the government is re-offering

17  all the exhibits just to make sure we've got everything in,

18  correct?

19    MS. BABU:  Correct, your Honor.

20    THE COURT:  All right.  And you're going to make a

21  motion, I assume?

22    MR. HYMAN:  Yes.  Judge, at this time, we're going to

23  offer all of our exhibits as well.

24    THE COURT:  Right.  And I have to admonish your

25  client.

1      MR. HYMAN:  Yes.

2      THE COURT:  Do you want to have him come forward?

3      MR. HYMAN:  Yes.

4      THE COURT:  You are -- you are Ernesto Godinez; is

5  that correct, sir?

6      THE DEFENDANT:  Yes, your Honor.

7      THE COURT:  The defendant in this case?

8      THE DEFENDANT:  Yes, your Honor.

9      THE COURT:  The government has rested, which means

10  that they've presented all the evidence they intend on the

11  case.  And now we turn to you to present whatever evidence you

12  wish to present in defense.  One of the -- you have the right

13  to testify in your own defense.  Do you understand that, sir?

14      THE DEFENDANT:  Yes, your Honor.

15      THE COURT:  Have you discussed with your lawyer,

16  lawyers, whether you wish to testify in your own defense?

17      THE DEFENDANT:  Yes, your Honor.

18      THE COURT:  Have you made a decision?

19      THE DEFENDANT:  Yes.

20      THE COURT:  What is your decision?

21      THE DEFENDANT:  No, your Honor.

22      THE COURT:  Have you -- you have had adequate time to

23  discuss this with your lawyers; is that right?

24      THE DEFENDANT:  Yes, your Honor.

25      THE COURT:  Okay.  And that is your choice, not to

1  testify in your own defense; is that correct, sir?

2        THE DEFENDANT:  Yes, your Honor.

3        THE COURT:  Thank you.

4        MR. HYMAN:  Thank you, your Honor.

5        MR. PISSETZKY:  Your Honor, Sergeant Evans is nowhere

6  to be seen.

7        THE COURT:  Pardon?

8        MR. PISSETZKY:  Sergeant Evans is nowhere to be found.

9        THE COURT:  Nowhere to be found.  Do you want me

10 to --

11        MR. HYMAN:  If the Court gives us a break, I'm going

12 to call the 4th District.  I'll talk to the commander if

13 they'll let me talk to him.

14        THE COURT:  What we can -- my thinking is, let the

15 jury go.  Do you have other witnesses today?

16        MR. HYMAN:  No.

17        THE COURT:  That was it?

18        MR. HYMAN:  That was, Evans was going to be it.

19        THE COURT:  What we can do is send the jury home and

20 then spend the weekend having the marshal or somebody go out

21 and grab him or whatever need be and then present him Monday

22 morning at 10:00 o'clock.

23        MR. HYMAN:  If the Court -- has the jury gone to

24 lunch?  I didn't hear.

25        THE COURT:  They haven't gone yet.  I'm going to

1    excuse them.

2             MR. HYMAN:  Before --

3             THE COURT:  There's no sense them hanging around.

4             MR. HYMAN:  Before you do, may I make the call to the

5    4th District --

6             THE COURT:  Yes.

7             MR. HYMAN:  -- to see what's going on?  Give me five

8    minutes --

9             THE COURT:  All right.

10            MR. HYMAN:  -- and I can report back.

11            THE COURT:  Who is going to make the argument on the

12   motion to dismiss, or are you just presenting it?

13            MR. PISSETZKY:  I'll make the argument.

14            THE COURT:  Okay.  While he's -- does he trust you to

15   make the argument?

16            MR. PISSETZKY:  I'm not sure.  I wore the bowtie to

17   look distinguished today.

18            Your Honor, at the end of the government's case, of

19   course, you have to look at the evidence in the light most

20   favorable to the government.  However, even in that scenario

21   and case, the government did not prove its case.

22            The evidence has not shown that Mr. Godinez fired the

23   gun that Agent Crump was hit with.  There is no direct

24   evidence whatsoever that Mr. Godinez fired anything that day

25   and, in fact, the opposite is true.  You heard even from the

1  cooperating witness and all the other agents, there are a lot

2  of shootings in that area.  That area is a high-crime area.

3  The agents themselves initially thought that the gunshots were

4  coming from somewhere else.

5          There's absolutely no evidence that my client shot or

6  used a handgun that day or discharged a gun.  So we would ask

7  that you grant the motion.

8          MS. BABU:  Your Honor, as Mr. Pissetzky said, the

9  evidence is taken in the light most favorable to the

10  government, and any rational trier of fact could find that the

11  government met its burden here.  The government has identified

12  the defendant in multiple surveillance videos from the

13  neighborhood at and around 3:18 a.m. on May 4th, 2018.

14          The defendant is identified as running into the

15  gangway immediately before Agent Crump is shot and running out

16  of the gangway, that same gangway, seconds after the shooting.

17  This is the same gangway that five shell casings were

18  recovered in.

19          THE COURT:  Did anybody specifically identify him?

20          MS. BABU:  Your Honor, the defense multiple times has

21  stated during -- during the pendency of this trial -- of

22  course, the burden is the government's, but the defendant --

23  the defense counsel has, multiple times has identified the

24  defendant as being the individual in these surveillance

25  videos.  In addition, Ms. Jean-Baptiste identified the

1  defendant as being in the video.

2      THE COURT:  All right.  I'm going to deny the motion

3  to -- for a directed verdict at this particular time.  So I'm

4  going -- we're going to wait.  So we'll take about 10 minutes.

5      MR. PISSETZKY:  Thank you.

6      (Recess from 11:49 a.m. to 12:00 p.m.)

7      THE COURT:  All right.  We're on the record.

8      All right.  Would you tell me what -- the efforts

9  you've made.

10     MR. HYMAN:  Yes, your Honor.

11     THE COURT:  This is Neal Evans of the Chicago Police

12 Department, correct?

13     MR. HYMAN:  Yes.  He was the -- he was the officer

14 who did all the initial paperwork as the Court has heard his

15 name multiple times.  He was -- before we even started this

16 trial, a subpoena was sent for his appearance for June 10th.

17 That subpoena was issued May 31st.  It was delivered to the

18 Chicago Police Department's subpoena unit as we were directed

19 at 3510 South Michigan.

20     Then when Mr. Evans did not show up, we then issued a

21 new subpoena at the request of the Chicago Police Department

22 on June 11th.  That was then issued to the Chicago Police

23 Department's officer notification unit.  Then that was on the

24 11th, which would have been Tuesday.

25     On Wednesday, I checked with that unit at 7:00

1  o'clock in the morning, and they advised me that that

2  information -- that subpoena, which has my phone number on it,

3  was, in fact, sent to or notified to the -- by -- to the 4th

4  District where Sergeant -- where Mr. Evans is now a sergeant.

5  In fact, when they asked me to fax it to them, when I did, I

6  also included my cell phone number.

7  So then on Wednesday the 12th, I called the district.

8  I was told he worked the midnight shift and he started at 9:00

9  o'clock.  I called the district at 10:00 o'clock that night,

10  almost 10:00 o'clock at night.  I asked for him.  I was given

11  to a Lieutenant Daly, D-a-l-y.

12  Lieutenant Daly said to me -- I told him who I was

13  and that I needed -- I'd like to talk to Mr. Evans.  He said,

14  and his words were, "He's got his notification, counsel."

15  I said, "Well, I'd like an opportunity to talk to

16  him."

17  He goes, "He's got his notification, counsel."  Now,

18  that was on Wednesday.

19  Yesterday evening, on Thursday, I again called the

20  district to see if there was a notification on the books, and

21  there was.  And then this morning at 8:00 o'clock in the

22  morning, I called the 4th District.  I talked to an Officer

23  Griffin who tried to be very helpful for me.  He did.  He

24  checked the books.  He checked.  He said there's a

25  notification that he was supposed to be here, and he said that

1  Evans had left already.

2          When he didn't appear, I went back -- I requested and

3  I went back to that phone.  I talked to Officer Griffin again.

4  He then came back and he said, "He had an excuse, that he had

5  a doctor's appointment on the 13th."

6          I go, "Well, today is the 14th."

7          Then I asked to speak to the commander of the 4th

8  District, a Commander Bolus, B-o-l-u-s.  I didn't talk to him

9  or her, but I talked to a Sergeant Ford who was apparently the

10  watch commander.  He said, according to the books, Lieutenant

11  Daly gave him an excuse that he didn't have to appear for

12  court on Friday.

13          So that's the status of what we have.  And I'm asking

14  the Court, as I said, for a rule to show cause.  And we will

15  try and attempt to get him in on Monday.  If not, then we can

16  go let the marshals pick him up.

17          THE COURT:  One other alternative, is it possible

18  that you and the government could work out a stipulation of

19  what he would testify to?

20          MR. HYMAN:  There's a lot that he was going to have

21  to testify, Judge.

22          THE COURT:  That's all right.  I'm going to discharge

23  the jury until 10:00 o'clock tomorrow -- 10:00 o'clock Monday.

24  Excuse me.

25          MR. HYMAN:  Yes.

1   THE COURT:  All right.  Do you want to bring the jury

2   in?

3   We'll have our instruction conference.

4   What I'll do is I'll make the rule returnable at 9:30

5   Monday and so hopefully, he'll be here.  Do you want to write

6   one up?  Write up the rule.

7   (Proceedings heard in open court.  Jury in.)

8   THE COURT:  Please be seated.

9   Members of the jury, as I said before we broke, the

10  government has rested.  It's now the defendant's opportunity,

11  if he chooses, to present evidence.  I've been advised that a

12  witness they have apparently is not available until Monday

13  morning.

14  So what we're going to do is, we're going to suspend

15  now until 10:00 o'clock Monday.  At that time, we'll hear the

16  witness, and then you'll immediately hear the closing

17  arguments and you will -- and my instructions and you will

18  retire to consider your verdict.

19  So you're excused until Monday morning.  Please don't

20  discuss the case.  Don't do any individual investigation, the

21  same as I've said before.  Have a nice weekend.  You're

22  excused.

23  (Proceedings heard in open court.  Jury out.)

24  THE COURT:  All right.  Do you want to meet now?  I

25  should put this on the record.  I have suggested, without

1  demanding, that the parties agree to meet in my chambers for a

2  pre-instruction conference in which we will discuss proposed

3  instructions.  And I will indicate how I intend to rule.  And

4  then Monday morning at 9:30, we'll go on record with our

5  actual instruction conference.  There will not be a court

6  reporter for the pre-instruction conference, but there will

7  be, of course, one on Monday.

8          And the defendant, of course, is entitled to be

9  present.  If he chooses to be present, we can do it in the

10  courtroom.  If he waives his appearance, then we can proceed.

11  So it's up to him.

12          MR. PISSETZKY:  We're going to waive, Judge.

13          THE COURT:  Okay.  Waived.  Is that correct,

14  Mr. Godinez?

15          All right.  So we'll meet in chambers.

16          MR. PISSETZKY:  Yes.

17          MR. HYMAN:  Yes.

18          MS. BABU:  Thank you, your Honor.

19          MR. HYMAN:  Thank you.

20          THE COURT:  We'll stand in recess until 9:30 Monday

21  morning.

22      (Proceedings adjourned from 12:08 p.m. to June 17, 2018,

23      at 9:30 a.m.)

24

25

```
 1                    C E R T I F I C A T E

 2          I, Judith A. Walsh, do hereby certify that the

 3     foregoing is a complete, true, and accurate transcript of the

 4     proceedings had in the above-entitled case before the

 5     Honorable HARRY D. LEINENWEBER, one of the judges of said

 6     Court, at Chicago, Illinois, on June 14, 2019.

 7

 8     /s/ Judith A. Walsh, CSR, RDR, F/CRR_____   February 18, 2020

 9     Official Court Reporter

10     United States District Court

11     Northern District of Illinois

12     Eastern Division

13

14

15

16

17

18

19

20

21

22

23

24

25
```