1              IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3  UNITED STATES OF AMERICA,     )
                          )
4          Plaintiff,     )
                          )
5    v.                )  No. 18 CR 00278
                          )
6  ERNESTO GODINEZ,        )  Chicago, Illinois
                          )  June 17, 2019
7          Defendant.     )  9:30 a.m.

8                    VOLUME 6-A
           TRANSCRIPT OF PROCEEDINGS - Trial
9     BEFORE THE HONORABLE HARRY D. LEINENWEBER and a Jury

10  APPEARANCES:

11  For the Plaintiff:      HON. ZACHARY T. FARDON
                      United States Attorney
12                   BY:  MS. KAVITHA J. BABU
                        MR. NICHOLAS J. EICHENSEER
13                   Assistant United States Attorneys
                      219 South Dearborn Street, Suite 500
14                   Chicago, Illinois 60604
                      (312) 353-5300
15
    For the Defendant:      MR. LAWRENCE H. HYMAN
16                   111 West Washington Street
                      Suite 1025
17                   Chicago, Illinois 60602
                      (312) 346-6766
18
                   PISSETZKY & BERLINER
19                   BY:  MR. GAL PISSETZKY
                      35 West Wacker Drive, Suite 1980
20                   Chicago, Illinois 60601
                      (312) 566-9900
21

22  Court Reporter:         Judith A. Walsh, CSR, RDR, F/CRR
                      Official Court Reporter
23                   219 South Dearborn Street, Room 2118
                      Chicago, Illinois 60604
24                   (312) 702-8865
                      judith_walsh@ilnd.uscourts.gov
25

INDEX

| WITNESS | DX | CX | RDX | RCX |
|---|---|---|---|---|
| SERGEANT NEIL EVANS | | | | |
|    By Mr. Hyman | 1002 | | 1017 | |
|    By Mr. Eichenseer | | 1013 | | |
| BEAU JACOBSEN | | | | |
|    By Mr. Pissetzky | 1018 | | | |
|    By Ms. Babu | | 1025 | | |

EXHIBITS

| NUMBER | RECEIVED |
|---|---|
| Godinez Picture 28 | 1019 |

CLOSING ARGUMENT ON BEHALF OF THE GOVERNMENT........Page 1031

CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT.........Page 1078

REBUTTAL ARGUMENT ON BEHALF OF THE GOVERNMENT.......Page 1106

JURY CHARGE.......................................Page 1115

1     (Proceedings heard in open court.  Jury out.)

2         MS. BABU:  Judge, would you like to handle the show

3  cause without the defendant, or does he want to be present for

4  that?

5         MR. HYMAN:  Both of the officers are here.

6         THE COURT:  Your witness, we don't need to show

7  cause.  I'll just vacate the --

8         MS. BABU:  Great.

9         THE COURT:  As long as he's here.

10        MR. HYMAN:  Yes, both.

11        THE COURT:  I'll vacate the rule.  You don't have any

12 objection to that, do you?

13        MR. HYMAN:  No.

14        MS. BABU:  Thank you, your Honor.

15     (Pause.)

16        THE COURT:  We'll go on the record.

17        For the record, the Court met with the attorneys in

18 chambers Friday evening for -- or Friday afternoon for a

19 period of time and discussed proposed instructions which was

20 done, as I understood, with the full consent of the defendant.

21 I had said we would go on record Monday morning, and I'll give

22 the official instruction conference.

23        So if you have your notes, I went through the

24 proposed final instructions.  I noted a couple of, I think,

25 discrepancies although they may go away.  Instruction No. 1

1  which is 1.01 is given as modified, and the modification was

2  made.

3          2 and 3 are given -- 1 is given without objection.

4          2 and 3 are given without objection unmodified.

5          4 was given without objection as modified without the

6  last sentence, as my reading of that has occurred.

7          2 -- 5, 2.02, is given without objection.

8          And 6, 2.03, is given without objection as proposed.

9          And 2.04, or instruction No. 7 without brackets --

10 let's see.  I have a note.  I didn't check that one off.

11 Let's see.  Without the bracketed material, that is out.  So

12 that was accomplished.

13         8 was withdrawn.

14         9, to present evidence, he is presenting evidence, so

15 that was supposed to be removed, but that needs to be modified

16 to remove that.

17         MS. BABU:  Will do, your Honor.  We will take care of

18 that at a break.

19         THE COURT:  All right.  10 is without -- I'm trying

20 to read, without last sentence, but I'm not sure.

21         MR. PISSETZKY:  You took out the bracketed language

22 on the top.

23         THE COURT:  Okay.  That's okay.

24         MR. PISSETZKY:  We took out the age of the witness.

25         THE COURT:  All right.  So that's okay.

1          11 is given without objection as written.

2          12 is modified -- let's see.  12 is objected to but

3 we made plural "witnesses," so that's no longer objected to.

4 Is that correct?  We made it plural.

5          MR. PISSETZKY:  Yes.

6          THE COURT:  All right.  13 was withdrawn.

7          14 was modified to make plural.  That was done.

8          15 --

9          MR. PISSETZKY:  Is out.

10         THE COURT:  -- is withdrawn.

11         16 was withdrawn.

12         17 is given with the brackets.  And that was done.

13         18 is given, is modified, removed, Bille and Chmelar,

14 and that was done.

15         19 was withdrawn.

16         20 was amended to for "map," and that was done.

17         21 was given without objection.

18         22 is given with the brackets, and that was done.

19         23, 4.05, is withdrawn.

20         26.

21         MR. PISSETZKY:  We just objected to --

22         THE COURT:  Pardon?

23         MR. PISSETZKY:  We objected to that one, but you had

24 given it.

25         THE COURT:  Yes, given over the objection of the

1  defendant.  Do you want to argue that?

2  MR. PISSETZKY:  Judge, the only argument that we have

3  is that I don't think that it accurately depicts what we have

4  here.  There's -- he is not accused of more than one crime.

5  There's one crime that is charged in two separate ways, so I

6  don't think it's appropriate.

7  THE COURT:  All right.  It will be given without --

8  with objection.

9  27, the elements.  There's an objection to that in my

10  notes.

11  MR. PISSETZKY:  Right.  We objected to the No. 4,

12  proposition 4 which says, "A, intentionally used a deadly

13  weapon or a dangerous weapon or, B, intentionally inflicted

14  bodily harm."  We're objecting to the second, to B basically

15  because it's not charged that way.

16  THE COURT:  Let's see.  Okay.  That's given over your

17  objection.

18  28 is given without objection.

19  29 was withdrawn.

20  30 was given without objection.

21  31 is given, but I don't see it in my packet.

22  MR. PISSETZKY:  I think they skipped -- there was no

23  31.  It was a typo.

24  THE COURT:  So you may want that one.  That's the one

25  that says that to commit a forceable assault of a federal --

1    it is not necessary he knew that it was a federal officer.

2         MR. EICHENSEER:  Yes, Judge.  We moved it after the

3    instruction conference on Friday.  It's now -- it's now part

4    of the knowingly definition right after the elements of Count

5    1.

6         THE COURT:  Okay.  Fine.

7         MR. PISSETZKY:  And we don't have an objection.

8         THE COURT:  All right.  That's good.

9         32 was withdrawn.

10        33 is given without objection.

11        34, 35, and 36 are withdrawn.

12        37 is -- let's see.  There's supposedly a

13   modification.  What was the modification?

14        MS. BABU:  Your Honor, instead of "yes," it was

15   changed to, "check, was discharged," and "no" was changed

16   to, "check, was not discharged" to track the verdict form.

17        MR. PISSETZKY:  Correct.

18        THE COURT:  All right.  So that's okay.

19        38 is given without objection.

20        39 is given with the bracketed.  That was done.

21        39 is given with the brackets.

22        40 is given without objection.

23        41 is given without objection.

24        And at least the verdict form, you've removed the

25   provision about, if you're not guilty of Count 1, you can't be

1  guilty of Count 2.

2          MR. PISSETZKY:  Well, your Honor, may I argue that?

3          THE COURT:  Yes --

4          MR. PISSETZKY:  The government sent you a nice

5  letter --

6          THE COURT:  -- you can.

7          MR. PISSETZKY:  -- over the weekend but you didn't

8  hear argument.

9          THE COURT:  I know.  I will.  I think we all thought

10  at the time that that was the law.  Now, the government

11  contends based upon Judge Easterbrook's opinion in *Davila*

12  *versus U.S.* that's, there can be a conviction of Count 2

13  without a conviction of Count 1.

14          MR. PISSETZKY:  Well, that's not truly accurate.  The

15  government loves to quote and lift quotes from different

16  cases.  I guess we all do that because we're lawyers, but

17  these are not the propositions of these cases.

18          We have a case specifically that charges in Count 1

19  that discharge of a firearm to cause bodily injury and then we

20  have a Count 2 which is the gun charge.  They're the same

21  exact charge.  It's not as if the government didn't charge him

22  with another case.

23          The cases that they quote are either cases that the

24  individual was not charged with the underlying offense, which

25  happened here because he is charged with the underlying

1   offense, or the government's quoted cases where in hindsight

2   on abuse of discretion, the appellate court said, well, it's

3   not -- it's not an error on the abuse of discretion standard

4   because it's not an inconsistent verdict in a scenario like

5   that.

6           There was not an objection during trial.  We're

7   objecting to it, and we're saying we need that language.  And

8   if you -- and we saw it now and we caught it at this point.

9   So when we see it, and we are saying it's inconsistent

10  verdicts at that time, then the appellate court is going to

11  side with us and say "you're correct" because we're raising

12  the objection now.  It's not a first-time objection on appeal,

13  Judge.  It's not abuse of discretion anymore.

14          MS. BABU:  Your Honor, I think the underlying issue

15  here and ultimate -- the ultimate issue here is that the

16  government could have charged just the 924(c) count here

17  without the predicate 111 count, and it still would have been

18  a valid indictment.  And so, therefore, it's not necessary

19  that the jury find the defendant guilty of Count 1 to find him

20  guilty of Count 2, and that's the ultimate issue before the

21  Court.

22          MR. PISSETZKY:  On the contrary.  Because the

23  government in this case charged him with the underlying

24  offense, it does create an inconsistent verdict issue,

25  especially because we're raising it now and we're telling the

1    Court, it will be -- as the Court said -- as one of the quotes

2    from the government, it says, it does cause -- it will cause

3    jury confusion at this point because there are inconsistent

4    verdicts. And we're raising it. And it's not an abuse of

5    discretion. It will be reviewed de novo because we are

6    raising it at this point and the government did charge it.

7       Now, if they're going to dismiss Count 1 then, of

8    course, they can charge him with a 924(c). There's no

9    question about it --

10       MS. BABU: Your Honor --

11       MR. PISSETZKY: -- but they're not.

12       MS. BABU: Your Honor, the Supreme Court has found

13    that while there may be an inconsistent verdict, that that is

14    sometimes okay, that that is fine. But if the jury, if the

15    jury in whatever, in their discretion for whatever reason they

16    choose, if they choose to find the defendant not guilty on

17    Count 1 and find him guilty on Count 2 and that is -- seems to

18    be inconsistent in our eyes, that that is an appropriate

19    verdict.

20       THE COURT: As a practical matter, I can't imagine

21    that that would occur. Either they're going to find him on

22    both or neither. So I mean, as far as that goes...

23       MR. PISSETZKY: There's a lot of splitting the baby,

24    Judge. Juries love to do that.

25       MS. BABU: And they're allowed to do that, your

Honor.

THE COURT: What?

MR. PISSETZKY: To split the baby.

THE COURT: I'm allowed to do that?

MR. HYMAN: They may not be allowed, but they do it.

THE COURT: What about the Bible?

MR. PISSETZKY: Well, the Bible comes into their mind, and then they do split the baby.

THE COURT: All right.

MR. PISSETZKY: It's not Moses.

THE COURT: I'm inclined to agree with the government that it's possible, so we can clean it up afterwards. You know, if something happens inconsistently, we'll take care of it then. So I think your verdict form is consistent with your position. Is that right?

MS. BABU: It's in -- your Honor, the version I sent last night does include the defendant's language in brackets. We can clean that up at a break.

THE COURT: I thought it didn't on mine.

MS. BABU: I sent -- I apologize, your Honor. We sent a version on Friday evening and then another version last night.

THE COURT: Oh, okay. So anyway, so you need to redo that one.

MS. BABU: Correct, your Honor.

1    THE COURT:  And I think -- anything else on the

2    record on the instructions?

3    MS. BABU:  No, your Honor.

4    THE COURT:  The defendant's happy with the

5    instructions?

6    I think on the record, the one instruction that was

7    submitted, and I just want the record to be clear, the other

8    acts, 404(b) instruction, the defendants do not want that.

9    MR. HYMAN:  Correct.

10   THE COURT:  Is that correct?

11   MR. HYMAN:  Correct.

12   THE COURT:  Okay.  So that has not been --

13   MS. BABU:  Correct, your Honor.

14   THE COURT:  That will not be given to the jury.

15   Anything else?  As soon as --

16   MR. HYMAN:  I'm going to get the -- can I bring this

17   witness in --

18   THE COURT:  Yes, bring the witness in.

19   MR. HYMAN:  -- and let him sit up there?

20   THE COURT:  And then we'll be ready to go.

21   MR. HYMAN:  All right.

22   THE COURT:  I'll see if our jurors are here.

23   (Proceedings heard in open court.  Jury in.)

24   THE COURT:  Please be seated.

25   Good morning, members of the jury.  When we left

1    Friday, the government had rested.  And we're here this
2    morning for the defense witnesses.
3            This is your first witness; is that correct?
4            MR. HYMAN:  Yes, your Honor.
5            THE COURT:  Would you raise your right hand, sir?
6        (Witness sworn.)
7            THE WITNESS:  I do.
8            THE COURT:  Please be seated.
9            Counsel, you may question the witness.
10           SERGEANT NEIL EVANS, DEFENDANT'S WITNESS, SWORN
11                        DIRECT EXAMINATION
12   BY MR. HYMAN:
13   Q.   Would you tell the members of the jury your name?
14   A.   Sergeant Neil Evans.
15   Q.   And where are you a sergeant?
16   A.   In the 4th District for the Chicago Police Department.
17   Q.   In May of 2018, were you a detective in the -- with the
18   Chicago Police Department?
19   A.   That's correct.
20   Q.   And where were you assigned?
21   A.   To Unit 180.
22   Q.   Tell us what Unit 180 is.
23   A.   Unit 180 is the investigative response team.
24   Q.   So you were at a particular area within the city of
25   Chicago that you covered?

1  A.  We covered citywide.

2  Q.  Did you -- before on May 4th of 2018, how long had you

3  been a Chicago policeman?

4  A.  Approximately 16 years.

5  Q.  Sergeant Evans, that's a subpoena for your appearance in

6  this courtroom, correct?

7  A.  Correct.

8  Q.  And that called for your appearance on Friday, correct,

9  the 14th?

10  A.  Correct.

11       MR. EICHENSEER:  Your Honor, can we be heard for a

12  moment?

13       MR. HYMAN:  I'll move on.  I'm not going to ask him

14  anything else.

15       THE COURT:  Move on.  He's here pursuant to a

16  subpoena.

17  BY MR. HYMAN:

18  Q.  Right.  Sergeant Evans, I asked you before we started if

19  you would talk to me, and you told me, "Only on the witness

20  stand," true?

21  A.  Correct.

22  Q.  Sergeant Evans, you did not bring anything with you in

23  this -- to this courtroom today, did you, no reports?

24  A.  No.

25  Q.  And before we started, I gave you a book that contained

1  your typed reports and also any handwritten notes that you had

2  taken that day, true?

3  A.   True.  I didn't look through the whole thing, but...

4  Q.   But I said feel free to look at certain records, and I

5  directed you to specific points within that report, correct?

6  A.   Correct.

7  Q.   At the time that you were -- I'm twisting my tongue here

8  this morning.  On May 4th of 2018, were you asked to go to an

9  area 44th and Hermitage?

10 A.   Correct.

11 Q.   How did you -- who told you to go there?

12 A.   My sergeant called me.

13 Q.   And when you went there, what was your understanding of

14 why you were going there?

15 A.   When I was notified, I was notified that there was an

16 officer-involved shooting and that an ATF special agent was

17 shot.

18 Q.   Now, when you headed to that scene, did you call any

19 forensic evidence team to join you?

20 A.   I did not make any notifications.  The notifications were

21 made from the scene by others.

22 Q.   When you got about, can -- do you recall what time you got

23 there?

24 A.   It's in my notes if approximate --

25 Q.   If it helps, if you can just quickly refer to it, help you

1   refresh your memory.

2       (Pause.)

3           Did you find it?

4   A.  Approximately 0415 hours.

5   Q.  Which means 4:15 in the morning?

6   A.  Correct.

7   Q.  And you learned that that shooting had occurred -- had

8   happened just about an hour before that, true?

9   A.  Approximately, yeah.

10  Q.  When you get there, when you get there, there are a lot of

11  officers there, true, a lot of different policemen walking

12  around, looking around?

13  A.  Yes.

14  Q.  Did you see when you approached -- when you got there, did

15  you talk to any of the agents who had worked in this mission,

16  the ATF agents?

17  A.  I may have.  I know I was trying to collect information as

18  far as where key evidence was, so I think if I had, they may

19  have pointed out where some things were.

20  Q.  You learned, did you not, that there was a -- shots were

21  fired on Hermitage and struck this officer as he was crossing

22  the street at 44th and Hermitage, true?

23  A.  Correct.

24  Q.  And you also learned that another officer, a Chicago

25  police officer assigned to this case, an officer by the name

1　of Spratte, fired his own weapon, true?

2　A.　True.

3　Q.　When you first saw -- when you first got there, was

4　Officer Spratte there?

5　A.　He was not on scene.

6　Q.　He was not on the scene?

7　A.　He was not on the scene.

8　Q.　There is a system that the detective division uses that --

9　where they write notes and then they transcribe those notes on

10　to an official case report, true?

11　A.　True.

12　Q.　Those notes are kept in the ordinary course of your

13　business, right?

14　A.　Yes.

15　Q.　Those are known as GPRs?

16　A.　Correct, general progress reports.

17　Q.　At some point that morning, you spoke to Mr. -- Officer

18　Spratte, right?

19　A.　Correct.

20　Q.　You understood that he was the officer involved in this

21　case who fired his weapon, true?

22　A.　True.

23　Q.　And when you spoke to Officer Spratte, he was not under

24　any medication, was he?

25　　　　　MR. EICHENSEER:　Object to the foundation, your

1    Honor.

2            THE COURT:  Excuse me?

3            MR. EICHENSEER:  Object to the foundation.

4            THE COURT:  Overruled.

5            MR. HYMAN:  Go ahead.

6            THE COURT:  He can answer if he knows.

7    BY MR. HYMAN:

8    Q.  You can answer.

9    A.  I wouldn't have any idea.  There was nothing indicated to

10   me that he was.

11   Q.  You were able to talk to him freely, correct?

12   A.  Correct.

13   Q.  He didn't indicate to you that he was not able to talk to

14   you, did he?

15   A.  There was nothing -- like, when I was able to interview

16   him, there was nothing --

17   Q.  Wrong with him?

18   A.  Nothing that precluded him from speaking to me.

19   Q.  Okay.  And when you spoke to him and asked him what

20   happened, he told you and which you wrote down in your GPR

21   that there was an unknown -- unknown person with a white

22   shirt, and he saw an unknown person with a white shirt and two

23   muzzle flashes, true?

24   A.  Can I check my notes?

25   Q.  Please, to help you refresh your memory, absolutely.  And

1  I think I may have -- as you had seen, I sort of put a little

2  tab on that section on the GPRs.

3  A.  Thank you.

4        There is no indication.  He didn't say -- specify how

5  many muzzle flashes.

6  Q.  Okay.  You've read that statement?

7  A.  I saw -- I see it in the GPR, yes.

8  Q.  He did tell you, the words that he used were he saw an

9  unknown, unknown with white T-shirt and muzzle flashes?

10  A.  An unknown individual on the street with a white shirt,

11  and in that vicinity, he saw muzzle flashes, yes.

12  Q.  Right.  And did he say he saw it on the sidewalk on the

13  north side of the street?

14  A.  He saw it northbound of his location on the west sidewalk

15  in the 4300 block.

16  Q.  And then you typed that -- you took that note and you

17  typed it, correct?

18  A.  Correct.

19  Q.  Into your official report?

20  A.  Correct.

21  Q.  And in that report, you said the same, that Officer

22  Spratte talked to you and that he saw an unknown person in a

23  white T-shirt and muzzle flashes, true?

24  A.  Yes.

25  Q.  Did he say to you that he saw someone in a white shirt

1  standing in the street, or did he say sidewalk?

2  A.  I have recorded here "sidewalk."

3  Q.  Did he tell you in your talking to him that he did not

4  recall when he saw this unknown individual?  Is that written

5  in your -- did you write that?

6  A.  I'm sorry.  Can you say that again, sir?

7  Q.  Sure.  Did he tell you that he did not recall when he saw

8  the individual?

9  A.  He explained to me while he was going for cover, when he

10  heard the initial gunshots and he turned and he looked, he saw

11  a person with a white T-shirt.  He also saw muzzle flashes in

12  that vicinity.

13  Q.  Sergeant Evans, I want to leave that subject now, and I

14  want to talk to you about scene preservation of evidence if

15  that's okay.

16  A.  Sure.

17  Q.  In your experience as a detective and in your training as

18  a detective, the scene preservation or the scene safety is of

19  great importance, true?

20  A.  Correct.

21  Q.  You don't want anything to be contaminated, right?

22  A.  Correct.

23  Q.  And when you got to the scene, were you told by either a

24  Chicago police officer or an ATF officer that they had found

25  any cartridge casings?

1  A.  When I initially responded?

2  Q.  Yes.

3  A.  No.

4  Q.  As you were there, you were -- I presume you were there a

5  good part of the morning?

6  A.  I was, but I was alerted to the shell casings that were

7  ultimately PO Spratte's.  I was not alerted to where the

8  suspect fired from at that point.

9  Q.  Those casings were on 44th Street near the park, right?

10 A.  Those were Spratte's, correct.

11 Q.  Did you also learn as you were there that day that there

12 were an originally -- originally four shell casings found in a

13 gangway at 4332 South Hermitage?

14 A.  I had -- can I check the notes here --

15 Q.  Please.

16 A.  -- to make sure.  It could have been -- I think it was a

17 different number off of memory.  I should check.

18      (Pause.)

19          When I was alerted -- when I was alerted, it was five

20 spent casings.

21 Q.  Five?

22 A.  Correct.

23 Q.  You didn't know that there were just initially four found?

24 A.  I was alerted to five.

25          MR. HYMAN:  Can you put up, if we can turn on --

1       THE COURT REPORTER:  Do you need it switched?

2       MR. HYMAN:  No, that's okay.

3  BY MR. HYMAN:

4  Q.  Sergeant Evans, do you know who found those casings?

5  A.  I do not.

6  Q.  Did you request as the detective, the lead detective in

7  this case, that those casings be sent to the crime lab for

8  fingerprint impressions?

9  A.  I believe that they may have been.  I believe so.

10  Q.  You don't know?

11  A.  If I can see the -- I need to see the crime scene

12  processing report.

13  Q.  Is it in with your records?

14  A.  My understanding, counsel, is it's very hard to get

15  fingerprint --

16  Q.  That's not the question I asked, Sergeant.  That's -- I

17  know you wanted to say that.  My question to you is very

18  specific.

19  A.  Correct.

20  Q.  Did you request that there be a latent print examination

21  of those cartridge casings?

22  A.  I believe -- I believe there was a determination between

23  us and the forensic services section and the ATF that we may

24  have attempted to do that, but I can't find it in this report,

25  in this book.

1  Q.  Are you familiar with gunshot residue?

2  A.  Yes.

3  Q.  Is there a test for gunshot residue?

4  A.  Yes.

5  Q.  Have you used that or requested that?

6  A.  In this case?

7  Q.  Not -- not in this case specifically but any of the cases

8  that you had as a detective.

9  A.  Yes.

10  Q.  All right.  And you -- and your understanding is gunshot

11  residue can be transferred from your hands to your clothes,

12  correct?

13  A.  Correct.

14  Q.  Sergeant Evans, I wanted to go back -- even though I said

15  we were going to leave that statement, I wanted to go back to

16  the statement that Mr. -- Officer Spratte made was

17  specifically that there was an unknown person wearing a white

18  T-shirt with muzzle flashes on the sidewalk on the north side,

19  northwest side, right?  Not in the vicinity but on the

20  sidewalk, true?

21  A.  No.  I have, "saw muzzle flashes northbound from his

22  location on the west sidewalk."

23  Q.  On the west sidewalk, not in the vicinity but that -- the

24  word "in the vicinity," he never used that word, did he?

25  A.  I didn't have it --

1  Q.  Right.  And if he had used the word, you probably more

2  likely true than not, you would have put that in there, right?

3  A.  If -- if he would have said it that day, I would have put

4  it in the report.  It would have been here.

5          MR. HYMAN:  Your Honor, nothing else.

6          THE COURT:  Cross-examine?

7          MR. EICHENSEER:  Briefly, your Honor.

8                    CROSS-EXAMINATION

9  BY MR. EICHENSEER:

10  Q.  Sergeant Evans, when you interviewed Officer Spratte that

11  morning, what time was it?

12  A.  I don't remember the exact time.

13  Q.  But Officer Spratte was not on the scene when you first

14  got to the scene --

15  A.  No.

16  Q.  -- right?

17          Do you know where he was?

18  A.  I believe he was getting treatment at a hospital.

19  Q.  So did you interview him after he got back from the

20  hospital?

21  A.  I did.

22  Q.  Did Officer Spratte ever tell you that he fired at a

23  person in a white T-shirt?

24  A.  No.

25  Q.  I want to -- Mr. Hyman asked you some questions about --

1  and by the way, you arrived at the scene after the shooting,

2  right?  You were not there for the shooting, correct?

3  A.  I was not.

4  Q.  Mr. Hyman asked you some questions about scene

5  preservation.  Do you remember those?

6  A.  Yes.

7  Q.  Where was the crime scene when you arrived?  What were the

8  parameters of it?

9  A.  It was primarily located near the intersection of 44th and

10  Hermitage.

11  Q.  You can use the map if you want.

12  A.  Sure.  The circle in the middle of 44th and Hermitage is a

13  traffic circle.  The shell casings were located -- from

14  Spratte were on the southeast corner, generally located near

15  the southeast corner, and Special Agent Crump was struck by

16  the round over on the -- toward the southwest corner.

17  Q.  The crime scene itself, did it extend across 44th Street

18  on Hermitage?  You can stand up and show the jury.

19  A.  Sure.  So we tried to make as big an area as we could

20  because there were so many unknowns when we first got there as

21  far as where the offender was.

22          MR. PISSETZKY:  I can't hear him, Judge.

23          THE COURT:  You have to speak a little louder since

24  you're not on the microphone.

25  BY MR. EICHENSEER:

1    Q.   You have to speak up, sir.

2    A.   We tried to make the scene -- when I got to the scene, it

3    was already established.  It was already a large scene because

4    there was so many unknowns that we didn't know where -- where

5    evidence would be located.  We didn't know where the shooter

6    fired from initially.

7              So the crime scene encompassed traffic being blocked

8    for traffic and vehicle traffic from Marshfield, 43rd to 45th

9    and over to Wood Street.  It was quite a large scene, but we

10   had a large scene because there were a lot of unknowns.

11   Q.   Was Hermitage taped off between 43rd and 45th?

12   A.   Was Hermitage?  There was some -- there was an inner

13   perimeter and outer perimeter, so we did have that.

14   Q.   Okay.  Where was the -- do you have any recollection of

15   where the inner perimeter was?

16   A.   The inner perimeter was in the vicinity of where the blood

17   from Special Agent Crump was and in the grass area.  There was

18   a fired bullet located down the street here approximately 4416

19   on the parkway.  So we tried to -- we tried to cordon it off

20   with tape as far as the inner perimeter where that evidence

21   was located.

22   Q.   Did the outer perimeter extend up to 43rd on Hermitage?

23   A.   Yes.

24   Q.   You can sit down again.

25             Did you or anybody on your team do a canvas of the

1  crime scene?

2  A.  Yes.

3  Q.  Can you just tell the --

4       MR. PISSETZKY:  Your Honor, objection to foundation,

5  who did it, because he testified before that he doesn't know

6  who collected the shell casings.

7       THE COURT:  All right.  Who collected -- let's see.

8  Who was on the team, I guess.

9  BY MR. EICHENSEER:

10  Q.  Can you tell the jury what a canvas is first?

11  A.  A canvas is done in order to locate evidence, locate

12  witnesses.  There was detectives from Area Central that

13  assisted us with the canvas.

14  Q.  Okay.  So you personally were involved in the canvas?

15  A.  I did do some interviews in the canvas to look for

16  witnesses.

17  Q.  Okay.  Did you also walk around to look for evidence, too?

18  A.  Correct.

19  Q.  Were you the only person that was part of the canvas team,

20  or were there other people that you saw doing canvassing?

21  A.  There was other people.

22  Q.  And during those other canvasses, did you become aware of

23  any other shell casings on the scene besides those five in the

24  gangway and the two that Officer Spratte fired?

25  A.  No.

1      MR. EICHENSEER:  No further questions, your Honor.

2      THE COURT:  Anything further?

3      MR. HYMAN:  Yes, Judge, if I may.

4                    REDIRECT EXAMINATION

5  BY MR. HYMAN:

6  Q.  All the canvassing that was done that morning, you had no

7  description of a shooter other than you saw -- Officer Spratte

8  saw someone in a white shirt and then muzzle flashes, true?

9  A.  True.  We had no eyewitness.

10 Q.  And all you heard -- all your canvassing produced were

11 people who told you that they had heard the shots, true?

12     MR. EICHENSEER:  Objection to hearsay, your Honor.

13     THE COURT:  Overruled.  He can answer.

14 BY THE WITNESS:

15 A.  The majority of the canvas result was people hearing

16 gunshots.

17 BY MR. HYMAN:

18 Q.  No one saw a thing?

19 A.  No one saw -- no one eyewitnessed the shooting, no.

20     THE COURT:  You can step down.  You're discharged.

21    (Witness excused.)

22     THE COURT:  Further defense witnesses?

23     MR. PISSETZKY:  Your Honor, we're going to call Beau

24 Jacobsen, please.

25     THE COURT:  All right.

1    Mr. Jacobsen, you're still under oath.  Do you

2  understand that?

3    THE WITNESS:  Yes, sir.

4    Do you want this back, sir?

5    MR. PISSETZKY:  Thank you.  I'll grab it.

6    First the ELMO but not publish it to the jury.

7    BEAU JACOBSEN, DEFENDANT'S WITNESS, PREVIOUSLY SWORN

8    DIRECT EXAMINATION

9  BY MR. PISSETZKY:

10 Q.  Good morning.

11 A.  Good morning, sir.

12 Q.  Can you remind the jury who you are?

13 A.  Beau Jacobsen.

14 Q.  And you are with?

15 A.  ATF.

16 Q.  And you are the case agent?

17 A.  Correct.

18 Q.  That means that all the evidence or the majority of the

19 evidence went through you.  You were sitting here in court,

20 and you are pretty familiar with this case, correct?

21 A.  Yes, sir.

22 Q.  I'm going to show you what I've marked as Godinez Picture

23 28.  Do you recognize this?

24 A.  Yes, sir.

25 Q.  Is that a picture that -- what is it of?

1  A.  It's a picture of an individual who's standing essentially

2  on the west sidewalk of Hermitage looking northbound.

3  Q.  On Hermitage?

4  A.  Yes.

5  Q.  And you recognize it to be the abandoned house at 4333, I

6  believe, South Hermitage?

7  A.  Yes, it appears so.

8  Q.  And does it look like an accurate depiction of the way

9  that the scene looked on May 4, 2018?

10  A.  Yes, it appears so.

11       MR. PISSETZKY:  Your Honor, I would ask that the

12  picture be admitted and published.

13       THE COURT:  Any objection?

14       MS. BABU:  No, your Honor.

15       THE COURT:  You may publish.  It's admitted.  You may

16  publish.

17     (Godinez Picture 28 received in evidence.)

18  BY MR. PISSETZKY:

19  Q.  Thank you.  And so on the right-hand -- on the left-hand

20  side, you see the green awning that we talked about before,

21  correct?

22  A.  Yes.

23  Q.  And then there's those boarded doors or entranceway?

24  A.  Yes.

25  Q.  Now, can you see the camera, the private camera that we

1  saw the recording from, the black-and-white recording that has

2  a view of the north and the south of the street?

3  A.  Yes, I --

4         THE COURT:  We just lost the picture.

5      (Pause.)

6  BY MR. PISSETZKY:

7  Q.  You don't see it on your thing, right?

8  A.  No, I do not.

9         THE COURT:  Nor do I.

10         MR. PISSETZKY:  Nor do I.

11         I think I broke something.

12         THE COURT:  There we go.

13      (Pause.)

14  BY MR. PISSETZKY:

15  Q.  So do you see the camera?

16  A.  Yes.  You said the two different directions, though.

17  Q.  Yes, the camera that is the private camera on the house.

18  A.  I believe how they set up is, there's two separate cameras

19  on the front of the house.

20  Q.  Okay.

21  A.  One is facing to the north and one is facing to the south.

22  Q.  And can you circle where the vicinity -- or that area

23  where it is?  There's that little bump in there, right, right

24  in the middle there?

25  A.  Yes.

1  Q.  So that's the camera.  Now, when you collected the

2  evidence, you also, you or your brother agents collected the

3  actual videos that we saw in court, correct?

4  A.  Yes.

5  Q.  And last week, you described that you watched the video of

6  south Hermitage, the camera that was going north, right?

7  A.  Yes.

8  Q.  And you watched it relative to the time of the shooting,

9  correct?

10  A.  Yes.

11  Q.  Okay.  And I think last week, you testified from your

12  memory that you don't remember seeing anybody in white north

13  of where the camera is, correct?

14  A.  I don't understand the question.  Sorry.

15  Q.  Well, you remember, there's some testimony about a person

16  wearing a white T-shirt.

17  A.  Yes.

18  Q.  And Officer Spratte said that he saw him down the

19  street --

20  A.  Yes.

21  Q.  -- or somewhere in the vicinity, right?

22  A.  Yes.

23  Q.  And you reviewed the cameras, correct?

24  A.  Correct.

25  Q.  And so I'm going to -- can we -- so is this -- do you see

1   it on your screen?

2   A.  I just have the court emblem on my screen, no picture.

3           I have the video now, it appears.

4           THE COURT REPORTER:  Can it be published to the jury?

5           THE COURT:  I've got one.

6           MR. PISSETZKY:  Do you mind if we publish it because

7   he can't see it?

8           THE WITNESS:  I can see the video now.

9   BY MR. PISSETZKY:

10  Q.  Oh, yes.  You see the video?

11  A.  Yes.

12  Q.  You see the video.  So does this accurately depict the

13  video that shows the north side of Hermitage?

14  A.  This is the view of -- yes.

15  Q.  Of the video?

16  A.  Facing north, yes.

17          MR. PISSETZKY:  Okay.  I would ask for it to be

18  marked as Godinez Video 3 and publish it, Judge.

19          MS. BABU:  Your Honor, foundation as to time.

20          MR. PISSETZKY:  Well, the timestamp is on the video.

21  So it's starting at 3:19 a.m.  Do you see that?

22          THE COURT:  All right.  You may publish.  It's

23  already -- is this already in evidence, this portion?

24          MR. PISSETZKY:  I think we stipulated to the

25  foundation of it --

1    THE COURT:  All right.

2    MR. PISSETZKY:  -- because it's all the videos.

3    THE COURT:  It's in evidence.  You may play it.

4  BY MR. PISSETZKY:

5  Q.  Thank you.  And do you see the video -- I'm playing it to

6  the jury.

7    (Said video recording played in open court.)

8    Do you see the video, the timestamp starts at 3:19

9  approximately?

10  A.  Yes.

11  Q.  And as we know, this video, the timestamp is about two

12  minutes fast, ahead?

13  A.  Roughly, yes.

14  Q.  And so the agent's car, the unmarked undercover car would

15  be driving into the area roughly around 3:20 and a few

16  seconds, correct?

17  A.  That sounds correct, yes.

18  Q.  And we see a car approaching, correct?

19  A.  Yes, we see a car approaching.

20  Q.  And that appears to be the agent's car, right?

21  A.  Yes, it appears to be so.

22  Q.  And so far, there's nobody on the street, correct?

23  A.  No.

24  Q.  Or the sidewalk?

25  A.  No.

1 Q. And incidentally, you can see the house number on the

2 bottom, 4324, that's where the cameras were mounted, right?

3 A. That's correct, sir.

4 Q. Still nobody with a white shirt on the street or anybody,

5 for that matter at all?

6 A. No, I don't see anyone.

7 Q. And you can see all the way up to 43rd Street, correct,

8 pretty much?

9 A. Yes, it appears so.

10 Q. And this is already a squad car after the shooting, right,

11 a police car driving with the lights flashing?

12 A. I believe that is the vehicle that transported Agent

13 Crump.

14 Q. So that's already after the shooting, right, and after

15 Officer Spratte said that he already shot by that time?

16 A. Yes.

17 Q. And we have not seen one person with a white T-shirt or

18 any other shirt north on 4 -- on Hermitage?

19 A. No, you have not seen anybody on this camera.

20 Q. So the only time that we see in that -- the only

21 individual with a white T-shirt was in the -- an individual

22 that we saw actually closer to 44th Street on the -- in the

23 alley shortly before the shooting, right?

24 A. Of all the videos?

25 Q. Right.

1  A.  The only time I remember seeing a white shirt is, yes, in

2  the alley south almost at 44th, yes.

3       MR. PISSETZKY:  May I have a moment, Judge?

4    (Pause.)

5       MR. PISSETZKY:  Thank you.

6       THE COURT:  Anything further?

7       MS. BABU:  Just two questions, your Honor.

8                    CROSS-EXAMINATION

9  BY MS. BABU:

10 Q.  Agent Jacobsen, Mr. Pissetzky just asked you some

11 questions about the video in which an individual in the white

12 T-shirt appeared in the alley.  Do you remember that?

13 A.  Yes.

14 Q.  That was video footage from the alley camera at 4324

15 facing south, correct?

16 A.  Yes.

17 Q.  And the timestamp on that video was 2:52 a.m., correct?

18 A.  Yes.

19 Q.  And that's corrected for the error in the timestamp on

20 that private surveillance camera?

21 A.  That's correct.

22 Q.  So the real time is approximately 2:52 a.m.?

23 A.  Yes.

24 Q.  And what time was the shooting of Special Agent Crump?

25 A.  Approximately 3:18.

1    MS. BABU:  Thank you.

2    MR. PISSETZKY:  Judge, I would object.  That was more

3  than two questions.

4    THE COURT:  If I was going to enforce that rule, the

5  case would never end.

6    You can step down.  You're excused.

7  (Witness excused.)

8    THE COURT:  Call your next witness.

9    MR. PISSETZKY:  Can I go outside and make sure that

10  he's here?

11    THE COURT:  Pardon?

12    MR. PISSETZKY:  I've got to go and find him.

13  (Pause.)

14    THE COURT:  Who is the next witness?

15    MR. PISSETZKY:  Judge, can we have a sidebar for just

16  a second?

17  (Proceedings heard at sidebar:)

18    MR. PISSETZKY:  He's our investigator that was out on

19  the scene.  Agent Jacobsen told me that he doesn't recognize

20  these pictures.  These are the pictures from the alley.  You

21  know, we took them.  And Agent Jacobsen took a picture from

22  where the traffic bump is looking that way.  I wanted him to

23  recognize these saying that this is the same alley, a picture

24  going the opposite way, but he is not willing to do that.

25    So unless the government is stipulating, would be

1    able -- would be willing to stipulate to these two pictures,

2    I'm waiting for my investigator to come in here and just say

3    this is the alley.

4        MS. BABU:  Can you just point out to me exact -- I'm

5    disoriented here looking at this.

6        MR. PISSETZKY:  So this is the back of 43 --

7        MS. BABU:  This is the fence?

8        MR. PISSETZKY:  Yes.  The fence is the 4344 South

9    Hermitage, and that's, these are the garbage cans, and this is

10   a picture --

11       MR. EICHENSEER:  The gangway is this direction?

12       MS. BABU:  This is on the west side of the alley?

13       MR. PISSETZKY:  Right.  And then this is the gangway

14   going north.

15       MS. BABU:  And this is the east side of the alley?

16       MR. PISSETZKY:  Yes.

17       MS. BABU:  That's fine.

18       THE COURT:  Okay.

19       MR. PISSETZKY:  Okay.  Great.  Thank you.

20       THE COURT:  How do you want to do it?  Do you want to

21   just -- describe it, say by agreement?

22       MR. PISSETZKY:  Yes.

23       THE COURT:  Okay.

24       (Proceedings heard in open court:)

25       THE COURT:  All right.  Proceed.

1    MR. HYMAN:  Your Honor, by way of stipulation between

2 the parties, Mr. Godinez and the government will agree that

3 photo number -- Godinez Picture No. 29 is a true and accurate

4 depiction of the alley behind Hermitage, and it's the view,

5 the south view of the alley right by 4344 South Hermitage.

6    So stipulated?

7    MS. BABU:  Yes.

8    THE COURT:  Okay.

9    MR. PISSETZKY:  And --

10    THE COURT:  You can publish that -- or have you

11 already?

12    MR. PISSETZKY:  Thank you.  And then Mr. Godinez and

13 the government will stipulate that this is a true and accurate

14 photo of the alley behind -- the alley behind Hermitage with a

15 north view where you can see the end of the alley is 43rd

16 Street.  And just as a reference point to -- of this picture,

17 there's, like, a driving bump here.

18    THE COURT:  Speed bump.

19    MR. PISSETZKY:  A speed bump.  Thank you.  The word

20 escaped me.  A speed bump that we saw yesterday -- or last

21 week in the picture that Agent Jacobsen took with a view south

22 from there.  So that's just for --

23    THE COURT:  All right.

24    MR. PISSETZKY:  -- the view.  And I would ask for it

25 to be admitted.

1    THE COURT:  They're admitted.  You can publish them,

2  or you already have.

3    MR. PISSETZKY:  Thank you.

4    THE COURT:  All right.  Further defense witnesses?

5    MR. HYMAN:  Your Honor, ladies and gentlemen of the

6  jury, with that, Mr. Godinez rests his case in chief.

7    THE COURT:  Okay.  Members of the jury, you now

8  heard -- any rebuttal testimony?

9    MS. BABU:  No, your Honor.

10    THE COURT:  Okay.  So both sides now rest.  You've

11  got all the evidence, members of the jury.  We're going to

12  take about a 10-minute recess while -- then we'll have the

13  final arguments on both sides.  The government will go first

14  followed by the defense and then the government's rebuttal.

15    So take the jurors out.

16    (Proceedings heard in open court.  Jury out.)

17    THE COURT:  Just on the record, each side gets an

18  hour and 20 minutes.  The government will split it, about an

19  hour --

20    MS. BABU:  Yes, your Honor.

21    THE COURT:  -- and then 20.

22    MS. BABU:  Your Honor, do you expect --

23    THE COURT:  We'll probably take a break after yours

24  because otherwise, it will be a pretty long time.

25    MS. BABU:  Thank you, your Honor.

1　　　　　THE COURT:  All right.  We'll start at a quarter to.

2　　　(Recess from 10:34 a.m. to 10:44 a.m.)

3　　　(Proceedings heard in open court.  Jury in.)

4　　　　　THE COURT:  Please be seated.

5　　　　　Members of the jury, you've now heard all the

6　　evidence.  As I indicated, we'll now hear the closing

7　　arguments of the lawyers.  This is their opportunity to bring

8　　everything together and to give you -- to suggest to you how

9　　you should interpret the evidence that you've heard during the

10　course of the trial.

11　　　　　It is designed to be helpful to you to, A, you'll get

12　their views on how you should decide the case and, B, it will

13　kind of bring things together, perhaps refresh your

14　recollection as to what you heard during the course of the

15　trial.

16　　　　　The one caveat is, as is the case with opening

17　statements, closing arguments by the lawyers are not in and of

18　themselves evidence.  If an attorney in the closing argument

19　asserts a fact, conclusion of a fact that it's your collective

20　recollection the evidence doesn't justify it you, of course,

21　follow your own recollections of the facts, but again, they're

22　designed to be helpful and you should, obviously, pay close

23　attention to them.

24　　　　　The government goes first.  You'll then hear from the

25　defendant, and then you'll hear a rebuttal from the --

1    opportunity for rebuttal from the government, and then I will

2    instruct you as to the evidence -- or the law as to the case,

3    and then you will proceed to consider your verdict.

4         So, Mr. Eichenseer, you're giving the opening for the

5    government?

6         MR. EICHENSEER:  Correct, your Honor.

7         THE COURT:  You may proceed.

8         CLOSING ARGUMENT ON BEHALF OF THE GOVERNMENT

9         MR. EICHENSEER:  Thank you, your Honor.

10        Good morning, ladies and gentlemen.  There's not too

11   many people that are awake at 3:00 o'clock in the morning, and

12   that's why an ATF team picked that time for a covert operation

13   so they can do their job without being seen.  And their job in

14   the morning of May 4th last year was to replace some GPS

15   trackers on cars in Back of the Yards.

16        Now, the ATF, what they didn't count on was that

17   there was one person who was wide awake at 3:00 o'clock that

18   morning:  The defendant, Ernesto Godinez.  And the defendant

19   wasn't just awake that morning.  He was out on the streets

20   patrolling the neighborhood, methodically circling the blocks

21   in that white Kia over and over again before pulling over by

22   44th and Wood and waiting.

23        What was the defendant doing?  He was on the lookout

24   for rivals.  He was protecting Saints territory.  That was his

25   job as a Saint.  At 44th and Wood where he pulled over, that

1  was the heart of Saints territory.

2        Of course, ATF knew this.  They knew what they were

3  getting into.  They had a plan that morning.  They were going

4  to send two teams in to do the trackers.  The first was a

5  scout team.  They were going to make sure that the area was

6  clear.  At 3:15, that scout team drove right past the

7  defendant at 44th and Wood and started to circle the block

8  slowly.

9        Now, the defendant, he saw them do that.  The scout

10  team didn't see him.  And, of course, the defendant didn't

11  recognize the scout team as cops.  These were two guys in

12  plain clothes driving a brown Impala going 15 miles an hour

13  circling his block slowly at 3:15 in the morning.  In the

14  defendant's eyes, these looked like rivals looking for

15  trouble, like something was up.

16        When the defendant realized they were circling his

17  block, he ran.  He ran all the way up Wood Street, across 44th

18  and into his front door, got a gun, and he came out moments

19  later and kept running up the street, kept running up Wood

20  Street, cut across the gangway, across that alley in back of

21  his house into another gangway on Hermitage.

22        And that just wasn't any gangway.  It was filled with

23  Saints graffiti, signs of disrespect to rival gangs.  It was a

24  gang lookout.  More importantly, it was a safe, protected spot

25  where the defendant could see what was happening on Hermitage.

1  He could stand post without anybody seeing him.

2       The defendant stood at the mouth of that gangway with

3  his gun at the ready.  He didn't wait long because 30 seconds

4  later, that second ATF team, the team with Agent Crump, drove

5  right past the defendant, 20 or 30 feet away from where he was

6  in that gangway.

7       Again, four guys in this car, plain clothes, unmarked

8  car.  What's more, the defendant sees this car pull over at

9  the end of the block.  Who gets out?  Three guys get out,

10  jeans, hooded sweatshirts, hoodies up, backs turned to

11  defendant.  They split into two groups and start walking down

12  the sidewalk, and the car that dropped them off pulls away.

13       So in the defendant's eyes, the situation has

14  escalated.  He sees three rivals now stalking Saints territory

15  on foot.  And that was when the defendant chooses to act.

16  That is when the defendant fires a hail of bullets down

17  Hermitage Avenue.  He stands at the mouth of that gangway, and

18  he fired five shots down the street.

19       One of those shots struck Agent Crump in the neck.

20  It tore through his head and it came out his face between his

21  eyes.  Agent Crump fell to the curb critically wounded.  His

22  partner turned around and returned two shots at the muzzle

23  flashes that defendant created.  And then the partners started

24  running up the street towards the defendant.

25       The defendant heard those return shots.  He saw guys

1  running towards him on the street.  He knew he had to get out

2  of that gangway and fast.  And so just seconds after he fired

3  his fifth and final shot, the defendant booked it out of that

4  gangway all the way across the alley back on to Wood Street

5  back into his house.  He gets to his house.  He texts his

6  girlfriend.  "Where you at" because he's ready to go now.

7  He steps outside.  He wipes the sweat off his face.

8  His girlfriend pulls up a few moments later.  You saw that

9  black car.  She kills the lights.  The defendant doesn't come

10  out right away.  He comes out a minute later out of the

11  gangway.  He walks down the sidewalk, gets in the passenger

12  seat.  He's still sweating.  He leans back and he says, "I

13  feel good.  Fuck that flake."

14  Except it wasn't a flake that the defendant just

15  shot.  It was a federal agent.  That, of course, is a federal

16  crime, and that's why the defendant is sitting in this

17  courtroom today charged with forcibly assaulting a federal

18  agent in the line of duty.

19  As in any case, it's the government's burden to prove

20  the defendant's guilt beyond a reasonable doubt.  And, ladies

21  and gentlemen, the government has met that burden at this

22  trial.  Through all the evidence that we've showed you over

23  the last five days, we've taken you back to the morning of May

24  4th, and we've recreated it on the screens and the speakers in

25  the court -- in this courtroom.

1       And all of that evidence together, it proves to you

2   beyond a reasonable doubt that it was the defendant who shot

3   Agent Crump that morning.  And I'm going to spend the rest of

4   my time walking you through that evidence, showing you how the

5   government met its burden.

6       But before I do that, I want to talk about the crime

7   that the defendant is charged with.  When you go back to

8   deliberate, you'll have the indictment in this case, and that

9   indictment charges the defendant with two crimes.  The first

10  is assault of a federal officer with a deadly or dangerous

11  weapon and the second, Count 2, is the use and discharge of

12  that firearm during the assault, during Count 1.

13      Now, I expect that the Court will instruct you that

14  to find the defendant guilty on Count 1, the government has to

15  prove to you four things beyond a reasonable doubt.  Those

16  things are called elements.  The first one is that defendant

17  forcibly assaulted Kevin Crump; the second, that at the time

18  of the assault, Kevin Crump was an officer or employee of the

19  United States performing his official duties; three, that the

20  defendant acted knowingly; and finally, that in committing the

21  assault, defendant either intentionally used a deadly weapon

22  or intentionally inflicted bodily harm.

23      Now, there are several things about these elements

24  that we don't need to spend a lot of time on, so I'm going to

25  start with those.  Number two is the first here because the

1   defendant and the government agree in this case that Agent

2   Crump was an ATF agent on duty that morning.  Number two, the

3   second element, has been established.

4          You see some phrases that are underlined on the

5   screen there:  Forcibly assaulted, used a deadly weapon, or

6   inflicted bodily harm.  There's been really no dispute in this

7   trial that Agent Crump was forcibly assaulted with a deadly

8   weapon and suffered bodily harm.

9          You might ask, what is a forcible assault.  And I

10  expect the Court is going to instruct you that an assault is

11  an attempt to inflict injury on another person.  And that

12  person commits assault forcibly when he makes physical contact

13  with the person he assaulted or otherwise uses physical force

14  to commit the crime.

15         Again, you saw plenty of evidence of that assault, of

16  that bodily harm at this trial.  You heard from Agent Crump

17  himself.  He explained how he was shot in the neck and the

18  face.  He explained about the days he spent in the trauma ICU.

19  He explained the multiple reconstructive surgeries to his

20  orbital bone and to his sinuses.

21         You saw Agent Crump's blood on the grass, on the

22  curb, on the street.  You saw the bullet that tore through his

23  head.  That's the bullet with Kevin Crump's DNA on it, marker

24  No. 3 right there.

25         Ladies and gentlemen, there's no serious dispute that

1  Agent Crump was forcibly assaulted in this case with a

2  dangerous or deadly weapon, i.e., a gun, and that he suffered

3  bodily harm.

4       So that leaves the first and the third element, that

5  the defendant forcibly assaulted Kevin Crump and that the

6  defendant acted knowingly. And "knowingly" is a legal term I

7  expect the Court to instruct you that a person acts knowingly

8  if he realizes what he is doing and is aware of the nature of

9  his conduct and does not act through ignorance, mistake, or

10  accident.

11       And that makes sense when you think about it, right.

12  It's not a crime to accidentally hurt somebody, mistakenly

13  injure somebody. You've got to know what you're doing.

14  Ladies and gentlemen, the defendant knew exactly what he was

15  doing. He acted knowingly in this case.

16       Now, there's an important -- there's another

17  important part of this instruction. It's a very important

18  part of this case. And I expect that the Court is going to

19  instruct you that it is not necessary that the defendant knew

20  that the person he assaulted was a federal officer.

21       And, in fact, that's what the evidence in this case

22  shows, that the defendant mistook Agent Crump for a rival gang

23  member that morning. But that mistake, that doesn't matter

24  for purposes of the evidence. All the government needs to

25  show is that the defendant knowingly assaulted someone.

1        So that leaves the first element.  And the government

2    submits to you that that has been the real issue at this

3    trial, whether the government has proved that it was the

4    defendant -- beyond a reasonable doubt that the defendant

5    forcibly assaulted Kevin Crump, that the defendant shot Agent

6    Crump in the head that morning.

7        And, ladies and gentlemen, we submit the answer to

8    that question is yes through all the evidence that you saw and

9    heard and that I'm going to go through.  This is just some of

10   that evidence.  Remember, you had video of him going into the

11   gangway where the shots were fired before and then booking out

12   of that gangway seconds later.

13       We have the five shell casings he left behind after

14   he ran.  You heard the five shots themselves.  That was that

15   audio recording you heard.  And you had ShotSpotter that

16   located those five shots right by where the defendant was

17   standing in that gangway.

18       We saw Officer Spratte.  He saw muzzle flashes in the

19   area of that gangway.  And you had the defendant's own words,

20   "Fuck that flake."  Those are admissions that the defendant

21   made.  You have DNA and ballistics that tied together the

22   casings, the bullets, Kevin Crump.  All of it comes together.

23   You saw Snapchat and phone records putting the defendant all

24   over the crime scene before, during, and right after the

25   shooting.  You have all the evidence about the Latin Saints.

1   And, ladies and gentlemen, to be clear, the
2  government does not have to prove why the defendant shot Agent
3  Crump that morning.  But we showed you this gang evidence so
4  you can understand why he shot Agent Crump that morning, what
5  he was doing, why he ran when he saw that scout team, why he
6  went to his house to get a gun, why he chose that gangway with
7  all the graffiti, why, most importantly, why he chose to shoot
8  at three strangers wearing hooded sweatshirts in the back at
9  3:15 in the morning and why he said, "Fuck that flake" when he
10 was done.  It all shows that he, of all people, had motive to
11 shoot Agent Crump because he thought it was a flake.

12   And finally, you have what defendant did after the
13 shooting.  He changes his clothes.  He ditches the hat.  He
14 tells his girlfriend or he tells his baby's mother, "I'm
15 sorry."  He does all these other things that shows the
16 consciousness of his guilt.

17   Now, I'm going to spend my -- the rest of my time
18 walking you through this evidence right here.  And as I do
19 that, each of these pieces standing by themselves may not tell
20 you everything.  Think of them kind of like puzzle pieces
21 scattered on the floor.  They may not show you the whole
22 picture.  They give you a part of it.

23   But as you start putting the pieces together and they
24 start coming together and interlocking, the picture becomes
25 clearer and clearer.  And the clear picture here beyond a

1  reasonable doubt is that the defendant shot Agent Crump in the

2  head that morning.

3  So you saw a lot of video in this trial.  And I'm

4  going to use the video footage to walk you through this

5  evidence because it provides a helpful timeline.  It allows

6  you to orient yourselves in time and space and understand what

7  you're seeing.

8  You'll have those videos when you go back to

9  deliberate.  They're important pieces of evidence in this

10  case.  It's Exhibits 110 and 111.  110, as you may remember,

11  is the screen with the five different panes in it, and 111 is

12  the screen with a single pane, a single camera view.  And ATF

13  video forensic expert Steve Greene is the one who put those

14  together and synchronized them so they all play back at the

15  same time.  And that's what I'm going to use to walk you

16  through the evidence right here.

17  So 2:59, this is 19 minutes before the shooting,

18  defendant leaves his house here with his phone.  That's his

19  white Kia right in front of him.  That white Kia has been in

20  the driveway for a while.  He's already pulled it in and

21  pulled back out.  He's parked it there.

22  And this is just to show you one of many examples of

23  the defendant in various places that you've seen in this

24  trial.  And there's no serious dispute that in all this

25  footage, that's -- the defendant right there is the guy that

1    you see in this footage. Defendant didn't dispute that in his

2    opening statement or during this trial but, nonetheless, it's

3    the government's burden. So we should talk about the evidence

4    that shows overwhelmingly that that's him in the video.

5         You can start with the lower right-hand pane because

6    as you remember, that's minutes after the shooting, that white

7    car there. That's Ms. Jean-Baptiste, his girlfriend. She

8    testified at this trial. That's her picking him up right

9    after the shooting wearing the dark shorts, the dark shirt,

10   the dark baseball hat, the dark shoes. Remember, you also saw

11   her leave her house to come pick him up. That's her with the

12   crime scene in back of her right there.

13        What else do you have? He's coming out of -- the

14   defendant is coming out of his house by the white Kia. That's

15   all evidence that shows it is him as opposed to somebody else

16   in these videos.

17        Most of all, you have the gas station footage from 15

18   minutes after the shooting. Defendant is wearing the same

19   clothes, the same dark shorts, the same Sox hat, the same gray

20   shirt, the same dark shoes. You see his face clean as day.

21   You notice the defendant doesn't look like he does now. He's

22   got long --

23        MR. HYMAN: I'm going to object to that statement.

24   It's not relevant.

25        THE COURT: Overruled.

1    MR. EICHENSEER:  His appearance was different that

2  morning.  He had long -- he had a long ponytail.  He had

3  facial hair like a goatee.  Of course, he was dressed in all

4  black as you heard here are Saints colors.  And if that

5  weren't enough, remember, that was defendant with his phone

6  right there in that photo.  He was Snapchatting with his

7  girlfriend before and after the shooting.

8    Remember, we saw evidence from his Snapchat account,

9  ebirdwdst, in this trial.  These are just two of the pings

10  that his account had on that day, 3:18:14 and 3:18:59 right

11  around the time of the shooting.  Now, remember, these dots

12  are not exact.  There's about a 100-meter margin of error, so

13  it can be anywhere within that big circle.

14    But notice where those circles interlap or overlap,

15  and you see that they encompass the gangway where the

16  defendant fired the shots and his house at that time.  This is

17  just more evidence that that's the defendant in those videos

18  and that the defendant did the shooting.

19    This is again, also, Ms. Jean-Baptiste, she had a

20  Snapchat account, Vicky0730.  You see all there together with

21  ebirdwdst at 3:22, this is just after the shooting, this is

22  just Snapchat records of her picking him up.  That's how it

23  looks in Snapchat's records.

24    So 3:00 o'clock to 3:08, this is when the defendant

25  pulls out in the white Kia, and he starts methodically

1   circling the blocks.  He circles about three blocks.  And it's

2   hard to tell from this video evidence, but I'll walk you

3   through it, but the blocks that he circles, he leaves his

4   house here on Wood Street.  Then he'll turn left.  He's going

5   to come down Honore, and he's going to go back east on 44th

6   and then back up in front of his house.

7          Then he's going to go -- he's going to go left on

8   43rd again and then circle the next block over.  You can't see

9   it on this map, but that's the block between Honore and

10  Wolcott.  Then he's going to go up Honore, and he's going to

11  go over on 43rd.  He's going to drive down Hermitage right

12  past the area where he's going to shoot Agent Crump in a few

13  minutes.

14         Now, that, the way he's driving there, that's not a

15  coincidence.  Remember, this is the northern boundary of

16  Saints territory.  The defendant is circling this to patrol

17  the perimeter.  And the defendant, of all people, has a reason

18  to be on the lookout.  You remember his brother Biscuit,

19  another Saints chief, you heard that he was shot and killed

20  just months before this at 43rd and Honore, right there.

21         Now, I want to talk for a moment, ladies and

22  gentlemen, about Hector Ruiz.  You probably remember him.  He

23  was the Latin Saint who testified at this trial, the guy with

24  the face tattoos.  Now, Mr. Ruiz, he's a drug dealer.  He's

25  shot people.  He's been shot himself.  He sold guns.  He

1    admitted all that to you on the stand.

2         But we didn't call him as a witness to this crime.

3    He wasn't there that day.  He didn't see it happen.  But we

4    called him as a witness to give you an inside view of the

5    Saints rules, territory, and factions.  And the rules here are

6    particularly important, the rules about having to stand post

7    24/7, chasing and shooting on rivals, having ready access to a

8    gun when you're on post.

9         Now, Mr. Pissetzky cross-examined Mr. Ruiz very

10   aggressively, and he asked -- and he pointed out that the

11   rules are not written.  There's no gang constitution or gang

12   code.  Well, they don't have to be written because they're

13   enforced by beatings.  You heard Mr. Ruiz tell you that.  He

14   had been -- he had gotten these beatings himself.  They're

15   called violations.  And that's why members follow the rules

16   because if they don't, they get beaten.

17        Now, you should -- Mr. Ruiz is getting benefits from

18   the government.  You heard that.  He's cooperating.  He's been

19   relocated.  He's been paid.  He's getting immigration

20   benefits.  And you can and you should consider what he tells

21   you with caution and great care.

22        But as you do that, keep in mind two things.  The

23   first is that you remember when Mr. Pissetzky was

24   cross-examining Mr. Ruiz, he accused him of just making this

25   all up to help the government's case against the defendant.

1    You remember how Mr. Ruiz answered that question?  He didn't

2    know he'd be testifying against the defendant just until a few

3    months ago when he walked into the grand jury.  He provided

4    all that information about the Saints to the government before

5    he ever knew he was going to be in this courtroom today.  He

6    didn't make it up just to help the government's case against

7    the defendant.

8         But more importantly, consider how what he explained

9    to you about Saints rules and posting up and having to chase

10   and shoot at rivals lines up with what you see in the video.

11   Consider that.

12        So back to the video.  I said again, it's hard to

13   tell exactly where -- how he's circling the blocks, but this

14   is him at 3:02 coming back on 44th Street, coming up past his

15   house again where he is doubling back past his house.  He's

16   not lost.  He's not running errands.  He's not looking for

17   parking.  This is him being methodical.

18        And, of course, this is him driving right down

19   Hermitage, right in front of the gangway where he's going to

20   shoot Agent Crump in a few minutes.  This is him patrolling

21   his turf.  At 3:06, you have him turning through the

22   intersection where he'll shoot Agent Crump in a few minutes.

23   And then he's going to turn south on to 44th Street -- or on

24   to Wood Street from 44th.  And as the ATF video technician

25   Mr. Greene told you, he doesn't see the white Kia after that.

1    So at 3:06, the defendant pulls over and is just

2  waiting at 44th and Wood.  He's posted up, in his car, at his

3  car, we just don't know, but he's there.  And he's there at

4  3:06.  He's there at 3:07.  He's there at 3:08 and at 3:09.

5  How do you know?  Well, remember, his girlfriend was

6  Snapchatting him at that point.

7    And she asked him at 3:06, "You're at home," question

8  mark?  At 3:08 he says, "No, 44 Wood."

9    You remember, there was some suggestion by

10  Mr. Pissetzky on cross-examination that the defendant was --

11  you know, he lives right here.  This is 44th and Wood.  That's

12  just maybe a reference to his house.  No, that's different.

13  44 Wood means he's out on the street.  He's out on post.

14  That's why he clarified to Ms. Jean-Baptiste that he's not at

15  home, he's at 44 Wood.  And 44 Wood is important because of

16  what happened next.

17    This is when the scout team is coming to the area.

18  That's Detective Schoenecker right there in the circled car.

19  This is him going up and down Hermitage south of 44th to make

20  sure that the area around those cars is clear.

21    But what's really important is that the scout team,

22  after they drive south on Hermitage in that bottom pane,

23  they're going to hang a left, and they're going to drive up

24  Wood past 44th and Wood right where the defendant is still

25  after he called.  He hasn't gone anywhere.  He's not doing

1    anything.  He's still at 44th and Wood.

2            And how do you know?  At 3:13 there's his Snapchat

3    ping.  Again, not exact, but it shows him right near that

4    intersection.

5            And about 3:14 is when the scout team drove through

6    that intersection.  There's a still of them right there having

7    just crossed 44th and driving up Wood.  There's the

8    defendant's house on your right.  The defendant, though, was

9    not in his house.  He's still at 44th and Wood south of there.

10           And how do you know?  Because after he -- after

11   seeing that scout team, he runs.  That yellow circle is him

12   running across 44th.  You're going to see him keep running all

13   the way up Wood to his house.  You see him briefly look behind

14   him as he's running, too.  Again, this is about three minutes

15   before the shooting.

16           And before we go into more details, just stop and

17   think for a second.  The defendant is running up the block at

18   3:15 in the morning.  Why is that?  He's not exercising.  He

19   just saw a bunch of strange guys in that brown Impala, the

20   scout team, driving slowly.  Remember, Detective Schoenecker

21   said they were driving 15 miles an hour.

22           There's not a lot of traffic on the streets at that

23   point.  You see that.  Well, the defendant saw the scout team

24   not only drive past his house but then take a right and start

25   to circle the block.  He's running because he thinks the

1  situation is urgent.  That's why he's running.  He thinks

2  something is up, something is fishy.  These guys look like

3  they're up to trouble.

4           Remember, the defendant, his own brother was killed

5  by rivals a couple months ago.  He doesn't want rivals to get

6  the jump on him.  He doesn't want that to happen again.  So

7  when he sees possible invaders, he runs to his house to get a

8  gun.

9           Remember, Hector Ruiz also explained to you that when

10 Saint members are outside the neighborhood, they've got to be

11 on post.  It just means they've got to be on the lookout, and

12 when they see rivals, they've got to chase and shoot them out.

13 But when you're on post by yourself and you're standing out

14 there alone, you don't have a gun on you.  It's too risky.

15 You heard that.  You get arrested, pulled over, it's too

16 dangerous to have a gun on you, so you have to have it nearby.

17          And what else did Mr. Ruiz tell you?  Well, that

18 these guns, the guns that are nearby, are called Nation guns.

19 They're communal guns amongst the Saints, and the chiefs are

20 in charge of those guns.  The defendant was a chief of the

21 Wood block.  So when the defendant runs here, that's why he's

22 running, to his house to get a gun because he's not going to

23 confront these rivals without protection.

24          So let's take a broader view.  This is a multi-cam

25 pane.  Again, that is the scout team on the right-hand corner.

1 They just drove past defendant's house. Now, just for

2 orientation, the defendant has not run across 44th yet. He's

3 still someplace south of 44th in this area on Wood. And you

4 see the scout team, they're turning right, Detective

5 Schoenecker, Detective Daquilante. Remember, they're driving

6 very slow.

7 The next spot that you're going to see the scout team

8 is in the lower left-hand pane driving down Hermitage. And

9 you're not going to see them for a few minutes because

10 Defendant Schoenecker is driving really slow. So imagine if

11 you're the defendant, you just saw this car drive past you

12 slowly, suspiciously. Now it's turning on 43rd Street, and

13 then it drives down Hermitage.

14 And there's the scout team. And as they pull up to

15 that intersection in the upper right-hand corner, this

16 intersection right here where Agent Crump is shot, that is

17 when the defendant decides to run. He saw or heard or both

18 the scout team. What originally looked pretty suspicious now

19 looks really suspicious. These guys had just circled his

20 block completely, and that's what caused him to run into his

21 house.

22 So that's an important fact because at 3:15:48,

23 that's when he goes inside his house. That's the lower

24 right-hand pane. There's the scout team. They have just

25 crossed 44th continuing south on Hermitage. So in the

1  defendant's head, when he runs inside, the last place that he

2  saw these rivals was on Hermitage.

3      MR. PISSETZKY:  Objection, your Honor.  There's no

4  testimony he saw his -- anybody, anyone.  Counsel is

5  misstating --

6      THE COURT:  Overruled.  The jury has heard the facts.

7  They'll make the decisions as to what facts were proved.

8      MR. EICHENSEER:  And he's in his house for just a few

9  moments, about 30, 34 seconds if you count them.  So at

10  3:16:22, again, two minutes now before the shooting, this is

11  the defendant still running out of his house.  He was there

12  for a little bit.  He keeps running north.

13      And his ultimate destination, as you know, is this

14  gangway right here.  But again, think about that.  He ran from

15  all the way down here, across 44th Street, up Wood and then

16  kept going to this gangway.  What was so urgent that he needed

17  to stop at his house for 30 seconds?  It wasn't his cell

18  phone.  You saw he had that.  It was a gun.  You know that

19  from Mr. Ruiz's testimony but, most of all, you know that from

20  what happens next.

21      It's 3:17.  This is now 70 seconds before the

22  shooting.  This is the alley in back of the defendant's house

23  looking south.  Here comes the defendant.  Notice, he looks

24  both ways before he crosses the alley.  He's on patrol.  He

25  wants to make sure that those possible rivals aren't in the

1   gangway or the alley, and he steps down as he goes into that

2   gangway.

3        Here are some stills of him crossing.  Again, he's

4   tentative.  He doesn't want to cross right away.  He goes like

5   this.  He wants to make sure the coast is clear because he

6   thinks there's a possible threat around, and he thinks that

7   that threat is on Hermitage.  That's why he's walking over

8   there.  He wants to monitor the situation from someplace safe,

9   and he knows that the gangway he's about to go into is a safe

10  spot.

11       Here is the inside of that gangway.  It's not a

12  coincidence he went in there.  "Saints 4500," you see that on

13  the left-hand side.  Remember Mr. Ruiz, he said that that

14  upsidedown "A," that is a sign of disrespect to the Ambrose,

15  another one of the Saints rivals.  And there's a stickman and

16  baby blue, the Saints symbol and Saint colors.  And he's

17  holding the upsidedown pitchfork which is a sign of disrespect

18  to the SDs, the Satan Disciples, another rival.

19       Where have you seen that stickman before?  On the

20  defendant's forearm in that gas station video.  There it is

21  right there.  It's not an accident or coincidence that the

22  defendant went in this gangway.  It was on purpose.  This is a

23  safe spot where he can look out.  It's literally a gang way.

24       Here is the gangway from the front.  Now, it's an

25  ideal lookout for several reasons here.  You notice how the

1  neighborhood is, the two houses on either side, they come

2  almost right up to the sidewalk.  In other words, they give

3  you protection from both sides almost to the sidewalk.  And

4  there are some steps in front, too, offering more protection

5  if you're inside the gangway.

6        But there's another reason, a more important reason

7  why this is an ideal Saints lookout.  You notice the 4336, the

8  building to the south, this one right here, it doesn't come

9  all the way to the sidewalk.  There's a little stub there with

10 a fence.  And that's a little perch.  From that perch, you can

11 see right down the sidewalk.  You've got a line of sight all

12 the way to the intersection.  And that's where the defendant

13 was standing in that approximate location when he fired those

14 five shots.

15        Look at that.  He's wearing all black.  No wonder

16 nobody can see him.  He's silhouetted against the dark back of

17 the gangway and dark clothing.  It's an ideal spot to shoot at

18 rivals, and that's why the defendant chose this gangway.

19        Here is the view looking south.  Remember this, Agent

20 Jacobsen, he took this photo.  He's not even on the sidewalk.

21 He's standing on top of the steps, you just saw earlier, a

22 clear line of sight to the intersection where Kevin Crump was.

23        And that's the view defendant had when he shot.  Of

24 course, it was dark then, but he was in the shadows.  The

25 three agents were in the streetlight.  They were visible.

1    This is a zoom-in of that view.  The right circle, that's

2    about where the defendant shot Agent Crump.  The middle circle

3    is the tree that the defendant shot with one of his stray

4    bullets, and the circle on the left is about where Spratte and

5    Winter were when the shooting started.  Again, that was an

6    ideal spot to shoot at the agents.

7        Now, how come -- this is a still of him right before

8    he steps down into that gangway.  And how can you be sure that

9    the gangway he was entering on this footage was that gangway

10   we just looked at?  Well, there's lots of reasons.

11       You heard from Agent Jacobsen.  He went out there

12   after the shooting.  He walked around.  He watched the video.

13   He determined that this gangway right here was the gangway

14   that defendant went into.

15       And there's lots of reasons why else you know that,

16   too, because if you look in the footage, there's some garbage

17   cans and utility pole to the north of the defendant right

18   about here.  There are those garbage cans.  There is the

19   utility pole.  And there, it's kind of hard to see in this

20   photo, but that's the step down that you see the defendant

21   taking as he enters the gangway.

22       So go back to the video again.  70 seconds before the

23   shooting, 3:17, you're going to see him cross again.  Notice

24   how he steps down.

25       (Said video recording played in open court.)

1    MR. EICHENSEER:  Now he's going to walk to the front

2  of that gangway.  He's got the gun now.  And you're about to

3  see the second ATF team drive right past him in about 30

4  seconds.

5        And notice what you don't see.  You don't see anybody

6  else coming in and out of that gangway, coming in or out of

7  the alley in front or back.  These cameras are on both sides

8  of the building, front and back, and they're both trained

9  south.  You watched the footage yourself.  It's almost a half

10  hour long.  There's not a single person in that alley, in that

11  gangway, except for the defendant.

12        There goes Officer O'Neill and Agent Crump.  Officer

13  Winter and Spratte are in the car.  And here is a still from

14  that.  This is 3:17:34, less than a minute before the

15  shooting.  Defendant is in the gangway right there.  And he

16  sees a second car pass by.

17        Again, it was suspicious enough when that first scout

18  team circles the block.  Here come four more strange guys in

19  another unmarked car in plain clothes.  The defendant

20  definitely thinks something is going down now.  And his

21  suspicions are confirmed.

22        At 3:18:05, this is a few seconds before the

23  shooting, Officer O'Neill, he pulls that car to the right here

24  and then the three agents get out:  Spratte, Winter, and

25  Crump.

1    3:18:05, that's O'Neill driving away.  3:18:06, it's

2   kind of hard to see, but there's three figures there.  That is

3   Crump, O'Neill -- sorry, Crump, Spratte, and Winter crossing

4   the street.

5          Remember, as they got out, they split in different

6   sides.  Crump goes to the west side of the sidewalk.  Spratte

7   and Winter go to the east side of the sidewalk.  They put on

8   their hooded sweatshirts.  They have their hoods up, hands in

9   their pockets.  They're walking away from the defendant.

10          Again, think of how this looks to the defendant.  He

11   just saw rivals circling his block, possible rivals, and he

12   sees a second car drop three guys off and the car pulls away.

13   The guys have their hoods up.  They appear to be in some kind

14   of formation.  It looks to him like these are rivals that are

15   now trespassing on Saints territory.

16          It's his job to chase and shoot them out he thinks,

17   and so this is when he decides to act.  This is when he

18   decides to ambush these guys by surprise from behind.  You

19   heard and saw the shooting.

20      (Said video recording played in open court.)

21          MR. EICHENSEER:  So you notice that when the shooting

22   began, Agent Crump and Spratte turned around, looked behind

23   them because they sensed that the gunfire was coming from

24   behind them, which it was.  Defendant was behind them.

25          And then you heard some yelling.  You heard Spratte

1    yell, "Shots fired. Shots fired." Then you heard Winter who

2    is next to him on the east side of the street go, "Where is it

3    at? Where is he at?"

4         And then you heard Officer Spratte reply, "He's over

5    at the," and then the audio cut off. But Officer Spratte

6    testified at this trial, he explained what he was saying. He

7    was yelling, "He's over there," and he was gesturing toward

8    the west side of Hermitage Avenue, he said, about halfway up

9    the block where he saw two muzzle flashes.

10        Now, the audio cuts off right there for a reason.

11   This is ShotSpotter recorded this. Defense tried to make a

12   big deal out of the fact that the audio cuts off, suggests

13   that there is some kind of conspiracy by ShotSpotter to keep

14   this evidence from you. Not true. ShotSpotter told you they

15   only record the two seconds before the first shot and the four

16   seconds after the last shot. That's by policy. That's why

17   you only heard that snippet.

18        And speaking of ShotSpotter, there was a ShotSpotter

19   sensor right at this intersection. That's why you were able

20   to hear all of those shots. And it didn't just capture the

21   audio from the shots. You see it captured the exact discharge

22   time of each shot, and it also captured their location.

23        This is very important information. You see the

24   first five shots are the defendant's, from 3:18:10 to 3:18:12.

25   He squeezed off five shots in two seconds. It's an ambush.

1    And then the last two shots, 6 and 7, those are Officer

2    Spratte's return fire, 3:18:14, '15.  Notice how quickly

3    Officer Spratte returned fire.  He heard gunshots behind him,

4    he turned around, and within seconds he saw the muzzle flashes

5    and returned two shots.

6            Well, how do you know that the first five are the

7    defendant's and the last two are Spratte's?  Well, again, the

8    shots fired map, it tracks the location of each shot.  Again,

9    this is not -- this map was created by software that senses

10   acoustically where those sounds are coming from and then plots

11   hyperbolic lines, charts where those lines intersect and gives

12   a lat/long coordinate.  This is a machine-generated document.

13           And look how accurate it is.  Shots 6 and 7, they

14   located them right about where Officer Spratte was.  Those

15   first five shots, No. 4 is hidden because they're piled on top

16   of each other, but those first five shots are right by the

17   defendant's gangway.

18           Now, remember, Paul Greene, the ShotSpotter expert,

19   he explained that these aren't pinpoint accurate locations.

20   There is a margin of error.  But in his experience, that

21   margin of error is about 10 to 12 feet.  And these dots on

22   this map are on -- some of them are on 4336 South Hermitage.

23   That's the block -- that's the house right next to the

24   gangway.

25           This plot right here, this map, just demonstrates

1 ShotSpotter's accuracy because we know Officer Spratte was

2 right here when he returned fire.  We know the defendant was

3 right there.  ShotSpotter is just confirming this.

4        But how else do you know that those five shots up

5 there are the defendant's?  Well, most importantly, you have

6 the five fresh shell casings that he left behind because he

7 was in too much of a hurry to pick them up.

8        What else do we know about those shell casings?  By

9 the way, the shell casings aren't at the mouth of the gangway.

10 They're maybe, I don't know, five to ten feet in from the

11 gangway, but you heard why that is.  You heard ATF firearm

12 expert, the ATF firearm expert, Esposito, he explained that

13 semiautomatic handguns, most of them eject to the right-hand

14 side, and they eject eight to ten feet typically.

15        So when the defendant is standing either on the steps

16 or on top of the steps holding the gun firing south, the

17 shells eject into the gangway.  That's why they landed right

18 there.

19        We know some more things about these shells, too.

20 They were fresh and shiny.  And that's not surprising because

21 the defendant had just fired them several hours before Chicago

22 police found these casings.

23        Officer Presnell, the evidence technician, he

24 explained that if shell casings have been there for a while,

25 they get dull and weathered, covered with dirt.  These

1  weren't.  These were fresh and shiny because they had just

2  come out of the defendant's gun.

3        We know some more about these shell casings, too.

4  They're all fired from the same gun, a .9 millimeter.  And you

5  heard that from the ATF firearms expert, Esposito.  He

6  compared the markings on all the casings, looked at them under

7  side-by-side microscope, applied his expertise.  He came to

8  the conclusion that these are all from the same gun.

9        Again, that's not surprising because these are the

10  defendant's shell casings.  You've heard suggestion during

11  cross-examination and argument from the defendant that Chicago

12  police somehow planted these casings here or the fifth one was

13  found later.  No, they're all from the same gun.  The markings

14  on the casings don't lie.  So those are just the casings

15  themselves.  That's what's left behind when the defendant

16  fires those five shots.

17        What about the bullets that he fires?  Well, we know

18  where two of them went.  One of them hit the north side of

19  this tree right here a few houses down from where he shot.

20  There's the picture of the bullet in the tree there.  Of

21  course, the second one is the one that tore through Agent

22  Crump's head.  Again, we know that because that bullet had

23  Agent Crump's DNA.  The only way it gets his DNA is by tearing

24  through his head.  And after it came out his eyes, that

25  bullet -- between his eyes, that bullet had traveled, and it

1 came to rest just off the sidewalk by evidence marker 3 right

2 there.

3 And what do you know about that bullet?  Again, fired

4 from the exact same gun as the bullet in the tree.

5 Mr. Esposito told you that, too.  He compared the rifle

6 markings on the bullets, and he concluded that those are fired

7 from the same gun.

8 And he told you more than that, too.  Again, without

9 having the actual gun, he can't tell you what gun these

10 bullets came from, but he can tell you that they were fired

11 from one of 49 different types of guns.  42 of those were .9

12 millimeters just like the casings in the gangway.  Again,

13 that's not a coincidence.  That's because the defendant fired

14 those two bullets from those five shell casings.  It's an

15 example of DNA and ballistics evidence coming together.

16 So I know we've talked a lot about where the casings

17 were, where the bullets were.  Let's look at it all in one

18 place.  The map on your right, that's the evidence plat that

19 Officer Presnell prepared after visiting the scene.  Remember,

20 he's the CPD evidence technician.

21 He goes out there, he measures the distances between

22 the streets.  You see that.  He charts where the blood is,

23 where the trees are, where the cars are, where the shell

24 casings are found, where the bullet that went through Agent

25 Crump is found.  He puts it all in this map and draws it to

1 scale.

2       So let's see where all this stuff lines up on the

3 map.  There's the shell casings up there in the gangway where

4 the defendant was.  There's the bullet in the tree.  That's

5 about where Agent Crump was shot, and that is where the bullet

6 landed.  Again, all consistent with defendant firing down the

7 sidewalk from that perch all in his line of sight.  The

8 evidence in this case literally lines up.

9       So I want to talk a little more about the sidewalk

10 that the defendant fired at because there was a camera trained

11 on that sidewalk.  We've already talked about this, right

12 down -- it was on 4324, right down the sidewalk.  But you

13 don't see the defendant shooting on that camera.  You don't

14 see him anywhere in the footage, but there's a reason for that

15 because there's an awning that's right in front of the

16 gangway.  That creates a blind spot in the footage.

17       There's a close-up of that blind spot.  You see the

18 red arrow there?  Right below it is a cement walkway.  If you

19 extend that walkway, it becomes the gangway that the defendant

20 is in.  That entire area and some of the sidewalk is obscured

21 by that awning.  It created a blind spot.  And that's where

22 the defendant was standing when he shot Agent Crump.

23       You've got a great illustration of that from Agent

24 Jacobsen.  He went out there with a video camera.  This is

25 what he shot.  The camera is running.  The security cameras

1  are right there on the left on the red house right below the

2  windows.  And as he walks over, he's not even in the gangway,

3  he's just on the top of the steps, but he's in that blind

4  spot.  The camera can't see him.  And that's the reason that

5  you don't see the defendant firing the gun.

6          So that's what we know.  That's standing in the

7  gangway looking toward the cameras.  And you already saw the

8  southern feed from there:  A clear line of fire to the

9  intersection, a clear line of fire to that tree.

10          So I'm going to talk a little bit more about that

11  sidewalk because remember, Officer Spratte was cross-examined

12  pretty heavily on the fact that he saw a person in a white

13  T-shirt somewhere out there during the shooting.  And he

14  testified that when he turned around, he saw muzzle flashes on

15  the west sidewalk halfway up the block on 4300.

16          He didn't see anybody by those muzzle flashes.  He

17  testified to that.  He couldn't see anybody behind them but at

18  some point, he saw a person in a white T-shirt.  He's not

19  exactly sure when.  But you know what?  That makes sense for

20  several reasons, ladies and gentlemen.  The first -- again, we

21  have this camera footage of that sidewalk.  You don't see

22  anybody in a white T-shirt on that sidewalk the whole -- the

23  whole footage.

24          It makes sense, when Officer Spratte tells you the

25  person in the white T-shirt, he wasn't the person that Officer

1  Spratte was shooting at.  That person wasn't by the muzzle

2  flashes.  What makes sense when you look at this video?  That

3  lines up.

4         But what also makes sense is why Agent Crump doesn't

5  remember -- Agent -- Officer Spratte, rather, doesn't remember

6  exactly when he saw that person because consider the few

7  seconds that Officer Spratte had gone through.  He's out there

8  with his partners 3:00 in the morning when he takes fire from

9  behind, five shots.  He doesn't know where the shots are

10 coming from.

11        In a split second, he turns around and he fires his

12 service revolver, his service weapon for the first time in his

13 career when he's on duty.  This is his first time.  Not only

14 that, he doesn't know who's shooting at them.  He just saw

15 muzzle flashes.  The assailant is still out there.  So this is

16 all happening in seconds.  He starts running up the street to

17 find that assailant with Winter, and then he realizes his

18 partner Agent Crump isn't with him, and he realizes that he's

19 lying over on the curb shot through the face.

20        And he goes over, he holds his -- he holds his

21 partner, bleeding from the face, hoists him into the car.  And

22 he told you, then he sat down.  He was in shock after that,

23 after Agent Crump went to the hospital.  Officer Spratte went

24 to the hospital himself.  And he came back to the scene when

25 it was light out, hadn't slept the whole night.

1    And when Officer Spratte, when he signed up to be a

2  police officer, there's -- he knew that there was risk and

3  danger in the job, but few are ever going to have that

4  sequence of a few seconds or experience those few seconds like

5  Officer Spratte did.

6    So back to the video.  3:18:15, that was Officer

7  Spratte's last shot.  The defendant's last shot was at

8  3:18:12.  So what happens?  This is an important part, so I'm

9  going to go slow here.  What happens ten seconds later?  Well,

10 here's some context.

11   3:18:25, ten seconds later, Agent Crump is lying on

12 the curb by that yellow street sign.  Officer O'Neill is

13 backing up into the intersection to see what happened because

14 he heard the shots.  What is the defendant doing?  He's

15 running fast out of that gangway.  This is ten seconds after

16 Officer Spratte's last shot, 13 seconds after the defendant's

17 last shot.

18   Remember, the gangway is long.  It takes him a few

19 seconds to get to the end of the gangway.  So just seconds

20 after he fires the last shot, he is already booking it out of

21 there.  There is a reason for that.

22   So again, here is some context.  Here's a multi-pane

23 view.  3:18:28, Agent Crump is on the ground right there.

24 Remember, Winter and Spratte, at first this is when they ran

25 north with their guns drawn toward the muzzle flashes.  They

1  were going to go find this assailant, neutralize the threat,

2  but they stopped. They got about this far before they

3  realized that Crump wasn't with them. They stop there, and

4  they ran back to attend to their wounded partner. And that

5  was about 3:18:20.

6        Here's the clip of Winter and Spratte running north

7  after they turned. There they are right there, and they stop.

8  And this is about 3:18:20. It's just seconds later that the

9  defendant chooses to run.

10        Think about that. He shot five rounds himself, but

11  he got shot back at. He heard two rounds fired back at him.

12  Then he sees two guys running up the street. He's

13  outnumbered. He doesn't have time to pick up those shell

14  casings. He's got to get out of there, and that's when he

15  decides to run. The time sequence here lines up exactly.

16        Here is the -- and keep in mind what he's doing when

17  he's running. This is the slow motion video of him running.

18  Notice his right hand. It's not moving as he runs. He's

19  running fast. This is slow motion. His left hand is pumping

20  away. The right hand stays right here at his side.

21        Here are some stills from that, right hand at his

22  side, side, side, side, side. You can see he's in full sprint

23  in that bottom center frame right there, but the right hand is

24  still down there. Now, the footage is too grainy to see

25  exactly what he's doing. Ladies and gentlemen, he's got the

1    gun somewhere on his right side.  You can't --

2            MR. HYMAN:  Judge, I'm going to object to that.

3            MR. EICHENSEER:  You can't tell --

4            MR. HYMAN:  Your Honor, I must object to that

5    inference.  That cannot be -- I understand it's closing

6    argument, but I object to that.

7            THE COURT:  Overruled.

8            MR. EICHENSEER:  He's got dark shorts on.  You just

9    can't see what he's doing exactly.  It's unclear, but the hand

10   stays there the whole time.

11           Now, what is clear, though, is what the defendant

12   left behind in that gangway:  The five shell casings from the

13   five shots that he just fired, the five shots, shots fired,

14   independently detected right at that location, five shots

15   right by where Officer Spratte saw the muzzle flashes.

16           None of that's a coincidence.  None of that's an

17   accident, ladies and gentlemen.  He's booking out of this

18   gangway ten seconds after the shooting because he's the

19   shooter.  He doesn't want to get shot himself.  He doesn't

20   have time to pick up his casings.  He thinks his own life is

21   in jeopardy at this point, so he takes off.

22           Now, you don't check your common sense at the door

23   when you become a juror, and you can use your common sense

24   here.  And please do because ask yourself, does it make sense

25   that the defendant just happened to be in this gangway at 3:18

1   in the morning the exact time of the shooting, where the five

2   shell casings were, where ShotSpotter detected them just at

3   the wrong place at the wrong time?  Of course not.  That

4   doesn't make any sense.  There's nobody else in that alley,

5   nobody else in that gangway.  It's the defendant.  Common

6   sense tells you that.

7        So where does he go after he comes out -- after he

8   runs through the alley?  He keeps running all the way back to

9   his house.  And this is when at 3:21, he texts his girlfriend,

10  "Where are you at?"  He's ready to leave.  He doesn't want to

11  stick around.  He's not sure if anybody saw him, what the deal

12  is, but he knows better than to stick around the neighborhood.

13       By the way, you're Snapchatting with Ms. Jean-

14  Baptiste, his girlfriend at the time, and at 3:18:55, that's

15  her, Vicky0730, she texts him, "Where you at?"  And the

16  defendant doesn't respond because he's busy shooting Agent

17  Crump and then making his escape.  That's why he doesn't

18  respond.

19       It's not until 3:21:24 when he's back at his house

20  that he says, "Where you at?"  Now he's ready to go.  At

21  3:21:40, a couple minutes after the shooting, this is

22  Ms. Jean-Baptiste getting into her car, swinging around to go

23  pick up the defendant at his house.  She texted him at 3:21,

24  "By the corner of 44th and Wood."  Well, she wasn't there yet.

25  That wasn't true.  She hadn't left.

1    Meanwhile, 3:22:40, a minute later, the defendant

2  steps out of his house.  He wipes the sweat off his face.

3  It's May 4th, still early spring, but the defendant's

4  adrenaline is pumping.  It's because he just squeezed off five

5  rounds at what he thought were rivals and then booked it out

6  of there because he thought people were coming for him.  No

7  wonder he's sweating.  No wonder his adrenaline is pumping.

8    And then at 3:22 in response to the, "Where you at"

9  text, finally, three minutes later, defendant says, "My crib."

10  Again, he's making clear, he's not at 44 Wood anymore.  He's

11  not posted up by that intersection.  He's now back at his

12  house, "back at my crib."

13    And then he disappears from view for about a minute

14  and a half.  You can watch the footage yourself.  At 3:23:21,

15  he walks north up to this direction and disappears by a

16  gangway.  Remember who lives up here?  His brother who is also

17  a Saint chief.  You can't see what the defendant is doing in

18  that minute and a half.  We just don't know.  The footage

19  doesn't tell you.

20    Ladies and gentlemen, you've heard from the defense

21  several times that there's no gun recovered in this case.

22  This minute and a half right here, it's just one chance of

23  many that the defendant had to ditch the gun between May 4th

24  when he shot Agent Crump and May 7th when he's actually taken

25  into custody.  He's got all of the rest of May 4th, all of May

1  5th, all of May 6th.  This is just one chance of many that he

2  had to ditch that gun.

3        And you heard the defendant is no stranger to

4  ditching evidence.  You heard that he deals drugs, that he

5  ditches his phones regularly.  He changes phones so that he

6  can avoid detection by the police.  And he took all those

7  other steps to avoid getting caught in this case.  He changed

8  his appearance.  He switched cars.  He ditched his cell phone

9  eventually.  It makes sense that the defendant would also

10  ditch the gun.

11        So at 3:23:50, his girlfriend finally pulls in.  This

12  is Ms. Jean-Baptiste.  She texted the defendant, "Here."  He

13  doesn't come out right away.  Again, he's up by that gangway.

14  He comes out about a minute later, walks down the gangway.

15  And again, ask yourself what's not happening this whole time?

16  Nobody else in that alley going into that gangway.  No one

17  else coming or going from the front, no one else coming or

18  going from the back.  This is him coming out of the gangway by

19  his brother's house.

20        (Said video recording played in open court.)

21        Remember, this is where he gets into the passenger

22  seat.  As he gets in, this is where he's still sweating.  This

23  is where he leans back, and this is where he says, "I feel

24  good, fuck that flake" just minutes after the shooting,

25  confirmation from the defendant's own mouth that he was the

1  shooter.

2       What else could have made the defendant feel good at

3  3:18 in the morning having just ran across the alley?  He

4  thought he just did his job as a Saint.  He thought he

5  protected Saints territory.  He chased and shot at rivals,

6  maybe even got some revenge for his brother's killing.  He

7  thought he did his job.  He felt good.

8       So I want to talk a little bit more about

9  Ms. Jean-Baptiste.  Remember, she's the girlfriend who picks

10  him up.  And the real reason that she matters in this case is

11  because of what the defendant said to her in that car right

12  there, leaned back, sweating, "I feel good.  Fuck that flake."

13       And you heard Ms. Jean-Baptiste.  She testified under

14  oath in the grand jury two months after the shooting.  Her

15  memory was still fresh.  And this is what she testified to

16  under oath.  You heard, she was asked every which way, "Is

17  this your testimony?  Is this true?  Is this accurate?"

18       She had her lawyer with her.  She had representation.

19  And she testified to this statement under oath because that's

20  what the defendant said.  You can consider that testimony

21  under oath just like she was testifying from the witness

22  stand, and you should because that's what he said.

23       Now, during the trial, you saw her get up on the

24  stand and try to walk back that statement, try to twist and

25  distort what he really said.  And there's a reason for that,

1  ladies and gentlemen.  Because she's trying to cover for the

2  defendant just like she did on the afternoon of the shooting.

3  Remember, Chicago police interviewed her, and they asked her,

4  "Where did you go after you heard gunshots?"  She didn't

5  mention that she picked up the defendant, not at all.  She

6  just left it out because she was trying to cover for him.

7       So what's changed since her grand jury testimony?

8  Well, you heard.  She's met with the defendant's lawyers.  Now

9  she realizes just how devastating that that phrase is for the

10 defendant.  That's why she walked out of the meeting with us.

11 Now she realizes what she said, what she swore under oath was

12 really bad for the defendant, so she's trying to walk it back.

13      And so what you saw from the witness stand from her

14 during this trial, that was an act.  That was a performance.

15 You saw her demeanor on the stand.  You saw that she had

16 canned laughter and smiles and could answer every single

17 question that Mr. Pissetzky posed to her, but when we asked

18 her questions on redirect, she couldn't remember anything.  "I

19 can't remember.  I can't remember.  I can't remember."

20      Ladies and gentlemen, it's your job to decide who to

21 believe and who not to believe, who's credible and who's not

22 credible.  Ladies and gentlemen, don't fall for the act.  She

23 testified in the grand jury that he said, "Fuck that flake"

24 because that's what he said.

25      And she knew exactly what he meant because remember,

1 an hour after the shooting, she texts her sister-in-law that,

2 "They just shot some flakes by the corner of 44th and

3 Hermitage."  And she knows that because the defendant told her

4 this.  Now she realizes that is bad for him, and now she's

5 trying to walk it back.

6            THE COURT:  Counsel, you've been speaking for

7 approximately one hour.

8            MR. EICHENSEER:  Thank you, your Honor.

9            So ladies and gentlemen, we've gone frame by frame.

10 We've chopped up those two minutes into little pieces.  So now

11 just watch those two and a half minutes straight through.  It

12 starts with the defendant running out of the house with the

13 gun.

14      (Said video recording played in open court.)

15            The next place you can see him is crossing through

16 the alley.

17            So again, the next car we're going to see is going to

18 be Agent Crump with the rest of the team.

19            That's the footage, ladies and gentlemen.  Those are

20 the two and a half minutes book-ending the shooting here.

21 Just focus on what the defendant did and said in the video, in

22 the footage that you just saw.  3:00 o'clock, 3:14, patrolling

23 Saints territory.  Then he stops at 44th and Wood.  3:15, sees

24 that ATF team, that first team circling the block driving past

25 that intersection prompting him at 3:16 to run into his house,

1    grab the gun, run back out moments later.

2            3:17, he walks in that gangway with the Saints

3    graffiti.  A few seconds later, he sees the second ATF team

4    drive past him.  3:18, he fires five shots from that gangway.

5    One of those hits Agent Crump.  A few seconds later, he runs

6    back out of that gangway holding his side like this.  And

7    3:25, "I feel good.  Fuck that flake."

8            Ladies and gentlemen, if this were all the evidence

9    that you saw and heard at this trial, it would show you beyond

10   a reasonable doubt that the defendant was the shooter, but

11   there was more.  There's all the things that the defendant did

12   afterwards, not to mention leave the neighborhood.

13           What did he do?  He downloaded that police scanner at

14   3:33.  And why was that?  Well, he wasn't sure if the police

15   were on to him.  He wanted to see.  He heard a cop was shot.

16   That was it.  So far, so good.  He then just to be safe, he

17   went to that second gas station and he bought a white T-shirt

18   and puts it on over his dark T-shirt.  He wants to do that to

19   change his appearance.  If anybody got a description of the

20   shooter, he didn't want to look like that person.

21           There's no reason for him to be buying a white

22   T-shirt on Garfield Boulevard at 4:00 o'clock in the morning

23   other than to change his appearance.  He came back to the

24   house and avoided the house altogether in the white T-shirt.

25   He kind of skulked around the scene to get the lay of the

1    land.

2          Now, remember, Ms. Jean-Baptiste, I want to go back

3    to her again.  Lots of things she told you at this trial were

4    corroborated by other evidence.  She couldn't walk those back.

5    The texts, the video of her picking him up, the video at the

6    gas station, all that stuff corroborates her testimony.

7          And she also said, remember, she's the one who said,

8    "We went to the second gas station."  And with the money from

9    the blunts and the water from the first gas station, he bought

10   that white T-shirt and put it on over his T-shirt, his dark

11   T-shirt.  And we know that happened because at 4:40, you see

12   their two Snapchat accounts together by the corner of 43rd and

13   Honore which is where she said she dropped him off.

14         Again, she doesn't drop him off by his house.  She

15   drops him off a block away.  How do you know that?  Because

16   you see the defendant in the white T-shirt on the video here.

17   This is 4:40, an hour after the shooting.  You've about to see

18   the defendant.  Where does he come out of?  He comes out of

19   the gangway over here on Honore.  He's very cautious about

20   coming back to the scene.

21         He's wearing a white T-shirt.  He's still got the

22   dark shorts on, but he's ditched the white T-shirt -- or

23   ditched the dark T-shirt.  He's also left the black hat

24   behind.  That's in Ms. Jean-Baptiste's car.  He doesn't want

25   to look too much like the shooter that he was.

1    And he doesn't go to his house.  He hangs out up here

2  by his brother's house trying to see what's happening,

3  avoiding the scene.  And then at 4:43, he walks back to the

4  opposite side of the sidewalk, and he goes and picks up that

5  white Kia to take his friend to the airport.  He wants to

6  stick with the program.  He's not sure that anybody is on to

7  him yet.

8    And there we have him later that morning in the white

9  Kia.  This is on the other side of the city.  Remember, he

10  went to hang out at his friend's, his cousin's house on the

11  far north side of the city.  He hid that Kia in his cousin's

12  garage.  Remember, then he changed cars.  He came back to the

13  neighborhood to pick up his baby's mother, Destiny Rodriguez.

14  That white Kia is hers, but he comes back to the neighborhood

15  in a completely different car, one she's never seen before to

16  pick her up.  And he does it by going in the alley.  He's

17  trying to keep a low profile.  He wants to make sure there's

18  no heat on him.

19    But most importantly, ladies and gentlemen, this is a

20  powerful episode of the trial.  Remember, Destiny Rodriguez,

21  his baby's mother, and the defendant, they're at the cousin's

22  house.  They're hanging out.  And that's when Ms. Rodriguez

23  gets that wanted poster of the defendant.  Remember, she's got

24  their child, the one-year-old child, with her.

25    And she broke down on the stand when she explained

1 how she felt.  It still triggers her to this day a year later

2 because at that moment, the life that she thought she had with

3 the defendant and her son was gone.

4      And what did defendant say at that emotional moment?

5 When he realized, he was standing right next to her, what did

6 he say?  He didn't say, "It's not me.  It's all a mistake.

7 This will blow over.  They got the wrong guy."

8      No.  He said, "I'm sorry" because he knew what he

9 did.  And, of course, at that point he realized he probably

10 was wanted.  It may have been a fake wanted poster, but the

11 defendant figured that he was wanted, stopped using his cell

12 phone, ditched that, leaves it at the house.

13      Again, all this conduct, ladies and gentlemen, this

14 is not the conduct of an innocent bystander or somebody who is

15 at the wrong place at the wrong time.  This is the conduct of

16 somebody who knows they did it and is trying not to get

17 caught.

18      Again, now the pieces have come together.  The

19 evidence that the defendant was the shooter that we've gone

20 through is overwhelming.  The defendant has -- the government

21 has met its burden on Count 1.

22      Count 2 is very quick.  I expect the Court will

23 instruct you that to find the defendant guilty on Count 2, the

24 government has to prove two things beyond a reasonable doubt.

25 First, that the defendant committed the crime of forcible

1  assault of a federal officer as charged in Count 1.  We just

2  established that.  That's taken care of.

3         Second, that the defendant knowingly used a firearm

4  during and in relation to such crime.  Ladies and gentlemen,

5  the defendant used a firearm to commit this crime.  That

6  element is established.

7         Now, after Count 2 on the verdict form which you will

8  have with you when you go back to deliberate, there will be a

9  question that will ask you whether the government has proved

10  beyond a reasonable doubt that the defendant discharged the

11  firearm.  Well, "discharged" just means fired.  And the

12  government has shown you that the defendant fired the gun,

13  discharged the gun five times.  You can check the "was

14  discharged" box.

15         So ladies and gentlemen, in closing, we spent the

16  last week focused on just a few minutes in the morning of May

17  4th, and we broke down those minutes frame by frame, second by

18  second to show you exactly what happened, exactly how the

19  defendant committed this crime.  And then we redid the

20  ShotSpotter evidence, ballistics, DNA, Snapchat records, gang

21  evidence.  It's a lot of evidence for a crime that took just

22  seconds to commit.

23         And when you deliberate, focus on those few seconds

24  because now as you've heard and seen all the evidence, you

25  know beyond a reasonable doubt what happened in those few

1 seconds: The defendant shot Agent Crump in the head from that

2 gangway and then he ran. All the pieces have come together.

3 The picture is clear. And we ask that you return the only

4 verdict consistent with all the evidence in this case:

5 Guilty. Thank you.

6      THE COURT: Thank you. We're going to take a

7 15-minute recess.

8     (Recess from 11:57 a.m. to 12:12 p.m.)

9     (Proceedings heard in open court. Jury out.)

10      THE COURT: The government took an hour and eight

11 minutes, by the way.

12      Bring the jury in.

13     (Proceedings heard in open court. Jury in.)

14      THE COURT: Please be seated.

15      Mr. Hyman, you may address the jury on behalf of

16 Mr. Godinez.

17      MR. HYMAN: May it please the Court.

18      THE COURT: Yes, sir.

19      CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

20      MR. HYMAN: Ladies and gentlemen, I am literally

21 going to speak to the tie, so if it makes too much noise, I

22 will take this thing off.

23     (Audio recording played in open court.)

24      MR. HYMAN: "Fuck them flakes." Shocking to me,

25 maybe shocking to you, but it happened all the time in the

1   Back of the Yards.  Someone has to be accountable.  Someone

2   has to pay for this horrible crime committed against Agent

3   Crump.  It's human nature, ladies and gentlemen, that you

4   would want someone to be held accountable for this crime.  As

5   I said to you a week ago, jurors have to look beyond sympathy.

6   You have to look dispassionately at the facts.  You need to

7   look at indisputable facts to see that Ernest Godinez is not

8   accountable.

9        The real burden of proof in this case as to who fired

10  those shots rests with the prosecution.  It's their burden to

11  prove Ernesto guilty beyond a reasonable doubt.  Judge

12  Leinenweber will tell you that you must conscientiously accept

13  the instructions of the Court.  And he will instruct you,

14  members of the jury, that the defendant is never required to

15  prove his innocence.  He will tell you the defendant is

16  presumed innocent of each and every one of the charges.

17       This presumption continues throughout the case

18  including, including during your deliberations.  It is not

19  overcome, his innocence is not overcome unless from all the

20  evidence in this case, you are convinced beyond a reasonable

21  doubt that Ernest Godino -- Ernesto Godinez is guilty as

22  charged.

23       His Honor will tell you that the government has the

24  burden of proving the defendant's guilt beyond a reasonable

25  doubt.  This burden of proof stays with the government

1  throughout the case.  The defendant is never required to prove

2  his innocence.  He is not required to produce any evidence at

3  all.

4       Ladies and gentlemen, those are going to be Judge

5  Leinenweber's words, not mine.  And a reasonable doubt, a

6  reasonable doubt arises not only from the evidence which has

7  been presented, but I suggest to you that reasonable doubt may

8  also arise from a failure of evidence to be presented to you.

9       What are the indisputable facts?  Maybe when I talked

10  to you, my opening statement last week, you sort of figured,

11  what he's talking about, all these facts that he was admitting

12  to.  Well, now you know.  It's indisputable, Ernesto was on

13  Wood Street.  He lives on Wood Street.  Vicky, Victoria

14  Jean-Baptiste is picking him up.  That's indisputable.  He's

15  going to the trap house.

16       Now, there were a lot of inferences that were made by

17  the prosecution for an hour, so I'm going to make another

18  inference.  You can infer from what Ernesto Godinez did by

19  going to that trap house and going back and waiting for

20  Victoria Jean-Baptiste and going to the Shell station to pick

21  up rolling papers is that is where he kept his marijuana.

22  That's where he kept his dope.  And I'll talk about that in a

23  little while because you heard that from the best money the

24  government has spent, the $10,000 informant.  And I'll get to

25  that.

1    He told you no one keeps their weed in their house,

2  right.  We keep drugs nearby so the cops can't charge us.

3  That's an indisputable fact.

4    Everybody heard those shots, ladies and gentlemen.

5  Victoria heard those shots.  The neighborhood heard those

6  shots.  Sergeant Evans, he came in.  He had to be subpoenaed

7  in, wouldn't talk to me.  It's okay.  Everybody is dragged

8  before the grand jury.  They're arrested to talk.  This is a

9  Chicago policeman, won't talk to me.  We have to subpoena him

10  into the courtroom.  Oh, talk to me on the stand, counsel.

11    He said they canvassed, they went around asked

12  people, knocking on doors.  Everybody heard those shots.

13  That's an indisputable fact.  Even their additional agent who

14  is there, Schoenecker, he told you, "I thought it was ten

15  shots.  I thought, but they're not for us.  They're not meant

16  for me."

17    Officer O'Neill, the driver of the agents' car, he

18  said, "Yeah, I heard the shots.  They were coming from behind

19  us."  Indisputable facts.

20    And what you also hear as indisputable facts is from

21  Officer Spratte.  Now, Spratte hears those shots.  He takes

22  cover.  And he says that he sees someone with a muzzle flash.

23  He sees a couple of muzzle flashes, right, two muzzle flashes.

24  That's not what he told Mr. -- Sergeant Evans, now Sergeant

25  Evans, back on May 4th of 2018.  Yes, he was upset.  Yes, he

1 went to the hospital, but you heard evidence, he had no

2 difficulty in talking to him.

3        What does he tell you, ladies and gentlemen?  Evans

4 tells you that in the sequence of the order of the

5 conversation, an unknown person wearing a white shirt and two

6 muzzle -- and muzzle flashes, not two.  Muzzle flashes.

7 Standing on the sidewalk, not hiding in the bushes, not on the

8 mouth of the alley, standing on the sidewalk down the street

9 on the north side, northwest side of that street.

10        He sees the man in a white shirt.  Again, that is an

11 indisputable fact.  But by the time he gets to trial, as you

12 remember, Mr. Spratte had other thoughts.  "Well, we're

13 really -- I wasn't sure if I saw him there.  He may have been

14 down the street.  He may have been down the block when I

15 turned and saw Agent Crump getting put into the car.  I'm not

16 sure where I saw him," one year later.

17        But what's indisputable for you, what's indisputable

18 for you is that Spratte told Evans that night, not two nights,

19 not one year, that night, a man -- there was a man in a white

20 shirt on the sidewalk.

21        And what's also indisputable, that video looking

22 south from 4324 South Hermitage.  And let's look -- that's

23 looking north.  We want to look south first.  There we go.  So

24 this is just before -- as members of the jury, you will see

25 the car, this car coming into view.  There is Mr. O'Neill, the

1  car Mr. O'Neill was driving along with the other agents.

2       (Said video recording played in open court.)

3            And if you look closely, you see down towards the end

4  of the block pretty clearly, and you see it stopped.  And it's

5  stopped because as O'Neill, and they all told you, they get

6  out of the car to start walking across the street.

7            O'Neill makes the turn.  And there it is.  There's

8  the turn there.  Other than the movement of the wind of the

9  bushes and the trees, members of the jury, there is no one

10 standing on the sidewalk at 4332, no one.  You can make up

11 whatever you want about, well, it's sort of hidden.  Whatever

12 it is, there is nobody standing on the sidewalk.

13           Those were the words of Spratte.  Those were not my

14 words.  Those were Spratte's words.  Those were not Evans'

15 words.  Those were the words that he took down.  And there,

16 now you see, it's after the shooting, and there is no one on

17 the sidewalk.

18           And then let's look to the north.  We'll go back to

19 our north view.  We want that video of the north.  If you

20 can -- now, it's sort of on the side, so you've got to kind of

21 crook your head a little bit.  But this is, as you saw the

22 video of the car going from the south, this is the car as it's

23 seen in the north.

24           And I want you to bear with me and have a little

25 patience because I'm going to ask that we play this through so

1    you can see the squad car, the undercover car, zoom by with

2    Agent Crump in it.

3         (Said video recording played in open court.)

4         Again, as Mr. Pissetzky pointed out just today, there

5    is nobody standing on that street.  There is no one with a

6    white shirt looking down the street.  There's not a shadow in

7    that video of an individual, not a shadow.  There is no one

8    because there was no one at that 4332.

9         Those are -- that's an indisputable fact because -- I

10   don't want to say it's an old saying, but I always get into

11   this.  A picture is worth a thousand words.  Everybody's heard

12   of it.  We've all heard of it.  Where is the gunman?  Where is

13   the gunman at 4332 South Hermitage?  He's not there because

14   he, Mr. Ernest, Ernesto Godino -- Godinez did not fire that

15   weapon.  He did not fire a gun at all.  He is not accountable

16   for this horrible act.  And those indisputable facts, members

17   of the jury, are what reasonable doubt is all about.  That's

18   reasonable doubt.

19        Let's talk another indisputable fact that you've

20   heard multiple times:  "Did you know, Officer Schoenecker, who

21   you were looking for?"

22        "No."

23        "Did you know, Officer O'Neill, who you were looking

24   for?"

25        "No."

1    "Did you have a description?"

2    "No."

3    "How about a description of a man in a white shirt?"

4    "No."

5    You're just going to grab whomever you want out on

6  the street and that's your suspect?  You never heard, ladies

7  and gentlemen, one word about, "Who are we looking for?  What

8  are we doing?"

9    We're relying upon an officer?  Yes.  We'll give him

10 the benefit of the doubt.  That was his first shooting.  I'm

11 sure it was -- and he said it was emotional.  You could tell

12 it was emotional for that young officer.  But guess what?

13 He's trained for it.  That's what he goes for:  Training,

14 training, training.  That's the purpose so when it comes that

15 time, he knows -- he said, "I fired my shot for my protection,

16 the protection of my other brother officers, and I fired it

17 only at the muzzle, the muzzle flashes."

18    "Did you see a muzzle flash looking north?  Did you

19 see a muzzle flash looking south?"

20    No, because no guns -- no gun was fired by Ernesto

21 Godinez at 4332 South Hermitage.  And we'll talk more about

22 that.  Again, an indisputable fact that, ladies and gentlemen,

23 is not proved beyond a reasonable doubt.  It is reasonable

24 doubt in the affirmative.  If you talk about it in the

25 affirmative, it's reasonable doubt.

1    What's another affirmative, indisputable fact?

2  Ernesto is wearing black.  He didn't change.  He fires, he

3  goes back to his house, he's in that house.  You saw the

4  video.  You saw the Snapchats.  He's in the house for almost,

5  what, four minutes.  He comes out, he's wearing the same

6  clothes, right.  He gets picked up by Victoria.

7    What does she tell you?  Okay.  You may not like

8  Victoria.  You may think it's a little -- you know, he was

9  with this young woman at 3:00 o'clock in the morning.  But

10  what does she tell you?  What does she corroborate?  That's

11  just a fancy word lawyers use to say, it supports.  It

12  bolsters what was going on that night.  They were going out to

13  smoke dope, party, pick up Adriana, and she was going to go

14  back to work.  That's corroboration.  That's a reasonable

15  inference you can make from that.

16    And let's talk about -- as I told you when I started

17  this, let's talk about things that we're not going to hide.

18  We're going to talk and discuss about that.  And that was the

19  statements that he makes to Victoria when he gets into the

20  car.  He leans back, according to her, says, "Fuck those

21  flakes."

22    Let's go back to the Disciple Killer.  Let's go back

23  to the government's informant, the $10,000 informant.  And

24  what does he say?  Pissetzky asked him, "You hear shots.  Do

25  you agree?  What do you say?"

1    And I apologize for this language, but this is what

2  was used:  "Fuck those flakes."  He tells you that himself.

3  He corroborated.  Everybody in the neighborhood, they hear the

4  shots, it's not the Saints area so, right, that's what they're

5  thinking:  Fuck those flakes.

6    You can infer Ernesto heard those same shots.  You

7  can infer that when he's in the back in that little trap house

8  that you've seen pictures of in the back of the gangway to get

9  his marijuana to be with Victoria, he hears those shots and he

10  gets out of there, too.  That's an indisputable fact.

11    Going to Manny's house, his friend Manny, sometimes I

12  think they call him their cousin, they learned -- as you heard

13  from Destiny Rodriguez, they saw on social media that there

14  was -- that Ernesto's picture came up with some sort of

15  warrant, some symbols of warrant from the government, that

16  he's wanted for the shooting.

17    Ladies and gentlemen, his statements, if you heard

18  her and listened to her which I'm sure you've done, you have

19  your notes, she said he wrapped his arms around -- they spent

20  the day, she and Ernesto and the baby spent the day and they

21  went to the Shake Shack.  They went out.  They ate.  They go

22  back to Manny's house.

23    And when he -- when they're there and they see this,

24  they see this frightening thing, Ernesto Godinez is charged

25  with shooting an officer, he doesn't say, "Oh, I'm sorry for

1　that."  What he says is, "Listen, I'm sorry for all what I

2　have put you through, everything" because he doesn't know

3　what's going to happen to him.  He's now -- people are saying

4　he's the shooter of this agent.  And he leaves, right.  He

5　leaves because it's hot.

6　　　　What did Ruiz say?  What does everybody say?  "We get

7　out of there.  When the neighborhood is hot and the police are

8　there, we don't want to be around."  Ernesto Godinez did not

9　flee to Mexico.  Ernesto Godinez did not go down to southern

10　Illinois.  He didn't go to Wisconsin.  Ernesto Godinez

11　through -- and you heard Officer Winter tell you, "They came

12　to me, and I surrendered him."  He surrendered to police.

13　　　　There's nothing wrong with surrendering.  He wanted

14　to face exactly what everybody said he was being accused of.

15　That is an indisputable fact and, ladies and gentlemen, that

16　fact has not changed.

17　　　　I think what you saw this morning, with all due

18　respect to the prosecutors, is that they have strung together

19　facts as an underpinning of a narrative to hold Ernesto

20　Godinez accountable, but these facts do not prove Ernesto

21　Godinez guilty beyond a reasonable doubt.

22　　　　Now, like the prosecutors, you may have some

23　suspicion.  You may think, well, like the prosecutors, there's

24　a possibility that Ernesto shot this agent, but that is not

25　proof beyond a reasonable doubt.  Being in a gang is not proof

1 beyond a reasonable doubt.

2 And I remember last Monday when Judge Leinenweber

3 specifically asked everyone, you know, you sat through all

4 this, you've heard people say -- and he asked, the fact that

5 Mr. Godinez is in a gang, will you still give him the same

6 ability, will you have the ability to decide his fate and not

7 give the government a leg up?

8 And each and every one of you, all of you said "yes."

9 And that was important to us. It was important to us because

10 he's in a gang. We never disputed that. I told you that in

11 my opening statement. But go beyond that. That does not

12 prove him guilty beyond a reasonable doubt.

13 You may not like gangs or anything about them, but

14 stick to the indisputable facts in this case. Facts do not

15 prove reasonable -- these facts do prove reasonable doubt, not

16 proof beyond a reasonable doubt. They prove reasonable doubt.

17 How do we know that? Let's talk about the man in the

18 white shirt. And yes, it was before the shooting in this

19 case, about 22, 27 minutes as you play with their -- with the

20 numbers on those cameras. But there is -- excuse me -- a man

21 in a white shirt, and he's seen on the video of the evidence

22 we produced.

23 You remember Mr. Greene, the gentleman from the ATF

24 who put all this together, all this -- all these fancy

25 pictures and postings and circles? What did he say? "Oh, I

1  missed that." He missed the man with the white shirt. So

2  let's play where you see the man with the white shirt. Yes,

3  there we go.

4      (Said video recording played in open court.)

5      MR. HYMAN:  Look closely to our circle. You will see

6  a man in a white shirt. There he is. He goes towards the

7  garbage cans and walks across. You see the figure walking

8  across and into the back.

9      Ladies and gentlemen of the jury, that is an

10  indisputable fact that that man in the white shirt is closer

11  to 44th Street. That man in the white shirt is an element of

12  a video that is indisputable.

13      Let's talk about what is reasonable doubt again.

14  Spot Shotter -- or ShotSpotter. ShotSpotter, Mr. Greene, Paul

15  Greene, he is the forensic engineer who isn't an engineer,

16  right? But he sure is a shareholder in that company, a

17  shareholder. And his results fluctuate depending upon who's

18  writing the report.

19      Remember, there were two reports in this case:  One

20  May 4th, 2018; one April 10th, 2019. The first was done by an

21  associate of his. And he said, "Listen, there is an 80

22  percent accuracy or a 20 percent inaccuracy of this, of our

23  system."

24      Then Mr. Greene, the shareholder, gets here. It has

25  gone from 80 percent to 90 percent of accuracy. Remember when

1  he said, "Oh, but that changed.  The 80 percent accuracy

2  changed in January of 2018."

3       Okay.  Well, if that's the case, then his associate,

4  his other engineer who is writing the report forgot to read

5  the memo because he specifically said in May of 2018 there's

6  only an 80 percent rate of accuracy, 20 percent inaccuracy.

7       Now, the importance of this ShotSpotter, the City of

8  Chicago has obviously spent a lot of money, probably millions

9  of dollars, on this system.  And there is a policy, did you

10 hear that, a private policy that they cut off the voice, voice

11 recording.  You heard Mr. Spratte in that recording before

12 they shut it off goes, "Where's he at?  Over here -- over

13 there," click.

14      This is not just any shooting.  This is a shooting of

15 an officer, serious crime.  Spot Shotter -- ShotSpotter

16 couldn't release that information?  Why?  What's proprietary

17 about it?  If you're going to help prove a case beyond a

18 reasonable doubt, get that information.  Ladies and gentlemen,

19 it wasn't there.  It cut it off.  For what, a private policy

20 for a company that's been involved in lawsuits?

21      And how about the wiggle room?  Oh, yeah, we can

22 only -- while we tell you where the shooting happened, it's

23 still within 25 meters, 82 feet.  That's in the reports.  But

24 when it gets in front of here, in front of you, ladies and

25 gentlemen, Mr. Greene all of a sudden has now narrowed it to

1   10 to 12 or 15 feet.  How do you believe him about that?

2        And how about the great -- that's the limited -- and

3   I wrote this down and I'm sure you did, too, the limited

4   performance guarantee.  What is that?  Are we buying a

5   dishwasher here?  This is an important fact.

6        And how about the five shots that were not

7   calculated?  The government has shown you this chart that

8   showed where these times of these shots.  The only shots that

9   are picked up -- you'll see these flex numbers.  The only

10  shots that were picked up were Agent Officer Spratte's.

11       Do you remember what Greene told you?  They got a

12  call from the Chicago Police Department.  They asked them,

13  well, "Can you hand-do this.  Can you manipulate this?  Can

14  you triangulate this through a manipulation?"  Of course, they

15  could manipulate.  And what did they come up with?  The

16  government didn't ask him what the address was.

17       I said, "Wait a minute.  The address you came up with

18  was not 4332.  You came up with 4338."  That's -- remember, he

19  talked about those hyperbolic curves and they all met.  Well,

20  that's the address:  4338.  Take that and take that out, maybe

21  it will get to 4332 but, ladies and gentlemen, it will also

22  take you to 4344 where the gunshot of Officer Spratte was

23  found in the side of the building.  Let's talk about now --

24  ShotSpotter, reasonable doubt just by that alone.

25       Let's talk about the evidence collection.  Remember,

1     I told you reasonable doubt may arise from a failure of

2     evidence presented. Above all else, ladies and gentlemen,

3     think about this. Above all else, what about those casings in

4     the gangway? Who found them? Shrug of the shoulder.

5     Mr. Evans, Detective -- Sergeant Evans, "I don't know."

6         "Mr. Presnell, you're the forensic investigator. Who

7     found them?"

8         "I don't know."

9         We do know whoever found it, some unit officer, some

10     beat officer who's got the numbers and the markings of the

11     police department on it, they put it there. They put it

12     there, but there's no -- no one knows. But Mr. Presnell comes

13     in. He puts his marks. He puts his marks -- go to the next

14     one.

15         The next one, please, next picture, group of

16     pictures. There we go.

17         He puts his marks all through there because his are

18     just the plain ones, right. So we have 1, 2, 3, 4. Four

19     casings. Who found them? No one knows.

20         "Well, if you have the casings, Mr. Presnell, do you

21     send them anywhere?"

22         "We send them to the forensic crime lab."

23         Okay. You can pick up an impression on the casing,

24     on a metal surface. Where is that impression? Ladies and

25     gentlemen, what was the rush by the Chicago Police Department

1   to put this into some sort of system?  This is, you may not

2   want to worry about any of the other four to 500 shootings

3   that occur a year in this city, but this had a priority.  This

4   was a young agent, an officer shot, one of theirs.  And what

5   do they do?  Mr. Jacobsen told you, Agent Jacobsen told you,

6   they cleaned them.  They cleaned them.

7         Now, the first thing Agent Jacobsen did is he got

8   that bullet that was found in the grass, and they sent it to

9   Washington, D.C.  They sent it to Washington, D.C., to see, A,

10  if there's DNA, right.  Then after the DNA, then you can do

11  fingerprinting.  They did that.  And then they make the

12  decision -- then they can look at it microscopically, as

13  Mr. Esposito told you, to determine what type of gun it had

14  come from, that little fragment of a bullet.

15        What about the Chicago Police Department?  Why clean

16  something that doesn't need to be cleaned?  ATF tried to raise

17  the impression, and that was just on the bullet.  Can you

18  imagine what you could possibly get on a whole cartridge?

19        And how about, there's four there, ladies and

20  gentlemen.  You can count it, right.  And where did the fifth

21  come from?  Let's go to the next picture, please.

22        This picture shows an area where Mr. Presnell, the

23  circle would be where Presnell carefully looked to determine

24  is there evidence there.  Right, you remember him saying that.

25  "I looked, and I made sure, and I look in the dirt and I see,

1  where's the evidence."  And he walks away.

2       "Investigator, forensic investigator Presnell, did

3  you put any red tape there?  Did you block this area off?"

4       "No."

5       "Did anybody put any yellow tape there?"

6       "No."

7       Okay.  And what happens?  He comes back.  And look at

8  the -- one other thing, ladies and gentlemen.  Look at the

9  placement of these casings, cartridge casings.

10      If you can go back out to the first one.  It's a

11 little wider.  Yes, right there.

12      Remember what Esposito said?  He said when you fire

13 these automatic weapons, they go back and they go six to eight

14 feet out.  Now, yes, they could -- if you remember the two of

15 Spratte's, they bounced.  One was found in the street and one

16 was on the sidewalk.  They're sort of neatly -- two are neatly

17 placed along the edge and a couple are thrown in the -- or are

18 seen on the sidewalk.

19      And then there's the spot which is circled.  It has a

20 little white piece of paper there.  I want you to pay

21 attention to the next photograph because in the next

22 photograph -- okay.  There it is, a little closer.  Right.

23 See, he supposedly doesn't find anything there.  No one sees.

24 And these aren't rusted old bullet casings, shell casings.

25 These, according to him, look pretty fresh.

1    But then he comes back, remember.  He says he leaves

2  that gangway, comes back.  And what does he find?

3    Next picture, please.  Next.  Next.

4    The fifth casing, right?  Where is it?  Right where

5  that white paper is.  How did everybody miss it?  A, we don't

6  know anything where it came from.  Okay.  They all came from

7  the same -- fired from the same gun.  But guess what?  There

8  are -- as you remember Esposito, he said there were three

9  different types of cartridge casings, three different types of

10 manufacturers.  How did he miss that shiny object?  How did

11 all these people looking and searching and scouring miss this

12 shiny object?  Ladies and gentlemen, that is proof to you of

13 reasonable doubt.

14    And let's talk about what Mr. Presnell said to you

15 and what he -- what the photos were, the photos that he took

16 when he gets on the scene two hours later.  Everybody's --

17 everybody is already there.  He comes in a couple hours later.

18    And that's the next series of photos.  No, go to the

19 street photos, please, all the street photos, please.  All

20 right.

21    With this, lo and behold, taken by Presnell that

22 morning, here's from the mouth of this gangway looking

23 straight down.  The bushes haven't moved.  Those same

24 evergreens on the right are still there.  Who can see

25 anything?  You can't see from down there.

1      Even with all these police cars around it, all these

2  guys standing around, you cannot see down.  As he said, he

3  measured it off.  Remember, I asked him how far was that from

4  there to the fireplug down on the corner?  400-some odd feet.

5  Can't see.

6      And what else did he photograph?  Looking this way

7  which we showed earlier, looking north.  You can see plenty.

8  Here's the video.  You saw the circle that Agent Jacobsen did

9  of the video camera on the house with the brown -- with that

10  brown siding.  It looks right down at this gangway.

11      If someone was there, you would have seen it.  It

12  would have been an indisputable fact.  It's not.  That is

13  proof beyond a reasonable doubt.  It is not proof of any kind

14  other than Ernesto Godinez is not the accountable person in

15  this case.

16      And what else did Presnell take?  The gangway, the

17  trap house.  There it is, the trap house.  This is where

18  Ernest Godino -- Ernesto Godinez picks up his dope.  That's

19  where he is.

20      The next, front.  The next, there.  From this

21  position, remember, this is where Presnell finds these

22  cartridge casings fired by -- and Sergeant Evans finds these

23  cartridge casings found by -- fired by Mr. Spratte.

24      What is the direction Spratte is firing into?  He

25  fires into the side of the fence, right, because what do we

1   have in that photo?  As you get closer, you see as he's firing

2   into the side, he has found two different bullets, right.  One

3   was on the corner.  And where does that bullet take you?  It

4   takes you to 4344 South Hermitage.  And this is a photo of

5   that.  Keep that up.

6          This is a photo from that angle looking at both the

7   east and the west sides of Hermitage, indisputable facts that

8   someone could have shot from there.  And look at the angle of

9   trajectory.  It goes -- you can stand behind that corner on

10  the left-hand side of the photo and shoot right towards that

11  house.  And guess where it hits?

12         Next photo, please.  No, the next photo of the house.

13  The photo of the house, the side of the house.

14         Bear with me, ladies and gentlemen.  I ask for your

15  patience.

16         There we are, 4344, the bullet in the side of the

17  house.  You can see it on the lower portion of that camera --

18  of the photograph.  There it is.  It's a little bit closer.

19  And there again where that bullet ends up.  Now, Mr. Spratte,

20  Agent Spratte didn't think that that bullet came from his gun,

21  didn't go through the fence.  Ladies and gentlemen, that is

22  reasonable doubt.

23         Here's what else is indisputable fact that the

24  government has told you this morning is proof beyond a

25  reasonable doubt.  All these sophisticated videos, ladies and

1   gentlemen, no gun was ever recovered.  Now, they can say that

2   they have superimposed the video and stopped the video of

3   Ernesto running across the gangway, but there's no gun there

4   because if there was a gun there, someone would have told you

5   besides the prosecution in their closing argument that there

6   was a gun there.

7           It could be his cell phone.  Why?  Because he's

8   Snapchatting with Victoria.  He's not going to leave the phone

9   in the house.  He's Snapchatting.  That's not a gun.  There is

10  no evidence that there is a gun.  No gun is found.  That's

11  indisputable.

12          Also what's indisputable:  Ernesto's cap.  It could

13  have had gunshot residue over it.  It could have had gunshot

14  residue on it.  You heard the sergeant this morning say, yes,

15  he tests for gunshot residue all the time.  It can transfer.

16          What do you see in the photo?  You see Ernesto coming

17  back to the house.  You see him taking his hat off and wiping

18  his hands and putting his cap back on.  If he fired that

19  firearm like they want you to believe in this case, all they

20  had to do when they seized that cap from Victoria's car on May

21  7th of 2018 is to test it for gunshot residue.

22          They tested it for DNA.  Why did they have to test it

23  for DNA?  They have the video of him wearing the hat.  Of

24  course, it's him.  Why not test it for what can prove guilt

25  beyond a reasonable doubt?  Gunshot residue.  Members of the

1   jury, that's an important fact, the transfer between the hands

2   and the hat. That failure is proof of reasonable doubt.

3         Let's talk about the federally funded $10,000

4   informant. What's interesting, Mr. Ruiz or Mr. Alejandro or

5   DK or whatever you want to call him, he said there were no

6   written rules, right. The government says, okay, there's no

7   written rules. Why? I guess because you can ask the

8   government to amend those rules at any time.

9         Why do I say that? Because don't you remember what

10   their own witness said, right, their own individual who they

11   have paid good money for, who's committed crimes, who was

12   arrested by Homeland Security, who has been working for them?

13   What does he tell you is there are three people that stand

14   out. "We stand outside. We want our presence to be known.

15   I'm not going to hide in some gangway. I'm not going to just

16   fire. We're going to fire down that street, but we're going

17   to be there."

18         Well, I guess one reason is you can -- those rules

19   aren't written down is because you can easily, easily amend

20   them. The government did it for you today by saying, oh, he's

21   a shooter and he's standing guard. That is not what -- even

22   Ruiz told you that isn't what happened. You've got three

23   people. They want to know, in this gang neighborhood, the

24   gang members want the next group of guys to know, the flakes

25   to know, they're there, don't come in.

1    What Ruiz does, ladies and gentlemen, do for you is

2  corroborate, corroborate what Destiny told you is that when he

3  talked to the agents on April -- the Homeland Security guys in

4  April of 2018, he was debriefed.  And one of the things he

5  talked to them about was Ernesto Godinez.  What did he say?

6  He was a low-level drug dealer, right.

7    March 2019, Ruiz, into the grand jury, oh, he's

8  cooperating.  He's got all our agreements.  That's -- that's

9  wonderful.  What does he say?  Oh, he tags him as a shooter.

10  Ladies and gentlemen, look at that testimony with suspect.

11  Look exactly what he's telling you he claims.  He has changed

12  his story.  Once he's got the grand jury, he's going to the

13  grand jury to make this case to hold Ernesto Godinez

14  accountable.

15    The other thing Ruiz does corroborate as I told you

16  earlier, he says when they hear gunshots, what do they all

17  say?  "Fuck them flakes."  And what do they also do?  They

18  also get out of the neighborhood.  Why?  Destiny Rodriguez

19  told you why.  Victoria Jean-Baptiste told you why.  And even

20  this guy told you why.  They don't want to be harassed.  They

21  don't want to be harassed by the police, right?

22    And in this case, definitely they would have been

23  harassed.  And Victoria, sure, it's okay that Victoria

24  Jean-Baptiste is brought to the grand jury.  First, don't

25  forget what she said.  She was arrested.  What was she

1    arrested for?  What did she do?  She's arrested, a 19-year-old

2    girl.  She's arrested.  She tells them some things.  They

3    don't believe her.  Then she admits to some other things, that

4    she had actually gone to Ernesto's house first before she went

5    to pick Adriana up.

6            And then they bring her to the grand jury.  And then

7    they want you to believe, oh, everything she said the first

8    time because it was closer in time is true.  But, oh, Officer

9    Spratte, ladies and gentlemen, think about it.  Officer

10   Spratte, within hours of the shooting, tells Detective Evans,

11   "Yeah, there's an unknown person, white shirt and muzzle

12   flashes."  By the time he comes here a year later, now

13   somebody's standing down the street.  "Oh, I'm not sure where

14   I saw him."

15           Guess what?  You can say to them, you can say that is

16   not proof of reasonable doubt.  That is -- beyond reasonable

17   doubt.  That is reasonable doubt.  Ladies and gentlemen, there

18   was nobody in those videos.  A picture is worth a thousand

19   words.

20           Oh, and which is sort of interesting, I'm sure you

21   remember this as well, you remember Ruiz says, "I don't -- I

22   don't like the Godinez family."  He admitted that, that they

23   didn't like each other.  But despite the fact that he was an

24   informant, despite the fact that the government, our

25   government, has paid him $10,000, despite the fact that he

1   gets the "get out of jail free" card, despite the fact that

2   he's going to stay in this country, despite the fact that he

3   shot people and admitted he shot people and has never been

4   charged, despite all of that, think of it, there is not one

5   statement that came from that man to say Ernesto Godinez fired

6   that weapon.

7         Of all the super intelligence he was going to give

8   the government, there's not one statement from any of these

9   other people that he was going to entrap or talk to that

10   Ernesto Godinez fired that shot. That, ladies and gentlemen,

11   is reasonable doubt.

12         And I just want to say a couple of things before I

13   end here. The government talked, the prosecutors have talked

14   about the blind spot. Remember, they had this picture what

15   they said that was a blind spot in the -- on the video.

16   Ladies and gentlemen, use your own eyes. There is no blind

17   spot. If -- if you want to believe Spratte that he was down

18   the street and he fired that weapon and he's standing on the

19   sidewalk, that video, that video alone is enough to show you

20   reasonable doubt. There is no blind spot there.

21         And this whole thing about his driving around with

22   the Kia, that he's patrolling, that he's looking for other

23   unknown gang people, well, if you look at the video as he's

24   going down 44th Street and he gets to Wood, he uses his turn

25   signal. Is that someone who's patrolling, looking for other

1 offenders -- other gang members?  I doubt it if he's going to

2 use his -- and when he runs across -- when he runs across the

3 street, look at the time again.  You want to take a look at

4 what reasonable doubt is?  He runs across, according to their

5 timeframe, about 3:15 and some seconds, right.

6 Schoenecker's car drives by the other direction on

7 a -- over a block away at 3:16.  He doesn't even see him.

8 There's no connection between the two.  You have collapsing

9 theories here.  They're trying to put it all into one and

10 that, ladies and gentlemen, is reasonable doubt.

11 Now, when I sit down, I don't get a chance to come

12 back up.  Neither myself nor Mr. Pissetzky is going to be able

13 to pop back up and have one more shot at it because that's

14 what the law is.  It's the government's burden.  They had to

15 prove Ernesto Godinez beyond a reasonable doubt, guilty beyond

16 a reasonable doubt.  So they have the burden.  And that's

17 fine.  That's fine.  We accept that.  And if they want, they

18 can get up and rebut what I have to say.

19 But during your deliberations, when you go back to

20 that room and you're sitting and talking about this case and

21 some one of you says that they wish to return a verdict of

22 guilty, you can say that -- and you can stand up and you can

23 say the prosecution has the burden here.

24 How can they overcome the testimony of Spratte that

25 the person, the unknown person in the white shirt.  You can

1   say to your fellow members, how do they overcome the video,

2   Godinez Video 1, of the camera of the man in the white shirt

3   going someplace closer to 44th Street?

4          You can say, how does Godinez Video 2 facing

5   southbound on that -- on Hermitage Street, how does it show

6   muzzle flashes?  You can say, how can they overcome the video

7   looking south -- looking northbound from -- with no one

8   standing on the street or the sidewalk in a white shirt before

9   the police car goes by.

10         You can say, how are they going to overcome, no one

11  knows who found those cartridge casings by the Chicago Police

12  Department.  You can say, confidently say, how are they going

13  to overcome what was the rush to test those cartridge casings?

14  What was -- where was the attempt to take the fingerprint

15  impressions when they knew they could get prints?  The ATF

16  tried it on the bullet, may not have been successful, but they

17  tried it.

18         You can say to them, how is the government going to

19  overcome while they had in their possession an item of

20  clothing of Ernesto's -- Godinez that he was seen wearing the

21  baseball cap and not a test for gunshot residue?  How are they

22  going to overcome that?  Say that to your fellow members.

23         How do they overcome no guns recovered?  They can

24  wish, they can imply, they can make up whatever they say they

25  believe they saw, but it's for you to determine what is in

1   that video.  And there is no video of Ernesto Godinez firing

2   that weapon.  There's no -- ladies and gentlemen, there's no

3   video of anyone firing that weapon with muzzle flashes from

4   the mouth of the gangway where the cartridge casings were

5   found.

6          His honorable -- when we're all done, his Honor will

7   give you, read you these instructions.  It's your roadmap of

8   how you're going to decide this case, how to figure out what

9   all this evidence is.

10          As I say, when I sit down, that's it.  Members of the

11   jury, you have to speak for Ernesto Godinez.  You have to

12   return a fair verdict.  You have to return a verdict in the

13   name of justice.  Only you, only each one of you together,

14   collectively, you have the power of returning two verdicts of

15   not guilty.  Thank you.

16          THE COURT:  The government has 12 minutes.

17          MS. BABU:  Thank you, your Honor.

18          MR. HYMAN:  Ms. Babu, do you want this?

19          MS. BABU:  It doesn't matter.  Thank you.

20          REBUTTAL ARGUMENT ON BEHALF OF THE GOVERNMENT

21          Ladies and gentlemen, Mr. Hyman just said that we're

22   here because the government thought there was a possibility

23   that the defendant was the shooter.  We didn't think there was

24   a possibility.  We're here because the defendant shot Kevin

25   Crump on May 4th, 2018, at 3:18 in the morning.  That is why

1    we're here.

2         And oddly enough, I found myself sort of surprised,

3    defense counsel and I, we agree on a whole lot apparently.

4    First, this was a very emotional moment for Officer Spratte.

5    That is absolutely true.  Mr. Godinez, the defendant, he

6    didn't change his clothes in his house.  We agree on that.

7    The man in the white T-shirt in that video at 2:52 in the

8    morning, yes, Steve Greene, he missed that.  He told you that

9    on the stand.  We agree on that.  That man in the white

10   T-shirt, never seen again, not once, not in any of the video

11   that you will have back there with you when you deliberate.

12   You never see that man in the white T-shirt again.

13        We also agree on the fact that Hector Ruiz, the

14   government's witness, he doesn't identify the defendant as the

15   shooter.  He wasn't there that day.  He didn't even know he

16   was going to be testifying in this trial until two months ago.

17        And finally, we agree, the defendant, there is no

18   video of the defendant pulling the trigger.  I told you that

19   when I got up in front of you a week ago.  We do not have a

20   video of the defendant pulling that trigger.  But let's talk

21   about why we don't have a video of the defendant pulling the

22   trigger.

23        You saw the gangway that the defendant entered, that

24   gangway covered with the Latin Saints graffiti, the gangway of

25   the stickman with the upsidedown pitchfork to show disrespect

1  to the SDs, the Satan Disciples which is a rival of the Latin

2  Saints.  Hector Ruiz told you that that was -- that was a

3  rival of the Saints.  You saw that same tattoo on the

4  defendant's arm when he went into that gas station clear as

5  day, right there.

6          You also saw the video that Agent Jacobsen took when

7  he stood in the mouth of that gangway, the entrance into that

8  gangway when it faced Hermitage.  You saw what happened when

9  Agent Jacobsen turned and looked to the cameras and then

10 stepped back into the mouth of the gangway.  You couldn't see

11 those cameras anymore.

12         The defendant knew that.  This was his gangway.  This

13 was a gangway of the Latin Saints.  He knew where he was

14 going.  He purposely chose that gangway because he could stand

15 there after he saw the surveillance officers circling the

16 blocks of his neighborhood.  He thought those were rivals.  He

17 had to act.

18         So he did what any good Saint would do, and he ran up

19 the street into his house.  He got his gun, ran back up the

20 street, across that alley, into the gangway and fired five

21 gunshots.  One of those gunshots ripped through Kevin Crump's

22 head.  That is why we are here today.

23         And, ladies and gentlemen, the judge will instruct

24 you in this case, and he will do that as soon as I'm finished.

25 And nowhere in those instructions will he tell you that you

1  have to see a video of the defendant pulling the trigger

2  because that is just not the case. That is not required.

3       We have proved beyond a reasonable doubt that the

4  defendant is the shooter here, but you don't need to see a

5  video of that. And why don't you need to see a video of that?

6  Because of all of the other evidence that Mr. Eichenseer

7  meticulously went through as he showed you what we did over

8  the course of the last week.

9       You have the five shell casings in the gangway that

10  the defendant ran into 30 seconds before the shooting; the

11  same gangway that he ran out of seconds after shooting Kevin

12  Crump; the same gangway that ShotSpotter put those five

13  casings at, 10 to 12 feet from that same gangway. And then

14  you have the defendant's statements, right, the defendant's

15  admissions when he gets into the car of Victoria

16  Jean-Baptiste, when he gets in her car and he says, "I feel

17  good. Fuck that flake."

18       You have all of that evidence. You don't need a

19  video of the defendant pulling the trigger. There is no video

20  of the defendant pulling the trigger.

21       There is also no video of this mystery shooter in a

22  white T-shirt because that mystery shooter doesn't exist.

23  He's a distraction. He is a distraction by the defense to

24  have you look away from the evidence that you do have in front

25  of you.

1    And now, to be very clear, the burden, as Mr. Hyman

2  said, is the government's.  It is our burden, and we have to

3  show beyond a reasonable doubt that the defendant is guilty.

4  However, the defense has put forward a theory here, and I'm

5  allowed to tell you why that theory is bunk.

6    So Steve Greene got on that stand, and he told you

7  that he missed that guy in the white T-shirt at 2:52.  2:52 is

8  26 minutes before the shooting.  You don't see that guy again.

9  But also think back to Steve Greene's testimony.  Do you

10  remember those long stretches of silence where we all just

11  stared at our monitors because nothing was happening in the

12  videos?  Because there was no one else in those videos.  The

13  only person in that video at 3:18 is the defendant because the

14  person who shot Kevin Crump is the defendant.

15    Now, Mr. Hyman when he was up here, he misstated some

16  of the evidence that you saw during this trial.  He told you

17  that the bullet in the siding of that house, that's 4344.  And

18  when you go back to the jury room, I'm going to recommend that

19  you look at Government Exhibit 403 which is the plat that

20  Officer Presnell put together.  It's the map.  And it has all

21  of the addresses.  It has marked on there where the casings

22  were found, the tree where the bullet -- sorry, the tree where

23  the bullet hit, the bullet that went through Special Agent

24  Crump.  It marks where the blood is.  It shows you where the

25  cars are parked on the street.  You can get a recreation of

1    what the scene looked like that morning.

2          Now, Mr. Hyman said that the bullet in the siding of

3    that house was Officer Spratte's bullet.  No one said that.

4    The judge will also instruct you that my words, Mr. Hyman's

5    words, Mr. Eichenseer's words, Mr. Pissetzky's words, none of

6    that is evidence.  The only evidence that you are to consider

7    are what came out of the witnesses' mouths and the evidence

8    that you take back with you.  And there is no evidence that

9    the bullet in that house was Officer Spratte's.

10          And let's -- let's talk about 4344 South Hermitage

11    for a second.  I'm not going to use the map because I have 12

12    minutes and putting it up will take up too much time.  So when

13    you're looking at Officer Presnell's plat and you look at

14    4344, if you look right down next to it is 4348.  That's the

15    house with the tree in front of it that the bullet went into.

16          So for this mystery shooter to have been standing in

17    4344, he would have had to have fired a bullet, for it to have

18    gone out of the yard and made a right turn into that tree.

19    Bullets don't do that.  You can use your common sense.  You

20    don't need an expert to tell you that.  Bullets don't make

21    right turns.  They go in straight lines.

22          And you know that because -- so the bullet in the

23    tree and the bullet halfway down the street, the bullet that

24    had Agent Crump's DNA on it, Mr. Esposito, the firearms

25    expert, he told you that those two bullets came from the same

1    gun.  So you know that the person who fired those two bullets

2    was the same person.  And so the person standing in a yard --

3    there was, first, no person there, but if a person was

4    standing in that yard, he couldn't hit that tree and hit Kevin

5    Crump.

6              MR. PISSETZKY:  Objection, Judge.  That's not true.

7              THE COURT:  Overruled.  It's argument.  The jurors

8    can make up their own minds.

9              MS. BABU:  And what else did Mr. Esposito tell you?

10   That there was the bullet in the tree and the bullet in the

11   grass.  They both came from the same gun.  The five shell

12   casings in the gangway, they all came from the same gun.

13             So let's talk about that for a second.  Mr. Hyman, I

14   think, was trying to get you to think that CPD planted the

15   shell casings in that gangway.  I think that's where he was

16   going.  So to take that to its logical conclusion, CPD,

17   minutes after the shooting happened, some officer showed up

18   with four shell casings.  Officer Presnell showed up with a

19   fifth at 5:00 o'clock all from the same gun.

20             They then planted, some officer planted four of those

21   casings, and then Officer Presnell came by later and planted

22   the fifth one.  And they all just happened to be from the same

23   gun?  That doesn't make sense because it isn't true.  There's

24   no way that that happens.

25             Mr. Hyman also talked about gunshot residue and the

1 fingerprinting and the DNA. First, gunshot residue is not

2 glitter. Just because you may have had gunshot residue on

3 your hand on Friday morning at 3:18 doesn't mean you're going

4 to have gunshot residue on you when you turn yourself in on

5 Monday evening.

6 MR. HYMAN: Judge, I'm going to object to that.

7 That's not the evidence.

8 THE COURT: Objection is overruled.

9 MS. BABU: In fact, ladies and gentlemen, Agent

10 Jacobsen, when he was on that stand, he told you that in his

11 five years as an agent and the hundreds of firearms cases that

12 he's worked that you don't -- he's never had a case in which

13 he's had fingerprints pulled off of ballistics evidence.

14 And he also told you that law enforcement had to make

15 a choice. It was either you submit these casings into NIBIN,

16 and he explained that NIBIN was able to track casings back to

17 guns. And you heard from Hector Ruiz that the Latin Saints

18 used Nation guns. They moved guns around.

19 So it is reasonable for law enforcement to think,

20 "Hey, we'll put these casings into NIBIN, and maybe this will

21 hit on another gun and that will further our investigation."

22 So they made a choice. It was NIBIN or

23 fingerprinting. And Agent Jacobsen told you that to put a

24 casing into NIBIN, they had to clean them off to be able to

25 make that determination. And cleaning those casings off,

1  you're not going to get fingerprints.  It was a choice that

2  had to be made in that moment.

3         Similarly, the gunshot residue.  Again, the shooting

4  happened at 3:18 on the morning of May 4th.  The defendant

5  turned himself in, by the way, after his car was found in

6  someone else's house miles outside the city.  His phone that

7  he ditched was found miles outside the house somewhere outside

8  of the city, turned himself in on Monday evening.  This is

9  almost four days later.

10         MR. HYMAN:  Judge, there's no such evidence it was

11  outside the city.  I object to that.

12         MS. BABU:  Excuse me.

13         THE COURT:  Overruled.

14         MS. BABU:  I misspoke.  Not outside the city.

15         THE COURT:  Overruled.

16         MS. BABU:  15 miles outside of the neighborhood,

17  northwest side of the city.

18         He turned himself in.  It's been four days.  He's

19  likely bathed.  He's certainly washed his hands.  He's not

20  wearing the same clothes.  There's nothing to be tested for

21  gunshot residue.  And don't -- it's unclear to me exactly what

22  law enforcement was to -- were to have done on that Monday

23  evening for gunshot residue.  That's not an issue here.

24         But what you should consider is the evidence before

25  you.  You should consider the ballistics evidence that you do

1   have before you.  You should consider the ShotSpotter evidence

2   that you do have before you.

3           THE COURT:  Counsel, your time is up.  Bring your

4   remarks to a close, please.

5           MS. BABU:  Yes.  Yes, your Honor.

6           Ladies and gentlemen, you should consider all of that

7   evidence.  You should consider the surveillance videos.  You

8   should consider the defendant running out of that gangway

9   seconds after he shot Agent Crump in the head.

10          You should consider the five shell casings in that

11  gangway.  You should consider the fact that ShotSpotter put

12  those five shell casings 10 to 12 feet from that gangway.  You

13  should consider the fact that the defendant got into his

14  girlfriend's car and said, "I feel good.  Fuck that flake."

15          And then you should consider all of the things he did

16  immediately after shooting Agent Crump, all of the ways he

17  tried to change his appearance and not go back to the

18  neighborhood.  You should consider all of that evidence and

19  find the defendant guilty of both counts.

20          THE COURT:  Thank you.

21          Members of the jury, I will now instruct you on the

22  law that you must follow in deciding this case.  I will also

23  give you a set of these instructions to use in the jury room.

24  You must follow all of my instructions about the law even if

25  you disagree with them.  This includes the instructions I gave

1  you before the trial, any instructions I gave you during the

2  trial, and the instructions I am giving you now.

3         As jurors, you have two duties.  The first duty is to

4  decide the facts from the evidence that you saw and heard here

5  in court.  This is your job, not my job or anybody else's job.

6         Your second duty is to take the law as I give it to

7  you, apply it the facts and decide if the government has

8  proved the defendant guilty beyond a reasonable doubt.

9         You must perform these duties fairly, impartially,

10  and do not let sympathy, prejudice, fear, or public opinion

11  influence you.  In addition, do not let any person's race,

12  color, religion, national ancestry, or gender influence you.

13         You must not take anything I said or did during the

14  trial as indicating that I have an opinion about the evidence

15  or about what I think your verdict should be.

16         The charge against the defendants are in a document

17  called an indictment.  You will have a copy of the indictment

18  during your deliberations.  The indictment in this case

19  charges the defendant committed the crimes of assault of a

20  federal officer and discharge of a firearm during the assault

21  of a federal officer.

22         The defendant has pled not guilty to the charges.

23  The indictment is simply the formal way of telling the

24  defendant what crimes he is accused of committing.  It is not

25  evidence that the defendant is guilty.  It does not even raise

1 a suspicion of guilt.

2      The defendant is presumed innocent of each and every

3 one of the charges.  This presumption continues throughout the

4 case including during your deliberations.  It is not overcome

5 unless from all the evidence in the case you are convinced

6 beyond a reasonable doubt that the defendant is guilty as

7 charged.

8      The government has the burden of proving the

9 defendant guilty beyond a reasonable doubt.  The burden of

10 proof stays with the government throughout the case.  The

11 defendant is never required to prove his innocence.  He is not

12 required to produce any evidence at all.

13      You must make your decision based only on the

14 evidence that you saw and heard here in court.  Do not

15 consider anything you may have seen or heard outside of the

16 court including anything in the newspaper, television, radio,

17 the internet, or any other source.  The evidence includes only

18 what the witnesses said when they were testifying under oath,

19 the exhibits that I allowed into evidence, and stipulations

20 that the lawyers agreed to.  A stipulation is an agreement

21 that certain facts are true.

22      Nothing else is evidence.  The lawyers' statements

23 and arguments are not evidence.  If what a lawyer said is

24 different from the evidence as you remember it, the evidence

25 is what counts.  The lawyers' questions and objections

1   likewise are not evidence.  A lawyer has a duty to object if

2   he thinks a question is improper.  If I sustained objections

3   to questions the lawyer asked, you must not speculate what the

4   answers might have been.

5           Part of your job as jurors is to decide how

6   believable each witness was and how much weight to give to

7   each witness' testimony.  You may accept all of what a witness

8   says or part of it or none of it.

9           Some factors you may consider include:  The

10  intelligence of the witness; the witness' ability and

11  opportunity to see, hear, or know the things the witness

12  testified about; the witness' memory; the witness' demeanor;

13  whether the witness has any bias, prejudice, or other reason

14  to lie or slant the testimony; the truthfulness and accuracy

15  of the witness' testimony in light of the other evidence

16  presented; and inconsistent or consistent statements or

17  conduct by the witness.

18          A defendant has an absolute right not to testify or

19  present evidence.  You may not consider in any way the fact

20  that the defendant did not testify.  You should not even

21  discuss it in your deliberations.

22          Give the evidence whatever weight you decide it

23  deserves.  Use your common sense in weighing the evidence and

24  consider the evidence in light of your own everyday

25  experience.  People sometimes look at one fact and conclude

1  from it that another fact exists.  This is called an

2  inference.  You are allowed to make reasonable inferences so

3  long as they are based on the evidence.

4       You may have heard the terms "direct evidence" and

5  "circumstantial evidence."  Direct evidence is evidence that

6  directly proves a fact.  Circumstantial evidence is evidence

7  that indirectly proves a fact.  You are to consider both

8  direct and circumstantial evidence.  The law does not say that

9  one is better than the other.

10      It is up to you to decide how much weight to give to

11  the evidence, whatever direct or circumstantial.  Do not make

12  any decision simply by counting the number of witnesses who

13  testified about a certain point.  What is important is how

14  truthful and accurate the witnesses were and how much weight

15  you think their testimony deserves.

16      It is proper for an attorney to interview any witness

17  in preparation for trial.

18      You have heard evidence that before trial, witnesses

19  made statements that may be inconsistent with their testimony

20  here in court.  You may consider an inconsistent statement

21  made before the trial to help you decide how believable a

22  witness' testimony was here in court.  If an earlier statement

23  was made under oath, you can also consider the earlier

24  statement as evidence of the truth of whatever the witness

25  said in the earlier statement.

1    You heard testimony from witnesses who were promised

2  a benefit in return for his or her testimony and cooperation

3  with the government.  You may give these witnesses' testimony

4  whatever weight you believe is appropriate, keeping in mind

5  you must consider that testimony with caution and great care.

6    You have heard testimony of an identification of a

7  person.  Identification testimony is an expression of the

8  witness' belief or impression.  In evaluating this testimony,

9  you should consider the opportunity the witness had to observe

10  the person at the time of the offense and to make a reliable

11  identification later.

12    You should also consider the circumstances under

13  which the witness later made the identification.  The

14  government must prove beyond a reasonable doubt that the

15  defendant is the person who committed the crime that is

16  charged.

17    You have heard testimony, namely, Arnold Esposito,

18  Paul Greene, and Steve Greene who gave opinions and testimony

19  about certain facts.  You do not have to accept these

20  witnesses' opinions and testimony.  You should judge these

21  witnesses' opinions and testimony the same way you judge the

22  testimony of any other witness.

23    In deciding how much weight to give to these opinions

24  and testimony, you should consider the witness'

25  qualifications, how he reached his opinions, and the factors I

1   have described for determining the believability of testimony.

2          You have heard evidence obtained from the

3   government -- excuse me.  You have heard evidence obtained

4   from the government's use of informants.  The government is

5   permitted to use these techniques.  You should consider

6   evidence obtained this way together with and in the same way

7   you consider the other evidence.

8          An aerial map was shown to you to help explain other

9   evidence that was admitted.  The aerial map is not itself

10  evidence or proof of any facts.  If it does not correctly

11  reflect the facts shown by the evidence, you should disregard

12  the aerial map and determine the facts from the underlying

13  evidence.

14         If you have taken notes during the trial, you may use

15  these during deliberation to help you remember what happened

16  during the trial.  You should use your notes only as aids to

17  your memory.  The notes are not evidence.  All of you should

18  rely on your independent recollections of the evidence, and

19  you should not be unduly influenced by the notes of other

20  jurors.  Notes are not entitled to any more weight than the

21  memory or impressions of each juror.

22         The defendant has been accused of more than one

23  crime.  The number of charges is not evidence of guilt and

24  should not influence your decision.  You must consider each

25  charge separately.  Your decision on one charge, whether it is

1    guilty or not guilty, should not influence your decision on

2    any other charge.

3         Count 1 of the indictment charges the defendant with

4    forcibly assaulting a federal officer with a deadly weapon.

5    In order for you to find the defendant guilty of the charge,

6    the defendant must prove each of the following elements beyond

7    a reasonable doubt:

8         1, the defendant forcibly assaulted Kevin Crump; 2,

9    at the time of the assault, Kevin Crump was an officer or an

10   employee of the United States performing his official duties;

11   3, the defendant acted knowingly and; 4, in committing the

12   assault, defendant either, A, intentionally used a deadly or

13   dangerous weapon or, B, intentionally inflicted bodily harm.

14   If you find from your consideration of all the evidence that

15   the government has proved each of these elements beyond a

16   reasonable doubt, then you should find the defendant guilty.

17        On the other hand, if you find from your

18   consideration of the evidence that the government has failed

19   to prove any one of these elements beyond a reasonable doubt,

20   then you should find the defendant not guilty.

21        A person acts knowingly if he realizes what he was

22   doing and is aware of the nature of his conduct and does not

23   act through ignorance, mistake, or accident.  In deciding

24   whether the defendant acted knowingly, you may consider all of

25   the evidence including what the defendant did or said.

1    To commit the crime of forcibly -- forcible assault

2  of a federal officer, it is not necessary that the defendant

3  knew the person he assaulted was a federal officer.

4    An assault is an attempt to inflict injury on another

5  person.  A person commits assault forcibly when he makes

6  physical contact with the person he assaulted or otherwise

7  uses physical force to commit the assault.

8    Count 2 of the indictment charges the defendant with

9  using a firearm during and in relation to a crime of violence.

10 In order for you to find the defendant guilty of this charge,

11 the government must prove each of the following elements

12 beyond a reasonable doubt:

13    1, the defendant committed the crime of forcible

14 assault of a federal officer with a deadly or dangerous weapon

15 as charged in Count 1 of the indictment; 2, the defendant

16 knowingly used a firearm during and in relation to such crime.

17    If you find from your consideration of all the

18 evidence that the government has proved each of these elements

19 beyond a reasonable doubt as to the charge you are

20 considering, then you should find the defendant -- excuse me.

21 I'll start over.

22    If you find from your consideration of all the

23 evidence that the government has proved each of these elements

24 beyond a reasonable doubt as to the charge you are

25 considering, then you should find the defendant guilty of that

1  charge.  If, on the other hand, you find from your

2  consideration of all the evidence that the government has

3  failed to prove any one of the elements beyond a reasonable

4  doubt as to the charge you are considering, then you should

5  find the defendant not guilty of the charge.

6          If you find the defendant guilty of the offense

7  charged in Count 2 of the indictment, you must then determine

8  whether the government has proven beyond a reasonable doubt

9  that the firearm was discharged.  You will see on the verdict

10 form a question about this issue.

11         You should consider this question only if you find

12 that the government has proved the defendant guilty of the

13 offense charged in Count 2 of the indictment.  If you find

14 that the government has proved beyond a reasonable doubt that

15 the defendant discharged the firearm, then you check,

16 quote, "was discharged" on the verdict form.  If you find that

17 defendant has not proved beyond a reasonable doubt that the

18 defendant charged the firearm -- excuse me -- then you should

19 check "was not discharged" on the verdict form.

20         Mr. Godinez's defense includes that the government

21 has failed to prove beyond a reasonable doubt that he forcibly

22 assaulted Kevin Crump and that he discharged the firearm as

23 charged in Counts 1 and 2 of the indictment.  In particular,

24 Mr. Godinez's position is that the government has not proved

25 beyond a reasonable doubt that on May 4th, 2018, he was armed

1  with a firearm, discharged the firearm, or caused bodily

2  harm -- injury to Kevin Crump.

3       If you decide -- excuse me.  In deciding your

4  verdict, you should not consider the possible punishment for

5  the defendant.  If you decide that the government has proved

6  the defendant guilty beyond a reasonable doubt, then it will

7  be my job to decide on the appropriate punishment.

8       Once you are all in the jury room, the first thing

9  you should do is choose a foreperson.  The foreperson should

10 see to it that your discussions are carried on in an organized

11 way and that everyone has a fair chance to be heard.  You may

12 discuss the case only when all jurors are present.

13      Once you start deliberating, do not communicate about

14 the case or your deliberations with anyone except other

15 members of your jury.  You may not communicate with others

16 about the case or your deliberations by any means.  This

17 includes oral or written communication as well as any

18 electronic method of communication such as telephone, cell

19 phone, smartphone, iPhone, Blackberry, computer, text

20 messaging, instant messaging, the internet, chat rooms, blogs,

21 websites, services like Facebook, You Tube, Twitter, or any

22 other method of communication.

23      If you need to communicate with me while you are

24 deliberating, send a note through the court security officer.

25 The note should be signed by the foreperson or by one or more

1  members of the jury.  To have a complete record of the trial,

2  it is important that you do not communicate with me except by

3  written note.  I may have to talk with the lawyers about your

4  message, so it may take me some time to get back to you.  You

5  may continue your deliberations while you wait for my answer.

6          Please be advised that transcripts of the trial

7  testimony are not available to you.  You must rely on your

8  collective memory of the testimony.

9          If you send me a message, do not enclose the

10  breakdown of any votes you may have conducted.  In other

11  words, do not tell me that you are split 6-6 or 8-4 or

12  whatever your vote happens to be.

13          A verdict form has been prepared for you.  I will

14  take -- you will take this form with you to the jury room.

15  When you have reached unanimous agreement, your foreperson

16  will fill in and date and sign the verdict form.  Each of you

17  will then sign it.  Advise the court security officer once you

18  have reached a verdict.  When you come back to the courtroom,

19  I will read the verdict aloud.

20          I'll go over it.  It's relatively -- on the first

21  page, it says, Count 1, with respect to Count 1 of the

22  indictment, we, the jury, find as follows as to the defendant,

23  Ernesto Godinez.  There's a "guilty" and then there's a line,

24  "not guilty," there's a line.  You would -- your foreman would

25  check whatever it is.

1    Now, bear in mind, you cannot answer this question of

2 guilt or not guilty unless you do so unanimously.  So you

3 cannot render a verdict on Count 1 or Count 2 unless your

4 answers are unanimous, which means all 12 of you.

5    And then on the next page, with respect to Count 2,

6 with respect to Count 2 of the indictment, we, the jury, find

7 as follows as to the defendant, Ernesto Godinez:  Guilty or

8 not guilty.  The same as Count 1.

9    Then after you have decided Count 2, if you find

10 defendant, Ernesto Godinez, guilty of the offense charged in

11 Count 2 of the indictment, then you must determine whether the

12 government has proven beyond a reasonable doubt that the

13 defendant discharged the firearm.

14    And then we, the jury, find that the firearm involved

15 in Count 2, then there is "was discharged," and there's a

16 space and then "was not discharged," and there's a space.

17 That also must be decided unanimously; all 12 of you, in other

18 words.

19    Now, your verdict must represent the considered

20 judgment of each juror.  Your verdict, whether it is guilty or

21 not guilty, must be unanimous.  If you make -- you should make

22 every reasonable effort to reach a verdict.  In doing so, you

23 should consult with each other, express your own views, and

24 listen to your fellow jurors' opinions.

25    Discuss your differences with an open mind.  Do not

1    hesitate to reexamine your own view and change your opinion if

2    you come to believe that it is wrong, but you should not

3    surrender your honest beliefs about the weight or effect of

4    evidence just because of the opinions of your fellow jurors or

5    just so there can be a unanimous verdict.

6        The 12 of you should give fair and equal

7    consideration to all the evidence.  You should deliberate with

8    a goal of reaching an agreement which is consistent with the

9    individual judgment of each juror.  You are impartial judges

10   of the facts.  Your sole interest is to determine whether the

11   government has proved its case beyond a reasonable doubt.

12       Now, at this time, since the 12 original jurors are

13   still here, the Court will excuse Mr. Martinez with our

14   thanks.

15       Mr. Marshal, please raise your right hand.

16   (Court security officer sworn.)

17       THE MARSHAL:  I do.

18       THE COURT:  Would you take the jury out, please?  And

19   you can take them to lunch.  And then we will put a copy of

20   the instructions together with the indictment and the exhibits

21   that have been entered into evidence so that you will have

22   those for your consideration.

23   (Proceedings heard in open court.  Jury out.)

24       THE COURT:  Okay.  Outside the presence of the jury,

25   I'll just say for the record that the defendant had renewed

1 the motion for a directed verdict, and the motion is denied.

2 One of the things that you did not include, the

3 defense theory.

4 MS. BABU: I'm sorry, your Honor. I think it was

5 during the -- we had someone added --

6 THE COURT: So anyway, I read it based on the copy

7 that you gave me, but when we had a copy, there's both

8 sides -- can you get it? I guess just get it Xeroxed probably

9 or whatever they call it now.

10 MS. BABU: I think it's still Xerox, your Honor.

11 THE COURT: I think just have it Xeroxed.

12 Does anybody want to put anything on the record now

13 that we have completed?

14 I would suggest that -- presumably, they'll go down.

15 Oftentimes, they'll have a working lunch. They'll come back

16 up. So we need to have -- be able to contact you in the event

17 they have a question and if they return a verdict.

18 Are the exhibits ready to go back?

19 MS. BABU: If I can have five minutes, your Honor,

20 they will be.

21 THE COURT: Okay. So get the defense together and go

22 over -- I don't think I -- I did refuse the one exhibit, the

23 one on the tattoos.

24 If they want to play your exhibits, is that easily

25 done?

1    MR. EICHENSEER:  Yes, your Honor.  There's a player

2  that can play all the files.

3    THE COURT:  A well tried case on both sides.  It's a

4  pleasure.

5    MR. HYMAN:  Thank you, your Honor.

6    MR. EICHENSEER:  Thank you, Judge.

7    MS. BABU:  Thank you, your Honor.

8    (Recess from 1:49 p.m. to 4:10 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3   UNITED STATES OF AMERICA,        )
                                     )
4              Plaintiff,            )
                                     )
5        v.                          )  No. 18 CR 00278
                                     )
6   ERNESTO GODINEZ,                 )  Chicago, Illinois
                                     )  June 17, 2019
7              Defendant.            )  4:15 p.m.

8                         VOLUME 6-B
              TRANSCRIPT OF PROCEEDINGS - Trial
9       BEFORE THE HONORABLE HARRY D. LEINENWEBER and a Jury

10  APPEARANCES:

11  For the Plaintiff:        HON. ZACHARY T. FARDON
                              United States Attorney
12                            BY:  MS. KAVITHA J. BABU
                                   MR. NICHOLAS J. EICHENSEER
13                            Assistant United States Attorneys
                              219 South Dearborn Street, Suite 500
14                            Chicago, Illinois 60604
                              (312) 353-5300
15
    For the Defendant:        MR. LAWRENCE H. HYMAN
16                            111 West Washington Street
                              Suite 1025
17                            Chicago, Illinois 60602
                              (312) 346-6766
18
                              PISSETZKY & BERLINER
19                            BY:  MR. GAL PISSETZKY
                              35 West Wacker Drive, Suite 1980
20                            Chicago, Illinois 60601
                              (312) 566-9900
21

22  Court Reporter:           Judith A. Walsh, CSR, RDR, F/CRR
                              Official Court Reporter
23                            219 South Dearborn Street, Room 2118
                              Chicago, Illinois 60604
24                            (312) 702-8865
                              judith_walsh@ilnd.uscourts.gov
25

1    (Proceedings heard in open court.  Jury in.)

2         THE COURT:  I understand, Courtney, you are the

3    foreman; is that correct?

4         THE FOREPERSON:  Yes, sir.

5         THE COURT:  You've reached a verdict; is that

6    correct?

7         THE FOREPERSON:  Yes, sir.

8         THE COURT:  Would you pass it to the marshal?

9         Thank you.  The verdict of the jury is as follows:

10   With respect to Count 1 of the indictment, we, the jury find

11   as follows:  As to defendant, Ernesto Godinez, guilty.

12        Count 2, with respect to Count 2 of the indictment,

13   we, the jury, find as follows:  As to defendant,

14   Ernesto Godinez, guilty.

15        If you find the defendant, Ernesto Godinez, guilty of

16   the offense charged in Count 2 of the indictment, then you

17   must determine whether the government has proven beyond a

18   reasonable doubt the defendant discharged the firearm.  We,

19   the jury, find the firearm involved in 2 was discharged.

20        Signed, Wendy Courtney and the other 11 jurors.

21        Do you wish the jury polled?

22        MR. PISSETZKY:  Please, your Honor.

23        THE COURT:  Members of the jury, when your name is

24   called, please stand at your seat and respond in a negative or

25   affirmative way to the question posed to you.  After you've

1  answered her question, you may resume your seat.

2         THE CLERK:  Corey Barnett, was this then and is this

3  now your verdict?

4         JUROR BARNETT:  Yes.

5         THE CLERK:  Okay.  Thank you.

6         Wendy Courtney, was this then and is this now your

7  verdict?

8         JUROR COURTNEY:  Yes.

9         THE CLERK:  Heidi Habas, was this then and is this

10  now your verdict?

11         JUROR HABAS:  Yes.

12         THE CLERK:  Ella Hansen, was this then and is this

13  now your verdict?

14         JUROR HANSEN:  Yes.

15         THE CLERK:  Thank you.

16         Willie Johnson, was this then and is this now your

17  verdict?

18         JUROR JOHNSON:  Yes.

19         THE CLERK:  Thank you.

20         Colleen McBrady, was this then and is this now your

21  verdict?

22         JUROR McBRADY:  Yes.

23         THE CLERK:  Thank you.

24         Marilyn Rebus, was this then and is this now your

25  verdict?

1    JUROR REBUS:  Yes.

2    THE CLERK:  Thank you.

3    Melanie Saunders, was this then and is this now your

4    verdict?

5    JUROR SAUNDERS:  Yes.

6    THE CLERK:  Thank you.

7    Cameron Smith, was this then and is this now your

8    verdict?

9    JUROR SMITH:  Yes.

10   THE CLERK:  Thank you.

11   Michelle Spellman, was this then and is this now your

12   verdict?

13   JUROR SPELLMAN:  Yes.

14   THE CLERK:  Thank you.

15   Kevin Waden, was this then and is this now your

16   verdict?

17   JUROR WADEN:  Yes.

18   THE CLERK:  Lisa Wilson, was this then and is this

19   now your verdict?

20   JUROR WILSON:  Yes.

21   THE CLERK:  Thank you.

22   THE COURT:  Is that it?

23   THE CLERK:  That's it, Judge.

24   THE COURT:  So say you all?

25   THE JURY:  Yes.

1    THE COURT:  All right.  The verdict on Count 1 and 2

2  of guilty is entered in the record.  Members of the jury, I

3  want to thank you for your participation in our jury system

4  here.  It's -- you probably read back when you were in civics

5  class that we have an obligation to serve as a juror when

6  we're called.  You folks were called, and you did serve.

7    And a lot of people try to get out of jury service

8  because it isn't the most pleasant work in the -- that you can

9  do, but you folks responded and you participated.

10    And I'm not going to keep you long because you've had

11  a long day.  So on behalf of the court system, I want to thank

12  you for your service.  And we'll stand adjourned.

13    THE CLERK:  All rise.

14    (Proceedings heard in open court.  Jury out.)

15    THE CLERK:  Please be seated and come to order.

16    THE COURT:  The verdict -- judgment is entered on the

17  verdicts.  The matter, I'm going to refer the matter to the

18  presentence -- to the probation office for a presentence

19  investigation.  Sentencing set for --

20    THE CLERK:  September 19th at 9:45.

21    THE COURT:  Posttrial motions, how long -- do you

22  need extra time?

23    MR. PISSETZKY:  Some extra time, Judge.

24    THE COURT:  How much time do you want?

25    MR. PISSETZKY:  By July 31st, your Honor.

1    THE CLERK: July 31st.

2    THE COURT: All right. We'll stand adjourned.

3    (Proceedings adjourned at 4:20 p.m.)

4    * * * * * * *

5    C E R T I F I C A T E

6    I, Judith A. Walsh, do hereby certify that the

7    foregoing is a complete, true, and accurate transcript of the

8    proceedings had in the above-entitled case before the

9    Honorable HARRY D. LEINENWEBER, one of the judges of said

10   court, at Chicago, Illinois, on June 17, 2019.

11

12   /s/ *Judith A. Walsh, CSR, RDR, F/CRR*_____   February 20, 2020

13   Official Court Reporter

14   United States District Court

15   Northern District of Illinois

16   Eastern Division