1          IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION

3   UNITED STATES OF AMERICA,        )
                                     )
4             Plaintiff,             )
                                     )
5             v.                     )   No. 18 CR 00278
                                     )
6   ERNESTO GODINEZ,                 )   Chicago, Illinois
                                     )   May 29, 2019
7             Defendant.             )   9:38 a.m.

8                  TRANSCRIPT OF PROCEEDINGS

9          BEFORE THE HONORABLE HARRY D. LEINENWEBER

10  APPEARANCES:

11  For the Plaintiff:      HON. ZACHARY T. FARDON
                            United States Attorney
12                          BY:  MS. KAVITHA J. BABU
                                 MR. NICHOLAS EICHENSEER
13                          Assistant United States Attorney
                            219 South Dearborn Street, Suite 500
14                          Chicago, Illinois 60604
                            (312) 353-5300
15
    For the Defendant:      MR. LAWRENCE H. HYMAN
16                          111 West Washington Street
                            Suite 1025
17                          Chicago, Illinois 60602
                            (312) 346-6766
18
                            PISSETZKY & BERLINER
19                          BY:  MR. GAL PISSETZKY
                            35 West Wacker Drive, Suite 1980
20                          Chicago, Illinois 60601
                            (312) 566-9900
21

22  Court Reporter:         Judith A. Walsh, CSR, RDR, F/CRR
                            Official Court Reporter
23                          219 South Dearborn Street, Room 2118
                            Chicago, Illinois 60604
24                          (312) 702-8865
                            judith_walsh@ilnd.uscourts.gov
25

1    (Proceedings heard in open court:)

2         THE CLERK:  18 CR 278, United States versus Godinez.

3         THE COURT:  Would you --

4         THE CLERK:  Do you want to re-call the civil case?

5         THE COURT:  No, go ahead.  We'll take Godinez.

6         MS. BABU:  Good morning, your Honor.  Kavitha Babu on

7    behalf of the United States.

8         MR. HYMAN:  May it please the Court, Lawrence Hyman

9    and Gal Pissetzky on behalf of Mr. Godinez.

10        MR. PISSETZKY:  Good morning, your Honor.

11   Mr. Godinez --

12        THE DEFENDANT:  Good morning.

13        THE COURT:  Okay.  There's been a number of motions

14   in limine filed.  I'm prepared to rule on them this morning.

15   So the superseding indictment in this case charges defendant

16   Ernesto Godinez with forcibly assaulting an ATF agent with a

17   deadly weapon as well as using, discharging a firearm during

18   and in relation to a crime of violence.

19        The government intends to prove at trial that Godinez

20   shot an undercover ATF agent in the head around 3:15 a.m. on

21   May 4th, 2018, at 44th Street and Hermitage Avenue in Chicago.

22   The agent was part of a team of law enforcement officers

23   seeking to covertly -- seeking covertly to replace a tracking

24   device on a car parked on Hermitage Avenue between 43rd and

25   44th Street.  He and his colleagues were in plain clothes and

driving unmarked cars.  The victim ATF agent was wearing a hooded sweatshirt with the hood up.

At about 3:18 a.m., five shots rang out from an area of the gangway that Godinez just entered.  One bullet struck the victim agent and came to rest in front of the nearby house.  Police later found five shell casings at the mouth of the gangway.

Seconds after the shooting, surveillance video showed that Godinez ran back out of the same gangway.  Godinez then messaged a friend to pick him up.  Police arrested Godinez several days later.

Defendant has filed three motions in limine and the government six.  Defendant's motion to bar gang evidence and testimony of Officer Christopher Chmelar, that's denied.  The gang evidence and testimony of Christopher Chmelar is relevant to show identity and motive.  To the extent that the introduction of such gang evidence tends -- needs to be limited or explained, the Court may use limiting instructions to ameliorate any possible prejudice.

Second one, defendant's motion to bar ballistic evidence:  Denied.  The ballistic evidence is relevant and non -- not prejudicial to Godinez.  This was evidence found at the scene of the crime.  As the government asserts, the evidence can be used to show how the bullets were matched to each other as well as how the cartridges were matched to each

other.  Moreover, the government intends to offer expert testimony on this evidence shedding light on what type of gun was used in the firing which might be a central question for the jury's determination.

Defendant's motion to bar ShotSpotter evidence: Denied.  The ShotSpotter evidence is admissible under Rule 702 and *Daubert*.  The Court finds that the Nebraska Supreme Court's decision in *State versus Hill*, 288 Nebraska 767, is persuasive.  That court found that Mr. Greene qualified as an expert and that the ShotSpotter system was sufficiently reliable.

Defendant has cited no case law to demonstrate otherwise.  Moreover, any concerns defendant has about the upkeep and accuracy of the ShotSpotter technology are matters that can be raised in cross-examination.

Finally, defendant has failed to show how the evidence is unduly prejudicial.  "Most relevant evidence is by its very nature prejudicial, and the evidence must be unfairly prejudicial to be excluded."  *United States versus Pulido*.

The government's motion to admit evidence of defendant's membership in Latin Saints and Saints Rules regarding protecting Saint territory, gang evidence, that's granted.  The government, admit evidence of Godinez's membership in the Latin Saints and the Saints Rules regarding protecting Saints territory for the reasons already stated:

1    To prove identity or motive.

2          Government's motion to admit evidence of defendant's

3    flight and concealment, that's granted.  The evidence can be

4    submitted to show guilt or consciousness of guilt.  See *U.S.*

5    *versus Skoczen*.  Defendant's objections, namely that the facts

6    are taken out of context, goes to the weight of the evidence.

7    Defendant can raise these objections, points through

8    cross-examination.  The jury can consider how much weight to

9    give to the evidence in its determination.

10          Let's see.  I've got my pages mixed up.

11          Three, government's motion to impeach defendant with

12    prior felony convictions should he testify, defendants did not

13    object in writing.  That will be granted.

14          MR. PISSETZKY:  Your Honor, as far as that is

15    concerned, we did not object to it because the government

16    suggested that they're not going to use the actual crimes,

17    just --

18          THE COURT:  That's correct.

19          MS. BABU:  That's correct, your Honor.

20          THE COURT:  Yes.  That's -- all right.

21          Four, the government's motion to exclude argument or

22    evidence designed to elicit jury nullification.  Without

23    objection, that's granted.

24          Government's motion to exclude arguments of

25    lawfulness, that was not objected to.  That's granted.

1    And government's motion to preclude defenses of alibi

2  or unavailability and mental defect are granted as having been

3  no objection.  I think that's all of them.

4    MR. HYMAN:  Your Honor, I know the Court has relied

5  upon the government's position on the ShotSpotter through the

6  Nebraska case of *State versus Hill*.  I don't think that anyone

7  in this jurisdiction has really gone through the *Daubert* test

8  in terms of the methodology and whether it is really a

9  scientific test in which they can support what Mr. Greene

10  claims is certain data.

11    We'd ask the Court before *Hill,* you allow him to

12  testify outside, of course, the presence of the jury, that we

13  have a *Daubert* hearing because this particular evidence

14  needs -- has never been tested.  I think the Court saw our

15  exhibit which was that article --

16    THE COURT:  It's been tested in, I don't know, about

17  80 different cases involving Mr. Greene alone, and one of

18  which went to the Nebraska Supreme Court.  Now, granted,

19  having gone through the expert testimony and the exhibits

20  listed, it appears to the Court that they've satisfied

21  *Daubert*.

22    Now, if we were to have a hearing, you know, if

23  defense had an expert to counter Greene or to say on an expert

24  basis why his testimony is out of whole cloth, that's a

25  different thing.  But to my understanding, there's been no

expert declared by the defense.

MS. BABU:  That's correct, your Honor.  And, your Honor, if I may address the exhibit that defense counsel has attached to their reply, the article has to do with ShotSpotter's reluctance to handle public safety statistics. It has nothing to do with the efficiency and reliability of the ShotSpotter system.

The ShotSpotter system, as the Court has noted, Mr. Greene has testified to as to over 80 times.  It's used in 100 municipalities across the country.  It is regularly tested probably on a daily basis even here in the city of Chicago. We don't think that a *Daubert* hearing is necessary here.  For one, as the Court has noted --

THE COURT:  Well, if there's no expert to counter his -- I've read his report, and I've read the documents.  For example, there's literature that was submitted along with it in the form of -- I can't remember if it was a law review article or it was an article in some --

MR. HYMAN:  Forbes.

MR. PISSETZKY:  Forbes magazine, Judge.

THE COURT:  Pardon?

MR. HYMAN:  There was an article in Forbes.

THE COURT:  Well, I mean, there was an --

MS. BABU:  There were multiple academic articles, your Honor, attached to the documents.

1          THE COURT:  Yes.  I don't know -- I don't recall

2     whether or not they were peer reviewed.

3          MR. HYMAN:  They were not.

4          MR. PISSETZKY:  None of them, Judge.

5          THE COURT:  Pardon?

6          MR. HYMAN:  None of them were peer reviewed.  And the

7     document, the one statement in terms of their verification of

8     their data or information was paid for by the SST Corporation

9     that owns ShotSpotter.  So it is not a peer reviewed science.

10          And I understand the Court's reluctance, but I think

11     this being an important issue in this case, we should have the

12     opportunity -- they're going to claim or they have claimed as

13     the Court has seen in the reports that Mr. Godinez was --

14          THE COURT:  Well, why don't we do this.  Make

15     Mr. Greene available so they can talk to him.

16          MS. BABU:  In what fashion, your Honor?  You mean

17     outside of him being cross-examined, your Honor?

18          THE COURT:  Yes, ahead of time so they can have a

19     little edge on when they do cross-examine him.

20          MS. BABU:  Your Honor, he will be testifying to the

21     contents of his report.  We've provided them with all of the

22     information that he'll be testifying to.

23          As to the peer review issue that they raised, I think

24     the defendants have sort of -- have relied here unnecessarily

25     on that one factor under *Daubert*.  If the Court were only to

1  look to peer review -- methodologies subjected to peer review,

2  we would only have white coat scientists testify under 702.

3  And that would exclude handwriting analysis.  That would

4  exclude coded drug language.  That would exclude a whole host

5  of experts that appear before this court.  And that's --

6  Mr. Greene is not a scientist, and we don't purport for him to

7  be a scientist.

8          MR. PISSETZKY:  But this is not -- your Honor, the

9  government is mixing everything up.  This is not a handprint.

10  This is not handwriting.  This is not fingerprint.  This is

11  actual science.  This is a white coat science.  This is

12  mathematics and chemistry and --

13          THE COURT:  I understand that.  I understand that,

14  and it's been around for a long time.  I mean, it's not -- the

15  principles are not new.

16          MS. BABU:  Correct, your Honor.

17          THE COURT:  That's why I don't see, I mean --

18          MR. PISSETZKY:  The principles are different, though.

19          THE COURT:  You can certainly cross-examine

20  Mr. Greene but, I mean, the principles that he's espousing,

21  it's not a question where he's pulling this out of the air.

22  You might disagree with it and might -- you know, the

23  principles, I think, are valid.  Whether or not they've been

24  properly utilized, of course, is subject to cross-examination.

25          MS. BABU:  Correct, your Honor.

1        THE COURT:  That's all that *Daubert* requires.  The

2   experts can be wrong.  I've been around here long enough to

3   know that experts are -- you know, you get two experts,

4   identical backgrounds, and they come up with identical -- or

5   absolute opposite conclusions.

6        Now, but it doesn't seem to me that there's anything

7   here.  Plus the fact, you've got witnesses who can, you know,

8   corroborate where the shots came from.  I mean, this is

9   basically, the ShotSpotter is --

10        MR. HYMAN:  Well --

11        MS. BABU:  That's correct, your Honor.

12        MR. PISSETZKY:  That's not true, Judge.

13        THE COURT:  There was, what, three or four ATF agents

14   who can testify that the shots came from that way and then we

15   shot that way.  And all this is basically --

16        MS. BABU:  That's correct, your Honor.  I think --

17        THE COURT:  -- confirming that the shots came from

18   that side and from that side.

19        MS. BABU:  Your Honor, the two law enforcement

20   officers we expect will testify that shots came from the

21   general direction --

22        THE COURT:  Yes.

23        MS. BABU:  -- of the north and the west of the

24   sidewalk.

25        THE COURT:  That's why I said, if it's --

1        MS. BABU:  How --

2        THE COURT:  Whether they need it, I don't know.

3        MR. HYMAN:  But the question -- but the question --

4        THE COURT:  It's not for me to determine whether they

5    need it or not.

6        MR. HYMAN:  The question for us and for a jury to

7    determine is what does this particular methodology that is --

8    that Mr. Greene is going to testify to has any relevance in

9    the issue of this officer being shot.

10        I don't want to be facetious, Judge, but you said,

11    you know, you're not pulling it out of the air but, in fact,

12    they are.  They are just taking sound waves as opposed to

13    radio frequencies and saying they've triangulated this, and

14    now we have the area where this man -- where these gunshots

15    were fired.  And that's -- that data and that methodology

16    maybe is okay in Nebraska, but I think it needs to be

17    vetted by --

18        THE COURT:  Well, you have the same thing here of

19    using telephone towers.  In fact, I guess these --

20        MR. HYMAN:  It's a different --

21        THE COURT:  These sensors are on telephone towers.

22        MS. BABU:  Sometimes they are, your Honor.

23        MR. HYMAN:  They're on light posts.  Most of them are

24    on light posts.

25        THE COURT:  Light posts or telephone towers.  In any

1    event, that's my ruling.

2            MR. PISSETZKY:  Judge, the telephone towers are

3    actually not sound waves.

4            THE COURT:  Pardon?

5            MR. PISSETZKY:  The telephone towers are not sound

6    waves.  They're radio waves.

7            THE COURT:  I understand.

8            MR. PISSETZKY:  They're completely different.

9            THE COURT:  They're similar technology, I mean, as

10   far as one is sound and one is --

11           MS. BABU:  Your Honor, the technology is different,

12   but the underlying mathematical principles are the same:

13   Triangulation and multilateration using --

14           THE COURT:  We know about sound waves --

15           MR. PISSETZKY:  Your Honor, sound waves are affected

16   by many, many things in the environment unless -- and the

17   radio waves that are tranjected out of the cell towers are

18   not.  It might be the way, the mathematical way of

19   triangulating the location is similar but the actual science

20   is different.

21           THE COURT:  Well, that's why I -- you're right.  It's

22   different.

23           MS. BABU:  Your Honor --

24           THE COURT:  As we say, one is -- but the principles

25   are similar.

1    MS. BABU:  Correct, your Honor.

2    THE COURT:  In any event, that's my ruling.

3    MS. BABU:  Thank you, your Honor.

4    MR. PISSETZKY:  Another issue, your Honor, you ruled

5  that -- you granted the government's motion to use an expert,

6  a gang expert and in addition, they're intending to use a

7  cooperating witness, an informer that is a gang member.  This

8  is absolutely compounding evidence based on information --

9  based on no evidence.

10    They don't have any evidence that this was a

11  gang-related shooting.  They don't have any evidence that this

12  was -- that Mr. Godinez, like they write in their motion,

13  spotted a car that he believed to be a rival gang and then

14  incidentally, the second car where the agent came out of is a

15  completely different car.  So now he's spotted two cars that

16  he believes are gang cars.

17    They're making this stuff up.  And in order to make

18  this stuff up, they need this gang evidence.  Just the fact

19  that he lives in that neighborhood and maybe in the past he

20  was written up as a gang member does not really make this a

21  gang incident.  Just because it's the location doesn't make it

22  a gang incident.

23    Now, you're allowing the government not only to bring

24  in an expert to talk and poison the jury with gang evidence,

25  you're now allowing them to also bring a gang member to

1    basically confirm what this expert is saying, or the other way

2    around, whoever they're going to call first based on zero

3    evidence that this is a gang shooting.  They don't have that.

4          They don't have any information that my client was

5    out there looking for gang members because of retaliation.

6    All the cases that they cite, your Honor, are cases that

7    allowed gang membership, are conspiracy cases and cases where

8    the element is actually something that they have to prove.

9    There's not one case in this district that allows them to

10   bring in gang evidence based on no evidence whatsoever.  In a

11   couple of the cases that they cited, the defendant confessed.

12         THE COURT:  It's a gang -- a gang member is going to

13   testify, right?

14         MR. HYMAN:  Well, that's why our objection --

15         MR. PISSETZKY:  But our objection to it, there's no

16   relevance to his testimony.  He's not saying, "I knew

17   Mr. Godinez to be out that night and shoot."

18         THE COURT:  He's driving him around, isn't he, the

19   gang -- wait a minute.  There's a driver and a -- who do you

20   have?  I'm trying to remember now.  There was the driver that

21   picked him up is going to testify.

22         MR. PISSETZKY:  Right, the female driver.  She's not

23   a gang member, and she has nothing to do with the gangs.

24         MR. HYMAN:  This was after the shooting.

25         MR. EICHENSEER:  Your Honor, if I could clear up some

1  factual confusion here in the record.

2       MR. HYMAN:  I don't believe there is any.

3       MR. EICHENSEER:  The expected witness to testify

4  about picking the defendant up is the girlfriend.  The

5  girlfriend is expected to testify -- or the girlfriend at the

6  time is expected to testify that the defendant was a member of

7  the Latin Saints, but to -- but the government really takes

8  issue with what the defense is saying right now, is that

9  there's no evidence that this -- that gang affiliation had

10  anything to do with this crime.

11       And the government just disagrees wholesale to that

12  assertion because the defendant, two minutes after the

13  shooting, testified, "F that flake," which "flake" means gang

14  member.  So it's the defendant that made gang evidence at

15  issue in this trial through that admission.

16       And I think there's a conceptual void in the

17  evidence.  If the government can explain why it is that the

18  defendant is driving around his block minutes before the

19  shooting, why it is that the defendant runs up a sidewalk into

20  his house and then comes out moments later, all of that, the

21  jury will be left wondering about why it happened without this

22  type of gang evidence coming in.

23       And, your Honor, just to be clear, the government

24  is -- understands the risk of prejudice with this type of

25  evidence which is why I think it's important to point out what

1 the government won't seek to elicit from the gang member,

2 won't seek to elicit from the gang expert, and that is

3 information about drug dealing, shootings, any other

4 prejudicial information that doesn't bear on this trial.

5 MR. PISSETZKY: It doesn't matter. We're in Chicago.

6 As soon as you say "gang member," anybody gets convicted.

7 It's over, your Honor. And there's -- they have absolutely --

8 and they still did not give you any information that they have

9 direct gang evidence in this case.

10 THE COURT: Well, there's --

11 MR. PISSETZKY: Just --

12 THE COURT: There's two Witness As. One is the

13 driver, right?

14 MR. EICHENSEER: Correct.

15 THE COURT: And there's another --

16 MR. HYMAN: There's Friend A and Witness A.

17 MR. EICHENSEER: The correct -- the second A is the

18 Gang Member A who wasn't involved in the shooting at all, but

19 this is the witness that was the subject of our motion in

20 limine on the gang evidence who will testify about gang rules,

21 about controlling the territory and what happens otherwise.

22 MR. PISSETZKY: And he knows nothing about this case,

23 Judge.

24 MR. EICHENSEER: And, your Honor, just --

25 THE COURT: You can't both talk at once.

1        MR. EICHENSEER:  One last point in response to,

2   "there's no evidence, there's no gang evidence in this case."

3   The defendant, at least in the government's theory, runs into

4   a gangway that's filled with Latin Saints graffiti.  In fact,

5   one of the symbols in the gangway is of a stickman which is a

6   Latin Saints symbol.

7        Defendant has the same tattoo on his forearm that was

8   in the gangway where the shooting happened.  So I think that

9   in combination with the defendant himself saying "F that

10  flake" two minutes after the shooting makes this gang evidence

11  extremely relevant in this case.

12       And to the defense's point that there's no case law

13  in support of the government's position, I think that's just a

14  flat-out misrepresentation as well.  Courts in this building

15  have repeatedly let in this type of evidence.  Yes, in RICO

16  cases where the gang itself is part of the charge, but also in

17  other cases like drug cases where gang evidence, at least at

18  first blush, is not relevant, but when it comes to proving up

19  association in the conspiracy, how members knew each other,

20  why they trust each other.

21       THE COURT:  There's a lot of cases with motive and --

22       MR. EICHENSEER:  Correct, your Honor.  And that's

23  what the government is seeking to admit it here for, for the

24  purposes of motive and intent and identity.

25       MR. HYMAN:  Judge Leinenweber, if you want to use the

1  language of -- I know the Court wants to move on, but if you

2  use the language of the government then every -- every matter

3  that comes here without any affiliation of any kind, they just

4  can wholesale, that's the term they used, wholesale introduce

5  this irrelevant, nonprobative evidence of gang membership.

6          If Mr. Godinez had a tattoo of U.S. Marine Corps,

7  would that mean that he is some sort of bad individual?  I

8  mean, the fact that he has a tattoo is not a relevant fact.

9  It really doesn't go to the issue for which he was indicted,

10 that he allegedly fired this shot during the course of the

11 activities of an agent.

12         THE COURT:  Well, the government needs to prove some

13 sort of motive.

14         MR. HYMAN:  No, they don't, your Honor.

15         MR. PISSETZKY:  Why?

16         MR. HYMAN:  They don't need to prove any motive.

17 They're claiming in their indictment that he was shot during

18 the course of a -- his activities, his duties, period.  They

19 don't say that he's there and being a gang expert and

20 surveiller and he knew he was -- if he was acting as an

21 undercover agent, as a gang member, some other gang member,

22 then that's not what they have charged him with, your Honor.

23         They have charged him merely with the fact that this

24 officer unfortunately was shot, and he was shot during the

25 course of his duties, period.  And he was shot with a handgun

1  that we know of.

2       So that is it.  It has nothing to do with this whole

3  issue of gangs.  As Mr. Pissetzky says, that's like throwing

4  dynamite into the courthouse when you bring in this whole

5  issue of gangs.  It is a serious issue.  As the Court well

6  knows, from the time the morning news hits on the week -- on

7  Monday, we already know about 25, 27 people that have been

8  shot.

9       I mean, our new mayor is even -- and a former U.S.

10  Attorney in this building has even attempted to defuse this,

11  and nothing has changed.  And SpotShotter, you can have as

12  many SpotShotters as you want, it's not going to change what

13  comes out on the morning news.  Every single person that comes

14  before this Court, as the Court well knows, hears it, reads

15  it, and they're going to hear "gang."  For what?

16       There's no probative, relevant value to the whole

17  terminology, Judge.  We ask the Court to reconsider your

18  position and deny their use of this information.

19       MR. PISSETZKY:  Especially in a cumulative manner,

20  Judge.  They want to call an expert and a gang member to

21  testify --

22       THE COURT:  I do have questions about the expert.  If

23  you have a gang member, that should be sufficient.

24       MR. EICHENSEER:  Your Honor, I think the government's

25  thinking was that because the gang member is a cooperating,

1  that some degree of cooperation as to what he's saying about

2  the gang's territory and just --

3        THE COURT:  Let me see.  I'll tell you what I'll do.

4  I'll reconsider the expert after you -- after the gang member

5  and see how the cross-examination goes.

6        MR. EICHENSEER:  Very well, your Honor.

7        MS. BABU:  That's fine.

8        THE COURT:  All right.  So tentatively --

9        MR. PISSETZKY:  Can we rehabilitate --

10        THE COURT:  -- I will exclude the expert, gang expert

11  in favor of the gang member but if -- depending on how, you

12  know, the cross-examination goes, whether I'll allow the

13  government to bolster his testimony at all.

14        Okay.  All right.  10:00 o'clock Monday --

15        MR. HYMAN:  June 10th.

16        THE COURT:  -- a week from Monday.

17        MR. HYMAN:  Judge, if the Court could, Mr. Godinez,

18  as you know, is way down in Livingston County.  It's not the

19  most convenient.  And though the Court has mentioned there are

20  good restaurants on the road, we found a couple but there --

21  we would like --

22        THE COURT:  I used to go to Springfield every week,

23  and I know there's all kinds of great restaurants.

24        MR. HYMAN:  But if the Court can order him to be

25  brought to the MCC --

1          THE COURT:  I don't know if I have the power to do

2   it, but I would request that they bring him here for the --

3   let's say next week for trial purposes.  He'll have to be here

4   for trial anyway, rather than making them go all the way to

5   Livingston to work on the case.  It seems to me reasonable.

6   So to the extent I can order that, consider it ordered.

7          MR. PISSETZKY:  At least -- at least for Monday,

8   Judge, so we can have a week.

9          THE COURT:  Yes, next week, next Monday.

10          So maybe the government can help make that happen.

11          MS. BABU:  It sounds like the marshals have it in

12   hand, your Honor.

13          MR. PISSETZKY:  Civilian clothes --

14          THE COURT:  There are some great restaurants.

15   There's one in Dwight, a really good restaurant down there.

16          MR. PISSETZKY:  We found a great McDonald's down

17   there.

18          MR. HYMAN:  Very efficient.

19          THE COURT:  All right.  Anyway, I'm going to be gone

20   next week.  So good luck on your trial preparation.

21          MR. PISSETZKY:  Thank you, Judge.

22          MR. HYMAN:  Thank you, your Honor.

23          MS. BABU:  Thank you, your Honor.

24      (Proceedings adjourned at 10:03 a.m.)

25

C E R T I F I C A T E

I, Judith A. Walsh, do hereby certify that the foregoing is a complete, true, and accurate transcript of the proceedings had in the above-entitled case before the Honorable HARRY D. LEINENWEBER, one of the judges of said court, at Chicago, Illinois, on May 29, 2019.


*/s/ Judith A. Walsh, CSR, RDR, F/CRR*_____    February 25, 2020
Official Court Reporter
United States District Court
Northern District of Illinois
Eastern Division